# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, THE FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. _____ |
| vs. | ) ) | |
| PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

Imperial Tobacco Canada Limited ("ITCAN")[1] files this Petition pursuant to 28 U.S.C. § 157(b)(5) and requests that the Court enter an Order transferring to this Court a civil action currently pending before the United States District Court for the Northern District of California. In support of this Petition, ITCAN respectfully shows the Court as follows:

---

[1] By filing this Petition, ITCAN does not, and has not agreed to, accept or attorn to the jurisdiction of any court within the United States. ITCAN reserves any and all of its rights in the underlying litigation, including the

1.      On May 1, 2004, The Flintkote Company ("Flintkote") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Flintkote's bankruptcy case is pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") with the case number 04-11300 (JKF) (the "Bankruptcy Case").

2.      On April 5, 2006, Flintkote, together with Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively, the "Asbestos Claimants") filed a complaint (the "Complaint") in Superior Court of California (Unlimited Jurisdiction) for the County of San Francisco to initiate a lawsuit (the "Pending Action") against ITCAN and additional defendants, Plant Insulation Company, Uniroyal Holding, Inc., Sullivan & Cromwell LLP, and Does 1 Through 100. On or about April 27, 2006, Flintkote and the Asbestos Claimants filed an amended complaint (the "Amended Complaint") in the Pending Action to add as plaintiffs the Official Committee of the Asbestos Personal Injury Claimants and James J. McMonagle, the Legal Representative For Future Asbestos Personal Injury Claimants (collectively, and together with Flintkote and the Asbestos Claimants, the "Plaintiffs"). Complete copies of all process, pleadings, and orders served on ITCAN in the Pending Action are attached hereto as Exhibit B.

3.      In the Pending Action, the Asbestos Claimants seek recovery for, among other things, wrongful death and loss of consortium resulting from the death of Norman Hopkins (the "Decedent") whose death was allegedly caused by exposure to asbestos. The Asbestos Claimants seek recovery against ITCAN on the theory that ITCAN is the alter ego of Flintkote and is, therefore, liable for asbestos claims against Flintkote. Flintkote also asserts, among other things, claims against ITCAN for a declaration of alter ego liability and recovery of alleged fraudulent transfers.

---

right to contest personal jurisdiction over ITCAN in the appropriate forum.

1387047/2

4.      On the date hereof, ITCAN removed the Pending Action to the United States District Court for the Northern District of California (the "California District Court") by filing a Notice of Removal pursuant to 28 U.S.C. § 1441 and, in the alternative, 28 U.S.C. § 1452. Together with the Notice of Removal, ITCAN filed a motion with the California District Court to transfer the Pending Action to this Court pursuant to 28 U.S.C. § 1404. In connection therewith, ITCAN requested that the California District Court stay any consideration of transfer and/or remand issues until this Court has an opportunity to consider this Petition.

5.      ITCAN files this Petition pursuant to 28 U.S.C. § 157(b)(5). That statute provides as follows:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending or in the district court in the district in which the claim arose, *as determined by the district court in which the bankruptcy case is pending.*

28 U.S.C. § 157(b)(5) (emphasis added).

6.      In the Pending Action, the Asbestos Claimants assert claims for, among other things, wrongful death and loss of consortium resulting from the Decedent's alleged exposure to asbestos. The Asbestos Claimants seek to recover against ITCAN on the theory that ITCAN is the alter ego of Flintkote. In other words, for the Asbestos Claimants to prevail in their action against ITCAN, they must first establish the validity of their tort claims against Flintkote. As such, the first three counts in the Pending Action are in fact personal injury tort claims against Flintkote and ITCAN (as Flintkote's alleged alter ego). Likewise, Flintkote's alter ego claims also are based on Flintkote's liability on asbestos tort claims. Accordingly, the Pending Action falls within the purview of section 157(b)(5). Therefore, this Court is the only court with authority to determine whether the Pending Action should be tried in this Court or in the district in which the claim arose.

3

7.     Moreover, this Court has jurisdiction over the pending action pursuant to 28 U.S.C. § 1334.  Under 28 U.S.C. § 1334, this Court has jurisdiction over cases arising under the Bankruptcy Code or cases related to a pending bankruptcy case.  The Pending Action arises under the Bankruptcy Code because Flintkote's standing to pursue the causes of action asserted against ITCAN is founded upon section 544 of the Bankruptcy Code which permits Flintkote, as a debtor-in-possession in a pending Chapter 11 case, to assert certain claims on behalf of its creditors and to avoid and recover certain prepetition transfers of property.  In addition, any recovery in the Pending Action will have a direct effect on the Bankruptcy Case by providing funds for distribution to creditors.  Indeed, Flintkote has stated that the Pending Action "represents potentially the largest group of assets" of its bankruptcy estate.  Thus, the claims that Flintkote asserts in the Pending Action arise under the Bankruptcy Code and are related to the Bankruptcy Case.  Accordingly, this Court has jurisdiction over the Pending Action pursuant to 28 U.S.C. § 1334.

8.     Together with the filing of this Petition, ITCAN has filed a Brief in support hereof.

WHEREFORE, for the reasons set forth herein and in the accompanying Brief, ITCAN respectfully requests that this Court:

(a)     enter an interim order on an emergency basis in the form attached hereto as Exhibit A transferring the Pending Action to this Court on a provisional basis pursuant to 28 U.S.C. § 157(b)(5);

(b)     stay all other proceedings related to the Pending Action that may be pending before any other court until such time as this Court has an opportunity to make a final ruling on this Petition; and,

4

(c)    enter a final order transferring the Pending Action to this Court pursuant 28 U.S.C. § 157(b)(5).

This 5th day of May, 2006.

Respectfully submitted,

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

_____
Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com
         bfallon@morrisjames.com

and

KING & SPALDING LLP
L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: 404-572-4600
Fax: 404-572-5141
jpardo@kslaw.com
jloveland@kslaw.com
mmaloney@kslaw.com

Attorneys for Defendant Imperial Tobacco Canada Limited

138704¹/2

# EXHIBIT A

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as )
Wrongful Death Heir, and as Successor-in- )
Interest to NORMAN HOPKINS, JR., )
Deceased; and MICHELLE HOPKINS, and )
MICHAEL HOPKINS, as Legal Heirs of )
NORMAN HOPKINS, Deceased, and THE )
FLINTKOTE COMPANY, )
                               )
                Plaintiffs, )       Case No. _____
                               )
      vs. )
                               )
PLANT INSULATION COMPANY; )
UNIROYAL HOLDING, INC.; IMPERIAL )
TOBACCO CANADA LIMITED; )
SULLIVAN & CROMWELL LLP; and )
DOES 1 through 100, )
                               )
               Defendants. )
_____)

## PROVISIONAL ORDER REGARDING EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

This matter having come before the Court on the Emergency Petition of Imperial Tobacco Canada Limited ("ITCAN") for an order of transfer pursuant to 28 U.S.C. § 157(b)(5) (the "Petition"); the Court having reviewed the Petition, and adequate and sufficient notice of the Petition having been given under the circumstances; and it appearing that the relief requested is warranted under 28 U.S.C. § 157(b)(5) and is in the best interests of the parties; it is hereby

ORDERED, that the Petition is granted on a provisional basis as set forth herein; and it is further

ORDERED, that the civil action styled MARLENE HOPKINS, Individually, as

Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and

MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS,

Deceased, THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE

ASBESTOS PERSONAL INJURY CLAIMANTS, JAMES J. MCMONAGLE as the LEGAL

REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS v.

PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO

CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, originally

filed in the Superior Court of California (Unlimited Jurisdiction) for the County of San Francisco

Civil Action No. with case no. 06-450944 (the "Pending Action") shall be transferred to this

Court on a provisional basis pending this Court's final determination of the appropriate venue for

the Pending Action pursuant to 28 U.S.C. § 157(b)(5); and it is further

ORDERED, that all other proceedings related to the Pending Action that are currently

pending before any other court shall be stayed pending further order of this Court.

Dated: May ___, 2006

_____
United States District Court Judge

1387047/2

**Exhibit B**

**Superior Court of California, County of San Francisco**

**Case No. 06-450944 Docket**

| **Exhibit B-1** | April 5, 2006 | OTHER NON EXEMPT COMPLAINTS, COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY AS TO DEFENDANT PLANT INSULATION COMPANY UNIROYAL HOLDING, INC. IMPERIAL TOBACCO CANADA LIMITED SULLIVAN & CROMWELL LLP DOES 1-100 SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR SEP-08-2006 PROOF OF SERVICE DUE ON JUN-05-2006 CASE MANAGEMENT STATEMENT DUE ON AUG-24-2006 COMPLEX LITIGATION ASSIGNMENT REQUESTED BY FILING PARTIES; FEE INCLUDED IN FILING FEE |
| --- | --- | --- |
| **Exhibit B-2** | April 5, 2006 | NOTICE TO PLAINTIFF |
| **Exhibit B-3** | April 10, 2006 | SUMMONS ON COMPLAINT, PROOF OF SERVICE ONLY, FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY SERVED APR-07-2006, SUBSTITUTE SERVICE ON NATURAL PERSON, ON DEFENDANT SULLIVAN & CROMWELL LLP |
| **Exhibit B-4** | April 14, 2006 | APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY |
| **Exhibit B-5** | April 20, 2006 | PROOF OF PERSONAL SERVICE (APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION) PARTY SERVED: IMPERIAL TOBACCO CANADA LIMITED FILED BY PETITIONER THE FLINTKOTE COMPANY |
| **Exhibit B-6** | April 20, 2006 | SUMMONS ON COMPLAINT, PROOF OF SERVICE ONLY, FILED BY PLAINTIFF THE FLINTKOTE COMPANY SERVED APR-07-2006, PERSONAL SERVICE, ON DEFENDANT IMPERIAL TOBACCO CANADA LIMITED |
| **Exhibit B-7** | April 20, 2006 | PROOF OF HAND DELIVERY (APPLICATION FOR DESIGNATION OF COMPLEX LIT) FILED BY PLAINTIFF THE FLINTKOTE COMPANY AS TO DEFENDANT SULLIVAN & CROMWELL LLP |

| **Exhibit B-8** | April 27, 2006 | 1ST AMENDED COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS MCMONAGLE, JAMES AS THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS AS TO DEFENDANT PLANT INSULATION COMPANY UNIROYAL HOLDING, INC. IMPERIAL TOBACCO CANADA LIMITED SULLIVAN & CROMWELL LLP DOES 1-100 |
|---|---|---|
| **Exhibit B-9** | May 2, 2006 | PROOF OF HAND DELIVERY AMENDED COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS MCMONAGLE, JAMES AS THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS |
| **Exhibit B-10** | May 4, 2006 | DEFENDANT IMPERIAL TOBACCO CANADA LIMITED'S ANSWER TO FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF AGAINST ALTER EGO, FOR RECOVERY OF DIVIDENDS, FOR RECOVERY OF FRAUDULENT TRANSFERS, FOR DAMAGES BY REASON OF BREACH OF FIDUCIARY DUTY, FOR DAMAGES FOR BREACH OF DUTY AND NEGLIGENCE, TO ENFORCE CONSTRUCTIVE TRUST, FOR RESTITUTION, AND FOR DECLARATORY RELIEF |

**Exhibit B-1**

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL
TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1
through 100.

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-
in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS,
and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased,
and THE FLINTKOTE COMPANY,

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.   There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.   If you cannot pay the filing fee, ask the court clerk for a fee waiver form.   If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
    There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO despues de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
    Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| San Francisco County Superior Court<br>400 McAllister Street<br><br>San Francisco, CA 94102 | CGC 06 450944 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jean L. Bertrand (CSB 083250)                415.901.8700              415.901.8701
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105

| DATE: *(Fecha)* | APR 05 2006 | Gordon Park-Li Clerk, by | Jun Panelo | , Deputy *(Adjunto)* |
|---|---|---|---|---|
| | | *(Secretario)* | | |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

---

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Legal Solutions Plus | Page 1 of 1<br>Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|---|

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Jean L. Bertrand (CSB 083250)
Eliot S. Jubelirer (CSB 061654)
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105
TELEPHONE NO.: 415.901.8700    FAX NO.: 415.901.8701
ATTORNEY FOR *(Name):* Plaintiff MARLENE HOPKINS, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME: MARLENE HOPKINS, et al. v. PLANT INSULATION COMPANY, et al.

**FOR COURT USE ONLY**

ENDORSED
FILED
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____
JUN P. PANELO
Deputy Clerk

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: CGC 0 6 4 5 0 9 4 4 |
|---|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE: / DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[x] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800-1812)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is  [ ] is not  complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [x] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought *(check all that apply):*
   a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive

4. Number of causes of action *(specify):* 16

5. This case [ ] is  [x] is not  a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015).*

Date: April 5, 2006
Jean L. Bertrand (CSB 083250)
(TYPE OR PRINT NAME)    *(signature)* (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 201.8, 1800-1812;
Standards of Judicial Administration, § 19

ALAN R. BRAYTON (State Bar No. 073685)
GILBERT L. PURCELL (State Bar No. 113603)
DAVID R. DONADIO (State Bar No. 154436)
BRAYTON PURCELL, LLP
222 Rush Landing Road
P.O. Box 6169
Novato, CA 94948-6169
Telephone (415) 898-1555

Attorneys for Plaintiffs
Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

STEPHEN M. SNYDER (State Bar No. 054598)
JAMES L. MILLER (State Bar No. 071958)
SNYDER MILLER & ORTON LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
Telephone: (415) 962-4400
Facsimile: (415) 962-4401

Attorneys for Plaintiff
The Flintkote Company
(Additional Counsel Listed On Signature Page)

ENDORSED
F I L E D
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO
                    Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

SEP 0 8 2006 – 9 00 AM

DEPARTMENT 212

SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

COUNTY OF SAN FRANCISCO

MARLENE HOPKINS, Individually, as
Wrongful Death Heir, and as Successor-in-
Interest to NORMAN HOPKINS, JR.,
Deceased; and MICHELLE HOPKINS, and
MICHAEL HOPKINS, as Legal Heirs of
NORMAN HOPKINS, Deceased, and THE
FLINTKOTE COMPANY,

　　　　　　　　　Plaintiffs,

vs.

PLANT INSULATION COMPANY;
UNIROYAL HOLDING, INC.; IMPERIAL
TOBACCO CANADA LIMITED;
SULLIVAN & CROMWELL LLP; and
DOES 1 through 100,

　　　　　　　　　Defendants.

Case No. CGC 0 6 4 5 0 9 4 4

COMPLAINT FOR DAMAGES AND
RELIEF AGAINST ALTER EGO, FOR
RECOVERY OF DIVIDENDS, FOR
RECOVERY OF FRAUDULENT
TRANSFERS, FOR DAMAGES BY REASON
OF BREACH OF FIDUCIARY DUTY, FOR
DAMAGES FOR BREACH OF DUTY AND
NEGLIGENCE, TO ENFORCE
CONSTRUCTIVE TRUST, FOR
RESTITUTION, AND FOR DECLARATORY
RELIEF.

Snyder
Miller
& Orton
LLP

1
COMPLAINT

1       Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, and MICHAEL HOPKINS and

2    THE FLINTKOTE COMPANY allege:

3                 **PARTIES, JURISDICTION AND VENUE**

4       1.    Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,

5    "Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),

6    who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene

7    Hopkins is successor in interest to Decedent under California Code of Civil Procedure section

8    377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil

9    Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent

10   contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos

11   containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of

12   Flintkote, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

13      2.    Plaintiff The Flintkote Company ("Flintkote) is, and at all relevant times, has been a

14   corporation organized and existing under the laws of the State of Delaware, with a principal place of

15   business in San Francisco, California, qualified to do and doing business in California.  For many

16   years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of

17   asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case

18   under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

19   Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the

20   "Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and

21   remains the debtor and debtor-in-possession in that case.

22      3.    Defendant Plant Insulation Company ("Plant") is a California corporation, with its

23   principal place of business situated in the city and county of San Francisco.

24      4.    Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in

25   interest to Uniroyal, Inc.

26      5.    Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major

27   Canadian tobacco company.  It is a Canadian corporation formerly known as Imasco Limited and will

28   be referred to herein as "Imperial Tobacco" or "Imasco."  Imperial Tobacco has manufactured

1  cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du
2  Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,
3  including California, for many years.

4       6.    Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C
5  maintains offices in California, among other places. S&C is a citizen of California, in that there are
6  S&C partners who reside in and are citizens of California.

7       7.    Plaintiffs are ignorant of the true names and capacities of defendants sued under the
8  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the
9  complaint may be amended to allege such names and capacities. Each of the fictitiously named
10  defendants is responsible in some manner for the occurrences alleged hereafter.

11       8.    Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because
12  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action
13  seeks in part declaratory relief under California Code of Civil Procedure section 1060. Flintkote is
14  authorized by virtue of the Bankruptcy Code to bring certain of the causes of action, all of which
15  arise under state law.

16       9.    Venue in the County of San Francisco is proper because defendants Imperial Tobacco
17  and S&C have no residence in California and can be sued in any county in California, and their
18  liability arises from conduct that occurred in San Francisco, and because defendant Plant has its
19  principal place of business situated in San Francisco.

20       10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco
21  directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to
22  the extent of losses held by them. The alter ego claims by Hopkins and Flintkote depend upon the
23  same set of facts. Pursuing such claims against a substantial well-financed defendant is difficult and
24  expensive, so that it is economically not practical for a single individual to pursue them alone.
25  Accordingly, Flintkote and plaintiffs Hopkins have agreed to bring the alter ego claims together as
26  plaintiffs and to cooperate in prosecuting them. Plaintiffs Hopkins make no claim against S&C.

27                            **FACTS**
28       11.    Flintkote manufactured and sold asbestos containing products for many years,

Snyder
Miller
& Orton
LLP

3

COMPLAINT

including vinyl asbestos floor tile, asbestos cement pipe and many other products. Flintkote, through its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946 through approximately 1970. Beginning in or about 1972, Flintkote, along with many other companies began to be named as a defendant in numerous lawsuits brought by persons exposed to asbestos contained in its products who suffered from a variety of asbestos induced diseases. The number of asbestos cases filed against Flintkote and the other companies increased over time.

12.  In August 1982 Johns Manville Corporation and twenty of its subsidiaries and affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims filed against it. The bankruptcy filing was major news as Johns Manville was, absent the asbestos litigation, a large and profitable American company. Other companies named as defendants in the asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

| Company | Date of Filing Bankruptcy |
| --- | --- |
| UNR Industries | July 19, 1982 |
| Amatex Corporation | November 1, 1982 |
| Forty-Eight Insulations, Inc. | April 19, 1985 |
| Standard Insulation | August 4, 1986 |
| Nicolet | July 17, 1987 |

13.  A number of defendants regularly sued in the asbestos litigation banded together in the early 1980's and sought to settle disputes with their insurers where possible and establish a facility that would provide an efficient joint defense to members of the group. The discussions were mediated by Dean Harry Wellington of the Yale Law School. The participants became known as the "Wellington Group." By June 1985 they had signed an agreement and had begun to operate as the Asbestos Claims Facility ("ACF").

14.  Flintkote was a member of the ACF and, for a while, asbestos cases against it were defended and settled or tried by lawyers selected by the Asbestos Claims Facility. The ACF defense arrangements were initially advantageous to Flintkote as they allowed the company to defend asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that would be more quickly consumed if it was required to defend cases on its own. The ACF operated through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as to appropriate defense strategies and as to how costs should be allocated among participants.

Snyder
Miller
& Orton
LLP

4

COMPLAINT

15.     Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to information which pointed to the threatening scope of the asbestos litigation to follow. That information included:

- The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos defendants, which increased the payment shares in the tort system of the surviving companies;

- Numbers of claims filings were increasing and claims values were increasing;

- Diseases caused by asbestos exposure could have a latency period of decades, which meant liabilities would extend far into the future;

- Commercial usage of asbestos in the United States continued to increase through the 1970's, with significant implications for future morbidity;

- Inability to extend the asbestos litigation to include significant responsible parties, such as the United States Government and the tobacco companies, all of whom had contributed to the diseases and injuries of asbestos victims;

- Unmistakable signals from casualty insurers that they could not be counted on by defendant companies in the face of ever-increasing demands, with signs from some that they would not survive. By mid-1987, two of Flintkote's insurers had become insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach agreements as to coverage with only 60% of its insurers;

- Substantial disagreements among ACF members that weakened the effectiveness of the ACF and hastened its demise. These disagreements were apparent as early as 1986. There were clear indicators that members were going to leave the ACF, and seven did so in 1987. Persons knowledgeable about the operations and functioning of the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF would not continue to operate indefinitely as originally agreed upon and also knew or should have known that disintegration of the ACF was likely in the foreseeable future.

16.     Imasco was quite familiar with the American asbestos litigation. It followed and

Snyder
Miller
& Orton
LLP

5

COMPLAINT

1   monitored that litigation for a variety of reasons, including that it knew there was a synergistic or

2   combinative effect which produced increased disease rates in persons who smoked its tobacco

3   products and who were also exposed to asbestos. Consequently Imasco understood that the litigation

4   posed risks to corporate and insurer solvency.

5        17.     In the 1980s, Imasco was engaged in a program of corporate diversification.

6   Specifically, it was seeking to acquire non-tobacco businesses. One target of Imasco's diversification

7   program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada

8   Trustco"). But, Canada Trustco had been acquired by another Canadian company, Genstar

9   Corporation. So, in order to get control of Canada Trustco, Imasco, operating through a corporate

10  subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar

11  Corporation ("Genstar"). At the time Genstar had a number of businesses and subsidiary

12  corporations, including several in the United States. Genstar was Flintkote's ultimate parent

13  company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.

14  Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco

15  common shares.

16       18.     From the outset, Imasco's strategy was to use the value of Genstar's assets, other than

17  Canada Trustco, to finance the purchase of Canada Trustco. The strategy therefore involved

18  restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada

19  Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for

20  the hostile takeover.

21       19.     Imasco acquired Genstar in August 1986. Then, as it had planned to do, it set about

22  selling most of Genstar's assets and businesses (other than Canada Trustco). To implement this

23  scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding. First it required

24  Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then

25  transferring Flintkote's valuable operating assets to them. Then, Imasco caused Flintkote to sell each

26  of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had

27  been created previously. Those sales were made to third parties for cash.

28       20.     Gross proceeds from the sales of the Flintkote assets were approximately

1  $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987.

2  These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

3  California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

4  planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing

5  Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to

6  represent its original client Imasco in connection with the liquidation throughout the process and

7  thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and

8  Imasco.

9      21.    After these transactions, Flintkote's valuable operating businesses were gone. Their

10  profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

11  Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

12  much of which was contested by the insurers who had written the policies. The cash and insurance

13  were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

14  However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

15  Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

16  it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

17  and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

18  dividends to be paid out by Flintkote.

19      22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

20  San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

21  was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

22  corporation of Flintkote.

23      23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

24  to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

25  the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

26  Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

27  that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

28  Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

Snyder
Miller
& Orton
LLP

7

COMPLAINT

1    advised the Flintkote board that it had received preliminary advice from the consultant, and that there

2    was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

3    declare the dividend. S&C told the board that it did not believe the consultant's final report would

4    alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

5    Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

6    knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

7    it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

8    dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

9    show that the board was informed of that fact.

10        24.    Stating that it was doing so in accordance with previous undertakings and "as an

11   inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

12   such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

13   them harmless against any and all actions, suits or claims arising out of their actions, omissions or

14   conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

15        25.    Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

16   meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

17   determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

18   that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

19   to replace funds to Flintkote to the extent required by an appropriate judicial body.

20        26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

21   dividend to be paid.

22        27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

23   of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

24   1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

25   corporations and entities that it controlled and dominated.

26        28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

27   and were representing Imasco, including with respect to Flintkote-related issues, such as the

28   consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

Snyder
Miller
& Orton
LLP

8

COMPLAINT

1  face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those
2  same issues, and on the issue of the director's liability in connection with declaring dividends to
3  Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were
4  present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal
5  memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the
6  board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant
7  S&C had retained and whose preliminary report was used by S&C in connection with the December
8  1986 board meeting.

9      29.   The board minutes of the July 1987 meeting reflect that after payment of the
10 dividends, Flintkote would have left retained earnings and paid-in capital of approximately
11 $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed
12 $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure
13 taken from the RPC study was $42,000,000.

14     30.   In the July 22, 1987 board meeting, the board members were told that Imasco would
15 undertake to restore dividend monies to the extent the declared dividends were deemed legally
16 improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply
17 a writing memorializing the understanding. After the meeting, Imasco issued a letter dated July 27,
18 1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends
19 declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent
20 jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets
21 because of dividends finally determined to have been improperly paid during Imasco's indirect
22 ownership of Flintkote. A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is
23 attached as Exhibit A and incorporated by reference.

24     31.   The S&C legal memorandum and the RPC study, both supplied by Imasco's and
25 Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to
26 be paid, as was Imasco's plan from the time it took over Genstar.

27     32.   S&C's relationship with Imasco supplied reason to structure S&C's advice so as to
28 ensure that Flintkote would pay the dividends. The S&C memorandum contained substantial errors,

Snyder
Miller
& Orton
LLP

9

COMPLAINT

1  omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

2  of Flinkote's payment of these dividends, including the following.

3       33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote. However,

4  it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

5  declare the dividend yet escape personal liability for doing so. The memorandum is vague and

6  indefinite as to Flintkote's obligations as a corporation.

7       34.    The S&C memorandum contains legal analysis, including discussion of California

8  law. In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

9  Conveyance Act. S&C wrote that a conveyance could be set aside if the debtor would be rendered

10  insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

11  existing debts as they became absolute and matured. S&C advised Flintkote that it was unclear

12  whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

13  not yet manifested itself – were considered existing debts. That advice misapprehended the

14  controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

15  fixed or contingent. S&C also did not alert Flintkote that under California law, as well as in other

16  jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

17  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

18  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

19  solvent. See *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

20       35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

21  changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

22  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

23  would incur debts beyond his ability to pay as they became due. The new statute therefore

24  incorporated an objective test specifically looking to the incurring of future debts. This test was in

25  addition to rules making fraudulent those transfers without fair consideration where the debtor was

26  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

27  which its remaining assets were unreasonably small in relation to the business.

28       36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

Snyder
Miller
& Orton
LLP

10

COMPLAINT

1   RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending

2   and possible future asbestos-related property damage claims against Flintkote, but only "to consider"

3   asbestos personal injury claims. RPC devoted cursory treatment to Flintkote's asbestos-related

4   personal injury claims. RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos

5   personal injury claims. The RPC report thus was based on an assumption, known to be questionable

6   by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to

7   Flintkote for 14 years. S&C assured Flintkote that directors were entitled to rely upon statements in

8   an appraisal by an appraiser selected by the board. Although it was not an appraisal under Delaware

9   law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury

10  liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC

11  report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors

12  could rely. Imasco and S&C did not advise the directors to seek an independent expert analysis

13  regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain

14  independent counsel without a conflict of interest.

15      37.     None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and

16  developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-

17  related personal injury liabilities.

18      38.     S&C labored under a conflict of interest when it undertook to represent and advise

19  Flintkote while still representing Imasco. Flintkote, a company facing substantial and increasing

20  asbestos-related claims, was obliged to consider and evaluate the interests of existing and future

21  creditors before paying out $525,200,000 in dividends. In contrast, Imasco had every interest in

22  obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all

23  along. S&C represented both Imasco and Flintkote, with plainly conflicting interests. The

24  declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading

25  legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which

26  was procured by S&C for the specific purpose of attempting to justify the legal propriety of the

27  dividends.

28      39.     Imasco improperly caused the dividends to be paid by telling the Flintkote board:

Snyder
Miller
& Orton
LLP

11

COMPLAINT

- our lawyers, acting as your lawyers, together with their consultants, say you can do it;
- to induce you to pay us we agree to protect you if someone sues you; and
- if we are wrong about this and creditors are left unsatisfied and a court finally decides the dividends were improper, we will pay them back.

40.    From the time Imasco acquired Genstar in August 1986, through September 29, 2003, Imasco held and maintained complete control over and dominated Flintkote through Imasco's indirect 100% ownership of Flintkote. Flintkote was in no position to assert claims against Imasco or to sue Imasco. S&C continued to act as an instrument of Imasco, guiding and giving legal advice to Flintkote, including with respect to the matters alleged herein, until September of 2003. Imasco's plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote, and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten alter ego liability upon Imasco for Flintkote's asbestos-related claims. That Flintkote had been injured by wrongful acts leading to the dividends was inherently unknowable, depending upon expertise available only to sophisticated professionals such as S&C and RPC. S&C did not disclose to Flintkote that it had rights with respect to the dividends.

41.    From and after the divestiture of its subsidiaries and payment of the dividends, Flintkote operated as an asbestos claims resolution facility. Imasco exercised its domination and control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and Imasco Holdings Group, Inc. (collectively, "IHI"). IHI took its orders from Imasco. IHI attorneys were involved in the claim resolution process. Flintkote consistently obtained releases for its parent companies, including Imasco, in settlements with asbestos claimants. Flintkote and IHI shared common officers and directors. Employees of Imasco or IHI were involved in management of Flintkote. S&C continued to advise Imasco or IHI and Flintkote on what should be done with Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related liabilities. Flintkote handled its own asbestos liabilities, rather than join the Center for Claims Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

Snyder
Miller
& Orton
LLP

12

COMPLAINT

1    Imasco therefore maintained control over the handling of the claims. Following the dividends, as a

2    claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical. Flintkote

3    continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

4    involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

5    critical issue of asbestos liability. The goals of Imasco throughout were to forestall any liability to

6    repay the dividend and to confine the asbestos-related liabilities to Flintkote.

7         42. .    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

8    it had taken and used the money to reimburse itself for funds it had expended for buying the one

9    business it did want, Genstar's Canada Trustco, a financial services company in Canada. After

10    Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

11    to satisfy its asbestos-related personal injury liabilities.

12         43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

13    financial statements. It did not publicly disclose its true financial condition and the nature and extent

14    of its asbestos liabilities. Instead, Imasco, as Flintkote's ultimate parent corporation filed public

15    financial statements in Canada that purported to represent Flintkote's financial condition. Imasco

16    represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

17    Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

18    represented, with respect to Flintkote's financial condition, that

19         [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

20         subject to numerous claims and suits, some of which allege significant damage. In the opinion of

21         management, all such claims and suits are adequately covered by insurance, or are provided for in

22         the financial statements, or if not so covered or provided for, the results are not expected to

23         material affect the Corporation's financial condition.

24    Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

25    repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

26    within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

27    as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

28    alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

1  had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

2  became due and were made in violation of California and other law, including California's Uniform

3  Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

4  applicable limitation period.

5      44.    In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

6  Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

7  subsidiary of Navigant Consulting, Inc. ("Navigant"). Navigant issued a report dated August 19,

8  2003. The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

9  billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

10  $3.4781 billion.

11      45.    In September, 2003, the shares of Flintkote stock were transferred to a trust, and

12  Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

13  <u>**FIRST CAUSE OF ACTION**</u>

14  **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –**
**Wrongful Death)**

15      46.    Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

16  paragraphs 1 through 45, inclusive.

17      47.    At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an

18  alter ego of Flintkote, and each of them, were and are engaged in the business of researching,

19  manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying,

20  offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving,

21  certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying,

22  requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain

23  product, namely asbestos and other products containing asbestos.

24      48.    At all times mentioned, said defendants, and each of them, singularly and jointly,

25  negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed

26  to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled,

27  distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for

28  installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and

Snyder
Miller
& Orton
LLP

14
COMPLAINT

1   advertised, a certain product, namely asbestos, and other products containing asbestos, in that said

2   products caused personal injuries to users, consumers, workers, bystanders and others, including the

3   Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed

4   persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said

5   products hazardous, unsafe, and dangerous for use by "exposed persons."

6       49.     Said defendants, and each of them, had a duty to exercise due care in the pursuance of

7   the activities mentioned above and defendants, and each of them, breached said duty of due care.

8       50.     Said defendants, and each of them, knew, or should have known, and intended that the

9   aforementioned asbestos and products containing asbestos and related products and equipment,

10  would be transported by truck, rail, ship, and other common carriers, that in the shipping process the

11  product would break, crumble, or otherwise be damaged; and/or that such products would be used for

12  insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

13  applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping,

14  hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation,

15  resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or

16  handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

17  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

18  persons working in proximity to said products, directly or through reentrainment.

19      51.     Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

20  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

21  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

22  employment status is, on current information and belief, as set forth at various locations and

23  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

24      52.     Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

25  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

26  perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

27  asbestos-containing products over a period time.

28      53.     Decedent suffered from a condition related to exposure of asbestos and asbestos-

Snyder
Miller
& Orton
LLP

15

COMPLAINT

1   containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-

2   containing products presented risk of injury and/or disease.

3       54.     As a direct and proximate result of the aforesaid conduct of said defendants, and each

4   of them, Decedent suffered permanent injuries to his person, body, and health, including, but not

5   limited to, asbestosis, other lung damage, and cancer and related sequelae, and the mental and

6   emotional distress attendant thereto, and ultimately death, from the effect of exposure to asbestos

7   fibers, all to his general damage in the sums to be proven at trial.

8       55.     As a direct and proximate result of the aforesaid conduct of said defendants, and each

9   of them, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine,

10  hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to

11  plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when the true and

12  exact cost thereof is ascertained. As a direct and proximate result of the aforesaid conduct of said

13  defendants, and each of them, Decedent incurred liability for the reasonable value of medical care

14  provided by Decedent's family members measured by, inter alia, the costs associated with the hiring

15  a registered nurse, home hospice, or other service provider, the true and exact amount thereof being

16  unknown to plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when

17  the true and exact costs are known or at time of trial.

18      56.     As a further direct and proximate result of the said conduct of said defendants, and

19  each of them, Decedent incurred loss of income, benefits, entitlements, wages, profits, and

20  commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and

21  extent of which are not yet known to plaintiffs; and leave is requested to amend this complaint to

22  conform to proof at the time of trial.

23      57.     As a further direct and proximate result of the said conduct of said defendants, and

24  each of them, Decedent's exposure to asbestos and asbestos-containing products caused severe and

25  permanent injury to Decedent, and ultimately Decedent died on September 27, 2005.

26      58.     Said defendants, and each of them, and their officers, directors and managing-agents

27  participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should

28  have known of, each of the acts set forth herein.

Snyder
Miller
& Orton
LLP

16

COMPLAINT

59.     The herein-described conduct of said defendants, and each of them, was and is despicable, willful, malicious, fraudulent, outrageous, and in conscious or reckless disregard and indifference to the safety, health, and rights of "exposed persons", including decedent herein, giving rise to decedent's claim herein alleged for punitive damages against said defendants.

60.     At all times prior to his death, Decedent was a faithful and dutiful spouse to plaintiff Marlene Hopkins, and parent to plaintiffs Michelle and Michael Hopkins.

61.     As a direct and proximate result of the conduct of said defendants, and each of them, and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of care, society, comfort attention, services, and support of Decedent all to the damage of decedent's heirs.

62.     As a further direct and proximate result of the conduct of said defendants, and each of them, and the death of Decedent, decedent's heirs have incurred funeral expenses in an amount currently not ascertained.

63.     As a direct and proximate result of the acts, omissions, and conduct of said, and each of them, as aforesaid, Decedent's exposure to harm or the Decedent as set forth in Exhibit B, attached to the complaint and incorporated by reference herein.

64.     Decedent's personal injury claim against Flintkote was resolved by Judgment filed June 25, 2003, following Flintkote's acceptance of an offer to compromise in action number 408556 in this court.

65.     Imasco completely dominated and controlled Flintkote, deliberately requiring Flintkote to divest itself of its operating businesses and assets solely for the benefit of Imasco. After the divestiture of its businesses, Flintkote did not manufacture or market any products or render any services to third parties. It served only as a vehicle for Imasco, resolving asbestos and other claims, including obtaining releases for Imasco, and prosecuting insurance coverage claims. By causing Flintkote to convert its assets and businesses to cash, and then stripping Flintkote of $525,200,000, most of that cash, Imasco prevented Flintkote both from benefiting from the operating profits of the sold businesses and/or from investing the sale proceeds and using the principal plus earnings to pay claims.

Snyder
Miller
& Orton
LLP

17
COMPLAINT

66.    In the years following the dividends, Flintkote's benefit programs were administered by Imasco's subsidiary, IHI.  Flintkote, with IHI, filed consolidated financial statements and tax returns.

67.    There became in 1986 and 1987 and thereafter such a unity of interest, and of ownership since Imasco owned indirectly 100% of Flintkote, that separate personalities of Flintkote and Imasco no longer existed.  If the companies are treated as separate, inequitable results will follow.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

## SECOND CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Products Liability – Wrongful Death)**

68.    Plaintiffs Hopkins incorporate by reference each and all the allegations of the First Cause of Action.

69.    Defendants Plant, Uniroyal, and Imperial Tobacco, knew and intended that the above-referenced asbestos and asbestos-containing products, would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

70.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease and/or death.  The defect existed in the said products at the time they left the possession of defendants, and each of them.  Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed persons", including Decedent herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

71.    "Exposed persons" did not know of the substantial danger of using said products.  Said dangers were not readily recognizable by "exposed persons".  Said defendants, and each of them, further failed to adequately warn of the risks to which decedent and others similarly situated were exposed.

72.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to

Snyder
Miller
& Orton
LLP

18

COMPLAINT

test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale,
supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,
representing, endorsing, servicing, installing, contracting for installation, repairing, marketing,
warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-
containing products, said defendants, and each of them, did so with conscious disregard for the safety
of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in
that said defendants, and each of them, had prior knowledge that there was a substantial risk of injury
or death resulting from exposure to asbestos or asbestos-containing products, including, but not
limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from
scientific studies performed by, at the request of, or with the assistance of, said defendants, and each
of them, and which knowledge was obtained by said defendants, and each of them on or before 1930,
and thereafter.

73.     On or before 1930, and thereafter, said defendants, and each of them, were aware that
members of the general public and other "exposed persons", who would come in contact with their
asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos
or asbestos-containing products could cause injury, and said defendants, and each of them, knew that
members of the general public and other "exposed persons", who came in contact with asbestos and
asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and
asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health
and human life.

74.     With said knowledge, said defendants, and each of them, opted to research, manufacture,
fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install,
contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said
asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn
"exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing
products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high
risk of injury or death resulting from exposure to asbestos and asbestos-containing products, said
defendants, and each of them, intentionally failed to reveal their knowledge of said risk, and

Snyder
Miller
& Orton
LLP

consciously and actively concealed and suppressed said knowledge from "exposed persons" and
members of the general public, thus impliedly representing to "exposed persons" and members of the
general public that asbestos and asbestos-containing products were safe for all reasonably
foreseeable uses. Said defendants, and each of them, engaged in this conduct and made these
implied representations with the knowledge of the falsity of said implied representations.

75.    The above-referenced conduct of said defendants, and each of them, was motivated by
the financial interest of said defendants, and each of them, in the continuing, uninterrupted research,
design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer
for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing,
warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or
otherwise directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing
products. In pursuance of said financial motivation, said defendants, and each of them, consciously
disregarded the safety of "exposed persons" and in fact were consciously willing and intended to
permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced
persons to work with and be exposed thereto, including plaintiff.

76.    Plaintiffs allege that the aforementioned defendants, and each of them impliedly warranted their
asbestos and asbestos-containing products, to be safe for their intended use, but that their asbestos and asbestos-
containing products, created an unreasonable risk of bodily harm to exposed persons.

77.    Decedent relied upon defendants', and each of their representations, lack of warnings, and
implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable, and
proximate result thereof, Decedent suffered permanent injury and death as alleged herein.

78.    As a direct and proximate result of the actions and conduct outlined herein,
Plaintiffs Hopkins have suffered the injuries and damages herein alleged.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal,
and Imperial Tobacco as set forth below.

### THIRD CAUSE OF ACTION
**(By Plaintiff Marlene Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Loss of
Consortium)**

79.    Plaintiff Marlene Hopkins re-alleges and incorporates by reference each and all the

Snyder
Miller
& Orton
LLP

allegations of the First and Second Causes of Action.

80.    Decedent and plaintiff Marlene Hopkins were married on February 18, 1961, and at all times relevant to this action were husband and wife.

81.    Prior to Decedent's injuries as alleged, Decedent was able and did perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof, and until Decedent's death, Decedent was unable to perform the necessary duties as a spouse and the work and service usually performed in the care, maintenance, and management of the family home. As a proximate result thereof, plaintiff Marlene Hopkins was permanently deprived of the consortium of her spouse, including the performance of duties, all to plaintiff Marlene Hopkin's damages, in an amount presently unknown to plaintiff, but which will be proved at the time of trial.

82.    Plaintiff Marlene Hopkins' discovery of the cause of Decedent's loss of consortium, as herein alleged, first occurred within one year last past from the filing of this Complaint.

83.    As a direct and proximate result of the acts of said defendants, and the severe injuries and death caused thereby to Decedent as set forth in this complaint, plaintiff Marlene Hopkins has suffered loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love, and affection of said spouse, and has suffered severe mental and emotional distress, and general nervousness as a result thereof.

WHEREFORE, plaintiff Marlene Hopkins prays judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

## FOURTH CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for Negligence -- Survival)**

84.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations of the First Cause of Action.

85.    Plaintiffs bring this action pursuant to California Code of Civil Procedure section 377.30 et. seq. As a direct and proximate result of the actions and conduct outlined herein, Decedent suffered the injuries and damages herein alleged. Plaintiffs are entitled to recover all damages sustained by Decedent as alleged above.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

Snyder
Miller
& Orton
LLP

21

COMPLAINT

set forth below.

## FIFTH CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal to Products Liability – Survival)**

86.     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations of the First and Second Causes of Action.

87.     As a direct and proximate result of the exposure to defendants' products and the conduct outlined herein, Decedent has suffered the injuries and damages herein alleged.

88.     Plaintiffs Hopkins are entitled to recover all damages sustained by Decedent as alleged above.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as set forth below.

## SIXTH CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for False Representation Under Restatement of Torts Section 402-B – Survival)**

89.     Plaintiffs Hopkins re-allege and incorporates by reference each and all the allegations of the First and Second Causes of Action.

90.     At the aforementioned time when defendants Plant and Uniroyal, and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented, endorsed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged, and advertised the said asbestos and asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other "exposed persons", including the decedent herein and his employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

91.     The purchasers and users of said asbestos and asbestos-containing products, and other "exposed persons", including the Decedent and his employers, relied upon said representations of said defendants, and each of them, in the selection purchase, and use of asbestos and asbestos-

Snyder
Miller
& Orton
LLP

22

COMPLAINT

containing products.

92.     Said representations by defendants, and each of them, were false and untrue, and defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products, were not safe for their intended use, nor were they of merchantable quality as represented by defendants, and each of them, in that asbestos and asbestos-containing products have very dangerous properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and have other defects that cause injury and damage to the users of said products and other "exposed persons", thereby threatening the health and life of said persons including decedent herein.

93.     As a direct and proximate result of said false representations by defendants, and each of them, the Decedent suffered injury and death as set forth.

WHEREFORE, plaintiffs pray judgment against defendants Plant and Uniroyal, set forth below.

### SEVENTH CAUSE OF ACTION
#### (By Plaintiffs Hopkins Against Defendant Plant for Contractor Liability)

94.     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations of the First and Second Causes of Action.

95.     At all times mentioned herein, defendant Plant, owned, leased, maintained, managed, and/or controlled the premises listed on Exhibit B where Decedent was present. The information provided on Exhibit B is preliminary, based on recall over events covering many years and further investigation and discovery may produce more reliable information. Additionally, Decedent might have been present at these or other of Plant's premises at other locations and on other occasions.

96.     Prior to and at said times and places, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid respective premises, by their own workers and/or by various unqualified or unskilled contractors and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to decedent and other persons exposed to said asbestos fibers and toxic substances while present at said premises.

Snyder
Millar
& Orton
LLP

23

COMPLAINT

97.    At all times mentioned herein, said defendant Plant knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to decedent and other workers or persons so exposed present on each of the aforesaid respective premises.

98.    At all times relevant herein, Decedent entered said premises and used or occupied each of said respective premises as intended and for Plant's benefit and advantage and at Plant's request and invitation. In so doing, Decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said defendant Plant.

99.    Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

100.    At all times mentioned herein, Defendant Plant remained in control of the premises where Decedent was performing his work.

101.    At all times mentioned herein, defendant Plant owed to decedent and others similarly situated a duty to exercise ordinary care in the management of such premises so as to avoid exposing workers such as decedent to an unreasonable risk of harm and to avoid causing injury to said person.

102.    At all times mentioned herein, defendant Plant, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforementioned hazardous conditions to which they were exposed on the premises.

103.    At all times mentioned herein, defendant Plant negligently failed to maintain, manage, inspect, survey, or control said premises, or to abate, or correct, or to warn decedent of, the existence of the aforesaid dangerous conditions and hazards on or about said premises.

Snyder
Miller
& Orton
LLP

24

COMPLAINT

104.    Prior to and at the times and places aforesaid, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured decedent.

105.    At all times mentioned herein, defendant Plant:

a.    Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would harm decedent and others unless special precautions were taken;

b.    Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled, unlicensed, or otherwise unqualified to do so;

c.    Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were competent, or qualified to do so.

106.    In part, Decedent was exposed to dangerous asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

107.    The work of contractors on premises controlled by defendant Plant created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances, including but not limited to asbestos.

108.    Prior to and at said times and places, defendant Plant was subject to certain ordinances, standards, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code § 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and §

Snyder
Miller
& Orton
LLP

25

COMPLAINT

1    4108, and Threshold Limit Values as documented for asbestos and other toxic substances under

2    Appendix A, Table 1 of said Safety Orders; additionally, <u>California Health and Safety Code</u> § 40.200,

3    <u>et seq.</u>, which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate

4    regulations including, but not limited to <u>B.A.A.Q.D. Regulation</u> 11, Rules 2 and 14, Title 40 <u>Code of</u>

5    <u>Federal Regulations</u>. Chapter 1, Part 61, <u>et seq.</u> -- The National Emission Standards for Hazardous Air

6    Pollutants, which required defendant Plant to provide specific safeguards or precautions to prevent or

7    reduce the inhalation of asbestos dust and other toxic fumes or substances; and said defendant Plant

8    failed to provide the required safeguards and precautions. Defendant's violations of said codes

9    include, but are not limited to:

10            (a)        Failing to comply with statutes and allowing ambient levels of airborne

11    asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned

12    statutes;

13            (b)        Failing to segregate work involving the release of asbestos or other toxic

14    dusts;

15            (c)        Failing to suppress dust using prescribed ventilation techniques;

16            (d)        Failing to suppress dust using prescribed "wet down" techniques;

17            (e)        Failing to warn or educate decedent or others regarding asbestos or other

18    toxic substances on the premises;

19            (f)        Failing to provide approved respiratory protection devices;

20            (g)        Failing to ensure "approved" respiratory protection devices were used

21    adequately;

22            (h)        Failing to provide for an on-going health screening program for those

23    exposed to asbestos on the premises;

24            (i)        Failing to provide adequate housekeeping and clean-up of the work place;

25

26            (j)        Failing to adequately warn of the hazards associated with asbestos as

27    required by these statutes;

28

Snyder
Miller
& Orton
LLP

26

COMPLAINT

1      (k)     Failing to adequately report renovation and disturbance of asbestos-containing

2  materials, including but not limited to B.A.A.O.M.D. Regulation 11, Rules 2 and 14;

3         (1)     Failing to have an asbestos removal supervisor as required by regulation;

4

5         (m)    Failing to get approval for renovation as required by statutes; and

6

7         (n)     Failing to maintain records as required by statute.

8      109.   Defendant Plant was the "statutory employer" of decedent as defined by the California

9  Labor Code and California case law.

10     110.   Decedent at all times was unaware of the hazardous condition or the risk of personal

11  injury created by defendant's violation of said regulations, ordinances, or statutes.

12     111.   At all times mentioned herein, Decedent was a member of the class of persons whose

13  safety was intended to be protected by the regulations, standards, statutes, or ordinances described in

14  the foregoing paragraphs.

15     112.   At all times mentioned herein, said defendant Plant, knew, or in the exercise of

16  ordinary and reasonable care should have known, that the premises that were in its control would be

17  used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present

18  and using said premises would not be aware of the aforesaid hazardous conditions to which they were

19  exposed on the premises, and that such persons were unaware of the aforesaid violations of codes,

20  regulations, and statutes.

21     113.   As a proximate result of the foregoing, Decedent developed asbestos-related illness,

22  which has caused great injury and disability to Decedent, and ultimately death, as previously set

23  forth, and plaintiffs have suffered damages as herein alleged.

24     WHEREFORE, plaintiffs Hopkins pray judgment against defendant Plant, as set forth below.

25               **EIGHTH CAUSE OF ACTION**

        **(By Flintkote Against Imperial Tobacco For Declaration of Alter Ego Liability)**

26     114.   Flintkote re-alleges and incorporates by reference each and all the allegations of

27  paragraphs 1 through 45 and 65 through 67, inclusive.

28     115.   An actual controversy exists between Flintkote and Imperial Tobacco arising from

Snyder
Miller
& Orton
LLP

27

COMPLAINT

1  Imasco's domination and control of Flintkote, including Imasco's causing Flintkote to create the

2  subsidiaries, isolate the asbestos liabilities, sell the subsidiaries, and declare and pay the Dividends,

3  and the use of Flintkote by Imasco solely for Imasco's own purposes, as set forth herein.

4      116.    Flintkote contends that Imperial Tobacco is Flintkote's alter ego and is responsible to

5  pay asbestos-related claims asserted against Flintkote, such that if Flintkote is correct, the burden of

6  those claims will be borne in whole or in part by Imperial Tobacco.

7      117.    Flintkote is informed and believes, and upon such information and belief alleges, that

8  Imperial Tobacco disagrees with each of Flintkote's contentions.

9      118.    Flintkote has the right to assert alter ego claims against its former indirect parent

10  Imperial Tobacco.

11      WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth

12      below.

13                         **NINTH CAUSE OF ACTION**

14        **(By Flintkote Against Imperial Tobacco For Receiving Illegal Dividends)**

15      119.    Flintkote re-alleges and incorporates by reference each and all the allegations of

16  paragraphs 1 through 45, inclusive.

17      120.    The dividends of $170,200,000 in 1986 and $355,000,000 in 1987 were not payable

18  out of Flintkote's net profits for either the year in which the dividend was declared or the preceding

19  fiscal year.

20      121.    The dividends in 1986 and 1987 (collectively, the "Dividends") could be paid only out

21  of surplus defined as the amount in excess of Flintkote's capital by which its assets exceeded its

22  liabilities.  Flintkote's asbestos related personal injury and its other liabilities exceeded its assets.

23      122.    Imasco and its lawyers, S&C, caused the directors to declare and pay the dividends

24  when they were not authorized under the dividend statutes.

25      123.    Imasco actively procured and participated in the declarations of the illegal dividends,

26  knew the receipt of the dividends was improper, and reaped the benefits of them.

27      WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth

28  below.

                         **TENTH CAUSE OF ACTION**

Snyder
Miller
& Orton
LLP

                                 28
                            COMPLAINT

**(By Flintkote Asserting the Rights of a Creditor,
Against Imperial Tobacco for Recovery of Illegal Dividends)**

1

2    124.    Flintkote realleges and incorporates by reference each and all the allegations of the

3    Ninth Cause of Action.

4    125.    Flintkote is operating its business and conducting its affairs as the debtor and debtor in

5    possession in the Bankruptcy Case.  Flintkote may recover any transfer of money that is voidable

6    under applicable state law by a creditor holding an unsecured claim that is allowable in the

7    Bankruptcy Case.

8    126.    The transfers of the Dividends, $170,200,000 on or about December 30, 1986, and

9    $355,000,000 on or about August 31, 1987, were transfers of interests of the debtor in property.

10    127.    At the time of the Dividends, there existed one or more individuals (a) who had

11    suffered from inherently unknowable injuries to a blameless ignorant party as a result of exposure to

12    asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, tolling the

13    applicable limitation periods until such time as the claimant was chargeable with knowledge that his

14    condition was attributable to asbestos exposure, (b) who were creditors of Flintkote due to exposure

15    to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, and (c)

16    who hold allowable claims against Flintkote and its bankruptcy estate.

17    128.    From and after the date of each Dividend, until at least September 29, 2003, Imasco

18    controlled and dominated Flintkote, and did not disclose, and caused Flintkote not to disclose the true

19    nature of Flintkote's financial condition to creditors.  Creditors did not know and could not have

20    known that the transfer of the dividends to Imasco rendered Flintkote insolvent.

21    129.    The Dividends are invalid and avoidable because the Dividends were paid at a time

22    when Flintkote did not have a surplus of assets over liabilities. Because of Imasco's domination and

23    control of Flintkote and because of the suppression of Flintkote's true financial condition in the

24    public financial reporting Imasco released in Canada, this fact was not known and could not

25    reasonably have been known to creditors of Flintkote, including asbestos disease claimants.  Flintkote

26    may recover the Dividends from Imasco who was the entity for whose benefit such transfers were

27    made.  To the extent the Dividends passed through entities before their delivery to Imasco, such

28    entities were mere conduits, or to the extent such intermediate entities were not mere conduits and the

Snyder
Miller
& Orton
LLP

29

COMPLAINT

transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the Dividends was not for value or in good faith.

WHEREFORE, Flintkote prays judgment against Imperial Tobacco as set forth below.

## ELEVENTH CAUSE OF ACTION
### (By Flintkote Asserting the Rights of a Creditor Against Imperial Tobacco For Recovery of Fraudulent Transfers)

130.    Flintkote realleges and incorporates by reference each and all the allegations of the Ninth and Tenth Causes of Action.

131.    At the time of the Dividends, or within the applicable limitation period thereafter, there existed (a) one or more individuals who had asbestos-related personal injury lawsuits on file against Flintkote, and those lawsuits remained on file until May 1, 2004, or (b) one or more individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote products who suffered from inherently unknowable injuries and who was blamelessly ignorant, thereby tolling any applicable limitation periods until such time as the each such individual was chargeable with knowledge that his condition was attributable to asbestos exposure, or (c) one or more individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote products who did not know and could not reasonably have been known of Flintkote's true financial condition because of Imasco's domination and control of Flintkote and because of the suppression of Flintkote's true financial condition in the public financial reporting Imasco released in Canada, some or all of which serve to toll the applicable limitations period.

132.    The Dividend of $170,200,000 was made without receipt of fair consideration by Flintkote who: (a) was or would be rendered insolvent by the transfer and/or (b) was about to be engaged in a business, paying asbestos claims, for which its property remaining after the Dividend was unreasonably small capital.

133.    When the Dividend of $355,000,000 was paid in 1987, it constituted a fraudulent transfer in that Flintkote received no reasonably equivalent value for it and one or more of the following was true: (a) Flintkote was insolvent or became insolvent as a result of the transfer, or (b) Flintkote was engaged in or about to engage in the business of paying asbestos claims for which

Snyder
Miller
& Orton
LLP

30

COMPLAINT

1   Flintkote's assets were unreasonably small in relation to the business, or (c) Flintkote reasonably
2   should have believed that it would incur debts beyond its ability to pay as they became due.

3        134.   The separation of Flintkote's asbestos liabilities from its valuable operating assets as a
4   result of the formation of subsidiary corporations, the sale of those subsidiary corporations; and the
5   transfer of the Dividends to Imasco, constituted an integrated scheme of transfers orchestrated by
6   Imasco with actual intent to hinder, delay or defraud one or more present or future creditors of
7   Flintkote, implicating at least the following badges of fraud:

8       •   The proceeds of the scheme were transferred to an insider;

9       •   The resulting financial condition of Flintkote was concealed;

10      •   The transfers, including the separation of asbestos liabilities from operating assets,
11          occurred because Flintkote had been sued and threatened with additional suits;

12      •   The transfers, including the separation of asbestos liabilities from operating assets,
13          involved substantially all of Flintkote's assets;

14      •   The consideration ultimately received by Flintkote at the conclusion of the integrated
15          scheme was not reasonably equivalent to the value of the assets transferred;

16      •   Flintkote was insolvent or became insolvent shortly after the transfers comprising the
17          integrated scheme;

18      •   The transfers comprising the integrated scheme were made after substantial contingent
19          and unmatured indebtedness had been incurred, but before such indebtedness had
20          matured.

21

22       135.   Flintkote may recover the Dividends from Imasco who was the entity for whose
23  benefit such transfers were made.  To the extent the Dividends passed through entities before their
24  delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were
25  not mere conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of
26  the Dividends was not for value or in good faith.

27  **TWELFTH CAUSE OF ACTION**
    **(By Flintkote Against Imperial Tobacco for Breach of Fiduciary Duty)**

28

136.   Flintkote re-alleges and incorporates by reference each and all the allegations of the Ninth, Tenth, and Eleventh Causes of Action.

137.   The directors of Flintkote owed a fiduciary duty to Flintkote and to its creditors because by reason of its asbestos-related liabilities, Flintkote was insolvent or in the vicinity of insolvency.  Flintkote directors were obliged to consider whether, and reasonably should have believed that, Flintkote would incur debts by reason of asbestos liabilities beyond its ability to pay as they became due.

138.   By reason of the foregoing, Imasco prevented the Flintkote directors from complying with their fiduciary duties in declaring the dividends and ordering them paid.

139.   Imasco, now Imperial Tobacco, actively procured and participated in the failure to comply with fiduciary duties and reaped the benefits of them.

WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth below.

## THIRTEENTH CAUSE OF ACTION
### (By Flintkote Against S&C for Breach of Duty and Negligence)

140.   Flintkote realleges and incorporates by reference each and all the allegations of the Ninth through the Twelfth Causes of Action.

141.   S&C as lawyers represented Flintkote in connection with the 1986 and 1987 dividends.  S&C also represented Imasco with respect to the same subject matter.  S&C continued to represent Flintkote with respect to the matters alleged herein until within one year of the filing of the Bankruptcy Case.

142.   The relation between attorney and client is a fiduciary relation of the very highest character.

143.   S&C had a duty without informed written consent of each client not to accept representation of more than one client in a matter in which the interests of the clients potentially conflict and not to accept or continue representation of more than one client in which the interests of the clients actually conflict.  Absent consent of both clients after full disclosure, S&C had a duty not to accept or continue employment of both clients if it would be likely to involve S&C in representing

1  differing and adverse interests.

2     144.   S&C breached its duty and accepted and continued representation of Flintkote and

3  Imasco in connection with the Dividends, which was a matter in which the interests of the clients

4  were in stark conflict, adverse, and differing.

5     145.   Flintkote did not give written consent to S&C's conflicting representation of differing

6  interests.

7     146.   S&C had a duty to use reasonable care in advising Flintkote. S&C without reasonable

8  care advised the Flintkote directors that they could go forward with the 1986 dividend. S&C in 1987

9  without reasonable care misrepresented California law to Flintkote as respects rules governing

10  potentially fraudulent transfers. S&C in 1987 also represented, without reasonable care, to the board

11  that the directors could rely upon the RPC report as an appraisal and thus were protected by a

12  principle that directors are entitled to rely on statements in an appraisal by an appraiser selected with

13  reasonable care by the board. But the RPC report was not an appraisal of Flintkote's asbestos-related

14  personal injury liabilities, and RPC was not selected by the board, but rather by Imasco's counsel.

15     147.   The conflicted representation and the misrepresentations by S&C proximately caused

16  the declaration and payment of the dividends.

17     WHEREFORE plaintiff Flintkote prays judgment against S&C as set forth below.

18     **FOURTEENTH CAUSE OF ACTION**
19     **(By Flintkote Against Imperial Tobacco For Constructive Trust)**

20     148.   Flintkote re-alleges and incorporates by reference each and all the allegations of the
   Ninth through the Thirteenth Causes of Action.

21
22     149.   By reason of the foregoing, Imperial Tobacco holds the dividend payments received

23  through the wrongful acts and the complete dominance, control, and authority Imasco held over

24  Flintkote, and by reason of the mistakes engendered by the conflicted representation and negligent

25  advice provided by Imasco's lawyers, shared with Flintkote, as set forth above. Flintkote has the

26  right to those dividends and Imperial Tobacco holds them as a constructive trustee for the benefit of

27  Flintkote.

28     **FIFTEENTH CAUSE OF ACTION**
      **(By Flintkote Against Imperial Tobacco For Restitution)**

Snyder
Miller
& Orton
LLP

33

COMPLAINT

150.   Flintkote realleges and incorporates by reference each and all the allegations of the Ninth through the Thirteenth Causes of Action.

151.   The declarations of the Dividends were invalid because they were the result of conflicted legal representation and erroneous legal advice given by Imasco's lawyers, shared with Flintkote.

152.   Imasco was the recipient of the Dividends under circumstances where it directly and through its lawyers wrongfully procured payment of the Dividends.

153.   Flintkote is entitled to restitution from Imperial Tobacco of the payments made pursuant to the tainted and invalid declarations of the Dividends.

### SIXTEENTH CAUSE OF ACTION
#### (By Flintkote against Imperial Tobacco for Declaratory Relief)

154.   Flintkote re-alleges and incorporates by reference each and all the allegations of the Ninth through the Fifteenth Causes of Action.

155.   An actual controversy exists between Flintkote and Imperial Tobacco arising from the Dividend Repayment Contract of July 27, 1987 ("Dividend Repayment Contract").

156.   Flintkote contends that the dividends were improperly paid within the meaning of the Dividend Repayment Contract because they were paid under one or more of the following circumstances

- as illegal dividends;

- as a fraudulent conveyance or fraudulent transfer under California law;

- in breach of fiduciary duty aided and abetted by Imasco;

- as products of conflicted and tainted legal representation by S&C;

- as products of negligent legal advice by S&C;

- as improper by reason of having been induced by the promise in 1986 by Imasco to repay, and by the Dividend Repayment Contract in 1987;

- as otherwise improper within the meaning of the Dividend Repayment Contract.

157.   Flintkote is informed and believes, and upon such information and belief alleges, that Imperial Tobacco disagrees with each of Flintkote's contentions.

Snyder
Miller
& Orton
LLP

34

COMPLAINT

158.    In the event the court finally determines that the 1986 and 1987 dividends were improperly paid, then Imperial Tobacco will be obligated to repay to Flintkote any amounts (up to the full amount of the dividends) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of assets of Flintkote because of the dividends finally determined to have been improperly paid, upon entry of the judgments described in the DRC.

159.    Flintkote seeks a declaration as to the legal rights and duties of the parties as to propriety of the dividends and duties arising from dividends having been improperly paid.

WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth below.

## PRAYER

WHEREFORE, plaintiffs pray judgment:

1.    On the First and Second Causes of Action for recovery by plaintiffs Hopkins against defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to proof;

2.    On the Third Cause of Action for recovery by plaintiff Marlene Hopkins against defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to proof;

3.    On the Fourth, Fifth, and Sixth Causes of Action, for recovery by plaintiffs Hopkins against defendants Plant and Uniroyal of damages according to proof;

4.    On the Seventh Cause of Action, for recovery by plaintiffs Hopkins against defendant Plant of damages according to proof;

5.    On the Eighth Cause of Action, for an order declaring that Imperial Tobacco is liable as the alter ego of Flintkote with respect to asbestos-related liabilities and is responsible to pay such liabilities;

6.    On the Ninth, Tenth, Eleventh, and Twelfth Causes of Action, for recovery by Flintkote from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount as may be proved;

COMPLAINT

Snyder
Miller
& Orton
LLP

1    7.    On the Thirteenth Cause of Action, for recovery by Flintkote from S&C in the amount

2    of $525,200,000 plus interest, or such other amount as may be proved;

3    8.    On the Fourteenth and Fifteenth Causes of Action, for recovery by Flintkote from

4    Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount as may be

5    proved;

6    9.    On the Sixteenth Cause of Action, for an order declaring and determining in favor of

7    Flintkote that the $170,200,000 dividend declared and paid in December 1986 and the $355,000,000

8    dividend declared and paid in July 1987 by Flintkote were improperly paid within the meaning of the

9    Dividend Recovery Contract letter from Imasco dated July 27, 1987, and that upon the occurrence of

10   the remaining determinations described in the Dividend Recovery Contract, that Imperial Tobacco

11   will be obligated to repay to Flintkote the amounts (up to the full amount of the dividends) finally

12   determined to be due to Flintkote creditors but that cannot be satisfied out of the assets of Flintkote

13   because of the payment of the dividends.

14   Date:  4/5/06

15                                         BRAYTON PURCELL LLP

16

17   Additional Counsel for Plaintiff The Flintkote    By: _____
     Company:                                          Gilbert L. Purcell
18                                                      Attorneys for Plaintiff Marlene Hopkins,
     Eliot S. Jubelirer (061654)                       Michelle Hopkins, and Michael Hopkins
19   Jean L. Bertrand (083250)
     Morgenstein & Jubelirer
20   One Market, Spear Street Tower
     Thirty-Second Floor                               SNYDER MILLER & ORTON LLP
21   San Francisco, CA 94105
     Telephone (415) 901-8700
22
     Alan Pedlar (State Bar No. 72216)                 By: _____
23   The Law Office of Alan Pedlar                     Stephen M. Snyder
     1112 Via Malibu                                   Attorneys for Plaintiff
24   Aptos, CA 95083                                   The Flintkote Company
     Telephone (831) 688-2667
25
26   Kelly C. Wooster (State Bar No. 41196)
     112 Rock Creek Court
27   P.O. Box 62
     Copperopolis, CA 95228
     Telephone: (209) 785-2437
28

Snyder
Miller
& Orton
LLP

{00007483.DOC; 5.2}                36

COMPLAINT

**EXHIBIT A**

Imasco Limited

4 Westmount Square
Montréal, Canada
H3Z 2S8

P.O. Box 6800
Montréal, Canada
H3C 3L4

(514) 937 9111
Cable: <Imasco>
Telex: 05 24178

July 27, 1987

Directors of
The Flintkote Company

Imasco Limited ("Imasco") hereby undertakes to repay to Flintkote any amounts (up to the full amount of dividends declared during the period in which Imasco has been the indirect owner of Flintkote) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors, including tort judgment creditors, but that cannot be satisfied out of the assets of Flintkote because of dividends finally determined to have been improperly paid during Imasco's indirect ownership of Flintkote. Repayment will be made after (i) entry of a final, unsatisfied judgment against Flintkote that cannot be satisfied from Flintkote assets, and (ii) entry of a final judgment against either Flintkote, its directors or Imasco on the basis that (a) the dividends in question were improperly paid, and (b) Flintkote would have been able to satisfy, at least in part, the creditor's judgment but for the payment of the improper dividends. For purposes of this undertaking, a judgment that can still be appealed or as to which an appeal is pending is not considered "final."

In the event the issue of the propriety of Flintkote dividends is raised in a suit against Flintkote or its directors, Flintkote and each director named in the suit shall give prompt notice to the General Counsel of Imasco that the issue has been raised and shall permit Imasco an opportunity to control the defense of that issue.

Very truly yours,

Imasco Limited

By:

FTKT 017467
CONFIDENTIAL

Exhibit A

**EXHIBIT B**

## EXHIBIT B

Decedent's exposure to asbestos and asbestos-containing products occurred at various locations inside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Roosevelt High School, 4250 R Tulare St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno High School, 1839 E. Echo St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 88, 5380 Tulare St., Fresno, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Reedley College, 995 N. Reedley Ave. Reedley, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Crocket Bros. Dodge Dealership, Tuolumne & Broadway Sts, Fresno, CA | Carpenter | Summer 1957 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | Summer 1958 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Technical School, Tuolumne & Blackstone Sts., Fresno, CA | Carpenter | Summer 1959 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | 1960 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry Plant East St. Fresno, CA | Carpenter (periodically) | 1960-1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Central High School 3535 N. Cornelia St., Fresno, CA | Carpenter | 1961 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Kirk Elementary, 2000 E. Belgravia St., Fresno, CA | Carpenter | 1960 |

Snyder
Miller
& Orton
LLP

1

EXHIBIT B

<u>EXHIBIT B (cont'd.)</u>

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | McKinley Avenue Medical Building,<br>610 McKinley Ave.,<br>Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | 7 Retail Stores, names presently unknown, downtown Fresno, between Fulton & Kern Sts.,<br>Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Scandinavian Middle School,<br>3232 N. Sierra St.,<br>Fresno, CA | Carpenter | 1962; 1964 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Pacific Gas & Electric, Main Building,<br>Corcoran, CA | Carpenter | 1963 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Laton Elementary School,<br>6065 East Latonia St.,<br>Laton, CA | Carpenter | 1963 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Travelers Body & Fender Works,<br>1861 N. Broadway St.,<br>Fresno, CA | Carpenter | 1963 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Jane Adams Elementary School,<br>2117 W. McKinley Ave.,<br>Fresno, CA | Carpenter | 1964 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Retail Store Building, Pine & Blackstone Sts.,<br>Fresno, CA | Carpenter | 1965 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | City of Fresno Waste Water Treatment Plant,<br>5607 W. Jensen St.,<br>Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction<br>P.O. 5438<br>Fresno, CA | Dairy Queen,<br>Pinedale, CA | Carpenter | 1966 |

Snyder
Miller
& Orton
LLP

1

<u>EXHIBIT B (cont'd.)</u>

2

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sequoia Middle School, 4050 E. Hamilton St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno, Welfare Dept. Building, 4468 E. Kings Canyon, Fresno, CA | Carpenter | 1967 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | PG&E Building, Fulton and Tuolumne Sts., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg. 633 Pollasky St., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg., Armstrong and Nees Ave., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | T.G. Schmeiser Co. Building, 3160 E. California St., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sheriff's Dept. Building, Fresno & M Sts., Fresno, CA | Carpenter | 1969 |
| Larsen Ratto Construction Co 820 E. Gettysburg Fresno, CA | Larsen Ratto Construction Co. Various locations throughout Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell, Main Building, Van Ness & Tuolumne Sts., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Calwa Elementary School, 4303 E. Jensen St., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, C A | County of Fresno, Hall of Records Building, 2281 Tulare Street, Fresno, CA | Carpenter | 1970 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snyder
Miller
& Orton
LLP

3

EXHIBIT B

<u>EXHIBIT B (cont'd.)</u>

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry, Turkey Processing Plant, California St. Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno Building, 2348 Mariposa Street, Fresno, CA | Carpenter | 1971 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Romaine School Administration Building, 1st & Belmont Sts., Fresno, CA | Carpenter | 1971 |
| Conklin Construction Co., Kingsburg, CA | Bear Club Bar & Restaurant, Manning and Lackjack Sts, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Reedley College, 995 N. Reedley Ave, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Madera Jr. High School, Yosemite Ave., Madera CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Easton Alcoa Elementary School, 29551 Avenue 12, Madera, CA | Carpenter | 1973 |
| Conklin Construction Co., Kingsburg, CA | Jackson Insurance Co. Building, Kingsburg, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Braun-Percilis-Wagner Surveyors Building, Blackstone & Princeton Ave., Fresno, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | C.H. Baker Shoe Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1973-1991 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Riverdale High School, Riverdale, CA | Carpenter | 1974 |

4

EXHIBIT B

### EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Northside Professional Building, 1313 E. Herndon St., Fresno, CA | Carpenter (periodically) | 1974-1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | French's Mustard Plant, Muscat & Chestnut Ave., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | California State University, Fresno, 5241 N. Maple St., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Shaw & Sixth Streets, Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Eddie's Pastry Shop, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Perry Boys Smorgy, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jiffy Mart, Elm Avenue between Lincoln & Hopkins Sts., Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Fresno and Fulton Streets, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Equipment Co. Building, 4288 S. Bagly Avenue, Fresno, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Washington Elementary School, 1420 2nd and Bauder Sts., Selma, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 12, Marks and Acacia Sts., Fresno, CA | Carpenter | 1977 |

Snyder Miller & Orton LLP

5

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Miniwana and Shaw Sts., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Bo Won Association Building, 9342 F Street, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Air Terminal, Lounge, Kitty Hawk Restaurant, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma Police Station, Selma, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma City Hall Building, Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Valley Pipe Supply Co. Building 801 Santa Clara St., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 7, Cherry Ave., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Heartland Elementary (aka Jefferson Elementary) Silvia & Thompson Sts., Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Lloyd's Bank, Shaw Avenue, Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | American Transfer Co. Bldg., 2810 E. Jensen St., Fresno, CA | Carpenter | 1979 |

Snyder Miller & Orton LLP

6

EXHIBIT B

## EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Long's Drug Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1979-1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Container Corporation of America Building, 2525 S. Sunland St., Fresno, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell Building, 334 DeWitt Avenue, Clovis, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Hopkins & Son Construction, Fresno, CA, various locations in and throughout Fresno, CA and northern CA | Carpenter | 1980-2/2002 |

PARA OCCUPATIONAL EXPOSURE:

Decedent recalled working with his father, William Hopkins, deceased. Decedent worked on the new construction and demolition of various commercial buildings, including but not limited to: firehouses; shopping centers; schools; office buildings; bank buildings; restaurants; and public utility buildings. Decedent's exposure (and secondary exposure from his father's work clothes) to asbestos and asbestos-containing products occurred at various locations inside the State of California, including plaintiffs family residence located at 5774 S. Elm Street, Fresno, California.

Decedent's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the decedent, including, but not limited to breathing difficulties, asbestosis, lung and/or other cancer, mesothelioma, and/or other lung damage. Decedent was diagnosed with mesothelioma on or about February 2002.

Decedent stopped working on February 19, 2002, due to his mesothelioma.

Snyder Miller & Orton LLP

7

**Exhibit B-2**

CASE NUMBER: CGC-06-450944  MARLENE HOPKINS et al VS. PLANT INSULATION COMPAN

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

DATE:     **SEP-08-2006**

TIME:     **9:00AM**

PLACE:    **Department 212**
          **400 McAllister Street**
          **San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 212 (g)(1) requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.**
(SEE LOCAL RULE 3)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

**Exhibit B-3**

APR-07-2006(FRI) 15:49    Legal                                      P. 002/003

FILED
SAN FRANCISCO COUNTY
SUPERIOR COURT

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jean L. Bertrand, 083250 MORGENSTEIN & JUBELIRER One Market Plaza 32nd Floor San Francisco, CA 94105 | 06 APR 10 AM 10: 48 GORDON PARK LI. CLERK BY: DEPUTY CLERK |

TELEPHONE NO.: (415) 901-8700
ATTORNEY FOR (Name): Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of San Francisco County
400 McAllister Street, Civil
San Francisco, CA 94102

PLAINTIFF/PETITIONER: Marlene Hopkins, et al.

DEFENDANT/RESPONDENT: Plant Insulation Company, et al.

| PROOF OF SERVICE OF SUMMONS | CASE NUMBER: CGC06450944 |
|---|---|
| | Ref. No. or File No.: 2914.1 WJB |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons, Hopkins v. Plant Insulation Co. Complaint, Case Management and ADR information

3. a. Party served: Sullivan & Cromwell LLP

   b. Person Served: Robert A. Sacks - Person authorized to accept service of process

4. Address where the party was served:  1888 Century Park East
                                         Los Angeles, CA 90067

5. I served the party
   b. by substituted service. On (date): April 6, 2006      at (time): 4:20 pm    I left the documents listed in item 2 with or
      in the presence of: Adam McFaden-Person in charge
      (1) (business)   a person at least 18 years of age apparently in charge at the office or usual place of business of
                       the person to be served. I informed him or her of the general nature of the papers.

      (4) A declaration of mailing is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:

   Sullivan & Cromwell LLP

   under:      Other:  Limited Liability Partnership

7. Person who served papers
   a. Name:      John Aldana
   b. Address:   One Legal, Inc. - 132-Marin
                 504 Redwood Blvd #223
                 Novato, CA 94947
   c. Telephone number: 415-491-0606
   d. The fee for service was:  $ 69.00
   e. I am:
      (3) registered California process server.
          (i)  Employee or independent contractor.
          (ii) Registration No.: 526 /
          (iii) County: Los Angeles

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: April 7, 2006

John Aldana
(NAME OF PERSON WHO SERVED PAPERS)                                  (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
(Rev. July 1, 2004)
10331850.tif - 4/7/2006 6:22:29 PM

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10

FF# 6618603

BY FAX

APR-07-2006(FRI) 15:49      . Legal                                    P. 003/003

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*: Jean L. Bertrand, 083250 MORGENSTEIN & JUBELIRER One Market Plaza 32nd Floor San Francisco, CA 94105 | TELEPHONE NO: (415) 901-8700 | FOR COURT USE ONLY |
|---|---|---|
| ATTORNEY FOR *(Name)*:  Plaintiff | Ref. No. or File No. 2914.1 WJB | |

Insert name of court, judicial district or branch court, if any:

Superior Court of San Francisco County
400 McAllister Street, Civil
San Francisco, CA 94102

PLAINTIFF:

  Marlene Hopkins, et al.

DEFENDANT:

  Plant Insulation Company, et al.

| PROOF OF SERVICE BY MAIL | | | | CASE NUMBER: CGC06450944 |
|---|---|---|---|---|

I am a citizen of the United States, over the age of 18 and not a party to the within action. My business address is 504 Redwood Blvd #223, Novato, CA 94947.
On April 7, 2006, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCIV.P 4(d)(1) was made, I mailed copies of the:

Summons, Hopkins v. Plant Insulation Co. Complaint, Case Management and ADR information

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Sullivan & Cromwell LLP
Robert A. Sacks
1888 Century Park East
Los Angeles, CA 90067

I am readily familiar with the firm's practice for collection and processing of documents for mailing. Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

$ 69.00

Maria Oung
One Legal, Inc.
504 Redwood Blvd #223
Novato, CA 94947

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on April 7, 2006 at Los Angeles, California.

Maria Oung

10331850.tif - 4/7/2006 5:22:29 PM

FF# 6618603

**SUMMONS**

*(CITACION JUDICIAL)*

SUM-100

| |
|---|
| FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY,

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Francisco County Superior Court<br>400 McAllister Street<br><br>San Francisco, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br>CGC 06450944 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jean L. Bertrand (CSB 083250)      415.901.8700      415.901.8701
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* APR 05 2006 | Gordon Park-Li | Clerk, by   Jun Panelo | , Deputy<br>*(Adjunto)* |
| | | *(Secretario)* | |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| | | |
|---|---|---|
| [SEAL] | | Page 1 of 1 |

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

**Exhibit B-4**

ALAN R. BRAYTON (State Bar No. 073685)
GILBERT L. PURCELL (State Bar No. 113603)
DAVID R. DONADIO (State Bar No. 154436)
BRAYTON PURCELL, LLP
222 Rush Landing Road
P. O. Box 6169
Novato, CA 94948-6269
Telephone: (415) 898-1555

Attorneys for Plaintiffs
Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

STEPHEN M. SNYDER (State Bar No. 054598)
JAMES L. MILLER (State Bar No. 071958)
SNYDER MILLER & ORTON LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
Telephone: (415) 962-4400
Facsimile: (415) 962-4401

Attorneys for Plaintiff
The Flintkote Company

(Additional Counsel Listed on Signature Page)

**FILED**
San Francisco County Superior Court

APR 1 4 2006

GORDON PARK-LI, Clerk
BY:
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

MARLENE HOPKINS, Individually, as
Wrongful Death Heir, and as Successor-in-
Interest to NORMAN HOPKINS, JR.,
Deceased; and MICHELLE HOPKINS, and
MICHAEL HOPKINS, as Legal Heirs of
NORMAN HOPKINS, Deceased, and THE
FLINTKOTE COMPANY,

                Plaintiffs,

      v.

PLANT INSULATION COMPANY;
UNIROYAL HOLDING, INC.; IMPERIAL
TOBACCO CANADA LIMITED; SULLIVAN
& CROMWELL LLP; and DOES 1 through
100,

                Defendants.

Case No.:  CGC06450944

**APPLICATION FOR DESIGNATION OF
COMPLEX LITIGATION**

**[C.R.C. 1800 and General Order Re:
Procedure for Approval of Complex
Litigation Designation]**

ORIGINAL

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 1 -

02914.00001
610164.1

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

1    Pursuant to California Rule of Court 1800 and the Court's General Order Re:

2    Procedure for Approval of Complex Litigation Designation, plaintiffs Marlene, Michelle

3    and Michael Hopkins (the "Hopkins family") and The Flintkote Company ("Flintkote")

4    request that this case be designated complex[1].

5    **THE COURT SHOULD APPROVE A COMPLEX DESIGNATION FOR THIS CASE**

6

7    This is a complicated case with two primary and interrelated claims: to recover

8    (with interest) over $500 million in corporate dividends declared by Flintkote in favor of

9    its ultimate parent, now known as Imperial Tobacco Canada Limited ("Imperial Tobacco")

10    and to establish Imperial Tobacco as the alter ego of Flintkote. These two primary

11    claims are knit together factually and legally. They are expressed in sixteen causes of

12    action against four defendants. (A true and correct copy of the Complaint and the Civil

13    Case Cover Sheet are attached as Exhibit A.) The causes of action include: declaratory

14    relief with respect to a written agreement by Imperial Tobacco (then known as Imasco

15    Limited and referred to here as "Imasco") to return the corporate dividends under

16    specified circumstances; for recovery of the dividends as illegally declared in favor of

17    Imasco; for breach of fiduciary duty by Imasco; for legal malpractice against Sullivan &

18    Cromwell, the attorneys who represented both Flintkote and Imasco in connection with

19    the payment of the illegal dividends; constructive trust; restitution and alter ego claims

20

21    [1] A party must designate a case as "complex," to alert the Court that the action
"requires exceptional judicial management to avoid placing unnecessary burdens on the
22    court or the litigants and to expedite the case, keep costs reasonable, and promote
effective decision making by the court, the parties and counsel." C.R.C. 1800(a).

23
    California Rule of Court 1800(b) directs courts, in determining whether a party's
24    designation of a case as complex is appropriate, to consider several factors, including:

25    (1)    Is the case likely to involve "[n]umerous pretrial motions raising difficult or
novel legal issues that will be time-consuming to resolve"?
26
    (2)    Will the case require "[m]anagement of a large number of witnesses or a
27    substantial amount of documentary evidence"?

28

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

02914.00001
610164.1

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

1 asserted in an asbestos-related wrongful death, loss of consortium and survival action

2 brought by the Hopkins family.

3     The asbestos claims are factually interwoven with the dividend recovery and

4 malpractice claims because wrongful activity with respect to the dividend payments to

5 Imasco left Flintkote without the ability to pay its asbestos-related personal

6 injury/wrongful death liabilities. Wrongful conduct by both Imasco and its lawyers,

7 Sullivan & Cromwell, caused the payment of the dividends and that payment and

8 associated misconduct are important factual components in plaintiffs' proof that Imperial

9 Tobacco is the alter ego of Flintkote. Ultimately, having been stripped of the dividends,

10 Flintkote filed a chapter 11 bankruptcy case, now pending in the United States

11 Bankruptcy Court for the District of Delaware. Thus, the wrongful acts by defendants

12 Imperial Tobacco and Sullivan & Cromwell, which caused Flintkote to transfer over half a

13 billion dollars in cash to its former corporate parent, have left the Hopkins family (and all

14 Flintkote asbestos claimants) without an adequate remedy against Flintkote.

15     Plaintiffs believe that this matter will require more than the usual amount of court

16 oversight and supervision. Plaintiffs have named one of Canada's largest tobacco

17 companies and a major international law firm as defendants, and recovery in excess of

18 $500 million is sought. Plaintiffs expect defendants to mount a vigorous defense that will

19 entail significant initial motion practice and after that, protracted discovery. Witnesses

20 number in the many dozens, and documents are voluminous. Flintkote's own document

21 repository consists of approximately 1500 bankers' boxes. Plaintiffs expect that the

22 volume of defendants' documents, particularly Imperial Tobacco's and Sullivan &

23 Cromwell's, will also be significant.

24     For all of the above reasons, plaintiffs request that the Court approve the

25 designation as complex. If there is additional information that the Court wishes to

26 consider before assigning the case to a case management program, plaintiffs are

27 prepared to provide it.

28 //

MORGENSTEIN & JUBELIRER LLP
ATTORNEY AT LAW
SAN FRANCISCO

02914.00001
610164.1

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

1

2     DATED: _April 11_, 2006

3

4

5

6

7     DATED: _April 14_, 2006

8

9

10

11

12

13    Additional Counsel for Plaintiff The Flintkote Company:

14

15    Eliot S. Jubelirer (State Bar No. 061654)
      Jean L. Bertrand (State Bar No. 083250)

16    MORGENSTEIN & JUBELIRER LLP
      One Market, Spear Street Tower, 32nd Floor
      San Francisco, CA 94105

17    Telephone: (415) 901-8700

18    Alan Pedlar (State Br No. 72216)
      THE LAW OFFICE OF ALAN PEDLAR

19    1112 Via Malibu
      Aptos, CA 95083

20    Telephone: (831) 688-2667

21    Kelly C. Wooster (State Bar No. 41196)
      112 Rock Creek Court

22    P. O. Box 62
      Copperopolis, CA 95228

23    Telephone: (209) 785-2437

24

25

26

27

28

Respectfully submitted,

BRAYTON PURCELL LLP

By _Alan R. Brayton_
Alan R. Brayton
Attorneys for Plaintiffs
Marlene Hopkins, Michelle Hopkins
and Michael Hopkins

MORGENSTEIN & JUBELIRER LLP

By _Wendy J. Ray for Jean Bertrand_
Jean L. Bertrand
Attorneys for Plaintiff
The Flintkote Company

02914.00001
610164.1

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**EXHIBIT A**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jean L. Bertrand (CSB 083250)<br>Eliot S. Jubelirer (CSB 061654)<br>MORGENSTEIN & JUBELIRER LLP<br>One Market, Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415.901.8700    FAX NO.: 415.901.8701<br>ATTORNEY FOR *(Name):* Plaintiff MARLENE HOPKINS, et al. | **ENDORSED**<br>**F I L E D**<br>San Francisco County Superior Court<br><br>APR 0 5 2006<br><br>GORDON PARK-LI, Clerk<br>BY: _____ JUN P. PANELO<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME: MARLENE HOPKINS, et al. v. PLANT INSULATION COMPANY, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: | CGC 0 6 4 5 0 9 4 4 |
|---|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | | JUDGE:<br>DEPT: | |

*Items 1-5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [X] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812 )**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is  [ ] is not  complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought *(check all that apply):*
   a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive

4. Number of causes of action *(specify):*  16

5. This case [ ] is  [X] is not  a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015).*

Date:  April 5, 2006

Jean L. Bertrand (CSB 083250)
_____
(TYPE OR PRINT NAME)                          *Jean L Bertrand*
                                       (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19

ENDORSED
F I L E D
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO
Deputy Clerk

1   ALAN R. BRAYTON (State Bar No. 073685)
    GILBERT L. PURCELL (State Bar No. 113603)
2   DAVID R. DONADIO (State Bar No. 154436)
    BRAYTON PURCELL, LLP
3   222 Rush Landing Road
    P.O. Box 6169
4   Novato, CA 94948-6169
    Telephone (415) 898-1555
5
    Attorneys for Plaintiffs
6   Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

7   STEPHEN M. SNYDER (State Bar No. 054598)
    JAMES L. MILLER (State Bar No. 071958)        CASE MANAGEMENT CONFERENCE SET
8   SNYDER MILLER & ORTON LLP
    111 Sutter Street, Suite 1950
9   San Francisco, CA 94104                       SEP 0 8 2006 ~ 9 00 AM
    Telephone: (415) 962-4400
10  Facsimile: (415) 962-4401
                                                  DEPARTMENT 212
11  Attorneys for Plaintiff
    The Flintkote Company
12  (Additional Counsel Listed On Signature Page)

13

14              SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

15                          COUNTY OF SAN FRANCISCO

16

17  MARLENE HOPKINS, Individually, as       Case No. CGC 06 450944
    Wrongful Death Heir, and as Successor-in-
18  Interest to NORMAN HOPKINS, JR.,        COMPLAINT FOR DAMAGES AND
    Deceased; and MICHELLE HOPKINS, and     RELIEF AGAINST ALTER EGO, FOR
19  MICHAEL HOPKINS, as Legal Heirs of      RECOVERY OF DIVIDENDS, FOR
    NORMAN HOPKINS, Deceased, and THE       RECOVERY OF FRAUDULENT
20  FLINTKOTE COMPANY,                      TRANSFERS, FOR DAMAGES BY REASON
                                            OF BREACH OF FIDUCIARY DUTY, FOR
21                                          DAMAGES FOR BREACH OF DUTY AND
                                            NEGLIGENCE, TO ENFORCE
22           Plaintiffs,                    CONSTRUCTIVE TRUST, FOR
                                            RESTITUTION, AND FOR DECLARATORY
23      vs.                                 RELIEF.

24  PLANT INSULATION COMPANY;
    UNIROYAL HOLDING, INC.; IMPERIAL
25  TOBACCO CANADA LIMITED;
    SULLIVAN & CROMWELL LLP; and
26  DOES 1 through 100,

27           Defendants.

28

Snyder
Miller
& Orton
LLP

                                    1
                                COMPLAINT

Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, and MICHAEL HOPKINS and
THE FLINTKOTE COMPANY allege:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,
"Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),
who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene
Hopkins is successor in interest to Decedent under California Code of Civil Procedure section
377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil
Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent
contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos
containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of
Flintkote, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

2.    Plaintiff The Flintkote Company ("Flintkote") is, and at all relevant times, has been a
corporation organized and existing under the laws of the State of Delaware, with a principal place of
business in San Francisco, California, qualified to do and doing business in California.  For many
years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of
asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case
under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States
Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the
"Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and
remains the debtor and debtor-in-possession in that case.

3.    Defendant Plant Insulation Company ("Plant") is a California corporation, with its
principal place of business situated in the city and county of San Francisco.

4.    Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in
interest to Uniroyal, Inc.

5.    Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major
Canadian tobacco company.  It is a Canadian corporation formerly known as Imasco Limited and will
be referred to herein as "Imperial Tobacco" or "Imasco."  Imperial Tobacco has manufactured

Snyder
Miller
& Orton
LLP

1  cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du

2  Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,

3  including California, for many years.

4       6.    Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C

5  maintains offices in California, among other places. S&C is a citizen of California, in that there are

6  S&C partners who reside in and are citizens of California.

7       7.    Plaintiffs are ignorant of the true names and capacities of defendants sued under the

8  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

9  complaint may be amended to allege such names and capacities. Each of the fictitiously named

10  defendants is responsible in some manner for the occurrences alleged hereafter.

11       8.    Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

12  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

13  seeks in part declaratory relief under California Code of Civil Procedure section 1060. Flintkote is

14  authorized by virtue of the Bankruptcy Code to bring certain of the causes of action, all of which

15  arise under state law.

16       9.    Venue in the County of San Francisco is proper because defendants Imperial Tobacco

17  and S&C have no residence in California and can be sued in any county in California, and their

18  liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

19  principal place of business situated in San Francisco.

20       10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

21  directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

22  the extent of losses held by them. The alter ego claims by Hopkins and Flintkote depend upon the

23  same set of facts. Pursuing such claims against a substantial well-financed defendant is difficult and

24  expensive, so that it is economically not practical for a single individual to pursue them alone.

25  Accordingly, Flintkote and plaintiffs Hopkins have agreed to bring the alter ego claims together as

26  plaintiffs and to cooperate in prosecuting them. Plaintiffs Hopkins make no claim against S&C.

27                           **FACTS**

28       11.    Flintkote manufactured and sold asbestos containing products for many years,

Snyder
Miller
& Orton
LLP

3

COMPLAINT

1  including vinyl asbestos floor tile, asbestos cement pipe and many other products. Flintkote, through

2  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

3  through approximately 1970. Beginning in or about 1972, Flintkote, along with many other

4  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

5  asbestos contained in its products who suffered from a variety of asbestos induced diseases. The

6  number of asbestos cases filed against Flintkote and the other companies increased over time.

7      12.    In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

8  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

9  filed against it. The bankruptcy filing was major news as Johns Manville was, absent the asbestos

10  litigation, a large and profitable American company. Other companies named as defendants in the

11  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

12

| Company | Date of Filing Bankruptcy |
|---|---|
| UNR Industries | July 19, 1982 |
| Amatex Corporation | November 1, 1982 |
| Forty-Eight Insulations, Inc. | April 19, 1985 |
| Standard Insulation | August 4, 1986 |
| Nicolet | July 17, 1987 |

13

14

15

16      13.    A number of defendants regularly sued in the asbestos litigation banded together in the

early 1980's and sought to settle disputes with their insurers where possible and establish a facility

17  that would provide an efficient joint defense to members of the group. The discussions were

18  mediated by Dean Harry Wellington of the Yale Law School. The participants became known as the

19

20  "Wellington Group." By June 1985 they had signed an agreement and had begun to operate as the

Asbestos Claims Facility ("ACF").

21

22      14.    Flintkote was a member of the ACF and, for a while, asbestos cases against it were

23  defended and settled or tried by lawyers selected by the Asbestos Claims Facility. The ACF defense

24  arrangements were initially advantageous to Flintkote as they allowed the company to defend

asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that

25  would be more quickly consumed if it was required to defend cases on its own. The ACF operated

26  through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as

27  to appropriate defense strategies and as to how costs should be allocated among participants.

28

Snyder
Miller
& Orton
LLP

4

COMPLAINT

1    15.    Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-
2 related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to
3 information which pointed to the threatening scope of the asbestos litigation to follow.  That
4 information included:

5    •    The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos
6         defendants, which increased the payment shares in the tort system of the surviving
7         companies;

8    •    Numbers of claims filings were increasing and claims values were increasing;

9    •    Diseases caused by asbestos exposure could have a latency period of decades, which
10        meant liabilities would extend far into the future;

11   •    Commercial usage of asbestos in the United States continued to increase through the
12        1970's, with significant implications for future morbidity;

13   •    Inability to extend  the asbestos litigation to include significant responsible parties,
14        such as the United States Government and the tobacco companies, all of whom had
15        contributed to the diseases and injuries of asbestos victims;

16   •    Unmistakable signals from casualty insurers that they could not be counted on by
17        defendant companies in the face of ever-increasing demands, with signs from some
18        that they would not survive.  By mid-1987, two of Flintkote's insurers had become
19        insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach
20        agreements as to coverage with only 60% of its insurers;

21   •    Substantial disagreements among ACF members that weakened the effectiveness of
22        the ACF and hastened its demise.  These disagreements were apparent as early as
23        1986.  There were clear indicators that members were going to leave the ACF, and
24        seven did so in 1987.  Persons knowledgeable about the operations and functioning of
25        the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF
26        would not continue to operate indefinitely as originally agreed upon and also knew or
27        should have known that disintegration of the ACF was likely in the foreseeable future.

28    16.    Imasco was quite familiar with the American asbestos litigation.  It followed and

1    monitored that litigation for a variety of reasons, including that it knew there was a synergistic or

2    combinative effect which produced increased disease rates in persons who smoked its tobacco

3    products and who were also exposed to asbestos. Consequently Imasco understood that the litigation

4    posed risks to corporate and insurer solvency.

5         17.    In the 1980s, Imasco was engaged in a program of corporate diversification.

6    Specifically, it was seeking to acquire non-tobacco businesses. One target of Imasco's diversification

7    program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada

8    Trustco"). But, Canada Trustco had been acquired by another Canadian company, Genstar

9    Corporation. So, in order to get control of Canada Trustco, Imasco, operating through a corporate

10   subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar

11   Corporation ("Genstar"). At the time Genstar had a number of businesses and subsidiary

12   corporations, including several in the United States. Genstar was Flintkote's ultimate parent

13   company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.

14   Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco

15   common shares.

16        18.    From the outset, Imasco's strategy was to use the value of Genstar's assets, other than

17   Canada Trustco, to finance the purchase of Canada Trustco. The strategy therefore involved

18   restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada

19   Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for

20   the hostile takeover.

21        19.    Imasco acquired Genstar in August 1986. Then, as it had planned to do, it set about

22   selling most of Genstar's assets and businesses (other than Canada Trustco). To implement this

23   scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding. First it required

24   Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then

25   transferring Flintkote's valuable operating assets to them. Then, Imasco caused Flintkote to sell each

26   of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had

27   been created previously. Those sales were made to third parties for cash.

28        20.    Gross proceeds from the sales of the Flintkote assets were approximately

Snyder
Miller
& Orton
LLP

6

COMPLAINT

1  $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987.

2  These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

3  California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

4  planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing

5  Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to

6  represent its original client Imasco in connection with the liquidation throughout the process and

7  thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and

8  Imasco.

9       21.    After these transactions, Flintkote's valuable operating businesses were gone. Their

10  profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

11  Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

12  much of which was contested by the insurers who had written the policies. The cash and insurance

13  were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

14  However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

15  Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

16  it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

17  and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

18  dividends to be paid out by Flintkote.

19       22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

20  San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

21  was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

22  corporation of Flintkote.

23       23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

24  to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

25  the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

26  Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

27  that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

28  Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

COMPLAINT

Snyder
Miller
& Orton
LLP

1  advised the Flintkote board that it had received preliminary advice from the consultant, and that there

2  was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

3  declare the dividend. S&C told the board that it did not believe the consultant's final report would

4  alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

5  Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

6  knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

7  it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

8  dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

9  show that the board was informed of that fact.

10      24.    Stating that it was doing so in accordance with previous undertakings and "as an

11  inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

12  such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

13  them harmless against any and all actions, suits or claims arising out of their actions, omissions or

14  conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

15      25.    Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

16  meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

17  determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

18  that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

19  to replace funds to Flintkote to the extent required by an appropriate judicial body.

20      26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

21  dividend to be paid.

22      27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

23  of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

24  1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

25  corporations and entities that it controlled and dominated.

26      28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

27  and were representing Imasco, including with respect to Flintkote-related issues, such as the

28  consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

Snyder
Miller
& Orton
LLP

8

COMPLAINT

1  face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those

2  same issues, and on the issue of the director's liability in connection with declaring dividends to

3  Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were

4  present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal

5  memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the

6  board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant

7  S&C had retained and whose preliminary report was used by S&C in connection with the December

8  1986 board meeting.

9      29.    The board minutes of the July 1987 meeting reflect that after payment of the

10  dividends, Flintkote would have left retained earnings and paid-in capital of approximately

11  $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed

12  $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure

13  taken from the RPC study was $42,000,000.

14      30.    In the July 22, 1987 board meeting, the board members were told that Imasco would

15  undertake to restore dividend monies to the extent the declared dividends were deemed legally

16  improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply

17  a writing memorializing the understanding. After the meeting, Imasco issued a letter dated July 27,

18  1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends

19  declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent

20  jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets

21  because of dividends finally determined to have been improperly paid during Imasco's indirect

22  ownership of Flintkote. A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is

23  attached as Exhibit A and incorporated by reference.

24      31.    The S&C legal memorandum and the RPC study, both supplied by Imasco's and

25  Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to

26  be paid, as was Imasco's plan from the time it took over Genstar.

27      32.    S&C's relationship with Imasco supplied reason to structure S&C's advice so as to

28  ensure that Flintkote would pay the dividends. The S&C memorandum contained substantial errors,

Snyder
Miller
& Orton
LLP

9

COMPLAINT

1  omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

2  of Flinkote's payment of these dividends, including the following.

3      33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote. However,

4  it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

5  declare the dividend yet escape personal liability for doing so. The memorandum is vague and

6  indefinite as to Flintkote's obligations as a corporation.

7      34.    The S&C memorandum contains legal analysis, including discussion of California

8  law. In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

9  Conveyance Act. S&C wrote that a conveyance could be set aside if the debtor would be rendered

10 insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

11 existing debts as they became absolute and matured. S&C advised Flintkote that it was unclear

12 whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

13 not yet manifested itself – were considered existing debts. That advice misapprehended the

14 controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

15 fixed or contingent. S&C also did not alert Flintkote that under California law, as well as in other

16 jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

17 without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

18 would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

19 solvent. See *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

20     35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

21 changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

22 transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

23 would incur debts beyond his ability to pay as they became due. The new statute therefore

24 incorporated an objective test specifically looking to the incurring of future debts. This test was in

25 addition to rules making fraudulent those transfers without fair consideration where the debtor was

26 insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

27 which its remaining assets were unreasonably small in relation to the business.

28     36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

Snyder
Miller
& Orton
LLP

10

COMPLAINT

1    RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending
2    and possible future asbestos-related property damage claims against Flintkote, but only "to consider"
3    asbestos personal injury claims.  RPC devoted cursory treatment to Flintkote's asbestos-related
4    personal injury claims.  RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos
5    personal injury claims.  The RPC report thus was based on an assumption, known to be questionable
6    by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to
7    Flintkote for 14 years.  S&C assured Flintkote that directors were entitled to rely upon statements in
8    an appraisal by an appraiser selected by the board.  Although it was not an appraisal under Delaware
9    law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury
10   liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC
11   report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors
12   could rely.  Imasco and S&C did not advise the directors to seek an independent expert analysis
13   regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain
14   independent counsel without a conflict of interest.

15        37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and
16   developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-
17   related personal injury liabilities.

18        38.    S&C labored under a conflict of interest when it undertook to represent and advise
19   Flintkote while still representing Imasco.  Flintkote, a company facing substantial and increasing
20   asbestos-related claims, was obliged to consider and evaluate the interests of existing and future
21   creditors before paying out $525,200,000 in dividends.  In contrast, Imasco had every interest in
22   obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all
23   along.  S&C represented both Imasco and Flintkote, with plainly conflicting interests.  The
24   declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading
25   legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which
26   was procured by S&C for the specific purpose of attempting to justify the legal propriety of the
27   dividends.

28        39.    Imasco improperly caused the dividends to be paid by telling the Flintkote board:

Snyder
Miller
& Orton
LLP

11

COMPLAINT .

1    • our lawyers, acting as your lawyers, together with their consultants, say you can do it;

2    • to induce you to pay us we agree to protect you if someone sues you; and

3    • if we are wrong about this and creditors are left unsatisfied and a court finally decides

4    the dividends were improper, we will pay them back.

5    40.    From the time Imasco acquired Genstar in August 1986, through September 29, 2003,

6    Imasco held and maintained complete control over and dominated Flintkote through Imasco's

7    indirect 100% ownership of Flintkote.  Flintkote was in no position to assert claims against Imasco or

8    to sue Imasco.  S&C continued to act as an instrument of Imasco, guiding and giving legal advice to

9    Flintkote, including with respect to the matters alleged herein, until September of 2003.  Imasco's

10   plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote,

11   and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as

12   long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the

13   goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten

14   alter ego liability upon Imasco for Flintkote's asbestos-related claims.  That Flintkote had been

15   injured by wrongful acts leading to the dividends was inherently unknowable, depending upon

16   expertise available only to sophisticated professionals such as S&C and RPC.  S&C did not disclose

17   to Flintkote that it had rights with respect to the dividends.

18   41.    From and after the divestiture of its subsidiaries and payment of the dividends,

19   Flintkote operated as an asbestos claims resolution facility.  Imasco exercised its domination and

20   control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and

21   Imasco Holdings Group, Inc. (collectively, "IHI").  IHI took its orders from Imasco.  IHI attorneys

22   were involved in the claim resolution process.  Flintkote consistently obtained releases for its parent

23   companies, including Imasco, in settlements with asbestos claimants.  Flintkote and IHI shared

24   common officers and directors.  Employees of Imasco or IHI were involved in management of

25   Flintkote.  S&C continued to advise Imasco or IHI and Flintkote on what should be done with

26   Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related

27   liabilities.  Flintkote handled its own asbestos liabilities, rather than join the Center for Claims

28   Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

Snyder
Miller
& Orton
LLP

12

COMPLAINT

1   Imasco therefore maintained control over the handling of the claims. Following the dividends, as a

2   claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical. Flintkote

3   continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

4   involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

5   critical issue of asbestos liability. The goals of Imasco throughout were to forestall any liability to

6   repay the dividend and to confine the asbestos-related liabilities to Flintkote.

7        42.    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

8   it had taken and used the money to reimburse itself for funds it had expended for buying the one

9   business it did want, Genstar's Canada Trustco, a financial services company in Canada. After

10  Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

11  to satisfy its asbestos-related personal injury liabilities.

12       43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

13  financial statements. It did not publicly disclose its true financial condition and the nature and extent

14  of its asbestos liabilities. Instead, Imasco, as Flintkote's ultimate parent corporation filed public

15  financial statements in Canada that purported to represent Flintkote's financial condition. Imasco

16  represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

17  Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

18  represented, with respect to Flintkote's financial condition, that

19        [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

20       subject to numerous claims and suits, some of which allege significant damage. In the opinion of

21       management, all such claims and suits are adequately covered by insurance, or are provided for in

22       the financial statements, or if not so covered or provided for, the results are not expected to

23       material affect the Corporation's financial condition.

24  Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

25  repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

26  within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

27  as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

28  alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

Snyder
Miller
& Orton
LLP

13

COMPLAINT

1   had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

2   became due and were made in violation of California and other law, including California's Uniform

3   Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

4   applicable limitation period.

5         44.   In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

6   Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

7   subsidiary of Navigant Consulting, Inc. ("Navigant"). Navigant issued a report dated August 19,

8   2003. The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

9   billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

10   $3.4781 billion.

11         45.   In September, 2003, the shares of Flintkote stock were transferred to a trust, and

12   Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

13                               **FIRST CAUSE OF ACTION**

14   **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –**
                                        **Wrongful Death)**

15         46.   Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

16   paragraphs 1 through 45, inclusive.

17         47.   At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an

18   alter ego of Flintkote, and each of them, were and are engaged in the business of researching,

19   manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying,

20   offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving,

21   certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying,

22   requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain

23   product, namely asbestos and other products containing asbestos.

24         48.   At all times mentioned, said defendants, and each of them, singularly and jointly,

25   negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed

26   to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled,

27   distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for

28   installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and

1  advertised, a certain product, namely asbestos, and other products containing asbestos, in that said

2  products caused personal injuries to users, consumers, workers, bystanders and others, including the

3  Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed

4  persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said

5  products hazardous, unsafe, and dangerous for use by "exposed persons."

6      49.    Said defendants, and each of them, had a duty to exercise due care in the pursuance of

7  the activities mentioned above and defendants, and each of them, breached said duty of due care.

8      50.    Said defendants, and each of them, knew, or should have known, and intended that the

9  aforementioned asbestos and products containing asbestos and related products and equipment,

10  would be transported by truck, rail, ship, and other common carriers, that in the shipping process the

11  product would break, crumble, or otherwise be damaged; and/or that such products would be used for

12  insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

13  applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping,

14  hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation,

15  resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or

16  handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

17  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

18  persons working in proximity to said products, directly or through reentrainment.

19      51.    Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

20  containing products referred to herein in a manner that was reasonably foreseeable.. Decedent's

21  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

22  employment status is, on current information and belief, as set forth at various locations and

23  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

24      52.    Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

25  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

26  perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

27  asbestos-containing products over a period time.

28      53.    Decedent suffered from a condition related to exposure of asbestos and asbestos-

Snyder
Miller
& Orton
LLP

Imasco Limited

4 Westmount Square
Montréal, Canada
H3Z 2S8

P.O. Box 6800
Montréal, Canada
H3C 3L4

(514) 937 9111
Cable: 'Talimasco
Telex: 05 24175

July 27, 1987

Directors of
The Flintkote Company

Imasco Limited ("Imasco") hereby undertakes to repay to Flintkote any
amounts (up to the full amount of dividends declared during the period in
which Imasco has been the indirect owner of Flintkote) that are finally
determined by a court of competent jurisdiction to be due to Flintkote creditors,
including tort judgment creditors, but that cannot be satisfied out of the
assets of Flintkote because of dividends finally determined to have been
improperly paid during Imasco's indirect ownership of Flintkote. Repayment
will be made after (i) entry of a final, unsatisfied judgment against Flintkote
that cannot be satisfied from Flintkote assets, and (ii) entry of a final
judgment against either Flintkote, its directors or Imasco on the basis
that (a) the dividends in question were improperly paid, and (b) Flintkote
would have been able to satisfy, at least in part, the creditor's judgment
but for the payment of the improper dividends. For purposes of this undertaking,
a judgment that can still be appealed or as to which an appeal is pending
is not considered "final."

In the event the issue of the propriety of Flintkote dividends is raised
in a suit against Flintkote or its directors, Flintkote and each director
named in the suit shall give prompt notice to the General Counsel of Imasco
that the issue has been raised and shall permit Imasco an opportunity to
control the defense of that issue.

Very truly yours,

Imasco Limited

By:

FTKT 017467
CONFIDENTIAL

Exhibit A

**EXHIBIT B**

1

## EXHIBIT B

2

Decedent's exposure to asbestos and asbestos-containing products occurred at various

3

locations inside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Roosevelt High School, 4250 R. Tulare St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno High School, 1839 E. Echo St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 88, 5380 Tulare St., Fresno, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Reedley College, 995 N. Reedley Ave. Reedley, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Crocket Bros. Dodge Dealership, Tuolumne & Broadway Sts, Fresno, CA | Carpenter | Summer 1957 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | Summer 1958 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Technical School, Tuolumne & Blackstone Sts., Fresno, CA | Carpenter | Summer 1959 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | 1960 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry Plant East St. Fresno, CA | Carpenter (periodically) | 1960-1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Central High School 3535 N. Cornelia St., Fresno, CA | Carpenter | 1961 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Kirk Elementary, 2000 E. Belgravia St., Fresno, CA | Carpenter | 1960 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snyder
Miller
& Orton
LLP

1

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | McKinley Avenue Medical Building, 610 McKinley Ave., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | 7 Retail Stores, names presently unknown, downtown Fresno, between Fulton & Kern Sts., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Scandinavian Middle School, 3232 N. Sierra St., Fresno, CA | Carpenter | 1962; 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Gas & Electric, Main Building, Corcoran, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Laton Elementary School, 6065 East Latonia St., Laton, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Travelers Body & Fender Works, 1861 N. Broadway St., Fresno, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jane Adams Elementary School, 2117 W. McKinley Ave., Fresno, CA | Carpenter | 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Retail Store Building, Pine & Blackstone Sts., Fresno, CA | Carpenter | 1965 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Dairy Queen, Pinedale, CA | Carpenter | 1966 |

Snyder
Miller
& Orton
LLP

2

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sequoia Middle School, 4050 E. Hamilton St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno, Welfare Dept. Building, 4468 E. Kings Canyon, Fresno, CA | Carpenter | 1967 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | PG&E Building, Fulton and Tuolumne Sts., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg. 633 Pollasky St., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg., Armstrong and Nees Ave., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | T.G. Schmeiser Co. Building, 3160 E. California St., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sheriff's Dept. Building, Fresno & M Sts., Fresno, CA | Carpenter | 1969 |
| Larsen Ratto Construction Co 820 E. Gettysburg Fresno, CA | Larsen Ratto Construction Co. Various locations throughout Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell, Main Building, Van Ness & Tuolumne Sts., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Calwa Elementary School, 4303 E. Jensen St., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, C A | County of Fresno, Hall of Records Building, 2281 Tulare Street, Fresno, CA | Carpenter | 1970 |

Snyder
Miller
& Orton
LLP

3

EXHIBIT B

<u>EXHIBIT B (cont'd.)</u>

| Employer | Location of Exposure | Job Title | Exposure Dates |
|----------|---------------------|-----------|----------------|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry, Turkey Processing Plant, California St. Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno Building, 2348 Mariposa Street, Fresno, CA | Carpenter | 1971 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Romaine School Administration Building, 1ˢᵗ & Belmont Sts., Fresno, CA | Carpenter | 1971 |
| Conklin Construction Co., Kingsburg, CA | Bear Club Bar & Restaurant, Manning and Lackjack Sts, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Reedley College, 995 N. Reedley Ave, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co. Kingsburg, CA | Madera Jr. High School, Yosemite Ave., Madera CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Easton Alcoa Elementary School, 29551 Avenue 12, Madera, CA | Carpenter | 1973 |
| Conklin Construction Co., Kingsburg, CA | Jackson Insurance Co. Building, Kingsburg, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O\ 5438 Fresno, CA | Braun-Percilis-Wagner Surveyors Building, Blackstone & Princeton Ave., Fresno, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | C.H. Baker Shoe Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1973-1991 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Riverdale High School, Riverdale, CA | Carpenter | 1974 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snyder
Miller
& Orton
LLP

4

<u>EXHIBIT B</u>

## EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Northside Professional Building, 1313 E. Herndon St., Fresno, CA | Carpenter (periodically) | 1974-1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | French's Mustard Plant, Muscat & Chestnut Ave., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | California State University, Fresno, 5241 N. Maple St., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Shaw & Sixth Streets, Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Eddie's Pastry Shop, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Perry Boys Smorgy, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jiffy Mart, Elm Avenue between Lincoln & Hopkins Sts., Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Fresno and Fulton Streets, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Equipment Co. Building, 4288 S. Bagly Avenue, Fresno, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Washington Elementary School, 1420 2nd and Bander Sts., Selma, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 12, Marks and Acacia Sts., Fresno, CA | Carpenter | 1977 |

Snyder
Miller
& Orton
LLP

5

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Minwana and Shaw Sts., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Bo Won Association Building, 9342 F Street, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Air Terminal, Lounge, Kitty Hawk Restaurant, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma Police Station, Selma, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma City Hall Building, Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Valley Pipe Supply Co. Building 801 Santa Clara St., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 7, Cherry Ave., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Heartland Elementary (aka Jefferson Elementary) Silvia & Thompson Sts., Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Lloyd's Bank, Shaw Avenue, Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | American Transfer Co. Bldg., 2810 E. Jensen St., Fresno, CA | Carpenter | 1979 |

Snyder
Miller
& Orton
LLP

6

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Long's Drug Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1979-1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Container Corporation of America Building, 2525 S. Sunland St., Fresno, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell Building, 334 DeWitt Avenue, Clovis, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Hopkins & Son Construction, Fresno, CA, various locations in and throughout Fresno, CA and northern CA | Carpenter | 1980-2/2002 |

## PARA OCCUPATIONAL EXPOSURE:

Decedent recalled working with his father, William Hopkins, deceased. Decedent worked on the new construction and demolition of various commercial buildings, including but not limited to: firehouses; shopping centers; schools; office buildings; bank buildings; restaurants; and public utility buildings. Decedent's exposure (and secondary exposure from his father's work clothes) to asbestos and asbestos-containing products occurred at various locations inside the State of California, including plaintiffs family residence located at 5774 S. Elm Street, Fresno, California.

     Decedent's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the decedent, including, but not limited to breathing difficulties, asbestosis, lung and/or other cancer, mesothelioma, and/or other lung damage. Decedent was diagnosed with mesothelioma on or about February 2002.

     Decedent stopped working on February 19, 2002, due to his mesothelioma.

Snyder
Miller
& Orton
LLP

7

EXHIBIT B

Hopkins v. Plant Insulation, et al.
San Francisco Superior Cour    CGC06450944

**PROOF OF SERVICE**

1

2    I, the undersigned, certify and declare as follows:

3    I am over the age of eighteen years and not a party to this action.  My business
address is One Market, Spear Street Tower, 32nd Floor, San Francisco, California.  On
4    the date stated below, at San Francisco, California, I served the attached document(s)
on the parties in this action as follows:

5

6    **APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION**

7

8

9

10    ☒    By causing the document listed above to be personally delivered to each
of the person(s) set forth below:

11

Robert A. Sacks                     Imperial Tobacco Canada Limited
12    Sullivan & Cromwell LLP             3711 West St-Antoine
1888 Century Park East              City of Montreal
13    Los Angeles, CA 90067               Province of Quebec, Canada H4C 3P6

14

15

16    I declare under penalty of perjury under the laws of the State of California that the
above is true and correct.

17    Executed this 14th day of April, 2006, at San Francisco, California.

18

19                                          Nyra Pierce

20

21

22

23

24

25

26

27

28
02914.00001
610747.1
PROOF OF SERVICE                                1

**Exhibit B-5**

Case no.CGC-06-450944

*UNITED STATES OF AMERICA*
*SUPERIOR COURT OF CALIFORNIA*
*(Unlimited juridiction)*
*COUNTY OF SAN FRANCISCO*

*BETWEEN:*

**MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY**

*Plaintiffs*

-and-

**PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.,; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100,**

*Defendants*

### AFFIDAVIT OF SERVICE

1. I, the undersigned, **ERIC MARTIN**, bailiff of Justice of the Province of Quebec, Canada, being duly sworn, having an elected domicile at 407, Saint-Laurent Street, in the city of Montreal, Province of Quebec, Canada, solemnly affirm the following:

2. I did on Tuesday, the 18th day of April 2006 at 15:05 serve the defendant, **IMPERIAL TOBACCO CANADA LIMITED**, herein named with a true copy of the within ATTESTATION, APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION and EXHIBIT "A", by delivering true copy, speaking to and leaving the same with ME TAMARA JITTO, Legal Advisor for IMPERIAL TOBACCO CANADA LIMITED, at 3711 West St-Antoine, in the city of Montreal, province of Quebec, Canada.

3. At the time and place of such service, the said person acknowledged to me that she was TAMARA JITTO, and at my request she produced her driver's license permit bearing no. G-3008-130870-01.

4. I certify that I have noted under my signature the date and hour of service on the back of the copy so served.

**SWORN BEFORE ME in the City of Montreal, in the Province of Quebec, Canada on April, 18**[TH]**, 2006**

COMMISSIONER OF OATHS

SUZY LODEC
# 64,850

ERIC MARTIN, Bailiff

Case no.CGC-06-450944

*UNITED STATES OF AMERICA*
*SUPERIOR COURT OF CALIFORNIA*
*(Unlimited juridiction)*
*COUNTY OF SAN FRANCISCO*

**BETWEEN:**

**MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY**

*Plaintiffs*

-and-

**PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.,; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100,**

*Defendants*

### AFFIDAVIT OF SERVICE

1. I, the undersigned, **ERIC MARTIN**, bailiff of Justice of the Province of Quebec, Canada, being duly sworn, having an elected domicile at 407, Saint-Laurent Street, in the city of Montreal, Province of Quebec, Canada, solemnly affirm the following:

2. I did on Tuesday, the 18th day of April 2006 at 15:05 serve the defendant, **IMPERIAL TOBACCO CANADA LIMITED**, herein named with a true copy of the within ATTESTATION, APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION and EXHIBIT "A", by delivering true copy, speaking to and leaving the same with ME TAMARA JITTO, Legal Advisor for IMPERIAL TOBACCO CANADA LIMITED, at 3711 West St-Antoine, in the city of Montreal, province of Quebec, Canada.

3. At the time and place of such service, the said person acknowledged to me that she was TAMARA JITTO, and at my request she produced her driver's license permit bearing no. G-3008-130870-01.

4. I certify that I have noted under my signature the date and hour of service on the back of the copy so served.

**SWORN BEFORE ME in the City of Montreal, in the Province of Quebec, Canada on April, 18TH , 2006**

_____
**COMMISSIONER OF OATHS**

SUZY LODEC
# 64,860

_____
**ERIC MARTIN, Bailiff**

**POS-040**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Jean L. Bertrand (CSB 083250)
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105
TELEPHONE NO.: 415.901.8700    FAX NO. *(Optional)*: 415.901.8701
E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name):* Plaintiff THE FLINTKOTE COMPANY

**F I L E D**
San Francisco County Superior Court

APR 2 0 2006

GORDON PARK-LI, Clerk
BY: _May Ann Mier_
                Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

PETITIONER/PLAINTIFF: MARLENE HOPKINS, et al.

RESPONDENT/DEFENDANT: PLANT INSULATION COMPANY, et al.

| CASE NUMBER: |
|---|
| CGC06450944 |

| **PROOF OF SERVICE—CIVIL** | |
|---|---|
| **Check method of service** *(only one):* | |

| | | |
|---|---|---|
| [X] By Personal Service | [ ] By Mail | [ ] By Overnight Delivery |
| [ ] By Messenger Service | [ ] By Facsimile | [ ] By E-Mail/Electronic Transmission |

| JUDGE: |
|---|
| DEPT.: |

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. At the time of service I was over 18 years of age and not a party to this action.

2. My address is *(specify one):*

  a. [X] Business:
  407 SAINT-LAURENT STREET,
  MONTREAL, QUEBEC, CANADA

  b. [ ] Residence:

3. On *(date):* APRIL 18, 2006    I served the following documents *(specify):*
APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

[ ] The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D)).

4. I served the documents on the persons below, as follows:
  a. Name of person served: TAMARA JITTO, LEGAL ADVISER FOR IMPERIAL TOBACCO CANADA LIMITED
  b. Address of person served: 3711 WEST ST-ANTOINE, MONTREAL, QUEBEC, CANADA

  c. Fax number or e-mail address of person served, if service was by fax or e-mail:

  d. Time of service, if personal service was used: 15:05 HOURS

  [ ] The names, addresses, and other applicable information about the persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

5. The documents were served by the following means *(specify):*

  a. [X] **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 4.
  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [New January 1, 2005] | **PROOF OF SERVICE—CIVIL**<br>(Proof of Service) | Legal<br>Solutions<br>Plus | Code of Civ. Proc., §§ 1011,<br>1013, 1013a, 2015.5 |

| CASE NAME HOPKINS, et al. v. PLANT INSULATION COMPANY, et al. | CASE NUMBER: CGC06450944 |
|---|---|

5  b. ☐ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 4 and *(specify one):*

    (1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2) ☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. ☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 4. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

f. ☐ **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  4/19/06

ERIC MARTIN, BAILIFF OF JUSTICE OF QUEBEC
    (TYPE OR PRINT NAME OF DECLARANT)

▶ _____
    (SIGNATURE OF DECLARANT)

*(If item 5d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

**DECLARATION OF MESSENGER**

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
    (NAME OF DECLARANT)

▶ _____
    (SIGNATURE OF DECLARANT)

POS-040 [New January 1, 2005]      **PROOF OF SERVICE—CIVIL**
                                **(Proof of Service)**

**Exhibit B-6**

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Jean L. Bertrand (CSB 083250)<br>MORGENSTEIN & JUBELIRER LLP<br>One Market, Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415.901.8700    FAX NO. *(Optional)*: 415.901.8701<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: Plaintiff THE FLINTKOTE COMPANY | **FILED**<br>San Francisco County Superior Court<br>APR 2 0 2006<br>GORDON PARK-LI, Clerk<br>BY: _May Ann Mera_ Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>STREET ADDRESS: 400 McAllister Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: San Francisco, CA 94102<br>BRANCH NAME: | |
| PLAINTIFF/PETITIONER: MARLENE HOPKINS, et al.<br><br>DEFENDANT/RESPONDENT: PLANT INSULATION COMPANY, et al. | CASE NUMBER:<br>CGC06450944 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents)*: NOTICE TO PLAINTIFF OF CASE MANAGEMENT CONFERENCE;<br>MEDIATION SERVICES BROCHURE AND ATTESTATION

3. a. Party served *(specify name of party as shown on documents served)*: IMPERIAL TOBACCO CANADA LIMITED

   b. Person served: [ ] party in item 3a  [X] other *(specify name and relationship to the party named in item 3a)*:<br>JOHN KISER, LEGAL ADVISOR FOR IMPERIAL TOBACCO CANADA LIMITED

4. Address where the party was served: 3711 WEST ST-ANTOINE, MONTREAL, QUEBEC, CANADA

5. I served the party *(check proper box)*
   a. [X] by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to<br>receive service of process for the party (1) on *(date)*: APRIL 7, 2006    (2) at *(time)*:14:10
   b. [ ] by substituted service. On *(date)*:           at *(time)*:           I left the documents listed in item 2 with or<br>in the presence of *(name and title or relationship to person indicated in item 3b)*:

      (1) [ ] (business) a person at least 18 years of age apparently in charge at the office or usual place of business<br>of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual<br>place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing<br>address of the person to be served, other than a United States Postal Service post office box. I informed<br>him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served<br>at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on<br>*(date)*:           from *(city)*:           or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER: MARLENE HOPKINS, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: PLANT INSULATION COMPANY, et al. | CGC06450944 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*     (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

    a. ☐ as an individual defendant.

    b. ☐ as the person sued under the fictitious name of *(specify):*

    c. ☐ as occupant.

    d. ☒ On behalf of *(specify):* IMPERIAL TOBACCO CANADA LIMITED

    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☒ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

    a. Name: ETIENNE MORIN, BALIFF OF JUSTICE OF THE PROVINCE OF QUEBEC, CANADA

    b. Address: 407 SAINT-LAURENT STREET, MONTREAL, QUEBEC, CANADA

    c. Telephone number:

    d. The fee for service was: $ 119.58 (CANADIAN)

    e. I am:

        (1) ☒ not a registered California process server.

        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

        (3) ☐ registered California process server:

            (i) ☐ owner ☐ employee ☐ independent contractor.

            (ii) Registration No.:

            (iii) County:

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 4/19/06

ETIENNE MORIN
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

(SIGNATURE)

Exhibit B-7

| | | | For Court Use Only |
|---|---|---|---|

*Attorney or Party without Attorney:*
JEAN L. BERTRAND, Bar #83250
MORGANSTEIN & JUBELIRER LLP
ONE MARKET, SPEAR STREET TOWER
32ND FLOOR
SAN FRANCISCO, CA 94105
*Telephone No:* 415-901-8700

*Attorney for:* Plaintiff, The Flintkote Company

*Ref. No. or File No.:* 2914.1

**F I L E D**
San Francisco County Superior Court

APR 2 0 2006

GORDON PAHK-LI, Clerk
BY: _____
Deputy Clerk

*Insert name of Court, and Judicial District and Branch Court:*
San Francisco County Superior Court, Civic Center Courthouse

*Plaintiff:* MARLENE HOPKINS, et al.

*Defendant:* Plant Insulation Company; Uniroyal Holding, Inc.; Imperial Tobacco Canada Limited; E

| **PROOF OF SERVICE HAND DELIVERY** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:* CGC06450944 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

3. a. *Party served:*        ROBERT E. SACKS @ SULLIVAN & CROMWELL LLP
    b. *Person served:*     DARLENE BISSADA, PERSON IN CHARGE OF OFFICE AT THE TIME OF SERVICE

4. *Address where the party was served:*     1888 CENTURY PARK EAST
                                      LOS ANGELES, CA 90067

5. *I served the party:*
    a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party on: Mon., Apr. 17, 2006 at: 11:30AM, to the person(s) indicated below in the manner as provided in 1011 CC
                DARLENE BISSADA, PERSON IN CHARGE OF OFFICE AT THE TIME OF SERVICE

    (1) **(Business)** I informed him or her of the general nature of the papers.

7. *Person Who Served Papers:*             Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. STEPHEN GROTH

                                           d. *The Fee for Service was:*

                                           e. I am: (3) registered California process server

**First Legal Support Services** ℠
ATTORNEY SERVICES
1511 BEVERLY BOULEVARD
Los Angeles, CA 90026
(213) 250-1111, FAX (213) 250-1197

                              *(i)*    Independent Contractor
                              *(ii)*    *Registration No.:*    5270
                              *(iii)*  *County:*           Los Angeles

*8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

Date: Tue, Apr. 18, 2006

                                        *(STEPHEN GROTH)*

Judicial Council Form             **PROOF OF SERVICE**                 6282122 *jeabe-mj.9435*
Rule 982.9.(a)&(b) Rev July 1, 2004     **HAND DELIVERY**

**Exhibit B-8**

## ATTESTATION

I, the undersigned, **Peter P. Meringolo,** Attorney, practicing law with the firm Snyder, Miller & Orton, LLP, residing and domiciled for the purposes hereof at 111 Sutter Street, Suite 1950, San Francisco, California, USA, 94104, am the attorney for The Flintkote Company and solemnly affirm that:

1.     I am a member of the California State Bar (CSB 197136).

2.     This copy is a certified true copy of :

- the FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF AGAINST ALTER EGO, FOR RECOVERY OF DIVIDENDS, FOR RECOVERY OF FRAUDULENT TRANSFERS, FOR DAMAGES BY REASON OF BREACH OF FIDUCIARY DUTY, FOR DAMAGES FOR BREACH OF DUTY AND NEGLIGENCE, TO ENFORCE CONSTRUCTIVE TRUST, FOR RESTITUTION, AND FOR DECLARATORY RELIEF

**SWORN TO BEFORE ME**, in the City of
_____
in the State of California, this _____
day of April, 2006.


**NOTARY PUBLIC**                                       **PETER P. MERINGOLO**
                                                        **SNYDER, MILLER & ORTON, LLP**


State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me this 28th day of April, 2006, by Peter P. MERINGOLO personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Jacob Koff, Notary Public

JACOB KOFF
COMM. #1569579
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires May 13, 2009

8107364.1

Apr. 27. 2006  2:58PM                                    No. 2023   P. 2

ENDORSED
FILED
San Francisco County Superior Court

APR 2 7 2006

GORDON PARK-LI, Clerk
BY: _____ MARIA SANCHEZ _____
                            Deputy Clerk

1 | ALAN R. BRAYTON (State Bar No. 073685)
  | GILBERT L. PURCELL (State Bar No. 113603)
  | DAVID R. DONADIO (State Bar No. 154436)
2 | BRAYTON PURCELL, LLP
  | 222 Rush Landing Road
3 | P.O. Box 6169
  | Novato, CA 94948-6169
4 | Telephone (415) 898-1555

5 | Attorneys for Plaintiffs Hopkins

6 | STEPHEN M. SNYDER (State Bar No. 054598)
  | JAMES L. MILLER (State Bar No. 071958)
7 | SNYDER MILLER & ORTON LLP
  | 111 Sutter Street, Suite 1950
8 | San Francisco, CA 94104
  | Telephone: (415) 962-4400
9 | Facsimile: (415) 962-4401

10 | Attorneys for The Flintkote Plaintiffs
   | (Additional Counsel Listed On Signature Page)

11

12 | SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

13 | COUNTY OF SAN FRANCISCO

14 | MARLENE HOPKINS, Individually, as             Case No. CGC06450944
   | Wrongful Death Heir, and as Successor-in-
15 | Interest to NORMAN HOPKINS, JR.,             FIRST AMENDED COMPLAINT FOR
   | Deceased; and MICHELLE HOPKINS, and          DAMAGES AND RELIEF AGAINST ALTER
16 | MICHAEL HOPKINS, as Legal Heirs of           EGO, FOR RECOVERY OF DIVIDENDS,
   | NORMAN HOPKINS, Deceased, THE                FOR RECOVERY OF FRAUDULENT
17 | FLINTKOTE COMPANY, THE OFFICIAL              TRANSFERS, FOR DAMAGES BY REASON
   | COMMITTEE OF THE ASBESTOS                    OF BREACH OF FIDUCIARY DUTY, FOR
18 | PERSONAL INJURY CLAIMANTS, and              DAMAGES FOR BREACH OF DUTY AND
   | JAMES J. MCMONAGLE as the LEGAL              NEGLIGENCE, TO ENFORCE
19 | REPRESENTATIVE FOR FUTURE                    CONSTRUCTIVE TRUST, FOR
   | ASBESTOS PERSONAL INJURY                     RESTITUTION, AND FOR DECLARATORY
20 | CLAIMANTS,                                   RELIEF.

21

22

23 |                  Plaintiffs,

24 |        vs.

25 | PLANT INSULATION COMPANY;
   | UNIROYAL HOLDING, INC.; IMPERIAL
26 | TOBACCO CANADA LIMITED;
   | SULLIVAN & CROMWELL LLP; and
27 | DOES 1 through 100,

28 |                  Defendants.

Snyder
Miller
& Orton
LLP

[00007643.DOC; 2]                            1

FIRST AMENDED COMPLAINT

May-02-2006  01:56pm  From-                                    T-204  P.004  F-949

1    Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, MICHAEL HOPKINS, THE

2    FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL

3    INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR

4    FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS allege:

5                          **PARTIES, JURISDICTION AND VENUE**

6        1.    Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,

7    "Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),

8    who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene

9    Hopkins is successor in interest to Decedent under California Code of Civil Procedure section

10   377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil

11   Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent

12   contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos

13   containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of

14   The Flintkote Company, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

15       2.    Plaintiff The Flintkote Company ("Flintkote") is, and at all relevant times, has been a

16   corporation organized and existing under the laws of the State of Delaware, with a principal place of

17   business in San Francisco, California, qualified to do and doing business in California.  For many

18   years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of

19   asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case

20   under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

21   Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the

22   "Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and

23   remains the debtor and debtor-in-possession in that case.  Subsequently, the Office of the United

24   States Trustee appointed Plaintiff The Official Committee of Asbestos Personal Injury Claimants

25   ("ACC") and the Bankruptcy Court appointed Plaintiff James J. McMonagle as the Legal

26   Representative for Future Asbestos Personal Injury Claimants ("FCR").  The ACC and FCR are the

27   only two official creditor constituencies in the Bankruptcy Case.  On April 27, 2006, the Bankruptcy

28   Court approved an agreement that authorized Flintkote, the ACC, and the FCR to collectively

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                               2

1  represent the interests of Flintkote's estate in this matter and, subject to any procedural limitations

2  applicable to party capacity in the above-entitled action, to be named and act as co-plaintiffs in this

3  action (the "April 27 Order").  Plaintiffs Flintkote, ACC, and FCR shall collectively be referred to

4  herein as "The Flintkote Plaintiffs."

5        3.       Defendant Plant Insulation Company ("Plant") is a California corporation, with its

6  principal place of business situated in the city and county of San Francisco.

7        4.       Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in

8  interest to Uniroyal, Inc.

9        5.       Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major

10  Canadian tobacco company.  It is a Canadian corporation formerly known as Imasco Limited and will

11  be referred to herein as "Imperial Tobacco" or "Imasco."  Imperial Tobacco has manufactured

12  cigarettes and other tobacco products in Canada for many years.  Its brands include "Players" and "du

13  Maurier" cigarettes.  Imperial Tobacco has sold and distributed its products in the United States,

14  including California, for many years.

15        6.       Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm.  S&C

16  maintains offices in California, among other places.  S&C is a citizen of California, in that there are

17  S&C partners who reside in and are citizens of California.

18        7.       Plaintiffs are ignorant of the true names and capacities of defendants sued under the

19  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

20  complaint may be amended to allege such names and capacities.  Each of the fictitiously named

21  defendants is responsible in some manner for the occurrences alleged hereafter.

22        8.       Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

23  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

24  seeks in part declaratory relief under California Code of Civil Procedure section 1060.  The Flintkote

25  Plaintiffs are authorized by virtue of the Bankruptcy Code and the April 27 Order to bring certain of

26  the causes of action, all of which arise under state law.

27        9.       Venue in the County of San Francisco is proper because defendants Imperial Tobacco

28  and S&C have no residence in California and can be sued in any county in California, and their

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                              3

FIRST AMENDED COMPLAINT

May-02-2006  01:57pm  From-                                                    T-204  P 006  F-949

1   liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

2   principal place of business situated in San Francisco.

3       10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

4   directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

5   the extent of losses held by them.  The alter ego claims by Hopkins and The Flintkote Plaintiffs

6   depend upon the same set of facts.  Pursuing such claims against a substantial well-financed

7   defendant is difficult and expensive, so that it is economically not practical for a single individual to

8   pursue them alone.  Accordingly, The Flintkote Plaintiffs and plaintiffs Hopkins have agreed to bring

9   the alter ego claims together as plaintiffs and to cooperate in prosecuting them.  Plaintiffs Hopkins

10  make no claim against S&C.

11                                      **FACTS**

12      11.    Flintkote manufactured and sold asbestos containing products for many years,

13  including vinyl asbestos floor tile, asbestos cement pipe and many other products.  Flintkote, through

14  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

15  through approximately 1970.  Beginning in or about 1972, Flintkote, along with many other

16  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

17  asbestos contained in its products who suffered from a variety of asbestos induced diseases.  The

18  number of asbestos cases filed against Flintkote and the other companies increased over time.

19      12.    In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

20  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

21  filed against it.  The bankruptcy filing was major news as Johns Manville was, absent the asbestos

22  litigation, a large and profitable American company.  Other companies named as defendants in the

23  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

| Company | Date of Filing Bankruptcy |
|---|---|
| UNR Industries | July 19, 1982 |
| Amatex Corporation | November 1, 1982 |
| Forty-Eight Insulations, Inc. | April 19, 1985 |
| Standard Insulation | August 4, 1986 |
| Nicolet | July 17, 1987 |

28      13.    A number of defendants regularly sued in the asbestos litigation banded together in the

early 1980's and sought to settle disputes with their insurers where possible and establish a facility
that would provide an efficient joint defense to members of the group. The discussions were
mediated by Dean Harry Wellington of the Yale Law School. The participants became known as the
"Wellington Group." By June 1985 they had signed an agreement and had begun to operate as the
Asbestos Claims Facility ("ACF").

14.    Flintkote was a member of the ACF and, for a while, asbestos cases against it were
defended and settled or tried by lawyers selected by the Asbestos Claims Facility. The ACF defense
arrangements were initially advantageous to Flintkote as they allowed the company to defend
asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that
would be more quickly consumed if it was required to defend cases on its own. The ACF operated
through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as
to appropriate defense strategies and as to how costs should be allocated among participants.

15.    Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-
related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to
information which pointed to the threatening scope of the asbestos litigation to follow. That
information included:

- The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos
  defendants, which increased the payment shares in the tort system of the surviving
  companies;

- Numbers of claims filings were increasing and claims values were increasing;

- Diseases caused by asbestos exposure could have a latency period of decades, which
  meant liabilities would extend far into the future;

- Commercial usage of asbestos in the United States continued to increase through the
  1970's, with significant implications for future morbidity;

- Inability to extend the asbestos litigation to include significant responsible parties,
  such as the United States Government and the tobacco companies, all of whom had
  contributed to the diseases and injuries of asbestos victims;

- Unmistakable signals from casualty insurers that they could not be counted on by

Snyder
Miller
& Orton
LLP

(00007643.DOC; 2)                              5

FIRST AMENDED COMPLAINT

1    defendant companies in the face of ever-increasing demands, with signs from some
2    that they would not survive. By mid-1987, two of Flintkote's insurers had become
3    insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach
4    agreements as to coverage with only 60% of its insurers;

5    •    Substantial disagreements among ACF members that weakened the effectiveness of
6    the ACF and hastened its demise. These disagreements were apparent as early as
7    1986. There were clear indicators that members were going to leave the ACF, and
8    seven did so in 1987. Persons knowledgeable about the operations and functioning of
9    the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF
10    would not continue to operate indefinitely as originally agreed upon and also knew or
11    should have known that disintegration of the ACF was likely in the foreseeable future.

12    16.    Imasco was quite familiar with the American asbestos litigation. It followed and
13    monitored that litigation for a variety of reasons, including that it knew there was a synergistic or
14    combinative effect which produced increased disease rates in persons who smoked its tobacco
15    products and who were also exposed to asbestos. Consequently Imasco understood that the litigation
16    posed risks to corporate and insurer solvency.

17    17.    In the 1980s, Imasco was engaged in a program of corporate diversification.
18    Specifically, it was seeking to acquire non-tobacco businesses. One target of Imasco's diversification
19    program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada
20    Trustco"). But, Canada Trustco had been acquired by another Canadian company, Genstar
21    Corporation. So, in order to get control of Canada Trustco, Imasco, operating through a corporate
22    subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar
23    Corporation ("Genstar"). At the time Genstar had a number of businesses and subsidiary
24    corporations, including several in the United States. Genstar was Flintkote's ultimate parent
25    company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.
26    Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco
27    common shares.

28    18.    From the outset, Imasco's strategy was to use the value of Genstar's assets, other than

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                6

FIRST AMENDED COMPLAINT

1  Canada Trustco, to finance the purchase of Canada Trustco.  The strategy therefore involved

2  restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada

3  Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for

4  the hostile takeover.

5        19.    Imasco acquired Genstar in August 1986.  Then, as it had planned to do, it set about

6  selling most of Genstar's assets and businesses (other than Canada Trustco).  To implement this

7  scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding.  First it required

8  Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then

9  transferring Flintkote's valuable operating assets to them.  Then, Imasco caused Flintkote to sell each

10 of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had

11 been created previously.  Those sales were made to third parties for cash.

12        20.    Gross proceeds from the sales of the Flintkote assets were approximately

13 $663,500,000 U.S., plus $100,000,000 Canadian.  The sales were completed by February 27, 1987.

14 These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

15 California.  Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

16 planned liquidation and sale of the Flintkote assets.  At Imasco's direction, S&C began representing

17 Flintkote and gave it legal advice in connection with the asset liquidation.  S&C continued to

18 represent its original client Imasco in connection with the liquidation throughout the process and

19 thereafter.  Flintkote did not give informed written consent to S&C representing both Flintkote and

20 Imasco.

21        21.    After these transactions, Flintkote's valuable operating businesses were gone.  Their

22 profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

23 Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

24 much of which was contested by the insurers who had written the policies.  The cash and insurance

25 were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

26 However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

27 Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

28 it expended in the hostile takeover of Genstar.  Imasco decided to transfer the cash out of Flintkote

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                              7

FIRST AMENDED COMPLAINT

1  and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

2  dividends to be paid out by Flintkote.

3      22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

4  San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

5  was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

6  corporation of Flintkote.

7      23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

8  to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

9  the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

10  Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

11  that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

12  Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

13  advised the Flintkote board that it had received preliminary advice from the consultant, and that there

14  was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

15  declare the dividend. S&C told the board that it did not believe the consultant's final report would

16  alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

17  Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

18  knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

19  it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

20  dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

21  show that the board was informed of that fact.

22      24.    Stating that it was doing so in accordance with previous undertakings and "as an

23  inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

24  such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

25  them harmless against any and all actions, suits or claims arising out of their actions, omissions or

26  conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

27      25.    Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

28  meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}        8

FIRST AMENDED COMPLAINT

1    determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

2    that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

3    to replace funds to Flintkote to the extent required by an appropriate judicial body.

4        26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

5    dividend to be paid.

6        27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

7    of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

8    1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

9    corporations and entities that it controlled and dominated.

10       28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

11   and were representing Imasco, including with respect to Flintkote-related issues, such as the

12   consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

13   face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those

14   same issues, and on the issue of the director's liability in connection with declaring dividends to

15   Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were

16   present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal

17   memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the

18   board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant

19   S&C had retained and whose preliminary report was used by S&C in connection with the December

20   1986 board meeting.

21       29.    The board minutes of the July 1987 meeting reflect that after payment of the

22   dividends, Flintkote would have left retained earnings and paid-in capital of approximately

23   $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed

24   $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure

25   taken from the RPC study was $42,000,000.

26       30.    In the July 22, 1987 board meeting, the board members were told that Imasco would

27   undertake to restore dividend monies to the extent the declared dividends were deemed legally

28   improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          9

FIRST AMENDED COMPLAINT

1    a writing memorializing the understanding. After the meeting, Imasco issued a letter dated July 27,

2    1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends

3    declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent

4    jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets

5    because of dividends finally determined to have been improperly paid during Imasco's indirect

6    ownership of Flintkote. A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is

7    attached as Exhibit A and incorporated by reference.

8         31.    The S&C legal memorandum and the RPC study, both supplied by Imasco's and

9    Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to

10   be paid, as was Imasco's plan from the time it took over Genstar.

11        32.    S&C's relationship with Imasco supplied reason to structure S&C's advice so as to

12   ensure that Flintkote would pay the dividends. The S&C memorandum contained substantial errors,

13   omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

14   of Flintkote's payment of these dividends, including the following.

15        33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote. However,

16   it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

17   declare the dividend yet escape personal liability for doing so. The memorandum is vague and

18   indefinite as to Flintkote's obligations as a corporation.

19        34.    The S&C memorandum contains legal analysis, including discussion of California

20   law. In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

21   Conveyance Act. S&C wrote that a conveyance could be set aside if the debtor would be rendered

22   insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

23   existing debts as they became absolute and matured. S&C advised Flintkote that it was unclear

24   whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

25   not yet manifested itself – were considered existing debts. That advice misapprehended the

26   controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

27   fixed or contingent. S&C also did not alert Flintkote that under California law, as well as in other

28   jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    10

FIRST AMENDED COMPLAINT

1  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

2  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

3  solvent. *See Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

4      35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

5  changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

6  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

7  would incur debts beyond his ability to pay as they became due. The new statute therefore

8  incorporated an objective test specifically looking to the incurring of future debts. This test was in

9  addition to rules making fraudulent those transfers without fair consideration where the debtor was

10  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

11  which its remaining assets were unreasonably small in relation to the business.

12      36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

13  RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending

14  and possible future asbestos-related property damage claims against Flintkote, but only "to consider"

15  asbestos personal injury claims. RPC devoted cursory treatment to Flintkote's asbestos-related

16  personal injury claims. RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos

17  personal injury claims. The RPC report thus was based on an assumption, known to be questionable

18  by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to

19  Flintkote for 14 years. S&C assured Flintkote that directors were entitled to rely upon statements in

20  an appraisal by an appraiser selected by the board. Although it was not an appraisal under Delaware

21  law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury

22  liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC

23  report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors

24  could rely. Imasco and S&C did not advise the directors to seek an independent expert analysis

25  regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain

26  independent counsel without a conflict of interest.

27      37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and

28  developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-

{00007643.DOC: 2}                    11

FIRST AMENDED COMPLAINT

1  related personal injury liabilities.

2        38.   S&C labored under a conflict of interest when it undertook to represent and advise

3  Flintkote while still representing Imasco.  Flintkote, a company facing substantial and increasing

4  asbestos-related claims, was obliged to consider and evaluate the interests of existing and future

5  creditors before paying out $525,200,000 in dividends.  In contrast, Imasco had every interest in

6  obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all

7  along.  S&C represented both Imasco and Flintkote, with plainly conflicting interests.  The

8  declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading

9  legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which

10  was procured by S&C for the specific purpose of attempting to justify the legal propriety of the

11  dividends.

12        39.   Imasco improperly caused the dividends to be paid by telling the Flintkote board:

13      &bull;    our lawyers, acting as your lawyers, together with their consultants, say you can do it;

14      &bull;    to induce you to pay us we agree to protect you if someone sues you; and

15      &bull;    if we are wrong about this and creditors are left unsatisfied and a court finally decides

16          the dividends were improper, we will pay them back.

17        40.   From the time Imasco acquired Genstar in August 1986, through September 29, 2003,

18  Imasco held and maintained complete control over and dominated Flintkote through Imasco's

19  indirect 100% ownership of Flintkote.  Flintkote was in no position to assert claims against Imasco or

20  to sue Imasco.  S&C continued to act as an instrument of Imasco, guiding and giving legal advice to

21  Flintkote, including with respect to the matters alleged herein, until September of 2003.  Imasco's

22  plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote,

23  and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as

24  long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the

25  goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten

26  alter ego liability upon Imasco for Flintkote's asbestos-related claims.  That Flintkote had been

27  injured by wrongful acts leading to the dividends was inherently unknowable, depending upon

28  expertise available only to sophisticated professionals such as S&C and RPC.  S&C did not disclose

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          12

FIRST AMENDED COMPLAINT

1    to Flintkote that it had rights with respect to the dividends.

2         41.    From and after the divestiture of its subsidiaries and payment of the dividends,

3    Flintkote operated as an asbestos claims resolution facility.  Imasco exercised its domination and

4    control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and

5    Imasco Holdings Group, Inc. (collectively, "IHI").  IHI took its orders from Imasco.  IHI attorneys

6    were involved in the claim resolution process.  Flintkote consistently obtained releases for its parent

7    companies, including Imasco, in settlements with asbestos claimants.  Flintkote and IHI shared

8    common officers and directors.  Employees of Imasco or IHI were involved in management of

9    Flintkote.  S&C continued to advise Imasco or IHI and Flintkote on what should be done with

10   Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related

11   liabilities.  Flintkote handled its own asbestos liabilities, rather than join the Center for Claims

12   Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

13   Imasco therefore maintained control over the handling of the claims.  Following the dividends, as a

14   claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical.  Flintkote

15   continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

16   involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

17   critical issue of asbestos liability.  The goals of Imasco throughout were to forestall any liability to

18   repay the dividend and to confine the asbestos-related liabilities to Flintkote.

19        42.    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

20   it had taken and used the money to reimburse itself for funds it had expended for buying the one

21   business it did want, Genstar's Canada Trustco, a financial services company in Canada.  After

22   Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

23   to satisfy its asbestos-related personal injury liabilities.

24        43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

25   financial statements.  It did not publicly disclose its true financial condition and the nature and extent

26   of its asbestos liabilities.  Instead, Imasco, as Flintkote's ultimate parent corporation filed public

27   financial statements in Canada that purported to represent Flintkote's financial condition.  Imasco

28   represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          13

FIRST AMENDED COMPLAINT

1  Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

2  represented, with respect to Flintkote's financial condition, that

3      [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

4      subject to numerous claims and suits, some of which allege significant damage. In the opinion of

5      management, all such claims and suits are adequately covered by insurance, or are provided for in

6      the financial statements, or if not so covered or provided for, the results are not expected to

7      material affect the Corporation's financial condition.

8  Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

9  repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

10 within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

11 as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

12 alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

13 had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

14 became due and were made in violation of California and other law, including California's Uniform

15 Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

16 applicable limitation period.

17      44.    In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

18 Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

19 subsidiary of Navigant Consulting, Inc. ("Navigant"). Navigant issued a report dated August 19,

20 2003. The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

21 billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

22 $3.4781 billion.

23      45.    In September, 2003, the shares of Flintkote stock were transferred to a trust, and

24 Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

25                          **FIRST CAUSE OF ACTION**

26  **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –**
                          **Wrongful Death)**

27      46.    Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

28 paragraphs 1 through 45, inclusive.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    14

                    FIRST AMENDED COMPLAINT

47.    At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an alter ego of Flintkote, and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving, certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain product, namely asbestos and other products containing asbestos.

48.    At all times mentioned, said defendants, and each of them, singularly and jointly, negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, and other products containing asbestos, in that said products caused personal injuries to users, consumers, workers, bystanders and others, including the Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said products hazardous, unsafe, and dangerous for use by "exposed persons."

49.    Said defendants, and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

50.    Said defendants, and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos and related products and equipment, would be transported by truck, rail, ship, and other common carriers, that in the shipping process the product would break, crumble, or otherwise be damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping, hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    15

FIRST AMENDED COMPLAINT

1  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

2  persons working in proximity to said products, directly or through reentrainment.

3      51.    Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

4  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

5  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

6  employment status is, on current information and belief, as set forth at various locations and

7  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

8      52.    Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

9  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

10 perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

11 asbestos-containing products over a period time.

12     53.    Decedent suffered from a condition related to exposure of asbestos and asbestos-

13 containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-

14 containing products presented risk of injury and/or disease.

15     54.    As a direct and proximate result of the aforesaid conduct of said defendants, and each

16 of them, Decedent suffered permanent injuries to his person, body, and health, including, but not

17 limited to, asbestosis, other lung damage, and cancer and related sequelae, and the mental and

18 emotional distress attendant thereto, and ultimately death, from the effect of exposure to asbestos

19 fibers, all to his general damage in the sums to be proven at trial.

20     55.    As a direct and proximate result of the aforesaid conduct of said defendants, and each

21 of them, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine,

22 hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to

23 plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when the true and

24 exact cost thereof is ascertained. As a direct and proximate result of the aforesaid conduct of said

25 defendants, and each of them, Decedent incurred liability for the reasonable value of medical care

26 provided by Decedent's family members measured by, inter alia, the costs associated with the hiring

27 a registered nurse, home hospice, or other service provider, the true and exact amount thereof being

28 unknown to plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          16

FIRST AMENDED COMPLAINT

1    the true and exact costs are known or at time of trial.

2       56.    As a further direct and proximate result of the said conduct of said defendants, and

3 each of them, Decedent incurred loss of income, benefits, entitlements, wages, profits, and

4 commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and

5 extent of which are not yet known to plaintiffs; and leave is requested to amend this complaint to

6 conform to proof at the time of trial.

7       57.    As a further direct and proximate result of the said conduct of said defendants, and

8 each of them, Decedent's exposure to asbestos and asbestos-containing products caused severe and

9 permanent injury to Decedent, and ultimately Decedent died on September 27, 2005.

10       58.    Said defendants, and each of them, and their officers, directors and managing agents

11 participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should

12 have known of, each of the acts set forth herein.

13       59.    The herein-described conduct of said defendants, and each of them, was and is

14 despicable, willful, malicious, fraudulent, outrageous, and in conscious or reckless disregard and

15 indifference to the safety, health, and rights of "exposed persons", including decedent herein, giving

16 rise to decedent's claim herein alleged for punitive damages against said defendants.

17       60.    At all times prior to his death, Decedent was a faithful and dutiful spouse to plaintiff

18 Marlene Hopkins, and parent to plaintiffs Michelle and Michael Hopkins.

19       61.    As a direct and proximate result of the conduct of said defendants, and each of them,

20 and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of

21 care, society, comfort attention, services, and support of Decedent all to the damage of decedent's

22 heirs.

23       62.    As a further direct and proximate result of the conduct of said defendants, and each of

24 them, and the death of Decedent, decedent's heirs have incurred funeral expenses in an amount

25 currently not ascertained.

26       63.    As a direct and proximate result of the acts, omissions, and conduct of said, and each

27 of them, as aforesaid, Decedent's exposure to harm or the Decedent as set forth in Exhibit B, attached

28 to the complaint and incorporated by reference herein.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                                    17

FIRST AMENDED COMPLAINT

64.    Decedent's personal injury claim against Flintkote was resolved by Judgment filed June 25, 2003, following Flintkote's acceptance of an offer to compromise in action number 408556 in this court.

65.    Imasco completely dominated and controlled Flintkote, deliberately requiring Flintkote to divest itself of its operating businesses and assets solely for the benefit of Imasco. After the divestiture of its businesses, Flintkote did not manufacture or market any products or render any services to third parties. It served only as a vehicle for Imasco, resolving asbestos and other claims, including obtaining releases for Imasco, and prosecuting insurance coverage claims. By causing Flintkote to convert its assets and businesses to cash, and then stripping Flintkote of $525,200,000, most of that cash, Imasco prevented Flintkote both from benefiting from the operating profits of the sold businesses and/or from investing the sale proceeds and using the principal plus earnings to pay claims.

66.    In the years following the dividends, Flintkote's benefit programs were administered by Imasco's subsidiary, IHI. Flintkote, with IHI, filed consolidated financial statements and tax returns.

67.    There became in 1986 and 1987 and thereafter such a unity of interest, and of ownership since Imasco owned indirectly 100% of Flintkote, that separate personalities of Flintkote and Imasco no longer existed. If the companies are treated as separate, inequitable results will follow.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

## SECOND CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Products Liability – Wrongful Death)**

68.    Plaintiffs Hopkins incorporate by reference each and all the allegations of the First Cause of Action.

69.    Defendants Plant, Uniroyal, and Imperial Tobacco, knew and intended that the above-referenced asbestos and asbestos-containing products, would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                                18

FIRST AMENDED COMPLAINT

1   hazards involved in such use.

2        70.    Said asbestos and asbestos-containing products were defective and unsafe for their

3   intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease and/or

4   death.  The defect existed in the said products at the time they left the possession of defendants, and

5   each of them.  Said products did, in fact, cause personal injuries, including asbestosis, other lung

6   damage, cancer, and death to "exposed persons", including Decedent herein, while being used in a

7   reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

8        71.    "Exposed persons" did not know of the substantial danger of using said products.  Said

9   dangers were not readily recognizable by "exposed persons".  Said defendants, and each of them,

10  further failed to adequately warn of the risks to which decedent and others similarly situated were

11  exposed.

12       72.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to

13  test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale,

14  supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,

15  representing, endorsing, servicing, installing, contracting for installation, repairing, marketing,

16  warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-

17  containing products, said defendants, and each of them, did so with conscious disregard for the safety

18  of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in

19  that said defendants, and each of them, had prior knowledge that there was a substantial risk of injury

20  or death resulting from exposure to asbestos or asbestos-containing products, including, but not

21  limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from

22  scientific studies performed by, at the request of, or with the assistance of, said defendants, and each

23  of them, and which knowledge was obtained by said defendants, and each of them on or before 1930,

24  and thereafter.

25       73.    On or before 1930, and thereafter, said defendants, and each of them, were aware that

26  members of the general public and other "exposed persons", who would come in contact with their

27  asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos

28  or asbestos-containing products could cause injury, and said defendants, and each of them, knew that

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          19

1  members of the general public and other "exposed persons", who came in contact with asbestos and

2  asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and

3  asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health

4  and human life.

5         74.    With said knowledge, said defendants, and each of them, opted to research, manufacture,

6  fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install,

7  contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said

8  asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn

9  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing

10  products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high

11  risk of injury or death resulting from exposure to asbestos and asbestos-containing products, said

12  defendants, and each of them, intentionally failed to reveal their knowledge of said risk, and

13  consciously and actively concealed and suppressed said knowledge from "exposed persons" and

14  members of the general public, thus impliedly representing to "exposed persons" and members of the

15  general public that asbestos and asbestos-containing products were safe for all reasonably

16  foreseeable uses. Said defendants, and each of them, engaged in this conduct and made these

17  implied representations with the knowledge of the falsity of said implied representations.

18         75.    The above-referenced conduct of said defendants, and each of them, was motivated by

19  the financial interest of said defendants, and each of them, in the continuing, uninterrupted research,

20  design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer

21  for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing,

22  warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

23  otherwise directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing

24  products. In pursuance of said financial motivation, said defendants, and each of them, consciously

25  disregarded the safety of "exposed persons" and in fact were consciously willing and intended to

26  permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced

27  persons to work with and be exposed thereto, including plaintiff.

28         76.    Plaintiffs allege that the aforementioned defendants, and each of them impliedly warranted their

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    20

FIRST AMENDED COMPLAINT

1  asbestos and asbestos-containing products, to be safe for their intended use, but that their asbestos and asbestos-

2  containing products, created an unreasonable risk of bodily harm to exposed persons.

3      77.   Decedent relied upon defendants', and each of their representations, lack of warnings, and

4  implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable, and

5  proximate result thereof, Decedent suffered permanent injury and death as alleged herein.

6      78.   As a direct and proximate result of the actions and conduct outlined herein,

7  Plaintiffs Hopkins have suffered the injuries and damages herein alleged.

8      WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal,

9  and Imperial Tobacco as set forth below.

10  

**THIRD CAUSE OF ACTION**

11  **(By Plaintiff Marlene Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Loss of Consortium)**

12      79.   Plaintiff Marlene Hopkins re-alleges and incorporates by reference each and all the

13  allegations of the First and Second Causes of Action.

14      80.   Decedent and plaintiff Marlene Hopkins were married on February 18, 1961, and at all

15  times relevant to this action were husband and wife.

16      81.   Prior to Decedent's injuries as alleged, Decedent was able and did perform duties

17  as a spouse. Subsequent to the injuries and as a proximate result thereof, and until Decedent's

18  death, Decedent was unable to perform the necessary duties as a spouse and the work and service

19  usually performed in the care, maintenance, and management of the family home. As a

20  proximate result thereof, plaintiff Marlene Hopkins was permanently deprived of the consortium of

21  her spouse, including the performance of duties, all to plaintiff Marlene Hopkin's damages, in an

22  amount presently unknown to plaintiff, but which will be proved at the time of trial.

23      82.   Plaintiff Marlene Hopkins' discovery of the cause of Decedent's loss of consortium, as

24  herein alleged, first occurred within one year last past from the filing of this Complaint.

25      83.   As a direct and proximate result of the acts of said defendants, and the severe injuries

26  and death caused thereby to Decedent as set forth in this complaint, plaintiff Marlene Hopkins has

27  suffered loss of consortium, including but not by way of limitation, loss of services, marital relations,

28  society, comfort, companionship, love, and affection of said spouse, and has suffered severe mental

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}       21

FIRST AMENDED COMPLAINT

1  and emotional distress, and general nervousness as a result thereof.

2      WHEREFORE, plaintiff Marlene Hopkins prays judgment against defendants Plant,

3  Uniroyal, and Imperial Tobacco as set forth below.

4
5                         **FOURTH CAUSE OF ACTION**
       **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for Negligence -- Survival)**

6      84.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

7  of the First Cause of Action.

8      85.    Plaintiffs bring this action pursuant to California Code of Civil Procedure section

9  377.30 et. seq.  As a direct and proximate result of the actions and conduct outlined herein, Decedent

10 suffered the injuries and damages herein alleged.  Plaintiffs are entitled to recover all damages

11 sustained by Decedent as alleged above.

12     WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

13 set forth below.

14                        **FIFTH CAUSE OF ACTION**
       **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal to Products Liability -- Survival)**
15
16     86.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

17 of the First and Second Causes of Action.

18     87.    As a direct and proximate result of the exposure to defendants' products and the

   conduct outlined herein, Decedent has suffered the injuries and damages herein alleged.
19
20     88.    Plaintiffs Hopkins are entitled to recover all damages sustained by Decedent as alleged

   above.
21
22     WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

23 set forth below.

24                        **SIXTH CAUSE OF ACTION**
       **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for False Representation Under**
                   **Restatement of Torts Section 402-B -- Survival)**
25
26     89.    Plaintiffs Hopkins re-allege and incorporates by reference each and all the allegations

   of the First and Second Causes of Action.
27
28     90.    At the aforementioned time when defendants Plant and Uniroyal, and each of them,

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                              22

                         FIRST AMENDED COMPLAINT

1  researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately

2  warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

3  sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented,

4  endorsed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for

5  others, packaged, and advertised the said asbestos and asbestos-containing products, as hereinabove

6  set forth, the defendants, and each of them, expressly and impliedly represented to members of the

7  general public, including the purchasers and users of said product, and other "exposed persons",

8  including the decedent herein and his employers, that asbestos and asbestos-containing products,

9  were of merchantable quality, and safe for the use for which they were intended.

10     91.    The purchasers and users of said asbestos and asbestos-containing products, and other

11  "exposed persons", including the Decedent and his employers, relied upon said representations of

12  said defendants, and each of them, in the selection purchase, and use of asbestos and asbestos-

13  containing products.

14     92.    Said representations by defendants, and each of them, were false and untrue, and

15  defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products,

16  were not safe for their intended use, nor were they of merchantable quality as represented by

17  defendants, and each of them, in that asbestos and asbestos-containing products have very dangerous

18  properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and

19  have other defects that cause injury and damage to the users of said products and other "exposed

20  persons", thereby threatening the health and life of said persons including decedent herein.

21     93.    As a direct and proximate result of said false representations by defendants, and each of

22  them, the Decedent suffered injury and death as set forth.

23     WHEREFORE, plaintiffs pray judgment against defendants Plant and Uniroyal, set forth

24  below.

25                      <u>SEVENTH CAUSE OF ACTION</u>

26  **(By Plaintiffs Hopkins Against Defendant Plant for Contractor Liability)**

27     94.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

28  of the First and Second Causes of Action.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                           23

FIRST AMENDED COMPLAINT

95.    At all times mentioned herein, defendant Plant, owned, leased, maintained, managed, and/or controlled the premises listed on Exhibit B where Decedent was present. The information provided on Exhibit B is preliminary, based on recall over events covering many years and further investigation and discovery may produce more reliable information.  Additionally, Decedent might have been present at these or other of Plant's premises at other locations and on other occasions.

96.    Prior to and at said times and places, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid respective premises, by their own workers and/or by various unqualified or unskilled contractors and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to decedent and other persons exposed to said asbestos fibers and toxic substances while present at said premises.

97.    At all times mentioned herein, said defendant Plant knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to decedent and other workers or persons so exposed present on each of the aforesaid respective premises.

98.    At all times relevant herein, Decedent entered said premises and used or occupied each of said respective premises as intended and for Plant's benefit and advantage and at Plant's request and invitation.  In so doing, Decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said defendant Plant.

99.    Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

100.    At all times mentioned herein, Defendant Plant remained in control of the premises where Decedent was performing his work.

{00007643.DOC; 2}                          24

FIRST AMENDED COMPLAINT

101.    At all times mentioned herein, defendant Plant owed to decedent and others similarly situated a duty to exercise

ordinary care in the management of such premises so as to avoid exposing workers such as decedent to an unreasonable risk of harm and to avoid causing injury to said person.

102.    At all times mentioned herein, defendant Plant, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforementioned hazardous conditions to which they were exposed on the premises.

103.    At all times mentioned herein, defendant Plant negligently failed to maintain, manage, inspect, survey, or control said premises, or to abate, or correct, or to warn decedent of, the existence of the aforesaid dangerous conditions and hazards on or about said premises.

104.    Prior to and at the times and places aforesaid, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured decedent.

105.    At all times mentioned herein, defendant Plant:

　　a.    Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would harm decedent and others unless special precautions were taken;

　　b.    Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled, unlicensed, or otherwise unqualified to do so;

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    25

FIRST AMENDED COMPLAINT

1           c.   Failed to use reasonable care to discover whether the contractors it selected and

2 hired to install, remove, abate, or otherwise handle asbestos-containing materials were

3 competent, or qualified to do so.

4         106.   In part, Decedent was exposed to dangerous asbestos fibers and other toxic

5 substances by reason of such contractors' failure to take the necessary precautions.

6        107.   The work of contractors on premises controlled by defendant Plant created an unsafe premise

7 and an unsafe work place by reason of the release of dangerous quantities of toxic substances, including but not

8 limited to asbestos.

9        108.   Prior to and at said times and places, defendant Plant was subject to certain ordinances,

10 standards, statutes, and other government regulations promulgated by the United States Government,

11 the State of California, and others, including but not limited to the General Industry Safety Orders

12 promulgated pursuant to <u>California Labor Code</u> § 6400 and the <u>California Administrative Code</u> under

13 the Division of Industrial Safety, Department of Industrial Relations, including but not limited to

14 <u>Title VHL</u> Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and §

15 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under

16 Appendix A, Table 1 of said Safety Orders; additionally, <u>California Health and Safety Code</u> § 40.200,

17 <u>et seq.</u>, which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate

18 regulations including, but not limited to <u>B.A.A.O.D. Regulation</u> 11, Rules 2 and 14, Title 40 <u>Code of</u>

19 <u>Federal Regulations</u>. Chapter 1, Part 61, <u>et seq.</u> -- The National Emission Standards for Hazardous Air

20 Pollutants, which required defendant Plant to provide specific safeguards or precautions to prevent or

21 reduce the inhalation of asbestos dust and other toxic fumes or substances; and said defendant Plant

22 failed to provide the required safeguards and precautions. Defendant's violations of said codes

23 include, but are not limited to:

24        (a)   Failing to comply with statutes and allowing ambient levels of airborne

25 asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned

26 statutes;

27        (b)   Failing to segregate work involving the release of asbestos or other toxic

28 dusts;

Snyder
Miller
& Orton
LLP

(00007643.DOC; 2)                              26

FIRST AMENDED COMPLAINT

(c)    Failing to suppress dust using prescribed ventilation techniques;

(d)    Failing to suppress dust using prescribed "wet down" techniques;

(e)    Failing to warn or educate decedent or others regarding asbestos or other toxic substances on the premises;

(f)    Failing to provide approved respiratory protection devices;

(g)    Failing to ensure "approved" respiratory protection devices were used adequately;

(h)    Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

(i)    Failing to provide adequate housekeeping and clean-up of the work place;

(j)    Failing to adequately warn of the hazards associated with asbestos as required by these statutes;

(k)    Failing to adequately report renovation and disturbance of asbestos-containing materials, including but not limited to B.A.A.O.M.D. Regulation 11, Rules 2 and 14;

(l)    Failing to have an asbestos removal supervisor as required by regulation;

(m)    Failing to get approval for renovation as required by statutes; and

(n)    Failing to maintain records as required by statute.

109.    Defendant Plant was the "statutory employer" of decedent as defined by the California Labor Code and California case law.

110.    Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by defendant's violation of said regulations, ordinances, or statutes.

111.    At all times mentioned herein, Decedent was a member of the class of persons whose safety was intended to be protected by the regulations, standards, statutes, or ordinances described in the foregoing paragraphs.

112.    At all times mentioned herein, said defendant Plant, knew, or in the exercise of

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    27

FIRST AMENDED COMPLAINT

1  ordinary and reasonable care should have known, that the premises that were in its control would be

2  used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present

3  and using said premises would not be aware of the aforesaid hazardous conditions to which they were

4  exposed on the premises, and that such persons were unaware of the aforesaid violations of codes,

5  regulations, and statutes.

6      113.    As a proximate result of the foregoing, Decedent developed asbestos-related illness,

7  which has caused great injury and disability to Decedent, and ultimately death, as previously set

8  forth, and plaintiffs have suffered damages as herein alleged.

9      WHEREFORE, plaintiffs Hopkins pray judgment against defendant Plant, as set forth below.

10              **EIGHTH CAUSE OF ACTION**
   **(By The Flintkote Plaintiffs Against Imperial Tobacco For Declaration of Alter Ego Liability)**

11     114.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

12  allegations of paragraphs 1 through 45 and 65 through 67, inclusive.

13     115.    An actual controversy exists between The Flintkote Plaintiffs and Imperial Tobacco

14  arising from Imasco's domination and control of Flintkote, including Imasco's causing Flintkote to

15  create the subsidiaries, isolate the asbestos liabilities, sell the subsidiaries, and declare and pay the

16  Dividends, and the use of Flintkote by Imasco solely for Imasco's own purposes, as set forth herein.

17     116.    The Flintkote Plaintiffs contend that Imperial Tobacco is Flintkote's alter ego and is

18  responsible to pay asbestos-related claims asserted against Flintkote, such that if The Flintkote

19  Plaintiffs are correct, the burden of those claims will be borne in whole or in part by Imperial

20  Tobacco.

21     117.    The Flintkote Plaintiffs are informed and believe, and upon such information and

22  belief alleges, that Imperial Tobacco disagrees with each of The Flintkote Plaintiffs' contentions.

23     118.    The Flintkote Plaintiffs have the right to assert alter ego claims against Flintkote's

24  former indirect parent Imperial Tobacco.

25     WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

26  below.

27

28

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          28

FIRST AMENDED COMPLAINT

## NINTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs Against Imperial Tobacco For Receiving Illegal Dividends)

119.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of paragraphs 1 through 45, inclusive.

120.    The dividends of $170,200,000 in 1986 and $355,000,000 in 1987 were not payable out of Flintkote's net profits for either the year in which the dividend was declared or the preceding fiscal year.

121.    The dividends in 1986 and 1987 (collectively, the "Dividends") could be paid only out of surplus defined as the amount in excess of Flintkote's capital by which its assets exceeded its liabilities. Flintkote's asbestos related personal injury and its other liabilities exceeded its assets.

122.    Imasco and its lawyers, S&C, caused the directors to declare and pay the dividends when they were not authorized under the dividend statutes.

123.    Imasco actively procured and participated in the declarations of the illegal dividends, knew the receipt of the dividends was improper, and reaped the benefits of them.

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## TENTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs Asserting the Rights of a Creditor, Against Imperial Tobacco for Recovery of Illegal Dividends)

124.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth Cause of Action.

125.    Flintkote is operating its business and conducting its affairs as the debtor and debtor in possession in the Bankruptcy Case. Flintkote may recover any transfer of money that is voidable under applicable state law by a creditor holding an unsecured claim that is allowable in the Bankruptcy Case.

126.    The transfers of the Dividends, $170,200,000 on or about December 30, 1986, and $355,000,000 on or about August 31, 1987, were transfers of interests of the debtor in property.

127.    At the time of the Dividends, there existed one or more individuals (a) who had suffered from inherently unknowable injuries to a blameless ignorant party as a result of exposure to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, tolling the

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                              29

FIRST AMENDED COMPLAINT

1   applicable limitation periods until such time as the claimant was chargeable with knowledge that his
2   condition was attributable to asbestos exposure, (b) who were creditors of Flintkote due to exposure
3   to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, and (c)
4   who hold allowable claims against Flintkote and its bankruptcy estate.

5       128.    From and after the date of each Dividend, until at least September 29, 2003, Imasco
6   controlled and dominated Flintkote, and did not disclose, and caused Flintkote not to disclose the true
7   nature of Flintkote's financial condition to creditors.  Creditors did not know and could not have
8   known that the transfer of the dividends to Imasco rendered Flintkote insolvent.

9       129.    The Dividends are invalid and avoidable because the Dividends were paid at a time
10  when Flintkote did not have a surplus of assets over liabilities. Because of Imasco's domination and
11  control of Flintkote and because of the suppression of Flintkote's true financial condition in the
12  public financial reporting Imasco released in Canada, this fact was not known and could not
13  reasonably have been known to creditors of Flintkote, including asbestos disease claimants.  The
14  Flintkote Plaintiffs may recover the Dividends from Imasco who was the entity for whose benefit
15  such transfers were made.  To the extent the Dividends passed through entities before their delivery
16  to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere
17  conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the
18  Dividends was not for value or in good faith.

19      WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth
20  below.

21                          **ELEVENTH CAUSE OF ACTION**
22  **(By The Flintkote Plaintiffs Asserting the Rights of a Creditor Against Imperial Tobacco For
    Recovery of Fraudulent Transfers)**

23      130.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the
24  allegations of the Ninth and Tenth Causes of Action.

25      131.    At the time of the Dividends, or within the applicable limitation period thereafter,
26  there existed (a) one or more individuals who had asbestos-related personal injury lawsuits on file
27  against Flintkote, and those lawsuits remained on file until May 1, 2004, or (b) one or more
28  individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                       30

1    products who suffered from inherently unknowable injuries and who was blamelessly ignorant,

2    thereby tolling any applicable limitation periods until such time as the each such individual was

3    chargeable with knowledge that his condition was attributable to asbestos exposure, or (c) one or

4    more individuals who suffered from asbestos-related diseases arising as a result of exposure to

5    Flintkote products who did not know and could not reasonably have been known of Flintkote's true

6    financial condition because of Imasco's domination and control of Flintkote and because of the

7    suppression of Flintkote's true financial condition in the public financial reporting Imasco released in

8    Canada, some or all of which serve to toll the applicable limitations period.

9        132.    The Dividend of $170,200,000 was made without receipt of fair consideration by

10   Flintkote who: (a) was or would be rendered insolvent by the transfer and/or (b) was about to be

11   engaged in a business, paying asbestos claims, for which its property remaining after the Dividend

12   was unreasonably small capital.

13       133.    When the Dividend of $355,000,000 was paid in 1987, it constituted a fraudulent

14   transfer in that Flintkote received no reasonably equivalent value for it and one or more of the

15   following was true:  (a) Flintkote was insolvent or became insolvent as a result of the transfer, or (b)

16   Flintkote was engaged in or about to engage in the business of paying asbestos claims for which

17   Flintkote's assets were unreasonably small in relation to the business, or (c) Flintkote reasonably

18   should have believed that it would incur debts beyond its ability to pay as they became due.

19       134.    The separation of Flintkote's asbestos liabilities from its valuable operating assets as a

20   result of the formation of subsidiary corporations, the sale of those subsidiary corporations; and the

21   transfer of the Dividends to Imasco, constituted an integrated scheme of transfers orchestrated by

22   Imasco with actual intent to hinder, delay or defraud one or more present or future creditors of

23   Flintkote, implicating at least the following badges of fraud:

24       •    The proceeds of the scheme were transferred to an insider;

25       •    The resulting financial condition of Flintkote was concealed;

26       •    The transfers, including the separation of asbestos liabilities from operating assets,

27            occurred because Flintkote had been sued and threatened with additional suits;

28       •    The transfers, including the separation of asbestos liabilities from operating assets,

Snyder
Miller
& Orton
LLP

{00007643.DOC: 2}                                        31

FIRST AMENDED COMPLAINT

involved substantially all of Flintkote's assets;

- The consideration ultimately received by Flintkote at the conclusion of the integrated scheme was not reasonably equivalent to the value of the assets transferred;

- Flintkote was insolvent or became insolvent shortly after the transfers comprising the integrated scheme;

- The transfers comprising the integrated scheme were made after substantial contingent and unmatured indebtedness had been incurred, but before such indebtedness had matured.

135.    The Flintkote Plaintiffs may recover the Dividends from Imasco who was the entity for whose benefit such transfers were made.  To the extent the Dividends passed through entities before their delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the Dividends was not for value or in good faith.

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## TWELFTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs Against Imperial Tobacco for Breach of Fiduciary Duty)

136.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth, Tenth, and Eleventh Causes of Action.

137.    The directors of Flintkote owed a fiduciary duty to Flintkote and to its creditors because by reason of its asbestos-related liabilities, Flintkote was insolvent or in the vicinity of insolvency.  Flintkote directors were obliged to consider whether, and reasonably should have believed that, Flintkote would incur debts by reason of asbestos liabilities beyond its ability to pay as they became due.

138.    By reason of the foregoing, Imasco prevented the Flintkote directors from complying with their fiduciary duties in declaring the dividends and ordering them paid.

139.    Imasco, now Imperial Tobacco, actively procured and participated in the failure to comply with fiduciary duties and reaped the benefits of them.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          32

FIRST AMENDED COMPLAINT

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## THIRTEENTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs Against S&C for Breach of Duty and Negligence)

140.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth through the Twelfth Causes of Action.

141.    S&C as lawyers represented Flintkote in connection with the 1986 and 1987 dividends. S&C also represented Imasco with respect to the same subject matter. S&C continued to represent Flintkote with respect to the matters alleged herein until within one year of the filing of the Bankruptcy Case.

142.    The relation between attorney and client is a fiduciary relation of the very highest character.

143.    S&C had a duty without informed written consent of each client not to accept representation of more than one client in a matter in which the interests of the clients potentially conflict and not to accept or continue representation of more than one client in which the interests of the clients actually conflict. Absent consent of both clients after full disclosure, S&C had a duty not to accept or continue employment of both clients if it would be likely to involve S&C in representing differing and adverse interests.

144.    S&C breached its duty and accepted and continued representation of Flintkote and Imasco in connection with the Dividends, which was a matter in which the interests of the clients were in stark conflict, adverse, and differing.

145.    Flintkote did not give written consent to S&C's conflicting representation of differing interests.

146.    S&C had a duty to use reasonable care in advising Flintkote. S&C without reasonable care advised the Flintkote directors that they could go forward with the 1986 dividend. S&C in 1987 without reasonable care misrepresented California law to Flintkote as respects rules governing potentially fraudulent transfers. S&C in 1987 also represented, without reasonable care, to the board that the directors could rely upon the RPC report as an appraisal and thus were protected by a

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                33

FIRST AMENDED COMPLAINT

1   principle that directors are entitled to rely on statements in an appraisal by an appraiser selected with
2   reasonable care by the board.  But the RPC report was not an appraisal of Flintkote's asbestos-related
3   personal injury liabilities, and RPC was not selected by the board, but rather by Imasco's counsel.

4       147.   The conflicted representation and the misrepresentations by S&C proximately caused
5   the declaration and payment of the dividends.

6       WHEREFORE The Flintkote Plaintiffs pray judgment against S&C as set forth below.

7                         **FOURTEENTH CAUSE OF ACTION**
8         **(By The Flintkote Plaintiffs Against Imperial Tobacco For Constructive Trust)**

9       148.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the
10  allegations of the Ninth through the Thirteenth Causes of Action.

11      149.   By reason of the foregoing, Imperial Tobacco holds the dividend payments received
12  through the wrongful acts and the complete dominance, control, and authority Imasco held over
13  Flintkote, and by reason of the mistakes engendered by the conflicted representation and negligent
14  advice provided by Imasco's lawyers, shared with Flintkote, as set forth above.  The Flintkote
15  Plaintiffs have the right to those dividends and Imperial Tobacco holds them as a constructive trustee
16  for the benefit of The Flintkote Plaintiffs.

17      WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth
18  below.

19                         **FIFTEENTH CAUSE OF ACTION**
         **(By The Flintkote Plaintiffs Against Imperial Tobacco For Restitution)**

20      150.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the
21  allegations of the Ninth through the Thirteenth Causes of Action.

22      151.   The declarations of the Dividends were invalid because they were the result of
23  conflicted legal representation and erroneous legal advice given by Imasco's lawyers, shared with
24  Flintkote.

25      152.   Imasco was the recipient of the Dividends under circumstances where it directly and
26  through its lawyers wrongfully procured payment of the Dividends.

27      153.   The Flintkote Plaintiffs are entitled to restitution from Imperial Tobacco of the
28  payments made pursuant to the tainted and invalid declarations of the Dividends.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                                34

                         FIRST AMENDED COMPLAINT

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

### SIXTEENTH CAUSE OF ACTION
**(By The Flintkote Plaintiffs against Imperial Tobacco for Declaratory Relief)**

154.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth through the Fifteenth Causes of Action.

155.    An actual controversy exists between The Flintkote Plaintiffs and Imperial Tobacco arising from the Dividend Repayment Contract of July 27, 1987 ("Dividend Repayment Contract").

156.    The Flintkote Plaintiffs contend that the dividends were improperly paid within the meaning of the Dividend Repayment Contract because they were paid under one or more of the following circumstances

- as illegal dividends;
- as a fraudulent conveyance or fraudulent transfer under California law;
- in breach of fiduciary duty aided and abetted by Imasco;
- as products of conflicted and tainted legal representation by S&C;
- as products of negligent legal advice by S&C;
- as improper by reason of having been induced by the promise in 1986 by Imasco to repay, and by the Dividend Repayment Contract in 1987;
- as otherwise improper within the meaning of the Dividend Repayment Contract.

157.    The Flintkote Plaintiffs are informed and believe, and upon such information and belief alleges, that Imperial Tobacco disagrees with each of The Flintkote Plaintiffs' contentions.

158.    In the event the court finally determines that the 1986 and 1987 dividends were improperly paid, then Imperial Tobacco will be obligated to repay to Flintkote any amounts (up to the full amount of the dividends) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of assets of Flintkote because of the dividends finally determined to have been improperly paid, upon entry of the judgments described in the DRC.

159.    The Flintkote Plaintiffs seek a declaration as to the legal rights and duties of the

{00007643.DOC; 2}                    35

FIRST AMENDED COMPLAINT

1  parties as to propriety of the dividends and duties arising from dividends having been improperly

2  paid.

3      WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

4  below.

5                                    <u>PRAYER</u>

6      WHEREFORE, plaintiffs pray judgment:

7      1.    On the First and Second Causes of Action for recovery by plaintiffs Hopkins against

8  defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to

9  proof;

10     2.    On the Third Cause of Action for recovery by plaintiff Marlene Hopkins against

11 defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to

12 proof;

13     3.    On the Fourth, Fifth, and Sixth Causes of Action, for recovery by plaintiffs Hopkins

14 against defendants Plant and Uniroyal of damages according to proof;

15     4.    On the Seventh Cause of Action, for recovery by plaintiffs Hopkins against defendant

16 Plant of damages according to proof;

17     5.    On the Eighth Cause of Action, for an order declaring that Imperial Tobacco is liable

18 as the alter ego of Flintkote with respect to asbestos-related liabilities and is responsible to pay such

19 liabilities;

20     6.    On the Ninth, Tenth, Eleventh, and Twelfth Causes of Action, for recovery by The

21 Flintkote Plaintiffs from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other

22 amount as may be proved;

23     7.    On the Thirteenth Cause of Action, for recovery by The Flintkote Plaintiffs from S&C

24 in the amount of $525,200,000 plus interest, or such other amount as may be proved;

25     8.    On the Fourteenth and Fifteenth Causes of Action, for recovery by The Flintkote

26 Plaintiffs from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount

27 as may be proved;

28     9.    On the Sixteenth Cause of Action, for an order declaring and determining in favor of

Snyder
Miller
& Orton
LLP

{00007643.DOC: 2}                              36

                              FIRST AMENDED COMPLAINT

1   The Flintkote Plaintiffs that the $170,200,000 dividend declared and paid in December 1986 and the

2   $355,000,000 dividend declared and paid in July 1987 by Flintkote were improperly paid within the

3   meaning of the Dividend Recovery Contract letter from Imasco dated July 27, 1987, and that upon

4   the occurrence of the remaining determinations described in the Dividend Recovery Contract, that

5   Imperial Tobacco will be obligated to repay to Flintkote the amounts (up to the full amount of the

6   dividends) finally determined to be due to Flintkote creditors but that cannot be satisfied out of the

7   assets of Flintkote because of the payment of the dividends.

8   Date: **4·26·06**

9                    BRAYTON PURCELL LLP

10

11  Additional Counsel for Plaintiffs The Flintkote    By:
    Company The Official Committee of:           Gilbert L. Purcell

12  Asbestos Personal Injury Claimants, and       Attorneys for Plaintiff Marlene Hopkins,
    James J. McMonagle as the Legal Representative  Michelle Hopkins, and Michael Hopkins

13  for Future Asbestos Personal Injury Claimants:

14  Eliot S. Jubelirer (061654)
    Jean L. Bertrand (083250)

15  Morgenstein & Jubelirer
    One Market, Spear Street Tower

16  Thirty-Second Floor              SNYDER MILLER & ORTON LLP
    San Francisco, CA 94105

17  Telephone (415) 901-8700

18  Alan Pedlar (State Bar No. 72216)
    The Law Office of Alan Pedlar       By:

19  1112 Via Malibu               Stephen M. Snyder
    Aptos, CA 95003             Attorneys for Plaintiffs

20  Telephone (831) 688-2667        The Flintkote Company, The Official
                               Committee of Asbestos Personal Injury

21  Kelly C. Wooster (State Bar No. 41196)  Claimants, and James J. McMonagle as the
    112 Rock Creek Court           Legal Representative for Future Asbestos

22  P.O. Box 62                    Personal Injury Claimants
    Copperopolis, CA 95228

23  Telephone: (209) 785-2437

24

25

26

27

28

Snyder
Miller
& Orton
LLP

      (00007643.DOC; 2)       31

CASE N°.:  CGC-06-450944

UNITED STATES OF AMERICA
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

MARLENE HOPKINS et al
                        Plaintiffs
vs.

IMPERIAL TOBACCO CANADA LIMITED et al
                        Defendants

- Attestation.
- First Amended Complaint for Damages (...)

COPY FOR:

IMPERIAL TOBACCO CANADA LIMITED
3711 rue Saint-Antoine
Montréal QC  H4C 3P6

Saulnier Robillard Lortie
Huissiers de Justice
Charles Laliberté, HJ

**Exhibit B-9**

**Exhibit B-9**

The document referenced as Exhibit B-9 was unavailable on the Superior Court of California County of San Francisco's Docket System as of 5:00 p.m. E.S.T., April 4, 2006. ITCAN will supplement the record once this document is available.

**Exhibit B-10**

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
       Loren Kieve (Bar No. 56280)
2  201 Sansome Street, 6th Floor
   San Francisco, California  94104
3  Telephone: (415) 986-5700
   Facsimile:  (415) 986-5707
4
   Counsel for Defendant
5  Imperial Tobacco Canada Limited

ENDORSED FILED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

MAY - 4 2006

GORDON PARK-LI, Clerk
BY: _____
         Deputy Clerk

6          SUPERIOR COURT FOR THE STATE OF CALIFORNIA

7              IN THE COUNTY OF SAN FRANCISCO

8  MARLENE HOPKINS, Individually, as          )   CASE NO. CGC06450944
   Wrongful Death Heir, and as Successor-in-  )
9  Interest to NORMAN HOPKINS, JR.,           )   **DEFENDANT IMPERIAL TOBACCO**
   Deceased; and MICHELLE HOPKINS, and        )   **CANADA LIMITED'S ANSWER TO**
10 MICHAEL HOPKINS, as Legal Heirs of         )   **FIRST AMENDED COMPLAINT FOR**
   NORMAN HOPKINS, Deceased, THE              )   **DAMAGES AND RELIEF AGAINST**
11 FLINTKOTE COMPANY, THE OFFICIAL            )   **ALTER EGO, FOR RECOVERY OF**
   COMMITTEE OF THE ASBESTOS                  )   **DIVIDENDS, FOR RECOVERY OF**
12 PERSONAL INJURY CLAIMANTS, and            )   **FRAUDULENT TRANSFERS, FOR**
   JAMES J. MCMONAGLE as the LEGAL           )   **DAMAGES BY REASON OF BREACH**
13 REPRESENTATIVE FOR FUTURE                 )   **OF FIDUCIARY DUTY, FOR**
   ASBESTOS PERSONAL INJURY                  )   **DAMAGES FOR BREACH OF DUTY**
14 CLAIMANTS,                                )   **AND NEGLIGENCE, TO ENFORCE**
                                             )   **CONSTRUCTIVE TRUST, FOR**
15              Plaintiffs,                   )   **RESTITUTION, AND FOR**
                                             )   **DECLARATORY RELIEF**
16      v.                                    )
                                             )
17 PLANT INSULATION COMPANY;                 )
   UNIROYAL HOLDING, INC.; IMPERIAL          )   Filing Date: May 4, 2006
18 TOBACCO CANADA LIMITED;                   )   Trial Date:  None Set
   SULLIVAN & CROMWELL LLP; and              )
19 DOES 1 through 100,                       )
                                             )
20              Defendants.                   )
                                             )
21

22

23      Defendant IMPERIAL TOBACCO CANADA LIMITED ("ITCAN"), for itself alone and

24 for no other defendant, hereby answers the unverified first amended complaint (the "Complaint")

25 of MARLENE HOPKINS, MICHELLE HOPKINS, MICHAEL HOPKINS (collectively, the

26 "Hopkins"), THE FLINTKOTE COMPANY ("Flintkote"), THE OFFICIAL COMMITTEE OF

27 THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the

28

---

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1  LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS

2  (together with the Hopkins and Flintkote, the "Plaintiffs") for damages and relief against alter

3  ego, for recovery of dividends, for recovery of fraudulent transfers, for damages by reason of

4  breach of fiduciary duty, for damages for breach of duty and negligence, to enforce constructive

5  trust, and for declaratory relief:

6

7                              GENERAL DENIAL

8        Pursuant to California Code of Civil Procedure § 431.30(d), ITCAN generally and

9  specifically denies each and every allegation of the unverified Complaint, denies that Plaintiffs

10  have been damaged in the sum or sums alleged therein or in any sums whatsoever, denies that

11  Plaintiffs are entitled to declaratory relief, and denies that Plaintiffs are entitled to any relief

12  whatsoever in this action.

13

14                                DEFENSES

15        ITCAN sets forth the following affirmative or additional defenses.  In asserting these

16  defenses, ITCAN is not assuming the burden to establish any fact or proposition where that

17  burden is properly imposed on Plaintiffs.

18

19                              FIRST DEFENSE

20              (Failure to State a Claim Upon Which Relief Can Be Granted)

21        1.      The Complaint, and each purported cause of action alleged therein, fails to state

22  facts sufficient to constitute any cause of action against ITCAN.

23

24                             SECOND DEFENSE

25                              (Lack of Standing)

26        2.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing

27  to assert any or all of the causes of action alleged in the Complaint.

28

~2~

---

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1

2 <u>THIRD DEFENSE</u>

3 (Personal Jurisdiction)

4     3.    This Court lacks personal jurisdiction over ITCAN, a company organized under

5 the laws of Canada and domiciled in Montreal, Quebec, and thus this Complaint should be

6 dismissed.

7

8 <u>FOURTH DEFENSE</u>

9 (Canadian Law)

10     4.    Plaintiffs' claims against ITCAN may not be asserted in this Court pursuant to

11 applicable Canadian law.

12

13 <u>FIFTH DEFENSE</u>

14 (Subject Matter Jurisdiction)

15     5.    This Court lacks subject matter jurisdiction over some or all of the counts of the

16 Complaint and thus those portions of the Complaint lacking jurisdiction should be dismissed.

17

18 <u>SIXTH DEFENSE</u>

19 (Statute of Limitations)

20     6.    Plaintiffs' claims are barred, in whole or in part, by applicable statutes of

21 limitation.

22

23 <u>SEVENTH DEFENSE</u>

24 (Statute of Repose)

25     7.    Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of

26 repose.

27

28

-3-

1

## EIGHTH DEFENSE

2

### (Improper Joinder)

3      8.     Plaintiffs are improperly joined because their claims do not arise from the same

4  transaction or occurrence, do not arise from a common nucleus of operative facts, do not raise

5  common questions of law, and because plaintiffs and their injuries do not all have a substantial

6  connection to the State of California.

7

8

## NINTH DEFENSE

9

### (Fraudulent Joinder)

10      9.     The Complaint should be dismissed or, at least, parties or claims should be

11  transferred to another jurisdiction both due to Plaintiffs' failure to properly join claims and

12  parties and due to Plaintiffs misjoinder of claims and parties, which was fraudulently designed to

13  confer jurisdiction on this Court over claims and/or parties that it does not and would not

14  otherwise have jurisdiction.

15

16

## TENTH DEFENSE

17

### (Failure to Join Indispensable Parties)

18      10.     To the extent the Complaint fails to name indispensable parties, the Complaint

19  must be dismissed or, alternatively, this civil action should be stayed pending other appropriate

20  relief by the Court.

21

22

## ELEVENTH DEFENSE

23

### (Improper Venue)

24      11.     Venue of this civil action does not properly lie in San Francisco County,

25  California.

26

27

28

4

1

## TWELFTH DEFENSE

2

(Forum Non Conveniens)

3    12.    Some or all of Plaintiffs' claims are barred in this Court by the common law

4 defense of forum non conveniens.

5

6

## THIRTEENTH DEFENSE

7

(Equitable Defenses)

8    13.    The Complaint, and each purported cause of action alleged therein, is barred by

9 the equitable doctrines of estoppel, waiver, laches and/or unclean hands.

10

11

## FOURTEENTH DEFENSE

12

(Failure to Mitigate Damages)

13    14.    Plaintiffs have failed to take reasonable, necessary, appropriate and feasible steps

14 to mitigate their alleged damages, and to the extent of such failure to mitigate, Plaintiffs should

15 be barred from recovering some or all of the alleged damages they seek.

16

17

## FIFTEENTH DEFENSE

18

(Waiver and Release)

19    15.    The Complaint, and each purported cause of action alleged therein, is barred to the

20 extent Plaintiffs have waived, released, relinquished or abandoned any claim for relief against

21 ITCAN with respect to the matters that are the subject of the Complaint.

22

23

## SIXTEENTH DEFENSE

24

(Applicable Law)

25    16.    ITCAN asserts that Plaintiffs' claims, or some of them, are or may be barred or

26 otherwise limited or affected by the application of provisions of the law or statutes of states or

27 jurisdictions other than the State of California.

28

-5-

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1

2 SEVENTEENTH DEFENSE

3 (Comparative Fault)

4    17.    ITCAN is informed and believes and therefore alleges that to the extent some or

5 all of the Plaintiffs suffered or sustained any loss, damage or injury as alleged in the Complaint,

6 such loss, damage, or injury was the direct and proximate result of the acts and omissions of the

7 Hopkins, or other persons or entities for whom ITCAN is not legally responsible.

8

9 EIGHTEENTH DEFENSE

10 (Defendant's Practices Not Unlawful)

11    18.    To the extent Plaintiffs prove ITCAN or its predecessors conducted any of the

12 activities alleged in the Complaint, those activities conformed with and were done pursuant to

13 any and all applicable statutes and regulations and were not unlawful.

14

15 NINETEENTH DEFENSE

16 (Separate Corporate Identities)

17    19.    The alleged causes of action are barred, in whole or in part, because the separate

18 corporate identities that existed between and among ITCAN and its predecessors, and all of

19 ITCAN's and its predecessor's direct and indirect subsidiaries, including Flintkote, were

20 maintained at all times relevant to the Complaint.

21

22 TWENTIETH DEFENSE

23 (No Injury Or Damage)

24    20.    ITCAN denies that Plaintiffs have suffered any injury or damage whatsoever, and

25 further denies it is liable to Plaintiffs for any of the injury or damage claimed or for any injury or

26 damage whatsoever.

27

28

-6-

---

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

## TWENTY-FIRST DEFENSE

### (No Proximate Causation)

21.    To the extent Plaintiffs suffered injury or damage, which ITCAN denies, such injury or damage was not proximately caused by any conduct or inaction of ITCAN or its predecessors, or was not foreseeable, or both.

## TWENTY-SECOND DEFENSE

### (Ratification)

22.    The alleged causes of action are barred, in whole or in part, because of ratification, agreement, assent, acquiescence or consent to ITCAN's or its predecessor's alleged conduct.

## TWENTY-THIRD DEFENSE

### (Justified and Privileged Conduct)

23.    The alleged causes of action are barred because the conduct of ITCAN and its predecessors was at all times justified and privileged, and did not result in any wrongful benefit or unjust enrichment to ITCAN or its predecessors.

## TWENTY-FOURTH DEFENSE

### (Lawful Business Means and Objectives)

24.    The alleged causes of action are barred because ITCAN and its predecessors employed lawful, proper and justified means to accomplish legitimate business objectives.

-7-

1

2          ### TWENTY-FIFTH DEFENSE

3          (Reasonable and Good Faith Conduct)

4          25.    The alleged causes of action are barred because ITCAN and its predecessors acted

5   reasonably and in good faith at all times material to the Complaint based on all relevant facts and

6   circumstances known to it at the time ITCAN or its predecessors so acted.

7

8          ### TWENTY-SIXTH DEFENSE

9          (Standard of Care)

10         26.    ITCAN denies any negligence on its part and shows that, at all times relevant to

11  Plaintiffs' Complaint, it and its predecessors met or exceeded the requisite standard of care.

12

13         ### TWENTY-SEVENTH DEFENSE

14         (Acts or Omissions)

15         27.    No act or omission on the part of ITCAN or its predecessors caused or contributed

16  to Plaintiffs' alleged injuries and damages.

17

18         ### TWENTY-EIGHTH DEFENSE

19         (No Duty)

20         28.    ITCAN is informed, believes and thereon alleges that Plaintiffs' Complaint, and

21  each cause of action therein, is barred because ITCAN and its predecessors did not owe any duty

22  to Plaintiffs.  To the extent that ITCAN or its predecessors owed any Plaintiffs a duty, including

23  without limitation a duty of good faith, a duty of care or a fiduciary duty, ITCAN states that at all

24  times relevant to Plaintiffs' Complaint, it or its predecessors met or exceeded such duty.

25

26

27

28

                            -8-

TWENTY-NINTH DEFENSE

(No Production of Asbestos Products)

29.    At no time did ITCAN, or its predecessors, engage in the business of manufacturing, fabricating, researching, designing, testing, marketing, offering for sale, selling, distributing, transporting, installing or otherwise producing asbestos or products containing asbestos.

THIRTIETH DEFENSE

(Asbestos Production Occurred Pre-Acquisition)

30.    The causes of action for alter ego liability are barred, in whole or in part, because Flintkote had ceased to engage in the business of manufacturing, fabricating, researching, designing, testing, marketing, offering for sale, selling, distributing, transporting, installing or otherwise producing asbestos or products containing asbestos prior to the point in time at which Flintkote became an indirect subsidiary of ITCAN or its predecessors.

THIRTY-FIRST DEFENSE

(Due Process)

31.    Plaintiff's claims violate the due process provisions of the United States Constitution and the correlative provisions of the California Constitution to the extent that they seek to deprive ITCAN of procedural and substantive safeguards, including traditional defenses to liability.

THIRTY-SECOND DEFENSE

(Unmanageable and Inequitable Relief Requested)

32.    The alleged causes of action are barred, in whole or part, because the relief requested by Plaintiffs is unmanageable and inequitable.

1

2              THIRTY-THIRD DEFENSE

3             (Punitive Damages Unconstitutional)

4       33.    The imposition of punitive or exemplary damages in the circumstances of this

5  case would violate the Constitutions of the United States of America and the State of California.

6

7              THIRTY-FOURTH DEFENSE
                (Declaratory Relief Improper)
8

9       34.    The Plaintiffs' prayer for declaratory relief is improper and should be barred

10  because it seeks a declaration as to the rights and duties of parties over which the Bankruptcy

11  Court adjudicating Flintkote's chapter 11 bankruptcy case has proper governing authority.

12

13             THIRTY-FIFTH DEFENSE

14            (No Restitution or Disgorgement)

15      35.    Plaintiffs are not entitled to restitution or disgorgement of profits.

16

17             THIRTY-SIXTH DEFENSE

18           (Constitutions of Other Jurisdictions)

19      36.    To the extent that the laws of other jurisdictions apply, ITCAN invokes each and

20  every constitutional defense available to it under the constitutions (or similar charters) of each of

21  the other forty-nine states, the District of Columbia, the Commonwealth of Puerto Rico, the

22  territories and possessions of the United States, as well as the constitutions (or similar charters)

23  of Canada and each of its provinces.  This specifically includes, but is not limited to, provisions

24  relating to due process, access to the courts, freedom of speech, freedom of association, freedom

25  to petition the government for redress of grievances, and limitations on compensatory damages.

26

27

28
                                    ⁓10⁓

1

2                        <u>THIRTY-SEVENTH DEFENSE</u>

3                      (Statutes of Other Jurisdictions)

4        37.    To the extent that the laws of other jurisdictions apply, ITCAN invokes each and

5  every statutory and common law defense available to it under the laws of each of the other forty-

6  nine states, the District of Columbia, the Commonwealth of Puerto Rico, the territories and

7  possessions of the United States, and Canada and each of its provinces, with respect to each of

8  the claims alleged in the Complaint that is recognized in that jurisdiction.

9

10                       <u>THIRTY-EIGHTH DEFENSE</u>

11                   (Incorporation of Co-Defendants' Defenses)

12       38.    ITCAN adopts and incorporates by reference any affirmative or additional defense

13  asserted by any other Defendant to this action, to the extent such affirmative or additional

14  defense applies to ITCAN.

15

16                        <u>THIRTY-NINTH DEFENSE</u>

17                   (Right to Assert Additional Defenses)

18       39.    ITCAN hereby gives notice that it intends to rely on any other defense or defenses

19  that may become available or apparent as a result of the development of additional information,

20  through discovery in this action or otherwise, and hereby reserves the right to amend its answer

21  and to assert any such defense.

22

23                          <u>FORTIETH DEFENSE</u>

24                        (Conforming Products)

25       40.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

26  the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

27  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

28

                                   ~11~

_____

                  IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

2  causes of action contained in the Complaint are barred to the extent the products referenced in

3  this action and the methods of manufacture and testing conformed to the generally recognized

4  and prevailing industry standards and the state of the art in existence at the time the design was

5  prepared and the products manufactured and tested.

6

7  ## FORTY-FIRST DEFENSE

8  ### (Conforming Products)

9      41.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

10  the business of manufacturing or selling asbestos-containing products. Nonetheless, because it

11  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

12  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

13  causes of action contained in the Complaint are barred to the extent the Hopkins' claims are

14  based on Norman Hopkins, Jr.'s (the "Decedent") exposure to the products referenced in the

15  Complaint, and said products at the time were manufactured in conformity with federal and state

16  regulations, standards, specifications, and laws.

17

18  ## FORTY-SECOND DEFENSE

19  ### (Government Contractor Defense)

20      42.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

21  the business of manufacturing or selling asbestos-containing products. Nonetheless, because it

22  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

23  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

24  causes of action contained in the Complaint are barred to the extent that any of the Hopkins'

25  claims are based on Decedent's exposure to any products that were provided pursuant to a

26  contract with the U.S. Government or otherwise provided under a contract whereby such

27  products were to meet government or military specifications, the use by Decedent of these

28

~12~

1   products, if any, was in accordance with the requirements of the designs, plans, and

2   specifications of the governmental entities or agencies or others and in strict compliance

3   therewith and with all required federal regulations and standards.  ITCAN specifically pleads the

4   government contractor defense.

5

6                                      FORTY-THIRD DEFENSE

7                                      (Failure to Exercise Care)

8           43.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

9   the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

10  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

11  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

12  causes of action contained in the Complaint are barred to the extent that Decedent failed to

13  exercise ordinary care for his own safety.  That failure is a partial or a complete bar to all claims

14  asserted by the Hopkins in the Complaint.

15

16                                     FORTY-FOURTH DEFENSE

17                                     (Contributory Negligence)

18          44.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

19  the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

20  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

21  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

22  causes of action contained in the Complaint are barred to the extent that some or all of the

23  Hopkins' alleged injuries, damages or losses, if any, were proximately caused, or contributed to,

24  by the negligence of Decedent or fellow servants over which Flintkote (or ITCAN or its

25  predecessors) had no control, thereby precluding recovery against it.

26

27

28

                                               ˇ13ˇ

1
2
3          ## FORTY-FIFTH DEFENSE
4               (Contributory Negligence)
5     45.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in
6   the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it
7   appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to
8   contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'
9   causes of action contained in the Complaint are barred to the extent that negligence and conduct
10  of Decedent's employers is a partial or a complete bar to all claims asserted in by the Hopkins in
11  the Complaint.
12
13         ## FORTY-SIXTH DEFENSE
14              (Non-Defendant Products)
15    46.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in
16  the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it
17  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to
18  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'
19  causes of action contained in the Complaint are barred to the extent that Decedent's death was or
20  may have been due to exposure to products of distributors, suppliers, and manufacturers not
21  named as defendants in this action.
22
23         ## FORTY-SEVENTH DEFENSE
24         (Learned Intermediary and Sophisticated User)
25    47.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in
26  the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it
27  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to
28

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1   contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

2   causes of action contained in the Complaint are barred by the learned intermediary and

3   sophisticated user doctrines.

4

5                    FORTY-EIGHTH DEFENSE

6                    (Assumption of Risk)

7      48.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

8   the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

9   appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

10   contest allegations of asbestos personal injury, ITCAN denies that the Hopkins incurred any

11   injuries or damages as a result of any actions or omissions of Flintkote (or ITCAN or its

12   predecessors).  Nevertheless, as to any injuries or damages alleged to have been incurred,

13   Decedent voluntarily and knowingly assumed the risk of incurring same and, therefore, the

14   Hopkins are not entitled to recover against ITCAN.

15

16                    FORTY-NINTH DEFENSE

17                    (Misuse of Product)

18      49.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

19   the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

20   appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

21   contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

22   causes of action contained in the Complaint are barred to the extent that the injuries alleged by

23   the Hopkins resulted solely and proximately from a misuse or an abnormal and unforeseeable use

24   of the products in question by third persons over whom Flintkote (or ITCAN or its predecessors)

25   had no control.

26

27

28

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1
2
3                    ## FIFTIETH DEFENSE
4                   (Unrelated Cause of Death)
5        50.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in
6    the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it
7    appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to
8    contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'
9    causes of action contained in the Complaint are barred to the extent that the Decedent's death
10   was based solely, or in substantial part, to disease and other causes that were not related or
11   connected with any product sold, distributed or manufactured by Flintkote (or ITCAN or its
12   predecessors).
13
14                   ## FIFTY-FIRST DEFENSE
15                   (Setoff and Recoupment)
16       51.    The Plaintiffs' claims are subject to ITCAN's rights of setoff and/or recoupment.
17
18       WHEREFORE, ITCAN prays judgment as follows:
19           1.    That Plaintiffs take nothing by reason of the Complaint;
20           2.    That judgment be entered in favor of ITCAN and against Plaintiffs;
21           3.    That the Complaint be dismissed with prejudice;
22           4.    That ITCAN be awarded its costs of suit, including reasonable attorneys'
23   fees; and
24           5.    For such other relief as this Court deems just and proper.
25
26
27
28

                              ¨16¨

1
2
3   May 4, 2006                            QUINN EMANUEL URQUHART
4                                          OLIVER & HEDGES, LLP
5
6                                   By _____
                                       Loren Kieve
7
8                                      Counsel for Defendant
9                                      Imperial Tobacco Canada Limited
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ˇ17ˇ

## PROOF OF SERVICE

I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 50 California Street, 22nd Floor, San Francisco, California 94111.

On May 4, 2006, I served true copies of the following document(s) described as:

**DEFENDANT IMPERIAL TOBACCO CANADA LIMITED'S ANSWER TO FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF AGAINST ALTER EGO, FOR RECOVERY OF DIVIDENDS, FOR RECOVERY OF FRADULENT TRANSFERS, FOR DAMAGES BY REASON OF BREACH OF FIDUCIARY DUTY, FOR DAMAGES FOR BREACH OF DUTY AND NEGLIGENCE, TO ENFORCE CONSTRUCTIVE TRUST, FOR RESTITUTION, AND FOR DECLARATORY RELIEF**

on the parties in this action as follows:

### SEE ATTACHED LIST

**BY EXPRESS MAIL:** I deposited such document(s) in a box or other facility regularly maintained by the United States Postal Service, in sealed envelope(s) or package(s) designated by the United States Postal Service with delivery fees paid or provided for, addressed to the person(s) being served.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 4, 2006, at San Francisco, California.

Nolene Chetty

**SERVICE LIST**

Alan R. Brayton
Gilbert Purcell
David Donadio
Brayton Purcell LLP
222 Rush Landing Road
Novato, CA 94948-6169

Stephen Snyder
James Miller
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104

50573/1809283.1

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

See Attached Sheet

**DEFENDANTS**

See Attached Sheet

**(b)** County Of Residence Of First Listed Plaintiff _____

(EXCEPT IN U.S. PLAINTIFF CASES)

County Of Residence Of First Listed Defendant _____

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorneys (Firm Name, Address And Telephone Number)

See Attached Sheet-

Attorneys (If Known)

See Attached Sheet

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place An 'X' In One Box For Plaintiff And One Box For Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" In One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

*PERSONAL INJURY*
- ☐ 362 Personal Injury Med. Malpractice
- ☐ 365 Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities – Employment
- ☐ 445 Amer. w/Disabilities – Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  *Habeas Corpus:*
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt Relations
- ☐ 730 Labor/Mgmt Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl Ret Inc Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☒ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS   Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 420 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" In One Box Only)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from State Court
- ☐ 4 Reinstated or Reopened
- ☒ 5 Transferred from another district (specify) N.D. Cal.
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
(Cite The U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §157(b)(5)

Brief description of cause: Seeks transfer of action originally filed in California state court

**VII. REQUESTED IN COMPLAINT**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint
JURY DEMAND: ☐ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions)

JUDGE _____   DOCKET NUMBER _____

DATE
5/5/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**Plaintiffs**

The Flintkote Company, Michael Hopkins, Michelle Hopkins, Marlene Hopkins, James McMonagle, as legal representative for future asbestos personal injury claimants and The Official Committee of Asbestos Personal Injury Claimants.

**Attorneys**
Alan R. Brayton
Gilbert R. Purcell
Brayton Purcell LLP
222 Rush Landing Road
Post Office Box 6169
Novato, CA  94948
Attorneys for Marlene Hopkins, Michele Hopkins and Michael Hopkins

Stephen M. Snyder
Snyder, Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA  94104
Attorneys for The Flintkote Company, The Official Committee of Asbestos Personal Injury Claimants and James J. McMonagle as the Legal Representative for Future Asbestos Personal Injury Claimants

Eliot S. Jubelirer
Jean L. Bertrand
Morgenstern & Jubelirer
One Market Street
Spear Street Tower, 32nd Floor
San Francisco, CA  94105
Additional Counsel for The Flintkote Company, the Official Committee of Asbestos Personal Injury Claimants and James J. McMonagle, as the Legal Representative for Future Asbestos Personal Injury Claimants

Alan Pedlar
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA  95083
Additional counsel for The Flintkote Company, the Official Committee of Asbestos Personal Injury Claimants and James J. McMonagle, as the Legal Representative for Future Asbestos Personal Injury Claimants

Kelly C. Wooster
112 Rock Creek Court
Post Office Box 62
Copperopolis, CA  95228
Additional Counsel for The Flintkote Company, the Official Committee of Asbestos
Personal Injury Claimants and James J. McMonagle, as the Legal Representative for
Future Asbestos Personal Injury Claimants

Kevin T. Lantry
Jeffrey E. Bjork
Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA  90013
Attorneys for The Flintkote Company

Laura Davis Jones
James E. O'Neill, III
Pachulski Stang Ziehl Young Jones & Weintraub LLP
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, DE  19899-8705
Attorneys for The Flintkote Company

Marla R. Eskin
Campbell & Levine, LLC
800 North King Street, Suite 300
Wilmington, DE  19801
Attorneys for Official Committee of Asbestos Personal Injury Claimants

James L. Patton, Jr.
Young, Conaway, Stargatt & Taylor LLP
1000 West Street, 17th Floor
Wilmington, DE  19801
Attorneys for James J. McMonagle as the Legal Representative for Future Asbestos
Personal Injury Claimants

**Defendants**

Plant Insulation Company, Uniroyal Holding, Inc., Imperial Tobacco Canada Limited, Sullivan & Cromwell LLP

**Attorneys**

Stephen M. Miller
Brett D. Fallon
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, DE  19899
Attorneys for Imperial Tobacco Canada Limited

L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
King & Spalding
1180 Peach Street, N. E.
Atlanta, GA  30309
Attorneys for Imperial Tobacco Canada Limited

Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
Attorneys for Sullivan & Cromwell

Monte S. Travis
Travis & Pon
2001 Fillmore Street
San Francisco, CA  94115-2708
Attorneys for Plant Insulation

Nancy E. Hudgins
565 Commercial Street, 4th Floor
San Francisco, CA  94111
Attorneys for Uniroyal Holdings, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as )
Wrongful Death Heir, and as Successor-in- )
Interest to NORMAN HOPKINS, JR., )
Deceased; and MICHELLE HOPKINS, and )
MICHAEL HOPKINS, as Legal Heirs of )
NORMAN HOPKINS, Deceased, THE )
FLINTKOTE COMPANY, THE OFFICIAL )
COMMITTEE OF THE ASBESTOS )
PERSONAL INJURY CLAIMANTS, and )
JAMES J. MCMONAGLE as the LEGAL )
REPRESENTATIVE FOR FUTURE )
ASBESTOS PERSONAL INJURY )
CLAIMANTS )
                               )
           Plaintiffs, )      Civil Action No. _____
                               )
      vs. )
                               )
PLANT INSULATION COMPANY; )
UNIROYAL HOLDING, INC.; IMPERIAL )
TOBACCO CANADA LIMITED; )
SULLIVAN & CROMWELL LLP; and )
DOES 1 through 100, )
                               )
           Defendants. )
_____)

## AFFIDAVIT OF REBECCA WORKMAN, PARALEGAL

STATE OF DELAWARE    :
                          : SS:
NEW CASTLE COUNTY    :

      I, Rebecca Workman, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on May 5, 2006, I caused to be served:

## EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

      Service was completed upon parties on the attached list in the manner indicated thereon.

13870.0/1

Date:   May 5, 2006.

_Rebecca Workman_
Rebecca Workman

SWORN AND SUBSCRIBED before me this 5th day of May, 2006.

_____
NOTARY

Notary Public - State of Delaware

1387030/1

**VIA FIRST CLASS MAIL**

Gilbert L. Purcell, Esquire
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169
(Attorneys for Plaintiff Marlene
Hopkins, Michelle Hopkins, and
Michael Hopkins)

Stephen M. Snyder, Esquire
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
(Attorneys for Plaintiffs The
Flintkote Company, The
Official Committee of Asbestos
Personal Injury Claimants, and
James J. McMonagle as the
Legal Representative for Future
Asbestos Personal Injury Claimants)

Eliot S. Jubelirer, Esquire
Jean L. Bertrand, Esquire
Morgenstein & Jubelirer
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(Additional Counsel for Plaintiffs)

Alan Pedlar, Esquire
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA 95083
(Additional Counsel for Plaintiffs)

Kelly C. Wooster, Esquire
112 Rock Creek Court
P.O. Box 62
Copperopolis, CA 95228
(Additional Counsel for Plaintiffs)

**VIA FIRST CLASS MAIL**

Kevin T. Lantry
Jeffrey E. Bjork
Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA 90013
Attorneys for The Flintkote Company

Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attorneys for Sullivan & Cromwell

Monte S. Travis
Travis & Pon
2001 Fillmore Street
San Francisco, CA 94115-2708
Attorneys for Plant Insulation

Nancy E. Hudgins
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Attorneys for Uniroyal Holdings, Inc.

**VIA HAND DELIVERY**

Laura Davis Jones
James E. O'Neill, III
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, DE 19899-8705
Attorneys for The Flintkote Company

138716 3/1

**VIA HAND DELIVERY**

Marla Eskin, Esquire
Kathleen Campbell, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(Counsel for the Official Committee of
Creditors)

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Legal Representative)