# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as )
Wrongful Death Heir, and as Successor-in- )
Interest to NORMAN HOPKINS, JR., )
Deceased; and MICHELLE HOPKINS, and )
MICHAEL HOPKINS, as Legal Heirs of )
NORMAN HOPKINS, Deceased, THE )
FLINTKOTE COMPANY, THE OFFICIAL )
COMMITTEE OF THE ASBESTOS )
PERSONAL INJURY CLAIMANTS, and )
JAMES J. MCMONAGLE as the LEGAL )
REPRESENTATIVE FOR FUTURE )
ASBESTOS PERSONAL INJURY )
CLAIMANTS )
                                     )
           Plaintiffs, )   Civil Action No. 06-298 (JJF)
                                     )
    vs. )
                                       )
PLANT INSULATION COMPANY; )
UNIROYAL HOLDING, INC.; IMPERIAL )
TOBACCO CANADA LIMITED; )
SULLIVAN & CROMWELL LLP; and )
DOES 1 through 100, )
                                       )
           Defendants. )

---

## EMERGENCY MOTION OF IMPERIAL TOBACCO CANADA LIMITED FOR IMMEDIATE ENTRY OF A PROVISIONAL ORDER OR, IN THE ALTERNATIVE, AN EXPEDITED HEARING REGARDING ITS EMERGENCY PETITION FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(b)(5)

Imperial Tobacco Canada Limited ("ITCAN") hereby moves for immediate entry of a provisional order or, in the alternative, an expedited hearing regarding its Emergency Petition For an Order of Transfer Pursuant to 28 U.S.C. § 157(b)(5) (Dkt. 1) (the "Emergency Petition"). In support of this Motion, ITCAN respectfully submits as follows:

1.     ITCAN filed the Emergency Petition and its brief in support thereof (Dkt. 3) (the "Opening Brief") on May 5, 2006.  In support of this Motion, ITCAN relies upon, and incorporates by reference herein, the Emergency Petition and the Opening Brief.  A copy of the Emergency Petition and the Opening Brief are attached hereto as Exhibits A and B, respectively. Capitalized terms not defined herein shall have the meaning given to them in the Emergency Petition.

2.     ITCAN is currently a defendant in the Pending Action that was commenced in California by The Flintkote Company ("Flintkote") and the additional Plaintiffs named in the caption above.   Flintkote is currently a debtor-in-possession in a chapter 11 bankruptcy case that is pending before the United States Bankruptcy Court for the District of Delaware.  As more fully explained in the Emergency Petition and the Opening Brief, the first three counts in the Pending Action are personal injury tort claims against Flinkote and ITCAN (as Flintkote's alleged alter ego).   In addition, Flintkote alleges alter ego claims that are based on Flintkote's liability for asbestos tort claims.  Because the Pending Action asserts personal injury and wrongful death claims that are related to a bankruptcy case that is pending in this district, the Pending Action falls within the purview of 28 U.S.C. § 157(b)(5).  Under that section, this Court is the only court with the authority to determine whether the Pending Action should proceed before this Court or in the district in which the claims alleged in the Pending Action arose.

3.     On the same day that ITCAN filed its Emergency Petition, ITCAN removed the Pending Action to the United States District Court for the Northern District of California (the "California District Court") by filing a Notice of Removal pursuant to 28 U.S.C. § 1441 and, in the alternative, 28 U.S.C. § 1452.  Simultaneously with the

removal, ITCAN requested that the California District Court stay any consideration of transfer and remand issues until this Court can make the determination required under Section 157(b)(5). On the date hereof, ITCAN learned that Plaintiffs filed a motion in the California District Court requesting that the Pending Action be remanded to state court. Plaintiffs' remand motion is currently set for hearing on June 21, 2006. To date, the California District Court has not issued a stay of the proceedings.

4.    As a result of the foregoing, issues related to the Pending Action are currently pending before this Court and the California District Court. Accordingly, and for the reasons set forth in more detail in the Opening Brief, this Court should enter a provisional order, in the form attached to the Emergency Petition as Exhibit A, transferring the Pending Action to this Court pending a final hearing on the issues raised by the Emergency Petition. The provisional order will protect this Court's jurisdiction over the Pending Action and will prevent conflicting decisions regarding transfer or remand issues arising in the California District Court. If a provisional order is not granted, the parties and the California District Court may waste time and resources determining transfer and remand issues which may become moot depending on this Court's ultimate ruling on the Emergency Petition.

5.    Provisional orders have been entered by other district courts that have been confronted with the need to make a determination under 28 U.S.C. § 157(b)(5). See, e.g., In re Federal-Mogul Global, Inc., 300 F.3d 368, 374 (3d Cir. 2002) (noting that the district court granted a provisional transfer order in order to consider the appropriateness of actual transfer as well as to examine its subject matter jurisdiction and the appropriateness of abstention and remand); see also A.H. Robins Co., 788 F.2d 994,

1015-1016 (4th Cir. 1986) (approving district court's transfer order interpreting that order as "conditional" pending objections of the parties and requests for abstention). Indeed, such orders have been entered on an *ex parte* basis. In re Dow Corning Corp., 1995 WL 495978 (Bankr. E.D. Mich. 1995) (recognizing that the district court had granted the movant's request for a provisional transfer pursuant to section 157(b)(5) on an immediate and *ex parte* basis).

[Remainder of the page intentionally left blank]

WHEREFORE, for the reasons set forth herein and in the Emergency Petition and the Opening Brief, ITCAN respectfully requests that the Court (1) immediately enter a provisional order in the form attached to the Emergency Petition as Exhibit A or, in the alternative, schedule an interim hearing on an expedited basis to consider ITCAN's request for a provisional order, and (2) upon the conclusion of a final hearing, enter a final order transferring the Pending Action to this District.

Dated: May 11, 2006       MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
Carl N. Kunz, III (#3201)
Rafael X. Zahralddin (#4166)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
Email: smiller@morrisjames.com
Email: bfallon@morrisjames.com
Email: ckunz@morrisjames.com
Email: rxza@morrisjames.com

and

KING & SPALDING LLP
L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: 404-572-4600
Fax: 404-572-5141
jloveland@kslaw.com
jpardo@kslaw.com
mmaloney@kslaw.com
*Attorneys for Defendant Imperial Tobacco Canada Limited*

RZA/110875-0001/1390304/1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, THE FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 06-298 (JJF) |
| vs. | ) ) | |
| PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF REBECCA WORKMAN, PARALEGAL

STATE OF DELAWARE     :
                      : SS:
NEW CASTLE COUNTY     :

I, Rebecca Workman, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on May 11, 2006, I caused to be served:

## EMERGENCY MOTION OF IMPERIAL TOBACCO CANADA LIMITED FOR IMMEDIATE ENTRY OF A PROVISIONAL ORDER OR, IN THE ALTERNATIVE, AN EXPEDITED HEARING REGARDING ITS EMERGENCY PETITION FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(b)(5)

1387171/1

Service was completed upon parties on the attached list in the manner indicated thereon.

Date:    May 11, 2006.

_____
Rebecca Workman

SWORN AND SUBSCRIBED before me this 11th day of May, 2006.

_____
NOTARY

138717 /1

**VIA FEDERAL EXPRESS**

Gilbert L. Purcell, Esquire
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169
(Attorneys for Plaintiff Marlene
Hopkins, Michelle Hopkins, and
Michael Hopkins)

Stephen M. Snyder, Esquire
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
(Attorneys for Plaintiffs The
Flintkote Company, The
Official Committee of Asbestos
Personal Injury Claimants, and
James J. McMonagle as the
Legal Representative for Future
Asbestos Personal Injury Claimants)

Eliot S. Jubelirer, Esquire
Jean L. Bertrand, Esquire
Morgenstein & Jubelirer
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(Additional Counsel for Plaintiffs)

Alan Pedlar, Esquire
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA 95003
(Additional Counsel for Plaintiffs)

Kelly C. Wooster, Esquire
112 Rock Creek Court
P.O. Box 62
Copperopolis, CA 95228
(Additional Counsel for Plaintiffs)

**VIA FEDERAL EXPRESS**

Kevin T. Lantry
Jeffrey E. Bjork
Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA 90013
Attorneys for The Flintkote Company

Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attorneys for Sullivan & Cromwell

Monte S. Travis
Travis & Pon
2001 Fillmore Street
San Francisco, CA 94115-2708
Attorneys for Plant Insulation

Nancy E. Hudgins
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Attorneys for Uniroyal Holdings, Inc.

**VIA HAND DELIVERY**

Laura Davis Jones
James E. O'Neill, III
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, DE 19899-8705
Attorneys for The Flintkote Company

138717 /1

**VIA HAND DELIVERY**

Marla Eskin, Esquire
Kathleen Campbell, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(Counsel for the Official Committee of
Creditors)

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Legal Representative)

138717 /1

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, THE FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. _____ |
| vs. | ) ) ) | 0 6 - 2 9 8 |
| PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

FILED 2006 MAY -5 PM 4:03 CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE

Civil Action No. 0 0 6 2 3

## EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

Imperial Tobacco Canada Limited ("ITCAN")[1] files this Petition pursuant to 28 U.S.C.

§ 157(b)(5) and requests that the Court enter an Order transferring to this Court a civil action

currently pending before the United States District Court for the Northern District of California.

In support of this Petition, ITCAN respectfully shows the Court as follows:

---

[1] By filing this Petition, ITCAN does not, and has not agreed to, accept or attorn to the jurisdiction of any court within the United States. ITCAN reserves any and all of its rights in the underlying litigation, including the

1.    On May 1, 2004, The Flintkote Company ("Flintkote") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Flintkote's bankruptcy case is pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") with the case number 04-11300 (JKF) (the "Bankruptcy Case").

2.    On April 5, 2006, Flintkote, together with Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively, the "Asbestos Claimants") filed a complaint (the "Complaint") in  Superior Court of California (Unlimited Jurisdiction) for the County of San Francisco to initiate a lawsuit (the "Pending Action") against ITCAN and additional defendants, Plant Insulation Company, Uniroyal Holding, Inc., Sullivan & Cromwell LLP, and Does 1 Through 100.  On or about April 27, 2006, Flintkote and the Asbestos Claimants filed an amended complaint (the "Amended Complaint") in the Pending Action to add as plaintiffs the Official Committee of the Asbestos Personal Injury Claimants and James J. McMonagle, the Legal Representative For Future Asbestos Personal Injury Claimants (collectively, and together with Flintkote and the Asbestos Claimants, the "Plaintiffs").  Complete copies of all process, pleadings, and orders served on ITCAN in the Pending Action are attached hereto as Exhibit B.

3.    In the Pending Action, the Asbestos Claimants seek recovery for, among other things, wrongful death and loss of consortium resulting from the death of Norman Hopkins (the "Decedent") whose death was allegedly caused by exposure to asbestos.  The Asbestos Claimants seek recovery against ITCAN on the theory that ITCAN is the alter ego of Flintkote and is, therefore, liable for asbestos claims against Flintkote.  Flintkote also asserts, among other things, claims against ITCAN for a declaration of alter ego liability and recovery of alleged fraudulent transfers.

---

right to contest personal jurisdiction over ITCAN in the appropriate forum.

1387047/2

4.    On the date hereof, ITCAN removed the Pending Action to the United States

District Court for the Northern District of California (the "California District Court") by filing a

Notice of Removal pursuant to 28 U.S.C. § 1441 and, in the alternative, 28 U.S.C. § 1452.

Together with the Notice of Removal, ITCAN filed a motion with the California District Court to

transfer the Pending Action to this Court pursuant to 28 U.S.C. § 1404.  In connection therewith,

ITCAN requested that the California District Court stay any consideration of transfer and/or

remand issues until this Court has an opportunity to consider this Petition.

5.    ITCAN files this Petition pursuant to 28 U.S.C. § 157(b)(5).  That statute

provides as follows:

> The district court shall order that personal injury tort and wrongful death claims
> shall be tried in the district court in which the bankruptcy case is pending or in the
> district court in the district in which the claim arose, *as determined by the district
> court in which the bankruptcy case is pending*.

28 U.S.C. § 157(b)(5) (emphasis added).

6.    In the Pending Action, the Asbestos Claimants assert claims for, among other

things, wrongful death and loss of consortium resulting from the Decedent's alleged exposure to

asbestos.  The Asbestos Claimants seek to recover against ITCAN on the theory that ITCAN is

the alter ego of Flintkote.  In other words, for the Asbestos Claimants to prevail in their action

against ITCAN, they must first establish the validity of their tort claims against Flintkote.  As

such, the first three counts in the Pending Action are in fact personal injury tort claims against

Flintkote and ITCAN (as Flintkote's alleged alter ego).  Likewise, Flintkote's alter ego claims

also are based on Flintkote's liability on asbestos tort claims.  Accordingly, the Pending Action

falls within the purview of section 157(b)(5).  Therefore, this Court is the only court with

authority to determine whether the Pending Action should be tried in this Court or in the district

in which the claim arose.

3

7.    Moreover, this Court has jurisdiction over the pending action pursuant to 28 U.S.C. § 1334. Under 28 U.S.C. § 1334, this Court has jurisdiction over cases arising under the Bankruptcy Code or cases related to a pending bankruptcy case. The Pending Action arises under the Bankruptcy Code because Flintkote's standing to pursue the causes of action asserted against ITCAN is founded upon section 544 of the Bankruptcy Code which permits Flintkote, as a debtor-in-possession in a pending Chapter 11 case, to assert certain claims on behalf of its creditors and to avoid and recover certain prepetition transfers of property. In addition, any recovery in the Pending Action will have a direct effect on the Bankruptcy Case by providing funds for distribution to creditors. Indeed, Flintkote has stated that the Pending Action "represents potentially the largest group of assets" of its bankruptcy estate. Thus, the claims that Flintkote asserts in the Pending Action arise under the Bankruptcy Code and are related to the Bankruptcy Case. Accordingly, this Court has jurisdiction over the Pending Action pursuant to 28 U.S.C. § 1334.

8.    Together with the filing of this Petition, ITCAN has filed a Brief in support hereof.

WHEREFORE, for the reasons set forth herein and in the accompanying Brief, ITCAN respectfully requests that this Court:

(a)    enter an interim order on an emergency basis in the form attached hereto as Exhibit A transferring the Pending Action to this Court on a provisional basis pursuant to 28 U.S.C. § 157(b)(5);

(b)    stay all other proceedings related to the Pending Action that may be pending before any other court until such time as this Court has an opportunity to make a final ruling on this Petition; and,

4

(c)    enter a final order transferring the Pending Action to this Court pursuant 28

U.S.C. § 157(b)(5).

This 5th day of May, 2006.

Respectfully submitted,

MORRIS, JAMES, HITCHENS & WILLIAMS
LLP

Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com
       bfallon@morrisjames.com

and

KING & SPALDING LLP
L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Phone: 404-572-4600
Fax: 404-572-5141
jpardo@kslaw.com
jloveland@kslaw.com
mmaloney@kslaw.com

Attorneys for Defendant Imperial Tobacco Canada
Limited

1387047/2

5

# EXHIBIT A

## EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. _____ |
| vs. | ) ) | |
| PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PROVISIONAL ORDER REGARDING EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

This matter having come before the Court on the Emergency Petition of Imperial Tobacco Canada Limited ("ITCAN") for an order of transfer pursuant to 28 U.S.C. § 157(b)(5) (the "Petition"); the Court having reviewed the Petition, and adequate and sufficient notice of the Petition having been given under the circumstances; and it appearing that the relief requested is warranted under 28 U.S.C. § 157(b)(5) and is in the best interests of the parties; it is hereby

ORDERED, that the Petition is granted on a provisional basis as set forth herein; and it is further

ORDERED, that the civil action styled MARLENE HOPKINS, Individually, as

Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and

MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS,

Deceased, THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE

ASBESTOS PERSONAL INJURY CLAIMANTS, JAMES J. MCMONAGLE as the LEGAL

REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS v.

PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO

CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, originally

filed in the Superior Court of California (Unlimited Jurisdiction) for the County of San Francisco

Civil Action No. with case no. 06-450944 (the "Pending Action") shall be transferred to this

Court on a provisional basis pending this Court's final determination of the appropriate venue for

the Pending Action pursuant to 28 U.S.C. § 157(b)(5); and it is further

ORDERED, that all other proceedings related to the Pending Action that are currently

pending before any other court shall be stayed pending further order of this Court.

Dated: May ___, 2006

_____
United States District Court Judge

2

# EXHIBIT B
[to the Emergency Petition]

**Exhibit B**

**Superior Court of California, County of San Francisco**

**Case No. 06-450944 Docket**

| | | |
|---|---|---|
| **Exhibit B-1** | April 5, 2006 | OTHER NON EXEMPT COMPLAINTS, COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY AS TO DEFENDANT PLANT INSULATION COMPANY UNIROYAL HOLDING, INC. IMPERIAL TOBACCO CANADA LIMITED SULLIVAN & CROMWELL LLP DOES 1-100 SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR SEP-08-2006 PROOF OF SERVICE DUE ON JUN-05-2006 CASE MANAGEMENT STATEMENT DUE ON AUG-24-2006 COMPLEX LITIGATION ASSIGNMENT REQUESTED BY FILING PARTIES; FEE INCLUDED IN FILING FEE |
| **Exhibit B-2** | April 5, 2006 | NOTICE TO PLAINTIFF |
| **Exhibit B-3** | April 10, 2006 | SUMMONS ON COMPLAINT, PROOF OF SERVICE ONLY, FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY SERVED APR-07-2006, SUBSTITUTE SERVICE ON NATURAL PERSON, ON DEFENDANT SULLIVAN & CROMWELL LLP |
| **Exhibit B-4** | April 14, 2006 | APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY |
| **Exhibit B-5** | April 20, 2006 | PROOF OF PERSONAL SERVICE (APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION) PARTY SERVED: IMPERIAL TOBACCO CANADA LIMITED FILED BY PETITIONER THE FLINTKOTE COMPANY |
| **Exhibit B-6** | April 20, 2006 | SUMMONS ON COMPLAINT, PROOF OF SERVICE ONLY, FILED BY PLAINTIFF THE FLINTKOTE COMPANY SERVED APR-07-2006, PERSONAL SERVICE, ON DEFENDANT IMPERIAL TOBACCO CANADA LIMITED |
| **Exhibit B-7** | April 20, 2006 | PROOF OF HAND DELIVERY (APPLICATION FOR DESIGNATION OF COMPLEX LIT) FILED BY PLAINTIFF THE FLINTKOTE COMPANY AS TO DEFENDANT SULLIVAN & CROMWELL LLP |

| **Exhibit B-8** | April 27, 2006 | 1ST AMENDED COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS MCMONAGLE, JAMES AS THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS AS TO DEFENDANT PLANT INSULATION COMPANY UNIROYAL HOLDING, INC. IMPERIAL TOBACCO CANADA LIMITED SULLIVAN & CROMWELL LLP DOES 1-100 |
|---|---|---|
| **Exhibit B-9** | May 2, 2006 | PROOF OF HAND DELIVERY AMENDED COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS MCMONAGLE, JAMES AS THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS |
| **Exhibit B-10** | May 4, 2006 | DEFENDANT IMPERIAL TOBACCO CANADA LIMITED'S ANSWER TO FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF AGAINST ALTER EGO, FOR RECOVERY OF DIVIDENDS, FOR RECOVERY OF FRAUDULENT TRANSFERS, FOR DAMAGES BY REASON OF BREACH OF FIDUCIARY DUTY, FOR DAMAGES FOR BREACH OF DUTY AND NEGLIGENCE, TO ENFORCE CONSTRUCTIVE TRUST, FOR RESTITUTION, AND FOR DECLARATORY RELIEF |

**Exhibit B-1**

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL
TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1
through 100.

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-
in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS,
and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased,
and THE FLINTKOTE COMPANY,

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
*Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Francisco County Superior Court<br>400 McAllister Street<br><br>San Francisco, CA  94102 | CASE NUMBER:<br>*(Número del Caso):* CGC 06 450944 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jean L. Bertrand (CSB 083250)                    415.901.8700        415.901.8701
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105

| DATE:<br>*(Fecha)*  **APR 0 5 2006**   Gordon Park-Li | Clerk, by   Jun Panelo | , Deputy |
|---|---|---|
| | *(Secretario)* | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

| [SEAL] | **NOTICE TO THE PERSON SERVED:** You are served |
|---|---|
| | 1. ☐ as an individual defendant. |
| | 2. ☐ as the person sued under the fictitious name of *(specify):* |
| | 3. ☐ on behalf of *(specify):* |
| | under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor) |
| | ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee) |
| | ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person) |
| | ☐ other *(specify):* |
| | 4. ☐ by personal delivery on *(date):*                          Page 1 of 1 |

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004] | **SUMMONS** |  | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|---|

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Jean L. Bertrand (CSB 083250)
Eliot S. Jubelier (CSB 061654)
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105

TELEPHONE NO.: 415.901.8700    FAX NO.: 415.901.8701
ATTORNEY FOR *(Name):* Plaintiff MARLENE HOPKINS, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME:    MARLENE HOPKINS, et al. v. PLANT INSULATION COMPANY, et al.

**FOR COURT USE ONLY**

ENDORSED
F I L E D
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____
JUN P. PANELO
Deputy Clerk

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CGC 06 450944 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE: |
| | | DEPT: |

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[X] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [X] is [ ] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties  d. [X] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve  e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence  f. [ ] Substantial postjudgment judicial supervision
3. Type of remedies sought *(check all that apply):*
   a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* 16
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015).*
Date: April 5, 2006

Jean L. Bertrand (CSB 083250)
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]    **CIVIL CASE COVER SHEET**    Legal Solutions Plus    Cal. Rules of Court, rules 201.8, 1800–1812; Standards of Judicial Administration, § 19

ALAN R. BRAYTON (State Bar No. 073685)
1  GILBERT L. PURCELL (State Bar No. 113603)
   DAVID R. DONADIO (State Bar No. 154436)
2  BRAYTON PURCELL, LLP
   222 Rush Landing Road
3  P.O. Box 6169
   Novato, CA 94948-6169
4  Telephone (415) 898-1555

5  Attorneys for Plaintiffs
   Marlene Hopkins, Michelle Hopkins, and Michael Hopkins
6
7  STEPHEN M. SNYDER (State Bar No. 054598)
   JAMES L. MILLER (State Bar No. 071958)
8  SNYDER MILLER & ORTON LLP
   111 Sutter Street, Suite 1950
   San Francisco, CA 94104
9  Telephone: (415) 962-4400
   Facsimile: (415) 962-4401
10
   Attorneys for Plaintiff
11 The Flintkote Company
   (Additional Counsel Listed On Signature Page)
12

13

14                SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

15                            COUNTY OF SAN FRANCISCO

16

17 MARLENE HOPKINS, Individually, as            Case No.  CGC-06-450944
   Wrongful Death Heir, and as Successor-in-
18 Interest to NORMAN HOPKINS, JR.,             COMPLAINT FOR DAMAGES AND
   Deceased; and MICHELLE HOPKINS, and          RELIEF AGAINST ALTER EGO, FOR
19 MICHAEL HOPKINS, as Legal Heirs of           RECOVERY OF DIVIDENDS, FOR
   NORMAN HOPKINS, Deceased, and THE            RECOVERY OF FRAUDULENT
20 FLINTKOTE COMPANY,                           TRANSFERS, FOR DAMAGES BY REASON
                                                OF BREACH OF FIDUCIARY DUTY, FOR
21                Plaintiffs,                    DAMAGES FOR BREACH OF DUTY AND
                                                NEGLIGENCE, TO ENFORCE
22        vs.                                    CONSTRUCTIVE TRUST, FOR
                                                RESTITUTION, AND FOR DECLARATORY
23                                               RELIEF.
   PLANT INSULATION COMPANY;
24 UNIROYAL HOLDING, INC.; IMPERIAL
   TOBACCO CANADA LIMITED;
25 SULLIVAN & CROMWELL LLP; and
   DOES 1 through 100,
26
                  Defendants.
27

28

Snyder
Miller
& Orton
LLP

                                    1
                              COMPLAINT

ENDORSED
F I L E D
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk
BY:        JUN P. PANELO
                    Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

SEP 0 8 2006 - 9:00 AM

DEPARTMENT 212

1      Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, and MICHAEL HOPKINS and

2  THE FLINTKOTE COMPANY allege:

3                 **PARTIES, JURISDICTION AND VENUE**

4        1.    Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,

5  "Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),

6  who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene

7  Hopkins is successor in interest to Decedent under California Code of Civil Procedure section

8  377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil

9  Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent

10  contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos

11  containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of

12  Flintkote, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

13        2.    Plaintiff The Flintkote Company ("Flintkote") is, and at all relevant times, has been a

14  corporation organized and existing under the laws of the State of Delaware, with a principal place of

15  business in San Francisco, California, qualified to do and doing business in California.  For many

16  years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of

17  asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case

18  under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

19  Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the

20  "Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and

21  remains the debtor and debtor-in-possession in that case.

22        3.    Defendant Plant Insulation Company ("Plant") is a California corporation, with its

23  principal place of business situated in the city and county of San Francisco.

24        4.    Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in

25  interest to Uniroyal, Inc.

26        5.    Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major

27  Canadian tobacco company.  It is a Canadian corporation formerly known as Imasco Limited and will

28  be referred to herein as "Imperial Tobacco" or "Imasco."  Imperial Tobacco has manufactured

1   cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du

2   Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,

3   including California, for many years.

4        6.     Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C

5   maintains offices in California, among other places. S&C is a citizen of California, in that there are

6   S&C partners who reside in and are citizens of California.

7        7.     Plaintiffs are ignorant of the true names and capacities of defendants sued under the

8   fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

9   complaint may be amended to allege such names and capacities. Each of the fictitiously named

10  defendants is responsible in some manner for the occurrences alleged hereafter.

11       8.     Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

12  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

13  seeks in part declaratory relief under California Code of Civil Procedure section 1060. Flintkote is

14  authorized by virtue of the Bankruptcy Code to bring certain of the causes of action, all of which

15  arise under state law.

16       9.     Venue in the County of San Francisco is proper because defendants Imperial Tobacco

17  and S&C have no residence in California and can be sued in any county in California, and their

18  liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

19  principal place of business situated in San Francisco.

20       10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

21  directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

22  the extent of losses held by them. The alter ego claims by Hopkins and Flintkote depend upon the

23  same set of facts. Pursuing such claims against a substantial well-financed defendant is difficult and

24  expensive, so that it is economically not practical for a single individual to pursue them alone.

25  Accordingly, Flintkote and plaintiffs Hopkins have agreed to bring the alter ego claims together as

26  plaintiffs and to cooperate in prosecuting them. Plaintiffs Hopkins make no claim against S&C.

27                            **FACTS**

28       11.    Flintkote manufactured and sold asbestos containing products for many years,

Snyder
Miller
& Orton
LLP

3

COMPLAINT

1  including vinyl asbestos floor tile, asbestos cement pipe and many other products. Flintkote, through

2  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

3  through approximately 1970. Beginning in or about 1972, Flintkote, along with many other

4  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

5  asbestos contained in its products who suffered from a variety of asbestos induced diseases. The

6  number of asbestos cases filed against Flintkote and the other companies increased over time.

7       12.     In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

8  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

9  filed against it. The bankruptcy filing was major news as Johns Manville was, absent the asbestos

10  litigation, a large and profitable American company. Other companies named as defendants in the

11  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

| Company | Date of Filing Bankruptcy |
|---|---|
| UNR Industries | July 19, 1982 |
| Amatex Corporation | November 1, 1982 |
| Forty-Eight Insulations, Inc. | April 19, 1985 |
| Standard Insulation | August 4, 1986 |
| Nicolet | July 17, 1987 |

15       13.     A number of defendants regularly sued in the asbestos litigation banded together in the

16  early 1980's and sought to settle disputes with their insurers where possible and establish a facility

17  that would provide an efficient joint defense to members of the group. The discussions were

18  mediated by Dean Harry Wellington of the Yale Law School. The participants became known as the

19  "Wellington Group." By June 1985 they had signed an agreement and had begun to operate as the

20  Asbestos Claims Facility ("ACF").

21       14.     Flintkote was a member of the ACF and, for a while, asbestos cases against it were

22  defended and settled or tried by lawyers selected by the Asbestos Claims Facility. The ACF defense

23  arrangements were initially advantageous to Flintkote as they allowed the company to defend

24  asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that

25  would be more quickly consumed if it was required to defend cases on its own. The ACF operated

26  through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as

27  to appropriate defense strategies and as to how costs should be allocated among participants.

28

Snyder
Miller
& Orton
LLP

4

COMPLAINT

15. Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to information which pointed to the threatening scope of the asbestos litigation to follow. That information included:

- The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos defendants, which increased the payment shares in the tort system of the surviving companies;

- Numbers of claims filings were increasing and claims values were increasing;

- Diseases caused by asbestos exposure could have a latency period of decades, which meant liabilities would extend far into the future;

- Commercial usage of asbestos in the United States continued to increase through the 1970's, with significant implications for future morbidity;

- Inability to extend the asbestos litigation to include significant responsible parties, such as the United States Government and the tobacco companies, all of whom had contributed to the diseases and injuries of asbestos victims;

- Unmistakable signals from casualty insurers that they could not be counted on by defendant companies in the face of ever-increasing demands, with signs from some that they would not survive. By mid-1987, two of Flintkote's insurers had become insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach agreements as to coverage with only 60% of its insurers;

- Substantial disagreements among ACF members that weakened the effectiveness of the ACF and hastened its demise. These disagreements were apparent as early as 1986. There were clear indicators that members were going to leave the ACF, and seven did so in 1987. Persons knowledgeable about the operations and functioning of the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF would not continue to operate indefinitely as originally agreed upon and also knew or should have known that disintegration of the ACF was likely in the foreseeable future.

16. Imasco was quite familiar with the American asbestos litigation. It followed and

5

COMPLAINT

1  monitored that litigation for a variety of reasons, including that it knew there was a synergistic or
2  combinative effect which produced increased disease rates in persons who smoked its tobacco
3  products and who were also exposed to asbestos. Consequently Imasco understood that the litigation
4  posed risks to corporate and insurer solvency.

5        17.    In the 1980s, Imasco was engaged in a program of corporate diversification.
6  Specifically, it was seeking to acquire non-tobacco businesses. One target of Imasco's diversification
7  program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada
8  Trustco"). But, Canada Trustco had been acquired by another Canadian company, Genstar
9  Corporation. So, in order to get control of Canada Trustco, Imasco, operating through a corporate
10  subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar
11  Corporation ("Genstar"). At the time Genstar had a number of businesses and subsidiary
12  corporations, including several in the United States. Genstar was Flintkote's ultimate parent
13  company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.
14  Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco
15  common shares.

16        18.    From the outset, Imasco's strategy was to use the value of Genstar's assets, other than
17  Canada Trustco, to finance the purchase of Canada Trustco. The strategy therefore involved
18  restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada
19  Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for
20  the hostile takeover.

21        19.    Imasco acquired Genstar in August 1986. Then, as it had planned to do, it set about
22  selling most of Genstar's assets and businesses (other than Canada Trustco). To implement this
23  scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding. First it required
24  Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then
25  transferring Flintkote's valuable operating assets to them. Then, Imasco caused Flintkote to sell each
26  of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had
27  been created previously. Those sales were made to third parties for cash.

28        20.    Gross proceeds from the sales of the Flintkote assets were approximately

Snyder
Miller
& Orton
LLP

6
COMPLAINT

1  $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987.

2  These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

3  California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

4  planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing

5  Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to

6  represent its original client Imasco in connection with the liquidation throughout the process and

7  thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and

8  Imasco.

9       21.    After these transactions, Flintkote's valuable operating businesses were gone. Their

10  profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

11  Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

12  much of which was contested by the insurers who had written the policies. The cash and insurance

13  were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

14  However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

15  Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

16  it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

17  and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

18  dividends to be paid out by Flintkote.

19       22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

20  San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

21  was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

22  corporation of Flintkote.

23       23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

24  to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

25  the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

26  Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

27  that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

28  Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

1    advised the Flintkote board that it had received preliminary advice from the consultant, and that there

2    was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

3    declare the dividend. S&C told the board that it did not believe the consultant's final report would

4    alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

5    Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

6    knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

7    it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

8    dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

9    show that the board was informed of that fact.

10        24.    Stating that it was doing so in accordance with previous undertakings and "as an

11    inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

12    such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

13    them harmless against any and all actions, suits or claims arising out of their actions, omissions or

14    conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

15        25.    Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

16    meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

17    determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

18    that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

19    to replace funds to Flintkote to the extent required by an appropriate judicial body.

20        26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

21    dividend to be paid.

22        27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

23    of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

24    1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

25    corporations and entities that it controlled and dominated.

26        28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

27    and were representing Imasco, including with respect to Flintkote-related issues, such as the

28    consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

1  face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those
2  same issues, and on the issue of the director's liability in connection with declaring dividends to
3  Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were
4  present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal
5  memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the
6  board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant
7  S&C had retained and whose preliminary report was used by S&C in connection with the December
8  1986 board meeting.

9      29.    The board minutes of the July 1987 meeting reflect that after payment of the
10 dividends, Flintkote would have left retained earnings and paid-in capital of approximately
11 $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed
12 $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure
13 taken from the RPC study was $42,000,000.

14     30.    In the July 22, 1987 board meeting, the board members were told that Imasco would
15 undertake to restore dividend monies to the extent the declared dividends were deemed legally
16 improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply
17 a writing memorializing the understanding. After the meeting, Imasco issued a letter dated July 27,
18 1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends
19 declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent
20 jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets
21 because of dividends finally determined to have been improperly paid during Imasco's indirect
22 ownership of Flintkote. A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is
23 attached as Exhibit A and incorporated by reference.

24     31.    The S&C legal memorandum and the RPC study, both supplied by Imasco's and
25 Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to
26 be paid as was Imasco's plan from the time it took over Genstar.
27     32.    S&C's relationship with Imasco supplied reason to structure S&C's advice so as to
28 ensure that Flintkote would pay the dividends. The S&C memorandum contained substantial errors,

Snyder
Miller
& Orton
LLP

9

COMPLAINT

1  omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

2  of Flinkote's payment of these dividends, including the following.

3      33.     The S&C memorandum is dated June 25, 1987, and addressed to Flintkote. However,

4  it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

5  declare the dividend yet escape personal liability for doing so. The memorandum is vague and

6  indefinite as to Flintkote's obligations as a corporation.

7      34.     The S&C memorandum contains legal analysis, including discussion of California

8  law. In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

9  Conveyance Act. S&C wrote that a conveyance could be set aside if the debtor would be rendered

10  insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

11  existing debts as they became absolute and matured. S&C advised Flintkote that it was unclear

12  whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

13  not yet manifested itself – were considered existing debts. That advice misapprehended the

14  controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

15  fixed or contingent. S&C also did not alert Flintkote that under California law, as well as in other

16  jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

17  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

18  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

19  solvent. See *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

20      35.     S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

21  changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

22  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

23  would incur debts beyond his ability to pay as they became due. The new statute therefore

24  incorporated an objective test specifically looking to the incurring of future debts. This test was in

25  addition to rules making fraudulent those transfers without fair consideration where the debtor was

26  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

27  which its remaining assets were unreasonably small in relation to the business.

28      36.     The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

Snyder
Miller
& Orton
LLP

10

COMPLAINT

1    RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending
2    and possible future asbestos-related property damage claims against Flintkote, but only "to consider"
3    asbestos personal injury claims.  RPC devoted cursory treatment to Flintkote's asbestos-related
4    personal injury claims.  RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos
5    personal injury claims.  The RPC report thus was based on an assumption, known to be questionable
6    by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to
7    Flintkote for 14 years.  S&C assured Flintkote that directors were entitled to rely upon statements in
8    an appraisal by an appraiser selected by the board.  Although it was not an appraisal under Delaware
9    law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury
10   liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC
11   report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors
12   could rely.  Imasco and S&C did not advise the directors to seek an independent expert analysis
13   regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain
14   independent counsel without a conflict of interest.

15          37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and
16   developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-
17   related personal injury liabilities.

18          38.    S&C labored under a conflict of interest when it undertook to represent and advise
19   Flintkote while still representing Imasco.  Flintkote, a company facing substantial and increasing
20   asbestos-related claims, was obliged to consider and evaluate the interests of existing and future
21   creditors before paying out $525,200,000 in dividends.  In contrast, Imasco had every interest in
22   obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all
23   along.  S&C represented both Imasco and Flintkote, with plainly conflicting interests.  The
24   declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading
25   legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which
26   was procured by S&C for the specific purpose of attempting to justify the legal propriety of the
27   dividends.

28          39.    Imasco improperly caused the dividends to be paid by telling the Flintkote board:

COMPLAINT

Snyder
Miller
& Orton
LLP

1     •   our lawyers, acting as your lawyers, together with their consultants, say you can do it;

2     •   to induce you to pay us we agree to protect you if someone sues you; and

3     •   if we are wrong about this and creditors are left unsatisfied and a court finally decides

4         the dividends were improper, we will pay them back.

5     40.  From the time Imasco acquired Genstar in August 1986, through September 29, 2003,

6  Imasco held and maintained complete control over and dominated Flintkote through Imasco's

7  indirect 100% ownership of Flintkote. Flintkote was in no position to assert claims against Imasco or

8  to sue Imasco. S&C continued to act as an instrument of Imasco, guiding and giving legal advice to

9  Flintkote, including with respect to the matters alleged herein, until September of 2003. Imasco's

10  plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote,

11  and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as

12  long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the

13  goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten

14  alter ego liability upon Imasco for Flintkote's asbestos-related claims. That Flintkote had been

15  injured by wrongful acts leading to the dividends was inherently unknowable, depending upon

16  expertise available only to sophisticated professionals such as S&C and RPC. S&C did not disclose

17  to Flintkote that it had rights with respect to the dividends.

18     41.  From and after the divestiture of its subsidiaries and payment of the dividends,

19  Flintkote operated as an asbestos claims resolution facility. Imasco exercised its domination and

20  control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and

21  Imasco Holdings Group, Inc. (collectively, "IHI"). IHI took its orders from Imasco. IHI attorneys

22  were involved in the claim resolution process. Flintkote consistently obtained releases for its parent

23  companies, including Imasco, in settlements with asbestos claimants. Flintkote and IHI shared

24  common officers and directors. Employees of Imasco or IHI were involved in management of

25  Flintkote. S&C continued to advise Imasco or IHI and Flintkote on what should be done with

26  Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related

27  liabilities. Flintkote handled its own asbestos liabilities, rather than join the Center for Claims

28  Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

Snyder
Miller
& Orton
LLP

12

COMPLAINT

1  Imasco therefore maintained control over the handling of the claims. Following the dividends, as a

2  claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical. Flintkote

3  continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

4  involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

5  critical issue of asbestos liability. The goals of Imasco throughout were to forestall any liability to

6  repay the dividend and to confine the asbestos-related liabilities to Flintkote.

7      42..    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

8  it had taken and used the money to reimburse itself for funds it had expended for buying the one

9  business it did want, Genstar's Canada Trustco, a financial services company in Canada. After

10  Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

11  to satisfy its asbestos-related personal injury liabilities.

12      43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

13  financial statements. It did not publicly disclose its true financial condition and the nature and extent

14  of its asbestos liabilities. Instead, Imasco, as Flintkote's ultimate parent corporation filed public

15  financial statements in Canada that purported to represent Flintkote's financial condition. Imasco

16  represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

17  Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

18  represented, with respect to Flintkote's financial condition, that

19      [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

20      subject to numerous claims and suits, some of which allege significant damage. In the opinion of

21      management, all such claims and suits are adequately covered by insurance, or are provided for in

22      the financial statements, or if not so covered or provided for, the results are not expected to

23      material affect the Corporation's financial condition.

24  Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

25  repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

26  within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

27  as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

28  alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

Snyder
Miller
& Orton
LLP

13

COMPLAINT

1  had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

2  became due and were made in violation of California and other law, including California's Uniform

3  Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

4  applicable limitation period.

5       44.    In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

6  Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

7  subsidiary of Navigant Consulting, Inc. ("Navigant"). Navigant issued a report dated August 19,

8  2003. The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

9  billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

10 $3.4781 billion.

11      45.    In September, 2003, the shares of Flintkote stock were transferred to a trust, and

12 Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

13                           **FIRST CAUSE OF ACTION**
14   **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –
                                Wrongful Death)**

15      46.    Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

16 paragraphs 1 through 45, inclusive.

17      47.    At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an

18 alter ego of Flintkote, and each of them, were and are engaged in the business of researching,

19 manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying,

20 offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving,

21 certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying,

22 requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain

23 product, namely asbestos and other products containing asbestos.

24      48.    At all times mentioned, said defendants, and each of them, singularly and jointly,

25 negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed

26 to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled,

27 distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for

28 installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and

Snyder
Miller
& Orton
LLP

14

COMPLAINT

advertised, a certain product, namely asbestos, and other products containing asbestos, in that said

products caused personal injuries to users, consumers, workers, bystanders and others, including the

Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed

persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said

products hazardous, unsafe, and dangerous for use by "exposed persons."

      49.    Said defendants, and each of them, had a duty to exercise due care in the pursuance of

the activities mentioned above and defendants, and each of them, breached said duty of due care.

      50.    Said defendants, and each of them, knew, or should have known, and intended that the

aforementioned asbestos and products containing asbestos and related products and equipment,

would be transported by truck, rail, ship, and other common carriers, that in the shipping process the

product would break, crumble, or otherwise be damaged; and/or that such products would be used for

insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping,

hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation,

resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or

handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

persons working in proximity to said products, directly or through reentrainment.

      51.    Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

employment status is, on current information and belief, as set forth at various locations and

circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

      52.    Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

asbestos-containing products over a period time.

      53.    Decedent suffered from a condition related to exposure of asbestos and asbestos-

COMPLAINT

Snyder
Miller
& Orton
LLP

1  containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-
2  containing products presented risk of injury and/or disease.
3       54.    As a direct and proximate result of the aforesaid conduct of said defendants, and each
4  of them, Decedent suffered permanent injuries to his person, body, and health, including, but not
5  limited to, asbestosis, other lung damage, and cancer and related sequelae, and the mental and
6  emotional distress attendant thereto, and ultimately death, from the effect of exposure to asbestos
7  fibers, all to his general damage in the sums to be proven at trial.
8       55.    As a direct and proximate result of the aforesaid conduct of said defendants, and each
9  of them, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine,
10  hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to
11  plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when the true and
12  exact cost thereof is ascertained. As a direct and proximate result of the aforesaid conduct of said
13  defendants, and each of them, Decedent incurred liability for the reasonable value of medical care
14  provided by Decedent's family members measured by, inter alia, the costs associated with the hiring
15  a registered nurse, home hospice, or other service provider, the true and exact amount thereof being
16  unknown to plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when
17  the true and exact costs are known or at time of trial.
18      56.    As a further direct and proximate result of the said conduct of said defendants, and
19  each of them, Decedent incurred loss of income, benefits, entitlements, wages, profits, and
20  commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and
21  extent of which are not yet known to plaintiffs; and leave is requested to amend this complaint to
22  conform to proof at the time of trial.
23      57.    As a further direct and proximate result of the said conduct of said defendants, and
24  each of them, Decedent's exposure to asbestos and asbestos-containing products caused severe and
25  permanent injury to Decedent, and ultimately Decedent died on September 27, 2005.
26      58.    Said defendants, and each of them, and their officers, directors and managing-agents
27  participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should
28  have known of, each of the acts set forth herein.

Snyder
Miller
& Orton
LLP

16

COMPLAINT

59.     The herein-described conduct of said defendants, and each of them, was and is despicable, willful, malicious, fraudulent, outrageous, and in conscious or reckless disregard and indifference to the safety, health, and rights of "exposed persons", including decedent herein, giving rise to decedent's claim herein alleged for punitive damages against said defendants.

60.     At all times prior to his death, Decedent was a faithful and dutiful spouse to plaintiff Marlene Hopkins, and parent to plaintiffs Michelle and Michael Hopkins.

61.     As a direct and proximate result of the conduct of said defendants, and each of them, and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of care, society, comfort attention, services, and support of Decedent all to the damage of decedent's heirs.

62.     As a further direct and proximate result of the conduct of said defendants, and each of them, and the death of Decedent, decedent's heirs have incurred funeral expenses in an amount currently not ascertained.

63.     As a direct and proximate result of the acts, omissions, and conduct of said, and each of them, as aforesaid, Decedent's exposure to harm or the Decedent as set forth in Exhibit B, attached to the complaint and incorporated by reference herein.

64.     Decedent's personal injury claim against Flintkote was resolved by Judgment filed June 25, 2003, following Flintkote's acceptance of an offer to compromise in action number 408556 in this court.

65.     Imasco completely dominated and controlled Flintkote, deliberately requiring Flintkote to divest itself of its operating businesses and assets solely for the benefit of Imasco. After the divestiture of its businesses, Flintkote did not manufacture or market any products or render any services to third parties. It served only as a vehicle for Imasco, resolving asbestos and other claims, including obtaining releases for Imasco, and prosecuting insurance coverage claims. By causing Flintkote to convert its assets and businesses to cash, and then stripping Flintkote of $525,200,000, most of that cash, Imasco prevented Flintkote both from benefiting from the operating profits of the sold businesses and/or from investing the sale proceeds and using the principal plus earnings to pay claims.

Snyder
Miller
& Orton
LLP

17

COMPLAINT

66.    In the years following the dividends, Flintkote's benefit programs were administered by Imasco's subsidiary, IHI.  Flintkote, with IHI, filed consolidated financial statements and tax returns.

67.    There became in 1986 and 1987 and thereafter such a unity of interest, and of ownership since Imasco owned indirectly 100% of Flintkote, that separate personalities of Flintkote and Imasco no longer existed.  If the companies are treated as separate, inequitable results will follow.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

## SECOND CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Products Liability – Wrongful Death)**

68.    Plaintiffs Hopkins incorporate by reference each and all the allegations of the First Cause of Action.

69.    Defendants Plant, Uniroyal, and Imperial Tobacco, knew and intended that the above-referenced asbestos and asbestos-containing products, would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

70.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease and/or death.  The defect existed in the said products at the time they left the possession of defendants, and each of them.  Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed persons", including Decedent herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

71.    "Exposed persons" did not know of the substantial danger of using said products.  Said dangers were not readily recognizable by "exposed persons".  Said defendants, and each of them, further failed to adequately warn of the risks to which decedent and others similarly situated were exposed.

72.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to

18

COMPLAINT

Snyder
Miller
& Orton
LLP

1    test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale,
2    supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,
3    representing, endorsing, servicing, installing, contracting for installation, repairing, marketing,
4    warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-
5    containing products, said defendants, and each of them, did so with conscious disregard for the safety
6    of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in
7    that said defendants, and each of them, had prior knowledge that there was a substantial risk of injury
8    or death resulting from exposure to asbestos or asbestos-containing products, including, but not
9    limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from
10   scientific studies performed by, at the request of, or with the assistance of, said defendants, and each
11   of them, and which knowledge was obtained by said defendants, and each of them on or before 1930,
12   and thereafter.
13       73.     On or before 1930, and thereafter, said defendants, and each of them, were aware that
14   members of the general public and other "exposed persons", who would come in contact with their
15   asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos
16   or asbestos-containing products could cause injury, and said defendants, and each of them, knew that
17   members of the general public and other "exposed persons", who came in contact with asbestos and
18   asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and
19   asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health
20   and human life.
21       74.     With said knowledge, said defendants, and each of them, opted to research, manufacture,
22   fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install,
23   contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said
24   asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn
25   "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing
26   products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high
27   risk of injury or death resulting from exposure to asbestos and asbestos-containing products, said
28   defendants, and each of them, intentionally failed to reveal their knowledge of said risk, and

Snyder
Miller
& Orton
LLP

19
COMPLAINT

consciously and actively concealed and suppressed said knowledge from "exposed persons" and members of the general public, thus impliedly representing to "exposed persons" and members of the general public that asbestos and asbestos-containing products were safe for all reasonably foreseeable uses. Said defendants, and each of them, engaged in this conduct and made these implied representations with the knowledge of the falsity of said implied representations.

75.    The above-referenced conduct of said defendants, and each of them, was motivated by the financial interest of said defendants, and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing products. In pursuance of said financial motivation, said defendants, and each of them, consciously disregarded the safety of "exposed persons" and in fact were consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced persons to work with and be exposed thereto, including plaintiff.

76.    Plaintiffs allege that the aforementioned defendants, and each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for their intended use, but that their asbestos and asbestos-containing products, created an unreasonable risk of bodily harm to exposed persons.

77.    Decedent relied upon defendants', and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable, and proximate result thereof, Decedent suffered permanent injury and death as alleged herein.

78.    As a direct and proximate result of the actions and conduct outlined herein, Plaintiffs Hopkins have suffered the injuries and damages herein alleged.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

### THIRD CAUSE OF ACTION
(By Plaintiff Marlene Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Loss of Consortium)

79.    Plaintiff Marlene Hopkins re-alleges and incorporates by reference each and all the

20

COMPLAINT

Snyder
Miller
& Orton
LLP

allegations of the First and Second Causes of Action.

80.     Decedent and plaintiff Marlene Hopkins were married on February 18, 1961, and at all times relevant to this action were husband and wife.

81.     Prior to Decedent's injuries as alleged, Decedent was able and did perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof, and until Decedent's death, Decedent was unable to perform the necessary duties as a spouse and the work and service usually performed in the care, maintenance, and management of the family home. As a proximate result thereof, plaintiff Marlene Hopkins was permanently deprived of the consortium of her spouse, including the performance of duties, all to plaintiff Marlene Hopkin's damages, in an amount presently unknown to plaintiff, but which will be proved at the time of trial.

82.     Plaintiff Marlene Hopkins' discovery of the cause of Decedent's loss of consortium, as herein alleged, first occurred within one year last past from the filing of this Complaint.

83.     As a direct and proximate result of the acts of said defendants, and the severe injuries and death caused thereby to Decedent as set forth in this complaint, plaintiff Marlene Hopkins has suffered loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love, and affection of said spouse, and has suffered severe mental and emotional distress, and general nervousness as a result thereof.

WHEREFORE, plaintiff Marlene Hopkins prays judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

### FOURTH CAUSE OF ACTION
#### (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for Negligence – Survival)

84.     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations of the First Cause of Action.

85.     Plaintiffs bring this action pursuant to California Code of Civil Procedure section 377.30 et. seq. As a direct and proximate result of the actions and conduct outlined herein, Decedent suffered the injuries and damages herein alleged. Plaintiffs are entitled to recover all damages sustained by Decedent as alleged above.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

Snyder
Miller
& Orton
LLP

21

COMPLAINT

set forth below.

## FIFTH CAUSE OF ACTION
### (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal to Products Liability -- Survival)

86.     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations of the First and Second Causes of Action.

87.     As a direct and proximate result of the exposure to defendants' products and the conduct outlined herein, Decedent has suffered the injuries and damages herein alleged.

88.     Plaintiffs Hopkins are entitled to recover all damages sustained by Decedent as alleged above.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as set forth below.

## SIXTH CAUSE OF ACTION
### (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for False Representation Under Restatement of Torts Section 402-B -- Survival)

89.     Plaintiffs Hopkins re-allege and incorporates by reference each and all the allegations of the First and Second Causes of Action.

90.     At the aforementioned time when defendants Plant and Uniroyal, and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented, endorsed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged, and advertised the said asbestos and asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other "exposed persons", including the decedent herein and his employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

91.     The purchasers and users of said asbestos and asbestos-containing products, and other "exposed persons", including the Decedent and his employers, relied upon said representations of said defendants, and each of them, in the selection purchase, and use of asbestos and asbestos-

Snyder
Miller
& Orton
LLP

22

COMPLAINT

1   containing products.

2       92.    Said representations by defendants, and each of them, were false and untrue, and

3   defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products,

4   were not safe for their intended use, nor were they of merchantable quality as represented by

5   defendants, and each of them, in that asbestos and asbestos-containing products have very dangerous

6   properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and

7   have other defects that cause injury and damage to the users of said products and other "exposed

8   persons", thereby threatening the health and life of said persons including decedent herein.

9       93.    As a direct and proximate result of said false representations by defendants, and each of

10  them, the Decedent suffered injury and death as set forth.

11      WHEREFORE, plaintiffs pray judgment against defendants Plant and Uniroyal, set forth

12  below.

13                          <u>SEVENTH CAUSE OF ACTION</u>
14          (By Plaintiffs Hopkins Against Defendant Plant for Contractor Liability)

15      94.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

16  of the First and Second Causes of Action.

17      95.    At all times mentioned herein, defendant Plant, owned, leased, maintained, managed,

18  and/or controlled the premises listed on Exhibit B where Decedent was present. The information

19  provided on Exhibit B is preliminary, based on recall over events covering many years and further

20  investigation and discovery may produce more reliable information.  Additionally, Decedent might

21  have been present at these or other of Plant's premises at other locations and on other occasions.

22      96.    Prior to and at said times and places, defendant Plant caused certain asbestos-

23  containing insulation, other building materials, products, and toxic substances to be constructed,

24  installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid

25  respective premises, by their own workers and/or by various unqualified or unskilled contractors and

26  caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the

27  ambient air and thereby created a hazardous and unsafe condition to decedent and other persons

28  exposed to said asbestos fibers and toxic substances while present at said premises.

Snyder
Miller
& Orton
LLP

                                23
                            COMPLAINT

97.    At all times mentioned herein, said defendant Plant knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to decedent and other workers or persons so exposed present on each of the aforesaid respective premises.

98.    At all times relevant herein, Decedent entered said premises and used or occupied each of said respective premises as intended and for Plant's benefit and advantage and at Plant's request and invitation. In so doing, Decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said defendant Plant.

99.    Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

100.    At all times mentioned herein, Defendant Plant remained in control of the premises where Decedent was performing his work.

101.    At all times mentioned herein, defendant Plant owed to decedent and others similarly situated a duty to exercise

ordinary care in the management of such premises so as to avoid exposing workers such as decedent to an unreasonable risk of harm and to avoid causing injury to said person.

102.    At all times mentioned herein, defendant Plant, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforementioned hazardous conditions to which they were exposed on the premises.

103.    At all times mentioned herein, defendant Plant negligently failed to maintain, manage, inspect, survey, or control said premises, or to abate, or correct, or to warn decedent of, the existence of the aforesaid dangerous conditions and hazards on or about said premises.

Snyder
Miller
& Orton
LLP

24
COMPLAINT

1    104.    Prior to and at the times and places aforesaid, defendant Plant caused certain

2    asbestos-containing insulation, other building materials, products, and toxic substances to be

3    constructed, installed, maintained, used, replaced, repaired and/or removed on each of their

4    aforesaid respective premises, by their own workers and/or by employing various contractors,

5    and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances

6    into the ambient air and thereby injured decedent.

7    105.    At all times mentioned herein, defendant Plant:

8         a.    Should have recognized that the work of said contractors would create during

9    the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would

10   harm decedent and others unless special precautions were taken;

11        b.    Knew or had reason to know, that the contractors it had selected and hired to

12   install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled,

13   unlicensed, or otherwise unqualified to do so;

14

15        c.    Failed to use reasonable care to discover whether the contractors it selected and

16   hired to install, remove, abate, or otherwise handle asbestos-containing materials were

17   competent, or qualified to do so.

18   106.    In part, Decedent was exposed to dangerous asbestos fibers and other toxic

19   substances by reason of such contractors' failure to take the necessary precautions.

20   107.    The work of contractors on premises controlled by defendant Plant created an unsafe premise

21   and an unsafe work place by reason of the release of dangerous quantities of toxic substances, including but not

22   limited to asbestos.

23   108.    Prior to and at said times and places, defendant Plant was subject to certain ordinances,

24   standards, statutes, and other government regulations promulgated by the United States Government,

25   the State of California, and others, including but not limited to the General Industry Safety Orders

26   promulgated pursuant to <u>California Labor Code</u> § 6400 and the <u>California Administrative Code</u> under

27   the Division of Industrial Safety, Department of Industrial Relations, including but not limited to

28   <u>Title VIII</u> Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and §

Snyder
Miller
& Orton
LLP

25

COMPLAINT

4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, <u>California Health and Safety Code</u> § 40.200, <u>et seq.</u>, which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate regulations including, but not limited to <u>B.A.A.Q.D. Regulation</u> 11, Rules 2 and 14, Title 40 <u>Code of Federal Regulations</u>. Chapter 1, Part 61, <u>et seq.</u> -- The National Emission Standards for Hazardous Air Pollutants, which required defendant Plant to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said defendant Plant failed to provide the required safeguards and precautions. Defendant's violations of said codes include, but are not limited to:

      (a)    Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

      (b)    Failing to segregate work involving the release of asbestos or other toxic dusts;

      (c)    Failing to suppress dust using prescribed ventilation techniques;

      (d)    Failing to suppress dust using prescribed "wet down" techniques;

      (e)    Failing to warn or educate decedent or others regarding asbestos or other toxic substances on the premises;

      (f)    Failing to provide approved respiratory protection devices;

      (g)    Failing to ensure "approved" respiratory protection devices were used adequately;

      (h)    Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

      (i)    Failing to provide adequate housekeeping and clean-up of the work place;

      (j)    Failing to adequately warn of the hazards associated with asbestos as required by these statutes;

COMPLAINT

Snyder
Miller
& Orton
LLP

1        (k)    Failing to adequately report renovation and disturbance of asbestos-containing

2  materials, including but not limited to B.A.A.O.M.D. Regulation 11, Rules 2 and 14;

3

4        (1)    Failing to have an asbestos removal supervisor as required by regulation;

5        (m)    Failing to get approval for renovation as required by statutes; and

6

7        (n)    Failing to maintain records as required by statute.

8      109.   Defendant Plant was the "statutory employer" of decedent as defined by the California

9  Labor Code and California case law.

10      110.   Decedent at all times was unaware of the hazardous condition or the risk of personal

11  injury created by defendant's violation of said regulations, ordinances, or statutes.

12      111.   At all times mentioned herein, Decedent was a member of the class of persons whose

13  safety was intended to be protected by the regulations, standards, statutes, or ordinances described in

14  the foregoing paragraphs.

15      112.   At all times mentioned herein, said defendant Plant, knew, or in the exercise of

16  ordinary and reasonable care should have known, that the premises that were in its control would be

17  used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present

18  and using said premises would not be aware of the aforesaid hazardous conditions to which they were

19  exposed on the premises, and that such persons were unaware of the aforesaid violations of codes,

20  regulations, and statutes.

21      113.   As a proximate result of the foregoing, Decedent developed asbestos-related illness,

22  which has caused great injury and disability to Decedent, and ultimately death, as previously set

23  forth, and plaintiffs have suffered damages as herein alleged.

24      WHEREFORE, plaintiffs Hopkins pray judgment against defendant Plant, as set forth below.

25            **EIGHTH CAUSE OF ACTION**
    **(By Flintkote Against Imperial Tobacco For Declaration of Alter Ego Liability)**

26      114.   Flintkote re-alleges and incorporates by reference each and all the allegations of

27  paragraphs 1 through 45 and 65 through 67, inclusive.

28      115.   An actual controversy exists between Flintkote and Imperial Tobacco arising from

Snyder
Miller
& Orton
LLP

27

COMPLAINT

1  Imasco's domination and control of Flintkote, including Imasco's causing Flintkote to create the

2  subsidiaries, isolate the asbestos liabilities, sell the subsidiaries, and declare and pay the Dividends,

3  and the use of Flintkote by Imasco solely for Imasco's own purposes, as set forth herein.

4        116.    Flintkote contends that Imperial Tobacco is Flintkote's alter ego and is responsible to

5  pay asbestos-related claims asserted against Flintkote, such that if Flintkote is correct, the burden of

6  those claims will be borne in whole or in part by Imperial Tobacco.

7        117.    Flintkote is informed and believes, and upon such information and belief alleges, that

8  Imperial Tobacco disagrees with each of Flintkote's contentions.

9        118.    Flintkote has the right to assert alter ego claims against its former indirect parent

10  Imperial Tobacco.

11       WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth

12  below.

13                        **NINTH CAUSE OF ACTION**

14        **(By Flintkote Against Imperial Tobacco For Receiving  Illegal Dividends)**

15       119.    Flintkote re-alleges and incorporates by reference each and all the allegations of

16  paragraphs 1 through 45, inclusive.

17       120.    The dividends of $170,200,000 in 1986 and $355,000,000 in 1987 were not payable

18  out of Flintkote's net profits for either the year in which the dividend was declared or the preceding

    fiscal year.

19       121.    The dividends in 1986 and 1987 (collectively, the "Dividends") could be paid only out

20  of surplus defined as the amount in excess of Flintkote's capital by which its assets exceeded its

21  liabilities.  Flintkote's asbestos related personal injury and its other liabilities exceeded its assets.

22       122.    Imasco and its lawyers, S&C, caused the directors to declare and pay the dividends

23  when they were not authorized under the dividend statutes.

24       123.    Imasco actively procured and participated in the declarations of the illegal dividends,

25  knew the receipt of the dividends was improper, and reaped the benefits of them.

26       WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth

27  below.

28                        **TENTH CAUSE OF ACTION**

Snyder
Miller
& Orton
LLP

28

COMPLAINT

**(By Flintkote Asserting the Rights of a Creditor,
Against Imperial Tobacco for Recovery of Illegal Dividends)**

1

2     124.    Flintkote realleges and incorporates by reference each and all the allegations of the

3     Ninth Cause of Action.

4     125.    Flintkote is operating its business and conducting its affairs as the debtor and debtor in

5     possession in the Bankruptcy Case.  Flintkote may recover any transfer of money that is voidable

6     under applicable state law by a creditor holding an unsecured claim that is allowable in the

7     Bankruptcy Case.

8     126.    The transfers of the Dividends, $170,200,000 on or about December 30, 1986, and

9     $355,000,000 on or about August 31, 1987, were transfers of interests of the debtor in property.

10    127.    At the time of the Dividends, there existed one or more individuals (a) who had

11    suffered from inherently unknowable injuries to a blameless ignorant party as a result of exposure to

12    asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, tolling the

13    applicable limitation periods until such time as the claimant was chargeable with knowledge that his

14    condition was attributable to asbestos exposure, (b) who were creditors of Flintkote due to exposure

15    to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, and (c)

16    who hold allowable claims against Flintkote and its bankruptcy estate.

17    128.    From and after the date of each Dividend, until at least September 29, 2003, Imasco

18    controlled and dominated Flintkote, and did not disclose, and caused Flintkote not to disclose the true

19    nature of Flintkote's financial condition to creditors.  Creditors did not know and could not have

20    known that the transfer of the dividends to Imasco rendered Flintkote insolvent.

21    129.    The Dividends are invalid and avoidable because the Dividends were paid at a time

22    when Flintkote did not have a surplus of assets over liabilities. Because of Imasco's domination and

23    control of Flintkote and because of the suppression of Flintkote's true financial condition in the

24    public financial reporting Imasco released in Canada, this fact was not known and could not

25    reasonably have been known to creditors of Flintkote, including asbestos disease claimants.  Flintkote

26    may recover the Dividends from Imasco who was the entity for whose benefit such transfers were

27    made.  To the extent the Dividends passed through entities before their delivery to Imasco, such

28    entities were mere conduits, or to the extent such intermediate entities were not mere conduits and the

Snyder
Miller
& Orton
LLP

29

COMPLAINT

1    transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the Dividends was not for

2    value or in good faith.

3         WHEREFORE, Flintkote prays judgment against Imperial Tobacco as set forth below.

4

5                        **ELEVENTH CAUSE OF ACTION**

6    **(By Flintkote Asserting the Rights of a Creditor Against Imperial Tobacco For Recovery of**
     **Fraudulent Transfers)**

7         130.    Flintkote realleges and incorporates by reference each and all the allegations of the

8    Ninth and Tenth Causes of Action.

9         131.    At the time of the Dividends, or within the applicable limitation period thereafter,

10   there existed (a) one or more individuals who had asbestos-related personal injury lawsuits on file

11   against Flintkote, and those lawsuits remained on file until May 1, 2004, or (b) one or more

12   individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote

13   products who suffered from inherently unknowable injuries and who was blamelessly ignorant,

14   thereby tolling any applicable limitation periods until such time as the each such individual was

15   chargeable with knowledge that his condition was attributable to asbestos exposure, or (c) one or

16   more individuals who suffered from asbestos-related diseases arising as a result of exposure to

17   Flintkote products who did not know and could not reasonably have been known of Flintkote's true

18   financial condition because of Imasco's domination and control of Flintkote and because of the

19   suppression of Flintkote's true financial condition in the public financial reporting Imasco released in

20   Canada, some or all of which serve to toll the applicable limitations period.

21        132.    The Dividend of $170,200,000 was made without receipt of fair consideration by

22   Flintkote who: (a) was or would be rendered insolvent by the transfer and/or (b) was about to be

23   engaged in a business, paying asbestos claims, for which its property remaining after the Dividend

24   was unreasonably small capital.

25        133.    When the Dividend of $355,000,000 was paid in 1987, it constituted a fraudulent

26   transfer in that Flintkote received no reasonably equivalent value for it and one or more of the

27   following was true: (a) Flintkote was insolvent or became insolvent as a result of the transfer, or (b)

28   Flintkote was engaged in or about to engage in the business of paying asbestos claims for which

Snyder
Miller
& Orton
LLP

                                    30
                                 COMPLAINT

1  Flintkote's assets were unreasonably small in relation to the business, or (c) Flintkote reasonably

2  should have believed that it would incur debts beyond its ability to pay as they became due.

3        134.   The separation of Flintkote's asbestos liabilities from its valuable operating assets as a

4  result of the formation of subsidiary corporations, the sale of those subsidiary corporations; and the

5  transfer of the Dividends to Imasco, constituted an integrated scheme of transfers orchestrated by

6  Imasco with actual intent to hinder, delay or defraud one or more present or future creditors of

7  Flintkote, implicating at least the following badges of fraud:

8        •   The proceeds of the scheme were transferred to an insider;

9        •   The resulting financial condition of Flintkote was concealed;

10      •   The transfers, including the separation of asbestos liabilities from operating assets,

11         occurred because Flintkote had been sued and threatened with additional suits;

12      •   The transfers, including the separation of asbestos liabilities from operating assets,

13         involved substantially all of Flintkote's assets;

14      •   The consideration ultimately received by Flintkote at the conclusion of the integrated

15         scheme was not reasonably equivalent to the value of the assets transferred;

16      •   Flintkote was insolvent or became insolvent shortly after the transfers comprising the

17         integrated scheme;

18      •   The transfers comprising the integrated scheme were made after substantial contingent

19         and unmatured indebtedness had been incurred, but before such indebtedness had

20         matured.

21

22        135.   Flintkote may recover the Dividends from Imasco who was the entity for whose

23  benefit such transfers were made.  To the extent the Dividends passed through entities before their

24  delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were

25  not mere conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of

26  the Dividends was not for value or in good faith.

27                  **TWELFTH CAUSE OF ACTION**

28          **(By Flintkote Against Imperial Tobacco for Breach of Fiduciary Duty)**

136.    Flintkote re-alleges and incorporates by reference each and all the allegations of the Ninth, Tenth, and Eleventh Causes of Action.

137.    The directors of Flintkote owed a fiduciary duty to Flintkote and to its creditors because by reason of its asbestos-related liabilities, Flintkote was insolvent or in the vicinity of insolvency. Flintkote directors were obliged to consider whether, and reasonably should have believed that, Flintkote would incur debts by reason of asbestos liabilities beyond its ability to pay as they became due.

138.    By reason of the foregoing, Imasco prevented the Flintkote directors from complying with their fiduciary duties in declaring the dividends and ordering them paid.

139.    Imasco, now Imperial Tobacco, actively procured and participated in the failure to comply with fiduciary duties and reaped the benefits of them.

WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth below.

## THIRTEENTH CAUSE OF ACTION
### (By Flintkote Against S&C for Breach of Duty and Negligence)

140.    Flintkote realleges and incorporates by reference each and all the allegations of the Ninth through the Twelfth Causes of Action.

141.    S&C as lawyers represented Flintkote in connection with the 1986 and 1987 dividends. S&C also represented Imasco with respect to the same subject matter. S&C continued to represent Flintkote with respect to the matters alleged herein until within one year of the filing of the Bankruptcy Case.

142.    The relation between attorney and client is a fiduciary relation of the very highest character.

143.    S&C had a duty without informed written consent of each client not to accept representation of more than one client in a matter in which the interests of the clients potentially conflict and not to accept or continue representation of more than one client in which the interests of the clients actually conflict. Absent consent of both clients after full disclosure, S&C had a duty not to accept or continue employment of both clients if it would be likely to involve S&C in representing

Snyder
Miller
& Orton
LLP

32

COMPLAINT

1  differing and adverse interests.

2      144.  S&C breached its duty and accepted and continued representation of Flintkote and

3  Imasco in connection with the Dividends, which was a matter in which the interests of the clients

4  were in stark conflict, adverse, and differing.

5      145.  Flintkote did not give written consent to S&C's conflicting representation of differing

6  interests.

7      146.  S&C had a duty to use reasonable care in advising Flintkote.  S&C without reasonable

8  care advised the Flintkote directors that they could go forward with the 1986 dividend.  S&C in 1987

9  without reasonable care misrepresented California law to Flintkote as respects rules governing

10  potentially fraudulent transfers.  S&C in 1987 also represented, without reasonable care, to the board

11  that the directors could rely upon the RPC report as an appraisal and thus were protected by a

12  principle that directors are entitled to rely on statements in an appraisal by an appraiser selected with

13  reasonable care by the board.  But the RPC report was not an appraisal of Flintkote's asbestos-related

14  personal injury liabilities, and RPC was not selected by the board, but rather by Imasco's counsel.

15      147.  The conflicted representation and the misrepresentations by S&C proximately caused

16  the declaration and payment of the dividends.

17      WHEREFORE plaintiff Flintkote prays judgment against S&C as set forth below.

18  **FOURTEENTH CAUSE OF ACTION**

19  **(By Flintkote Against Imperial Tobacco For Constructive Trust)**

20      148.  Flintkote re-alleges and incorporates by reference each and all the allegations of the

Ninth through the Thirteenth Causes of Action.

21      149.  By reason of the foregoing, Imperial Tobacco holds the dividend payments received

22  through the wrongful acts and the complete dominance, control, and authority Imasco held over

23  Flintkote, and by reason of the mistakes engendered by the conflicted representation and negligent

24  advice provided by Imasco's lawyers, shared with Flintkote, as set forth above.  Flintkote has the

25  right to those dividends and Imperial Tobacco holds them as a constructive trustee for the benefit of

26  Flintkote.

27  **FIFTEENTH CAUSE OF ACTION**

28  **(By Flintkote Against Imperial Tobacco For Restitution)**

Snyder
Miller
& Orton
LLP

33

COMPLAINT

150.   Flintkote realleges and incorporates by reference each and all the allegations of the Ninth through the Thirteenth Causes of Action.

151.   The declarations of the Dividends were invalid because they were the result of conflicted legal representation and erroneous legal advice given by Imasco's lawyers, shared with Flintkote.

152.   Imasco was the recipient of the Dividends under circumstances where it directly and through its lawyers wrongfully procured payment of the Dividends.

153.   Flintkote is entitled to restitution from Imperial Tobacco of the payments made pursuant to the tainted and invalid declarations of the Dividends.

## SIXTEENTH CAUSE OF ACTION
### (By Flintkote against Imperial Tobacco for Declaratory Relief)

154.   Flintkote re-alleges and incorporates by reference each and all the allegations of the Ninth through the Fifteenth Causes of Action.

155.   An actual controversy exists between Flintkote and Imperial Tobacco arising from the Dividend Repayment Contract of July 27, 1987 ("Dividend Repayment Contract").

156.   Flintkote contends that the dividends were improperly paid within the meaning of the Dividend Repayment Contract because they were paid under one or more of the following circumstances

- as illegal dividends;
- as a fraudulent conveyance or fraudulent transfer under California law;
- in breach of fiduciary duty aided and abetted by Imasco;
- as products of conflicted and tainted legal representation by S&C;
- as products of negligent legal advice by S&C;
- as improper by reason of having been induced by the promise in 1986 by Imasco to repay, and by the Dividend Repayment Contract in 1987;
- as otherwise improper within the meaning of the Dividend Repayment Contract.

157.   Flintkote is informed and believes, and upon such information and belief alleges, that Imperial Tobacco disagrees with each of Flintkote's contentions.

Snyder
Miller
& Orton
LLP

34
COMPLAINT

158. In the event the court finally determines that the 1986 and 1987 dividends were improperly paid, then Imperial Tobacco will be obligated to repay to Flintkote any amounts (up to the full amount of the dividends) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of assets of Flintkote because of the dividends finally determined to have been improperly paid, upon entry of the judgments described in the DRC.

159. Flintkote seeks a declaration as to the legal rights and duties of the parties as to propriety of the dividends and duties arising from dividends having been improperly paid.

WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth below.

## PRAYER

WHEREFORE, plaintiffs pray judgment:

1. On the First and Second Causes of Action for recovery by plaintiffs Hopkins against defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to proof;

2. On the Third Cause of Action for recovery by plaintiff Marlene Hopkins against defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to proof;

3. On the Fourth, Fifth, and Sixth Causes of Action, for recovery by plaintiffs Hopkins against defendants Plant and Uniroyal of damages according to proof;

4. On the Seventh Cause of Action, for recovery by plaintiffs Hopkins against defendant Plant of damages according to proof;

5. On the Eighth Cause of Action, for an order declaring that Imperial Tobacco is liable as the alter ego of Flintkote with respect to asbestos-related liabilities and is responsible to pay such liabilities;

6. On the Ninth, Tenth, Eleventh, and Twelfth Causes of Action, for recovery by Flintkote from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount as may be proved;

Snyder
Miller
& Orton
LLP

35

COMPLAINT

1    7.    On the Thirteenth Cause of Action, for recovery by Flintkote from S&C in the amount

2    of $525,200,000 plus interest, or such other amount as may be proved;

3    8.    On the Fourteenth and Fifteenth Causes of Action, for recovery by Flintkote from

4    Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount as may be

5    proved;

6    9.    On the Sixteenth Cause of Action, for an order declaring and determining in favor of

7    Flintkote that the $170,200,000 dividend declared and paid in December 1986 and the $355,000,000

8    dividend declared and paid in July 1987 by Flintkote were improperly paid within the meaning of the

9    Dividend Recovery Contract letter from Imasco dated July 27, 1987, and that upon the occurrence of

10   the remaining determinations described in the Dividend Recovery Contract, that Imperial Tobacco

11   will be obligated to repay to Flintkote the amounts (up to the full amount of the dividends) finally

12   determined to be due to Flintkote creditors but that cannot be satisfied out of the assets of Flintkote

13   because of the payment of the dividends.

14   Date:  4/5/06

     BRAYTON PURCELL LLP

     By: _____
         Gilbert L. Purcell
17   Additional Counsel for Plaintiff The Flintkote    Attorneys for Plaintiff Marlene Hopkins,
     Company:                                          Michelle Hopkins, and Michael Hopkins

19   Eliot S. Jubelirer (061654)
     Jean L. Bertrand (083250)
20   Morgenstein & Jubelirer
     One Market, Spear Street Tower                    SNYDER MILLER & ORTON LLP
21   Thirty-Second Floor
     San Francisco, CA 94105
     Telephone (415) 901-8700
22
     Alan Pedlar (State Bar No. 72216)                 By: _____
23   The Law Office of Alan Pedlar                         Stephen M. Snyder
     1112 Via Malibu                                       Attorneys for Plaintiff
24   Aptos, CA 95003                                        The Flintkote Company
     Telephone (831) 688-2667
25
     Kelly C. Wooster (State Bar No. 41196)
26   112 Rock Creek Court
     P.O. Box 62
27   Copperopolis, CA 95228
     Telephone: (209) 785-2437
28

Snyder
Miller
& Orton
LLP

{00007483.DOC; 5.2}                    36
                                COMPLAINT

**EXHIBIT A**

Imasco Limited

4 Westmount Square
Montréal, Canada
H3Z 2S8

P.O. Box 6500
Montréal, Canada
H3C 3K4

(514) 937 9111
Cable: ‹Tallmasco›
Telex: 05 24178

July 27, 1987

Directors of
The Flintkote Company

Imasco Limited ("Imasco") hereby undertakes to repay to Flintkote any amounts (up to the full amount of dividends declared during the period in which Imasco has been the indirect owner of Flintkote) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors, including tort judgment creditors, but that cannot be satisfied out of the assets of Flintkote because of dividends finally determined to have been improperly paid during Imasco's indirect ownership of Flintkote. Repayment will be made after (i) entry of a final, unsatisfied judgment against Flintkote that cannot be satisfied from Flintkote assets, and (ii) entry of a final judgment against either Flintkote, its directors or Imasco on the basis that (a) the dividends in question were improperly paid, and (b) Flintkote would have been able to satisfy, at least in part, the creditor's judgment but for the payment of the improper dividends. For purposes of this undertaking, a judgment that can still be appealed or as to which an appeal is pending is not considered "final."

In the event the issue of the propriety of Flintkote dividends is raised in a suit against Flintkote or its directors, Flintkote and each director named in the suit shall give prompt notice to the General Counsel of Imasco that the issue has been raised and shall permit Imasco an opportunity to control the defense of that issue.

Very truly yours,

Imasco Limited

By:

FTKT 017467
CONFIDENTIAL

Exhibit A

**EXHIBIT B**

1

<u>EXHIBIT B</u>

2

Decedent's exposure to asbestos and asbestos-containing products occurred at various

3

locations inside the State of California, including but not limited to:

4

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| 5 | | | |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Roosevelt High School, 4250 R Tulare St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno High School, 1839 E. Echo St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 88, 5380 Tulare St., Fresno, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Reedley College, 995 N. Reedley Ave. Reedley, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Crocket Bros. Dodge Dealership, Tuolumne & Broadway Sts, Fresno, CA | Carpenter | Summer 1957 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | Summer 1958 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Technical School, Tuolumne & Blackstone Sts., Fresno, CA | Carpenter | Summer 1959 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | 1960 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry Plant East St. Fresno, CA | Carpenter (periodically) | 1960-1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Central High School 3535 N. Cornelia St., Fresno, CA | Carpenter | 1961 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Kirk Elementary, 2000 E. Belgravia St., Fresno, CA | Carpenter | 1960 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snyder
Miller
& Orton
LLP

1

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | McKinley Avenue Medical Building, 610 McKinley Ave., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | 7 Retail Stores, names presently unknown, downtown Fresno, between Fulton & Kern Sts., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Scandinavian Middle School, 3232 N. Sierra St., Fresno, CA | Carpenter | 1962; 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Gas & Electric, Main Building, Corcoran, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Laton Elementary School, 6065 East Latonia St., Laton, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Travelers Body & Fender Works, 1861 N. Broadway St., Fresno, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jane Adams Elementary School, 2117 W. McKinley Ave., Fresno, CA | Carpenter | 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Retail Store Building, Pine & Blackstone Sts., Fresno, CA | Carpenter | 1965 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Dairy Queen, Pinedale, CA | Carpenter | 1966 |

Snyder
Miller
& Orton
LLP

2

EXHIBIT B

## EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sequoia Middle School, 4050 E. Hamilton St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno, Welfare Dept. Building, 4468 E. Kings Canyon, Fresno, CA | Carpenter | 1967 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | PG&E Building, Fulton and Tuolumne Sts., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg. 633 Pollasky St., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg. Armstrong and Nees Ave., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | T.G. Schmeiser Co. Building, 3160 E. California St., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sheriff's Dept. Building, Fresno & M Sts., Fresno, CA | Carpenter | 1969 |
| Larsen Ratto Construction Co 820 E. Gettysburg Fresno, CA | Larsen Ratto Construction Co. Various locations throughout Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell, Main Building, Van Ness & Tuolumne Sts., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Calwa Elementary School, 4303 E. Jensen St., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, C A | County of Fresno, Hall of Records Building, 2281 Tulare Street, Fresno, CA | Carpenter | 1970 |

Snyder
Miller
& Orton
LLP

3

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry, Turkey Processing Plant, California St. Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno Building, 2348 Mariposa Street, Fresno, CA | Carpenter | 1971 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Romaine School Administration Building, 1st & Belmont Sts., Fresno, CA | Carpenter | 1971 |
| Conklin Construction Co., Kingsburg, CA | Bear Club Bar & Restaurant, Manning and Lackjack Sts, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Reedley College, 995 N. Reedley Ave, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co. Kingsburg, CA | Madera Jr. High School, Yosemite Ave., Madera CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Easton Alcoa Elementary School, 29551 Avenue 12, Madera, CA | Carpenter | 1973 |
| Conklin Construction Co., Kingsburg, CA | Jackson Insurance Co. Building, Kingsburg, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Braun-Percilis-Wagner Surveyors Building, Blackstone & Princeton Ave., Fresno, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | C.H. Baker Shoe Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1973-1991 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Riverdale High School, Riverdale, CA | Carpenter | 1974 |

Snyder Miller & Orton LLP

4

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Northside Professional Building, 1313 E. Herndon St., Fresno, CA | Carpenter (periodically) | 1974-1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | French's Mustard Plant, Muscat & Chestnut Ave., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | California State University, Fresno, 5241 N. Maple St., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Shaw & Sixth Streets, Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Eddie's Pastry Shop, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Perry Boys Smorgy, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jiffy Mart, Elm Avenue between Lincoln & Hopkins Sts., Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Fresno and Fulton Streets, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Equipment Co. Building, 4288 S. Bagly Avenue, Fresno, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Washington Elementary School, 1420 2nd and Bauder Sts., Selma, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 12, Marks and Acacia Sts., Fresno, CA | Carpenter | 1977 |

Snyder
Miller
& Orton
LLP

5

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Miniwana and Shaw Sts., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Bo Won Association Building, 9342 F Street, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Air Terminal, Lounge, Kitty Hawk Restaurant, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma Police Station, Selma, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma City Hall Building, Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Valley Pipe Supply Co. Building 801 Santa Clara St., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 7, Cherry Ave., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Heartland Elementary (aka Jefferson Elementary) Silvia & Thompson Sts., Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Lloyd's Bank, Shaw Avenue, Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | American Transfer Co. Bldg., 2810 E. Jensen St., Fresno, CA | Carpenter | 1979 |

Snyder Miller & Orton LLP

6

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Long's Drug Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1979-1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Container Corporation of America Building, 2525 S. Sunland St., Fresno, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell Building, 334 DeWitt Avenue, Clovis, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Hopkins & Son Construction, Fresno, CA, various locations in and throughout Fresno, CA and northern CA | Carpenter | 1980-2/2002 |

PARA OCCUPATIONAL EXPOSURE:

Decedent recalled working with his father, William Hopkins, deceased. Decedent worked on the new construction and demolition of various commercial buildings, including but not limited to: firehouses; shopping centers; schools; office buildings; bank buildings; restaurants; and public utility buildings. Decedent's exposure (and secondary exposure from his father's work clothes) to asbestos and asbestos-containing products occurred at various locations inside the State of California, including plaintiffs family residence located at 5774 S. Elm Street, Fresno, California.

Decedent's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the decedent, including, but not limited to breathing difficulties, asbestosis, lung and/or other cancer, mesothelioma, and/or other lung damage. Decedent was diagnosed with mesothelioma on or about February 2002.

Decedent stopped working on February 19, 2002, due to his mesothelioma.

Snyder
Miller
& Orton
LLP

7

EXHIBIT B

**Exhibit B-2**

CASE NUMBER: CGC-06-450944  MARLENE HOPKINS et al VS. PLANT INSULATION COMPANY

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

DATE: **SEP-08-2006**

TIME: **9:00AM**

PLACE: **Department 212**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 212 (g)(1) requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.** (SEE LOCAL RULE 3)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

**Exhibit B-3**

APR-07-2006(FRI) 15:49    Legal    P. 002/003

FILED
SAN FRANCISCO COUNTY
SUPERIOR COURT

06 APR 10  AM 10: 48

GORDON PARK LI. CLERK

BY:
DEPUTY CLERK

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jean L. Bertrand, 083250<br>MORGENSTEIN & JUBELIRER<br>One Market Plaza 32nd Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: (415) 901-8700<br>ATTORNEY FOR (Name): Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of San Francisco County
400 McAllister Street, Civil
San Francisco, CA 94102

| PLAINTIFF/PETITIONER: Marlene Hopkins, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Plant Insulation Company, et al. | CGC06450944 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: 2914.1 WJB |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons, Hopkins v. Plant Insulation Co. Complaint, Case Management and ADR information

3. a. Party served: Sullivan & Cromwell LLP

   b. Person Served: Robert A. Sacks - Person authorized to accept service of process

4. Address where the party was served: 1888 Century Park East
   Los Angeles, CA 90067

5. I served the party
   b. by substituted service. On (date): April 6, 2006     at (time): 4:20 pm    I left the documents listed in item 2 with or
      in the presence of: Adam McFaden-Person in charge
      (1) (business)    a person at least 18 years of age apparently in charge at the office or usual place of business of
                        the person to be served. I informed him or her of the general nature of the papers.

      (4) A declaration of mailing is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   c. on behalf of:
   Sullivan & Cromwell LLP
   under:        Other: Limited Liability Partnership

7. Person who served papers
   a. Name:        John Aldana
   b. Address:     One Legal, Inc. - 132-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947
   c. Telephone number: 415-491-0606
   d. The fee for service was: $69.00
   e. I am:
      (3) registered California process server.
          (i)   Employee or independent contractor.
          (ii)  Registration No.: 5261
          (iii) County: Los Angeles

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: April 7, 2006

John Aldana
(NAME OF PERSON WHO SERVED PAPERS)                    (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. July 1, 2004]
1033186D.rtf - 4/7/2006 5:22:29 PM

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10

FF# 6618603

BY FAX

APR-07-2006(FRI) 15:49        . Legal                                              P. 003/003

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): | TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|---|
| Jean L. Bertrand, 083250 | (415) 901-8700 | |
| MORGENSTEIN & JUBELIRER | | |
| One Market Plaza 32nd Floor | | |
| San Francisco, CA 94105 | | |
| ATTORNEY FOR (Name): Plaintiff | Ref. No. or File No. 2914.1 WJB | |

Insert name of court, judicial district or branch court, if any:

Superior Court of San Francisco County
400 McAllister Street, Civil
San Francisco, CA 94102

PLAINTIFF:

Marlene Hopkins, et al.

DEFENDANT:

Plant Insulation Company, et al.

| PROOF OF SERVICE BY MAIL | | | | CASE NUMBER: CGC06450944 |
|---|---|---|---|---|

. I am a citizen of the United States, over the age of 18 and not a party to the within action.  My business address is 504 Redwood Blvd #223, Novato, CA 94947.
On April 7, 2006, after substituted service under section CCP 415.20(a) or 415.20(b) or FRCIV.P 4(d)(1) was made, I mailed copies of the:

Summons, Hopkins v. Plant Insulation Co. Complaint, Case Management and ADR information

to the person to be served at the place where the copies were left by placing a true copy thereof enclosed in a sealed envelope, with First Class postage thereon fully prepaid, in the United States Mail at Los Angeles, California, addressed as follows:

Sullivan & Cromwell LLP
Robert A. Sacks
1888 Century Park East
Los Angeles, CA 90067

I am readily familiar with the firm's practice for collection and processing of documents for mailing.  Under that practice, it would be deposited within the United States Postal Service, on that same day, with postage thereon fully prepaid, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

$ 69.00

Maria Oung
One Legal, Inc.
504 Redwood Blvd #223
Novato, CA 94947

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on April 7, 2006 at Los Angeles, California.

Maria Oung

10331850.tif - 4/7/2006 5:22:29 PM                                                FF# 6618603

# SUM~ONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL
TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1
through 100.

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-
in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS,
and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased,
and THE FLINTKOTE COMPANY,

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.   Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
   Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Francisco County Superior Court<br>400 McAllister Street<br><br>San Francisco, CA 94102 | **CASE NUMBER:**<br>*(Número del Caso):*<br>CGC 06 450 944 |
| --- | --- |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jean L. Bertrand (CSB 083250)                                415.901.8700          415.901.8701
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105

| DATE:<br>*(Fecha)* APR 0 5 2006 | Gordon Park-Li | Clerk, by<br>*(Secretario)* | Jun Panelo | , Deputy<br>*(Adjunto)* |
| --- | --- | --- | --- | --- |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**


Legal
Solutions
Plus

Page 1 of 1

Code of Civil Procedure §§ 412.20, 465

**Exhibit B-4**

1  ALAN R. BRAYTON (State Bar No. 073685)
   GILBERT L. PURCELL (State Bar No. 113603)
2  DAVID R. DONADIO (State Bar No. 154436)
   BRAYTON PURCELL, LLP
3  222 Rush Landing Road
   P. O. Box 6169
4  Novato, CA 94948-6269
   Telephone: (415) 898-1555
5
   Attorneys for Plaintiffs
6  Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

7  STEPHEN M. SNYDER (State Bar No. 054598)
   JAMES L. MILLER (State Bar No. 071958)
8  SNYDER MILLER & ORTON LLP
   111 Sutter Street, Suite 1950
9  San Francisco, CA 94104
   Telephone: (415) 962-4400
10 Facsimile: (415) 962-4401

11 Attorneys for Plaintiff
   The Flintkote Company
12
   (Additional Counsel Listed on Signature Page)
13

14            SUPERIOR COURT OF CALIFORNIA

15             COUNTY OF SAN FRANCISCO

16

17 MARLENE HOPKINS, Individually, as          Case No.: CGC06450944
   Wrongful Death Heir, and as Successor-in-
18 Interest to NORMAN HOPKINS, JR.,           APPLICATION FOR DESIGNATION OF
   Deceased; and MICHELLE HOPKINS, and       COMPLEX LITIGATION
19 MICHAEL HOPKINS, as Legal Heirs of
   NORMAN HOPKINS, Deceased, and THE         [C.R.C. 1800 and General Order Re:
20 FLINTKOTE COMPANY,                         Procedure for Approval of Complex
                                              Litigation Designation]
21            Plaintiffs,

22        v.

23 PLANT INSULATION COMPANY;
   UNIROYAL HOLDING, INC.; IMPERIAL
24 TOBACCO CANADA LIMITED; SULLIVAN
   & CROMWELL LLP; and DOES 1 through
25 100,

26            Defendants.

27

28

02914.00001
610164.1
APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

ORIGINAL

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FILED
San Francisco County Superior Court
APR 1 4 2006
GORDON PARK-LI, Clerk
BY:
Deputy Clerk

1    Pursuant to California Rule of Court 1800 and the Court's General Order Re:

2  Procedure for Approval of Complex Litigation Designation, plaintiffs Marlene, Michelle

3  and Michael Hopkins (the "Hopkins family") and The Flintkote Company ("Flintkote")

4  request that this case be designated complex[1].

5  **THE COURT SHOULD APPROVE A COMPLEX DESIGNATION FOR THIS CASE**

6

7    This is a complicated case with two primary and interrelated claims:  to recover

8  (with interest) over $500 million in corporate dividends declared by Flintkote in favor of

9  its ultimate parent, now known as Imperial Tobacco Canada Limited ("Imperial Tobacco")

10  and to establish Imperial Tobacco as the alter ego of Flintkote.  These two primary

11  claims are knit together factually and legally.  They are expressed in sixteen causes of

12  action against four defendants.  (A true and correct copy of the Complaint and the Civil

13  Case Cover Sheet are attached as Exhibit A.)  The causes of action include:  declaratory

14  relief with respect to a written agreement by Imperial Tobacco (then known as Imasco

15  Limited and referred to here as "Imasco") to return the corporate dividends under

16  specified circumstances; for recovery of the dividends as illegally declared in favor of

17  Imasco; for breach of fiduciary duty by Imasco; for legal malpractice against Sullivan &

18  Cromwell, the attorneys who represented  both Flintkote and Imasco in connection with

19  the payment of the illegal dividends; constructive trust; restitution and alter ego claims

20

21    [1] A party must designate a case as "complex," to alert the Court that the action

22  "requires exceptional judicial management to avoid placing unnecessary burdens on the
court or the litigants and to expedite the case, keep costs reasonable, and promote
effective decision making by the court, the parties and counsel."  C.R.C. 1800(a).

23    California Rule of Court 1800(b) directs courts, in determining whether a party's

24  designation of a case as complex is appropriate, to consider several factors, including:

25    (1)    Is the case likely to involve "[n]umerous pretrial motions raising difficult or
novel legal issues that will be time-consuming to resolve"?

26    (2)    Will the case require "[m]anagement of a large number of witnesses or a

27  substantial amount of documentary evidence"?

28

- 2 -

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   asserted in an asbestos-related wrongful death, loss of consortium and survival action

2   brought by the Hopkins family.

3       The asbestos claims are factually interwoven with the dividend recovery and

4   malpractice claims because wrongful activity with respect to the dividend payments to

5   Imasco left Flintkote without the ability to pay its asbestos-related personal

6   injury/wrongful death liabilities. Wrongful conduct by both Imasco and its lawyers,

7   Sullivan & Cromwell, caused the payment of the dividends and that payment and

8   associated misconduct are important factual components in plaintiffs' proof that Imperial

9   Tobacco is the alter ego of Flintkote. Ultimately, having been stripped of the dividends,

10  Flintkote filed a chapter 11 bankruptcy case, now pending in the United States

11  Bankruptcy Court for the District of Delaware. Thus, the wrongful acts by defendants

12  Imperial Tobacco and Sullivan & Cromwell, which caused Flintkote to transfer over half a

13  billion dollars in cash to its former corporate parent, have left the Hopkins family (and all

14  Flintkote asbestos claimants) without an adequate remedy against Flintkote.

15      Plaintiffs believe that this matter will require more than the usual amount of court

16  oversight and supervision. Plaintiffs have named one of Canada's largest tobacco

17  companies and a major international law firm as defendants, and recovery in excess of

18  $500 million is sought. Plaintiffs expect defendants to mount a vigorous defense that will

19  entail significant initial motion practice and after that, protracted discovery. Witnesses

20  number in the many dozens, and documents are voluminous. Flintkote's own document

21  repository consists of approximately 1500 bankers' boxes. Plaintiffs expect that the

22  volume of defendants' documents, particularly Imperial Tobacco's and Sullivan &

23  Cromwell's, will also be significant.

24      For all of the above reasons, plaintiffs request that the Court approve the

25  designation as complex. If there is additional information that the Court wishes to

26  consider before assigning the case to a case management program, plaintiffs are

27  prepared to provide it.

28  //

MORGENSTEIN & JUBELIRER LLP
ATTORNEY AT LAW
SAN FRANCISCO

1

2  DATED: _April 11_, 2006

3

4

5

6

7  DATED: _April 14_, 2006

8

9

10

11

12

13

14  Additional Counsel for Plaintiff The Flintkote Company:

15  Eliot S. Jubelirer (State Bar No. 061654)
    Jean L. Bertrand (State Bar No. 083250)
16  MORGENSTEIN & JUBELIRER LLP
    One Market, Spear Street Tower, 32nd Floor
17  San Francisco, CA 94105
    Telephone: (415) 901-8700

18  Alan Pedlar (State Br No. 72216)
    THE LAW OFFICE OF ALAN PEDLAR
19  1112 Via Malibu
    Aptos, CA 95083
20  Telephone: (831) 688-2667

21  Kelly C. Wooster (State Bar No. 41196)
    112 Rock Creek Court
22  P. O. Box 62
    Copperopolis, CA 95228
23  Telephone: (209) 785-2437

24

25

26

27

28

Respectfully submitted,

BRAYTON PURCELL LLP


By _____
   Alan R. Brayton
   Attorneys for Plaintiffs
   Marlene Hopkins, Michelle Hopkins
   and Michael Hopkins

MORGENSTEIN & JUBELIRER LLP


By _____
   Jean L. Bertrand
   Attorneys for Plaintiff
   The Flintkote Company

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 4 -

02914.00001
610164.1

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

EXHIBIT A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Jean L. Bertrand (CSB 083250)
Eliot S. Jubelier (CSB 061654)
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105
TELEPHONE NO: 415.901.8700    FAX NO: 415.901.8701
ATTORNEY FOR *(Name):* Plaintiff MARLENE HOPKINS, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

ENDORSED
**F I L E D**
*San Francisco County Superior Court*

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____
JUN P. PANELO
Deputy Clerk

CASE NAME: MARLENE HOPKINS, et al. v. PLANT INSULATION COMPANY, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CGC 0 6 4 5 0 9 4 4 |
|---|---|---|
| [X] Unlimited   [ ] Limited (Amount (Amount demanded demanded is exceeds $25,000) $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE: DEPT: |

*Items 1-5 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [X] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812 )**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

**2.** This case [X] is [ ] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
- a. [ ] Large number of separately represented parties
- b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
- c. [X] Substantial amount of documentary evidence
- d. [X] Large number of witnesses
- e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
- f. [ ] Substantial postjudgment judicial supervision

**3.** Type of remedies sought *(check all that apply):*
- a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [ ] punitive

**4.** Number of causes of action *(specify):* 16

**5.** This case [ ] is [X] is not a class action suit.

**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015).*

Date: April 5, 2006

Jean L. Bertrand (CSB 083250)
_____
(TYPE OR PRINT NAME)

*Jean H Bertrand*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rule 201.8, 1800–1812;
Standards of Judicial Administration, § 19

Page 1 of 2

ENDORSED
F I L E D
*San Francisco County Superior Court*

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO
Deputy Clerk

1   ALAN R. BRAYTON (State Bar No. 073685)
    GILBERT L. PURCELL (State Bar No. 113603)
2   DAVID R. DONADIO (State Bar No. 154436)
    BRAYTON PURCELL, LLP
3   222 Rush Landing Road
    P.O. Box 6169
4   Novato, CA 94948-6169
    Telephone (415) 898-1555
5
    Attorneys for Plaintiffs
6   Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

7   STEPHEN M. SNYDER (State Bar No. 054598)
    JAMES L. MILLER (State Bar No. 071958)
8   SNYDER MILLER & ORTON LLP
    111 Sutter Street, Suite 1950
9   San Francisco, CA 94104
    Telephone: (415) 962-4400
10  Facsimile: (415) 962-4401

11  Attorneys for Plaintiff
    The Flintkote Company
12  (Additional Counsel Listed On Signature Page)

13

14        SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

15                    COUNTY OF SAN FRANCISCO

16

17  MARLENE HOPKINS, Individually, as        Case No.  CGC 0 6 4 5 0 9 4 4
    Wrongful Death Heir, and as Successor-in-
18  Interest to NORMAN HOPKINS, JR.,          COMPLAINT FOR DAMAGES AND
    Deceased; and MICHELLE HOPKINS, and       RELIEF AGAINST ALTER EGO, FOR
19  MICHAEL HOPKINS, as Legal Heirs of        RECOVERY OF DIVIDENDS, FOR
    NORMAN HOPKINS, Deceased, and THE         RECOVERY OF FRAUDULENT
20  FLINTKOTE COMPANY,                        TRANSFERS, FOR DAMAGES BY REASON
                                              OF BREACH OF FIDUCIARY DUTY, FOR
21                                            DAMAGES FOR BREACH OF DUTY AND
              Plaintiffs,                     NEGLIGENCE, TO ENFORCE
22                                            CONSTRUCTIVE TRUST, FOR
        vs.                                   RESTITUTION, AND FOR DECLARATORY
23                                            RELIEF.
    PLANT INSULATION COMPANY;
24  UNIROYAL HOLDING, INC.; IMPERIAL
    TOBACCO CANADA LIMITED;
25  SULLIVAN & CROMWELL LLP; and
    DOES 1 through 100,
26
              Defendants.
27

28

CASE MANAGEMENT CONFERENCE SET

SEP 0 8 2006 - 9 00 AM

DEPARTMENT 212

Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, and MICHAEL HOPKINS and
THE FLINTKOTE COMPANY allege:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,
"Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),
who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene
Hopkins is successor in interest to Decedent under California Code of Civil Procedure section
377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil
Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent
contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos
containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of
Flintkote, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

2.    Plaintiff The Flintkote Company ("Flintkote) is, and at all relevant times, has been a
corporation organized and existing under the laws of the State of Delaware, with a principal place of
business in San Francisco, California, qualified to do and doing business in California.  For many
years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of
asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case
under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States
Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the
"Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and
remains the debtor and debtor-in-possession in that case.

3.    Defendant Plant Insulation Company ("Plant") is a California corporation, with its
principal place of business situated in the city and county of San Francisco.

4.    Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in
interest to Uniroyal, Inc.

5.    Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major
Canadian tobacco company.  It is a Canadian corporation formerly known as Imasco Limited and will
be referred to herein as "Imperial Tobacco" or "Imasco."  Imperial Tobacco has manufactured

Snyder
Miller
& Orton
LLP

2

COMPLAINT

1  cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du

2  Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,

3  including California, for many years.

4      6.    Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C

5  maintains offices in California, among other places. S&C is a citizen of California, in that there are

6  S&C partners who reside in and are citizens of California.

7      7.    Plaintiffs are ignorant of the true names and capacities of defendants sued under the

8  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

9  complaint may be amended to allege such names and capacities. Each of the fictitiously named

10  defendants is responsible in some manner for the occurrences alleged hereafter.

11     8.    Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

12  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

13  seeks in part declaratory relief under California Code of Civil Procedure section 1060. Flintkote is

14  authorized by virtue of the Bankruptcy Code to bring certain of the causes of action, all of which

15  arise under state law.

16     9.    Venue in the County of San Francisco is proper because defendants Imperial Tobacco

17  and S&C have no residence in California and can be sued in any county in California, and their

18  liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

19  principal place of business situated in San Francisco.

20     10.   Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

21  directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

22  the extent of losses held by them. The alter ego claims by Hopkins and Flintkote depend upon the

23  same set of facts. Pursuing such claims against a substantial well-financed defendant is difficult and

24  expensive, so that it is economically not practical for a single individual to pursue them alone.

25  Accordingly, Flintkote and plaintiffs Hopkins have agreed to bring the alter ego claims together as

26  plaintiffs and to cooperate in prosecuting them. Plaintiffs Hopkins make no claim against S&C.

27                                    **FACTS**

28     11.   Flintkote manufactured and sold asbestos containing products for many years,

Snyder
Miller
& Orton
LLP

3

COMPLAINT

1  including vinyl asbestos floor tile, asbestos cement pipe and many other products. Flintkote, through

2  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

3  through approximately 1970. Beginning in or about 1972, Flintkote, along with many other

4  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

5  asbestos contained in its products who suffered from a variety of asbestos induced diseases. The

6  number of asbestos cases filed against Flintkote and the other companies increased over time.

7      12.     In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

8  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

9  filed against it. The bankruptcy filing was major news as Johns Manville was, absent the asbestos

10  litigation, a large and profitable American company. Other companies named as defendants in the

11  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

12  
| Company | Date of Filing Bankruptcy |
| --- | --- |
| UNR Industries | July 19, 1982 |
| Amatex Corporation | November 1, 1982 |
| Forty-Eight Insulations, Inc. | April 19, 1985 |
| Standard Insulation | August 4, 1986 |
| Nicolet | July 17, 1987 |

13      A number of defendants regularly sued in the asbestos litigation banded together in the

early 1980's and sought to settle disputes with their insurers where possible and establish a facility

that would provide an efficient joint defense to members of the group. The discussions were

mediated by Dean Harry Wellington of the Yale Law School. The participants became known as the

"Wellington Group." By June 1985 they had signed an agreement and had begun to operate as the

Asbestos Claims Facility ("ACF").

14      Flintkote was a member of the ACF and, for a while, asbestos cases against it were

defended and settled or tried by lawyers selected by the Asbestos Claims Facility. The ACF defense

arrangements were initially advantageous to Flintkote as they allowed the company to defend

asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that

would be more quickly consumed if it was required to defend cases on its own. The ACF operated

through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as

to appropriate defense strategies and as to how costs should be allocated among participants.

Snyder
Miller
& Orton
LLP

4

COMPLAINT

15.    Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to information which pointed to the threatening scope of the asbestos litigation to follow. That information included:

- The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos defendants, which increased the payment shares in the tort system of the surviving companies;

- Numbers of claims filings were increasing and claims values were increasing;

- Diseases caused by asbestos exposure could have a latency period of decades, which meant liabilities would extend far into the future;

- Commercial usage of asbestos in the United States continued to increase through the 1970's, with significant implications for future morbidity;

- Inability to extend the asbestos litigation to include significant responsible parties, such as the United States Government and the tobacco companies, all of whom had contributed to the diseases and injuries of asbestos victims;

- Unmistakable signals from casualty insurers that they could not be counted on by defendant companies in the face of ever-increasing demands, with signs from some that they would not survive. By mid-1987, two of Flintkote's insurers had become insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach agreements as to coverage with only 60% of its insurers;

- Substantial disagreements among ACF members that weakened the effectiveness of the ACF and hastened its demise. These disagreements were apparent as early as 1986. There were clear indicators that members were going to leave the ACF, and seven did so in 1987. Persons knowledgeable about the operations and functioning of the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF would not continue to operate indefinitely as originally agreed upon and also knew or should have known that disintegration of the ACF was likely in the foreseeable future.

16.    Imasco was quite familiar with the American asbestos litigation. It followed and

1   monitored that litigation for a variety of reasons, including that it knew there was a synergistic or

2   combinative effect which produced increased disease rates in persons who smoked its tobacco

3   products and who were also exposed to asbestos.  Consequently Imasco understood that the litigation

4   posed risks to corporate and insurer solvency.

5        17.    In the 1980s, Imasco was engaged in a program of corporate diversification.

6   Specifically, it was seeking to acquire non-tobacco businesses.  One target of Imasco's diversification

7   program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada

8   Trustco").  But, Canada Trustco had been acquired by another Canadian company, Genstar

9   Corporation.  So, in order to get control of Canada Trustco, Imasco, operating through a corporate

10  subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar

11  Corporation ("Genstar").  At the time Genstar had a number of businesses and subsidiary

12  corporations, including several in the United States.  Genstar was Flintkote's ultimate parent

13  company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.

14  Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco

15  common shares.

16       18.    From the outset, Imasco's strategy was to use the value of Genstar's assets, other than

17  Canada Trustco, to finance the purchase of Canada Trustco.  The strategy therefore involved

18  restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada

19  Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for

20  the hostile takeover.

21       19.    Imasco acquired Genstar in August 1986.  Then, as it had planned to do, it set about

22  selling most of Genstar's assets and businesses (other than Canada Trustco).  To implement this

23  scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding.  First it required

24  Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then

25  transferring Flintkote's valuable operating assets to them.  Then, Imasco caused Flintkote to sell each

26  of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had

27  been created previously.  Those sales were made to third parties for cash.

28       20.    Gross proceeds from the sales of the Flintkote assets were approximately

Snyder
Milter
& Orton
LLP

6

COMPLAINT

1    $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987.

2    These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

3    California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

4    planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing

5    Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to

6    represent its original client Imasco in connection with the liquidation throughout the process and

7    thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and

8    Imasco.

9        21.    After these transactions, Flintkote's valuable operating businesses were gone. Their

10    profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

11    Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

12    much of which was contested by the insurers who had written the policies. The cash and insurance

13    were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

14    However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

15    Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

16    it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

17    and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

18    dividends to be paid out by Flintkote.

19        22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

20    San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

21    was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

22    corporation of Flintkote.

23        23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

24    to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

25    the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

26    Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

27    that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

28    Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

Snyder
Miller
& Orton
LLP

7

COMPLAINT

1   advised the Flintkote board that it had received preliminary advice from the consultant, and that there

2   was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

3   declare the dividend. S&C told the board that it did not believe the consultant's final report would

4   alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

5   Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

6   knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

7   it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

8   dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

9   show that the board was informed of that fact.

10        24.   Stating that it was doing so in accordance with previous undertakings and "as an

11   inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

12   such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

13   them harmless against any and all actions, suits or claims arising out of their actions, omissions or

14   conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

15        25.   Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

16   meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

17   determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

18   that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

19   to replace funds to Flintkote to the extent required by an appropriate judicial body.

20        26.   S&C's legal advice and Imasco's domination and control over Flintkote caused the

21   dividend to be paid.

22        27.   The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

23   of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

24   1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

25   corporations and entities that it controlled and dominated.

26        28.   At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

27   and were representing Imasco, including with respect to Flintkote-related issues, such as the

28   consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

Snyder
Miller
& Orton
LLP

8

COMPLAINT

1    face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those

2    same issues, and on the issue of the director's liability in connection with declaring dividends to

3    Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were

4    present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal

5    memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the

6    board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant

7    S&C had retained and whose preliminary report was used by S&C in connection with the December

8    1986 board meeting.

9        29.    The board minutes of the July 1987 meeting reflect that after payment of the

10    dividends, Flintkote would have left retained earnings and paid-in capital of approximately

11    $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed

12    $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure

13    taken from the RPC study was $42,000,000.

14        30.    In the July 22, 1987 board meeting, the board members were told that Imasco would

15    undertake to restore dividend monies to the extent the declared dividends were deemed legally

16    improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply

17    a writing memorializing the understanding. After the meeting, Imasco issued a letter dated July 27,

18    1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends

19    declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent

20    jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets

21    because of dividends finally determined to have been improperly paid during Imasco's indirect

22    ownership of Flintkote. A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is

23    attached as Exhibit A and incorporated by reference.

24        31.    The S&C legal memorandum and the RPC study, both supplied by Imasco's and

25    Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to

26    be paid, as was Imasco's plan from the time it took over Genstar.

27        32.    S&C's relationship with Imasco supplied reason to structure S&C's advice so as to

28    ensure that Flintkote would pay the dividends. The S&C memorandum contained substantial errors,

Snyder
Miller
& Orton
LLP

9

COMPLAINT

1  omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

2  of Flinkote's payment of these dividends, including the following.

3      33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote. However,

4  it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

5  declare the dividend yet escape personal liability for doing so. The memorandum is vague and

6  indefinite as to Flintkote's obligations as a corporation.

7      34.    The S&C memorandum contains legal analysis, including discussion of California

8  law. In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

9  Conveyance Act. S&C wrote that a conveyance could be set aside if the debtor would be rendered

10  insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

11  existing debts as they became absolute and matured. S&C advised Flintkote that it was unclear

12  whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

13  not yet manifested itself – were considered existing debts. That advice misapprehended the

14  controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

15  fixed or contingent. S&C also did not alert Flintkote that under California law, as well as in other

16  jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

17  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

18  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

19  solvent. See *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

20      35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

21  changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

22  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

23  would incur debts beyond his ability to pay as they became due. The new statute therefore

24  incorporated an objective test specifically looking to the incurring of future debts. This test was in

25  addition to rules making fraudulent those transfers without fair consideration where the debtor was

26  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

27  which its remaining assets were unreasonably small in relation to the business.

28      36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

Snyder
Miller
& Orton
LLP

10

COMPLAINT

1  RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending

2  and possible future asbestos-related property damage claims against Flintkote, but only "to consider"

3  asbestos personal injury claims. RPC devoted cursory treatment to Flintkote's asbestos-related

4  personal injury claims. RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos

5  personal injury claims. The RPC report thus was based on an assumption, known to be questionable

6  by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to

7  Flintkote for 14 years. S&C assured Flintkote that directors were entitled to rely upon statements in

8  an appraisal by an appraiser selected by the board. Although it was not an appraisal under Delaware

9  law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury

10  liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC

11  report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors

12  could rely. Imasco and S&C did not advise the directors to seek an independent expert analysis

13  regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain

14  independent counsel without a conflict of interest.

15      37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and

16  developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-

17  related personal injury liabilities.

18      38.    S&C labored under a conflict of interest when it undertook to represent and advise

19  Flintkote while still representing Imasco. Flintkote, a company facing substantial and increasing

20  asbestos-related claims, was obliged to consider and evaluate the interests of existing and future

21  creditors before paying out $525,200,000 in dividends. In contrast, Imasco had every interest in

22  obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all

23  along. S&C represented both Imasco and Flintkote, with plainly conflicting interests. The

24  declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading

25  legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which

26  was procured by S&C for the specific purpose of attempting to justify the legal propriety of the

27  dividends.

28      39.    Imasco improperly caused the dividends to be paid by telling the Flintkote board:

Snyder
Miller
& Orton
LLP

11

COMPLAINT

    • our lawyers, acting as your lawyers, together with their consultants, say you can do it;

    • to induce you to pay us we agree to protect you if someone sues you; and

    • if we are wrong about this and creditors are left unsatisfied and a court finally decides the dividends were improper, we will pay them back.

40.    From the time Imasco acquired Genstar in August 1986, through September 29, 2003, Imasco held and maintained complete control over and dominated Flintkote through Imasco's indirect 100% ownership of Flintkote. Flintkote was in no position to assert claims against Imasco or to sue Imasco. S&C continued to act as an instrument of Imasco, guiding and giving legal advice to Flintkote, including with respect to the matters alleged herein, until September of 2003. Imasco's plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote, and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten alter ego liability upon Imasco for Flintkote's asbestos-related claims. That Flintkote had been injured by wrongful acts leading to the dividends was inherently unknowable, depending upon expertise available only to sophisticated professionals such as S&C and RPC. S&C did not disclose to Flintkote that it had rights with respect to the dividends.

41.    From and after the divestiture of its subsidiaries and payment of the dividends, Flintkote operated as an asbestos claims resolution facility. Imasco exercised its domination and control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and Imasco Holdings Group, Inc. (collectively, "IHI"). IHI took its orders from Imasco. IHI attorneys were involved in the claim resolution process. Flintkote consistently obtained releases for its parent companies, including Imasco, in settlements with asbestos claimants. Flintkote and IHI shared common officers and directors. Employees of Imasco or IHI were involved in management of Flintkote. S&C continued to advise Imasco or IHI and Flintkote on what should be done with Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related liabilities. Flintkote handled its own asbestos liabilities, rather than join the Center for Claims Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

COMPLAINT

Snyder
Miller
& Orton
LLP

1    Imasco therefore maintained control over the handling of the claims. Following the dividends, as a

2    claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical. Flintkote

3    continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

4    involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

5    critical issue of asbestos liability. The goals of Imasco throughout were to forestall any liability to

6    repay the dividend and to confine the asbestos-related liabilities to Flintkote.

7        42.    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

8    it had taken and used the money to reimburse itself for funds it had expended for buying the one

9    business it did want, Genstar's Canada Trustco, a financial services company in Canada. After

10   Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

11   to satisfy its asbestos-related personal injury liabilities.

12       43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

13   financial statements. It did not publicly disclose its true financial condition and the nature and extent

14   of its asbestos liabilities. Instead, Imasco, as Flintkote's ultimate parent corporation filed public

15   financial statements in Canada that purported to represent Flintkote's financial condition. Imasco

16   represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

17   Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

18   represented, with respect to Flintkote's financial condition, that

19       [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

20      subject to numerous claims and suits, some of which allege significant damage. In the opinion of

21      management, all such claims and suits are adequately covered by insurance, or are provided for in

22      the financial statements, or if not so covered or provided for, the results are not expected to

23      material affect the Corporation's financial condition.

24   Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

25   repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

26   within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

27   as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

28   alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

1    had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

2    became due and were made in violation of California and other law, including California's Uniform

3    Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

4    applicable limitation period.

5        44.    In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

6    Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

7    subsidiary of Navigant Consulting, Inc. ("Navigant").  Navigant issued a report dated August 19,

8    2003.  The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

9    billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

10   $3.4781 billion.

11       45.    In September, 2003, the shares of Flintkote stock were transferred to a trust, and

12   Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

13                      **FIRST CAUSE OF ACTION**

14   **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –**
                              **Wrongful Death)**

15       46.    Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

16   paragraphs 1 through 45, inclusive.

17       47.    At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an

18   alter ego of Flintkote, and each of them, were and are engaged in the business of researching,

19   manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying,

20   offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving,

21   certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying,

22   requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain

23   product, namely asbestos and other products containing asbestos.

24       48.    At all times mentioned, said defendants, and each of them, singularly and jointly,

25   negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed

26   to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled,

27   distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for

28   installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and

Snyder
Miller
& Orton
LLP

14

COMPLAINT

1   advertised, a certain product, namely asbestos, and other products containing asbestos, in that said

2   products caused personal injuries to users, consumers, workers, bystanders and others, including the

3   Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed

4   persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said

5   products hazardous, unsafe, and dangerous for use by "exposed persons."

6       49.    Said defendants, and each of them, had a duty to exercise due care in the pursuance of

7   the activities mentioned above and defendants, and each of them, breached said duty of due care.

8       50.    Said defendants, and each of them, knew, or should have known, and intended that the

9   aforementioned asbestos and products containing asbestos and related products and equipment,

10  would be transported by truck, rail, ship, and other common carriers, that in the shipping process the

11  product would break, crumble, or otherwise be damaged; and/or that such products would be used for

12  insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

13  applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping,

14  hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation,

15  resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or

16  handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

17  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

18  persons working in proximity to said products, directly or through reentrainment.

19      51.    Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

20  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

21  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

22  employment status is, on current information and belief, as set forth at various locations and

23  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

24      52.    Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

25  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

26  perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

27  asbestos-containing products over a period time.

28      53.    Decedent suffered from a condition related to exposure of asbestos and asbestos-

Snyder
Miller
& Orton
LLP

15

COMPLAINT

Imasco Limited

4 Westmount Square
Montréal, Canada
H3Z 2S8

P.O. Box 6800
Montréal, Canada
H3C 3K4

(514) 937 9111
Cable: 〈Taﬁmasco
Telex: 05 24176

July 27, 1987

Directors of
The Flintkote Company

Imasco Limited ("Imasco") hereby undertakes to repay to Flintkote any
amounts (up to the full amount of dividends declared during the period in
which Imasco has been the indirect owner of Flintkote) that are finally
determined by a court of competent jurisdiction to be due to Flintkote creditors,
including tort judgment creditors, but that cannot be satisfied out of the
assets of Flintkote because of dividends finally determined to have been
improperly paid during Imasco's indirect ownership of Flintkote. Repayment
will be made after (i) entry of a final, unsatisfied judgment against Flintkote
that cannot be satisfied from Flintkote assets, and (ii) entry of a final
judgment against either Flintkote, its directors or Imasco on the basis
that (a) the dividends in question were improperly paid, and (b) Flintkote
would have been able to satisfy, at least in part, the creditor's judgment
but for the payment of the improper dividends. For purposes of this undertaking,
a judgment that can still be appealed or as to which an appeal is pending
is not considered "final."

In the event the issue of the propriety of Flintkote dividends is raised
in a suit against Flintkote or its directors, Flintkote and each director
named in the suit shall give prompt notice to the General Counsel of Imasco
that the issue has been raised and shall permit Imasco an opportunity to
control the defense of that issue.

Very truly yours,

Imasco Limited

By:

FTKT 017467
CONFIDENTIAL

Exhibit A

**EXHIBIT B**

## EXHIBIT B

Decedent's exposure to asbestos and asbestos-containing products occurred at various locations inside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Roosevelt High School, 4250 R Tulare St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno High School, 1839 E. Echo St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 88, 5380 Tulare St., Fresno, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Reedley College, 995 N. Reedley Ave. Reedley, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Crocket Bros. Dodge Dealership, Tuolumne & Broadway Sts, Fresno, CA | Carpenter | Summer 1957 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | Summer 1958 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Technical School, Tuolumne & Blackstone Sts., Fresno, CA | Carpenter | Summer 1959 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | 1960 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry Plant East St. Fresno, CA | Carpenter (periodically) | 1960-1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Central High School 3535 N. Cornelia St., Fresno, CA | Carpenter | 1961 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Kirk Elementary, 2000 E. Belgravia St., Fresno, CA | Carpenter | 1960 |

Snyder Miller & Orton LLP

1

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | McKinley Avenue Medical Building, 610 McKinley Ave., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | 7 Retail Stores, names presently unknown, downtown Fresno, between Fulton & Kern Sts., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Scandinavian Middle School, 3232 N. Sierra St., Fresno, CA | Carpenter | 1962; 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Gas & Electric, Main Building, Corcoran, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Laton Elementary School, 6065 East Latonia St., Laton, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Travelers Body & Fender Works, 1861 N. Broadway St., Fresno, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jane Adams Elementary School, 2117 W. McKinley Ave., Fresno, CA | Carpenter | 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Retail Store Building, Pine & Blackstone Sts., Fresno, CA | Carpenter | 1965 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Dairy Queen, Pinedale, CA | Carpenter | 1966 |

Snyder Miller & Orton LLP

2

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sequoia Middle School, 4050 E. Hamilton St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno, Welfare Dept. Building, 4468 E. Kings Canyon, Fresno, CA | Carpenter | 1967 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | PG&E Building, Fulton and Tuolumne Sts., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg. 633 Pollasky St., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg., Armstrong and Nees Ave., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | T.G. Schmeiser Co. Building, 3160 E. California St., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sheriff's Dept. Building, Fresno & M Sts., Fresno, CA | Carpenter | 1969 |
| Larsen Ratto Construction Co 820 E. Gettysburg Fresno, CA | Larsen Ratto Construction Co. Various locations throughout Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell, Main Building, Van Ness & Tuolumne Sts., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Calwa Elementary School, 4303 E. Jensen St., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, C A | County of Fresno, Hall of Records Building, 2281 Tulare Street, Fresno, CA | Carpenter | 1970 |

Snyder Miller & Orton LLP

3
EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry, Turkey Processing Plant, California St. Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno Building, 2348 Mariposa Street, Fresno, CA | Carpenter | 1971 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Romaine School Administration Building, 1st & Belmont Sts., Fresno, CA | Carpenter | 1971 |
| Conklin Construction Co., Kingsburg, CA | Bear Club Bar & Restaurant, Manning and Lackjack Sts, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Reedley College, 995 N. Reedley Ave, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co. Kingsburg, CA | Madera Jr. High School, Yosemite Ave., Madera CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Easton Alcoa Elementary School, 29551 Avenue 12, Madera, CA | Carpenter | 1973 |
| Conklin Construction Co., Kingsburg, CA | Jackson Insurance Co. Building, Kingsburg, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Braun-Percilis-Wagner Surveyors Building, Blackstone & Princeton Ave., Fresno, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | C.H. Baker Shoe Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1973-1991 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Riverdale High School, Riverdale, CA | Carpenter | 1974 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snyder Miller & Orton LLP

4

EXHIBIT B

### EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Northside Professional Building, 1313 E. Herndon St., Fresno, CA | Carpenter (periodically) | 1974-1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | French's Mustard Plant, Muscat & Chestnut Ave., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | California State University, Fresno, 5241 N. Maple St., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Shaw & Sixth Streets, Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Eddie's Pastry Shop, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Perry Boys Smorgy, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jiffy Mart, Elm Avenue between Lincoln & Hopkins Sts., Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Fresno and Fulton Streets, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Equipment Co. Building, 4288 S. Bagly Avenue, Fresno, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Washington Elementary School, 1420 2nd and Bander Sts., Selma, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 12, Marks and Acacia Sts., Fresno, CA | Carpenter | 1977 |

Snyder
Miller
& Orton
LLP

5

EXHIBIT B

1

<u>EXHIBIT B (cont'd.)</u>

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Miniwana and Shaw Sts., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Bo Won Association Building, 9342 F Street, Fresno, CA. | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Air Terminal, Lounge, Kitty Hawk Restaurant, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma Police Station, Selma, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma City Hall Building, Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Valley Pipe Supply Co. Building 801 Santa Clara St., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 7, Cherry Ave., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Heartland Elementary (aka Jefferson Elementary) Silvia & Thompson Sts., Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Lloyd's Bank, Shaw Avenue, Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | American Transfer Co. Bldg., 2810 E. Jensen St., Fresno, CA | Carpenter | 1979 |

Snyder Miller & Orton LLP

6

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Long's Drug Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1979-1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Container Corporation of America Building, 2525 S. Sunland St., Fresno, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell Building, 334 DeWitt Avenue, Clovis, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Hopkins & Son Construction, Fresno, CA, various locations in and throughout Fresno, CA and northern CA | Carpenter | 1980- 2/2002 |

PARA OCCUPATIONAL EXPOSURE:

Decedent recalled working with his father, William Hopkins, deceased. Decedent worked on the new construction and demolition of various commercial buildings, including but not limited to: firehouses; shopping centers; schools; office buildings; bank buildings; restaurants; and public utility buildings. Decedent's exposure (and secondary exposure from his father's work clothes) to asbestos and asbestos-containing products occurred at various locations inside the State of California, including plaintiffs family residence located at 5774 S. Elm Street, Fresno, California.

Decedent's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the decedent, including, but not limited to breathing difficulties, asbestosis, lung and/or other cancer, mesothelioma, and/or other lung damage. Decedent was diagnosed with mesothelioma on or about February 2002.

Decedent stopped working on February 19, 2002, due to his mesothelioma.

Snyder Miller & Orton LLP

7

EXHIBIT B

Hopkins v. Plant Insulation, et al.
San Francisco Superior Cour    CGC06450944

1                        PROOF OF SERVICE

2        I, the undersigned, certify and declare as follows:

3        I am over the age of eighteen years and not a party to this action.  My business
    address is One Market, Spear Street Tower, 32nd Floor, San Francisco, California.  On
4   the date stated below, at San Francisco, California, I served the attached document(s)
    on the parties in this action as follows:

5

6        APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

7

8

9

10   ☒        By causing the document listed above to be personally delivered to each
             of the person(s) set forth below:

11

12   Robert A. Sacks                          Imperial Tobacco Canada Limited
     Sullivan & Cromwell LLP                  3711 West St-Antoine
     1888 Century Park East                   City of Montreal
13   Los Angeles, CA 90067                    Province of Quebec, Canada H4C 3P6

14

15

16        I declare under penalty of perjury under the laws of the State of California that the
     above is true and correct.

17        Executed this 14th day of April, 2006, at San Francisco, California.

18

19                                                  Nyra Pierce

20

21

22

23

24

25

26

27

28

02914.00001
610747.1
                                            1
PROOF OF SERVICE

MORGENSTEIN & JUBELIRER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Exhibit B-5**

Case no.CGC-06-450944

*UNITED STATES OF AMERICA*
*SUPERIOR COURT OF CALIFORNIA*
*(Unlimited juridiction)*
*COUNTY OF SAN FRANCISCO*

**BETWEEN:**

**MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY**

*Plaintiffs*

-and-

**PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.,; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100,**

*Defendants*

### AFFIDAVIT OF SERVICE

1. I, the undersigned, **ERIC MARTIN**, bailiff of Justice of the Province of Quebec, Canada, being duly sworn, having an elected domicile at 407, Saint-Laurent Street, in the city of Montreal, Province of Quebec, Canada, solemnly affirm the following:

2. I did on Tuesday, the 18th day of April 2006 at 15:05 serve the defendant, **IMPERIAL TOBACCO CANADA LIMITED**   , herein named with a true copy of the within ATTESTATION, APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION and EXHIBIT "A", by delivering true copy, speaking to and leaving the same with ME TAMARA JITTO, Legal Advisor for IMPERIAL TOBACCO CANADA LIMITED, at 3711 West St-Antoine, in the city of Montreal, province of Quebec, Canada.

3. At the time and place of such service, the said person acknowledged to me that she was TAMARA JITTO, and at my request she produced her driver's license permit bearing no. G-3008-130870-01.

4. I certify that I have noted under my signature the date and hour of service on the back of the copy so served.

**SWORN BEFORE ME in the City of Montreal, in the Province of Quebec, Canada on April, 18TH , 2006**

_____
**COMMISSIONER OF OATHS**

SUZY LODER
# 64,850

_____
**ERIC MARTIN, Bailiff**

Case no.CGC-06-450944

### UNITED STATES OF AMERICA
### SUPERIOR COURT OF CALIFORNIA
#### (Unlimited juridiction)
### COUNTY OF SAN FRANCISCO

**BETWEEN:**

**MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY**

*Plaintiffs*

-and-

**PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.,; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100,**

*Defendants*

### AFFIDAVIT OF SERVICE

1. I, the undersigned, **ERIC MARTIN**, bailiff of Justice of the Province of Quebec, Canada, being duly sworn, having an elected domicile at 407, Saint-Laurent Street, in the city of Montreal, Province of Quebec, Canada, solemnly affirm the following:

2. I did on Tuesday, the 18th day of April 2006 at 15:05 serve the defendant, **IMPERIAL TOBACCO CANADA LIMITED**, herein named with a true copy of the within ATTESTATION, APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION and EXHIBIT "A", by delivering true copy, speaking to and leaving the same with ME TAMARA JITTO, Legal Advisor for IMPERIAL TOBACCO CANADA LIMITED, at 3711 West St-Antoine, in the city of Montreal, province of Quebec, Canada.

3. At the time and place of such service, the said person acknowledged to me that she was TAMARA JITTO, and at my request she produced her driver's license permit bearing no. G-3008-130870-01.

4. I certify that I have noted under my signature the date and hour of service on the back of the copy so served.

**SWORN BEFORE ME in the City of Montreal, in the Province of Quebec, Canada on April, 18TH , 2006**

_____
**COMMISSIONER OF OATHS**

SUZY LOBEC
# 64,850

_____
**ERIC MARTIN, Bailiff**

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

Jean L. Bertrand (CSB 083250)
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105
TELEPHONE NO. *(Optional)*: 415.901.8700    FAX NO. *(Optional)* 415.901.8701
E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name)*: Plaintiff THE FLINTKOTE COMPANY

**F I L E D**
San Francisco County Superior Co...
APR 2 0 2006
GORDON PARK-LI, Clerk
BY Mary Ann Mu...
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA  94102
BRANCH NAME:

PETITIONER/PLAINTIFF: MARLENE HOPKINS, et al.

RESPONDENT/DEFENDANT: PLANT INSULATION COMPANY, et al.

CASE NUMBER:
CGC06450944

**PROOF OF SERVICE—CIVIL**
Check method of service *(only one)*:
[X] By Personal Service   [ ] By Mail   [ ] By Overnight Delivery
[ ] By Messenger Service   [ ] By Facsimile   [ ] By E-Mail/Electronic Transmission

JUDGE:
DEPT.:

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. At the time of service I was over 18 years of age and not a party to this action.

2. My address is *(specify one)*:
    a. [X] Business:
    407 SAINT-LAURENT STREET,
    MONTREAL, QUEBEC, CANADA
    b. [ ] Residence:

3. On *(date)*:APRIL 18, 2006    I served the following documents *(specify)*:
APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

[ ] The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

4. I served the documents on the persons below, as follows:
    a. Name of person served:TAMARA JITTO, LEGAL ADVISER FOR IMPERIAL TOBACCO CANADA LIMITED
    b. Address of person served:3711 WEST ST-ANTOINE, MONTREAL, QUEBEC, CANADA

    c. Fax number or e-mail address of person served, if service was by fax or e-mail:

    d. Time of service, if personal service was used: 15:05 HOURS

    [ ] The names, addresses, and other applicable information about the persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

5. The documents were served by the following means *(specify)*:
    a. [X] By personal service. I personally delivered the documents to the persons at the addresses listed in item 4.
    (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

Form Approved for Optional Use
Judicial Council of California
POS-040 [New January 1, 2005]
**PROOF OF SERVICE—CIVIL**
(Proof of Service)
Legal Solutions Plus
Code of Civ. Proc., §§ 1011, 1013, 1013a, 2015.5

| CASE NAME HOPKINS, et al. v. PLANT INSULATION COMPANY, et al. | CASE NUMBER: CGC06450944 |
|---|---|

5 b. ☐ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 4 and *(specify one):*

    (1) ☐    deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2) ☐    placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. ☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. ☐ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 4. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

f. ☐ **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: **4/19/06**

ERIC MARTIN, BAILIFF OF JUSTICE OF QUEBEC
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 5d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

PGS-040 [New January 1, 2005]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

**Exhibit B-6**

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Jean L. Bertrand (CSB 083250)<br>MORGENSTEIN & JUBELIRER LLP<br>One Market, Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415.901.8700    FAX NO. *(Optional)*: 415.901.8701<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: Plaintiff THE FLINTKOTE COMPANY | **FILED**<br>San Francisco County Superior Court<br><br>APR 20 2006<br><br>GORDON PARK-LI, Clerk<br>BY: _____<br>Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>STREET ADDRESS: 400 McAllister Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: San Francisco, CA 94102<br>BRANCH NAME: | |

| PLAINTIFF/PETITIONER: MARLENE HOPKINS, et al.<br>DEFENDANT/RESPONDENT: PLANT INSULATION COMPANY, et al. | CASE NUMBER:<br>CGC06450944 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1.  At the time of service I was at least 18 years of age and not a party to this action.
2.  I served copies of:
    a.  [X] summons
    b.  [X] complaint
    c.  [X] Alternative Dispute Resolution (ADR) package
    d.  [X] Civil Case Cover Sheet *(served in complex cases only)*
    e.  [ ] cross-complaint
    f.  [X] other *(specify documents)*: NOTICE TO PLAINTIFF OF CASE MANAGEMENT CONFERENCE; MEDIATION SERVICES BROCHURE AND ATTESTATION

3.  a. Party served *(specify name of party as shown on documents served)*: IMPERIAL TOBACCO CANADA LIMITED

    b. Person served: [ ] party in item 3a  [X] other *(specify name and relationship to the party named in item 3a)*:
       JOHN KISER, LEGAL ADVISOR FOR IMPERIAL TOBACCO CANADA LIMITED

4.  Address where the party was served: 3711 WEST ST-ANTOINE, MONTREAL, QUEBEC, CANADA

5.  I served the party *(check proper box)*
    a.  [X] by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: APRIL 7, 2006    (2) at *(time)*: 14:10
    b.  [ ] by substituted service. On *(date)*:    at *(time)*:    I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b)*:

        (1)  [ ] (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

        (2)  [ ] (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

        (3)  [ ] (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

        (4)  [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:    from *(city)*:    or [ ] a declaration of mailing is attached.

        (5)  [ ] I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. July 1, 2004] | **PROOF OF SERVICE OF SUMMONS** | Legal<br>Solutions<br>& Plus | Code of Civil Procedure, § 417.10 |

| PLAINTIFF/PETITIONER: MARLENE HOPKINS, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: PLANT INSULATION COMPANY, et al. | CGC06450944 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date)*:    (2) from *(city)*:

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
    a. ☐ as an individual defendant.
    b. ☐ as the person sued under the fictitious name of *(specify):*
    c. ☐ as occupant.
    d. ☒ On behalf of *(specify):* IMPERIAL TOBACCO CANADA LIMITED
        under the following Code of Civil Procedure section:

| | |
|---|---|
| ☒ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
    a. Name: ETIENNE MORIN, BALIFF OF JUSTICE OF THE PROVINCE OF QUEBEC, CANADA
    b. Address: 407  SAINT-LAURENT STREET, MONTREAL, QUEBEC, CANADA
    c. Telephone number:
    d. The fee for service was: $ 119.58 (CANADIAN)
    e. I am:
        (1) ☒ not a registered California process server.
        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
        (3) ☐ registered California process server:
            (i) ☐ owner ☐ employee ☐ independent contractor.
            (ii) Registration No.:
            (iii) County:

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 4/19/06

ETIENNE MORIN
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)              ▶                           (SIGNATURE)

**Exhibit B-7**

| Attorney or Party without Attorney:<br>JEAN L. BERTRAND, Bar #83250<br>MORGANSTEIN & JUBELIRER LLP<br>ONE MARKET, SPEAR STREET TOWER<br>32ND FLOOR<br>SAN FRANCISCO, CA 94105<br>Telephone No: 415-901-8700 | For Court Use Only<br><br>**FILED**<br>San Francisco County Superior Court<br>APR 2 0 2006<br>GORDON PARK-LI, Clerk<br>BY: _May Ann Mora_<br>Deputy Clerk |
|---|---|

| Attorney for: Plaintiff, The Flintkote Company | Ref. No. or File No.:<br>2914.1 |
|---|---|

Insert name of Court, and Judicial District and Branch Court:

San Francisco County Superior Court, Civic Center Courthouse

Plaintiff: MARLENE HOPKINS, et al.

Defendant: Plant Insulation Company; Uniroyal Holding, Inc.; Imperial Tobacco Canada Limited; E

| **PROOF OF SERVICE**<br>**HAND DELIVERY** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CGC06450944 |
|---|---|---|---|---|

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of the APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

3. a. Party served:          ROBERT E. SACKS @ SULLIVAN & CROMWELL LLP
   b. Person served:        DARLENE BISSADA, PERSON IN CHARGE OF OFFICE AT THE TIME OF
                                     SERVICE

4. Address where the party was served:     1888 CENTURY PARK EAST
                                                               LOS ANGELES, CA 90067

5. I served the party:
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of
      process for the party on: Mon., Apr. 17, 2006 at: 11:30AM, to the person(s) indicated below in the manner as provided in 1011 CC
                                      DARLENE BISSADA, PERSON IN CHARGE OF OFFICE AT THE TIME
                                      OF SERVICE
   (1) **(Business)** I informed him or her of the general nature of the papers.

7. *Person Who Served Papers:*                          Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. STEPHEN GROTH                                d.  *The Fee for Service was:*

   **First Legal Support Services** ℠         e.  I am: (3) registered California process server
   ATTORNEY SERVICES                                  *(i)* Independent Contractor
   1511 BEVERLY BOULEVARD                         *(ii) Registration No.:*        5270
   Los Angeles, CA 90026                              *(iii) County:*                Los Angeles
   (213) 250-1111, FAX (213) 250-1197

8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:Tue, Apr. 18, 2006

_Stephen Groth_                                                        ✦

| Judicial Council Form<br>Rule 982.9.(a)&(b) Rev July 1, 2004 | PROOF OF SERVICE<br>HAND DELIVERY | (STEPHEN GROTH)    6282122   jeabe-mj.9435 |
|---|---|---|

**Exhibit B-8**

## ATTESTATION

I, the undersigned, **Peter P. Meringolo**, Attorney, practicing law with the firm Snyder, Miller & Orton, LLP, residing and domiciled for the purposes hereof at 111 Sutter Street, Suite 1950, San Francisco, California, USA, 94104, am the attorney for The Flintkote Company and solemnly affirm that:

1.      I am a member of the California State Bar (CSB 197136).

2.      This copy is a certified true copy of :

- the FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF AGAINST ALTER EGO, FOR RECOVERY OF DIVIDENDS, FOR RECOVERY OF FRAUDULENT TRANSFERS, FOR DAMAGES BY REASON OF BREACH OF FIDUCIARY DUTY, FOR DAMAGES FOR BREACH OF DUTY AND NEGLIGENCE, TO ENFORCE CONSTRUCTIVE TRUST, FOR RESTITUTION, AND FOR DECLARATORY RELIEF

**SWORN TO BEFORE ME**, in the City of

in the State of California, this _____
day of April, 2006.


_____
**NOTARY PUBLIC**


_____
**PETER P. MERINGOLO**
**SNYDER, MILLER & ORTON, LLP**

State of California, County of _San Francisco_ .

Subscribed and sworn to (or affirmed) before me this 28th day of _April_ , 2006 , by _Peter P. MERINGOLO_ personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_Jacob Koff_
Jacob Koff, Notary Public

JACOB KOFF
COMM. #1569579
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires May 13, 2009

8107364.1

Apr. 27. 2006 2:58PM                                    No. 2023 P. 2

1 | ALAN R. BRAYTON (State Bar No. 073685)
GILBERT L. PURCELL (State Bar No. 113603)
DAVID R. DONADIO (State Bar No. 154436)
2 | BRAYTON PURCELL, LLP
222 Rush Landing Road
3 | P.O. Box 6169
Novato, CA 94948-6169
4 | Telephone (415) 898-1555

5 | Attorneys for Plaintiffs Hopkins

6 | STEPHEN M. SNYDER (State Bar No. 054598)
JAMES L. MILLER (State Bar No. 071958)
7 | SNYDER MILLER & ORTON LLP
111 Sutter Street, Suite 1950
8 | San Francisco, CA 94104
Telephone: (415) 962-4400
9 | Facsimile: (415) 962-4401

10 | Attorneys for The Flintkote Plaintiffs
(Additional Counsel Listed On Signature Page)
11

12 | SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

13 | COUNTY OF SAN FRANCISCO

14 | MARLENE HOPKINS, Individually, as
Wrongful Death Heir, and as Successor-in-
15 | Interest to NORMAN HOPKINS, JR.,
Deceased; and MICHELLE HOPKINS, and
16 | MICHAEL HOPKINS, as Legal Heirs of
NORMAN HOPKINS, Deceased, THE
17 | FLINTKOTE COMPANY, THE OFFICIAL
COMMITTEE OF THE ASBESTOS
18 | PERSONAL INJURY CLAIMANTS, and
JAMES J. MCMONAGLE as the LEGAL
19 | REPRESENTATIVE FOR FUTURE
ASBESTOS PERSONAL INJURY
20 | CLAIMANTS,
21
22
23 |                     Plaintiffs,
24 |               vs.
25 | PLANT INSULATION COMPANY;
UNIROYAL HOLDING, INC.; IMPERIAL
26 | TOBACCO CANADA LIMITED;
SULLIVAN & CROMWELL LLP; and
27 | DOES 1 through 100,
28 |                     Defendants.

Case No. CGC06450944

FIRST AMENDED COMPLAINT FOR
DAMAGES AND RELIEF AGAINST ALTER
EGO, FOR RECOVERY OF DIVIDENDS,
FOR RECOVERY OF FRAUDULENT
TRANSFERS, FOR DAMAGES BY REASON
OF BREACH OF FIDUCIARY DUTY, FOR
DAMAGES FOR BREACH OF DUTY AND
NEGLIGENCE, TO ENFORCE
CONSTRUCTIVE TRUST, FOR
RESTITUTION, AND FOR DECLARATORY
RELIEF.

ENDORSED
FILED
San Francisco County Superior Court

APR 27 2006

GORDON PARK-LI, Clerk
BY: _____
    MARIA SANCHEZ
        Deputy Clerk

FILED BY FAX

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    1

FIRST AMENDED COMPLAINT

1       Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, MICHAEL HOPKINS, THE

2   FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL

3   INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR

4   FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS allege:

5                     **PARTIES, JURISDICTION AND VENUE**

6       1.     Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,

7   "Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),

8   who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene

9   Hopkins is successor in interest to Decedent under California Code of Civil Procedure section

10  377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil

11  Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent

12  contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos

13  containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of

14  The Flintkote Company, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

15      2.     Plaintiff The Flintkote Company ("Flintkote") is, and at all relevant times, has been a

16  corporation organized and existing under the laws of the State of Delaware, with a principal place of

17  business in San Francisco, California, qualified to do and doing business in California.  For many

18  years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of

19  asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case

20  under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

21  Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the

22  "Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and

23  remains the debtor and debtor-in-possession in that case.  Subsequently, the Office of the United

24  States Trustee appointed Plaintiff The Official Committee of Asbestos Personal Injury Claimants

25  ("ACC") and the Bankruptcy Court appointed Plaintiff James J. McMonagle as the Legal

26  Representative for Future Asbestos Personal Injury Claimants ("FCR").  The ACC and FCR are the

27  only two official creditor constituencies in the Bankruptcy Case.  On April 27, 2006, the Bankruptcy

28  Court approved an agreement that authorized Flintkote, the ACC, and the FCR to collectively

Snyder
Miller
& Orton
LLP
        {00007643.DOC; 2}        2

                    FIRST AMENDED COMPLAINT

1   represent the interests of Flintkote's estate in this matter and, subject to any procedural limitations

2   applicable to party capacity in the above-entitled action, to be named and act as co-plaintiffs in this

3   action (the "April 27 Order"). Plaintiffs Flintkote, ACC, and FCR shall collectively be referred to

4   herein as "The Flintkote Plaintiffs."

5          3.      Defendant Plant Insulation Company ("Plant") is a California corporation, with its

6   principal place of business situated in the city and county of San Francisco.

7          4.      Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in

8   interest to Uniroyal, Inc.

9          5.      Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major

10  Canadian tobacco company. It is a Canadian corporation formerly known as Imasco Limited and will

11  be referred to herein as "Imperial Tobacco" or "Imasco." Imperial Tobacco has manufactured

12  cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du

13  Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,

14  including California, for many years.

15         6.      Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C

16  maintains offices in California, among other places. S&C is a citizen of California, in that there are

17  S&C partners who reside in and are citizens of California.

18         7.      Plaintiffs are ignorant of the true names and capacities of defendants sued under the

19  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

20  complaint may be amended to allege such names and capacities. Each of the fictitiously named

21  defendants is responsible in some manner for the occurrences alleged hereafter.

22         8.      Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

23  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

24  seeks in part declaratory relief under California Code of Civil Procedure section 1060. The Flintkote

25  Plaintiffs are authorized by virtue of the Bankruptcy Code and the April 27 Order to bring certain of

26  the causes of action, all of which arise under state law.

27         9.      Venue in the County of San Francisco is proper because defendants Imperial Tobacco

28  and S&C have no residence in California and can be sued in any county in California, and their

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          3

FIRST AMENDED COMPLAINT

1  liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

2  principal place of business situated in San Francisco.

3       10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

4  directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

5  the extent of losses held by them.  The alter ego claims by Hopkins and The Flintkote Plaintiffs

6  depend upon the same set of facts.  Pursuing such claims against a substantial well-financed

7  defendant is difficult and expensive, so that it is economically not practical for a single individual to

8  pursue them alone.  Accordingly, The Flintkote Plaintiffs and plaintiffs Hopkins have agreed to bring

9  the alter ego claims together as plaintiffs and to cooperate in prosecuting them.  Plaintiffs Hopkins

10  make no claim against S&C.

11  **FACTS**

12       11.    Flintkote manufactured and sold asbestos containing products for many years,

13  including vinyl asbestos floor tile, asbestos cement pipe and many other products.  Flintkote, through

14  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

15  through approximately 1970.  Beginning in or about 1972, Flintkote, along with many other

16  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

17  asbestos contained in its products who suffered from a variety of asbestos induced diseases.  The

18  number of asbestos cases filed against Flintkote and the other companies increased over time.

19       12.    In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

20  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

21  filed against it.  The bankruptcy filing was major news as Johns Manville was, absent the asbestos

22  litigation, a large and profitable American company.  Other companies named as defendants in the

23  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

24
25
26
27

| Company | Date of Filing Bankruptcy |
|---|---|
| UNR Industries | July 19, 1982 |
| Amatex Corporation | November 1, 1982 |
| Forty-Eight Insulations, Inc. | April 19, 1985 |
| Standard Insulation | August 4, 1986 |
| Nicolet | July 17, 1987 |

     13.    A number of defendants regularly sued in the asbestos litigation banded together in the

28

Snyder
Miller
& Orton
LLP

1   early 1980's and sought to settle disputes with their insurers where possible and establish a facility

2   that would provide an efficient joint defense to members of the group.  The discussions were

3   mediated by Dean Harry Wellington of the Yale Law School.  The participants became known as the

4   "Wellington Group."  By June 1985 they had signed an agreement and had begun to operate as the

5   Asbestos Claims Facility ("ACF").

6          14.     Flintkote was a member of the ACF and, for a while, asbestos cases against it were

7   defended and settled or tried by lawyers selected by the Asbestos Claims Facility.  The ACF defense

8   arrangements were initially advantageous to Flintkote as they allowed the company to defend

9   asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that

10   would be more quickly consumed if it was required to defend cases on its own.  The ACF operated

11   through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as

12   to appropriate defense strategies and as to how costs should be allocated among participants.

13          15.     Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-

14   related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to

15   information which pointed to the threatening scope of the asbestos litigation to follow.  That

16   information included:

17       •     The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos

18           defendants, which increased the payment shares in the tort system of the surviving

19           companies;

20       •     Numbers of claims filings were increasing and claims values were increasing;

21       •     Diseases caused by asbestos exposure could have a latency period of decades, which

22           meant liabilities would extend far into the future;

23       •     Commercial usage of asbestos in the United States continued to increase through the

24           1970's, with significant implications for future morbidity;

25       •     Inability to extend the asbestos litigation to include significant responsible parties,

26           such as the United States Government and the tobacco companies, all of whom had

27           contributed to the diseases and injuries of asbestos victims;

28       •     Unmistakable signals from casualty insurers that they could not be counted on by

{00007643.DOC; 2}          5

FIRST AMENDED COMPLAINT

1    defendant companies in the face of ever-increasing demands, with signs from some

2    that they would not survive. By mid-1987, two of Flintkote's insurers had become

3    insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach

4    agreements as to coverage with only 60% of its insurers;

5    •    Substantial disagreements among ACF members that weakened the effectiveness of

6    the ACF and hastened its demise. These disagreements were apparent as early as

7    1986. There were clear indicators that members were going to leave the ACF, and

8    seven did so in 1987. Persons knowledgeable about the operations and functioning of

9    the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF

10   would not continue to operate indefinitely as originally agreed upon and also knew or

11   should have known that disintegration of the ACF was likely in the foreseeable future.

12        16.    Imasco was quite familiar with the American asbestos litigation. It followed and

13   monitored that litigation for a variety of reasons, including that it knew there was a synergistic or

14   combinative effect which produced increased disease rates in persons who smoked its tobacco

15   products and who were also exposed to asbestos. Consequently Imasco understood that the litigation

16   posed risks to corporate and insurer solvency.

17        17.    In the 1980s, Imasco was engaged in a program of corporate diversification.

18   Specifically, it was seeking to acquire non-tobacco businesses. One target of Imasco's diversification

19   program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada

20   Trustco"). But, Canada Trustco had been acquired by another Canadian company, Genstar

21   Corporation. So, in order to get control of Canada Trustco, Imasco, operating through a corporate

22   subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar

23   Corporation ("Genstar"). At the time Genstar had a number of businesses and subsidiary

24   corporations, including several in the United States. Genstar was Flintkote's ultimate parent

25   company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.

26   Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco

27   common shares.

28        18.    From the outset, Imasco's strategy was to use the value of Genstar's assets, other than

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                        6

FIRST AMENDED COMPLAINT

1   Canada Trustco, to finance the purchase of Canada Trustco. The strategy therefore involved

2   restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada

3   Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for

4   the hostile takeover.

5        19.     Imasco acquired Genstar in August 1986. Then, as it had planned to do, it set about

6   selling most of Genstar's assets and businesses (other than Canada Trustco). To implement this

7   scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding. First it required

8   Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then

9   transferring Flintkote's valuable operating assets to them. Then, Imasco caused Flintkote to sell each

10  of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had

11  been created previously. Those sales were made to third parties for cash.

12       20.     Gross proceeds from the sales of the Flintkote assets were approximately

13  $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987.

14  These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

15  California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

16  planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing

17  Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to

18  represent its original client Imasco in connection with the liquidation throughout the process and

19  thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and

20  Imasco.

21       21.     After these transactions, Flintkote's valuable operating businesses were gone. Their

22  profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

23  Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

24  much of which was contested by the insurers who had written the policies. The cash and insurance

25  were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

26  However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

27  Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

28  it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                                    7

FIRST AMENDED COMPLAINT

1   and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

2   dividends to be paid out by Flintkote.

3       22.   The first transfer was accomplished through a dividend of $170,200,000 declared in

4   San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

5   was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

6   corporation of Flintkote.

7       23.   At the time of the December 1986 dividend, S&C were and had been outside counsel

8   to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

9   the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

10  Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

11  that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

12  Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

13  advised the Flintkote board that it had received preliminary advice from the consultant, and that there

14  was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

15  declare the dividend. S&C told the board that it did not believe the consultant's final report would

16  alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

17  Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

18  knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

19  it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

20  dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

21  show that the board was informed of that fact.

22      24.   Stating that it was doing so in accordance with previous undertakings and "as an

23  inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

24  such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

25  them harmless against any and all actions, suits or claims arising out of their actions, omissions or

26  conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

27      25.   Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

28  meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                           8

                        FIRST AMENDED COMPLAINT

1    determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

2    that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

3    to replace funds to Flintkote to the extent required by an appropriate judicial body.

4         26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

5    dividend to be paid.

6         27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

7    of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

8    1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

9    corporations and entities that it controlled and dominated.

10        28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

11   and were representing Imasco, including with respect to Flintkote-related issues, such as the

12   consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

13   face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those

14   same issues, and on the issue of the director's liability in connection with declaring dividends to

15   Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were

16   present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal

17   memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the

18   board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant

19   S&C had retained and whose preliminary report was used by S&C in connection with the December

20   1986 board meeting.

21        29.    The board minutes of the July 1987 meeting reflect that after payment of the

22   dividends, Flintkote would have left retained earnings and paid-in capital of approximately

23   $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed

24   $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure

25   taken from the RPC study was $42,000,000.

26        30.    In the July 22, 1987 board meeting, the board members were told that Imasco would

27   undertake to restore dividend monies to the extent the declared dividends were deemed legally

28   improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          9

FIRST AMENDED COMPLAINT

1  a writing memorializing the understanding.  After the meeting, Imasco issued a letter dated July 27,

2  1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends

3  declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent

4  jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets

5  because of dividends finally determined to have been improperly paid during Imasco's indirect

6  ownership of Flintkote.  A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is

7  attached as Exhibit A and incorporated by reference.

8       31.    The S&C legal memorandum and the RPC study, both supplied by Imasco's and

9  Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to

10  be paid, as was Imasco's plan from the time it took over Genstar.

11       32.    S&C's relationship with Imasco supplied reason to structure S&C's advice so as to

12  ensure that Flintkote would pay the dividends.  The S&C memorandum contained substantial errors,

13  omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

14  of Flintkote's payment of these dividends, including the following.

15       33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote.  However,

16  it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

17  declare the dividend yet escape personal liability for doing so.  The memorandum is vague and

18  indefinite as to Flintkote's obligations as a corporation.

19       34.    The S&C memorandum contains legal analysis, including discussion of California

20  law.  In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

21  Conveyance Act.  S&C wrote that a conveyance could be set aside if the debtor would be rendered

22  insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

23  existing debts as they became absolute and matured.  S&C advised Flintkote that it was unclear

24  whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

25  not yet manifested itself – were considered existing debts.  That advice misapprehended the

26  controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

27  fixed or contingent.  S&C also did not alert Flintkote that under California law, as well as in other

28  jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          10

FIRST AMENDED COMPLAINT

1  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

2  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

3  solvent. *See Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

4      35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

5  changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

6  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

7  would incur debts beyond his ability to pay as they became due. The new statute therefore

8  incorporated an objective test specifically looking to the incurring of future debts. This test was in

9  addition to rules making fraudulent those transfers without fair consideration where the debtor was

10  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

11  which its remaining assets were unreasonably small in relation to the business.

12      36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

13  RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending

14  and possible future asbestos-related property damage claims against Flintkote, but only "to consider"

15  asbestos personal injury claims. RPC devoted cursory treatment to Flintkote's asbestos-related

16  personal injury claims. RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos

17  personal injury claims. The RPC report thus was based on an assumption, known to be questionable

18  by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to

19  Flintkote for 14 years. S&C assured Flintkote that directors were entitled to rely upon statements in

20  an appraisal by an appraiser selected by the board. Although it was not an appraisal under Delaware

21  law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury

22  liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC

23  report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors

24  could rely. Imasco and S&C did not advise the directors to seek an independent expert analysis

25  regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain

26  independent counsel without a conflict of interest.

27      37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and

28  developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-

{00007643.DOC: 2}                              11

FIRST AMENDED COMPLAINT

1  related personal injury liabilities.

2      38.    S&C labored under a conflict of interest when it undertook to represent and advise
3  Flintkote while still representing Imasco.  Flintkote, a company facing substantial and increasing
4  asbestos-related claims, was obliged to consider and evaluate the interests of existing and future
5  creditors before paying out $525,200,000 in dividends.  In contrast, Imasco had every interest in
6  obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all
7  along.  S&C represented both Imasco and Flintkote, with plainly conflicting interests.  The
8  declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading
9  legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which
10  was procured by S&C for the specific purpose of attempting to justify the legal propriety of the
11  dividends.

12      39.    Imasco improperly caused the dividends to be paid by telling the Flintkote board:
13      •    our lawyers, acting as your lawyers, together with their consultants, say you can do it;
14      •    to induce you to pay us we agree to protect you if someone sues you; and
15      •    if we are wrong about this and creditors are left unsatisfied and a court finally decides
16          the dividends were improper, we will pay them back.

17      40.    From the time Imasco acquired Genstar in August 1986, through September 29, 2003,
18  Imasco held and maintained complete control over and dominated Flintkote through Imasco's
19  indirect 100% ownership of Flintkote.  Flintkote was in no position to assert claims against Imasco or
20  to sue Imasco.  S&C continued to act as an instrument of Imasco, guiding and giving legal advice to
21  Flintkote, including with respect to the matters alleged herein, until September of 2003.  Imasco's
22  plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote,
23  and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as
24  long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the
25  goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten
26  alter ego liability upon Imasco for Flintkote's asbestos-related claims.  That Flintkote had been
27  injured by wrongful acts leading to the dividends was inherently unknowable, depending upon
28  expertise available only to sophisticated professionals such as S&C and RPC.  S&C did not disclose

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                         12

FIRST AMENDED COMPLAINT

1    to Flintkote that it had rights with respect to the dividends.

2        41.    From and after the divestiture of its subsidiaries and payment of the dividends,

3    Flintkote operated as an asbestos claims resolution facility.  Imasco exercised its domination and

4    control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and

5    Imasco Holdings Group, Inc. (collectively, "IHI").  IHI took its orders from Imasco.  IHI attorneys

6    were involved in the claim resolution process.  Flintkote consistently obtained releases for its parent

7    companies, including Imasco, in settlements with asbestos claimants.  Flintkote and IHI shared

8    common officers and directors.  Employees of Imasco or IHI were involved in management of

9    Flintkote.  S&C continued to advise Imasco or IHI and Flintkote on what should be done with

10   Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related

11   liabilities.  Flintkote handled its own asbestos liabilities, rather than join the Center for Claims

12   Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

13   Imasco therefore maintained control over the handling of the claims.  Following the dividends, as a

14   claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical.  Flintkote

15   continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

16   involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

17   critical issue of asbestos liability.  The goals of Imasco throughout were to forestall any liability to

18   repay the dividend and to confine the asbestos-related liabilities to Flintkote.

19       42.    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

20   it had taken and used the money to reimburse itself for funds it had expended for buying the one

21   business it did want, Genstar's Canada Trustco, a financial services company in Canada.  After

22   Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

23   to satisfy its asbestos-related personal injury liabilities.

24       43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

25   financial statements.  It did not publicly disclose its true financial condition and the nature and extent

26   of its asbestos liabilities.  Instead, Imasco, as Flintkote's ultimate parent corporation filed public

27   financial statements in Canada that purported to represent Flintkote's financial condition.  Imasco

28   represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                                13

FIRST AMENDED COMPLAINT

1  Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

2  represented, with respect to Flintkote's financial condition, that

3         [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

4         subject to numerous claims and suits, some of which allege significant damage. In the opinion of

5         management, all such claims and suits are adequately covered by insurance, or are provided for in

6         the financial statements, or if not so covered or provided for, the results are not expected to

7         material affect the Corporation's financial condition.

8  Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

9  repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

10 within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

11 as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

12 alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

13 had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

14 became due and were made in violation of California and other law, including California's Uniform

15 Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

16 applicable limitation period.

17         44.    In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

18 Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

19 subsidiary of Navigant Consulting, Inc. ("Navigant"). Navigant issued a report dated August 19,

20 2003. The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

21 billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

22 $3.4781 billion.

23         45.    In September, 2003, the shares of Flintkote stock were transferred to a trust, and

24 Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

25                          **FIRST CAUSE OF ACTION**
26    **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –
      Wrongful Death)**

27         46.    Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

28 paragraphs 1 through 45, inclusive.

Snydar
Miller
& Orton
LLP

{00007643.DOC; 2}                          14

                          FIRST AMENDED COMPLAINT

47. At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an alter ego of Flintkote, and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving, certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain product, namely asbestos and other products containing asbestos.

48. At all times mentioned, said defendants, and each of them, singularly and jointly, negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, and other products containing asbestos, in that said products caused personal injuries to users, consumers, workers, bystanders and others, including the Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said products hazardous, unsafe, and dangerous for use by "exposed persons."

49. Said defendants, and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

50. Said defendants, and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos and related products and equipment, would be transported by truck, rail, ship, and other common carriers, that in the shipping process the product would break, crumble, or otherwise be damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping, hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

Snyder
Miller
& Orton
LLP

{00007643.DOC: 2}                        15

FIRST AMENDED COMPLAINT

1  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

2  persons working in proximity to said products, directly or through reentrainment.

3      51.     Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

4  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

5  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

6  employment status is, on current information and belief, as set forth at various locations and

7  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

8      52.     Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

9  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

10  perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

11  asbestos-containing products over a period time.

12      53.     Decedent suffered from a condition related to exposure of asbestos and asbestos-

13  containing products. Decedent was not aware at the time of exposure that asbestos or asbestos-

14  containing products presented risk of injury and/or disease.

15      54.     As a direct and proximate result of the aforesaid conduct of said defendants, and each

16  of them, Decedent suffered permanent injuries to his person, body, and health, including, but not

17  limited to, asbestosis, other lung damage, and cancer and related sequelae, and the mental and

18  emotional distress attendant thereto, and ultimately death, from the effect of exposure to asbestos

19  fibers, all to his general damage in the sums to be proven at trial.

20      55.     As a direct and proximate result of the aforesaid conduct of said defendants, and each

21  of them, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine,

22  hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to

23  plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when the true and

24  exact cost thereof is ascertained. As a direct and proximate result of the aforesaid conduct of said

25  defendants, and each of them, Decedent incurred liability for the reasonable value of medical care

26  provided by Decedent's family members measured by, inter alia, the costs associated with the hiring

27  a registered nurse, home hospice, or other service provider, the true and exact amount thereof being

28  unknown to plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                              16

FIRST AMENDED COMPLAINT

1   the true and exact costs are known or at time of trial.

2       56.    As a further direct and proximate result of the said conduct of said defendants, and

3   each of them, Decedent incurred loss of income, benefits, entitlements, wages, profits, and

4   commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and

5   extent of which are not yet known to plaintiffs; and leave is requested to amend this complaint to

6   conform to proof at the time of trial.

7       57.    As a further direct and proximate result of the said conduct of said defendants, and

8   each of them, Decedent's exposure to asbestos and asbestos-containing products caused severe and

9   permanent injury to Decedent, and ultimately Decedent died on September 27, 2005.

10      58.    Said defendants, and each of them, and their officers, directors and managing agents

11  participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should

12  have known of, each of the acts set forth herein.

13      59.    The herein-described conduct of said defendants, and each of them, was and is

14  despicable, willful, malicious, fraudulent, outrageous, and in conscious or reckless disregard and

15  indifference to the safety, health, and rights of "exposed persons", including decedent herein, giving

16  rise to decedent's claim herein alleged for punitive damages against said defendants.

17      60.    At all times prior to his death, Decedent was a faithful and dutiful spouse to plaintiff

18  Marlene Hopkins, and parent to plaintiffs Michelle and Michael Hopkins.

19      61.    As a direct and proximate result of the conduct of said defendants, and each of them,

20  and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of

21  care, society, comfort attention, services, and support of Decedent all to the damage of decedent's

22  heirs.

23      62.    As a further direct and proximate result of the conduct of said defendants, and each of

24  them, and the death of Decedent, decedent's heirs have incurred funeral expenses in an amount

25  currently not ascertained.

26      63.    As a direct and proximate result of the acts, omissions, and conduct of said, and each

27  of them, as aforesaid, Decedent's exposure to harm or the Decedent as set forth in Exhibit B, attached

28  to the complaint and incorporated by reference herein.

Snyder
Miller
& Orton
LLP

{00007643.DOC: 2}                                    17

FIRST AMENDED COMPLAINT

1    64.    Decedent's personal injury claim against Flintkote was resolved by Judgment filed

2    June 25, 2003, following Flintkote's acceptance of an offer to compromise in action number 408556

3    in this court.

4    65.    Imasco completely dominated and controlled Flintkote, deliberately requiring

5    Flintkote to divest itself of its operating businesses and assets solely for the benefit of Imasco. After

6    the divestiture of its businesses, Flintkote did not manufacture or market any products or render any

7    services to third parties. It served only as a vehicle for Imasco, resolving asbestos and other claims,

8    including obtaining releases for Imasco, and prosecuting insurance coverage claims. By causing

9    Flintkote to convert its assets and businesses to cash, and then stripping Flintkote of $525,200,000,

10   most of that cash, Imasco prevented Flintkote both from benefiting from the operating profits of the

11   sold businesses and/or from investing the sale proceeds and using the principal plus earnings to pay

12   claims.

13   66.    In the years following the dividends, Flintkote's benefit programs were administered

14   by Imasco's subsidiary, IHI. Flintkote, with IHI, filed consolidated financial statements and tax

15   returns.

16   67.    There became in 1986 and 1987 and thereafter such a unity of interest, and of

17   ownership since Imasco owned indirectly 100% of Flintkote, that separate personalities of Flintkote

18   and Imasco no longer existed. If the companies are treated as separate, inequitable results will

19   follow.

20   WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and

21   Imperial Tobacco as set forth below.

22   ## SECOND CAUSE OF ACTION
23   **(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Products Liability –**
     **Wrongful Death)**

24   68.    Plaintiffs Hopkins incorporate by reference each and all the allegations of the First

25   Cause of Action.

26   69.    Defendants Plant, Uniroyal, and Imperial Tobacco, knew and intended that the above-

27   referenced asbestos and asbestos-containing products, would be used by the purchaser or user without

28   inspection for defects therein or in any of their component parts and without knowledge of the

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                         18

FIRST AMENDED COMPLAINT

1 hazards involved in such use.

2    70.    Said asbestos and asbestos-containing products were defective and unsafe for their

3 intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease and/or

4 death. The defect existed in the said products at the time they left the possession of defendants, and

5 each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung

6 damage, cancer, and death to "exposed persons", including Decedent herein, while being used in a

7 reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

8    71.    "Exposed persons" did not know of the substantial danger of using said products. Said

9 dangers were not readily recognizable by "exposed persons". Said defendants, and each of them,

10 further failed to adequately warn of the risks to which decedent and others similarly situated were

11 exposed.

12    72.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to

13 test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale,

14 supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,

15 representing, endorsing, servicing, installing, contracting for installation, repairing, marketing,

16 warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-

17 containing products, said defendants, and each of them, did so with conscious disregard for the safety

18 of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in

19 that said defendants, and each of them, had prior knowledge that there was a substantial risk of injury

20 or death resulting from exposure to asbestos or asbestos-containing products, including, but not

21 limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from

22 scientific studies performed by, at the request of, or with the assistance of, said defendants, and each

23 of them, and which knowledge was obtained by said defendants, and each of them on or before 1930,

24 and thereafter.

25    73.    On or before 1930, and thereafter, said defendants, and each of them, were aware that

26 members of the general public and other "exposed persons", who would come in contact with their

27 asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos

28 or asbestos-containing products could cause injury, and said defendants, and each of them, knew that

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          19

FIRST AMENDED COMPLAINT

1  members of the general public and other "exposed persons", who came in contact with asbestos and

2  asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and

3  asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health

4  and human life.

5      74.    With said knowledge, said defendants, and each of them, opted to research, manufacture,

6  fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install,

7  contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said

8  asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn

9  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing

10 products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high

11 risk of injury or death resulting from exposure to asbestos and asbestos-containing products, said

12 defendants, and each of them, intentionally failed to reveal their knowledge of said risk, and

13 consciously and actively concealed and suppressed said knowledge from "exposed persons" and

14 members of the general public, thus impliedly representing to "exposed persons" and members of the

15 general public that asbestos and asbestos-containing products were safe for all reasonably

16 foreseeable uses. Said defendants, and each of them, engaged in this conduct and made these

17 implied representations with the knowledge of the falsity of said implied representations.

18     75.    The above-referenced conduct of said defendants, and each of them, was motivated by

19 the financial interest of said defendants, and each of them, in the continuing, uninterrupted research,

20 design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer

21 for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing,

22 warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

23 otherwise directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing

24 products. In pursuance of said financial motivation, said defendants, and each of them, consciously

25 disregarded the safety of "exposed persons" and in fact were consciously willing and intended to

26 permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced

27 persons to work with and be exposed thereto, including plaintiff.

28     76.    Plaintiffs allege that the aforementioned defendants, and each of them impliedly warranted their

{00007643.DOC; 2}                    20

FIRST AMENDED COMPLAINT

1   asbestos and asbestos-containing products, to be safe for their intended use, but that their asbestos and asbestos-

2   containing products, created an unreasonable risk of bodily harm to exposed persons.

3       77.   Decedent relied upon defendants', and each of their representations, lack of warnings, and

4   implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable, and

5   proximate result thereof, Decedent suffered permanent injury and death as alleged herein.

6       78.   As a direct and proximate result of the actions and conduct outlined herein,

7   Plaintiffs Hopkins have suffered the injuries and damages herein alleged.

8       WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal,

9   and Imperial Tobacco as set forth below.

10              **THIRD CAUSE OF ACTION**

11  **(By Plaintiff Marlene Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Loss of
    Consortium)**

12      79.   Plaintiff Marlene Hopkins re-alleges and incorporates by reference each and all the

13  allegations of the First and Second Causes of Action.

14      80.   Decedent and plaintiff Marlene Hopkins were married on February 18, 1961, and at all

15  times relevant to this action were husband and wife.

16      81.   Prior to Decedent's injuries as alleged, Decedent was able and did perform duties

17  as a spouse. Subsequent to the injuries and as a proximate result thereof, and until Decedent's

18  death, Decedent was unable to perform the necessary duties as a spouse and the work and service

19  usually performed in the care, maintenance, and management of the family home. As a

20  proximate result thereof, plaintiff Marlene Hopkins was permanently deprived of the consortium of

21  her spouse, including the performance of duties, all to plaintiff Marlene Hopkin's damages, in an

22  amount presently unknown to plaintiff, but which will be proved at the time of trial.

23      82.   Plaintiff Marlene Hopkins' discovery of the cause of Decedent's loss of consortium, as

24  herein alleged, first occurred within one year last past from the filing of this Complaint.

25      83.   As a direct and proximate result of the acts of said defendants, and the severe injuries

26  and death caused thereby to Decedent as set forth in this complaint, plaintiff Marlene Hopkins has

27  suffered loss of consortium, including but not by way of limitation, loss of services, marital relations,

28  society, comfort, companionship, love, and affection of said spouse, and has suffered severe mental

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                           21

FIRST AMENDED COMPLAINT

1    and emotional distress, and general nervousness as a result thereof.

2        WHEREFORE, plaintiff Marlene Hopkins prays judgment against defendants Plant,

3    Uniroyal, and Imperial Tobacco as set forth below.

4
                            **FOURTH CAUSE OF ACTION**
5        **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for Negligence -- Survival)**

6        84.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

7    of the First Cause of Action.

8        85.    Plaintiffs bring this action pursuant to California Code of Civil Procedure section

9    377.30 et. seq.  As a direct and proximate result of the actions and conduct outlined herein, Decedent

10   suffered the injuries and damages herein alleged.  Plaintiffs are entitled to recover all damages

11   sustained by Decedent as alleged above.

12       WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

13   set forth below.

14                          **FIFTH CAUSE OF ACTION**
15   **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal to Products Liability -- Survival)**

16       86.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

     of the First and Second Causes of Action.
17
         87.    As a direct and proximate result of the exposure to defendants' products and the
18
     conduct outlined herein, Decedent has suffered the injuries and damages herein alleged.
19
         88.    Plaintiffs Hopkins are entitled to recover all damages sustained by Decedent as alleged
20
     above.
21
         WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as
22
     set forth below.
23
                            **SIXTH CAUSE OF ACTION**
24   **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for False Representation Under**
     **Restatement of Torts Section 402-B -- Survival)**
25
         89.    Plaintiffs Hopkins re-allege and incorporates by reference each and all the allegations
26
     of the First and Second Causes of Action.
27
         90.    At the aforementioned time when defendants Plant and Uniroyal, and each of them,
28

Snyder
Miller
& Orton
LLP

                            {00007643.DOC; 2)                    22

                            FIRST AMENDED COMPLAINT

1  researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately

2  warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

3  sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented,

4  endorsed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for

5  others, packaged, and advertised the said asbestos and asbestos-containing products, as hereinabove

6  set forth, the defendants, and each of them, expressly and impliedly represented to members of the

7  general public, including the purchasers and users of said product, and other "exposed persons",

8  including the decedent herein and his employers, that asbestos and asbestos-containing products,

9  were of merchantable quality, and safe for the use for which they were intended.

10      91.    The purchasers and users of said asbestos and asbestos-containing products, and other

11  "exposed persons", including the Decedent and his employers, relied upon said representations of

12  said defendants, and each of them, in the selection purchase, and use of asbestos and asbestos-

13  containing products.

14      92.    Said representations by defendants, and each of them, were false and untrue, and

15  defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products,

16  were not safe for their intended use, nor were they of merchantable quality as represented by

17  defendants, and each of them, in that asbestos and asbestos-containing products have very dangerous

18  properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and

19  have other defects that cause injury and damage to the users of said products and other "exposed

20  persons", thereby threatening the health and life of said persons including decedent herein.

21      93.    As a direct and proximate result of said false representations by defendants, and each of

22  them, the Decedent suffered injury and death as set forth.

23      WHEREFORE, plaintiffs pray judgment against defendants Plant and Uniroyal, set forth

24  below.

25          **SEVENTH CAUSE OF ACTION**
26      **(By Plaintiffs Hopkins Against Defendant Plant for Contractor Liability)**

27      94.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

28  of the First and Second Causes of Action.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    23

FIRST AMENDED COMPLAINT

1   95.   At all times mentioned herein, defendant Plant, owned, leased, maintained, managed,

2   and/or controlled the premises listed on Exhibit B where Decedent was present. The information

3   provided on Exhibit B is preliminary, based on recall over events covering many years and further

4   investigation and discovery may produce more reliable information.  Additionally, Decedent might

5   have been present at these or other of Plant's premises at other locations and on other occasions.

6   96.   Prior to and at said times and places, defendant Plant caused certain asbestos-

7   containing insulation, other building materials, products, and toxic substances to be constructed,

8   installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid

9   respective premises, by their own workers and/or by various unqualified or unskilled contractors and

10  caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the

11  ambient air and thereby created a hazardous and unsafe condition to decedent and other persons

12  exposed to said asbestos fibers and toxic substances while present at said premises.

13  97.   At all times mentioned herein, said defendant Plant knew or in the exercise of ordinary

14  and reasonable care should have known, that the foregoing conditions and activities created a

15  dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to

16  decedent and other workers or persons so exposed present on each of the aforesaid respective

17  premises.

18  98.   At all times relevant herein, Decedent entered said premises and used or occupied

19  each of said respective premises as intended and for Plant's benefit and advantage and at Plant's

20  request and invitation.  In so doing, Decedent was exposed to dangerous quantities of asbestos fibers

21  and other toxic substances released into the ambient air by the aforesaid hazardous conditions and

22  activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said

23  defendant Plant.

24  99.   Decedent at all times was unaware of the hazardous condition or the risk of

25  personal injury created by the aforesaid presence and use of asbestos products and materials and

26  other toxic substances on said premises.

27  100.  At all times mentioned herein, Defendant Plant remained in control of the premises

28  where Decedent was performing his work.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                        24

FIRST AMENDED COMPLAINT

101.    At all times mentioned herein, defendant Plant owed to decedent and others similarly situated a duty to exercise

ordinary care in the management of such premises so as to avoid exposing workers such as decedent to an unreasonable risk of harm and to avoid causing injury to said person.

102.    At all times mentioned herein, defendant Plant, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforementioned hazardous conditions to which they were exposed on the premises.

103.    At all times mentioned herein, defendant Plant negligently failed to maintain, manage, inspect, survey, or control said premises, or to abate, or correct, or to warn decedent of, the existence of the aforesaid dangerous conditions and hazards on or about said premises.

104.    Prior to and at the times and places aforesaid, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured decedent.

105.    At all times mentioned herein, defendant Plant:

    a.    Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would harm decedent and others unless special precautions were taken;

    b.    Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled, unlicensed, or otherwise unqualified to do so;

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    25

FIRST AMENDED COMPLAINT

1    c. Failed to use reasonable care to discover whether the contractors it selected and

2 hired to install, remove, abate, or otherwise handle asbestos-containing materials were

3 competent, or qualified to do so.

4   106. In part, Decedent was exposed to dangerous asbestos fibers and other toxic

5 substances by reason of such contractors' failure to take the necessary precautions.

6   107. The work of contractors on premises controlled by defendant Plant created an unsafe premise

7 and an unsafe work place by reason of the release of dangerous quantities of toxic substances, including but not

8 limited to asbestos.

9   108. Prior to and at said times and places, defendant Plant was subject to certain ordinances,

10 standards, statutes, and other government regulations promulgated by the United States Government,

11 the State of California, and others, including but not limited to the General Industry Safety Orders

12 promulgated pursuant to <u>California Labor Code</u> § 6400 and the <u>California Administrative Code</u> under

13 the Division of Industrial Safety, Department of Industrial Relations, including but not limited to

14 <u>Title VHL</u> Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and §

15 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under

16 Appendix A, Table 1 of said Safety Orders; additionally, <u>California Health and Safety Code</u> § 40.200,

17 <u>et seq.</u>, which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate

18 regulations including, but not limited to <u>B.A.A.O.D. Regulation</u> 11, Rules 2 and 14, Title 40 <u>Code of</u>

19 <u>Federal Regulations</u>. Chapter 1, Part 61, <u>et seq.</u> -- The National Emission Standards for Hazardous Air

20 Pollutants, which required defendant Plant to provide specific safeguards or precautions to prevent or

21 reduce the inhalation of asbestos dust and other toxic fumes or substances; and said defendant Plant

22 failed to provide the required safeguards and precautions. Defendant's violations of said codes

23 include, but are not limited to:

24   (a) Failing to comply with statutes and allowing ambient levels of airborne

25 asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned

26 statutes;

27   (b) Failing to segregate work involving the release of asbestos or other toxic

28 dusts;

Snyder
Miller
& Orton
LLP

FIRST AMENDED COMPLAINT

1    (c)    Failing to suppress dust using prescribed ventilation techniques;

2    (d)    Failing to suppress dust using prescribed "wet down" techniques;

3    (e)    Failing to warn or educate decedent or others regarding asbestos or other

4    toxic substances on the premises;

5    (f)    Failing to provide approved respiratory protection devices;

6    (g)    Failing to ensure "approved" respiratory protection devices were used

7    adequately;

8    (h)    Failing to provide for an on-going health screening program for those

9    exposed to asbestos on the premises;

10
11    (i)    Failing to provide adequate housekeeping and clean-up of the work place;

12    (j)    Failing to adequately warn of the hazards associated with asbestos as

13    required by these statutes;

14
15    (k)    Failing to adequately report renovation and disturbance of asbestos-containing

16    materials, including but not limited to B.A.A.O.M.D. Regulation 11, Rules 2 and 14;

17    (l)    Failing to have an asbestos removal supervisor as required by regulation;

18
19    (m)    Failing to get approval for renovation as required by statutes; and

20    (n)    Failing to maintain records as required by statute.

21    109.    Defendant Plant was the "statutory employer" of decedent as defined by the California

22    Labor Code and California case law.

23    110.    Decedent at all times was unaware of the hazardous condition or the risk of personal

24    injury created by defendant's violation of said regulations, ordinances, or statutes.

25    111.    At all times mentioned herein, Decedent was a member of the class of persons whose

26    safety was intended to be protected by the regulations, standards, statutes, or ordinances described in

27    the foregoing paragraphs.

28    112.    At all times mentioned herein, said defendant Plant, knew, or in the exercise of

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                           27

FIRST AMENDED COMPLAINT

1 | ordinary and reasonable care should have known, that the premises that were in its control would be

2 | used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present

3 | and using said premises would not be aware of the aforesaid hazardous conditions to which they were

4 | exposed on the premises, and that such persons were unaware of the aforesaid violations of codes,

5 | regulations, and statutes.

6 |      113.   As a proximate result of the foregoing, Decedent developed asbestos-related illness,

7 | which has caused great injury and disability to Decedent, and ultimately death, as previously set

8 | forth, and plaintiffs have suffered damages as herein alleged.

9 |      WHEREFORE, plaintiffs Hopkins pray judgment against defendant Plant, as set forth below.

10 | **EIGHTH CAUSE OF ACTION**

11 | **(By The Flintkote Plaintiffs Against Imperial Tobacco For Declaration of Alter Ego Liability)**

12 |      114.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

13 | allegations of paragraphs 1 through 45 and 65 through 67, inclusive.

14 |      115.   An actual controversy exists between The Flintkote Plaintiffs and Imperial Tobacco

15 | arising from Imasco's domination and control of Flintkote, including Imasco's causing Flintkote to

16 | create the subsidiaries, isolate the asbestos liabilities, sell the subsidiaries, and declare and pay the

17 | Dividends, and the use of Flintkote by Imasco solely for Imasco's own purposes, as set forth herein.

18 |      116.   The Flintkote Plaintiffs contend that Imperial Tobacco is Flintkote's alter ego and is

19 | responsible to pay asbestos-related claims asserted against Flintkote, such that if The Flintkote

20 | Plaintiffs are correct, the burden of those claims will be borne in whole or in part by Imperial

21 | Tobacco.

22 |      117.   The Flintkote Plaintiffs are informed and believe, and upon such information and

23 | belief alleges, that Imperial Tobacco disagrees with each of The Flintkote Plaintiffs' contentions.

24 |      118.   The Flintkote Plaintiffs have the right to assert alter ego claims against Flintkote's

25 | former indirect parent Imperial Tobacco.

26 |      WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

27 | below.

28 |

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    28

FIRST AMENDED COMPLAINT

## NINTH CAUSE OF ACTION
**(By The Flintkote Plaintiffs Against Imperial Tobacco For Receiving Illegal Dividends)**

119.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of paragraphs 1 through 45, inclusive.

120.   The dividends of $170,200,000 in 1986 and $355,000,000 in 1987 were not payable out of Flintkote's net profits for either the year in which the dividend was declared or the preceding fiscal year.

121.   The dividends in 1986 and 1987 (collectively, the "Dividends") could be paid only out of surplus defined as the amount in excess of Flintkote's capital by which its assets exceeded its liabilities. Flintkote's asbestos related personal injury and its other liabilities exceeded its assets.

122.   Imasco and its lawyers, S&C, caused the directors to declare and pay the dividends when they were not authorized under the dividend statutes.

123.   Imasco actively procured and participated in the declarations of the illegal dividends, knew the receipt of the dividends was improper, and reaped the benefits of them.

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## TENTH CAUSE OF ACTION
**(By The Flintkote Plaintiffs Asserting the Rights of a Creditor, Against Imperial Tobacco for Recovery of Illegal Dividends)**

124.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth Cause of Action.

125.   Flintkote is operating its business and conducting its affairs as the debtor and debtor in possession in the Bankruptcy Case. Flintkote may recover any transfer of money that is voidable under applicable state law by a creditor holding an unsecured claim that is allowable in the Bankruptcy Case.

126.   The transfers of the Dividends, $170,200,000 on or about December 30, 1986, and $355,000,000 on or about August 31, 1987, were transfers of interests of the debtor in property.

127.   At the time of the Dividends, there existed one or more individuals (a) who had suffered from inherently unknowable injuries to a blameless ignorant party as a result of exposure to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, tolling the

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    29

FIRST AMENDED COMPLAINT

1   applicable limitation periods until such time as the claimant was chargeable with knowledge that his

2   condition was attributable to asbestos exposure, (b) who were creditors of Flintkote due to exposure

3   to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, and (c)

4   who hold allowable claims against Flintkote and its bankruptcy estate.

5          128.   From and after the date of each Dividend, until at least September 29, 2003, Imasco

6   controlled and dominated Flintkote, and did not disclose, and caused Flintkote not to disclose the true

7   nature of Flintkote's financial condition to creditors.  Creditors did not know and could not have

8   known that the transfer of the dividends to Imasco rendered Flintkote insolvent.

9          129.   The Dividends are invalid and avoidable because the Dividends were paid at a time

10  when Flintkote did not have a surplus of assets over liabilities. Because of Imasco's domination and

11  control of Flintkote and because of the suppression of Flintkote's true financial condition in the

12  public financial reporting Imasco released in Canada, this fact was not known and could not

13  reasonably have been known to creditors of Flintkote, including asbestos disease claimants.  The

14  Flintkote Plaintiffs may recover the Dividends from Imasco who was the entity for whose benefit

15  such transfers were made.  To the extent the Dividends passed through entities before their delivery

16  to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere

17  conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the

18  Dividends was not for value or in good faith.

19         WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

20  below.

21                             **ELEVENTH CAUSE OF ACTION**

22  **(By The Flintkote Plaintiffs Asserting the Rights of a Creditor Against Imperial Tobacco For**
    **Recovery of Fraudulent Transfers)**

23         130.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

24  allegations of the Ninth and Tenth Causes of Action.

25         131.   At the time of the Dividends, or within the applicable limitation period thereafter,

26  there existed (a) one or more individuals who had asbestos-related personal injury lawsuits on file

27  against Flintkote, and those lawsuits remained on file until May 1, 2004, or (b) one or more

28  individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote

Snyder
Miller
& Orton
LLP

          {00007643.DOC; 2}                         30

                              FIRST AMENDED COMPLAINT

T-204   P 033/040   F-949

1  products who suffered from inherently unknowable injuries and who was blamelessly ignorant,
2  thereby tolling any applicable limitation periods until such time as the each such individual was
3  chargeable with knowledge that his condition was attributable to asbestos exposure, or (c) one or
4  more individuals who suffered from asbestos-related diseases arising as a result of exposure to
5  Flintkote products who did not know and could not reasonably have been known of Flintkote's true
6  financial condition because of Imasco's domination and control of Flintkote and because of the
7  suppression of Flintkote's true financial condition in the public financial reporting Imasco released in
8  Canada, some or all of which serve to toll the applicable limitations period.

9       132.    The Dividend of $170,200,000 was made without receipt of fair consideration by
10  Flintkote who: (a) was or would be rendered insolvent by the transfer and/or (b) was about to be
11  engaged in a business, paying asbestos claims, for which its property remaining after the Dividend
12  was unreasonably small capital.

13       133.    When the Dividend of $355,000,000 was paid in 1987, it constituted a fraudulent
14  transfer in that Flintkote received no reasonably equivalent value for it and one or more of the
15  following was true:  (a) Flintkote was insolvent or became insolvent as a result of the transfer, or (b)
16  Flintkote was engaged in or about to engage in the business of paying asbestos claims for which
17  Flintkote's assets were unreasonably small in relation to the business, or (c) Flintkote reasonably
18  should have believed that it would incur debts beyond its ability to pay as they became due.

19       134.    The separation of Flintkote's asbestos liabilities from its valuable operating assets as a
20  result of the formation of subsidiary corporations, the sale of those subsidiary corporations; and the
21  transfer of the Dividends to Imasco, constituted an integrated scheme of transfers orchestrated by
22  Imasco with actual intent to hinder, delay or defraud one or more present or future creditors of
23  Flintkote, implicating at least the following badges of fraud:

24      •    The proceeds of the scheme were transferred to an insider;

25      •    The resulting financial condition of Flintkote was concealed;

26      •    The transfers, including the separation of asbestos liabilities from operating assets,
27          occurred because Flintkote had been sued and threatened with additional suits;

28      •    The transfers, including the separation of asbestos liabilities from operating assets,

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}

31

FIRST AMENDED COMPLAINT

involved substantially all of Flintkote's assets;

- The consideration ultimately received by Flintkote at the conclusion of the integrated scheme was not reasonably equivalent to the value of the assets transferred;

- Flintkote was insolvent or became insolvent shortly after the transfers comprising the integrated scheme;

- The transfers comprising the integrated scheme were made after substantial contingent and unmatured indebtedness had been incurred, but before such indebtedness had matured.

135.   The Flintkote Plaintiffs may recover the Dividends from Imasco who was the entity for whose benefit such transfers were made. To the extent the Dividends passed through entities before their delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the Dividends was not for value or in good faith.

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## TWELFTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs Against Imperial Tobacco for Breach of Fiduciary Duty)

136.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth, Tenth, and Eleventh Causes of Action.

137.   The directors of Flintkote owed a fiduciary duty to Flintkote and to its creditors because by reason of its asbestos-related liabilities, Flintkote was insolvent or in the vicinity of insolvency. Flintkote directors were obliged to consider whether, and reasonably should have believed that, Flintkote would incur debts by reason of asbestos liabilities beyond its ability to pay as they became due.

138.   By reason of the foregoing, Imasco prevented the Flintkote directors from complying with their fiduciary duties in declaring the dividends and ordering them paid.

139.   Imasco, now Imperial Tobacco, actively procured and participated in the failure to comply with fiduciary duties and reaped the benefits of them.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}          32

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

### THIRTEENTH CAUSE OF ACTION
#### (By The Flintkote Plaintiffs Against S&C for Breach of Duty and Negligence)

140.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth through the Twelfth Causes of Action.

141.    S&C as lawyers represented Flintkote in connection with the 1986 and 1987 dividends. S&C also represented Imasco with respect to the same subject matter. S&C continued to represent Flintkote with respect to the matters alleged herein until within one year of the filing of the Bankruptcy Case.

142.    The relation between attorney and client is a fiduciary relation of the very highest character.

143.    S&C had a duty without informed written consent of each client not to accept representation of more than one client in a matter in which the interests of the clients potentially conflict and not to accept or continue representation of more than one client in which the interests of the clients actually conflict. Absent consent of both clients after full disclosure, S&C had a duty not to accept or continue employment of both clients if it would be likely to involve S&C in representing differing and adverse interests.

144.    S&C breached its duty and accepted and continued representation of Flintkote and Imasco in connection with the Dividends, which was a matter in which the interests of the clients were in stark conflict, adverse, and differing.

145.    Flintkote did not give written consent to S&C's conflicting representation of differing interests.

146.    S&C had a duty to use reasonable care in advising Flintkote. S&C without reasonable care advised the Flintkote directors that they could go forward with the 1986 dividend. S&C in 1987 without reasonable care misrepresented California law to Flintkote as respects rules governing potentially fraudulent transfers. S&C in 1987 also represented, without reasonable care, to the board that the directors could rely upon the RPC report as an appraisal and thus were protected by a

{00007643.DOC; 2}    33

Snyder Miller & Orton LLP

FIRST AMENDED COMPLAINT

1 | principle that directors are entitled to rely on statements in an appraisal by an appraiser selected with
2 | reasonable care by the board. But the RPC report was not an appraisal of Flintkote's asbestos-related
3 | personal injury liabilities, and RPC was not selected by the board, but rather by Imasco's counsel.

4 |     147.    The conflicted representation and the misrepresentations by S&C proximately caused
5 | the declaration and payment of the dividends.

6 |     WHEREFORE The Flintkote Plaintiffs pray judgment against S&C as set forth below.

7 |                              **FOURTEENTH CAUSE OF ACTION**
8 |        **(By The Flintkote Plaintiffs Against Imperial Tobacco For Constructive Trust)**

9 |     148.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the
10 | allegations of the Ninth through the Thirteenth Causes of Action.

11 |     149.    By reason of the foregoing, Imperial Tobacco holds the dividend payments received
12 | through the wrongful acts and the complete dominance, control, and authority Imasco held over
13 | Flintkote, and by reason of the mistakes engendered by the conflicted representation and negligent
14 | advice provided by Imasco's lawyers, shared with Flintkote, as set forth above. The Flintkote
15 | Plaintiffs have the right to those dividends and Imperial Tobacco holds them as a constructive trustee
16 | for the benefit of The Flintkote Plaintiffs.

17 |     WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth
18 | below.

19 |                              **FIFTEENTH CAUSE OF ACTION**
20 |        **(By The Flintkote Plaintiffs Against Imperial Tobacco For Restitution)**

20 |     150.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the
21 | allegations of the Ninth through the Thirteenth Causes of Action.

22 |     151.    The declarations of the Dividends were invalid because they were the result of
23 | conflicted legal representation and erroneous legal advice given by Imasco's lawyers, shared with
24 | Flintkote.

25 |     152.    Imasco was the recipient of the Dividends under circumstances where it directly and
26 | through its lawyers wrongfully procured payment of the Dividends.

27 |     153.    The Flintkote Plaintiffs are entitled to restitution from Imperial Tobacco of the
28 | payments made pursuant to the tainted and invalid declarations of the Dividends.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    34

FIRST AMENDED COMPLAINT

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## SIXTEENTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs against Imperial Tobacco for Declaratory Relief)

154.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth through the Fifteenth Causes of Action.

155.   An actual controversy exists between The Flintkote Plaintiffs and Imperial Tobacco arising from the Dividend Repayment Contract of July 27, 1987 ("Dividend Repayment Contract").

156.   The Flintkote Plaintiffs contend that the dividends were improperly paid within the meaning of the Dividend Repayment Contract because they were paid under one or more of the following circumstances

- as illegal dividends;
- as a fraudulent conveyance or fraudulent transfer under California law;
- in breach of fiduciary duty aided and abetted by Imasco;
- as products of conflicted and tainted legal representation by S&C;
- as products of negligent legal advice by S&C;
- as improper by reason of having been induced by the promise in 1986 by Imasco to repay, and by the Dividend Repayment Contract in 1987;
- as otherwise improper within the meaning of the Dividend Repayment Contract.

157.   The Flintkote Plaintiffs are informed and believe, and upon such information and belief alleges, that Imperial Tobacco disagrees with each of The Flintkote Plaintiffs' contentions.

158.   In the event the court finally determines that the 1986 and 1987 dividends were improperly paid, then Imperial Tobacco will be obligated to repay to Flintkote any amounts (up to the full amount of the dividends) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of assets of Flintkote because of the dividends finally determined to have been improperly paid, upon entry of the judgments described in the DRC.

159.   The Flintkote Plaintiffs seek a declaration as to the legal rights and duties of the

{00007643.DOC; 2}   35

FIRST AMENDED COMPLAINT

1    parties as to propriety of the dividends and duties arising from dividends having been improperly

2    paid.

3             WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

4    below.

5                                          PRAYER

6        WHEREFORE, plaintiffs pray judgment:

7        1.    On the First and Second Causes of Action for recovery by plaintiffs Hopkins against

8    defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to

9    proof;

10       2.    On the Third Cause of Action for recovery by plaintiff Marlene Hopkins against

11   defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to

12   proof;

13       3.    On the Fourth, Fifth, and Sixth Causes of Action, for recovery by plaintiffs Hopkins

14   against defendants Plant and Uniroyal of damages according to proof;

15       4.    On the Seventh Cause of Action, for recovery by plaintiffs Hopkins against defendant

16   Plant of damages according to proof;

17       5.    On the Eighth Cause of Action, for an order declaring that Imperial Tobacco is liable

18   as the alter ego of Flintkote with respect to asbestos-related liabilities and is responsible to pay such

19   liabilities;

20       6.    On the Ninth, Tenth, Eleventh, and Twelfth Causes of Action, for recovery by The

21   Flintkote Plaintiffs from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other

22   amount as may be proved;

23       7.    On the Thirteenth Cause of Action, for recovery by The Flintkote Plaintiffs from S&C

24   in the amount of $525,200,000 plus interest, or such other amount as may be proved;

25       8.    On the Fourteenth and Fifteenth Causes of Action, for recovery by The Flintkote

26   Plaintiffs from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount

27   as may be proved;

28       9.    On the Sixteenth Cause of Action, for an order declaring and determining in favor of

Snyder
Miller
& Orton
LLP

{00007643.DOC: 2}                    36

FIRST AMENDED COMPLAINT

May-02-2006 02:09pm From-                                           T-204  P 037/040  F-949

Apr.27. 2006  3:09PM                                                No. 2023   P. 38/38

1   The Flintkote Plaintiffs that the $170,200,000 dividend declared and paid in December 1986 and the

2   $355,000,000 dividend declared and paid in July 1987 by Flintkote were improperly paid within the

3   meaning of the Dividend Recovery Contract letter from Inasco dated July 27, 1987, and that upon

4   the occurrence of the remaining determinations described in the Dividend Recovery Contract, that

5   Imperial Tobacco will be obligated to repay to Flintkote the amounts (up to the full amount of the

6   dividends) finally determined to be due to Flinkote creditors but that cannot be satisfied out of the

7   assets of Flintkote because of the payment of the dividends.

8   Date: 4·26·06

9                                          BRAYTON PURCELL LLP

10

11                                         By:
    Additional Counsel for Plaintiffs The Flintkote       Gilbert L. Purcell
12  Company The Official Committee of:                     Attorneys for Plaintiff Marlene Hopkins,
    Asbestos Personal Injury Claimants, and               Michelle Hopkins, and Michael Hopkins
13  James J. McMonagle as the Legal Representative
    for Future Asbestos Personal Injury Claimants:

14  Eliot S. Jubelirer (061654)
    Jean L. Bertrand (083250)
15  Morgenstein & Jubelirer
    One Market, Spear Street Tower
16  Thirty-Second Floor                      SNYDER MILLER & ORTON LLP
    San Francisco, CA 94105
17  Telephone (415) 901-8700

18  Alan Pedlar (State Bar No. 72216)
    The Law Office of Alan Pedlar           By:
19  1112 Via Malibu                              Stephen M. Snyder
    Aptos, CA 95083                              Attorneys for Plaintiffs
20  Telephone (831) 688-2667                     The Flintkote Company, The Official
                                                 Committee of Asbestos Personal Injury
21  Kelly C. Wooster (State Bar No. 41196)       Claimants, and James J. McMonagle as the
    112 Rock Creek Court                         Legal Representative for Future Asbestos
22  P.O. Box 62                                  Personal Injury Claimants
    Copperopolis, CA 95228
23  Telephone: (209) 785-2437

24

25

26

27

28
Snyder
Miller
& Orton      (00007643.DOC: 2)                       37
LLP
                              FIRST AMENDED COMPLAINT

APR 27 2006 15:21                                                          PAGE.27

CASE N°:  CGC-06-450944

UNITED STATES OF AMERICA
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

MARLENE HOPKINS et al
          Plaintiffs

vs.

IMPERIAL TOBACCO CANADA LIMITED et al
          Defendants

- Attestation.
- First Amended Complaint for Damages (...)

COPY FOR:

IMPERIAL TOBACCO CANADA LIMITED
3711 rue Saint-Antoine
Montréal QC  H4C 3P6

05/06/13 /hrs

Saulnier Robillard Lortie
Huissiers de Justice
Charles Laliberté, HJ

**Exhibit B-9**

**Exhibit B-9**

The document referenced as Exhibit B-9 was unavailable on the Superior Court of California County of San Francisco's Docket System as of 5:00 p.m. E.S.T., April 4, 2006. ITCAN will supplement the record once this document is available.

**Exhibit B-10**

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     Loren Kieve (Bar No. 56280)
2   201 Sansome Street, 6th Floor
  San Francisco, California 94104
3   Telephone: (415) 986-5700
  Facsimile: (415) 986-5707
4

5   Counsel for Defendant
  Imperial Tobacco Canada Limited

ENDORSED FILED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

MAY - 4 2006

GORDON PARK-LI, Clerk
BY: _____
      Deputy Clerk

6        SUPERIOR COURT FOR THE STATE OF CALIFORNIA

7          IN THE COUNTY OF SAN FRANCISCO

8   MARLENE HOPKINS, Individually, as   )   CASE NO. CGC06450944
  Wrongful Death Heir, and as Successor-in- )
9   Interest to NORMAN HOPKINS, JR.,    )   **DEFENDANT IMPERIAL TOBACCO**
  Deceased; and MICHELLE HOPKINS, and )   **CANADA LIMITED'S ANSWER TO**
10   MICHAEL HOPKINS, as Legal Heirs of  )   **FIRST AMENDED COMPLAINT FOR**
  NORMAN HOPKINS, Deceased, THE    )   **DAMAGES AND RELIEF AGAINST**
11   FLINTKOTE COMPANY, THE OFFICIAL )   **ALTER EGO, FOR RECOVERY OF**
  COMMITTEE OF THE ASBESTOS     )   **DIVIDENDS, FOR RECOVERY OF**
12   PERSONAL INJURY CLAIMANTS, and  )   **FRAUDULENT TRANSFERS, FOR**
  JAMES J. MCMONAGLE as the LEGAL  )   **DAMAGES BY REASON OF BREACH**
13   REPRESENTATIVE FOR FUTURE    )   **OF FIDUCIARY DUTY, FOR**
  ASBESTOS PERSONAL INJURY      )   **DAMAGES FOR BREACH OF DUTY**
14   CLAIMANTS,                  )   **AND NEGLIGENCE, TO ENFORCE**
                              )   **CONSTRUCTIVE TRUST, FOR**
15            Plaintiffs,       )   **RESTITUTION, AND FOR**
                              )   **DECLARATORY RELIEF**
16                            )

     v.                         )
17   PLANT INSULATION COMPANY;    )
  UNIROYAL HOLDING, INC.; IMPERIAL )   Filing Date: May 4, 2006
18   TOBACCO CANADA LIMITED;      )   Trial Date: None Set
  SULLIVAN & CROMWELL LLP; and   )
19   DOES 1 through 100,           )
                              )
20          Defendants.       )
                              )
21   _____)

22

23       Defendant IMPERIAL TOBACCO CANADA LIMITED ("ITCAN"), for itself alone and

24   for no other defendant, hereby answers the unverified first amended complaint (the "Complaint")

25   of MARLENE HOPKINS, MICHELLE HOPKINS, MICHAEL HOPKINS (collectively, the

26   "Hopkins"), THE FLINTKOTE COMPANY ("Flintkote"), THE OFFICIAL COMMITTEE OF

27   THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the

28

1  LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS

2  (together with the Hopkins and Flintkote, the "Plaintiffs") for damages and relief against alter

3  ego, for recovery of dividends, for recovery of fraudulent transfers, for damages by reason of

4  breach of fiduciary duty, for damages for breach of duty and negligence, to enforce constructive

5  trust, and for declaratory relief:

6

7                          GENERAL DENIAL

8         Pursuant to California Code of Civil Procedure § 431.30(d), ITCAN generally and

9  specifically denies each and every allegation of the unverified Complaint, denies that Plaintiffs

10  have been damaged in the sum or sums alleged therein or in any sums whatsoever, denies that

11  Plaintiffs are entitled to declaratory relief, and denies that Plaintiffs are entitled to any relief

12  whatsoever in this action.

13

14                          DEFENSES

15         ITCAN sets forth the following affirmative or additional defenses.  In asserting these

16  defenses, ITCAN is not assuming the burden to establish any fact or proposition where that

17  burden is properly imposed on Plaintiffs.

18

19                          FIRST DEFENSE

20              (Failure to State a Claim Upon Which Relief Can Be Granted)

21         1.      The Complaint, and each purported cause of action alleged therein, fails to state

22  facts sufficient to constitute any cause of action against ITCAN.

23

24                          SECOND DEFENSE

25                          (Lack of Standing)

26         2.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing

27  to assert any or all of the causes of action alleged in the Complaint.

28

                                 ˘2˘

_____

1
2                          THIRD DEFENSE
3                       (Personal Jurisdiction)
4          3.      This Court lacks personal jurisdiction over ITCAN, a company organized under
5   the laws of Canada and domiciled in Montreal, Quebec, and thus this Complaint should be
6   dismissed.
7
8                          FOURTH DEFENSE
9                         (Canadian Law)
10         4.      Plaintiffs' claims against ITCAN may not be asserted in this Court pursuant to
11  applicable Canadian law.
12
13                          FIFTH DEFENSE
14                      (Subject Matter Jurisdiction)
15         5.      This Court lacks subject matter jurisdiction over some or all of the counts of the
16  Complaint and thus those portions of the Complaint lacking jurisdiction should be dismissed.
17
18                          SIXTH DEFENSE
19                       (Statute of Limitations)
20         6.      Plaintiffs' claims are barred, in whole or in part, by applicable statutes of
21  limitation.
22
23                         SEVENTH DEFENSE
24                        (Statute of Repose)
25         7.      Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of
26  repose.
27
28

                                    -3-

## EIGHTH DEFENSE

### (Improper Joinder)

8.    Plaintiffs are improperly joined because their claims do not arise from the same transaction or occurrence, do not arise from a common nucleus of operative facts, do not raise common questions of law, and because plaintiffs and their injuries do not all have a substantial connection to the State of California.

## NINTH DEFENSE

### (Fraudulent Joinder)

9.    The Complaint should be dismissed or, at least, parties or claims should be transferred to another jurisdiction both due to Plaintiffs' failure to properly join claims and parties and due to Plaintiffs misjoinder of claims and parties, which was fraudulently designed to confer jurisdiction on this Court over claims and/or parties that it does not and would not otherwise have jurisdiction.

## TENTH DEFENSE

### (Failure to Join Indispensable Parties)

10.    To the extent the Complaint fails to name indispensable parties, the Complaint must be dismissed or, alternatively, this civil action should be stayed pending other appropriate relief by the Court.

## ELEVENTH DEFENSE

### (Improper Venue)

11.    Venue of this civil action does not properly lie in San Francisco County, California.

4

## TWELFTH DEFENSE

### (Forum Non Conveniens)

12.    Some or all of Plaintiffs' claims are barred in this Court by the common law defense of forum non conveniens.

## THIRTEENTH DEFENSE

### (Equitable Defenses)

13.    The Complaint, and each purported cause of action alleged therein, is barred by the equitable doctrines of estoppel, waiver, laches and/or unclean hands.

## FOURTEENTH DEFENSE

### (Failure to Mitigate Damages)

14.    Plaintiffs have failed to take reasonable, necessary, appropriate and feasible steps to mitigate their alleged damages, and to the extent of such failure to mitigate, Plaintiffs should be barred from recovering some or all of the alleged damages they seek.

## FIFTEENTH DEFENSE

### (Waiver and Release)

15.    The Complaint, and each purported cause of action alleged therein, is barred to the extent Plaintiffs have waived, released, relinquished or abandoned any claim for relief against ITCAN with respect to the matters that are the subject of the Complaint.

## SIXTEENTH DEFENSE

### (Applicable Law)

16.    ITCAN asserts that Plaintiffs' claims, or some of them, are or may be barred or otherwise limited or affected by the application of provisions of the law or statutes of states or jurisdictions other than the State of California.

-5-

1

2 <u>SEVENTEENTH DEFENSE</u>

3 (Comparative Fault)

4    17.    ITCAN is informed and believes and therefore alleges that to the extent some or

5 all of the Plaintiffs suffered or sustained any loss, damage or injury as alleged in the Complaint,

6 such loss, damage, or injury was the direct and proximate result of the acts and omissions of the

7 Hopkins, or other persons or entities for whom ITCAN is not legally responsible.

8

9 <u>EIGHTEENTH DEFENSE</u>

10 (Defendant's Practices Not Unlawful)·

11    18.    To the extent Plaintiffs prove ITCAN or its predecessors conducted any of the

12 activities alleged in the Complaint, those activities conformed with and were done pursuant to

13 any and all applicable statutes and regulations and were not unlawful.

14

15    <u>NINETEENTH DEFENSE</u>

16 (Separate Corporate Identities)

17    19.    The alleged causes of action are barred, in whole or in part, because the separate

18 corporate identities that existed between and among ITCAN and its predecessors, and all of

19 ITCAN's and its predecessor's direct and indirect subsidiaries, including Flintkote, were

20 maintained at all times relevant to the Complaint.

21

22 <u>TWENTIETH DEFENSE</u>

23 (No Injury Or Damage)

24    20.    ITCAN denies that Plaintiffs have suffered any injury or damage whatsoever, and

25 further denies it is liable to Plaintiffs for any of the injury or damage claimed or for any injury or

26 damage whatsoever.

27

28

-6-

1

2 **TWENTY-FIRST DEFENSE**

3 (No Proximate Causation)

4     21.    To the extent Plaintiffs suffered injury or damage, which ITCAN denies, such

5 injury or damage was not proximately caused by any conduct or inaction of ITCAN or its

6 predecessors, or was not foreseeable, or both.

7

8 **TWENTY-SECOND DEFENSE**

9 (Ratification)

10     22.    The alleged causes of action are barred, in whole or in part, because of

11 ratification, agreement, assent, acquiescence or consent to ITCAN's or its predecessor's alleged

12 conduct.

13

14 **TWENTY-THIRD DEFENSE**

15 (Justified and Privileged Conduct)

16     23.    The alleged causes of action are barred because the conduct of ITCAN and its

17 predecessors was at all times justified and privileged, and did not result in any wrongful benefit

18 or unjust enrichment to ITCAN or its predecessors.

19

20 **TWENTY-FOURTH DEFENSE**

21 (Lawful Business Means and Objectives)

22     24.    The alleged causes of action are barred because ITCAN and its predecessors

23 employed lawful, proper and justified means to accomplish legitimate business objectives.

24

25

26

27

28

-7-

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1

2 ### TWENTY-FIFTH DEFENSE

3 (Reasonable and Good Faith Conduct)

4 25.     The alleged causes of action are barred because ITCAN and its predecessors acted

5 reasonably and in good faith at all times material to the Complaint based on all relevant facts and

6 circumstances known to it at the time ITCAN or its predecessors so acted.

7

8 ### TWENTY-SIXTH DEFENSE

9 (Standard of Care)

10 26.     ITCAN denies any negligence on its part and shows that, at all times relevant to

11 Plaintiffs' Complaint, it and its predecessors met or exceeded the requisite standard of care.

12

13 ### TWENTY-SEVENTH DEFENSE

14 (Acts or Omissions)

15 27.     No act or omission on the part of ITCAN or its predecessors caused or contributed

16 to Plaintiffs' alleged injuries and damages.

17

18 ### TWENTY-EIGHTH DEFENSE

19 (No Duty)

20 28.     ITCAN is informed, believes and thereon alleges that Plaintiffs' Complaint, and

21 each cause of action therein, is barred because ITCAN and its predecessors did not owe any duty

22 to Plaintiffs.  To the extent that ITCAN or its predecessors owed any Plaintiffs a duty, including

23 without limitation a duty of good faith, a duty of care or a fiduciary duty, ITCAN states that at all

24 times relevant to Plaintiffs' Complaint, it or its predecessors met or exceeded such duty.

25

26

27

28

-8-

1

2                         TWENTY-NINTH DEFENSE

3                    (No Production of Asbestos Products)

4          29.     At no time did ITCAN, or its predecessors, engage in the business of

5    manufacturing, fabricating, researching, designing, testing, marketing, offering for sale, selling,

6    distributing, transporting, installing or otherwise producing asbestos or products containing

7    asbestos.

8

9                           THIRTIETH DEFENSE

10                  (Asbestos Production Occurred Pre-Acquisition)

11         30.     The causes of action for alter ego liability are barred, in whole or in part, because

12   Flintkote had ceased to engage in the business of manufacturing, fabricating, researching,

13   designing, testing, marketing, offering for sale, selling, distributing, transporting, installing or

14   otherwise producing asbestos or products containing asbestos prior to the point in time at which

15   Flintkote became an indirect subsidiary of ITCAN or its predecessors.

16

17                         THIRTY-FIRST DEFENSE

18                              (Due Process)

19         31.     Plaintiff's claims violate the due process provisions of the United States

20   Constitution and the correlative provisions of the California Constitution to the extent that they

21   seek to deprive ITCAN of procedural and substantive safeguards, including traditional defenses

22   to liability.

23

24                        THIRTY-SECOND DEFENSE

25                  (Unmanageable and Inequitable Relief Requested)

26         32.     The alleged causes of action are barred, in whole or part, because the relief

27   requested by Plaintiffs is unmanageable and inequitable.

28

1

2                    THIRTY-THIRD DEFENSE

3                  (Punitive Damages Unconstitutional)

4      33.    The imposition of punitive or exemplary damages in the circumstances of this

5   case would violate the Constitutions of the United States of America and the State of California.

6

7                    THIRTY-FOURTH DEFENSE

8                    (Declaratory Relief Improper)

9      34.    The Plaintiffs' prayer for declaratory relief is improper and should be barred

10   because it seeks a declaration as to the rights and duties of parties over which the Bankruptcy

11   Court adjudicating Flintkote's chapter 11 bankruptcy case has proper governing authority.

12

13                    THIRTY-FIFTH DEFENSE

14                  (No Restitution or Disgorgement)

15      35.    Plaintiffs are not entitled to restitution or disgorgement of profits.

16

17                    THIRTY-SIXTH DEFENSE

18                  (Constitutions of Other Jurisdictions)

19      36.    To the extent that the laws of other jurisdictions apply, ITCAN invokes each and

20   every constitutional defense available to it under the constitutions (or similar charters) of each of

21   the other forty-nine states, the District of Columbia, the Commonwealth of Puerto Rico, the

22   territories and possessions of the United States, as well as the constitutions (or similar charters)

23   of Canada and each of its provinces. This specifically includes, but is not limited to, provisions

24   relating to due process, access to the courts, freedom of speech, freedom of association, freedom

25   to petition the government for redress of grievances, and limitations on compensatory damages.

26

27

28

THIRTY-SEVENTH DEFENSE

(Statutes of Other Jurisdictions)

37.     To the extent that the laws of other jurisdictions apply, ITCAN invokes each and every statutory and common law defense available to it under the laws of each of the other forty-nine states, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, and Canada and each of its provinces, with respect to each of the claims alleged in the Complaint that is recognized in that jurisdiction.

THIRTY-EIGHTH DEFENSE

(Incorporation of Co-Defendants' Defenses)

38.     ITCAN adopts and incorporates by reference any affirmative or additional defense asserted by any other Defendant to this action, to the extent such affirmative or additional defense applies to ITCAN.

THIRTY-NINTH DEFENSE

(Right to Assert Additional Defenses)

39.     ITCAN hereby gives notice that it intends to rely on any other defense or defenses that may become available or apparent as a result of the development of additional information, through discovery in this action or otherwise, and hereby reserves the right to amend its answer and to assert any such defense.

FORTIETH DEFENSE

(Conforming Products)

40.     As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in the business of manufacturing or selling asbestos-containing products. Nonetheless, because it appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

~11~

1  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

2  causes of action contained in the Complaint are barred to the extent the products referenced in

3  this action and the methods of manufacture and testing conformed to the generally recognized

4  and prevailing industry standards and the state of the art in existence at the time the design was

5  prepared and the products manufactured and tested.

6

7                          **FORTY-FIRST DEFENSE**

8                            (Conforming Products)

9        41.     As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

10 the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

11 appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

12 contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

13 causes of action contained in the Complaint are barred to the extent the Hopkins' claims are

14 based on Norman Hopkins, Jr.'s (the "Decedent") exposure to the products referenced in the

15 Complaint, and said products at the time were manufactured in conformity with federal and state

16 regulations, standards, specifications, and laws.

17

18                         **FORTY-SECOND DEFENSE**

19                      (Government Contractor Defense)

20       42.     As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

21 the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

22 appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

23 contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

24 causes of action contained in the Complaint are barred to the extent that any of the Hopkins'

25 claims are based on Decedent's exposure to any products that were provided pursuant to a

26 contract with the U.S. Government or otherwise provided under a contract whereby such

27 products were to meet government or military specifications, the use by Decedent of these

28

                                  ˇ12ˇ

                 IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1   products, if any, was in accordance with the requirements of the designs, plans, and

2   specifications of the governmental entities or agencies or others and in strict compliance

3   therewith and with all required federal regulations and standards. ITCAN specifically pleads the

4   government contractor defense.

5

6                              FORTY-THIRD DEFENSE

7                              (Failure to Exercise Care)

8        43.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

9   the business of manufacturing or selling asbestos-containing products. Nonetheless, because it

10  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

11  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

12  causes of action contained in the Complaint are barred to the extent that Decedent failed to

13  exercise ordinary care for his own safety. That failure is a partial or a complete bar to all claims

14  asserted by the Hopkins in the Complaint.

15

16                             FORTY-FOURTH DEFENSE

17                             (Contributory Negligence)

18       44.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

19  the business of manufacturing or selling asbestos-containing products. Nonetheless, because it

20  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

21  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

22  causes of action contained in the Complaint are barred to the extent that some or all of the

23  Hopkins' alleged injuries, damages or losses, if any, were proximately caused, or contributed to,

24  by the negligence of Decedent or fellow servants over which Flintkote (or ITCAN or its

25  predecessors) had no control, thereby precluding recovery against it.

26

27

28

                                       ˜13˜

_____

1

2

3                          FORTY-FIFTH DEFENSE

4                          (Contributory Negligence)

5       45.     As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

6   the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

7   appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

8   contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

9   causes of action contained in the Complaint are barred to the extent that negligence and conduct

10  of Decedent's employers is a partial or a complete bar to all claims asserted in by the Hopkins in

11  the Complaint.

12

13                         FORTY-SIXTH DEFENSE

14                         (Non-Defendant Products)

15      46.     As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

16  the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

17  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

18  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

19  causes of action contained in the Complaint are barred to the extent that Decedent's death was or

20  may have been due to exposure to products of distributors, suppliers, and manufacturers not

21  named as defendants in this action.

22

23                         FORTY-SEVENTH DEFENSE

24                         (Learned Intermediary and Sophisticated User)

25      47.     As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

26  the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

27  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

28

                                     ˜14˜
_____

                    IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

2  causes of action contained in the Complaint are barred by the learned intermediary and

3  sophisticated user doctrines.

4

5                        FORTY-EIGHTH DEFENSE

6                        (Assumption of Risk)

7        48.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

8  the business of manufacturing or selling asbestos-containing products. Nonetheless, because it

9  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

10  contest allegations of asbestos personal injury, ITCAN denies that the Hopkins incurred any

11  injuries or damages as a result of any actions or omissions of Flintkote (or ITCAN or its

12  predecessors). Nevertheless, as to any injuries or damages alleged to have been incurred,

13  Decedent voluntarily and knowingly assumed the risk of incurring same and, therefore, the

14  Hopkins are not entitled to recover against ITCAN.

15

16                        FORTY-NINTH DEFENSE

17                        (Misuse of Product)

18        49.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

19  the business of manufacturing or selling asbestos-containing products. Nonetheless, because it

20  appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

21  contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

22  causes of action contained in the Complaint are barred to the extent that the injuries alleged by

23  the Hopkins resulted solely and proximately from a misuse or an abnormal and unforeseeable use

24  of the products in question by third persons over whom Flintkote (or ITCAN or its predecessors)

25  had no control.

26

27

28

                                    ˇ15ˇ

                        IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1

2

3                        FIFTIETH DEFENSE

4                     (Unrelated Cause of Death)

5        50.    As set forth in paragraph 29, ITCAN, and its predecessors, did not participate in

6   the business of manufacturing or selling asbestos-containing products.  Nonetheless, because it

7   appears that no other defendant named in Plaintiffs' Complaint may be able or motivated to

8   contest allegations of asbestos personal injury, ITCAN asserts that some or all of the Hopkins'

9   causes of action contained in the Complaint are barred to the extent that the Decedent's death

10  was based solely, or in substantial part, to disease and other causes that were not related or

11  connected with any product sold, distributed or manufactured by Flintkote (or ITCAN or its

12  predecessors).

13

14                      FIFTY-FIRST DEFENSE

15                     (Setoff and Recoupment)

16       51.    The Plaintiffs' claims are subject to ITCAN's rights of setoff and/or recoupment.

17

18    WHEREFORE, ITCAN prays judgment as follows:

19            1.      That Plaintiffs take nothing by reason of the Complaint;

20            2.      That judgment be entered in favor of ITCAN and against Plaintiffs;

21            3.      That the Complaint be dismissed with prejudice;

22            4.      That ITCAN be awarded its costs of suit, including reasonable attorneys'

23  fees; and

24            5.      For such other relief as this Court deems just and proper.

25

26

27

28

                              ˜16˜

―――――――――――――――――――――――――――――――――――――――――――

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

1
2
3    May 4, 2006                          QUINN EMANUEL URQUHART
4                                         OLIVER & HEDGES, LLP
5
     By  _Loren Kieve_____
6         Loren Kieve
7
8    Counsel for Defendant
     Imperial Tobacco Canada Limited
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

˘17˘

IMPERIAL TOBACCO CANADA LIMITED'S ANSWER

## PROOF OF SERVICE

I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 50 California Street, 22nd Floor, San Francisco, California 94111.

On May 4, 2006, I served true copies of the following document(s) described as:

**DEFENDANT IMPERIAL TOBACCO CANADA LIMITED'S ANSWER TO FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF AGAINST ALTER EGO, FOR RECOVERY OF DIVIDENDS, FOR RECOVERY OF FRADULENT TRANSFERS, FOR DAMAGES BY REASON OF BREACH OF FIDUCIARY DUTY, FOR DAMAGES FOR BREACH OF DUTY AND NEGLIGENCE, TO ENFORCE CONSTRUCTIVE TRUST, FOR RESTITUTION, AND FOR DECLARATORY RELIEF**

on the parties in this action as follows:

### SEE ATTACHED LIST

**BY EXPRESS MAIL:** I deposited such document(s) in a box or other facility regularly maintained by the United States Postal Service, in sealed envelope(s) or package(s) designated by the United States Postal Service with delivery fees paid or provided for, addressed to the person(s) being served.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 4, 2006, at San Francisco, California.

Nolene Chetty

**SERVICE LIST**

Alan R. Brayton
Gilbert Purcell
David Donadio
Brayton Purcell LLP
222 Rush Landing Road
Novato, CA 94948-6169

Stephen Snyder
James Miller
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104

50573/1809283.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as | ) | |
| Wrongful Death Heir, and as Successor-in- | ) | |
| Interest to NORMAN HOPKINS, JR., | ) | |
| Deceased; and MICHELLE HOPKINS, and | ) | |
| MICHAEL HOPKINS, as Legal Heirs of | ) | |
| NORMAN HOPKINS, Deceased, THE | ) | |
| FLINTKOTE COMPANY, THE OFFICIAL | ) | |
| COMMITTEE OF THE ASBESTOS | ) | |
| PERSONAL INJURY CLAIMANTS, and | ) | |
| JAMES J. MCMONAGLE as the LEGAL | ) | |
| REPRESENTATIVE FOR FUTURE | ) | |
| ASBESTOS PERSONAL INJURY | ) | |
| CLAIMANTS | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| PLANT INSULATION COMPANY; | ) | |
| UNIROYAL HOLDING, INC.; IMPERIAL | ) | |
| TOBACCO CANADA LIMITED; | ) | |
| SULLIVAN & CROMWELL LLP; and | ) | |
| DOES 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF REBECCA WORKMAN, PARALEGAL**

STATE OF DELAWARE     :
                                    :  SS:
NEW CASTLE COUNTY   :

    I, Rebecca Workman, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on May 5, 2006, I caused to be served:

**EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN**
**ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)**

    Service was completed upon parties on the attached list in the manner indicated thereon.

1387030/1

Date:   May 5, 2006.

*Rebecca Workman*

Rebecca Workman

SWORN AND SUBSCRIBED before me this 5th day of May, 2006.

NOTARY

ELLEN J. ZICKEFOOSE
Notary Public - State of Delaware
My Comm. Expires Feb. 21, 2007

1387030/1

**VIA FIRST CLASS MAIL**

Gilbert L. Purcell, Esquire
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169
(Attorneys for Plaintiff Marlene
Hopkins, Michelle Hopkins, and
Michael Hopkins)

Stephen M. Snyder, Esquire
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
(Attorneys for Plaintiffs The
Flintkote Company, The
Official Committee of Asbestos
Personal Injury Claimants, and
James J. McMonagle as the
Legal Representative for Future
Asbestos Personal Injury Claimants)

Eliot S. Jubelirer, Esquire
Jean L. Bertrand, Esquire
Morgenstein & Jubelirer
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(Additional Counsel for Plaintiffs)

Alan Pedlar, Esquire
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA 95083
(Additional Counsel for Plaintiffs)

Kelly C. Wooster, Esquire
112 Rock Creek Court
P.O. Box 62
Copperopolis, CA 95228
(Additional Counsel for Plaintiffs)

**VIA FIRST CLASS MAIL**

Kevin T. Lantry
Jeffrey E. Bjork
Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA 90013
Attorneys for The Flintkote Company

Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attorneys for Sullivan & Cromwell

Monte S. Travis
Travis & Pon
2001 Fillmore Street
San Francisco, CA 94115-2708
Attorneys for Plant Insulation

Nancy E. Hudgins
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Attorneys for Uniroyal Holdings, Inc.

**VIA HAND DELIVERY**

Laura Davis Jones
James E. O'Neill, III
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, DE 19899-8705
Attorneys for The Flintkote Company

1387171/1

**<u>VIA HAND DELIVERY</u>**

Marla Eskin, Esquire
Kathleen Campbell, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(Counsel for the Official Committee of
Creditors)

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Legal Representative)

1387163/1

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2006 MAY -5  PM 4: 04

MARLENE HOPKINS, Individually, as
Wrongful Death Heir, and as Successor-in-
Interest to NORMAN HOPKINS, JR.,
Deceased; and MICHELLE HOPKINS, and
MICHAEL HOPKINS, as Legal Heirs of
NORMAN HOPKINS, Deceased, THE
FLINTKOTE COMPANY, THE OFFICIAL
COMMITTEE OF THE ASBESTOS
PERSONAL INJURY CLAIMANTS, and
JAMES J. MCMONAGLE as the LEGAL
REPRESENTATIVE FOR FUTURE
ASBESTOS PERSONAL INJURY
CLAIMANTS

        Plaintiffs,

      vs.

PLANT INSULATION COMPANY;
UNIROYAL HOLDING, INC.; IMPERIAL
TOBACCO CANADA LIMITED;
SULLIVAN & CROMWELL LLP; and
DOES 1 through 100,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. _____

0 6 - 2 9 8

---

**BRIEF OF IMPERIAL TOBACCO CANADA LIMITED
IN SUPPORT OF ITS EMERGENCY PETITION FOR AN
ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com

Attorneys for Imperial Tobacco Canada  Limited

Dated:  May 5, 2006

1387048/1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as            )
Wrongful Death Heir, and as Successor-in-    )
Interest to NORMAN HOPKINS, JR.,             )
Deceased; and MICHELLE HOPKINS, and          )
MICHAEL HOPKINS, as Legal Heirs of           )
NORMAN HOPKINS, Deceased, THE                )
FLINTKOTE COMPANY, THE OFFICIAL              )
COMMITTEE OF THE ASBESTOS                    )
PERSONAL INJURY CLAIMANTS, and               )
JAMES J. MCMONAGLE as the LEGAL              )
REPRESENTATIVE FOR FUTURE                    )
ASBESTOS PERSONAL INJURY                     )
CLAIMANTS                                    )
                                             )
              Plaintiffs,                    )        Civil Action No. _____
                                             )
        vs.                                  )
                                             )
PLANT INSULATION COMPANY;                    )
UNIROYAL HOLDING, INC.; IMPERIAL             )
TOBACCO CANADA LIMITED;                      )
SULLIVAN & CROMWELL LLP; and                 )
DOES 1 through 100,                          )
                                             )
              Defendants.                    )
_____      )

BRIEF OF IMPERIAL TOBACCO CANADA LIMITED
IN SUPPORT OF ITS EMERGENCY PETITION FOR AN
ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com

Attorneys for Imperial Tobacco Canada Limited

Dated: May 5, 2006

1387048/1

## TABLE OF CONTENTS

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................................... 1

SUMMARY OF ARGUMENT .................................................................................................. 3

STATEMENT OF FACTS ........................................................................................................ 4

ARGUMENT ............................................................................................................................ 6

I.    This Court Has Jurisdiction Over the Pending Action ............................................. 6

II.   This Court is Authorized to Transfer The Pending Action Pursuant to 28 U.S.C.
      § 157(b)(5), And Should Enter A Provisional Order Granting Such Transfer. ....... 9

      A.    Section 157(b)(5) Applies to the Pending Action. ......................................... 9

      B.    This Court Should Enter A Provisional Order Transferring the Pending Action to this
            District Pending A Final Hearing. .................................................................. 13

III.  The District of Delaware Is The Appropriate Venue for the Pending Action ....... 15

CONCLUSION ....................................................................................................................... 18

1387043/1

## TABLE OF AUTHORITIES

## FEDERAL CASES

A.H. Robins Co., Inc. v. Piccinin,
    788 F.2d 994 (4th Cir. 1986) ..........................................................10, 14, 15

Celotex Corp. v. Edwards,
    514 U.S. 300 (1995).....................................................................................8

In re Continental Airlines, Inc.,
    133 B.R. 585 (Bankr. D. Del. 1991) .........................................................15

In re DaimlerChrysler Corp.,
    294 F.3d 697 (5th Cir. 2002) ....................................................................14

In re Dow Corning Corp.,
    86 F.3d 482 (6th Cir. 1996) ......................................................................11

In re Federal-Mogul Global, Inc.,
    300 F.3d 368 (3d Cir. 2002).........................................................11, 12, 14

Fletcher v. Atex, Inc.,
    68 F.3d 1451 (2d Cir. 1995).....................................................................17

Halper v. Halper,
    164 F.3d 830 (3d Cir. 1999).......................................................................7

Hohl v. Bastian,
    279 B.R. 165 (W.D. Pa. 2002)..................................................................15

Lasalle National Bank v. Perelman,
    82 F. Supp. 2d 279 (D.Del. 2000).............................................................16

Pacor, Inc. v. Higgins,
    743 F.2d 984 (3rd Cir. 1984) .....................................................................8

In re Pan Am Corp.,
    16 F.3d 513 (2d Cir. 1994).......................................................................11

In re Pan Am Corp.,
    950 F.2d 839 (2d Cir. 1991).....................................................................15

Rahl v. Bande, et al.,
    316 B.R. 127 (S.D.N.Y. 2004)....................................................................7

<u>In re Wood</u>,
    825 F.2d 90 (5th Cir 1987) ................................................................................6, 7

<u>In re Dow Corning Corp.</u>,
    1995 WL 495978 (Bankr. E.D. Mich. 1995) ............................................................14

## FEDERAL STATUTES

28 U.S.C. § 1334(b) ........................................................................................................6

28 U.S.C. § 157(b)(5) ......................................................................................................9

ii

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On May 1, 2004, The Flintkote Company ("Flintkote") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Flintkote's bankruptcy case is pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") with the case number 04-11300 (JKF) (the "Bankruptcy Case").

On April 5, 2006, Flintkote, together with Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively, the "Asbestos Claimants") filed a complaint (the "Complaint") in Superior Court of California (Unlimited Jurisdiction) for the County of San Francisco (the "California State Court") to initiate a lawsuit (the "Pending Action") against ITCAN[1] and additional defendants, Plant Insulation Company, Uniroyal Holding, Inc., Sullivan & Cromwell LLP, and Does 1 Through 100. On or about April 27, 2006, Flintkote and the Asbestos Claimants filed an amended complaint (the "Amended Complaint") in the Pending Action to add as plaintiffs the Official Committee of the Asbestos Personal Injury Claimants and James J. McMonagle, the Legal Representative For Future Asbestos Personal Injury Claimants (collectively, and together with Flintkote and the Asbestos Claimants, the "Plaintiffs").

In the Pending Action, the Asbestos Claimants seek recovery for, among other things, wrongful death and loss of consortium resulting from the death of Norman Hopkins (the "Decedent") whose death was allegedly caused by exposure to asbestos. The Asbestos Claimants seek recovery against ITCAN on the theory that ITCAN is the alter ego of Flintkote and is, therefore, liable for asbestos claims against Flintkote. Flintkote also asserts, among other

---

[1] By filing this Brief, ITCAN does not, and has not agreed to, accept or attorn to the jurisdiction of any court within the United States. ITCAN reserves any and all of its rights in the underlying litigation.

things, claims against ITCAN for a declaration of alter ego liability and recovery of dividends allegedly paid to ITCAN's predecessor.

On the same day that Flintkote and the Asbestos Claimants filed the Complaint that initiated the Pending Action, Flintkote filed in the Bankruptcy Court the Debtors' Motion For Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay In Connection With Dividend Recovery Litigation (the "Joint Prosecution Motion"). (A copy of the Joint Prosecution Motion is attached hereto as Exhibit A.) Among other things, in the Joint Prosecution Motion, Flintkote sought the approval of an agreement with the Asbestos Claimants whereby Flintkote would partially transfer to the Asbestos Claimants a portion of Flintkote's alter ego liability claims against ITCAN. (Joint Prosecution Motion, ¶ 24).

On the date hereof or as contemporaneously as possible, ITCAN has filed or will file papers in the Bankruptcy Court, the United States District Court for the Northern District of California (the "California District Court"), and this Court to accomplish three things:

- First, ITCAN removed the Pending Action to the California District Court by filing a Notice of Removal pursuant to 28 U.S.C. § 1441 and, in the alternative, 28 U.S.C. § 1452. Together with the Notice of Removal, ITCAN filed a motion with the California District Court to transfer the Pending Action to this Court pursuant to 28 U.S.C. § 1404. ITCAN has requested that the California District Court stay any consideration of transfer and remand issues pending this Court's consideration of this Emergency Petition for an Order of Transfer Pursuant to 28 U.S.C. §157(b)(5).

- Second, ITCAN filed with this Court the instant Emergency Petition for an Order of Transfer Pursuant to 28 U.S.C. § 157(b)(5) (the "Petition").

- Finally, ITCAN filed or will file a motion in the Bankruptcy Case seeking that the reference to the Bankruptcy Court be withdrawn with respect to the Joint Prosecution Motion so that the issues raised by the Joint Prosecution Motion, which have a

2

direct impact on the Pending Action, may be resolved by this
Court in connection with the resolution of this Petition.

The relief sought by these various pleadings will consolidate all issues regarding the

Pending Action in the District of Delaware, the district in which the Bankruptcy Case is pending.

This Brief addresses ITCAN's Emergency Petition for an Order of Transfer Pursuant to 28

U.S.C. § 157(b)(5).

## SUMMARY OF ARGUMENT

1.      This Court has jurisdiction over the Pending Action pursuant to 28 U.S.C.

§ 1334. Under 28 U.S.C. § 1334, this Court has jurisdiction over cases arising under the

Bankruptcy Code or cases related to a pending bankruptcy case. The Pending Action arises

under the Bankruptcy Code because Flintkote's standing to pursue the causes of action asserted

against ITCAN is founded upon section 544 of the Bankruptcy Code. That section permits

Flintkote, as a debtor-in-possession in a pending Chapter 11 case, to assert certain claims on

behalf of its creditors and to avoid and recover certain pre-petition transfers of property. In

addition, the Pending Action will have a direct effect on the Bankruptcy Case because it will

require the determination of Flintkote's own asbestos liability, and any recovery in the Pending

Action will provide funds for distribution to creditors. Therefore, the claims that Flintkote

asserts in the Pending Action arise under the Bankruptcy Code and are related to the Bankruptcy

Case. Therefore, this Court has jurisdiction over the Pending Action pursuant to 28 U.S.C.

§ 1334.

2.      In the Pending Action, the Asbestos Claimants assert claims for, among other

things, wrongful death and loss of consortium resulting from the Decedent's alleged exposure to

asbestos. The Asbestos Claimants seek to recover against ITCAN on the theory that ITCAN is

the alter ego of Flintkote. In other words, for the Asbestos Claimants to prevail in their action

3

138704;1/1

against ITCAN, they must first establish the validity of their tort claims against Flintkote. As such, the first three counts in the Pending Action are in fact personal injury tort claims against Flintkote and ITCAN (as Flintkote's alleged alter ego). Likewise, Flintkote's alter ego claims are themselves based on Flintkote's alleged asbestos tort liability. Accordingly, the Pending Action falls within the purview of section 157(b)(5). Therefore, this Court is authorized to transfer the Pending Action to this Court.

        3.      The District of Delaware is the appropriate venue for the Pending Action. There is a general presumption that actions related to a bankruptcy case should be heard in the district where the bankruptcy case is pending. This presumption is strengthened in this case by the fact that the Pending Action falls within the purview of 28 U.S.C. § 157(b)(5). No party to the Pending Action will be prejudiced by transferring the Pending Action to this Court. Further, because the Pending Action is largely premised on alter ego claims with respect to a Delaware corporation (Flintkote), and otherwise raises fraudulent conveyance and illegal dividend issues with which the District of Delaware is imminently familiar, this Court offers the best and most appropriate forum for this litigation.

## STATEMENT OF FACTS

      Flintkote filed for protection under chapter 11 of the Bankruptcy Code on May 1, 2004. According to the Affidavit of David J. Gordon In Support of First Day Motions (the "First Day Affidavit")[2] that was filed in the Bankruptcy Case, Flintkote's bankruptcy filing was caused primarily because of increased number of asbestos claims asserted against Flintkote. *Id.* at ¶ 4. According to Flintkote, in the year prior to the filing of the Bankruptcy Case, 44,000 new asbestos claims were filed against Flintkote. *Id.* at ¶ 21. As of the filing of the Bankruptcy Case,

---

[2] A copy of the First Day Affidavit is attached hereto as <u>Exhibit B</u>.

138704 3/1

Flintkote was a defendant in over 155,000 asbestos-related personal injury claims. *Id.* at ¶ 4. Flintkote's stated goal in the Bankruptcy Case is to form an asbestos personal injury trust pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan of reorganization. *Id.* at ¶ 6.

Flintkote and the Asbestos Claimants commenced the Pending Action on April 5, 2006 by filing the Complaint in the California State Court. The claims asserted in the Pending Action may be broken down into two categories: (1) claims for alter ego liability and (2) claims against ITCAN on various theories to recover corporate dividends. The Asbestos Claimants assert three causes of action against ITCAN comprised of two causes of action for wrongful death (Amended Complaint, Counts I and II)[3] and one cause of action for loss of consortium. (Amended Complaint, Count III). The Asbestos Claimants bring each of these claims against ITCAN on the theory that ITCAN is the alter ego of Flintkote. (Amended Complaint, ¶ 47). Flintkote also asserts a claim against ITCAN for declaration of alter ego liability. (Amended Complaint, Count 8). In addition, Flintkote asserts claims under several different theories to recover dividends allegedly paid to ITCAN's predecessor. (Amended Complaint, Counts 9-15 and 16).

On the same day that Flintkote and the Asbestos Claimants filed the Complaint that initiated the Pending Action, Flintkote filed the Joint Prosecution Motion in the Bankruptcy Court. The Joint Prosecution Motion seeks, among other things, the approval of an agreement with the Asbestos Claimants whereby Flintkote would transfer to the Asbestos Claimants an undivided interest in Flintkote's alter ego liability claims against ITCAN. (Joint Prosecution Motion, ¶ 24). If the Joint Prosecution Motion is granted, then any amount determined to be owed to the Asbestos Claimants as a result of the Pending Action would be "classified as an

---

[3] A copy of the Amended Complaint was attached hereto as Exhibit C.

5

asbestos personal injury claim against Flintkote" and "treated under any asbestos trust established in the Bankruptcy Case." (Joint Prosecution Motion, ¶ 28).

In connection with the Joint Prosecution Motion, Flintkote stated that the Pending Action "represents potentially the largest group of assets" of its bankruptcy estate.[4] Flintkote also disclosed that it intends for the Pending Action ultimately to be transferred to an asbestos personal injury trust pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan of reorganization and that any proceeds recovered by the Pending Action will be distributed for the benefit of current and future holders of asbestos personal injury claims pursuant to a confirmed plan of reorganization. (Joint Prosecution Motion, ¶ 11).

## ARGUMENT

### I.     This Court Has Jurisdiction Over the Pending Action.

Section 1334(b) of title 28 sets forth Congress's broad jurisdictional grant to the district courts for bankruptcy cases and related proceedings - including the claims and causes of action that are the subject of this petition:

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to a case under title 11.

28 U.S.C. § 1334(b).

Courts generally hold that for the purposes of section 1334(b), a case arises under title 11 if it is based on a cause of action created by the Bankruptcy Code. *See, e.g., In re Wood*, 825

---

[4] See *Debtors' Motion to Shorten Notice Periods With Respect to Certain Pleadings Filed in Connection with the Dividend Recovery Litigation*, filed in the Bankruptcy Case (Docket No. 1435) on April 5, 2006, a copy of which is attached hereto as Exhibit D, at page 2.

6

F.2d 90, 96 (5th Cir 1987) ("Congress used the phrase arising under title 11 to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11."), *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) ("the phrases 'arising under' and "arising in" are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding . . . .").

Under section 544 of the Bankruptcy Code, a debtor-in-possession in a chapter 11 case is granted the ability to bring causes of action that, absent the filing of the bankruptcy case, could only be brought by creditors of the debtor. In the Amended Complaint, Flintkote invokes the power granted by section 544 of the Bankruptcy Code to bring certain of the claims asserted against ITCAN. (Amended Complaint, ¶ 8) ("The Flintkote Plaintiffs are authorized by virtue of the Bankruptcy Code . . . to bring certain of the causes of action . . .").

Courts have routinely held that a cause of action brought pursuant to section 544 of the Bankruptcy Code is an action that arises under title 11. *See, e.g., Rahl v. Bande, et al.*, 316 B.R. 127 (S.D.N.Y. 2004) (finding that a cause of action under section 544 of the Bankruptcy Code asserted by bankruptcy trustee in state court was a claim "arising under" title 11 that should not be remanded to state court); *Collier on Bankruptcy*, at ¶ 3.01[4][c][i] (15th ed. rev. 1996) ("courts have held that civil proceedings 'arising under title 11' include causes of action to recover fraudulent conveyances, avoidance actions brought under section 544(b) of the Bankruptcy Code . . . ."). Accordingly, this Court has jurisdiction over the Pending Action because it asserts causes of action that arise under the Bankruptcy Code.

Moreover, to the extent the Pending Action asserts claims that do not arise under the Bankruptcy Code, such claims are undoubtedly related to the Bankruptcy Case. In *Celotex Corp.*

7

1387043/1

*v. Edwards*, the Supreme Court adopted the expansive definition of "related to" jurisdiction first

enunciated by the Third Circuit:

> The usual articulation for determining whether a civil proceeding is related to
> bankruptcy is whether the ***outcome of that proceeding could conceivably have
> any effect on the estate being administered in bankruptcy....*** Thus, the
> proceeding need not necessarily be against the debtor or against the debtor's
> property. An action is related to bankruptcy if the outcome could alter the
> debtor's rights, liability, options, or freedom of action (either positively or
> negatively) and which in any way impacts upon the handling and
> administration of the bankrupt estate.

514 U.S. 300, 306, 308 n. 6 (1995) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir.

1984)) (emphasis in original).

There can be no question that this standard is met with respect to the Pending Action. In

order for the Asbestos Claimants to prevail on their alter ego claims, they must first establish that

they have valid claims against Flintkote. Likewise, because Flintkote has based its alleged alter

ego damages on the amount of its alleged liability for asbestos tort claims, those alleged tort

claims are also at issue. Accordingly, the Pending Action will require a determination of

Flinkote's own liability. It is impossible for a proceeding to be more related to a pending

bankruptcy than a proceeding that involves an adjudication of a debtor's own liability.

As further evidence that the Pending Action is related to the Bankruptcy Case, Flintkote

itself has stated that the Pending Action "represents potentially the largest group of assets" of its

bankruptcy estate.[5] *See Celotex*, 514 U.S. at 308 n.5 (1995) ("Proceedings 'related to' the

bankruptcy include (1) causes of action owned by the debtor which become property of the estate

. . . ."). Indeed, the Pending Action is not merely related to the Bankruptcy Case, but in fact, is

---

[5] See *Debtors' Motion to Shorten Notice Periods With Respect to Certain Pleadings Filed in Connection with the
Dividend Recovery Litigation*, filed in the Bankruptcy Case (Docket No. 1435) on April 5, 2006, a copy of which is
attached hereto as Exhibit D, at page 2.

8

1387043/1

an integral part of the bankruptcy proceedings and Flintkote's reorganization plans. For instance, in the Joint Prosecution Motion, Flintkote states that it intends for the Pending Action to ultimately be transferred to an asbestos personal injury trust pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan of reorganization and for any proceeds recovered by the Pending Action to be distributed for the benefit of current and future holders of asbestos personal injury claims pursuant to a confirmed plan of reorganization. (Joint Prosecution Motion, ¶ 11).

In sum, the outcome of the Pending Action will have a profound and substantial impact on Flintkote's bankruptcy proceedings, and the Pending Action contains causes of action that arise under the Bankruptcy Code. Accordingly, this Court has jurisdiction over the Pending Action pursuant to 28 U.S.C. § 1334.

**II.    This Court is Authorized to Transfer The Pending Action Pursuant to 28 U.S.C. § 157(b)(5), And Should Enter A Provisional Order Granting Such Transfer.**

As discussed in detail below, 28 U.S.C. § 157(b)(5) grants exclusive authority to this Court to determine the venue of the Pending Action. ITCAN requests that this Court enter an immediate provisional order transferring the Pending Action to this Court to ensure that this Court, in the first instance, can make final determinations with respect to jurisdiction and venue.

**A.    Section 157(b)(5) Applies to the Pending Action.**

Under 28 U.S.C. § 157(b)(5), a district court where a bankruptcy case is pending has sole authority either to try personal injury claims related to the bankruptcy case or to transfer such claims to the district in which the claim arose. Specifically, the statute provides as follows:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

9

1387043/1

28 U.S.C. § 157(b)(5).

One of the leading cases addressing the impact of section 157(b)(5) is *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986). In that case, the District Court for the Eastern District of Virginia, the location of the underlying bankruptcy case of A.H. Robins Co., Inc., entered an order pursuant to section 157(b)(5) transferring to the Eastern District of Virginia all actions, wherever pending, that were based upon personal injury tort or wrongful death claims arising from the use of the Dalkon Shield. *Id.* at 998.

As stated by the Fourth Circuit Court of Appeals, the primary issue on appeal related "not so much to the power of the district court in this case to fix venue for all the pending Dalkon Shield tort cases -- **that power is stated in unmistakable terms in section 157(b)(5)** -- but to the manner in which that power may be exercised." *Id.* at 1010-1011. (emphasis added). Instead, the issue on appeal was whether the procedure to be followed was proscribed by 28 U.S.C. § 1412, the statute that generally applies to transfer of venue for bankruptcy cases.

The court rejected the suggestion that section 1412 governed a motion to transfer under section 157(b)(5). In so holding, the court stated:

> Section 157(b)(5), however, expressly confers on the district court sitting in bankruptcy and having jurisdiction of the bankruptcy proceedings the power to fix the venue of any tort case against the debtor pending in other districts. The purpose of this latter statute was, as Congressman Kastenmeier declared, to centralize the administration of the estate and to eliminate the "multiplicity of forums for the adjudication of parts of a bankruptcy case." 130 Cong.Rec. H 7492, June 29, 1984, reprinted in 1984 U.S.Code Cong. & Adm.News at 579.

*Id.*

Similarly, in the bankruptcy case of Pan Am Corporation, the District Court for the Southern District of New York entered an order transferring personal injury cases from state

10

court in Florida to the Southern District of New York. *In re Pan Am Corp.*, 16 F.3d 513, 516 (2d Cir. 1994). The Second Circuit Court of Appeals affirmed the decision of the district court and clarified that a transfer motion under section 157(b)(5) "should be made to the district court where the bankruptcy is proceeding." *Id.*

In the case of *In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir. 1996), the Sixth Circuit Court of Appeals addressed the issue of whether non-debtor defendants could rely on section 157(b)(5) to seek the transfer of cases that were related to a pending bankruptcy case. In finding that non-debtor defendants could rely on section 157(b)(5), the court stated:

> We agree with the Fourth Circuit that Section 157(b)(5) should be read to allow a district court to fix venue for cases pending against nondebtor defendants which are "related to" a debtor's bankruptcy proceedings pursuant to [28 U.S.C. § 1334(b)]. This approach will further the prompt, fair, and complete resolution of all claims "related to" bankruptcy proceedings, and harmonize Section 1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate.

*Id.* at 497.

The Third Circuit Court of Appeals has not yet directly addressed issues related to section 157(b)(5). Nevertheless, the court's decision in *In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002) is instructive. In that case, the district court had denied a motion to transfer state court asbestos claims against various non-debtor entities pursuant to section 157(b)(5). The primary basis for the district court's decision was its conclusion that the claims against the non-debtors were not related to the pending bankruptcy and, therefore, that the court did not have jurisdiction over the claims for which transfer was sought. *Id.* at 372.

The central issue addressed by the Third Circuit Court of Appeals was whether the court had jurisdiction to review the district court's order. *Id.* Ultimately, the court treated the appeal as a petition for a writ of mandamus and, after applying the "clear error of law" standard

11

applicable to such petitions, held that the district court had not committed "clear error" in finding

that the actions for which transfer was sought were not related to the pending bankruptcy case.

*Id.* at 384.

Thus, at most, the *Federal Mogul* decision supports the obvious rule that section

157(b)(5) is inapplicable to cases that are unrelated to the pending bankruptcy case. As

discussed above, however, in this case, the Pending Action is unquestionably related to

Flintkote's bankruptcy case. Therefore, the *Federal Mogul* decision is easily distinguished from

the present case. Moreover, although the *Federal Mogul* decision never expressly addressed

issues related to section 157(b)(5), the Third Circuit, in its discussion regarding "related to"

jurisdiction of the bankruptcy courts, distinguished the *Dow Corning* decision as follows:

> In [*Dow Corning*], each of the co-defendants was closely involved
> in using the same material, originating with the debtor, to make the
> same, singular product, sold to the same market and incurring
> substantially similar injuries. This circumstance created **a unity of
> identity between the debtor and the co-defendants not present
> here** . . . . Therefore, while we do not disagree that certain mass
> tort claims in some circumstances might be consolidated with
> bankruptcy proceedings in a single district in accordance with §
> 157(b)(5), the relationship of the co-defendants in [*Dow Corning*]
> is distinguishable. . . .

*Id.* at 384 (quoting *Arnold v. Garlock, Inc.*, 278 F.3d 426 (5th Cir. 2001), *reh'g denied*, 288 F.3d

234 (2002) (emphasis added).

This case presents the exact type of "unity of identity" that the Third Circuit found to be

lacking in *Federal Mogul*. Indeed, the Asbestos Claimants are seeking to recover against

ITCAN solely on the theory that ITCAN is the alter ego of the debtor, Flintkote. Thus, for the

Asbestos Claimants to prevail, they must first establish a claim against Flintkote in order to

obtain any recovery from ITCAN. Moreover, if the Joint Prosecution Motion is granted, any

amount determined to be owed to the Asbestos Claimants as a result of the Pending Action

138704.3/1

would be "classified as an asbestos personal injury claim against Flintkote" and "treated under any asbestos trust established in the Bankruptcy Case." (Joint Prosecution Motion, ¶ 28). Although ITCAN objects to the relief sought in the Joint Prosecution Motion, the proposed agreement between the Asbestos Claimants and Flintkote further evidences the exact relief the Asbestos Claimants are seeking -- the liquidation of a claim against Flintkote and subsequent recovery from ITCAN.

Put quite simply, Flintkote cannot, on the one hand, propose that the Pending Action result in the liquidation of the Asbestos Claimants' claim against the bankruptcy estate and then argue, on the other hand, that section 157(b)(5) is inapplicable. Even if the Joint Prosecution Motion is denied, that would not change the fact that for the Asbestos Claimants to prevail against ITCAN, they must first establish the validity of a claim against Flintkote. Thus, the Pending Action will necessarily require the determination of Flintkote's own asbestos liability. When properly viewed in this context, it is clear that the Pending Action asserts wrongful death claims within the purview of section 157(b)(5).

## B.    This Court Should Enter A Provisional Order Transferring the Pending Action to this District Pending A Final Hearing.

As discussed above, because this case falls within the purview of section 157(b)(5), this Court is the only court with the authority to determine whether the Pending Action should proceed in this court or in the district where the claim arose. Thus, to prevent conflicting decisions regarding transfer or remand issues that may arise in the California District Court, this Court should enter a provisional order transferring the Pending Action to this Court pending a final hearing on the issues raised by this Petition.

The procedure requested herein is the precise procedure that was followed in the *Federal Mogul* case. In that case, the district court granted a provisional transfer order pursuant to section 157(b)(5) in order to consider the appropriateness of actual transfer as well as to examine its subject matter jurisdiction and the appropriateness of abstention and remand. *Federal Mogul*, 300 F.3d at 374. The Fifth Circuit Court of Appeals held that the provisional transfer order entered by the district court in *Federal Mogul* was binding on other federal district courts. *See In re DaimlerChrysler Corp.*, 294 F.3d 697, 699-700 (5th Cir. 2002) (granting petition for writ of mandamus prohibiting district courts from deciding any issues related to cases provisionally transferred pursuant to 28 U.S.C. § 157(b)(5).)

Provisional transfer orders were also entered in the *Robins* and *Dow Corning* cases. *See A.H. Robins Co.*, 788 F.2d at 1015-1016 (approving district court's transfer order interpreting that order as "conditional" pending objections of the parties and requests for abstention); *In re Dow Corning Corp.* 1995 WL 495978 (Bankr. E.D. Mich. 1995) (recognizing that the district court had granted the movant's request for a provisional transfer pursuant to section 157(b)(5) on an immediate and *ex parte* basis).

Based on the above precedent, it is clear that this Court has the authority to grant the Petition on an immediate and *ex parte* basis. Such a transfer would further the principles of judicial economy by allowing this court, which is the only court with the authority to determine the appropriate venue under section 157(b)(5), the ability to make a determination on this Petition without the risk of an inconsistent order regarding transfer and/or remand being entered by the California District Court. Accordingly, ITCAN believes it is appropriate for this Court to enter an order provisionally transferring the Pending Action to this Court pending final resolution of the issues raised by the Petition.

14

1387043/1

III.    **The District of Delaware Is The Appropriate Venue for the Pending Action**

Because this case falls within the purview of section 157(b)(5), this Court has the sole authority to determine whether the Pending Action should proceed before this Court or whether it should be transferred to the district in which the claim arose. In this case, the Pending Action should be transferred to this Court.

As an initial matter, there is a general presumption that the district in which a bankruptcy case is pending is the district in which related proceedings should be pursued. *In re Continental Airlines, Inc.*, 133 B.R. 585 (Bankr. D. Del. 1991) (stating there is a strong presumption in favor maintaining venue in the "home court"); *Hohl v. Bastian*, 279 B.R. 165, 177-78 (W.D. Pa. 2002) ("[T]he home court presumption provides that a court in which the bankruptcy case itself is pending is the proper venue for adjudicating all related litigation, including those suits which have been filed in other state or federal courts.").

That presumption is especially strong in cases that fall under the purview of 28 U.S.C. § 157(b)(5). The entire purpose of section 157(b)(5) is to consolidate proceedings in a central forum -- the district where the underlying bankruptcy case is proceeding. *See Robins*, 788 F.2d at 1011 (stating that the purpose of the statute was "to centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case."). Thus, it has been stated that in considering a motion pursuant to section 157(b)(5), "[t]ransfer should be the rule, abstention the exception." *In re Pan Am Corp.*, 950 F.2d 839, 845 (2d Cir. 1991) (citing *A.H. Robins Co*, 788 F.2d at 1011).

Pursuing the Pending Action in California is directly contrary to the very purpose of section 157(b)(5). Rather than adjudicating in a central forum causes of action that Flintkote concedes are the largest assets of its bankruptcy estate and will form the basis of any plan of

15

1387048/1

reorganization, Flintkote proposes to have those causes of action litigated in a forum with

absolutely no connection to the Bankruptcy Case.  While the Asbestos Claimants may prefer to

litigate the Pending Action in California, the Asbestos Claimants are but a tiny fraction of the

more than 155,000 asbestos claims pending against Flintkote.

Indeed, Flintkote has stated that "the asbestos claims are factually interwoven with the

dividend recovery" claims.[6]  If one were to assume that is true with respect to the Asbestos

Claimants, then it is also true with respect to the more than 155,000 asbestos claims that

Flintkote tries to ignore in the Pending Action.  The fact that the Pending Action is intertwined

with and will necessarily impact thousands of claims against Flintkote's bankruptcy estate shows

perfectly why there is a presumption that such litigation should be heard in the most central

forum -- the district where the Bankruptcy Case is pending.

In addition, in the event that the Pending Action results in a settlement, any settlement

agreement would have to be approved as part of the Bankruptcy Case pursuant to Federal Rule of

Bankruptcy Procedure 9019.  Likewise, any trust created pursuant to section 524(g) of the

Bankruptcy Code (one of Flintkote's stated goals) must be approved by the Delaware District

Court pursuant to section 524(g)(3)(A) of the Bankruptcy Code.  Because any settlement or trust

for asbestos claims would have to be approved as part of the Bankruptcy Case, it would be a

waste of resources to have the case tried in a district other than that in which the Bankruptcy

Case is pending.  In sum, there is simply no reason why causes of action that represent the largest

assets of the Bankruptcy Case and that will provide the foundation of a confirmed plan or

reorganization should be heard in any venue other than the district where the Bankruptcy Case is

---

[6] See *Application for Designation of Complex Litigation* filed by Flintkote in the California State Court, at p. 3, lines 3-5.  A copy of the Application is attached hereto as Exhibit E.

16

pend.ng.

Moreover, the Pending Action is premised largely on alter ego claims that seek to disregard the corporate form of a Delaware corporation (Flintkote). *See Lasalle Nat'l Bank v. Perelman*, 82 F.Supp. 2d 279, 289 (D.Del. 2000) (applying Delaware law to claims to pierce the corporate veil because "the law of the state of incorporation should determine issues relating to internal corporate affairs") (citing *McDermott, Inc. v. Lewis*, 531 A.2d 206, 214-215 (Del. 1987)); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (holding that Delaware law applies to alter ego claims related to Delaware corporation). There can be no question that this Court is better suited than the California courts to decide issues of Delaware law. Likewise, the other claims in the Pending Action involve questions of illegal dividends and fraudulent transfers -- issues that are likely more familiar to the courts of Delaware than any other courts in the Nation. Accordingly, given the profound connection between the Pending Action and Delaware and the expertise of this Court on the relevant issues, there can be no legitimate dispute that the District of Delaware is the most appropriate forum for this litigation.

Finally, no party will be prejudiced if the Pending Action is transferred to the District of Delaware. As an initial matter, Flintkote has already shown that Delaware is a convenient forum by filing its Bankruptcy Case in this district and actively participating in this district for the past two years. Moreover, Flintkote has stated that it believes witnesses will number in the many dozens.[7] There is nothing to suggest that these witnesses are only located in California. Instead, witnesses are likely scattered across the United States and Canada. Thus, there is no reason to

---

[7] See *Application for Designation of Complex Litigation* filed by Flintkote in the California State Court, at p. 3, lines 19-20. A copy of the Application is attached hereto as Exhibit E.

17

1387048/1

believe that any witness or party would be prejudiced if the Pending Action is transferred to this Court.

## CONCLUSION

This Court has jurisdiction over the Pending Action pursuant to 28 U.S.C. § 1334. By Flintkote's own admission, the Pending Action represents the largest asset of its bankruptcy estate and will form the basis of any plan of reorganization. Accordingly, the Pending Action should be transferred to this district pursuant to 28 U.S.C. § 157(b)(5).

For the foregoing reasons, ITCAN respectfully requests that the Court enter an order pursuant to 28 U.S.C. § 157(b)(5) to transfer the Pending Action to this Court and grant such further relief as the Court deems appropriate.

This 5th day of May, 2006.

Respectfully submitted,

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com
Email: bfallon@morrisjames.com

and

18

1387048/1

KING & SPALDING LLP
L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Phone: 404-572-4600
Fax: 404-572-5141
jloveland@kslaw.com
jpardo@kslaw.com
mmaloney@kslaw.com

Attorneys for Defendant Imperial Tobacco Canada
Limited

19

# EXHIBIT A
## [to the Brief in Support]

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Objections Due: April 13, 2006 at 4:00 p.m. (requested)** |
| | ) | **Hearing Date:  April 17, 2006 at 9:30 a.m. (requested)** |

### DEBTORS' MOTION FOR ORDER APPROVING CERTAIN JOINT PROSECUTION AGREEMENTS AND ANNULLING THE AUTOMATIC STAY IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

The Flintkote Company ("Flintkote") and Flintkote Mines Limited ("Mines"), the debtors and debtors in possession (the "Debtors") in these jointly-administered cases, hereby move the Court (the "Motion") for entry of an order (i) approving an "Agreement for Joint Prosecution of the Dividend Recovery Litigation" dated April 3, 2006, by and among the Debtors, the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), and James J. McMonagle as the Legal Representative for Future Asbestos Personal Injury Claimants (the "FCR") (the "Joint Prosecution Agreement"), (ii) approving an "Agreement Providing for Joint Pursuit of Alter Ego Remedies" dated April 4 2006, by and between the Debtors and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, the "Asbestos Claimants") and consented to by the ACC and FCR (the "Alter Ego Agreement"), and (iii) annulling the automatic stay to allow the Dividend Recovery Litigation (as defined below) to proceed in all respects from the date of its commencement.

In support of this Motion, the Debtors respectfully submit the Declaration of David Gordon dated April 5, 2006 (the "Gordon Declaration"). In further support hereof, the Debtors respectfully state as follows:

### STATUS OF CASE AND JURISDICTION

1.       On May 1, 2004, Flintkote filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On August 25, 2004, Mines, the wholly-owned subsidiary of Flintkote, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.       On September 9, 2004, the Court entered the "Order (i) Directing Joint Administration; (ii) Directing that Certain Orders in the Chapter 11 Case of the Flintkote Company be Made Applicable to Flintkote Mines Limited" (Docket No. 238) directing the joint administration of these two chapter 11 cases.

3.       The Debtors have continued in possession of their respective properties and have continued to operate and manage their respective businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.       No request has been made for the appointment of a trustee or examiner in these cases. On May 19, 2004, the ACC was appointed by the Office of the United States Trustee. Additionally, the Court appointed James J. McMonagle as the FCR for Flintkote and Mines on August 26, 2004 and September 9, 2004, respectively (Docket Nos. 199 and 238, respectively).

5.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2). The bases for the relief sought herein are 11 U.S.C. § 362(d) and applicable case law.

## RELIEF REQUESTED

6.    By this Motion, the Debtors seek entry of an order (i) approving the Joint Prosecution Agreement (substantially in the form attached hereto as Exhibit A), (ii) approving the Alter Ego Agreement (substantially in the form attached hereto as Exhibit B) and (iii) annulling the automatic stay so that the Dividend Recovery Litigation may proceed in all respects from the date of its commencement. The ACC and the FCR support the relief sought in this Motion.

## BASIS FOR RELIEF

A.    Commencement of the Dividend Recovery Litigation.

7.    On April 5, 2006, Plaintiffs Flintkote and the Asbestos Claimants jointly filed a complaint (the "Complaint") against Defendants Imperial Tobacco Canada Limited (formerly known as Imasco Limited ("Imasco")), Sullivan & Cromwell LLP ("S&C") and Does 1 though 100 in the Superior Court of California, County of San Francisco (the "Superior Court") (Case No. CGC 06450944). The Complaint (i) seeks substantial damages and requests declaratory relief, including with respect to certain contract rights of Flintkote against Imasco, (ii) asserts alter ego, veil piercing and similar theories of recovery against Imasco (collectively, "Alter Ego Remedies"), and (iii) asserts claims arising out of or related to certain dividends ultimately received by Imasco, the former ultimate parent of Flintkote (collectively referred to as the "Dividend Recovery Litigation"). A true and correct copy of the Complaint is attached hereto as Exhibit C.

-3-

8.    As more fully described in the Complaint, the claims arise from or relate to two dividends, totaling $525 million that were ultimately received by the former ultimate parent company of Flintkote, Imasco (now Imperial Tobacco Canada Limited), in 1986 and 1987. The dividends were paid as part of an orchestrated scheme whereby Imasco acquired Flintkote's parent company in a hostile takeover, and caused Flintkote to sell off its operating assets and to become, for all practical purposes, an asbestos claims paying facility. Imasco caused Flintkote to pay it $525 million of the proceeds of the sales. The payment took the form of two dividends. The result was that Flintkote, or as it now turns out, Flintkote's asbestos creditors, funded a substantial portion of Imasco's hostile acquisition. S&C historically represented Imasco, but at Imasco's instigation, represented both Imasco and Flintkote in connection with the dividend transactions. S&C erroneously and negligently advised Flintkote and its board of directors with respect to the dividends.

9.    As part of the transaction, Imasco agreed to repay to Flintkote (up to the full amount of the dividends) amounts due to Flintkote's creditors, including asbestos personal injury claimants that cannot be satisfied out of the assets of Flintkote if a court of competent jurisdiction finally determines that the dividends were improperly paid to Imasco. The respective experts retained by the ACC and the FCR agree that, based upon their analyses, Flintkote's current and future asbestos liabilities are estimated to exceed $3 billion, which is materially in excess of the amount of assets available to satisfy such liabilities. Similarly, the Debtors commenced these chapter 11 cases because they believed that the amount of their current and future asbestos personal injury liabilities materially exceed the value of their assets.

-4-

B.     The Purpose Of The Joint Prosecution Agreement.

10.     The Debtors, the ACC and the FCR (the "Estate Representatives") seek to jointly represent the interest of the Debtors' estates (the "Estates") in the prosecution of the claims set forth in the Complaint (including, without limitation, all Alter Ego Remedies) and other claims arising from or related to the Dividend Recovery Litigation, subject to the terms of the Joint Prosecution Agreement (discussed in detail below).

11.     The Debtors believe that it is in the best interests of the Estates and their creditors to begin to prosecute the Dividend Recovery Litigation at this time and before confirmation of a plan in these chapter 11 cases (although confirmation of a plan in these cases is in no way dependent upon the resolution of the Dividend Recovery Litigation). The Debtors further believe that the interests of the Estate Representatives are aligned in seeking to maximize the potential recovery resulting from the Dividend Recovery Litigation. Among other reasons, it is contemplated (i) that, to the extent necessary, the right to control the Dividend Recovery Litigation may ultimately be transferred to an asbestos personal injury trust established pursuant to § 524(g) of the Bankruptcy Code under a confirmed plan or plans of reorganization, and (ii) that the overwhelming majority, if not all, of any net recovery that ultimately results from the Dividend Recovery Litigation will be distributed for the benefit of current and future holders of asbestos personal injury claims against the Debtors pursuant to a confirmed plan of reorganization.

12.     The Estate Representatives have entered into the Joint Prosecution Agreement in order to (i) memorialize the Debtors' consent to the ACC and the FCR jointly representing the Estates' rights in the Dividend Recovery Litigation, (ii) delineate their joint participation rights in respect of the Dividend Recovery Litigation that will be in effect prior to

-5-

confirmation of any plan, and (iii) set forth the manner in which confidential information will be shared between and among the Estate Representatives and the Estates' special litigation counsel (the "Dividend Recovery Litigation Counsel" or "DRLC") and applicable privileges maintained.

C.    The Purpose Of The Alter Ego Agreement.

13.    As more fully detailed in the Complaint, the Estate Representatives believe that substantial grounds exist to hold Imasco responsible for the payment of asbestos claims against the Debtors. Alter ego liability arises from Imasco's scheme to acquire Flintkote's indirect parent company; its efforts to force, dominate, and control the liquidation of Flintkote's assets for the purpose of using sale proceeds to reimburse Imasco for the costs of its hostile acquisition; and Imasco's complete domination and control over Flintkote's subsequent activities for the next 16 years, which had the result of forestalling any efforts to recover the dividends.

14.    In the Dividend Recovery Litigation, Flintkote seeks to establish, among other things, that Imasco is liable to persons exposed to asbestos in Flintkote's products under various Alter Ego Remedies. In addition, the Asbestos Claimants (who hold an asbestos-related wrongful death claim against Flintkote) contend that they have Alter Ego Remedies that they would be entitled to assert directly against Imasco but for operation of the automatic stay and the commencement of these chapter 11 cases. Because there is no controlling authority under California or Ninth Circuit law with regard to whether an individual claimant or a bankruptcy trustee (or debtor-in-possession), on behalf of an estate, is the correct party to assert theories of alter ego recovery (as further discussed below), the Debtors have entered into the Alter Ego Agreement (the terms of which are described in detail below) to enable all theories of alter ego recovery to be brought against Imasco in the Dividend Recovery Litigation by plaintiffs

-6-

(Flintkote and the Asbestos Claimants) who, as a result of the Alter Ego Agreement, collectively have standing to assert all such grounds for relief.

15. Approval of the Alter Ego Agreement will result in several benefits to the Estates:

(a) *First*, the arrangement with the Asbestos Claimants will permit a single adjudication of all Alter Ego Remedies against Imasco in the context of the Dividend Recovery Litigation and avoid unnecessary arguments over whether the Alter Ego Remedies are being asserted by the correct party as a matter of California law. By having the Estates and the Asbestos Claimants assert each of the possible grounds for recovery on an alter ego basis, the Superior Court will be in the best position to reach the merits and issue a declaratory judgment in respect of the Alter Ego Remedies against Imasco.

(b) *Second*, the successful prosecution of all Alter Ego Remedies by Flintkote and the Asbestos Claimants should result in a direct benefit to all creditors of these Estates by creating *res judicata* and offensive collateral estoppel rights with respect to Imasco. Such rights would benefit not only current asbestos claimants, but future claimants as well.

(c) *Third*, the alter ego litigation may be long, expensive and hard fought, all of which would make the pursuit of alter ego remedies by individual claimants very costly and hence less feasible; however, by pooling resources, the Asbestos Claimants can economically pursue an alter ego remedy in conjunction with the Estates' prosecution of the Dividend Recovery Litigation that will inure to the benefit of all claimants.

(d) *Fourth*, involvement of the Asbestos Claimants as co-plaintiffs in the Dividend Recovery Litigation will allow the trier of fact to better understand and appreciate the harm that has been caused to at least one of the thousands of individual asbestos claimants by

-7-

Imasco's actions, especially its dismemberment of Flintkote as a going concern and the related siphoning of cash to fund its acquisition—cash that otherwise would have been available to satisfy asbestos claims.

D.    The Purpose For Annulling The Automatic Stay.

16.    The Debtors seek to annul the automatic stay in respect of the Dividend Recovery Litigation for two reasons.  First, annulment of the automatic stay is necessary to permit the Superior Court (and any other court of competent jurisdiction before which the Dividend Recovery Litigation may be heard) to fully adjudicate the merits of the Dividend Recovery Litigation from the date of its commencement.  Although Flintkote was not subject to, and did not need relief from, the automatic stay in commencing the Dividend Recovery Litigation, the Defendants will be barred from responding to the Complaint by operation of the automatic stay unless the Court annuls the stay to allow the Dividend Recovery Litigation to proceed in all respects (as further discussed below).  Second, to ensure that all theories of alter ego recovery can be brought against Imasco in the Dividend Recovery Litigation by plaintiffs who collectively have standing, it is appropriate to annul the automatic stay so that the Asbestos Claimants may join with Flintkote in prosecuting all Alter Ego Remedies against Imasco in the Dividend Recovery Litigation without potentially violating the automatic stay.

## SUMMARY OF THE AGREEMENTS[1]

A.    Joint Prosecution Agreement.

---

[1] The following is intended to be a summary of the salient provisions of the Joint Prosecution Agreement and the Alter Ego Agreement (collectively, the "Agreements"), which are attached hereto as Exhibit A and Exhibit B, respectively.  In the event that the terms as summarized in this Motion conflict with the terms of the respective Agreements, the Agreements shall control.

17.    As summarized below, the Joint Prosecution Agreement addresses various matters related to the joint prosecution of the Dividend Recovery Litigation (including the Alter Ego Remedies being asserted by Flintkote and the Asbestos Claimants).

18.    <u>Consent to Joint Prosecution</u>. The Debtors consent and agree that they, the ACC, and the FCR shall jointly represent the Estates' interests in the Dividend Recovery Litigation. The Estates will be represented by the Dividend Recovery Litigation Counsel whom the Debtors concurrently seek Court authority to retain on behalf of the Estates.[2] Because DRLC will represent the Estates in the Dividend Recovery Litigation, none of the Estate Representatives will need, or be entitled, to employ its own separate counsel of record in the Dividend Recovery Litigation.

19.    <u>Rights of Estate Representatives in Respect of Joint Prosecution</u>. The right of joint participation in respect of the Dividend Recovery Litigation shall include, without limitation, the right to communicate with DRLC, the right to receive full and complete access to all files and communications (whether oral or written) from or received by DRLC, the right to receive full and complete copies of any and all documents that DRLC would or could be required to provide a client under applicable laws and ethical rules or professional canons, and the right to participate equally in all decisions concerning the Dividend Recovery Litigation, including, without limitation, whether to prosecute, dismiss or settle any or all of it.

20.    <u>Case Management</u>. DRLC shall communicate with regard to day-to-day case management matters related to the Dividend Recovery Litigation directly with Dave Gordon (in his capacity as President of the Debtors and acting on behalf of the Debtors), and shall

---

[2] The DRLC consists of two law firms and two individual lawyers who, together, will represent the Estates in respect of the Dividend Recovery Litigation and will be compensated under the terms of a single fee agreement. The Debtors have filed concurrently herewith an application to retain DRLC as litigation counsel pursuant to § 327(e) of the Bankruptcy Code, which sets forth the terms of the proposed engagement and the fee arrangement with the DRLC.

-9-

communicate with regard to all material litigation strategy matters and settlement discussions with each of Dave Gordon, a designated representative of the ACC, and James McMonagle (in his capacity as the FCR). All material decisions with respect to litigation strategy involving the Dividend Recovery Litigation, and the direction to be given to DRLC in respect of such litigation strategy decisions, shall be determined based upon a majority vote of (i) the Debtors (with the Debtors together receiving a single vote), (ii) the ACC, and (iii) the FCR. If any issues regarding the prosecution of the Dividend Recovery Litigation on behalf of the Estates cannot be resolved pursuant to a majority vote, any Estate Representative may bring a motion asking the Court to address and resolve the issue. This Court shall have exclusive, continuing jurisdiction to decide all matters arising under the Joint Prosecution Agreement.

       21.    <u>Maintenance of Privilege and Confidentiality</u>. The Estate Representatives have exchanged and will exchange among themselves and with DRLC privileged and work-product information, both orally and in documents, including, without limitation, factual analyses, strategies and mental impressions, investigative reports, and other information ("<u>Joint Materials</u>") for the purpose of advancing the Estates' interest in prosecuting the Dividend Recovery Litigation. The Estate Representatives agree (i) that all Joint Materials which the Estate Representatives have exchanged, or will exchange, among themselves and with DRLC are privileged from disclosure, (ii) that they will act to preserve to the maximum extent permitted by applicable law the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections which they may have and (iii) that they will immediately notify counsel for the other Estate Representatives if any other person or entity requests or demands, by subpoena or otherwise, the disclosure or production of any Joint Materials or other protected information, so that the Estate

Representatives (or any of them) may seek an appropriate protective order or other remedy to assure that such information will be accorded confidential treatment.

22.    Scope of DRLC Representation.    The Estate Representatives agree that all claims asserted in the Dividend Recovery Litigation are claims of the Estates, and not of any of them individually or in any capacity other than as representatives of the Estates. DRLC shall at all times represent only the Debtors, unless the Court approves DRLC to also represent the ACC and FCR in their capacity as representatives of the Estates. DRLC shall not represent or be deemed to represent the ACC or the FCR in performing any function except as co-representative of the Estates' claims. The ACC and the FCR agree that to the extent DRLC, pursuant to a Court order approving this Joint Prosecution Agreement, represents them together with the Debtors as co-representatives of the Estates' rights in the Dividend Recovery Litigation, DRLC is not, by virtue of such representation, representing a party having an adverse interest to the ACC or the FCR in connection with these cases. Under no circumstances shall any disagreement among the Estates Representatives, or a withdrawal of one or more of the Estates Representatives from the Joint Prosecution Agreement, form the basis for a request to disqualify DRLC, and the Estates Representatives waive any and all such potential conflicts of interest and agree that DRLC may continue to represent the then-acting representatives of the Estates in the Dividend Recovery Litigation.

B.    Alter Ego Agreement.

23.    As summarized below, the Alter Ego Agreement addresses various matters as between the Estate Representatives and the Asbestos Claimants related to all Alter Ego Remedies being asserted in connection with or related to the Dividend Recovery Litigation.

-11-

24.    <u>Partial Transfer of Alter Ego Remedies</u>.  The Debtors have partially transferred to the Asbestos Claimants, and have authorized them to pursue for their own benefit, that portion of the Alter Ego Remedies, if any, held by the Estates against Imasco with respect to Asbestos Claimants' Claim, up to the full amount of Asbestos Claimants' Claim, but subject in all respects to the terms of the Alter Ego Agreement, including limitations on recovery.  In addition, the Asbestos Claimants may assert in the Dividend Recovery Litigation any theories of alter ego recovery that they hold directly.  Nothing in the Agreement shall otherwise affect the Alter Ego Remedies held by the Estate.

25.    <u>Allocation of Net Recoveries From Alter Ego Remedies</u>.  The Asbestos Claimants shall be entitled to retain those net recoveries (after payment of costs as permitted under the Alter Ego Agreement) resulting from their assertion of the Alter Ego Remedies in an amount up to $400,000.  Any net recoveries on account of such Alter Ego Remedies in excess of $400,000 shall be paid or remitted by the Asbestos Claimants to the Estates or to the § 524(g) trust established under a confirmed plan in these cases (if applicable), for distribution to current and future asbestos personal injury claims under a confirmed plan.

26.    <u>Settlement Of Alter Ego Remedies</u>.  Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the ACC and the FCR; provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the ACC and the FCR, shall not be unreasonably withheld.  Any dispute in that regard shall be submitted to the Bankruptcy Court.

27.    <u>Management Of Alter Ego Litigation</u>.  The DRLC (acting under the direction of Debtors, the ACC and the FCR in accordance with the Joint Prosecution Agreement) shall be entitled to manage the litigation (and to advance costs and expenses incurred by the

-12-

Asbestos Claimants in the manner contemplated in the Alter Ego Agreement) on all Alter Ego Remedies common to the Dividend Recovery Litigation and to the Alter Ego Remedies being asserted by the Asbestos Claimants; provided, however, that the Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estates in the Dividend Recovery Litigation to the maximum extent feasible.

28.    Claim Amount.  The Estate Representatives agree that any amount determined to be owed to the Asbestos Claimants on account of any Alter Ego Remedies that they assert in connection with or related to the Dividend Recovery Litigation will be binding on the Debtors and their Estates (including any § 524(g) trust established under a confirmed plan) but will not be enforced, except in accordance with the terms of a confirmed plan of reorganization.  Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' claims against Imasco, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

29.    Payment of Expenses of Asbestos Claimants.  The Asbestos Claimants agree to limit the fees payable to his/her counsel in pursuing any Alter Ego Remedies in connection with the Dividend Recovery Litigation to 25% of actual recoveries by the Asbestos Claimants.

## AUTHORITY

A.    Approval Of The Joint Prosecution Agreement Will Facilitate The Estates' Management And Prosecution Of The Dividend Recovery Litigation.

30.    The Court should approve the Joint Prosecution Agreement for several reasons.

-13-

31.    First, the Debtors have consented to jointly prosecute the Dividend Recovery Litigation with the ACC and the FCR, pursuant and subject to the terms of the Joint Prosecution Agreement. Courts in this Circuit and elsewhere have recognized the standing of an official committee to prosecute an action on behalf of a debtor's estate, particularly where (as here) the debtor consents to such standing. See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 330 F.3d 548 (3d Cir. 2003) (authorizing a committee to bring derivative litigation on behalf of debtor's estate); Official Unsecured Creditors Committee v. Michaels (In re Marin Motor Oil), 689 F.2d 445 (3d Cir. 1982) (creditors' committee has an absolute right to intervene in adversary proceedings initiated by the trustee); In re Nat'l Forge Co., 326 B.R. 532 (W.D. Pa. 2005) (authorizing a creditors' committee to pursue an action on behalf of the debtor's estate); Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.), 262 F.3d 96, 100 (2d Cir. 2001) (granting standing to a committee "if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings"). The relief being sought here is a step removed from the conferral of standing on an official committee, as addressed in Cybergenics and the above-referenced cases. It bears emphasis that the Debtors have not agreed to cede control over the litigation to the ACC and the FCR prior to confirmation of a plan, nor are the Debtors seeking to confer standing on the ACC and the FCR for them to pursue this litigation alone. Rather, the Debtors have agreed to work cooperatively with the ACC and the FCR in jointly pursuing the Estates' interest in respect of the Dividend Recovery Litigation, for all the reasons articulated above.

-14-

32.    In addition, approval of the Joint Prosecution Agreement (including confirmation of the joint participation rights of the ACC and the FCR in respect of the Dividend Recovery Litigation) is in the best interest of the Estates because it establishes (i) the respective rights of the Estate Representatives to communicate with DRLC, to access information and to manage the litigation, (ii) a mechanism for the Estate Representatives to agree upon the litigation strategy and give clear and unambiguous direction to DRLC in respect of such strategy, and (iii) safeguards designed to ensure that all applicable privileges are maintained between and among the Estate Representatives and DRLC in respect of the Dividend Recovery Litigation. See Commodore, 262 F.3d at 100.

33.    The Joint Prosecution Agreement also is necessary and beneficial to a fair and efficient resolution of these cases. See id. The Debtors, the ACC and the FCR have been working together cooperatively since the outset of these chapter 11 cases and, to that end, they are working together as co-plan proponents to develop and propose a consensual joint plan of reorganization. Because it is contemplated the overwhelming majority, if not all, of any net recovery from the Dividend Recovery Litigation will benefit the current and future asbestos claimants and that control of the litigation ultimately will be transferred to the § 524(g) trust, the Joint Prosecution Agreement will provide continuity in the plan process.

B.    Approval Of The Alter Ego Agreement Will Permit All Theories Of Alter Ego Recovery To Be Asserted In The Dividend Recovery Litigation.

34.    Approval of the Alter Ego Agreement will ensure that the Estates are able to maximize their potential recovery in the Dividend Recovery Litigation. This Court has authority to approve the Alter Ego Agreement in all respects.

35.    Cause exists for the Court to annul the automatic stay pursuant § 362(d) of the Bankruptcy Code, in order to give effect to the terms of the Alter Ego Agreement and allow

the Asbestos Claimants to pursue a portion of the Alter Ego Remedies that may constitute property of the Estates. See 11 U.S.C. §§ 362(a)(3) and (d)(2). There appears to be no controlling case law in California or the Ninth Circuit as to whether an individual claimant or a trustee (or debtor in possession) has standing to assert alter ego-type remedies. Compare Stodd v. Goldberger, 73 Cal. App. 3d 827 (1977) (holding that a trustee in bankruptcy cannot maintain an alter ego claim, because such claims must be brought by one or more real parties in interest), with In re Davey Roofing, Inc., 167 B.R. 604, 608 (B.A.P. 9th Cir. 1994) (holding that only a debtor has standing to assert the alter ego claim "where injury to the corporation is alleged"). The issue is one of standing under applicable California law, and that issue can be properly determined by the Superior Court, as and when appropriate, in the context of the Dividend Recovery Litigation. For this reason, the Debtors are not asking this Court to decide who has standing to assert the Alter Ego Remedies, but rather they seek approval of the Alter Ego Agreement which will ensure that all theories of alter ego recovery can and will be asserted against Imasco by a plaintiff (Flintkote or the Asbestos Claimants) with standing because the Asbestos Claimants will be holding and asserting both their own rights and a share of the Estates' rights in such Alter Ego Remedies (i.e., the complete set of Alter Ego Remedies that the Asbestos Claimants held immediately prior to the Petition Date).

36.     It is not uncommon for a court to grant relief from the automatic stay to allow an individual creditor of a debtor to pursue or attempt to realize upon estate property in satisfaction of its claim. In an analogous context, courts have approved stipulations by and between a debtor and a claimant, whereby the automatic stay is lifted to allow the claimant to proceed against the debtor's insurance, or against appeals bonds secured by the debtor's insurance receivables, even though such insurance constitutes property of the estate. See, e.g., In

-16-

re Federal Mogul Global Inc., T&N Limited, et al., Case No. 01-10578 (Docket No. 1868); In re
The Flintkote Company and Flintkote Mines Limited, Case No. 04-11300 (Docket No. 669).

37.    The Debtors do not believe that specific Court authorization is required to
effectuate the partial transfer back to the Asbestos Claimants of the Estates' interest in the Alter
Ego Remedies that they could have asserted prior to the filing of these cases. It bears emphasis
that the ACC and the FCR have consented to such transfer. Nonetheless, to the extent that
specific Court approval is required, the Debtors request that the Court authorize them to
effectuate the transfer to the Asbestos Claimants the Estates' interest in the Alter Ego Remedies
pursuant to § 363(b) of the Bankruptcy Code, or otherwise authorize them to abandon to the
Asbestos Claimants the Estates' interest in the Alter Ego Remedies, so that the Alter Ego
Remedies may be pursued by the Asbestos Claimants in accordance with the terms of the Alter
Ego Agreement. See, e.g., St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 698
(2d Cir. 1989) (even where an alter ego claim is property of the estate, "a trustee could choose to
abandon a claim, and allow creditors to pursue it independently"); Board of Directors Of
Chestnut Grove Condominium Unit Owners' Ass'n v. Resolution Trust Corp., 161 B.R. 860, 863
(D.D.C. 1993) (same).

38.    Pursuing the course of action contemplated by the Alter Ego Agreement
will in no manner hinder the Estates' ability to settle or compromise all of the Estates' rights in
the Alter Ego Remedies against Imasco on a global basis, because a power of attorney is granted
to the Estates under the Alter Ego Agreement which allows the claims and interests of the
Asbestos Claimants to be settled by the Estates so long as the Asbestos Claimants receives the
agreed upon consideration. In this regard, the Debtors have transferred a limited amount of the
Estates' potential recovery that may result from the Alter Ego Remedies, but the Estate

-17-

Representatives have retained full authority to manage and control all Alter Ego Remedies asserted in the Dividend Recovery Litigation (including those asserted by the Asbestos Claimants). The Alter Ego Agreement establishes appropriate safeguards to ensure that the Debtors, the ACC and the FCR have equal rights and say in the prosecution (and, if warranted, the settlement) of all Alter Ego Remedies being asserted in connection with or relating to the Dividend Recovery Litigation. For the foregoing reasons, the Alter Ego Agreement is supported by the Debtors, the ACC and the FCR as being a reasonable exercise of the Debtors' business judgment and in the best interests of the Estates.

**C.     Cause Exists To Annul The Automatic Stay To Ensure That The Dividend Recovery Litigation Proceeds In All Respects.**

39.     The Debtors ask this Court to annul the automatic stay so that the Dividend Recovery Litigation may proceed in all respects from the date of its commencement.

40.     The commencement of the Dividend Recovery Litigation, including the filing of the Complaint, was an appropriate exercise of the Debtors' business judgment and did not require the Court to lift or modify the automatic stay prior to its commencement. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1992) ("Although the scope of the automatic stay is broad, the clear language of section 362(a) indicates that it stays only proceedings *against* a 'debtor'--the term used by the statute itself. . . . '[t]he statute does not address actions brought *by* the debtor which would inure to the benefit of the bankruptcy estate'") (emphasis in original) (internal citations omitted); In re Kaiser Aluminum Corp., 303 B.R. 299, 303 (D. Del. 2003) ("the automatic stay does not apply to actions brought by the debtor . . . [r]ather, the automatic stay only applies to actions brought against the debtor,") quoting Rhone-Poulenc Surfactants and Specialties, L.P. v. C.I.R., 249 F.3d 175, 180 (3d Cir. 2001).

-18-

41.    In contrast, the automatic stay bars the Defendants from asserting whatever counterclaims or cross-claims they may believe they have (which the Debtors dispute as being valid) or taking other actions against Flintkote in the Dividend Recovery Litigation. Maritime Elec. Co., Inc., 959 F.2d at 1204-05 (holding that "[m]ultiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay . . . [t]hus, within one case, actions *against* a debtor will be suspended even though closely related claims asserted *by* the debtor may continue"); Sansone v. Walsworth (In re Sansone), 99 B.R. 981, 984-85 (Bankr. C.D. Cal. 1989) (filing of compulsory counterclaim against debtor in action brought by debtor violates the automatic stay). Moreover, it is possible that the Defendants might have taken some action in response to the Complaint before the Court has heard the relief sought in this Motion. The Estate Representatives want the Superior Court to fully adjudicate the Dividend Recovery Litigation on the merits. As such, the Debtors request that the Court annul the automatic stay to allow the Dividend Recovery Litigation to proceed in all respects from the date of its commencement, so that all actions taken in the litigation since its commencement are not violative (or deemed to be violative) of the automatic stay.

42.    In addition, annulment of the automatic stay to the date of the filing of the Complaint is necessary and appropriate to allow the Asbestos Claimants to pursue that portion of the Estates' interest in the Alter Ego Remedies ceded to them in connection with Divided Recovery Litigation, as described above and permitted under the Alter Ego Agreement.[3]

---

[3] To clarify, the Debtors are not seeking to annul or otherwise modify the automatic stay to allow individual claimants (other than the Asbestos Claimants) to prosecute Alter Ego Remedies, or other causes of action, that are held, or may be held, by the Estates. The automatic stay should remain in full force and effect with respect to such claimants and the Estates' property.

-19-

43.     For these reasons, cause exists for the Court to annul the automatic stay pursuant to § 362(d) so that the Dividend Recovery Litigation can proceed in all respects from the date of its commencement.

## NOTICE

44.     Notice of this Motion has been provided to (i) the Office of the United States Trustee, (ii) counsel to the ACC, (iii) counsel to the FCR, and (iv) all parties that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

45.     No previous application for the relief sought herein has been made to this Court or any other court.

-20-

WHEREFORE, the Debtors respectfully request that the Court enter an order granting this Motion and providing such other relief as the Court deems necessary.

Dated: April __5__, 2006

SIDLEY AUSTIN LLP
Kevin T. Lantry
Jeffrey E. Bjork
555 West Fifth Street
Los Angeles, California 90013-6000
Telephone: (213) 896-6000
Facsimile:  (213) 896-6600

- and -

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

_____

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

-21-

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## Agreement For Joint Prosecution Of Dividend Recovery Litigation

The Flintkote Company ("Flintkote"), Flintkote Mines Limited ("Mines," together with Flintkote, the "Debtors"), the Official Committee of Asbestos Personal Injury Claimants ("Asbestos Creditors Committee" or "ACC"), and James J. McMonagle, the Legal Representative for Future Asbestos Personal Injury Claimants ("Futures Representative" or "FCR," together with the Debtors and the ACC, the "Parties"), hereby enter into this Agreement whereby (a) the Debtors agree with the ACC and FCR that they shall all collectively represent the interests of the Debtors' estates (the "Estates") with respect to any and all claims (including, without limitation, all theories of alter ego recovery) arising out of or related to certain dividends received by the former parent of Flintkote (the "Dividend Recovery Litigation"), including in an action to be filed in the Superior Court of the State Of California, and (b) the Parties agree upon the terms governing their joint participation rights in respect of the Dividend Recovery Litigation.

## RECITALS

A.     On May 1, 2004, Flintkote filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the District of Delaware (the "Court"). On August 25, 2004, Mines filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On September 9, 2004, the Court entered an order directing the procedural consolidation and joint administration of these chapter 11 cases.

    B.  On May 19, 2004, the Office of the United States Trustee appointed the Asbestos Creditors Committee. Additionally, the Court appointed James J. McMonagle as the Futures Representative in these chapter 11 cases. The ACC and FCR are the only two official creditor constituencies in the Debtors' chapter 11 cases.

    C.  The Parties believe that the Estates have substantial claims against various parties that participated in certain transactions that left Flintkote with insufficient assets to satisfy asbestos-related liabilities. The claims arise from or relate to two dividends, totaling $525 million, that were ultimately received by the former ultimate parent company of Flintkote, Imasco Limited (now known as Imperial Tobacco Canada Limited), in 1986 and 1987. The dividends were paid as part of an orchestrated scheme whereby Imasco acquired Flinktoke's parent company in a hostile takeover, and caused Flintkote to sell off its operating assets and to become, for all practical purposes, an asbestos claims paying facility. Imasco caused Flintkote to pay it $525,000,000 of the proceeds of the sales. The payment took the form of two dividends. The result was that Flintkote, or as it now turns out, Flintkote's asbestos creditors, funded all or a substantial portion of Imasco's hostile acquisition. As part of the transaction, Imasco agreed to repay to Flintkote (up to the full amount of the dividends) amounts due to Flintkote's creditors, including asbestos personal injury claimants that cannot be satisfied out of the assets of Flintkote if a court of competent jurisdiction finally determines that the dividends were improperly paid to

Imasco. The Parties intend to jointly prosecute these and other claims arising from or related to the dividends as part of the Dividend Recovery Litigation.

        D.     The Parties will seek a Court order authorizing them to serve jointly as the representatives of the Estates with respect to prosecution of the Dividend Recovery Litigation.

        E.     Because the Parties believe that it is in the best interests of the Estates and the Debtors' creditors to begin to prosecute the Dividend Recovery Litigation as soon as practicable and before confirmation of a plan or plans in these chapter 11 cases, the Parties seek to delineate their joint participation rights in respect of the Dividend Recovery Litigation that will be in effect prior to confirmation of any plan. It is contemplated (i) that, to the extent necessary, the right to control the Dividend Recovery Litigation may ultimately be transferred to an asbestos personal injury trust established pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan or plans of reorganization, and (ii) that the overwhelming majority, if not all, of any net recovery that ultimately results from the Dividend Recovery Litigation will be distributed for the benefit of current and future holders of asbestos personal injury claims against the Debtors pursuant to a confirmed plan of reorganization. For these reasons, the Parties believe that joint representation of the Estates' interests in the Dividend Recovery Litigation is appropriate prior to confirmation of a plan or plans in these chapter 11 cases.

        F.     The interests of the Parties are aligned with respect to prosecution of the Dividend Recovery Litigation. It is essential to the interests of each Party and its counsel that all communications between and among the Parties and the special litigation counsel initially retained by Flintkote (subject to Court approval) to prosecute the Dividend Recovery Litigation ("DRLC"), and all related issues and matters, be shared among the Parties and that the communications remain confidential and protected by attorney-client privilege and as work

3

product. The Parties believe that the sharing of otherwise confidential information between and among themselves and DRLC is essential to the preparation of effective legal positions and the joint prosecution of the Dividend Recovery Litigation. The Parties do not intend to waive any evidentiary privileges as to these communications, but rather intend to share otherwise protected and privileged information without loss of evidentiary privileges or protections including attorney-client privilege and attorney work product. In order to advance the interests of the Parties in consulting with counsel with respect to the Dividend Recovery Litigation, the Parties intend that confidential communications, information and work product will be shared among them and that such shared communications, information and work product will be kept confidential among the Parties and their counsel.

G.    Accordingly, the Parties have entered into this Agreement to (i) evidence the Debtors' consent to the ACC and the FCR jointly representing the Estates' rights in the Dividend Recovery Litigation, (ii) set forth the Parties' joint participation rights in respect of the Dividend Recovery Litigation and (iii) set forth the manner in which confidential information will be shared between and among the Parties and DRLC and applicable privileges maintained.

## AGREEMENT

1.    The Debtors hereby consent and agree that they, the ACC, and the FCR shall jointly represent the Estates' interests in the Dividend Recovery Litigation.

2.    The ACC and the FCR may, but shall not be required to be, named as plaintiffs in the Dividend Recovery Litigation in their capacity as co-representatives of the Estates' rights, subject to any procedural limitations applicable to party capacity in the Dividend Recovery Litigation; provided, however, that the status of the ACC and the FCR as co-representatives of the Estates' interests or as named plaintiffs in the Dividend Recovery

4

Litigation will not entitle them to employ their own counsel of record in the Dividend Recovery Litigation. The Debtors, the ACC, and the FCR all agree that all claims asserted in the Dividend Recovery Litigation are claims of the Estates, and not of any of them individually or in any capacity other than as a representatives of the Estates. They further agree that DRLC shall at all times represent only the Debtors, unless the Court approves DRLC to also represent the ACC and FCR in their capacity as representatives of the Estates. They further agree that DRLC shall not represent or be deemed to represent the ACC or the FCR in performing any function except as co-representative of the Estates' claims. The ACC and the FCR agree that to the extent DRLC, pursuant to a Court order approving this Agreement, represents them together with the Debtors as co-representatives of the Estates' rights in the Dividend Recovery Litigation, DRLC is not, by virtue of such representation, representing a party having an adverse interest to the ACC or the FCR in connection with these cases.

3.    Whether or not the ACC and/or the FCR actually are named as Plaintiffs in the Dividend Recovery Litigation, each shall have the right, but not the obligation, to participate in client strategy and settlement decisions. The right of joint participation in respect of the Dividend Recovery Litigation shall include, without limitation, the right to communicate with DRLC, the right to receive full and complete access to all files and communications (whether oral or written) from or received by DRLC, the right to receive full and complete copies of any and all documents that DRLC would or could be required to provide a client under applicable laws and ethical rules or professional canons, and the right to participate equally in all decisions concerning the Dividend Recovery Litigation, including, without limitation, whether to prosecute, dismiss or settle any or all of it. DRLC shall communicate with regard to day-to-day case management matters related to the Dividend Recovery Litigation directly with Dave Gordon

5

(on behalf of the Debtors), and shall communicate with regard to all material litigation strategy matters and settlement discussions with each of Dave Gordon, a designated representative of the ACC, and James McMonagle (as the FCR), each of whom is duly authorized to act on behalf of their respective constituencies in exercising their joint participation rights regarding the Dividend Recovery Litigation.

4.      All material decisions with respect to litigation strategy involving the Dividend Recovery Litigation (including, without limitation, with respect to any alter ego claim(s) that might be asserted by an individual claimant in connection with or related to the Dividend Recovery Litigation), and the direction to be given to DRLC in respect of such litigation strategy decisions, shall be determined based upon a majority vote of (i) the Debtors (with the Debtors together receiving a single vote), (ii) the ACC, and (iii) the FCR.

5.      If any issues regarding the prosecution of the Dividend Recovery Litigation on behalf of the Estates cannot be resolved pursuant to a majority vote as set forth above in paragraph 4, any Party hereto may bring a motion asking the Court to address and resolve the issue. The Court shall have exclusive, continuing jurisdiction to decide all matters arising under this Agreement.

6.      The Parties have exchanged and will exchange among themselves and with DRLC privileged and work-product information, both orally and in documents, including factual analyses, strategies and mental impressions, investigative reports, and other information ("Joint Materials") for the purpose of advancing the interests of the Parties who have retained and may retain DRLC and assisting DRLC in prosecuting the Dividend Recovery Litigation. It is reasonably necessary to further the interests of each of the Parties and to accomplish the purposes of consulting with and retaining DRLC that such exchange of information take place in

6

a confidential manner. The Parties hereby agree that all Joint Materials which the Parties have exchanged, or will exchange, among themselves and with DRLC are privileged from disclosure to adverse or other third parties as a result of the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections. The Parties hereby agree to preserve to the maximum extent permitted by applicable law the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections which they may have. The Parties have communicated with DRLC, and provided Joint Materials to DRLC, in anticipation of retaining them as lawyers, and they hereby agree that all such communications, direct or indirect, and Joint Materials are and will be maintained as confidential and protected as work product and not disclosed except as permitted by this Agreement.

7.    The Parties agree they will use Joint Materials solely in connection with the Dividend Recovery Litigation and for no other purpose. If another person or entity requests or demands of a Party hereto, by subpoena or otherwise, to disclose or produce any privileged communications, Joint Materials or other protected information related to the Dividend Recovery Litigation, counsel for the Party subject to such request or demand shall immediately notify the other Parties hereto and DRLC, so that the Parties may seek an appropriate protective order or other remedy to assure that such privileged communications, Joint Materials or other protected information will be accorded confidential treatment.

8.    Any Party may withdraw from participating as a co-representative of the Estates' claims in the Dividend Recovery Litigation at any time and for any reason and without Court approval by providing ten (10) days written notice to the other Parties, but only to the

extent that such withdrawal does not impair the right and authority of the other Parties to prosecute the Dividend Recovery Litigation. Under such circumstances, the remaining parties shall serve as co-representatives of the Estates' rights. Any withdrawing Party shall continue to be bound by this Agreement in all respects with regard to the disclosure of any privileged communications, Joint Materials or other protected information received, learned, or obtained at any time in connection with the Dividend Recovery Litigation.

9. Under no circumstances shall any disagreement among the Parties hereto, or a withdrawal of one or more of the Parties as provided in Paragraph 8 above, form the basis for a request to disqualify DRLC, and the Parties hereto hereby waive all such potential conflicts of interest and agree that DRLC may continue to represent the then-acting representatives of the Estates in the Dividend Recovery Litigation.

10. The terms of this Agreement may be modified only by (i) the prior written consent of all Parties, (ii) an order of the Court, or (iii) pursuant to a confirmed plan of reorganization.

11. Following execution of this Agreement by all of the Parties (or their respective counsel on their behalf), the Debtors shall file a motion with the Court seeking an order approving this Agreement in all respects and confirming that the ACC and the FCR have standing to participate as co-representatives of the Estates' interests in the Dividend Recovery Litigation in accordance with the terms hereof.

8

Dated: 4/3, 2006

THE FLINTKOTE COMPANY

By: _____
Name: DAVID J GORDON
Its: PRESIDENT

Dated: 4/3, 2006

FLINTKOTE MINES LIMITED

By: _____
Name: DAVID J GORDON
Its: PRESIDENT

Dated: _____, 2006

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS

By: _____
Name: _____
Its: _____

Dated: _____, 2006

LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Name: _____
Its: _____

LA1 764291v.2

9

Dated: _____, 2006          THE FLINTKOTE COMPANY

                                 By: _____
                                 Name: _____
                                 Its: _____


Dated: _____, 2006          FLINTKOTE MINES LIMITED

                                 By: _____
                                 Name: _____
                                 Its: _____


Dated: 4/5, 2006                 OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                 INJURY CLAIMANTS

                                 By: _____
                                 Name: _Edward E. Pender_
                                 Its: _Counsel_


Dated: _____, 2006          LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                 PERSONAL INJURY CLAIMANTS

                                 By: _____
                                 Name: _____
                                 Its: _____

9

Dated: _____, 2006          THE FLINTKOTE COMPANY

                                 By:    _____
                                 Name:  _____
                                 Its:   _____

Dated: _____, 2006          FLINTKOTE MINES LIMITED

                                 By:    _____
                                 Name:  _____
                                 Its:   _____

Dated: _____, 2006          OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                 INJURY CLAIMANTS

                                 By:    _____
                                 Name:  _____
                                 Its:   _____

Dated: 4/4/, 2006                LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                 PERSONAL INJURY CLAIMANTS

                                 By:    _____
                                 Name:  JAMES J. McMONAGLE
                                 Its:   FCR

9

# EXHIBIT B

42125-001\DOCS_DE:6375.1

## AGREEMENT PROVIDING FOR
## JOINT PURSUIT OF ALTER EGO REMEDIES

This "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") is entered into as of April 4, 2006, by and among The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") (Debtor and Asbestos Claimants are hereinafter referred to collectively as the "Parties" and individually as a "Party"), with reference to the following facts and recitals:

### RECITALS

A.    Debtor is the debtor and debtor in possession in a case being jointly administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 04-11300 (JKF) (the "Bankruptcy Case").

B.    Asbestos Claimants hold asbestos-related claims against Flintkote (the "Claims") and contend that they additionally have remedies against the present or former, non-debtor affiliates of Debtors for the payment of the Claims on alter ego, veil piercing, or similar theories of recovery (collectively, "Alter Ego Remedies").

C.    The Debtor is about to commence litigation (the "Dividend Recovery Litigation") against, among others, one or more former, non-debtor affiliates of the Debtor (an "Affiliate Defendant") and will assert, among other theories of recovery, Alter Ego Remedies against one or more Affiliate Defendants. The Dividend Recovery Litigation seeks to establish, among other things, that the Affiliate Defendants are liable to persons with asbestos-related claims against the Debtor.

D.    As a result of this Agreement, all theories of alter ego recovery to be asserted against Affiliate Defendants, including Imasco Limited, now known as Imperial Tobacco Canada Limited) ("Imasco"), can be brought in the same action by plaintiffs who collectively have standing to assert all such grounds for relief. This will have several benefits to the Debtor's estate (the "Estate") and its creditors, including the following: (1) the arrangement will allow the assertion that Imasco is the alter ego of the Debtor and therefore responsible for the payment of the claims against the Debtor to be determined on its merits, avoiding unnecessary procedural arguments over whether the Alter Ego Remedies are being asserted by the correct party; (2) a successful prosecution of all potential Alter Ego Remedies by either an individual claimant or the Estate should result in a direct benefit to all creditors of the Estate by creating res judicata and collateral estoppel issue preclusion rights with respect to Imasco; (3) by pooling resources, an individual claimant can more feasibly pursue Alter Ego Remedies in conjunction with the Estate's efforts; and (4) by having individual

claimants in the case, the trier of fact will be more able to appreciate fully the nature of the type of claims being asserted against Flintkote and the harm that has been caused by Imasco's dismantling of the Debtor's going concern operations and the upstreaming of Flintkote's assets.

E.    The Parties wish to proceed promptly with the Dividend Recovery Litigation with the Debtor and Asbestos Claimants as parties. Accordingly, the Parties desire to authorize Asbestos Claimants to proceed on the Alter Ego Remedies on the terms and conditions set forth below.

## NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

## AGREEMENT

### A. Terms Of Joint Pursuit of Alter Ego Remedies.

1.    Authorization To Pursue Alter Ego Remedies.  Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants shall be transferred and authorized to pursue for their own benefit that portion of the Alter Ego Remedies, if any, held by the Estate against the Affiliate Defendants that relates to Asbestos Claimants' Claim, as limited by the amount of such Claims, and to have authorized Asbestos Claimants to assert such remedy in the Dividend Recovery Litigation.  Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly.  Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

2.    Contribution To Dividend Recovery Litigation Expenses.  Asbestos Claimants recognize that their costs of litigation will be substantially reduced by the efforts of the Debtors in the Dividend Recovery Litigation, and agree to contribute to such litigation costs in the following manner:

a.    Asbestos Claimants shall limit the fees payable to their counsel in pursuing the Alter Ego Remedies to twenty-five percent (25%) of actual recoveries by Asbestos Claimants, either directly or as a result of any distribution on account of an allowed claim against the Estate as a result of the litigation of Asbestos Claimants' Claims against Imasco; and

b.    Asbestos Claimants shall retain all net recoveries as a result of the assertion of their Alter Ego Remedies (after payment of costs) up to $400,000 and shall pay any excess recoveries to the Estate, which excess recoveries shall be held for the benefit of asbestos claimants, and shall be contributed by the Estate to any asbestos trust established pursuant to section 524(g) of the Bankruptcy Code, or

2

otherwise, for distribution in accordance with the trust distribution procedures governing such asbestos trust as approved by the Bankruptcy Court, including in connection with confirmation of a plan or plans of reorganization for Flintkote and its affiliates.

3.    Settlement Of Alter Ego Remedies.  Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the Official Committee Of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case (the "Committee") and the "Legal Representative For Future Asbestos Claimants" appointed in the Bankruptcy Case (the "Futures Representative"); provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the Committee and the Futures Representative, shall not be unreasonably withheld.  If a dispute arises as to whether such consent by the Asbestos Claimants has been unreasonably withheld, then such dispute shall be submitted to the Bankruptcy Court for determination as a contested matter without the right to a trial by jury.  If an asbestos trust is created pursuant to section 524(g) of the Bankruptcy Code, the trustee or trustees of such trust (the "Asbestos Trust Trustee") may act for the Committee, the Futures Representative, and/or the Debtor under this provision to the extent provided in the confirmed plan or plans of reorganization.

4.    Management Of Alter Ego Litigation.  The special litigation counsel retained on behalf of the Estates to prosecute the Dividend Recovery Litigation ("DRLC"), acting under the direction of Debtor, the Committee and the Futures Representative in accordance with the terms of the Joint Prosecution Agreement, shall manage the litigation (and advance the expenses and costs incurred by Asbestos Claimants in respect thereof, subject to and in accordance with paragraph 2 above) on all Alter Ego Remedies issues common to the Dividend Recovery Litigation and the Alter Ego Remedies being asserted by Asbestos Claimants; provided, however, that Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estate in the Dividend Recovery Litigation to the maximum extent feasible.

5.    Claim Amount.  The Parties agree that any amount determined to be owed to Asbestos Claimants on account of Asbestos Claimant's Claim in the Dividend Recovery Litigation shall be binding on the Debtor and the Estate but will not be enforced against the Debtor or the Estate except in accordance with the terms of a confirmed plan of reorganization in these cases and any § 524(g) trust distribution procedures approved by the Court in connection therewith.  Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' Claims against Imasco as provided in Paragraph A.2.b, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

3

**B. General Provisions**

1.    <u>Limitation on Third-Party Beneficiaries</u>.  No provision contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, the Committee, the Futures Representative, and the Asbestos Trust Trustee, if any.

2.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and assigns, including, in the case of Debtor, any trustee appointed under chapters 11 or 7 of the Bankruptcy Code, and the Asbestos Trust Trustee, if any.

3.    <u>No Representations or Warranties</u>.  Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

4.    <u>Headings</u>.  The descriptive headings of the several paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

5.    <u>Representation By Counsel</u>.  The Parties acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel.  This Agreement is a negotiated document.  As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

6.    <u>Due Authorization</u>.  Each Party to this Agreement hereby represents and warrants that (i) such Party is duly authorized to enter into this Agreement without the permission of any third party; and (ii) the person purporting to execute this Agreement on behalf of such Party has been duly authorized to execute this Agreement on behalf of and bind such Party; provided, however, that this representation and warranty as against Debtor shall be of no force and effect with respect to matters that require the approval of the Bankruptcy Court in the Bankruptcy Case unless and until such approval is obtained.

7.    <u>Entire Agreement; Amendment; Waiver</u>.    This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.  This Agreement may not be modified or amended except in writing signed by the Parties hereto, with the consent of the Committee and the Futures Representative.  No waiver of any term, provision or condition of this Agreement, in any

4

one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

8.    Effective Date.  Except as otherwise provided in this paragraph, this Agreement shall be binding upon Asbestos Claimants upon the execution of the Agreement by all signatories below (including the Committee and the Futures Representative), but it shall only be binding upon Debtor and the Estate upon entry of an order of Bankruptcy Court approving it after notice and an opportunity for a hearing. Absent the approval of this Agreement by the Bankruptcy Court, the parties shall be returned to the status quo ante as if this Agreement had not be executed by the Parties, and Asbestos Claimants shall cease any further prosecution involving the assertion of the Alter Ego Remedies in which the Estate has an interest but for the execution of this Agreement.

9.    Governing Law and Choice of Forum.  This Agreement shall be governed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, and by the United States Bankruptcy Code.  The Bankruptcy Court shall be the exclusive forum to hear, determine and enter appropriate orders and judgments regarding all disputes in respect of this Agreement.

10.    Counterparts.  This Agreement may be executed in two or more counterparts by the Parties, and such counterparts shall be considered as and construed to be part of a single agreement.  Signatures transmitted by facsimile shall have the same effect as original signatures.

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006

THE FLINTKOTE COMPANY

By: _____
Name: DAVID J BORDON
Its: PRESIDENT

Dated: April 5, 2006

MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS

By:_____
David R. Donadio, Brayton Purcell, LLP,
authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

By: _____
Name:_____
Its: _____

Dated: April 5, 2006

LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS

By: _____
Name:_____
Its: _____

6

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006      **THE FLINTKOTE COMPANY** By:

_____ Name:

_____ Its:

Dated: April 5, 2006      **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS** By:

_____ David R. Donadio, Brayton Purcell,

LLP, authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006      **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS** By:

_____ Name:

_____ Its:

Dated: April 5, 2006      **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS** By:

_____ Name:

_____ Its:

_____

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006          **THE FLINTKOTE COMPANY**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006          **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By: _____
David R. Donadio, Brayton Purcell, LLP, authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006          **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006          **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _John Wyland_
Name: _JOHN WYLAND PERO_
Its: _AUTHORIZED AGENT AND ATTORNEY for JAMES J. MCMONAGLE_

6

LA1 763587v.1

The foregoing is approved as to form and content:

Dated: April 5, 2006

**OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS**

By: _____

Name: _____

Its: _____

**LEGAL REPRESENTATIVE OF FUTURE
ASBESTOS PERSONAL INJURY CLAIMANTS**

Dated: April ___, 2006

By: _____

Name: _____

Its: _____

6

LA1 763597v.1

# EXHIBIT C

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

SUM-100

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is:<br>(El nombre y dirección de la corte es):<br>San Francisco County Superior Court<br>400 McAllister Street<br><br>San Francisco, CA 94102 | CASE NUMBER:<br>(Número del Caso): CGC 06 450944 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jean L. Bertrand (CSB 083250)                415.901.8700        415.901.8701
MORGENSTEIN & JUBELIRER LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105

| DATE:<br>(Fecha)  APR 0 5 2006 | Gordon Park-Li | Clerk, by<br>(Secretario) | Jun Panelo | , Deputy<br>(Adjunto) |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jean L. Bertrand (CSB 083250)<br>Eliot S Jubelirer (CSB 061654)<br>MORGENSTEIN & JUBELIRER LLP<br>One Market, Spear Street Tower, 32nd Floor<br>San Francisco, CA 94105<br>TELEPHONE NO.: 415.901.8700    FAX NO.: 415.901.8701<br>ATTORNEY FOR (Name): Plaintiff MARLENE HOPKINS, et al. | ENDORSED<br>F I L E D<br>San Francisco County Superior Court<br><br>APR 0 5 2006<br><br>GORDON PARK-Li, Clerk<br>BY: _____ JUN P. PANELO _____<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME: MARLENE HOPKINS, et al. v. PLANT INSULATION COMPANY, et al.

| CIVIL CASE COVER SHEET<br>[X] Unlimited   [ ] Limited<br>(Amount    (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | CASE NUMBER:<br>CGC 06 4 5 0 9 4 4<br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1-5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [X] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. This case [X] is [ ] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [X] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve     in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought (*check all that apply*):
   a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [ ] punitive

4. Number of causes of action (*specify*): 16

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015*).

Date: April 5, 2006

Jean L. Bertrand (CSB 083250)
_____
(TYPE OR PRINT NAME)       (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19

ENDORSED
F I L E D
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO _____
Deputy Clerk

1  ALAN R. BRAYTON (State Bar No. 073685)
   GILBERT L. PURCELL (State Bar No. 113603)
2  DAVID R. DONADIO (State Bar No. 154436)
   BRAYTON PURCELL, LLP
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, CA 94948-6169
   Telephone (415) 898-1555

5  Attorneys for Plaintiffs
6  Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

7  STEPHEN M. SNYDER (State Bar No. 054598)
   JAMES L. MILLER (State Bar No. 071958)
8  SNYDER MILLER & ORTON LLP
   111 Sutter Street, Suite 1950
9  San Francisco, CA 94104
   Telephone: (415) 962-4400
10 Facsimile: (415) 962-4401

11 Attorneys for Plaintiff
   The Flintkote Company
12 (Additional Counsel Listed On Signature Page)

CASE MANAGEMENT CONFERENCE SET

SEP 0 8 2006 - 9 ∞ AM

DEPARTMENT 212

14 SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)
15 COUNTY OF SAN FRANCISCO

17 MARLENE HOPKINS, Individually, as       Case No. CGC 06 450944
   Wrongful Death Heir, and as Successor-in-
18 Interest to NORMAN HOPKINS, JR.,         COMPLAINT FOR DAMAGES AND
   Deceased; and MICHELLE HOPKINS, and     RELIEF AGAINST ALTER EGO, FOR
19 MICHAEL HOPKINS, as Legal Heirs of      RECOVERY OF DIVIDENDS, FOR
   NORMAN HOPKINS, Deceased, and THE       RECOVERY OF FRAUDULENT
20 FLINTKOTE COMPANY,                      TRANSFERS, FOR DAMAGES BY REASON
                                           OF BREACH OF FIDUCIARY DUTY, FOR
21             Plaintiffs,                 DAMAGES FOR BREACH OF DUTY AND
                                           NEGLIGENCE, TO ENFORCE
22        vs.                              CONSTRUCTIVE TRUST, FOR
                                           RESTITUTION, AND FOR DECLARATORY
23 PLANT INSULATION COMPANY;               RELIEF.
   UNIROYAL HOLDING, INC.; IMPERIAL
24 TOBACCO CANADA LIMITED;
   SULLIVAN & CROMWELL LLP; and
25 DOES 1 through 100,

26             Defendants.

Snyder
Miller
& Orton
LLP

1
COMPLAINT

1   Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, and MICHAEL HOPKINS and

2   THE FLINTKOTE COMPANY allege:

3                              **PARTIES, JURISDICTION AND VENUE**

4       1.      Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,

5   "Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),

6   who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins. Marlene

7   Hopkins is successor in interest to Decedent under California Code of Civil Procedure section

8   377.11. Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil

9   Procedure sections 377.30 and 377.60. Plaintiffs Hopkins are the legal heirs of Decedent. Decedent

10  contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos

11  containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of

12  Flintkote, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

13      2.      Plaintiff The Flintkote Company ("Flintkote") is, and at all relevant times, has been a

14  corporation organized and existing under the laws of the State of Delaware, with a principal place of

15  business in San Francisco, California, qualified to do and doing business in California. For many

16  years, Flintkote manufactured and sold asbestos-containing products. Because of the number of

17  asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case

18  under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

19  Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the

20  "Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities. Flintkote is and

21  remains the debtor and debtor-in-possession in that case.

22      3.      Defendant Plant Insulation Company ("Plant") is a California corporation, with its

23  principal place of business situated in the city and county of San Francisco.

24      4.      Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in

25  interest to Uniroyal, Inc.

26      5.      Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major

27  Canadian tobacco company. It is a Canadian corporation formerly known as Imasco Limited and will

28  be referred to herein as "Imperial Tobacco" or "Imasco." Imperial Tobacco has manufactured

Snyder
Miller
& Orton
LLP

2

COMPLAINT

1  cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du

2  Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,

3  including California, for many years.

4    6.    Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C

5  maintains offices in California, among other places. S&C is a citizen of California, in that there are

6  S&C partners who reside in and are citizens of California.

7    7.    Plaintiffs are ignorant of the true names and capacities of defendants sued under the

8  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

9  complaint may be amended to allege such names and capacities. Each of the fictitiously named

10  defendants is responsible in some manner for the occurrences alleged hereafter.

11    8.    Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

12  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

13  seeks in part declaratory relief under California Code of Civil Procedure section 1060. Flintkote is

14  authorized by virtue of the Bankruptcy Code to bring certain of the causes of action, all of which

15  arise under state law.

16    9.    Venue in the County of San Francisco is proper because defendants Imperial Tobacco

17  and S&C have no residence in California and can be sued in any county in California, and their

18  liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

19  principal place of business situated in San Francisco.

20    10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

21  directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

22  the extent of losses held by them. The alter ego claims by Hopkins and Flintkote depend upon the

23  same set of facts. Pursuing such claims against a substantial well-financed defendant is difficult and

24  expensive, so that it is economically not practical for a single individual to pursue them alone.

25  Accordingly, Flintkote and plaintiffs Hopkins have agreed to bring the alter ego claims together as

26  plaintiffs and to cooperate in prosecuting them. Plaintiffs Hopkins make no claim against S&C.

27                              **FACTS**

28    11.    Flintkote manufactured and sold asbestos containing products for many years,

Snyder
Miller
& Orton
LLP

3

COMPLAINT

1  including vinyl asbestos floor tile, asbestos cement pipe and many other products.  Flintkote, through

2  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

3  through approximately 1970.  Beginning in or about 1972, Flintkote, along with many other

4  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

5  asbestos contained in its products who suffered from a variety of asbestos induced diseases.  The

6  number of asbestos cases filed against Flintkote and the other companies increased over time.

7      12.    In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

8  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

9  filed against it.  The bankruptcy filing was major news as Johns Manville was, absent the asbestos

10  litigation, a large and profitable American company.  Other companies named as defendants in the

11  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

12      | Company | Date of Filing Bankruptcy |
    | --- | --- |
13  | UNR Industries | July 19, 1982 |
    | Amatex Corporation | November 1, 1982 |
    | Forty-Eight Insulations, Inc. | April 19, 1985 |
14  | Standard Insulation | August 4, 1986 |
    | Nicolet | July 17, 1987 |

15      13.    A number of defendants regularly sued in the asbestos litigation banded together in the

16  early 1980's and sought to settle disputes with their insurers where possible and establish a facility

17  that would provide an efficient joint defense to members of the group.  The discussions were

18  mediated by Dean Harry Wellington of the Yale Law School.  The participants became known as the

19  "Wellington Group."  By June 1985 they had signed an agreement and had begun to operate as the

20  Asbestos Claims Facility ("ACF").

21      14.    Flintkote was a member of the ACF and, for a while, asbestos cases against it were

22  defended and settled or tried by lawyers selected by the Asbestos Claims Facility.  The ACF defense

23  arrangements were initially advantageous to Flintkote as they allowed the company to defend

24  asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that

25  would be more quickly consumed if it was required to defend cases on its own.  The ACF operated

26  through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as

27  to appropriate defense strategies and as to how costs should be allocated among participants.

28

Snydur
Miller
& Orton
LLP

4

COMPLAINT

15.    Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to information which pointed to the threatening scope of the asbestos litigation to follow.  That information included:

- The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos defendants, which increased the payment shares in the tort system of the surviving companies;

- Numbers of claims filings were increasing and claims values were increasing;

- Diseases caused by asbestos exposure could have a latency period of decades, which meant liabilities would extend far into the future;

- Commercial usage of asbestos in the United States continued to increase through the 1970's, with significant implications for future morbidity;

- Inability to extend  the asbestos litigation to include significant responsible parties, such as the United States Government and the tobacco companies, all of whom had contributed to the diseases and injuries of asbestos victims;

- Unmistakable signals from casualty insurers that they could not be counted on by defendant companies in the face of ever-increasing demands, with signs from some that they would not survive.  By mid-1987, two of Flintkote's insurers had become insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach agreements as to coverage with only 60% of its insurers;

- Substantial disagreements among ACF members that weakened the effectiveness of the ACF and hastened its demise.  These disagreements were apparent as early as 1986.  There were clear indicators that members were going to leave the ACF, and seven did so in 1987.  Persons knowledgeable about the operations and functioning of the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF would not continue to operate indefinitely as originally agreed upon and also knew or should have known that disintegration of the ACF was likely in the foreseeable future.

16.    Imasco was quite familiar with the American asbestos litigation.  It followed and

Snyder
Miller
& Orton
LLP

5

COMPLAINT

1  monitored that litigation for a variety of reasons, including that it knew there was a synergistic or
2  combinative effect which produced increased disease rates in persons who smoked its tobacco
3  products and who were also exposed to asbestos.  Consequently Imasco understood that the litigation
4  posed risks to corporate and insurer solvency.

5      17.    In the 1980s, Imasco was engaged in a program of corporate diversification.
6  Specifically, it was seeking to acquire non-tobacco businesses.  One target of Imasco's diversification
7  program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada
8  Trustco").  But, Canada Trustco had been acquired by another Canadian company, Genstar
9  Corporation.  So, in order to get control of Canada Trustco, Imasco, operating through a corporate
10  subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar
11  Corporation ("Genstar").  At the time Genstar had a number of businesses and subsidiary
12  corporations, including several in the United States.  Genstar was Flintkote's ultimate parent
13  company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.
14  Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco
15  common shares.

16      18.    From the outset, Imasco's strategy was to use the value of Genstar's assets, other than
17  Canada Trustco, to finance the purchase of Canada Trustco.  The strategy therefore involved
18  restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada
19  Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for
20  the hostile takeover.

21      19.    Imasco acquired Genstar in August 1986.  Then, as it had planned to do, it set about
22  selling most of Genstar's assets and businesses (other than Canada Trustco).  To implement this
23  scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding.  First it required
24  Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then
25  transferring Flintkote's valuable operating assets to them.  Then, Imasco caused Flintkote to sell each
26  of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had
27  been created previously.  Those sales were made to third parties for cash.

28      20.    Gross proceeds from the sales of the Flintkote assets were approximately

Snyder
Miller
& Orton
LLP

6

COMPLAINT

1   $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987.

2   These asset transfers and sales were overseen by Imasco personnel working in San Francisco,

3   California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the

4   planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing

5   Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to

6   represent its original client Imasco in connection with the liquidation throughout the process and

7   thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and

8   Imasco.

9           21.    After these transactions, Flintkote's valuable operating businesses were gone. Their

10   profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote.

11   Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance,

12   much of which was contested by the insurers who had written the policies. The cash and insurance

13   were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation.

14   However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of

15   Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies

16   it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

17   and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

18   dividends to be paid out by Flintkote.

19           22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

20   San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

21   was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

22   corporation of Flintkote.

23           23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

24   to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

25   the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

26   Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

27   that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

28   Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

Snyder
Miller
& Orton
LLP

7
COMPLAINT

1    advised the Flintkote board that it had received preliminary advice from the consultant, and that there

2    was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

3    declare the dividend. S&C told the board that it did not believe the consultant's final report would

4    alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

5    Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

6    knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

7    it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

8    dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

9    show that the board was informed of that fact.

10        24.    Stating that it was doing so in accordance with previous undertakings and "as an

11    inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

12    such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

13    them harmless against any and all actions, suits or claims arising out of their actions, omissions or

14    conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

15        25.    Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

16    meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

17    determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

18    that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

19    to replace funds to Flintkote to the extent required by an appropriate judicial body.

20        26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

21    dividend to be paid.

22        27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

23    of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

24    1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

25    corporations and entities that it controlled and dominated.

26        28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

27    and were representing Imasco, including with respect to Flintkote-related issues, such as the

28    consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

Snyder
Miller
& Orion
LLP

8

COMPLAINT

1  face of Flintkote's asbestos liabilities.  At the same time, S&C was representing Flintkote on those

2  same issues, and on the issue of the director's liability in connection with declaring dividends to

3  Imasco in the face of Flintkote's asbestos liabilities.  On July 22, 1987, S&C as well as Imasco were

4  present by telephone at the Flintkote board meeting in San Francisco.  S&C had prepared a legal

5  memorandum addressed to Flintkote.  During the meeting, the memorandum was presented to the

6  board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant

7  S&C had retained and whose preliminary report was used by S&C in connection with the December

8  1986 board meeting.

9      29.   The board minutes of the July 1987 meeting reflect that after payment of the

10  dividends, Flintkote would have left retained earnings and paid-in capital of approximately

11  $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed

12  $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure

13  taken from the RPC study was $42,000,000.

14      30.   In the July 22, 1987 board meeting, the board members were told that Imasco would

15  undertake to restore dividend monies to the extent the declared dividends were deemed legally.

16  improper and necessary to satisfy unpaid judgment creditors of Flintkote.  Imasco promised to supply

17  a writing memorializing the understanding.  After the meeting, Imasco issued a letter dated July 27,

18  1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends

19  declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent

20  jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets

21  because of dividends finally determined to have been improperly paid during Imasco's indirect

22  ownership of Flintkote.  A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is

23  attached as Exhibit A and incorporated by reference.

24      31.   The S&C legal memorandum and the RPC study, both supplied by Imasco's and

25  Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to

26  be paid as was Imasco's plan from the time it took over Genstar.

27      32.   S&C's relationship with Imasco supplied reason to structure S&C's advice so as to

28  ensure that Flintkote would pay the dividends.  The S&C memorandum contained substantial errors,

1   omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

2   of Flintkote's payment of these dividends, including the following.

3          33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote.  However,

4   it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

5   declare the dividend yet escape personal liability for doing so.  The memorandum is vague and

6   indefinite as to Flintkote's obligations as a corporation.

7          34.    The S&C memorandum contains legal analysis, including discussion of California

8   law.  In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

9   Conveyance Act.  S&C wrote that a conveyance could be set aside if the debtor would be rendered

10  insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

11  existing debts as they became absolute and matured.  S&C advised Flintkote that it was unclear

12  whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

13  not yet manifested itself – were considered existing debts.  That advice misapprehended the

14  controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

15  fixed or contingent.  S&C also did not alert Flintkote that under California law, as well as in other

16  jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

17  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

18  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

19  solvent.  See *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

20         35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

21  changed the law and adopted a version of the Uniform Fraudulent Transfer Act.  The new law made a

22  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

23  would incur debts beyond his ability to pay as they became due.  The new statute therefore

24  incorporated an objective test specifically looking to the incurring of future debts.  This test was in

25  addition to rules making fraudulent those transfers without fair consideration where the debtor was

26  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

27  which its remaining assets were unreasonably small in relation to the business.

28         36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C.  The

Snyder
Miller
& Orton
LLP

10

COMPLAINT

1   RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending

2   and possible future asbestos-related property damage claims against Flintkote, but only "to consider"

3   asbestos personal injury claims. RPC devoted cursory treatment to Flintkote's asbestos-related

4   personal injury claims. RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos

5   personal injury claims. The RPC report thus was based on an assumption, known to be questionable

6   by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to

7   Flintkote for 14 years. S&C assured Flintkote that directors were entitled to rely upon statements in

8   an appraisal by an appraiser selected by the board. Although it was not an appraisal under Delaware

9   law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury

10  liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC

11  report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors

12  could rely. Imasco and S&C did not advise the directors to seek an independent expert analysis

13  regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain

14  independent counsel without a conflict of interest.

15      37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and

16  developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-

17  related personal injury liabilities.

18      38.    S&C labored under a conflict of interest when it undertook to represent and advise

19  Flintkote while still representing Imasco. Flintkote, a company facing substantial and increasing

20  asbestos-related claims, was obliged to consider and evaluate the interests of existing and future

21  creditors before paying out $525,200,000 in dividends. In contrast, Imasco had every interest in

22  obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all

23  along. S&C represented both Imasco and Flintkote, with plainly conflicting interests. The

24  declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading

25  legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which

26  was procured by S&C for the specific purpose of attempting to justify the legal propriety of the

27  dividends.

28      39.    Imasco improperly caused the dividends to be paid by telling the Flintkote board:

Snyder
Miller
& Orton
LLP

11

COMPLAINT

1        •    our lawyers, acting as your lawyers, together with their consultants, say you can do it;

2        •    to induce you to pay us we agree to protect you if someone sues you; and

3        •    if we are wrong about this and creditors are left unsatisfied and a court finally decides

4              the dividends were improper, we will pay them back.

5       40.    From the time Imasco acquired Genstar in August 1986, through September 29, 2003,

6  Imasco held and maintained complete control over and dominated Flintkote through Imasco's

7  indirect 100% ownership of Flintkote. Flintkote was in no position to assert claims against Imasco or

8  to sue Imasco. S&C continued to act as an instrument of Imasco, guiding and giving legal advice to

9  Flintkote, including with respect to the matters alleged herein, until September of 2003. Imasco's

10  plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote,

11  and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as

12  long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the

13  goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten

14  alter ego liability upon Imasco for Flintkote's asbestos-related claims. That Flintkote had been

15  injured by wrongful acts leading to the dividends was inherently unknowable, depending upon

16  expertise available only to sophisticated professionals such as S&C and RPC. S&C did not disclose

17  to Flintkote that it had rights with respect to the dividends.

18       41.    From and after the divestiture of its subsidiaries and payment of the dividends,

19  Flintkote operated as an asbestos claims resolution facility. Imasco exercised its domination and

20  control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and

21  Imasco Holdings Group, Inc. (collectively, "IHI"). IHI took its orders from Imasco. IHI attorneys

22  were involved in the claim resolution process. Flintkote consistently obtained releases for its parent

23  companies, including Imasco, in settlements with asbestos claimants. Flintkote and IHI shared

24  common officers and directors. Employees of Imasco or IHI were involved in management of

25  Flintkote. S&C continued to advise Imasco or IHI and Flintkote on what should be done with

26  Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related

27  liabilities. Flintkote handled its own asbestos liabilities, rather than join the Center for Claims

28  Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

Snyder
Miller
& Orton
LLP

1 Imasco therefore maintained control over the handling of the claims. Following the dividends, as a

2 claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical. Flintkote

3 continued to consult S&C, Imasco's outside counsel, on asbestos issues, and IHI legal personnel were

4 involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

5 critical issue of asbestos liability. The goals of Imasco throughout were to forestall any liability to

6 repay the dividend and to confine the asbestos-related liabilities to Flintkote.

7      42.    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

8 it had taken and used the money to reimburse itself for funds it had expended for buying the one

9 business it did want, Genstar's Canada Trustco, a financial services company in Canada. After

10 Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

11 to satisfy its asbestos-related personal injury liabilities.

12      43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

13 financial statements. It did not publicly disclose its true financial condition and the nature and extent

14 of its asbestos liabilities. Instead, Imasco, as Flintkote's ultimate parent corporation filed public

15 financial statements in Canada that purported to represent Flintkote's financial condition. Imasco

16 represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

17 Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

18 represented, with respect to Flintkote's financial condition, that

19     [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

20     subject to numerous claims and suits, some of which allege significant damage. In the opinion of

21     management, all such claims and suits are adequately covered by insurance, or are provided for in

22     the financial statements, or if not so covered or provided for, the results are not expected to

23     material affect the Corporation's financial condition.

24 Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

25 repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

26 within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

27 as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

28 alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

1    had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

2    became due and were made in violation of California and other law, including California's Uniform

3    Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

4    applicable limitation period.

5          44.     In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

6    Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

7    subsidiary of Navigant Consulting, Inc. ("Navigant").  Navigant issued a report dated August 19,

8    2003.  The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

9    billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

10   $3.4781 billion.

11         45.     In September, 2003, the shares of Flintkote stock were transferred to a trust, and

12   Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

13                                    FIRST CAUSE OF ACTION
     (By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence –
14                                         Wrongful Death)

15         46.     Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

16   paragraphs 1 through 45, inclusive.

17         47.     At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an

18   alter ego of Flintkote, and each of them, were and are engaged in the business of researching,

19   manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying,

20   offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving,

21   certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying,

22   requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain

23   product, namely asbestos and other products containing asbestos.

24         48.     At all times mentioned, said defendants, and each of them, singularly and jointly,

25   negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed

26   to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled,

27   distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for

28   installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and

Snyder
Miller
& Orton
LLP

14

COMPLAINT

1   advertised, a certain product, namely asbestos, and other products containing asbestos, in that said

2   products caused personal injuries to users, consumers, workers, bystanders and others, including the

3   Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed

4   persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said

5   products hazardous, unsafe, and dangerous for use by "exposed persons."

6       49.     Said defendants, and each of them, had a duty to exercise due care in the pursuance of

7   the activities mentioned above and defendants, and each of them, breached said duty of due care.

8       50.     Said defendants, and each of them, knew, or should have known, and intended that the

9   aforementioned asbestos and products containing asbestos and related products and equipment,

10  would be transported by truck, rail, ship, and other common carriers, that in the shipping process the

11  product would break, crumble, or otherwise be damaged; and/or that such products would be used for

12  insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

13  applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping,

14  hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation,

15  resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or

16  handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

17  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

18  persons working in proximity to said products, directly or through reentrainment.

19      51.     Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

20  containing products referred to herein in a manner that was reasonably foreseeable. Decedent's

21  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

22  employment status is, on current information and belief, as set forth at various locations and

23  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

24      52.     Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

25  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

26  perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

27  asbestos-containing products over a period time.

28      53.     Decedent suffered from a condition related to exposure of asbestos and asbestos-

Snyder
Miller
& Orton
LLP

15

COMPLAINT

1  containing products.  Decedent was not aware at the time of exposure that asbestos or asbestos-

2  containing products presented risk of injury and/or disease.

3      54.  As a direct and proximate result of the aforesaid conduct of said defendants, and each

4  of them, Decedent suffered permanent injuries to his person, body, and health, including, but not

5  limited to, asbestosis, other lung damage, and cancer and related sequelae, and the mental and

6  emotional distress attendant thereto, and ultimately death, from the effect of exposure to asbestos

7  fibers, all to his general damage in the sums to be proven at trial.

8      55.  As a direct and proximate result of the aforesaid conduct of said defendants, and each

9  of them, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine,

10  hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to

11  plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when the true and

12  exact cost thereof is ascertained.  As a direct and proximate result of the aforesaid conduct of said

13  defendants, and each of them, Decedent incurred liability for the reasonable value of medical care

14  provided by Decedent's family members measured by, inter alia, the costs associated with the hiring

15  a registered nurse, home hospice, or other service provider, the true and exact amount thereof being

16  unknown to plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when

17  the true and exact costs are known or at time of trial.

18      56.  As a further direct and proximate result of the said conduct of said defendants, and

19  each of them, Decedent incurred loss of income, benefits, entitlements, wages, profits, and

20  commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and

21  extent of which are not yet known to plaintiffs; and leave is requested to amend this complaint to

22  conform to proof at the time of trial.

23      57.  As a further direct and proximate result of the said conduct of said defendants, and

24  each of them, Decedent's exposure to asbestos and asbestos-containing products caused severe and

25  permanent injury to Decedent, and ultimately Decedent died on September 27, 2005.

26      58.  Said defendants, and each of them, and their officers, directors and managing-agents

27  participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should

28  have known of, each of the acts set forth herein.

Snyder
Miller
& Orton
LLP

16

COMPLAINT

59. The herein-described conduct of said defendants, and each of them, was and is despicable, willful, malicious, fraudulent, outrageous, and in conscious or reckless disregard and indifference to the safety, health, and rights of "exposed persons", including decedent herein, giving rise to decedent's claim herein alleged for punitive damages against said defendants.

60. At all times prior to his death, Decedent was a faithful and dutiful spouse to plaintiff Marlene Hopkins, and parent to plaintiffs Michelle and Michael Hopkins.

61. As a direct and proximate result of the conduct of said defendants, and each of them, and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of care, society, comfort attention, services, and support of Decedent all to the damage of decedent's heirs.

62. As a further direct and proximate result of the conduct of said defendants, and each of them, and the death of Decedent, decedent's heirs have incurred funeral expenses in an amount currently not ascertained.

63. As a direct and proximate result of the acts, omissions, and conduct of said, and each of them, as aforesaid, Decedent's exposure to harm or the Decedent as set forth in Exhibit B, attached to the complaint and incorporated by reference herein.

64. Decedent's personal injury claim against Flintkote was resolved by Judgment filed June 25, 2003, following Flintkote's acceptance of an offer to compromise in action number 408556 in this court.

65. Imasco completely dominated and controlled Flintkote, deliberately requiring Flintkote to divest itself of its operating businesses and assets solely for the benefit of Imasco. After the divestiture of its businesses, Flintkote did not manufacture or market any products or render any services to third parties. It served only as a vehicle for Imasco, resolving asbestos and other claims, including obtaining releases for Imasco, and prosecuting insurance coverage claims. By causing Flintkote to convert its assets and businesses to cash, and then stripping Flintkote of $525,200,000, most of that cash, Imasco prevented Flintkote both from benefiting from the operating profits of the sold businesses and/or from investing the sale proceeds and using the principal plus earnings to pay claims.

Snyder
Miller
& Orton
LLP

17

COMPLAINT

66.    In the years following the dividends, Flintkote's benefit programs were administered by Imasco's subsidiary, IHI. Flintkote, with IHI, filed consolidated financial statements and tax returns.

67.    There became in 1986 and 1987 and thereafter such a unity of interest, and of ownership since Imasco owned indirectly 100% of Flintkote, that separate personalities of Flintkote and Imasco no longer existed. If the companies are treated as separate, inequitable results will follow.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

## SECOND CAUSE OF ACTION
**(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Products Liability – Wrongful Death)**

68.    Plaintiffs Hopkins incorporate by reference each and all the allegations of the First Cause of Action.

69.    Defendants Plant, Uniroyal, and Imperial Tobacco, knew and intended that the above-referenced asbestos and asbestos-containing products, would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

70.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed persons", including Decedent herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

71.    "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons". Said defendants, and each of them, further failed to adequately warn of the risks to which decedent and others similarly situated were exposed.

72.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to

Snyder
Miller
& Orton
LLP

18

COMPLAINT

1   test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale,

2   supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,

3   representing, endorsing, servicing, installing, contracting for installation, repairing, marketing,

4   warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-

5   containing products, said defendants, and each of them, did so with conscious disregard for the safety

6   of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in

7   that said defendants, and each of them, had prior knowledge that there was a substantial risk of injury

8   or death resulting from exposure to asbestos or asbestos-containing products, including, but not

9   limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from

10  scientific studies performed by, at the request of, or with the assistance of, said defendants, and each

11  of them, and which knowledge was obtained by said defendants, and each of them on or before 1930,

12  and thereafter.

13      73.     On or before 1930, and thereafter, said defendants, and each of them, were aware that

14  members of the general public and other "exposed persons", who would come in contact with their

15  asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos

16  or asbestos-containing products could cause injury, and said defendants, and each of them, knew that

17  members of the general public and other "exposed persons", who came in contact with asbestos and

18  asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and

19  asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health

20  and human life.

21      74.     With said knowledge, said defendants, and each of them, opted to research, manufacture,

22  fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install,

23  contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said

24  asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn

25  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing

26  products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high

27  risk of injury or death resulting from exposure to asbestos and asbestos-containing products, said

28  defendants, and each of them, intentionally failed to reveal their knowledge of said risk, and

Snyder
Miller
& Orton
LLP

19

COMPLAINT

1   consciously and actively concealed and suppressed said knowledge from "exposed persons" and

2   members of the general public, thus impliedly representing to "exposed persons" and members of the

3   general public that asbestos and asbestos-containing products were safe for all reasonably

4   foreseeable uses. Said defendants, and each of them, engaged in this conduct and made these

5   implied representations with the knowledge of the falsity of said implied representations.

6       75.     The above-referenced conduct of said defendants, and each of them, was motivated by

7   the financial interest of said defendants, and each of them, in the continuing, uninterrupted research,

8   design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer

9   for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing,

10  warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

11  otherwise directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing

12  products. In pursuance of said financial motivation, said defendants, and each of them, consciously

13  disregarded the safety of "exposed persons" and in fact were consciously willing and intended to

14  permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced

15  persons to work with and be exposed thereto, including plaintiff.

16      76.     Plaintiffs allege that the aforementioned defendants, and each of them impliedly warranted their

17  asbestos and asbestos-containing products, to be safe for their intended use, but that their asbestos and asbestos-

18  containing products, created an unreasonable risk of bodily harm to exposed persons.

19      77.     Decedent relied upon defendants', and each of their representations, lack of warnings, and

20  implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable, and

21  proximate result thereof, Decedent suffered permanent injury and death as alleged herein.

22      78.     As a direct and proximate result of the actions and conduct outlined herein,

23  Plaintiffs Hopkins have suffered the injuries and damages herein alleged.

24      WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal,

25  and Imperial Tobacco as set forth below.

26                          **THIRD CAUSE OF ACTION**

27  **(By Plaintiff Marlene Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Loss of Consortium)**

28      79.     Plaintiff Marlene Hopkins re-alleges and incorporates by reference each and all the

Snyder
Miller
& Orton
LLP

20

COMPLAINT

1   allegations of the First and Second Causes of Action.

2       80.    Decedent and plaintiff Marlene Hopkins were married on February 18, 1961, and at all

3   times relevant to this action were husband and wife.

4       81.    Prior to Decedent's injuries as alleged, Decedent was able and did perform duties

5   as a spouse. Subsequent to the injuries and as a proximate result thereof, and until Decedent's

6   death, Decedent was unable to perform the necessary duties as a spouse and the work and service

7   usually performed in the care, maintenance, and management of the family home. As a

8   proximate result thereof, plaintiff Marlene Hopkins was permanently deprived of the consortium of

9   her spouse, including the performance of duties, all to plaintiff Marlene Hopkin's damages, in an

10   amount presently unknown to plaintiff, but which will be proved at the time of trial.

11      82.    Plaintiff Marlene Hopkins' discovery of the cause of Decedent's loss of consortium, as

12   herein alleged, first occurred within one year last past from the filing of this Complaint.

13      83.    As a direct and proximate result of the acts of said defendants, and the severe injuries

14   and death caused thereby to Decedent as set forth in this complaint, plaintiff Marlene Hopkins has

15   suffered loss of consortium, including but not by way of limitation, loss of services, marital relations,

16   society, comfort, companionship, love, and affection of said spouse, and has suffered severe mental

17   and emotional distress, and general nervousness as a result thereof.

18      WHEREFORE, plaintiff Marlene Hopkins prays judgment against defendants Plant,

19   Uniroyal, and Imperial Tobacco as set forth below.

20                          **FOURTH CAUSE OF ACTION**

21   **(By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for Negligence -- Survival)**

22      84.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

23   of the First Cause of Action.

24      85.    Plaintiffs bring this action pursuant to California Code of Civil Procedure section

25   377.30 et. seq. As a direct and proximate result of the actions and conduct outlined herein, Decedent

26   suffered the injuries and damages herein alleged. Plaintiffs are entitled to recover all damages

27   sustained by Decedent as alleged above.

28      WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

Snyder
Miller
& Orton
LLP

21

COMPLAINT

set forth below.

## FIFTH CAUSE OF ACTION
### (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal to Products Liability -- Survival)

86.     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations of the First and Second Causes of Action.

87.     As a direct and proximate result of the exposure to defendants' products and the conduct outlined herein, Decedent has suffered the injuries and damages herein alleged.

88.     Plaintiffs Hopkins are entitled to recover all damages sustained by Decedent as alleged above.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as set forth below.

## SIXTH CAUSE OF ACTION
### (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for False Representation Under Restatement of Torts Section 402-B -- Survival)

89.     Plaintiffs Hopkins re-allege and incorporates by reference each and all the allegations of the First and Second Causes of Action.

90.     At the aforementioned time when defendants Plant and Uniroyal, and each of them, researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented, endorsed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged, and advertised the said asbestos and asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of said product, and other "exposed persons", including the decedent herein and his employers, that asbestos and asbestos-containing products, were of merchantable quality, and safe for the use for which they were intended.

91.     The purchasers and users of said asbestos and asbestos-containing products, and other "exposed persons", including the Decedent and his employers, relied upon said representations of said defendants, and each of them, in the selection purchase, and use of asbestos and asbestos-

22

COMPLAINT

Snyder
Miller
& Orton
LLP

1    containing products.

2       92.     Said representations by defendants, and each of them, were false and untrue, and

3    defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products,

4    were not safe for their intended use, nor were they of merchantable quality as represented by

5    defendants, and each of them, in that asbestos and asbestos-containing products have very dangerous

6    properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and

7    have other defects that cause injury and damage to the users of said products and other "exposed

8    persons", thereby threatening the health and life of said persons including decedent herein.

9       93.     As a direct and proximate result of said false representations by defendants, and each of

10    them, the Decedent suffered injury and death as set forth.

11       WHEREFORE, plaintiffs pray judgment against defendants Plant and Uniroyal, set forth

12    below.

13

14

**SEVENTH CAUSE OF ACTION**
**(By Plaintiffs Hopkins Against Defendant Plant for Contractor Liability)**

15       94. ·     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

16    of the First and Second Causes of Action.

17       95.     At all times mentioned herein, defendant Plant, owned, leased, maintained, managed,

18    and/or controlled the premises listed on Exhibit B where Decedent was present. The information

19    provided on Exhibit B is preliminary, based on recall over events covering many years and further

20    investigation and discovery may produce more reliable information. Additionally, Decedent might

21    have been present at these or other of Plant's premises at other locations and on other occasions.

22       96.     Prior to and at said times and places, defendant Plant caused certain asbestos-

23    containing insulation, other building materials, products, and toxic substances to be constructed,

24    installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid

25    respective premises, by their own workers and/or by various unqualified or unskilled contractors and

26    caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the

27    ambient air and thereby created a hazardous and unsafe condition to decedent and other persons

28    exposed to said asbestos fibers and toxic substances while present at said premises.

Snyder
Miller
& Orton
LLP

23

COMPLAINT

97.     At all times mentioned herein, said defendant Plant knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to decedent and other workers or persons so exposed present on each of the aforesaid respective premises.

98.     At all times relevant herein, Decedent entered said premises and used or occupied each of said respective premises as intended and for Plant's benefit and advantage and at Plant's request and invitation.  In so doing, Decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said defendant Plant.

99.     Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

100.     At all times mentioned herein, Defendant Plant remained in control of the premises where Decedent was performing his work.

101.     At all times mentioned herein, defendant Plant owed to decedent and others similarly situated a duty to exercise
ordinary care in the management of such premises so as to avoid exposing workers such as decedent to an unreasonable risk of harm and to avoid causing injury to said person.

102.     At all times mentioned herein, defendant Plant, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforementioned hazardous conditions to which they were exposed on the premises.

103.     At all times mentioned herein, defendant Plant negligently failed to maintain, manage, inspect, survey, or control said premises, or to abate, or correct, or to warn decedent of, the existence of the aforesaid dangerous conditions and hazards on or about said premises.

104.    Prior to and at the times and places aforesaid, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, replaced, repaired and/or removed on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured decedent.

105.    At all times mentioned herein, defendant Plant:

a.    Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would harm decedent and others unless special precautions were taken;

b.    Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled, unlicensed, or otherwise unqualified to do so;

c.    Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were competent, or qualified to do so.

106.    In part, Decedent was exposed to dangerous asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

107.    The work of contractors on premises controlled by defendant Plant created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances, including but not limited to asbestos.

108.    Prior to and at said times and places, defendant Plant was subject to certain ordinances, standards, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code § 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VHL Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and §

1  4108, and Threshold Limit Values as documented for asbestos and other toxic substances under

2  Appendix A, Table 1 of said Safety Orders; additionally, <u>California Health and Safety Code</u> § 40.200,

3  <u>et seq.</u>, which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate

4  regulations including, but not limited to <u>B.A.A.Q.D. Regulation</u> 11, Rules 2 and 14, Title 40 <u>Code of</u>

5  <u>Federal Regulations</u>. Chapter 1, Part 61, <u>et seq.</u> -- The National Emission Standards for Hazardous Air

6  Pollutants, which required defendant Plant to provide specific safeguards or precautions to prevent or

7  reduce the inhalation of asbestos dust and other toxic fumes or substances; and said defendant Plant

8  failed to provide the required safeguards and precautions. Defendant's violations of said codes

9  include, but are not limited to:

10       (a)    Failing to comply with statutes and allowing ambient levels of airborne

11  asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned

12  statutes;

13       (b)    Failing to segregate work involving the release of asbestos or other toxic

14  dusts;

15       (c)    Failing to suppress dust using prescribed ventilation techniques;

16       (d)    Failing to suppress dust using prescribed "wet down" techniques;

17       (e)    Failing to warn or educate decedent or others regarding asbestos or other

18  toxic substances on the premises;

19       (f)    Failing to provide approved respiratory protection devices;

20       (g)    Failing to ensure "approved" respiratory protection devices were used

21  adequately;

22       (h)    Failing to provide for an on-going health screening program for those

23  exposed to asbestos on the premises;

24       (i)    Failing to provide adequate housekeeping and clean-up of the work place;

25

26       (j)    Failing to adequately warn of the hazards associated with asbestos as

27  required by these statutes;

28

Snyder
Mills
& Orten
LLP

26
COMPLAINT

1        (k)    Failing to adequately report renovation and disturbance of asbestos-containing

2    materials, including but not limited to <u>B.A.A.O.M.D. Regulation</u> 11, Rules 2 and 14;

3               (l)    Failing to have an asbestos removal supervisor as required by regulation;

4

5               (m)    Failing to get approval for renovation as required by statutes; and

6

7               (n)    Failing to maintain records as required by statute.

8        109.    Defendant Plant was the "statutory employer" of decedent as defined by the <u>California</u>

9    <u>Labor Code</u> and California case law.

10       110.    Decedent at all times was unaware of the hazardous condition or the risk of personal

11   injury created by defendant's violation of said regulations, ordinances, or statutes.

12       111.    At all times mentioned herein, Decedent was a member of the class of persons whose

13   safety was intended to be protected by the regulations, standards, statutes, or ordinances described in

14   the foregoing paragraphs.

15       112.    At all times mentioned herein, said defendant Plant, knew, or in the exercise of

16   ordinary and reasonable care should have known, that the premises that were in its control would be

17   used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present

18   and using said premises would not be aware of the aforesaid hazardous conditions to which they were

19   exposed on the premises, and that such persons were unaware of the aforesaid violations of codes,

20   regulations, and statutes.

21       113.    As a proximate result of the foregoing, Decedent developed asbestos-related illness,

22   which has caused great injury and disability to Decedent, and ultimately death, as previously set

23   forth, and plaintiffs have suffered damages as herein alleged.

24       WHEREFORE, plaintiffs Hopkins pray judgment against defendant Plant, as set forth below.

25       <u>EIGHTH CAUSE OF ACTION</u>
         <b>(By Flintkote Against Imperial Tobacco For Declaration of Alter Ego Liability)</b>

26       114.    Flintkote re-alleges and incorporates by reference each and all the allegations of

27   paragraphs 1 through 45 and 65 through 67, inclusive.

28       115.    An actual controversy exists between Flintkote and Imperial Tobacco arising from

1  Imasco's domination and control of Flintkote, including Imasco's causing Flintkote to create the

2  subsidiaries, isolate the asbestos liabilities, sell the subsidiaries, and declare and pay the Dividends,

3  and the use of Flintkote by Imasco solely for Imasco's own purposes, as set forth herein.

4      116.   Flintkote contends that Imperial Tobacco is Flintkote's alter ego and is responsible to

5  pay asbestos-related claims asserted against Flintkote, such that if Flintkote is correct, the burden of

6  those claims will be borne in whole or in part by Imperial Tobacco.

7      117.   Flintkote is informed and believes, and upon such information and belief alleges, that

8  Imperial Tobacco disagrees with each of Flintkote's contentions.

9      118.   Flintkote has the right to assert alter ego claims against its former indirect parent

10  Imperial Tobacco.

11      WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth

12  below.

13                    NINTH CAUSE OF ACTION
        (By Flintkote Against Imperial Tobacco For Receiving Illegal Dividends)

14      119.   Flintkote re-alleges and incorporates by reference each and all the allegations of

15  paragraphs 1 through 45, inclusive.

16      120.   The dividends of $170,200,000 in 1986 and $355,000,000 in 1987 were not payable

17  out of Flintkote's net profits for either the year in which the dividend was declared or the preceding

18  fiscal year.

19      121.   The dividends in 1986 and 1987 (collectively, the "Dividends") could be paid only out

20  of surplus defined as the amount in excess of Flintkote's capital by which its assets exceeded its

21  liabilities. Flintkote's asbestos related personal injury and its other liabilities exceeded its assets.

22      122.   Imasco and its lawyers, S&C, caused the directors to declare and pay the dividends

23  when they were not authorized under the dividend statutes.

24      123.   Imasco actively procured and participated in the declarations of the illegal dividends,

25  knew the receipt of the dividends was improper, and reaped the benefits of them.

26      WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth

27  below.

28                    TENTH CAUSE OF ACTION

Snyder
Miller
& Orton
LLP

28

COMPLAINT

**(By Flintkote Asserting the Rights of a Creditor,**
**Against Imperial Tobacco for Recovery of Illegal Dividends)**

124.    Flintkote realleges and incorporates by reference each and all the allegations of the Ninth Cause of Action.

125.    Flintkote is operating its business and conducting its affairs as the debtor and debtor in possession in the Bankruptcy Case.  Flintkote may recover any transfer of money that is voidable under applicable state law by a creditor holding an unsecured claim that is allowable in the Bankruptcy Case.

126.    The transfers of the Dividends, $170,200,000 on or about December 30, 1986, and $355,000,000 on or about August 31, 1987, were transfers of interests of the debtor in property.

127.    At the time of the Dividends, there existed one or more individuals (a) who had suffered from inherently unknowable injuries to a blameless ignorant party as a result of exposure to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, tolling the applicable limitation periods until such time as the claimant was chargeable with knowledge that his condition was attributable to asbestos exposure, (b) who were creditors of Flintkote due to exposure to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, and (c) who hold allowable claims against Flintkote and its bankruptcy estate.

128.    From and after the date of each Dividend, until at least September 29, 2003, Imasco controlled and dominated Flintkote, and did not disclose, and caused Flintkote not to disclose the true nature of Flintkote's financial condition to creditors.  Creditors did not know and could not have known that the transfer of the dividends to Imasco rendered Flintkote insolvent.

129.    The Dividends are invalid and avoidable because the Dividends were paid at a time when Flintkote did not have a surplus of assets over liabilities. Because of Imasco's domination and control of Flintkote and because of the suppression of Flintkote's true financial condition in the public financial reporting Imasco released in Canada, this fact was not known and could not reasonably have been known to creditors of Flintkote, including asbestos disease claimants.  Flintkote may recover the Dividends from Imasco who was the entity for whose benefit such transfers were made.  To the extent the Dividends passed through entities before their delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere conduits and the

Snyder
Miller
& Orton
LLP

29
COMPLAINT

1  transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the Dividends was not for

2  value or in good faith.

3      WHEREFORE, Flintkote prays judgment against Imperial Tobacco as set forth below.

4

5  <u>**ELEVENTH CAUSE OF ACTION**</u>

6  **(By Flintkote Asserting the Rights of a Creditor Against Imperial Tobacco For Recovery of Fraudulent Transfers)**

7      130.    Flintkote realleges and incorporates by reference each and all the allegations of the

8  Ninth and Tenth Causes of Action.

9      131.    At the time of the Dividends, or within the applicable limitation period thereafter,

10  there existed (a) one or more individuals who had asbestos-related personal injury lawsuits on file

11  against Flintkote, and those lawsuits remained on file until May 1, 2004, or (b) one or more

12  individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote

13  products who suffered from inherently unknowable injuries and who was blamelessly ignorant,

14  thereby tolling any applicable limitation periods until such time as the each such individual was

15  chargeable with knowledge that his condition was attributable to asbestos exposure, or (c) one or

16  more individuals who suffered from asbestos-related diseases arising as a result of exposure to

17  Flintkote products who did not know and could not reasonably have been known of Flintkote's true

18  financial condition because of Imasco's domination and control of Flintkote and because of the

19  suppression of Flintkote's true financial condition in the public financial reporting Imasco released in

20  Canada, some or all of which serve to toll the applicable limitations period.

21      132.    The Dividend of $170,200,000 was made without receipt of fair consideration by

22  Flintkote who: (a) was or would be rendered insolvent by the transfer and/or (b) was about to be

23  engaged in a business, paying asbestos claims, for which its property remaining after the Dividend

24  was unreasonably small capital.

25      133.    When the Dividend of $355,000,000 was paid in 1987, it constituted a fraudulent

26  transfer in that Flintkote received no reasonably equivalent value for it and one or more of the

27  following was true: (a) Flintkote was insolvent or became insolvent as a result of the transfer, or (b)

28  Flintkote was engaged in or about to engage in the business of paying asbestos claims for which

Snyder Miller & Orten LLP

30

COMPLAINT

1  Flintkote's assets were unreasonably small in relation to the business, or (c) Flintkote reasonably
2  should have believed that it would incur debts beyond its ability to pay as they became due.

3        134.    The separation of Flintkote's asbestos liabilities from its valuable operating assets as a
4  result of the formation of subsidiary corporations, the sale of those subsidiary corporations; and the
5  transfer of the Dividends to Imasco, constituted an integrated scheme of transfers orchestrated by
6  Imasco with actual intent to hinder, delay or defraud one or more present or future creditors of
7  Flintkote, implicating at least the following badges of fraud:

8        •    The proceeds of the scheme were transferred to an insider;
9        •    The resulting financial condition of Flintkote was concealed;
10       •    The transfers, including the separation of asbestos liabilities from operating assets,
11            occurred because Flitnkote had been sued and threatened with additional suits;
12       •    The transfers, including the separation of asbestos liabilities from operating assets,
13            involved substantially all of Flintkote's assets;
14       •    The consideration ultimately received by Flintkote at the conclusion of the integrated
15            scheme was not reasonably equivalent to the value of the assets transferred;
16       •    Flintkote was insolvent or became insolvent shortly after the transfers comprising the
17            integrated scheme;
18       •    The transfers comprising the integrated scheme were made after substantial contingent
19            and unmatured indebtedness had been incurred, but before such indebtedness had
20            matured.
21

22       135.    Flintkote may recover the Dividends from Imasco who was the entity for whose
23  benefit such transfers were made.  To the extent the Dividends passed through entities before their
24  delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were
25  not mere conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of
26  the Dividends was not for value or in good faith.

27                            **TWELFTH CAUSE OF ACTION**
28                **(By Flintkote Against Imperial Tobacco for Breach of Fiduciary Duty)**

Snyder
Miller
& Orton
LLP

                                        31
                                    COMPLAINT

136.   Flintkote re-alleges and incorporates by reference each and all the allegations of the Ninth, Tenth, and Eleventh Causes of Action.

137.   The directors of Flintkote owed a fiduciary duty to Flintkote and to its creditors because by reason of its asbestos-related liabilities, Flintkote was insolvent or in the vicinity of insolvency.  Flintkote directors were obliged to consider whether, and reasonably should have believed that, Flintkote would incur debts by reason of asbestos liabilities beyond its ability to pay as they became due.

138.   By reason of the foregoing, Imasco prevented the Flintkote directors from complying with their fiduciary duties in declaring the dividends and ordering them paid.

139.   Imasco, now Imperial Tobacco, actively procured and participated in the failure to comply with fiduciary duties and reaped the benefits of them.

WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth below.

## THIRTEENTH CAUSE OF ACTION
### (By Flintkote Against S&C for Breach of Duty and Negligence)

140.   Flintkote realleges and incorporates by reference each and all the allegations of the Ninth through the Twelfth Causes of Action.

141.   S&C as lawyers represented Flintkote in connection with the 1986 and 1987 dividends.  S&C also represented Imasco with respect to the same subject matter.  S&C continued to represent Flintkote with respect to the matters alleged herein until within one year of the filing of the Bankruptcy Case.

142.   The relation between attorney and client is a fiduciary relation of the very highest character.

143.   S&C had a duty without informed written consent of each client not to accept representation of more than one client in a matter in which the interests of the clients potentially conflict and not to accept or continue representation of more than one client in which the interests of the clients actually conflict.  Absent consent of both clients after full disclosure, S&C had a duty not to accept or continue employment of both clients if it would be likely to involve S&C in representing

Snyder
Miller
& Ortor
LLP

32

COMPLAINT

1  differing and adverse interests.

2    144.    S&C breached its duty and accepted and continued representation of Flintkote and
3  Imasco in connection with the Dividends, which was a matter in which the interests of the clients
4  were in stark conflict, adverse, and differing.

5    145.    Flintkote did not give written consent to S&C's conflicting representation of differing
6  interests.

7    146.    S&C had a duty to use reasonable care in advising Flintkote. S&C without reasonable
8  care advised the Flintkote directors that they could go forward with the 1986 dividend. S&C in 1987
9  without reasonable care misrepresented California law to Flintkote as respects rules governing
10 potentially fraudulent transfers. S&C in 1987 also represented, without reasonable care, to the board
11 that the directors could rely upon the RPC report as an appraisal and thus were protected by a
12 principle that directors are entitled to rely on statements in an appraisal by an appraiser selected with
13 reasonable care by the board. But the RPC report was not an appraisal of Flintkote's asbestos-related
14 personal injury liabilities, and RPC was not selected by the board, but rather by Imasco's counsel.

15    147.    The conflicted representation and the misrepresentations by S&C proximately caused
16 the declaration and payment of the dividends.

17    WHEREFORE plaintiff Flintkote prays judgment against S&C as set forth below.

18              **FOURTEENTH CAUSE OF ACTION**
19          **(By Flintkote Against Imperial Tobacco For Constructive Trust)**

20    148.    Flintkote re-alleges and incorporates by reference each and all the allegations of the
   Ninth through the Thirteenth Causes of Action.
21
22    149.    By reason of the foregoing, Imperial Tobacco holds the dividend payments received
23 through the wrongful acts and the complete dominance, control, and authority Imasco held over
24 Flintkote, and by reason of the mistakes engendered by the conflicted representation and negligent
25 advice provided by Imasco's lawyers, shared with Flintkote, as set forth above. Flintkote has the
26 right to those dividends and Imperial Tobacco holds them as a constructive trustee for the benefit of
   Flintkote.
27
              **FIFTEENTH CAUSE OF ACTION**
28          **(By Flintkote Against Imperial Tobacco For Restitution)**

Snyder
Miller
& Orton
LLP

33

COMPLAINT

150.     Flintkote realleges and incorporates by reference each and all the allegations of the Ninth through the Thirteenth Causes of Action.

151.     The declarations of the Dividends were invalid because they were the result of conflicted legal representation and erroneous legal advice given by Imasco's lawyers, shared with Flintkote.

152.     Imasco was the recipient of the Dividends under circumstances where it directly and through its lawyers wrongfully procured payment of the Dividends.

153.     Flintkote is entitled to restitution from Imperial Tobacco of the payments made pursuant to the tainted and invalid declarations of the Dividends.

## SIXTEENTH CAUSE OF ACTION
### (By Flintkote against Imperial Tobacco for Declaratory Relief)

154.     Flintkote re-alleges and incorporates by reference each and all the allegations of the Ninth through the Fifteenth Causes of Action.

155.     An actual controversy exists between Flintkote and Imperial Tobacco arising from the Dividend Repayment Contract of July 27, 1987 ("Dividend Repayment Contract").

156.     Flintkote contends that the dividends were improperly paid within the meaning of the Dividend Repayment Contract because they were paid under one or more of the following circumstances

- as illegal dividends;
- as a fraudulent conveyance or fraudulent transfer under California law;
- in breach of fiduciary duty aided and abetted by Imasco;
- as products of conflicted and tainted legal representation by S&C;
- as products of negligent legal advice by S&C;
- as improper by reason of having been induced by the promise in 1986 by Imasco to repay, and by the Dividend Repayment Contract in 1987;
- as otherwise improper within the meaning of the Dividend Repayment Contract.

157.     Flintkote is informed and believes, and upon such information and belief alleges, that Imperial Tobacco disagrees with each of Flintkote's contentions.

Snyder
Miller
& Orton
LLP

34

COMPLAINT

1    158.    In the event the court finally determines that the 1986 and 1987 dividends were
2    improperly paid, then Imperial Tobacco will be obligated to repay to Flintkote any amounts (up to the
3    full amount of the dividends) that are finally determined by a court of competent jurisdiction to be
4    due to Flintkote creditors but that cannot be satisfied out of assets of Flintkote because of the
5    dividends finally determined to have been improperly paid, upon entry of the judgments described in
6    the DRC.

7    159.    Flintkote seeks a declaration as to the legal rights and duties of the parties as to
8    propriety of the dividends and duties arising from dividends having been improperly paid.

9    WHEREFORE, plaintiff Flintkote prays judgment against Imperial Tobacco as set forth
10    below.

11    <u>PRAYER</u>

12    WHEREFORE, plaintiffs pray judgment:

13    1.    On the First and Second Causes of Action for recovery by plaintiffs Hopkins against
14    defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to
15    proof;

16    2.    On the Third Cause of Action for recovery by plaintiff Marlene Hopkins against
17    defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to
18    proof;

19    3.    On the Fourth, Fifth, and Sixth Causes of Action, for recovery by plaintiffs Hopkins
20    against defendants Plant and Uniroyal of damages according to proof;

21    4.    On the Seventh Cause of Action, for recovery by plaintiffs Hopkins against defendant
22    Plant of damages according to proof;

23    5.    On the Eighth Cause of Action, for an order declaring that Imperial Tobacco is liable
24    as the alter ego of Flintkote with respect to asbestos-related liabilities and is responsible to pay such
25    liabilities;

26    6.    On the Ninth, Tenth, Eleventh, and Twelfth Causes of Action, for recovery by
27    Flintkote from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount
28    as may be proved;

Snyder
Miller
& Ortor
LLP

35
COMPLAINT

1      7.    On the Thirteenth Cause of Action, for recovery by Flintkote from S&C in the amount

2 of $525,200,000 plus interest, or such other amount as may be proved;

3      8.    On the Fourteenth and Fifteenth Causes of Action, for recovery by Flintkote from

4 Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount as may be

5 proved;

6      9.    On the Sixteenth Cause of Action, for an order declaring and determining in favor of

7 Flintkote that the $170,200,000 dividend declared and paid in December 1986 and the $355,000,000

8 dividend declared and paid in July 1987 by Flintkote were improperly paid within the meaning of the

9 Dividend Recovery Contract letter from Imasco dated July 27, 1987, and that upon the occurrence of

10 the remaining determinations described in the Dividend Recovery Contract, that Imperial Tobacco

11 will be obligated to repay to Flintkote the amounts (up to the full amount of the dividends) finally

12 determined to be due to Flintkote creditors but that cannot be satisfied out of the assets of Flintkote

13 because of the payment of the dividends.

14  Date:  **4/5/06**

                                 BRAYTON PURCELL LLP

15

16

                                   By: _____

17 Additional Counsel for Plaintiff The Flintkote            Gilbert L. Purcell

18 Company:                                   Attorneys for Plaintiff Marlene Hopkins,

    Eliot S. Jubelirer (061654)                  Michelle Hopkins, and Michael Hopkins

19 Jean L. Bertrand (083250)

    Morgenstein & Jubelirer

20 One Market, Spear Street Tower

    Thirty-Second Floor                          SNYDER MILLER & ORTON LLP

21 San Francisco, CA 94105

    Telephone (415) 901-8700

22

    Alan Pedlar (State Bar No. 72216)         By: _____

23 The Law Office of Alan Pedlar                      Stephen M. Snyder

    1112 Via Malibu                                 Attorneys for Plaintiff

24 Aptos, CA 95083                                  The Flintkote Company

    Telephone (831) 688-2667

25

    Kelly C. Wooster (State Bar No. 41196)

26 112 Rock Creek Court

    P.O. Box 62

27 Copperopolis, CA 95228

    Telephone: (209) 785-2437

28

               {00007483.DOC; 5.2}         36

                              COMPLAINT

Snyder
Miller
& Orton
LLP

**EXHIBIT A**

Imasco Limited

4 Westmount Square
Montréal, Canada
H3Z 2S8

P.O. Box 6800
Montréal, Canada
H3C 3K4

(514) 937 9111
Cable: (Tellerasco
Telex: 05 24178

July 27, 1987

Directors of
The Flintkote Company

Imasco Limited ("Imasco") hereby undertakes to repay to Flintkote any amounts (up to the full amount of dividends declared during the period in which Imasco has been the indirect owner of Flintkote) that are finally determined by a court of competent jurisdiction to be due to Flintkote creditors, including tort judgment creditors, but that cannot be satisfied out of the assets of Flintkote because of dividends finally determined to have been improperly paid during Imasco's indirect ownership of Flintkote. Repayment will be made after (i) entry of a final, unsatisfied judgment against Flintkote that cannot be satisfied from Flintkote assets, and (ii) entry of a final judgment against either Flintkote, its directors or Imasco on the basis that (a) the dividends in question were improperly paid, and (b) Flintkote would have been able to satisfy, at least in part, the creditor's judgment but for the payment of the improper dividends. For purposes of this undertaking, a judgment that can still be appealed or as to which an appeal is pending is not considered "final."

In the event the issue of the propriety of Flintkote dividends is raised in a suit against Flintkote or its directors, Flintkote and each director named in the suit shall give prompt notice to the General Counsel of Imasco that the issue has been raised and shall permit Imasco an opportunity to control the defense of that issue.

Very truly yours,

Imasco Limited

By: _____

FTKT 017467
CONFIDENTIAL

Exhibit A

**EXHIBIT B**

## EXHIBIT B

Decedent's exposure to asbestos and asbestos-containing products occurred at various locations inside the State of California, including but not limited to:

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Roosevelt High School, 4250 R Tulare St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno High School, 1839 E. Echo St., Fresno, CA | Carpenter | Summer 1950 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 88, 5380 Tulare St., Fresno, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Reedley College, 995 N. Reedley Ave. Reedley, CA | Carpenter | Summer 1951 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Crocket Bros. Dodge Dealership, Tuolumne & Broadway Sts, Fresno, CA | Carpenter | Summer 1957 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | Summer 1958 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Technical School, Tuolumne & Blackstone Sts., Fresno, CA | Carpenter | Summer 1959 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Ann's Beer Mug, 3046 E. Belmont St., Fresno, CA | Carpenter | 1960 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry Plant East St. Fresno, CA | Carpenter (periodically) | 1960-1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Central High School 3535 N. Cornelia St., Fresno, CA | Carpenter | 1961 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Kirk Elementary, 2000 E. Belgravia St., Fresno, CA | Carpenter | 1960 |

Snyder Miller & Orton LLP

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | McKinley Avenue Medical Building, 610 McKinley Ave., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | 7 Retail Stores, names presently unknown, downtown Fresno, between Fulton & Kern Sts., Fresno, CA | Carpenter | 1962 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Scandinavian Middle School, 3232 N. Sierra St., Fresno, CA | Carpenter | 1962; 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Gas & Electric, Main Building, Corcoran, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Laton Elementary School, 6065 East Latonia St., Laton, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Travelers Body & Fender Works, 1861 N. Broadway St., Fresno, CA | Carpenter | 1963 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jane Adams Elementary School, 2117 W. McKinley Ave., Fresno, CA | Carpenter | 1964 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Retail Store Building, Pine & Blackstone Sts., Fresno, CA | Carpenter | 1965 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Dairy Queen, Pinedale, CA | Carpenter | 1966 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snyder
Miller
& Orton
LLP

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sequoia Middle School, 4050 E. Hamilton St., Fresno, CA | Carpenter | 1966 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno, Welfare Dept. Building, 4468 E. Kings Canyon, Fresno, CA | Carpenter | 1967 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | PG&E Building, Fulton and Tuolumne Sts., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg. 633 Pollasky St., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Clovis Fire Station, Administration Bldg., Armstrong and Nees Ave., Clovis, CA | Carpenter | 1968-1969 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | T.G. Schmeiser Co. Building, 3160 E. California St., Fresno, CA | Carpenter | 1968 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Sheriff's Dept. Building, Fresno & M Sts., Fresno, CA | Carpenter | 1969 |
| Larsen Ratto Construction Co 820 E. Gettysburg Fresno, CA | Larsen Ratto Construction Co. Various locations throughout Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell, Main Building, Van Ness & Tuolumne Sts., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Calwa Elementary School, 4303 E. Jensen St., Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, C A | County of Fresno, Hall of Records Building, 2281 Tulare Street, Fresno, CA | Carpenter | 1970 |

Snyder
Miller
& Orton
LLP

3

EXHIBIT B

## EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Swift Poultry, Turkey Processing Plant, California St. Fresno, CA | Carpenter | 1970 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | County of Fresno Building, 2348 Mariposa Street, Fresno, CA | Carpenter | 1971 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Romaine School Administration Building, 1st & Belmont Sts., Fresno, CA | Carpenter | 1971 |
| Conklin Construction Co., Kingsburg, CA | Bear Club Bar & Restaurant, Manning and Lackjack Sts, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Reedley College, 995 N. Reedley Ave, Reedley, CA | Carpenter | 1972 |
| Conklin Construction Co. Kingsburg, CA | Madera Jr. High School, Yosemite Ave., Madera CA | Carpenter | 1972 |
| Conklin Construction Co., Kingsburg, CA | Easton Alcoa Elementary School, 29551 Avenue 12, Madera, CA | Carpenter | 1973 |
| Conklin Construction Co., Kingsburg, CA | Jackson Insurance Co. Building, Kingsburg, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O 5438 Fresno, CA | Braun-Percilis-Wagner Surveyors Building, Blackstone & Princeton Ave., Fresno, CA | Carpenter | 1973 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | C.H. Baker Shoe Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1973-1991 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Riverdale High School, Riverdale, CA | Carpenter | 1974 |

Snyder
Miller
& Orton
LLP

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Northside Professional Building, 1313 E. Herndon St., Fresno, CA | Carpenter (periodically) | 1974–1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | French's Mustard Plant, Muscat & Chestnut Ave., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | California State University, Fresno, 5241 N. Maple St., Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Shaw & Sixth Streets, Fresno, CA | Carpenter | 1975 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Eddie's Pastry Shop, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Perry Boys Smorgy, Manchester Shopping Center, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Jiffy Mart, Elm Avenue between Lincoln & Hopkins Sts., Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Fresno and Fulton Streets, Fresno, CA | Carpenter | 1976 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Equipment Co. Building, 4288 S. Bagly Avenue, Fresno, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Washington Elementary School, 1420 2nd and Bauder Sts., Selma, CA | Carpenter | 1977 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 12, Marks and Acacia Sts., Fresno, CA | Carpenter | 1977 |

Snyder Miller & Orton LLP

5

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | City of Fresno Waste Water Treatment Plant, 5607 W. Jensen St., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Guarantee Savings & Loan Building, Miniwana and Shaw Sts., Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Bo Won Association Building, 9342 F Street, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fresno Air Terminal, Lounge, Kitty Hawk Restaurant, Fresno, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma Police Station, Selma, CA | Carpenter | 1978 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Selma City Hall Building, Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Valley Pipe Supply Co. Building 801 Santa Clara St., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Fire Station No. 7, Cherry Ave., Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Heartland Elementary (aka Jefferson Elementary) Silvia & Thompson Sts., Selma, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Lloyd's Bank, Shaw Avenue, Fresno, CA | Carpenter | 1979 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | American Transfer Co. Bldg., 2810 E. Jensen St., Fresno, CA | Carpenter | 1979 |

Snyder
Miller
& Orton
LLP

6

EXHIBIT B

EXHIBIT B (cont'd.)

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Long's Drug Store, Manchester Shopping Center, Fresno, CA | Carpenter | 1979-1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Container Corporation of America Building, 2525 S. Sunland St., Fresno, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Pacific Bell Building, 334 DeWitt Avenue, Clovis, CA | Carpenter | 1980 |
| Hopkins & Son Construction P.O. 5438 Fresno, CA | Hopkins & Son Construction, Fresno, CA, various locations in and throughout Fresno, CA and northern CA | Carpenter | 1980- 2/2002 |

PARA OCCUPATIONAL EXPOSURE:

Decedent recalled working with his father, William Hopkins, deceased. Decedent worked on the new construction and demolition of various commercial buildings, including but not limited to: firehouses; shopping centers; schools; office buildings; bank buildings; restaurants; and public utility buildings. Decedent's exposure (and secondary exposure from his father's work clothes) to asbestos and asbestos-containing products occurred at various locations inside the State of California, including plaintiffs family residence located at 5774 S. Elm Street, Fresno, California.

Decedent's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the decedent, including, but not limited to breathing difficulties, asbestosis, lung and/or other cancer, mesothelioma, and/or other lung damage. Decedent was diagnosed with mesothelioma on or about February 2002.

Decedent stopped working on February 19, 2002, due to his mesothelioma.

Snyder Miller & Orton LLP

7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**ORDER APPROVING CERTAIN JOINT PROSECUTION
AGREEMENTS AND ANNULLING THE AUTOMATIC STAY IN
CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION**

Upon the motion (the "Motion") of The Flintkote Company and Flintkote Mines Limited (collectively, the "Debtors") for entry of an order (i) approving that certain Joint Prosecution Agreement by and among the Debtors, the ACC and the FCR,[1] (ii) approving that certain Alter Ego Agreement by and among the Debtors and the Asbestos Claimant and (iii) annulling the automatic stay to allow the Dividend Recovery Litigation to proceed in all respects in the Superior Court from the date of its commencement; and the Court having considered the Motion, the Gordon Declaration, and any objections filed in respect of the Motion; and it appearing that due and proper notice of the Motion was given and that no additional notice need be given; and after due deliberation, and good cause having been shown therefor; it is hereby

ORDERED, that the Motion is hereby GRANTED in its entirety; and it is further

ORDERED, that the Joint Prosecution Agreement, in the form attached hereto as Exhibit A, is approved in all respects; and it is further

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Motion.

ORDERED, that the Alter Ego Agreement, in the form attached hereto as <u>Exhibit</u> <u>B</u>, is approved in all respects; and it is further

ORDERED, that the automatic stay is hereby annulled to the extent necessary so as to permit the Dividend Recovery Litigation to proceed in all respects from the date of its commencement, including (i) to allow the Defendants to assert any and all counterclaims, cross-claims, or take other actions, against Flintkote in the Dividend Recovery Litigation, and (ii) to allow the Asbestos Claimant to jointly pursue with Flintkote any and all Alter Ego Remedies that either may have, including as a result of the Alter Ego Agreement, in connection with the Dividend Recovery Litigation in accordance with and subject to the terms of the Alter Ego Agreement; and it is further

ORDERED, that this Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated:_____, 2006


_____
Honorable Judith K. Fitzgerald

-2-

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

## Agreement For Joint Prosecution Of Dividend Recovery Litigation

The Flintkote Company ("Flintkote"), Flintkote Mines Limited ("Mines," together

with Flintkote, the "Debtors"), the Official Committee of Asbestos Personal Injury Claimants

("Asbestos Creditors Committee" or "ACC"), and James J. McMonagle, the Legal

Representative for Future Asbestos Personal Injury Claimants ("Futures Representative" or

"FCR," together with the Debtors and the ACC, the "Parties"), hereby enter into this Agreement

whereby (a) the Debtors agree with the ACC and FCR that they shall all collectively represent

the interests of the Debtors' estates (the "Estates") with respect to any and all claims (including,

without limitation, all theories of alter ego recovery) arising out of or related to certain dividends

received by the former parent of Flintkote (the "Dividend Recovery Litigation"), including in an

action to be filed in the Superior Court of the State Of California, and (b) the Parties agree upon

the terms governing their joint participation rights in respect of the Dividend Recovery

Litigation.

## RECITALS

A.      On May 1, 2004, Flintkote filed a voluntary petition for relief under

chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the District of Delaware (the "Court"). On August 25, 2004, Mines filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On September 9, 2004, the Court entered an order directing the procedural consolidation and joint administration of these chapter 11 cases.

        B.      On May 19, 2004, the Office of the United States Trustee appointed the Asbestos Creditors Committee. Additionally, the Court appointed James J. McMonagle as the Futures Representative in these chapter 11 cases. The ACC and FCR are the only two official creditor constituencies in the Debtors' chapter 11 cases.

        C.      The Parties believe that the Estates have substantial claims against various parties that participated in certain transactions that left Flintkote with insufficient assets to satisfy asbestos-related liabilities. The claims arise from or relate to two dividends, totaling $525 million, that were ultimately received by the former ultimate parent company of Flintkote, Imasco Limited (now known as Imperial Tobacco Canada Limited), in 1986 and 1987. The dividends were paid as part of an orchestrated scheme whereby Imasco acquired Flinktoke's parent company in a hostile takeover, and caused Flintkote to sell off its operating assets and to become, for all practical purposes, an asbestos claims paying facility. Imasco caused Flintkote to pay it $525,000,000 of the proceeds of the sales. The payment took the form of two dividends. The result was that Flintkote, or as it now turns out, Flintkote's asbestos creditors, funded all or a substantial portion of Imasco's hostile acquisition. As part of the transaction, Imasco agreed to repay to Flintkote (up to the full amount of the dividends) amounts due to Flintkote's creditors, including asbestos personal injury claimants that cannot be satisfied out of the assets of Flintkote if a court of competent jurisdiction finally determines that the dividends were improperly paid to

2

Imasco. The Parties intend to jointly prosecute these and other claims arising from or related to the dividends as part of the Dividend Recovery Litigation.

        D.      The Parties will seek a Court order authorizing them to serve jointly as the representatives of the Estates with respect to prosecution of the Dividend Recovery Litigation.

        E.      Because the Parties believe that it is in the best interests of the Estates and the Debtors' creditors to begin to prosecute the Dividend Recovery Litigation as soon as practicable and before confirmation of a plan or plans in these chapter 11 cases, the Parties seek to delineate their joint participation rights in respect of the Dividend Recovery Litigation that will be in effect prior to confirmation of any plan. It is contemplated (i) that, to the extent necessary, the right to control the Dividend Recovery Litigation may ultimately be transferred to an asbestos personal injury trust established pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan or plans of reorganization, and (ii) that the overwhelming majority, if not all, of any net recovery that ultimately results from the Dividend Recovery Litigation will be distributed for the benefit of current and future holders of asbestos personal injury claims against the Debtors pursuant to a confirmed plan of reorganization. For these reasons, the Parties believe that joint representation of the Estates' interests in the Dividend Recovery Litigation is appropriate prior to confirmation of a plan or plans in these chapter 11 cases.

        F.      The interests of the Parties are aligned with respect to prosecution of the Dividend Recovery Litigation. It is essential to the interests of each Party and its counsel that all communications between and among the Parties and the special litigation counsel initially retained by Flintkote (subject to Court approval) to prosecute the Dividend Recovery Litigation ("DRLC"), and all related issues and matters, be shared among the Parties and that the communications remain confidential and protected by attorney-client privilege and as work

3

product. The Parties believe that the sharing of otherwise confidential information between and among themselves and DRLC is essential to the preparation of effective legal positions and the joint prosecution of the Dividend Recovery Litigation. The Parties do not intend to waive any evidentiary privileges as to these communications, but rather intend to share otherwise protected and privileged information without loss of evidentiary privileges or protections including attorney-client privilege and attorney work product. In order to advance the interests of the Parties in consulting with counsel with respect to the Dividend Recovery Litigation, the Parties intend that confidential communications, information and work product will be shared among them and that such shared communications, information and work product will be kept confidential among the Parties and their counsel.

G.    Accordingly, the Parties have entered into this Agreement to (i) evidence the Debtors' consent to the ACC and the FCR jointly representing the Estates' rights in the Dividend Recovery Litigation, (ii) set forth the Parties' joint participation rights in respect of the Dividend Recovery Litigation and (iii) set forth the manner in which confidential information will be shared between and among the Parties and DRLC and applicable privileges maintained.

<u>**AGREEMENT**</u>

1.    The Debtors hereby consent and agree that they, the ACC, and the FCR shall jointly represent the Estates' interests in the Dividend Recovery Litigation.

2.    The ACC and the FCR may, but shall not be required to be, named as plaintiffs in the Dividend Recovery Litigation in their capacity as co-representatives of the Estates' rights, subject to any procedural limitations applicable to party capacity in the Dividend Recovery Litigation; provided, however, that the status of the ACC and the FCR as co-representatives of the Estates' interests or as named plaintiffs in the Dividend Recovery

4

Litigation will not entitle them to employ their own counsel of record in the Dividend Recovery Litigation. The Debtors, the ACC, and the FCR all agree that all claims asserted in the Dividend Recovery Litigation are claims of the Estates, and not of any of them individually or in any capacity other than as a representatives of the Estates. They further agree that DRLC shall at all times represent only the Debtors, unless the Court approves DRLC to also represent the ACC and FCR in their capacity as representatives of the Estates. They further agree that DRLC shall not represent or be deemed to represent the ACC or the FCR in performing any function except as co-representative of the Estates' claims. The ACC and the FCR agree that to the extent DRLC, pursuant to a Court order approving this Agreement, represents them together with the Debtors as co-representatives of the Estates' rights in the Dividend Recovery Litigation, DRLC is not, by virtue of such representation, representing a party having an adverse interest to the ACC or the FCR in connection with these cases.

   3.  Whether or not the ACC and/or the FCR actually are named as Plaintiffs in the Dividend Recovery Litigation, each shall have the right, but not the obligation, to participate in client strategy and settlement decisions. The right of joint participation in respect of the Dividend Recovery Litigation shall include, without limitation, the right to communicate with DRLC, the right to receive full and complete access to all files and communications (whether oral or written) from or received by DRLC, the right to receive full and complete copies of any and all documents that DRLC would or could be required to provide a client under applicable laws and ethical rules or professional canons, and the right to participate equally in all decisions concerning the Dividend Recovery Litigation, including, without limitation, whether to prosecute, dismiss or settle any or all of it. DRLC shall communicate with regard to day-to-day case management matters related to the Dividend Recovery Litigation directly with Dave Gordon

(on behalf of the Debtors), and shall communicate with regard to all material litigation strategy matters and settlement discussions with each of Dave Gordon, a designated representative of the ACC, and James McMonagle (as the FCR), each of whom is duly authorized to act on behalf of their respective constituencies in exercising their joint participation rights regarding the Dividend Recovery Litigation.

4.    All material decisions with respect to litigation strategy involving the Dividend Recovery Litigation (including, without limitation, with respect to any alter ego claim(s) that might be asserted by an individual claimant in connection with or related to the Dividend Recovery Litigation), and the direction to be given to DRLC in respect of such litigation strategy decisions, shall be determined based upon a majority vote of (i) the Debtors (with the Debtors together receiving a single vote), (ii) the ACC, and (iii) the FCR.

5.    If any issues regarding the prosecution of the Dividend Recovery Litigation on behalf of the Estates cannot be resolved pursuant to a majority vote as set forth above in paragraph 4, any Party hereto may bring a motion asking the Court to address and resolve the issue. The Court shall have exclusive, continuing jurisdiction to decide all matters arising under this Agreement.

6.    The Parties have exchanged and will exchange among themselves and with DRLC privileged and work-product information, both orally and in documents, including factual analyses, strategies and mental impressions, investigative reports, and other information ("Joint Materials") for the purpose of advancing the interests of the Parties who have retained and may retain DRLC and assisting DRLC in prosecuting the Dividend Recovery Litigation. It is reasonably necessary to further the interests of each of the Parties and to accomplish the purposes of consulting with and retaining DRLC that such exchange of information take place in

6

a confidential manner. The Parties hereby agree that all Joint Materials which the Parties have exchanged, or will exchange, among themselves and with DRLC are privileged from disclosure to adverse or other third parties as a result of the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections. The Parties hereby agree to preserve to the maximum extent permitted by applicable law the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections which they may have. The Parties have communicated with DRLC, and provided Joint Materials to DRLC, in anticipation of retaining them as lawyers, and they hereby agree that al. such communications, direct or indirect, and Joint Materials are and will be maintained as confidential and protected as work product and not disclosed except as permitted by this Agreement.

7.     The Parties agree they will use Joint Materials solely in connection with the Dividend Recovery Litigation and for no other purpose. If another person or entity requests or demands of a Party hereto, by subpoena or otherwise, to disclose or produce any privileged communications, Joint Materials or other protected information related to the Dividend Recovery Litigation, counsel for the Party subject to such request or demand shall immediately notify the other Parties hereto and DRLC, so that the Parties may seek an appropriate protective order or other remedy to assure that such privileged communications, Joint Materials or other protected information will be accorded confidential treatment.

8.     Any Party may withdraw from participating as a co-representative of the Estates' claims in the Dividend Recovery Litigation at any time and for any reason and without Court approval by providing ten (10) days written notice to the other Parties, but only to the

7

extent that such withdrawal does not impair the right and authority of the other Parties to prosecute the Dividend Recovery Litigation. Under such circumstances, the remaining parties shall serve as co-representatives of the Estates' rights. Any withdrawing Party shall continue to be bound by this Agreement in all respects with regard to the disclosure of any privileged communications, Joint Materials or other protected information received, learned, or obtained at any time in connection with the Dividend Recovery Litigation.

9.      Under no circumstances shall any disagreement among the Parties hereto, or a withdrawal of one or more of the Parties as provided in Paragraph 8 above, form the basis for a request to disqualify DRLC, and the Parties hereto hereby waive all such potential conflicts of interest and agree that DRLC may continue to represent the then-acting representatives of the Estates in the Dividend Recovery Litigation.

10.      The terms of this Agreement may be modified only by (i) the prior written consent of all Parties, (ii) an order of the Court, or (iii) pursuant to a confirmed plan of reorganization.

11.      Following execution of this Agreement by all of the Parties (or their respective counsel on their behalf), the Debtors shall file a motion with the Court seeking an order approving this Agreement in all respects and confirming that the ACC and the FCR have standing to participate as co-representatives of the Estates' interests in the Dividend Recovery Litigation in accordance with the terms hereof.

Dated: 4/3 , 2006                          THE FLINTKOTE COMPANY

                                           By: _____
                                           Name: _DAVID J GORDON_____
                                           Its: _PRESIDENT_____

Dated: 4/3 , 2006                          FLINTKOTE MINES LIMITED

                                           By: _____
                                           Name: _DAVID J GORDON_____
                                           Its: _PRESIDENT_____

Dated: _____, 2006                     OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                           INJURY CLAIMANTS

                                           By:   _____
                                           Name: _____
                                           Its:  _____

Dated: _____, 2006                     LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                           PERSONAL INJURY CLAIMANTS

                                           By:   _____
                                           Name: _____
                                           Its:  _____

LA1 764291v.2

Dated: _____, 2006          THE FLINTKOTE COMPANY


                                By:      _____
                                Name:    _____
                                Its:     _____


Dated: _____, 2006          FLINTKOTE MINES LIMITED


                                By:      _____
                                Name:    _____
                                Its:     _____


Dated: 4/5, 2006                OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                INJURY CLAIMANTS

                                By:      _____
                                Name:    ROALD E. PERUGA
                                Its:     Counsel


Dated: _____, 2006          LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                PERSONAL INJURY CLAIMANTS


                                By:      _____
                                Name:    _____
                                Its:     _____

9

Dated: _____, 2006          THE FLINTKOTE COMPANY

                                 By:   _____
                                 Name: _____
                                 Its:  _____


Dated: _____, 2006          FLINTKOTE MINES LIMITED

                                 By:   _____
                                 Name: _____
                                 Its:  _____


Dated: _____, 2006          OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                 INJURY CLAIMANTS

                                 By:   _____
                                 Name: _____
                                 Its:  _____


Dated: 4/4/, 2006                LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                 PERSONAL INJURY CLAIMANTS

                                 By:   _____
                                 Name: _James J. Mc Monagle_____
                                 Its:  FCR

9

LA1 76409v.2

# EXHIBIT B

# AGREEMENT PROVIDING FOR
# JOINT PURSUIT OF ALTER EGO REMEDIES

This "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") is entered into as of April 4, 2006, by and among The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") (Debtor and Asbestos Claimants are hereinafter referred to collectively as the "Parties" and individually as a "Party"), with reference to the following facts and recitals:

## RECITALS

A.      Debtor is the debtor and debtor in possession in a case being jointly administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 04-11300 (JKF) (the "Bankruptcy Case").

B.      Asbestos Claimants hold asbestos-related claims against Flintkote (the "Claims") and contend that they additionally have remedies against the present or former, non-debtor affiliates of Debtors for the payment of the Claims on alter ego, veil piercing, or similar theories of recovery (collectively, "Alter Ego Remedies").

C.      The Debtor is about to commence litigation (the "Dividend Recovery Litigation") against, among others, one or more former, non-debtor affiliates of the Debtor (an "Affiliate Defendant") and will assert, among other theories of recovery, Alter Ego Remedies against one or more Affiliate Defendants. The Dividend Recovery Litigation seeks to establish, among other things, that the Affiliate Defendants are liable to persons with asbestos-related claims against the Debtor.

D.      As a result of this Agreement, all theories of alter ego recovery to be asserted against Affiliate Defendants, including Imasco Limited, now known as Imperial Tobacco Canada Limited) ("Imasco"), can be brought in the same action by plaintiffs who collectively have standing to assert all such grounds for relief. This will have several benefits to the Debtor's estate (the "Estate") and its creditors, including the following: (1) the arrangement will allow the assertion that Imasco is the alter ego of the Debtor and therefore responsible for the payment of the claims against the Debtor to be determined on its merits, avoiding unnecessary procedural arguments over whether the Alter Ego Remedies are being asserted by the correct party; (2) a successful prosecution of all potential Alter Ego Remedies by either an individual claimant or the Estate should result in a direct benefit to all creditors of the Estate by creating res judicata and collateral estoppel issue preclusion rights with respect to Imasco; (3) by pooling resources, an individual claimant can more feasibly pursue Alter Ego Remedies in conjunction with the Estate's efforts; and (4) by having individual

claimants in the case, the trier of fact will be more able to appreciate fully the nature of the type of claims being asserted against Flintkote and the harm that has been caused by Imasco's dismantling of the Debtor's going concern operations and the upstreaming of Flintkote's assets.

E.     The Parties wish to proceed promptly with the Dividend Recovery Litigation with the Debtor and Asbestos Claimants as parties. Accordingly, the Parties desire to authorize Asbestos Claimants to proceed on the Alter Ego Remedies on the terms and conditions set forth below.

## NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

## AGREEMENT

### A. Terms Of Joint Pursuit of Alter Ego Remedies.

1.     Authorization To Pursue Alter Ego Remedies. Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants shall be transferred and authorized to pursue for their own benefit that portion of the Alter Ego Remedies, if any, held by the Estate against the Affiliate Defendants that relates to Asbestos Claimants' Claim, as limited by the amount of such Claims, and to have authorized Asbestos Claimants to assert such remedy in the Dividend Recovery Litigation. Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly. Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

2.     Contribution To Dividend Recovery Litigation Expenses. Asbestos Claimants recognize that their costs of litigation will be substantially reduced by the efforts of the Debtors in the Dividend Recovery Litigation, and agree to contribute to such litigation costs in the following manner:

a.     Asbestos Claimants shall limit the fees payable to their counsel in pursuing the Alter Ego Remedies to twenty-five percent (25%) of actual recoveries by Asbestos Claimants, either directly or as a result of any distribution on account of an allowed claim against the Estate as a result of the litigation of Asbestos Claimants' Claims against Imasco; and

b.     Asbestos Claimants shall retain all net recoveries as a result of the assertion of their Alter Ego Remedies (after payment of costs) up to $400,000 and shall pay any excess recoveries to the Estate, which excess recoveries shall be held for the benefit of asbestos claimants, and shall be contributed by the Estate to any asbestos trust established pursuant to section 524(g) of the Bankruptcy Code, or

otherwise, for distribution in accordance with the trust distribution procedures governing such asbestos trust as approved by the Bankruptcy Court, including in connection with confirmation of a plan or plans of reorganization for Flintkote and its affiliates.

3.    Settlement Of Alter Ego Remedies.  Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the Official Committee Of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case (the "Committee") and the "Legal Representative For Future Asbestos Claimants" appointed in the Bankruptcy Case (the "Futures Representative"); provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the Committee and the Futures Representative, shall not be unreasonably withheld.  If a dispute arises as to whether such consent by the Asbestos Claimants has been unreasonably withheld, then such dispute shall be submitted to the Bankruptcy Court for determination as a contested matter without the right to a trial by jury.  If an asbestos trust is created pursuant to section 524(g) of the Bankruptcy Code, the trustee or trustees of such trust (the "Asbestos Trust Trustee") may act for the Committee, the Futures Representative, and/or the Debtor under this provision to the extent provided in the confirmed plan or plans of reorganization.

4.    Management Of Alter Ego Litigation.  The special litigation counsel retained on behalf of the Estates to prosecute the Dividend Recovery Litigation ("DRLC"), acting under the direction of Debtor, the Committee and the Futures Representative in accordance with the terms of the Joint Prosecution Agreement, shall manage the litigation (and advance the expenses and costs incurred by Asbestos Claimants in respect thereof, subject to and in accordance with paragraph 2 above) on all Alter Ego Remedies issues common to the Dividend Recovery Litigation and the Alter Ego Remedies being asserted by Asbestos Claimants; provided, however, that Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estate in the Dividend Recovery Litigation to the maximum extent feasible.

5.    Claim Amount.  The Parties agree that any amount determined to be owed to Asbestos Claimants on account of Asbestos Claimant's Claim in the Dividend Recovery Litigation shall be binding on the Debtor and the Estate but will not be enforced against the Debtor or the Estate except in accordance with the terms of a confirmed plan of reorganization in these cases and any § 524(g) trust distribution procedures approved by the Court in connection therewith.  Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' Claims against Imasco as provided in Paragraph A.2.b, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

3

## B. General Provisions

1.   Limitation on Third-Party Beneficiaries. No provision contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, the Committee, the Futures Representative, and the Asbestos Trust Trustee, if any.

2.   Successors and Assigns. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and assigns, including, in the case of Debtor, any trustee appointed under chapters 11 or 7 of the Bankruptcy Code, and the Asbestos Trust Trustee, if any.

3.   No Representations or Warranties. Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

4.   Headings. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

5.   Representation By Counsel. The Parties acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel. This Agreement is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

6.   Due Authorization. Each Party to this Agreement hereby represents and warrants that (i) such Party is duly authorized to enter into this Agreement without the permission of any third party; and (ii) the person purporting to execute this Agreement on behalf of such Party has been duly authorized to execute this Agreement on behalf of and bind such Party; provided, however, that this representation and warranty as against Debtor shall be of no force and effect with respect to matters that require the approval of the Bankruptcy Court in the Bankruptcy Case unless and until such approval is obtained.

7.   Entire Agreement; Amendment; Waiver. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Agreement may not be modified or amended except in writing signed by the Parties hereto, with the consent of the Committee and the Futures Representative. No waiver of any term, provision or condition of this Agreement, in any

4

one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

8.    Effective Date. Except as otherwise provided in this paragraph, this Agreement shall be binding upon Asbestos Claimants upon the execution of the Agreement by all signatories below (including the Committee and the Futures Representative), but it shall only be binding upon Debtor and the Estate upon entry of an order of Bankruptcy Court approving it after notice and an opportunity for a hearing. Absent the approval of this Agreement by the Bankruptcy Court, the parties shall be returned to the status quo ante as if this Agreement had not be executed by the Parties, and Asbestos Claimants shall cease any further prosecution involving the assertion of the Alter Ego Remedies in which the Estate has an interest but for the execution of this Agreement.

9.    Governing Law and Choice of Forum. This Agreement shall be governed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, and by the United States Bankruptcy Code. The Bankruptcy Court shall be the exclusive forum to hear, determine and enter appropriate orders and judgments regarding all disputes in respect of this Agreement.

10.    Counterparts. This Agreement may be executed in two or more counterparts by the Parties, and such counterparts shall be considered as and construed to be part of a single agreement. Signatures transmitted by facsimile shall have the same effect as original signatures.

5

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006

THE FLINTKOTE COMPANY

By: _____
Name: DAVID J GORDON
Its: PRESIDENT

Dated: April 5, 2006

**MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By: _____
David R. Donadio, Brayton Purcell, LLP, authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

6

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006      **THE FLINTKOTE COMPANY**  By:

_____ Name:

_____ Its:


Dated: April 5, 2006      **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**  By:

_____ David R. Donadio, Brayton Purcell,

LLP, authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006      **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**  By:

_____ Name:

_____ Its:


Dated: April 5, 2006      **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**  By:

_____ Name:

_____ Its:

_____

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006          **THE FLINTKOTE COMPANY**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006          **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By: _____
David R. Donadio, Brayton Purcell, LLP, authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006          **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006          **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _John Wynglad_
Name: _JOHN WINSHIP READ_
Its: _AUTHORIZED AGENT AND ATTORNEY for JAMES J. MC MONAGLE_

6

LA1 763587v.2

The foregoing is approved as to form and content:

Dated: April _5_, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____

Name: _____

Its: _____

Dated: April ___, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____

Name: _____

Its: _____

6

LA1 763597v.1

# EXHIBIT B
## [to the Brief in Support]

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY, | ) | Case No. 04-11300 (_____) |
| | ) | |
| Debtor. | ) | |

**AFFIDAVIT OF DAVID J. GORDON
IN SUPPORT OF FIRST DAY MOTIONS**

| | |
|---|---|
| STATE OF CALIFORNIA | ) |
| | ) ss.: |
| COUNTY OF SAN FRANCISCO | ) |

DAVID J. GORDON, being duly sworn, deposes and states:

1.    I am the President and Chief Executive Officer of The Flintkote Company (the "Debtor" or the "Company"). Previously, I served as the Debtor's Vice President and Assistant Secretary (from July 17, 2000 to August 5, 2002) and later as Senior Vice President and Secretary (from August 5, 2003 to December 31, 2003). In addition, I have served as a member of the Board of Directors of the Company since 2001. Based on my various roles with the Company, I am familiar with the Debtor's operations, business affairs and books and records.

2.    I submit this Affidavit in support of the "first day" motions and applications described further below (each, a "First Day Motion" or "Motion" and collectively, the "First Day Motions" or "Motions"). Except as otherwise indicated, all facts and statements set forth herein are based upon my personal experience and knowledge of the Debtor's operations and financial conditions, upon information supplied to me by other members of the Debtor's management, or upon my review of relevant documents. If I were called to testify, I

DOCS_DE:92961.2

could and would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtor.

        3.     Part I of this Affidavit describes the Debtor's business and the developments that led to the filing of this Chapter 11 Case. Part II sets forth the relevant facts in support of certain First Day Motions filed concurrently herewith, which the Debtor seeks to have heard as soon as possible after the commencement of this case. Part III sets forth the remaining First Day Motions filed concurrently herewith, which the Debtor does <u>not</u> seek to have heard at the "first day" hearing, but for which the Debtor will request at the "first day" hearing that the Court schedule a separate hearing to consider such Motions as soon as practicable, so that an official creditors' committee appointed in this case may be heard with respect to such Motions. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the relevant First Day Motions.

I.

<u>Background and Status of Debtor's Case</u>

**B.**    <u>Overview</u>

        4.     The Debtor is currently a defendant in over 155,000 asbestos-related personal injury claims, asserted by plaintiffs seeking damages for personal injuries allegedly caused by exposure to asbestos-containing products manufactured or distributed by the Debtor. As discussed below, the Debtor stopped its manufacturing and distribution operations in the mid-1980's. Since then, the Debtor has focused its business primarily on two areas: (i) managing and resolving its asbestos-related and environmental liabilities and (ii) increasing the value of its assets through realization of insurance coverage through negotiation, litigation and prudent

-2-

investment of financial assets, all with the objective of maximizing assets available to satisfy such liabilities. For the past 17 years, the Debtor has worked diligently to achieve these goals. However, given the dramatic increase of asbestos-related personal injury claims being asserted against the Debtor in recent years, and the impact of those claims on the Debtor's remaining assets, it has become apparent that the Debtor cannot hope to fairly and equitably address both its existing and future asbestos-related liabilities outside of bankruptcy.

    5.    On May 1, 2004 (the "Petition Date"), the Debtor intends to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")(the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

    6.    The Debtor's primary goal in filing this Chapter 11 Case is to confirm a plan of reorganization pursuant to §§ 524(g) and 1129 of the Bankruptcy Code that will create a trust mechanism to address both current and future asbestos-related personal injury claims against the Debtor and provide a means by which to realize upon the value of the Debtor's assets for the benefit of such claimants, so that current asbestos claims and future demands that involve similar claims are treated in a fair and equitable manner.

## C.    Background Concerning the Debtor's Business

    7.    The Debtor, a Delaware corporation, traces its origin to the Flintkote Manufacturing Company ("FMC"), which was founded in 1901. In 1912, the Debtor was incorporated in Massachusetts as a separate company from FMC, and was later incorporated in Delaware following a merger with another entity.

DOCS_DE:92961.2                         -3-

8.      From the time it commenced its independent operations in 1912 until around 1987, the Debtor was primarily engaged in the manufacture, processing and distribution of building materials. The materials were sold throughout the United States. As its mainstay product line, the Debtor manufactured roofing and insulation for use in commercial and residential construction. However, during the 1940's, the Debtor began to manufacture asphalt and plastic flooring materials. The Company later expanded its operations to the processing of limestone, aggregates, redi-mix concrete, cement, pre-fabricated chimneys, wallboard and water pipe. By the beginning of the 1980's, the Debtor's main business activities were grouped into four divisions: Building Products (including roofing and insulation, gypsum, and flooring products), Cement Products, Lime Products and Stone Products. Certain of the products manufactured, processed or distributed by the Debtor contained asbestos.

9.      In the early-1980's, the Debtor stopped manufacturing and selling asbestos containing materials. The Debtor ceased all of its remaining operations by 1987, when it disposed of the Building, Cement, Lime and Stone products divisions to various third parties through the sale or other disposition of its remaining divisions and operations.

10.      Although it ceased its manufacturing, processing and distribution operations, the Debtor has remained active. Since 1987, the Debtor has been engaged in complex claim resolution, litigation and insurance activities related to paying liabilities arising from its prior operations. The Debtor has focused its efforts on managing its asbestos-related liabilities (by way of litigation defense or settlement) and maximizing the value of its assets. This has proven to be a substantial undertaking, particularly given the rapidly escalating volume of asbestos related claims in recent years.

DOCS_DE:92961.2                              -4-

11.    Since 1987, the Debtor has paid in excess of $630 million in the defense and settlement of over 350,000 asbestos-related and environmental claims.  During that same time period, it has generated cash in excess of $670 million, resulting primarily from the collection of insurance receivables, commutations of insurance policies and settlements with insurers, and investment income.  Most recently, for the twelve month period ending March 31, 2004, the Debtor paid approximately $150 million for defense and settlement of asbestos-related claims and generated insurance receipts and investment income of approximately $125 million.

12.    Despite the voluminous and complex nature of its business, the Debtor has effectively and efficiently operated using a handful of employees and outside professionals.  In conjunction with the sale of its manufacturing and distribution operations in 1987, the Debtor decided to employ a small staff and rely upon a team of outside professionals and consultants to assist the Debtor in managing its liabilities (including its asbestos-related liabilities) and its assets.  I believe that this approach has resulted in significant cost savings to the Debtor over time (by, among other things, reducing the Debtor's fixed costs for employee salaries and benefits and permitting the Debtor to retain the most highly qualified employees and professionals) and has avoided the duplication of efforts between the employees and outside professionals.

13.    The Debtor currently employs seven (7) salaried employees, each of whom plays a vital role in processing and resolving asbestos claims, collecting from insurers, realizing maximum insurance coverage and managing the Company's assets and liabilities.  The Debtor also utilizes several outside professionals and consultants (each of whom has a long-standing relationship with the Company) to assist it in defending against the myriad of asbestos

claims and related lawsuits filed against it and litigating and negotiating with insurers. Among these professionals is the law firm of Frantz Ward LLP ("Frantz Ward"), which serves as the Debtor's primary outside counsel in connection with all asbestos personal injury litigation against the Debtor, and Nossaman Guthner Knox & Elliott LLP ("Nossaman Guthner"), which represents the Debtor in connection with the Pru-Re Litigation (as defined below) involving a material insurance coverage and collection dispute. The Debtor has filed separate applications to retain each of Frantz Ward and Nossaman Guthner as special counsel to the Debtor, as more particularly described below. These employees and professionals are critical to the Debtor's ability to confirm a plan of reorganization under §§ 524(g) and 1129 of the Bankruptcy Code and maximize the value of its assets during this Chapter 11 Case.

**D.     Description of Debtor's Financial Structure and Assets**

14.     As of March 31, 2004, the Debtor's financial statements report assets of approximately $160 million and liabilities of approximately $70 million (which does not reflect contingent asbestos liability). The financial statements do not reflect the remaining aggregate policy limits available to pay asbestos-related personal injury claims, which total several hundred million dollars (which includes approximately $95 million arising from a settlement with an insurer which currently is held in trust). The liabilities set forth on the financial statement relate primarily to settlement installments payable and provisions for minimum asbestos claims costs. The Debtor is not a party to any secured financing arrangements, and it does not presently intend to secure debtor-in-possession financing in this Chapter 11 Case.

15.     The Debtor is the wholly-owned subsidiary of The Flintkote Trust (the "Trust"), which holds all of the stock of the Debtor in trust for the sole benefit of Long Beach

Memorial Medical Center.  The Trust was established by the Debtor's former parent company,

Genstar Pacific Company, on September 29, 2003.   I am the sole trustee of the Trust.

      16.     The Debtor's assets consist primarily of insurance assets, investments and

cash on hand, stock in its wholly-owned Canadian subsidiary, Flintkote Mines Limited, and

potential causes of action against third parties.  The Debtor is the named insured under various

policies covering all manner of liabilities, including, without limitation, liability for asbestos-

related personal injury.  Although the Debtor estimates that the remaining aggregate policy limits

available to pay asbestos-related personal injury claims total several hundred million dollars, the

Debtor's ability to realize upon the full value of such policies is subject to any number of factors,

including, without limitation, the solvency of the insurers and the outcome of coverage disputes.

Certain of the Debtor's insurers are subject to insolvency proceedings.  The Debtor is actively

pursuing claims against such insurers.  Additionally, the Debtor is pressing what it believes are

highly meritorious claims for substantial insurance coverage and collections against certain

insurers including MMIC Litigation, which is described below.

      17.     As further described below, the Debtor has approximately $43 million in

cash and marketable securities as of the Petition Date, which are maintained, in part, in a general

operating account with Wachovia Bank, National Association ("Wachovia") and a payroll

account at Wells Fargo Bank, N.A. and is otherwise invested in overnight and short-term

commercial paper managed by Wachovia and certain medium-term investment  portfolios

managed by Credit Suisse First Boston and Alliance Bernstein.

      18.     Additionally, the Debtor owns all of the stock of Flintkote Mines Limited.

Flintkote Mines Limited is a Canadian corporation located in Montreal, Quebec, Canada.  It has

no operations but does manage assets consisting of various investments totaling approximately US $5 million (CAD $7 million). Asbestos personal injury claims have been asserted against Flintkote Mines Limited.

### E.    Description of Debtor's Liabilities

19.    The Debtor's most significant liability is the numerous current claims, and projected future demands, of plaintiffs seeking damages for asbestos-related personal injury. The Debtor's other pre-petition liabilities are relatively small in amount. As of the Petition Date, the Debtor was current on its trade payables to vendors and the rent due to its landlord under its lease of office space in San Francisco. I believe that the aggregate amount of accrued trade payables as of the Petition Date is less than $75,000.

20.    The Debtor has been named on occasion as a defendant in certain actions filed by plaintiffs seeking damages for asbestos-related property damage and environmental liability purportedly caused by the Debtor's products or prior operations. As of May 1, 2004, however, there exist only three (3) asbestos-property damage lawsuits and two (2) environmental actions pending against the Debtor. Some of these actions have been pending for years, and all are in various stages of litigation. I believe there is adequate insurance for the disposition of known environmental and asbestos property damage claims.

### F.    Events Precipitating This Chapter 11 Filing

21.    The Debtor has been forced to file for chapter 11 protection because of a growing number of asbestos-related lawsuits wherein the plaintiffs claim to have suffered personal injury due to asbestos-containing products manufactured, processed or sold by the Debtor. The first wave of asbestos-related lawsuits hit the Debtor in the mid-1970's. Since that

time, the number of claims (and the incremental cost to resolve such claims through settlement or litigation) has increased dramatically, with particularly large increases in the last five years. For example, in 1999, approximately 25,000 new claims were asserted against the Debtor. For the year ended December 31, 2003, approximately 44,000 new claims were asserted against the Debtor, representing an increase in claims of 76 % over 1999. In 1999, the Debtor paid approximately $57 million in asbestos personal injury claims and related defense costs. In 2003, the Debtor paid more than $127 million in claims and defense costs.

22.    The increase of litigation has been due to a number of factors, including the filing of chapter 11 petitions by numerous other parties alleged to be potentially responsible for the injuries suffered by asbestos plaintiffs. Many of these debtor parties are co-defendants with the Debtor in numerous lawsuits. The resulting stay of litigation against such parties has placed increased financial pressure on the Debtor, in the form of higher settlement demands from plaintiffs.

23.    The cost to defend against this litigation is overwhelming. For the twelve month period ending March 31, 2004, the Debtor spent approximately $12.5 million per month, on average, on primarily asbestos personal injury settlements and defense costs. Recently, recoveries from insurers have failed to keep up with such costs. The magnitude of this litigation has left the Debtor with no realistic alternative but to seek protection under chapter 11 of the Bankruptcy Code.

## II.

### First Day Motions and Applications

24.    I believe that a critical and necessary element of the Debtor's efforts at

reorganization is the approval of the First Day Motions submitted concurrently herewith. The

factual background and support for each of these first day pleadings is provided below.

### Case Administration

**A.    Motion Of The Debtor For An Order
       Approving Litigation Claimant Notice Procedures**

25.    By this motion, the Debtor seeks approval of a procedure for sending all

notices, mailings and other communications related to this Chapter 11 Case to tens of thousands

of asbestos-related personal injury claims ("Asbestos PI Claims") in care of their counsel of

record at such counsel's address.

26.    To date, approximately 155,000 Asbestos PI Claims are pending against

the Debtor. Such Claims have historically been processed by the Debtor's outside litigation

counsel, the law firm of Frantz Ward, which maintains an extensive claims litigation database

containing the names and addresses of the respective counsel for the Asbestos PI Claimants,

rather than the names and addresses of each Asbestos PI Claimant. As a result, the Debtor has

information only with respect to the counsel of record of each Asbestos PI Claimant. To date, all

communication regarding the asbestos claims and the various pending lawsuits has been through

and with such counsel of record. It would be a costly and a time-consuming exercise to attempt

to ascertain the addresses of the Asbestos PI Claimants. Nor is it clear that the Debtor or Frantz

Ward, in searching their respective files, would be able to identify current addresses for each of

the Asbestos PI Claimants. To provide notice to each Asbestos PI Claimant (as opposed to their counsel) could result in mass confusion on the part of such claimants, because the Debtor has never communicated directly with them in the past.

27. The Debtor asks this Court to approve a procedure for sending all notices, mailings and other communications related to this Chapter 11 Case to the Asbestos PI Claimants in care of their counsel of record at such counsel's address (the "Litigation Claimant Notice Procedures"). The Litigation Claimant Notice Procedures will ease the Debtor's administrative burden of sending notices to the more than 155,000 Asbestos PI Claimants, thereby resulting in a more cost-efficient notice procedure and a direct benefit to the Debtor, its estate and creditors.

**B.     Application Of Debtor For An Order Under**
**28 U.S.C. § 156(C) Appointing Garden City Group, Inc.**
**As Notice, Claims and Balloting Agent For The Court**

28. By this Application, the Debtor seeks to retain Garden City Group, Inc. ("GCG") as its notice, claims and balloting agent in this Chapter 11 Case. I have reviewed and been involved in the negotiation of the terms of GCG's engagement. A true and complete copy of the fully-executed engagement letter with GCG is attached as Exhibit B to the Application. I am advised that GCG is one of the country's leading noticing agents, with substantial expertise in the matters upon which it is to be engaged. I believe that the Debtor, its estate and creditors would benefit greatly from the services of GCG, given the large number of claims in this case.

**Business Operations**

C.    **Motion Of Debtor For An Order Authorizing
      Debtor To Pay Pre-Petition Salaries And Employee Benefits**

        29.    Each of the Debtor's seven (7) salaried employees (collectively, the "Employees") plays a vital role in processing asbestos claims, collecting from insurers, and managing the Company's assets.  These Employees perform a myriad of tasks in an economical and efficient manner, including, among others: managing the Debtor's financial investment portfolio; performing a variety of accounting functions (such as  processing transactions, maintaining records, preparing financial statements, reports, forecasts and financial plans); reporting on and analyzing specialized insurance coverage projects; providing litigation support (including document review and production); and performing the Debtor's corporate and administrative functions.  In addition, members of the Senior Management, in particular, play a key role in negotiating with the Debtor's various insurers over coverage issues and pursuing coverage disputes (such as in the Pru-Re Litigation, described herein).  The long-term, institutional knowledge and company specific skills of the Employees with respect to these and other tasks is critical to the Debtor's ability to successfully navigate this Chapter 11 Case.

        30.    By this motion, the Debtor seeks an order authorizing, but not requiring, the Debtor to pay and honor its pre-petition obligations with respect to the Employee Salaries, Reimbursable Business Expenses and the Employee Benefit Programs (together, the "Employee Salaries and Benefits").  I believe that it is essential for the Debtor to honor and pay any pre-petition Employee Salaries and Benefits in the ordinary course of business, in order to maintain Employee morale and each Employee's continued dedication to the significant task at hand and

-12-

to avoid the disruption of service. Without these Employees, I believe the Debtor cannot successfully accomplish its goal of maximizing the value of its assets for the benefit of its creditors and confirming a plan of reorganization in this Chapter 11 Case.

        (i)     Employee Salaries and Reimbursable Business Expenses

        31.     The Employees are paid twice a month from the Debtor's payroll account (the "Payroll Account") at Wells Fargo Bank ("Wells Fargo"). The total semi-monthly payroll is approximately $40,000. Prior to the Petition Date, the Employees were paid their respective salaries earned through April 30, 2004 through direct deposit. Given that the bankruptcy petition was filed the very next day, I do not believe that the Debtor owes any pre-petition Employee Salaries.

        32.     Furthermore, some of the Employees incur travel and transportation expenses which are reimbursable per Company policy (the "Reimbursable Business Expenses"). These Reimbursable Business Expenses typically are paid by the Debtor on a rolling basis as processed. As of the Petition Date, I believe that less than $10,000 was owed on account of Reimbursable Business Expenses.

        (ii)     Payroll Tax Withholdings

        33.     In the ordinary course of its business, the Debtor instructs Wells Fargo, as the administrator of the Payroll Account, to withhold and remit certain payroll taxes (such as income, FICA and Medicare taxes) from the Employees' paychecks to the appropriate taxing authorities.

(iii)    Vacation, Sick Leave and Other Paid Time Off

34.    The Debtor provides its Employees with benefits under various Employee Benefit Programs. Among other benefits, the Employees accrue paid vacation leave on a semi-monthly basis and are permitted to take paid vacation each year. The Employees must use all of their accrued vacation in the year in which it accrues, or lose it. Thus, the Employees may have accrued vacation from January 1, 2004 through the Petition Date. In addition to vacation, the Employees are entitled to certain holiday pay, sick leave pay for six (6) days per year, and one (1) floating holiday/personal day.

(iv)    Retirement Benefit Plans

35.    Depending upon their respective salary structure, certain Employees are eligible to participate in either (i) a 401(k) profit sharing plan (the "401(k) Plan") or (ii) an alternative retirement program (the "Alternative Program," together with the 401(k) Plan, the "Retirement Benefit Plans"). I do not believe that the Debtor owes any contributions or amounts under the Retirement Benefit Plans as of the Petition Date.

(v)    Workers' Compensation

36.    The Debtor maintains a workers' compensation policy to cover Employees' injury claims arising from or relating to their respective employment with the Debtor. The policy coverage is not subject to a per occurrence deductible. The Debtor is not aware of any outstanding claims under the workers' compensation policy as of the Petition Date.

(vi)    Medical and Insurance Benefits

37.    The Debtor offers to its Employees various medical, life, accidental death and dismemberment, and long-term disability insurance coverage (the "Group Plan"). The

Debtor pays all premiums for the Group Plan in advance, on a quarterly basis.  Additionally, the
Debtor also pays the premiums on separate medical and life coverage for certain Employees not
otherwise eligible for the Group Plan.  I believe that all pre-petition premiums due under these
Plans were paid as of the Petition Date.

**D.    Motion Of Debtor For An Order (A) Authorizing Use Of
Pre-Petition Accounts and Cash Management System and
(B) Waiving Requirements of 11 U.S.C. § 345 On An Interim and Final Basis**

38.    By this motion, the Debtor seeks (i) authority to maintain and use its Pre-
Petition Account and existing Cash Management System and (ii) a waiver of the investment and
deposit guidelines set forth in § 345(b) of the Bankruptcy Code on an interim and final basis.
For the reasons described below, I believe that granting the relief requested in the motion is in
the best interest of the Debtor, its estate and creditors.

(i)    Description of the Cash Management System

39.    The Cash Management System (or the "System") provides the Debtor with
the ability to control receipts and disbursements to ensure maximum availability of funds, to
reduce the costs and administrative expenses inherent in moving and tracking such funds and to
earn income on funds not immediately necessary to meet the Debtor's obligations.  The Debtor is
accustomed to using the Cash Management System on a daily basis.  Continuing the Cash
Management System will ease the administrative burdens imposed on the Debtor and will result
in greater efficiency for the benefit of the estate.

40.    The System consists of two bank accounts: an operating account at
Wachovia Bank (the "Operating Account") and the Payroll Account at Wells Fargo (collectively,
the "Pre-Petition Accounts" or "Accounts").  These Accounts are integrally tied to the Debtor's

DOCS_DE:92961.2                              -15-

investment practices, which consists primarily of three separate investment portfolios (the "Investment Portfolios").

41.    Any funds received by the Debtor, including funds received from insurers, are deposited into the operating account at Wachovia Bank . The deposited funds are used (i) to pay the Debtor's current operating expenses, as well other liabilities of the Debtor, such as payroll and professional fees and (ii) to make investment purchases, as described below.  Prior to the Petition Date, the Debtor also paid asbestos-related settlements from funds held in the Operating Account.

42.    Once a month, the Debtor transfers funds from the Operating Account to the Payroll Account in an amount sufficient to fund approximately three pay periods. Disbursements from the Payroll Account are made by direct deposit into each Employee's bank account.  Wells Fargo automatically withholds taxes and Employee-specified 401(k) contributions, as well as any other amounts as directed by the Employees or the Debtor.  Wells Fargo remits such withheld funds to the appropriate taxing authorities and forwards Employee contributions along with the Debtor's matching contribution to its 401(k) manager, Fidelity Investments.

43.    The Debtor proposes to keep in place all Pre-Petition Accounts, which would remain open, but would be designated as "Debtor-in-Possession" accounts.  The Debtor will work closely with Wachovia and Wells Fargo to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court.  Going forward, the Debtor will maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be

documented in its books and records to the same extent such information was maintained by the Debtor prior to the Petition Date. Finally, to minimize expenses, the Debtor requests that it be authorized to continue to use all remaining checks and other business forms without reference to the Debtor's status as debtor in possession, until the same are exhausted.

      (ii)     Description of Investment Practices

      44.     In addition to maintaining the Cash Management System, I believe that it is in the best interest of the Debtor's estate and creditors that the Court waive the strictures of § 345(b) of the Bankruptcy Code. The Debtor maintains predictable investments with financial institutions with Moody's Rating of "A1" or better and employs a careful strategy for investing its assets. True and complete copies of the investment guidelines for each of the CSAM Portfolio and the Alliance Bernstein Portfolio (as such terms are defined below) are attached as Exhibit B and Exhibit C, respectively, to the motion. This investment program has yielded significant returns for the Debtor to date. The Debtor does not believe that liquidating its investments in order to comply with § 345(b) of the Bankruptcy Code will provide more certainty or a greater return on its investment. The Debtor therefore requests that the Court waive the requirement of § 345(b).

      45.     At the end of each business day, Wachovia, by and through Wachovia Capital Management ("WCM"), automatically invests funds from the Operating Account in excess of $70,000, in Wachovia commercial paper that matures the following business day (the "Sweep Investment"). As of the Petition Date, approximately $7 million of operating funds were invested in the Sweep Investment. To the extent that funds in the Sweep Investment exceed anticipated near term cash requirements, the Debtor invests such funds in the Short-Term

-17-

Investment Portfolio managed by WCM, which has authority to invest in commercial paper, bankers' acceptances and certificates of deposit with terms up to 180 days.

46.     Based on its liquidity needs, the Debtor also allocates certain funds in the Operating Account to the Investment Portfolios managed by Credit Suisse Asset Management ("CSAM") and Alliance Bernstein. As of the Petition Date, the CSAM Portfolio contained securities with a market value of approximately $27 million, and the Alliance Bernstein Portfolio contained securities with a market value of approximately $9 million. The investment guidelines followed by each of CSAM and Alliance Bernstein are described in detail in the cash management motion. Both of the Debtor's investment portfolios have overall investment grade credit ratings. I believe that WCM, CSAM and Alliance Bernstein and are well-regarded investing institutions that will continue to maintain prudent investment decisions throughout this Chapter 11 Case.

III.

**Other First Day Motions**

47.     Described below are the remaining First Day Motions filed concurrently herewith. The Debtor does <u>not</u> seek to have these remaining First Day Motions heard at the "first day" hearing. Rather, the Debtor will request at the "first day" hearing that the Court schedule a separate hearing to consider such Motions as soon as practicable, so that the official creditors' committee appointed in this case may be heard with respect to such Motions.

<u>Employee Retention and Severance</u>

A.    Debtor's Motion For Order Pursuant To 11 U.S.C. §§ 363 And 365(a)
      Authorizing (1) Implementation Of Retention And Severance Program;
      (2) Assumption Of Employment Agreements With Senior Management;
      <u>And (3) Assumption Of Indemnification Agreement With Outside Director</u>

        48.    The Debtor seeks authority of this Court to implement a Retention and Severance Program for its Employees and to assume the pre-petition Employment Agreements between the Debtor and its senior management and the pre-petition Indemnification Agreement with Jack West (the only non-employee member of the Debtor's Board of Directors).

     (i)    <u>Implementation of the Retention and Severance Program</u>

        49.    For the past 17 years, the Debtor and its Employees have focused their efforts primarily on managing and resolving the Company's considerable asbestos-related liabilities and increasing the value of its assets. The Employees understand that the Debtor intends to confirm a plan of reorganization pursuant to §§ 524(g) and 1129 of the Bankruptcy Code that will create a trust mechanism to process and pay asbestos-related personal injury claims and provide a means to realize upon the value of the Debtor's assets. Although it is possible that the Trust may want the Debtor and its existing Employees to assist in its administration of the Trust assets and asbestos claims, the Employees are aware that they may lose their jobs after the plan is confirmed and the trust is established. The Retention and Severance Program outlined in the motion is intended to provide some measure of security and certainty to these Employees so that they will continue to provide their services to the Debtor during this Chapter 11 Case. I believe that the Retention and Severance Program will accomplish that goal and thereby will benefit the Debtor and its estate and creditors.

DOCS_DE:92961.2

-19-

50.    The bankruptcy filing has created concerns among the Debtor's Employees regarding their future employment prospects. The Employees (including the members of Senior Management) are foregoing other employment opportunities by continuing to work for the Debtor. Also, many, if not all, of the Employees have undertaken significant additional duties in order to comply with the operating guidelines and disclosure requirements of the Bankruptcy Code and Rules.

51.    Historically, the Debtor has paid annual bonuses to its employees, with the amount of such bonuses fixed by the Board of Directors in its discretion. For example, in years past, the Board has tied the bonuses to the Debtor's performance in reducing payments to claimants or increasing its asset base through investment management, commutations of policies and settlements with insurers. However, because of the nature of the Debtor's operations post-petition, it is difficult to base the amount of such bonuses on any meaningful and objective financial targets. As a part of its bankruptcy, I believe that it is appropriate for the Debtor to discontinue its practice of paying "discretionary" bonuses at year end and instead implement a retention program aimed at encouraging the Employees to stay through the effective date of a plan of reorganization.

52.    In addition to the annual bonus, the Debtor offered a modified severance policy to its Employees prior to the Petition Date. The Debtor wishes to continue to offer this reduced severance to its Employees in the amount set forth in the motion. Historically, the amount of the pre-petition severance varied for each Employee, but it was primarily based upon the Employee's position within the Company and/or years of service. In contemplation of this Chapter 11 Case, the Debtor has reduced the amount of the severance being offered to each

Employee from the historical levels and built that reduction into the proposed retention payments for each Employee. I believe that the proposed retention payments, together with a reduced post-petition severance, will more effectively encourage the Employees to stay with the Company through this Chapter 11 Case, than would the prospect of a larger, one-time severance payment. Although the Employees understand that the proposed Retention and Severance Program is subject to Court approval, I believe that this program already has enhanced Employee morale and staved off, at least temporarily, the Employees from pursuing other job opportunities. I am concerned that the Employees will seek other jobs if the proposed Retention and Severance Program is not approved.

53.    With respect to the Senior Management, the proposed retention payments and severance (as set forth in the motion) is the product of arms' length negotiation between the Debtor and each member of the Senior Management. Eric Bower has signed an affidavit, which is filed concurrently herewith, stating that my proposed retention payments and severance is the product of arms' length negotiation between the Debtor and me. For the other Employees, the Debtor fixed the proposed retention and severance payments based upon their years of service and position within the Company.

54.    Based upon my review of the analysis performed by AON Corporation with respect to the proposed compensation (including retention and severance) for the Senior Management, and my personal business experience, I believe the terms of the proposed Retention and Severance Program are comparable to the incentive programs offered by comparable insurance companies and claim paying organizations.

(ii)    Assumption of Employment Agreements and Indemnification Agreement

55.    The Debtor also seeks to assume the pre-petition Employment Agreements between the Debtor and its Senior Management and the Indemnification Agreement with Director Jack West. These Agreements are the product of arms' length negotiation between the Debtor and each member of the Senior Management. The Board of Directors has reviewed and approved the terms and conditions of the Employment Agreements pursuant to a vote of the applicable disinterested Directors. The Board of Directors also has reviewed and approved the terms of the Indemnification Agreement. A true and complete copy of each Employment Agreement and the Indemnification Agreement is attached as Exhibits D through G, respectively, to the motion.

56.    I believe that the terms of each of the Employment Agreements and the Indemnification Agreement are fair and reasonable and will benefit the Debtor and its estate by allowing the Debtor to retain its Senior Management and maintain the current composition of its Board of Directors. Under the terms of the Employment Agreements and the Indemnification Agreement, the Debtor has agreed to indemnify its Senior Management and Directors, as applicable, for their post-petition conduct.

### Professional Retention and Compensation

**A.    Motion Of Debtor For An Order Authorizing
The Appointment Of A Futures Representative**

57.    The Debtor seeks authority to appoint a Futures Representative to represent the interests of Future Claimants in this Chapter 11 Case. As part of this Chapter 11 Case, the Debtor hopes to confirm a plan of reorganization establishing a trust under § 524(g) of

the Bankruptcy Code, in order to deal with its current and future asbestos liability. Although the Debtor expects to negotiate the terms of such plan with the major constituencies in this case, including any official committee of creditors, the Debtor proposes that the interest of future asbestos claimants (who do not presently have claims pending) be represented by a Futures Representative.

58.    One of the key elements of any plan of reorganization proposed by the Debtor in this case will be a establishing a trust pursuant to which all current and future asbestos-related claims involving the Debtor will be channeled for liquidation and payment. Statistically speaking, I believe that future claims represent a greater portion of the Debtor's ultimate asbestos liability than do current claims. In order to best protect the interests of Future Claimants with respect to their asbestos-related Demands, a Futures Representative should be appointed.

59.    I believe that appointing a Futures Representative at the outset of this Chapter 11 Case will facilitate the negotiations between the various constituencies over the terms of a plan of reorganization and result in a more efficient process. The Debtor has considered the qualifications of various candidates, and has decided to recommend Lawrence Fitzpatrick to the Court as the most qualified candidate for Futures Representative. The Debtor has agreed to provide Lawrence Fitzpatrick with the Futures Representative's Liability Insurance to provide him with insurance coverage effective as of the date of his appointment as the Futures Representative. The Debtor has been advised by counsel to Lawrence Fitzpatrick that the Futures Representative's Liability Insurance has an annual premium of approximately $25,000,

which amount the Debtor has agreed to pay. I believe that appointing Lawrence Fitzpatrick as

the Futures Representative is in the best interest of the Debtor, its estate and creditors.

**B.      Application Of Debtor For An Order Authorizing
         The Retention Of Sidley Austin Brown & Wood LLP
         As Attorneys For The Debtor And Debtor In Possession**

        60.      This Chapter 11 Case will be complex, particularly given the nature and

extent of the Debtor's asbestos-related liabilities and its insurance assets. The Debtor has chosen

Sidley Austin Brown & Wood LLP ("Sidley") as its bankruptcy counsel for this case because of

Sidley's extensive experience and knowledge in business reorganizations, in general, and in mass

tort and asbestos-related bankruptcies, in particular.

        61.      The partners and associates of Sidley who will advise the Debtor in this

case have wide-ranging experience in insolvency and bankruptcy law, as well as in litigation and

corporate law. I understand that Sidley serves as counsel to other companies in complex chapter

11 cases and, in those representations, the firm has advised those companies on many of the

same or similar issues confronting the Debtor in this case. For all of the foregoing reasons, I

believe that Sidley is well-qualified to represent the Debtor as debtor in possession in this

Chapter 11 Case.

**C.      Application Of Debtor For An Order Authorizing The Retention And
         Employment Of Pachulski Stang Ziehl Young Jones & Weintraub, P.C.
         As Attorneys For The Debtor And Debtor In Possession**

        62.      The Debtor seeks to retain the firm of Pachulski Stang Ziehl Young Jones

& Weintraub, P.C. ("Pachulski Stang") as Delaware bankruptcy co-counsel to the Debtor.

Pachulski Stang will serve primarily as local counsel, but it has the capability to provide full

representation to the Debtor, as may be required from time to time in the event of potential

conflicts. Given its proximity to the Court, Pachulski Stang will be able to respond quickly to

emergency hearings and other emergency matters in this Court.

63.    I believe that Pachulski Stang's appearance before this Court for the

miscellaneous applications, motions and matters in this Chapter 11 Case will be efficient and

cost-effective for the Debtor's estate. Sidley and Pachulski Stang will endeavor to avoid

duplication of efforts. In preparing for this case, Pachulski Stang has become familiar with the

Debtor's business and with many of the potential legal issues that may arise in the context of this

Chapter 11 Case. Accordingly, I believe that Pachulski Stang is both well-qualified and able to

represent the Debtor in its Chapter 11 Case.

D.    **Application Of Debtor For An Order Authorizing
      The Debtor To Employ Frantz Ward As Special Asbestos
      Litigation Counsel Pursuant To 11 U.S.C. § 327(e)**

64.    The Debtor requests authority to employ and retain Frantz Ward as special

asbestos litigation counsel to the Debtor. The Debtor seeks to retain Frantz Ward as its special

counsel because of the long-standing familiarity of Barbara Arison and Patrick Haggerty, both

Frantz Ward partners, with the business and asbestos-related liabilities of the Debtor, as well as

Frantz Ward's extensive experience in the field of asbestos litigation defense.

65.    I believe that Ms. Arison and her colleagues are intimately familiar with

the Debtor's business affairs, including its alleged asbestos-related personal injury liabilities.

Moreover, Frantz Ward maintains an extensive database of all asbestos-related personal injury

claims that have been asserted against the Debtor (including pending and settled claims). I

believe that Ms. Arison's knowledge of these liabilities and this database is critical to the Debtor

being able to determine the extent of its current and future asbestos liability. For these reasons, I

DOCS_DE:92961.2                        -25-

believe that it is necessary and in the best interests of its estate and creditors to employ and retain

Frantz Ward as its special asbestos litigation counsel in connection with this Chapter 11 Case.

**E.    Application Of Debtor For An Order
Authorizing The Debtor To Employ Nossaman
Guthner Knox & Elliott LLP As Special Insurance Counsel
In Matters Related To Pru-Re Pursuant To 11 U.S.C. § 327(e)**

66.    The Debtor seeks to employ and retain Nossaman Guthner as its special

insurance counsel in matters related to the Pru-Re Litigation.  Nossaman represents the Debtor

with respect to its claims for substantial insurance coverage under several primary policies

written by Everest Reinsurance Company, formerly known as Prudential Reinsurance Company,

and Mt. McKinley Insurance Company, formerly known as Gibralter Casualty Company,

(collectively referred to as, "MMIC") and issued to the Debtor at various times from 1975

through 1980.  MMIC currently owes the Debtor in excess of $25 million for unpaid insurance

claims, which MMIC disputes.  In May 2002, MMIC filed an action for declaratory relief in San

Francisco Superior Court and the Debtor answered and counter-claimed (the "Pru-Re

Litigation").  Extensive discovery has occurred and several court days of the first phase of the

trial have been completed.  The potential recovery from the Pru-Re Litigation represents a

significant asset of the Debtor's estate.

67.    I believe that Nossaman's continued representation of the Debtor in

connection with the Pru-Re Litigation and will provide a substantial benefit to the Debtor, its

estate and creditors.  Nossaman is well-qualified to represent the Debtor as its special insurance

counsel with respect to the Pru-Re Litigation and related matters.

F.    Motion Of Debtor For An Order Under
      11 U.S.C. §§105(a) and 331 Establishing Procedures for
      Interim Compensation and Reimbursement of Expenses for Professionals

68.    The Debtor requests that the Court establish procedures for compensating and reimbursing Court-approved, professionals on a monthly basis.  Such procedures will streamline the professional compensation process and enable the Court, the Debtor and all other parties to more effectively monitor the professional fees incurred in this Chapter 11 Case.  I believe that an order establishing interim compensation procedures is in the best interest of the Debtor and its estate and creditors.

G.    Motion Of Debtor For An Order Authorizing The
      Debtor To Employ And Compensate Certain Professionals
      For Services Rendered In The Ordinary Course Of Business

69.    Prior to the Petition Date, the Debtor employed, from time to time, various consultants, attorneys and/or law firms and other professionals in the ordinary course of its business (the "Ordinary Course Professionals").  The Debtor wants to continue to retain certain of these professionals post-petition.  The Debtor seeks to retain the Ordinary Course Professionals identified in Exhibit A to the motion.  Notably, these Ordinary Court Professionals were culled out from a much larger group of outside professionals who formerly provided services to the Debtor.  The Debtor recognizes that each of the Ordinary Course Professionals provides specialized services and unique experience and knowledge of the Debtor's assets and liabilities that are necessary to the Debtor's operations and its ultimate success in this Chapter 11 Case.  Because each of these Ordinary Course Professionals has worked with the Debtor for years, each has obtained a particular level of expertise and knowledge of the Debtor and its liabilities and assets (including its insurance assets) that cannot be easily replaced.

70.     The Debtor desires to continue to retain the Ordinary Course Professionals to render services to the estate similar to those services rendered prior to the Petition Date. Given the limited scope of the services provided by each Ordinary Course Professional, and the relatively small amount of fees paid to each Professional on a monthly basis, I believe it would be inefficient to submit an individual application and proposed retention order to the Court for each such Ordinary Course Professional. Retaining the Ordinary Course Professionals in this manner will result in savings to the Debtor and its estate, by avoiding the need to file monthly fee applications and the associated preparation costs charged to the estate and providing a stream-lined procedure for compensating such Professionals each month. The uninterrupted services of the Ordinary Course Professionals are vital to the Debtor's continuing operations and its ultimate ability to reorganize. For these reasons, I submit that approval of relief requested in the motion is in the best interest of the Debtors and its estate and creditors.

## IV.

### Conclusion

71.     Based upon my personal knowledge, and my review of the Debtor's books, records and other information, I believe that the relief sought by the Debtor in the First Day Motions is necessary to enable the Debtor to continue to operate effectively as a debtor in possession following the filing of this Chapter 11 Case. For all the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 day of April, 2004.

David J. Gordon
President and Chief Executive Officer
The Flinkote Company

SWORN to and subscribed before
me this 28 day of April, 2004

Notary Public

My Commission Expires: April 1, 2007
(SEAL)

LEANDRA DIXON
COMM. #1408685
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. April 1, 2007

# EXHIBIT C
## [to the Brief in Support]

Apr. 27. 2006  2:58PM                                                No. 2023   P. 2

FILED AND ENTERED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

06 APR 27  PM 3:41

GORDON PARK-LI, CLERK

BY: _____
M. SANCHEZ
DEPUTY CLERK

1  ALAN R. BRAYTON (State Bar No. 073685)
   GILBERT L. PURCELL (State Bar No. 113603)
2  DAVID R. DONADIO (State Bar No. 154436)
   BRAYTON PURCELL, LLP
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, CA 94948-6169
   Telephone (415) 898-1555
5
   Attorneys for Plaintiffs Hopkins
6
   STEPHEN M. SNYDER (State Bar No. 054598)
7  JAMES L. MILLER (State Bar No. 071958)
   SNYDER MILLER & ORTON LLP
8  111 Sutter Street, Suite 1950
   San Francisco, CA 94104
9  Telephone: (415) 962-4400
   Facsimile: (415) 962-4401
10
   Attorneys for The Flintkote Plaintiffs
11 (Additional Counsel Listed On Signature Page)

12              SUPERIOR COURT OF CALIFORNIA (UNLIMITED JURISDICTION)

13                           COUNTY OF SAN FRANCISCO

14  MARLENE HOPKINS, Individually, as       Case No. CGC06450944
    Wrongful Death Heir, and as Successor-in-
15  Interest to NORMAN HOPKINS, JR.,        FIRST AMENDED COMPLAINT FOR
    Deceased; and MICHELLE HOPKINS, and     DAMAGES AND RELIEF AGAINST ALTER
16  MICHAEL HOPKINS, as Legal Heirs of      EGO, FOR RECOVERY OF DIVIDENDS,
    NORMAN HOPKINS, Deceased, THE           FOR RECOVERY OF FRAUDULENT
17  FLINTKOTE COMPANY, THE OFFICIAL         TRANSFERS, FOR DAMAGES BY REASON
    COMMITTEE OF THE ASBESTOS               OF BREACH OF FIDUCIARY DUTY, FOR
18  PERSONAL INJURY CLAIMANTS, and          DAMAGES FOR BREACH OF DUTY AND
    JAMES J. MCMONAGLE as the LEGAL         NEGLIGENCE, TO ENFORCE
19  REPRESENTATIVE FOR FUTURE               CONSTRUCTIVE TRUST, FOR
    ASBESTOS PERSONAL INJURY                RESTITUTION, AND FOR DECLARATORY
20  CLAIMANTS,                              RELIEF.
21
22              Plaintiffs,
23
    vs.
24
    PLANT INSULATION COMPANY;
25  UNIROYAL HOLDING, INC.; IMPERIAL
    TOBACCO CANADA LIMITED;
26  SULLIVAN & CROMWELL LLP; and
    DOES 1 through 100,
27
                Defendants.
28

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                          1

                         FIRST AMENDED COMPLAINT

1    Plaintiffs MARLENE HOPKINS, MICHELLE HOPKINS, MICHAEL HOPKINS, THE

2  FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL

3  INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR

4  FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS allege:

5                    PARTIES, JURISDICTION AND VENUE

6    1.    Plaintiffs Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively,

7  "Hopkins") bring this action as the result of the wrongful death of Norman Hopkins ("Decedent"),

8  who was the husband of Marlene Hopkins and father of Michelle and Michael Hopkins.  Marlene

9  Hopkins is successor in interest to Decedent under California Code of Civil Procedure section

10  377.11.  Plaintiffs Hopkins are entitled to bring this action pursuant to California Code of Civil

11  Procedure sections 377.30 and 377.60.  Plaintiffs Hopkins are the legal heirs of Decedent.  Decedent

12  contracted mesothelioma and died on September 27, 2005, as the result of exposure to asbestos

13  containing products manufactured and/or distributed by defendant Imperial Tobacco, an alter ego of

14  The Flintkote Company, and by defendants Plant Insulation Company and Uniroyal Holding, Inc.

15    2.    Plaintiff The Flintkote Company ("Flintkote") is, and at all relevant times, has been a

16  corporation organized and existing under the laws of the State of Delaware, with a principal place of

17  business in San Francisco, California, qualified to do and doing business in California.  For many

18  years, Flintkote manufactured and sold asbestos-containing products.  Because of the number of

19  asbestos personal injury and death claims against it, numbering over 157,000, Flintkote filed a case

20  under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

21  Bankruptcy Court for the District of Delaware on May 1, 2004, Case No. 04-11300 (JKF) (the

22  "Bankruptcy Case"), as a result of its asbestos-related personal injury liabilities.  Flintkote is and

23  remains the debtor and debtor-in-possession in that case.  Subsequently, the Office of the United

24  States Trustee appointed Plaintiff The Official Committee of Asbestos Personal Injury Claimants

25  ("ACC") and the Bankruptcy Court appointed Plaintiff James J. McMonagle as the Legal

26  Representative for Future Asbestos Personal Injury Claimants ("FCR").  The ACC and FCR are the

27  only two official creditor constituencies in the Bankruptcy Case.  On April 27, 2006, the Bankruptcy

28  Court approved an agreement that authorized Flintkote, the ACC, and the FCR to collectively

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    2

FIRST AMENDED COMPLAINT

1  represent the interests of Flintkote's estate in this matter and, subject to any procedural limitations

2  applicable to party capacity in the above-entitled action, to be named and act as co-plaintiffs in this

3  action (the "April 27 Order"). Plaintiffs Flintkote, ACC, and FCR shall collectively be referred to

4  herein as "The Flintkote Plaintiffs."

5          3.      Defendant Plant Insulation Company ("Plant") is a California corporation, with its

6  principal place of business situated in the city and county of San Francisco.

7          4.      Defendant Uniroyal Holding, Inc. ("Uniroyal") is a corporation, and is successor in

8  interest to Uniroyal, Inc.

9          5.      Defendant Imperial Tobacco Canada Limited ("Imperial Tobacco") is the major

10  Canadian tobacco company. It is a Canadian corporation formerly known as Imasco Limited and will

11  be referred to herein as "Imperial Tobacco" or "Imasco." Imperial Tobacco has manufactured

12  cigarettes and other tobacco products in Canada for many years. Its brands include "Players" and "du

13  Maurier" cigarettes. Imperial Tobacco has sold and distributed its products in the United States,

14  including California, for many years.

15          6.      Defendant Sullivan & Cromwell LLP ("S&C") is a partnership and a law firm. S&C

16  maintains offices in California, among other places. S&C is a citizen of California, in that there are

17  S&C partners who reside in and are citizens of California.

18          7.      Plaintiffs are ignorant of the true names and capacities of defendants sued under the

19  fictitious names Doe 1 through Doe 100, inclusive, and pray that when they are discovered the

20  complaint may be amended to allege such names and capacities. Each of the fictitiously named

21  defendants is responsible in some manner for the occurrences alleged hereafter.

22          8.      Jurisdiction in the Superior Court as a case of unlimited jurisdiction is proper because

23  the monetary causes of action all arise under state law, the demand exceeds $25,000, and the action

24  seeks in part declaratory relief under California Code of Civil Procedure section 1060. The Flintkote

25  Plaintiffs are authorized by virtue of the Bankruptcy Code and the April 27 Order to bring certain of

26  the causes of action, all of which arise under state law.

27          9.      Venue in the County of San Francisco is proper because defendants Imperial Tobacco

28  and S&C have no residence in California and can be sued in any county in California, and their

Snyder
Miller
& Orton
LLP

{00007653.DOC; 2}                          3

**FIRST AMENDED COMPLAINT**

1   liability arises from conduct that occurred in San Francisco, and because defendant Plant has its

2   principal place of business situated in San Francisco.

3       10.    Plaintiffs Hopkins have the right to assert an alter ego claim against Imperial Tobacco

4   directly, and/or by reason of the abandonment and/or transfer by Flintkote to Hopkins of the right, to

5   the extent of losses held by them.  The alter ego claims by Hopkins and The Flintkote Plaintiffs

6   depend upon the same set of facts.  Pursuing such claims against a substantial well-financed

7   defendant is difficult and expensive, so that it is economically not practical for a single individual to

8   pursue them alone.  Accordingly, The Flintkote Plaintiffs and plaintiffs Hopkins have agreed to bring

9   the alter ego claims together as plaintiffs and to cooperate in prosecuting them.  Plaintiffs Hopkins

10  make no claim against S&C.

11                                        **FACTS**

12      11.    Flintkote manufactured and sold asbestos containing products for many years,

13  including vinyl asbestos floor tile, asbestos cement pipe and many other products.  Flintkote, through

14  its wholly owned subsidiary Flinkote Mines, Inc. mined asbestos in Quebec, Canada from 1946

15  through approximately 1970.  Beginning in or about 1972, Flintkote, along with many other

16  companies began to be named as a defendant in numerous lawsuits brought by persons exposed to

17  asbestos contained in its products who suffered from a variety of asbestos induced diseases.  The

18  number of asbestos cases filed against Flintkote and the other companies increased over time.

19      12.    In August 1982 Johns Manville Corporation and twenty of its subsidiaries and

20  affiliates filed for bankruptcy and claimed they were forced into bankruptcy by the asbestos claims

21  filed against it.  The bankruptcy filing was major news as Johns Manville was, absent the asbestos

22  litigation, a large and profitable American company.  Other companies named as defendants in the

23  asbestos litigation were also forced into bankruptcy as a result of the litigation, including:

24      Company                     Date of Filing Bankruptcy
        UNR Industries              July 19, 1982
25      Amatex Corporation          November 1, 1982
        Forty-Eight Insulations, Inc.   April 19, 1985
26      Standard Insulation         August 4, 1986
        Nicolet                     July 17, 1987
27

28      13.    A number of defendants regularly sued in the asbestos litigation banded together in the

Snyder
Miller
& Orton
LLP

early 1980's and sought to settle disputes with their insurers where possible and establish a facility that would provide an efficient joint defense to members of the group. The discussions were mediated by Dean Harry Wellington of the Yale Law School. The participants became known as the "Wellington Group." By June 1985 they had signed an agreement and had begun to operate as the Asbestos Claims Facility ("ACF").

14.     Flintkote was a member of the ACF and, for a while, asbestos cases against it were defended and settled or tried by lawyers selected by the Asbestos Claims Facility. The ACF defense arrangements were initially advantageous to Flintkote as they allowed the company to defend asbestos personal injury cases at shared cost and thus allowed it to conserve insurance resources that would be more quickly consumed if it was required to defend cases on its own. The ACF operated through late 1988, at which point it dissolved as a result of disagreements among its members, e.g., as to appropriate defense strategies and as to how costs should be allocated among participants.

15.     Tobacco companies whose cigarettes were implicated in the rising tide of asbestos-related disease, such as Imasco and its counsel S&C, by 1986 knew or had ready access to information which pointed to the threatening scope of the asbestos litigation to follow. That information included:

- The aforementioned bankruptcies of Johns-Manville Corporation and other asbestos defendants, which increased the payment shares in the tort system of the surviving companies;
- Numbers of claims filings were increasing and claims values were increasing;
- Diseases caused by asbestos exposure could have a latency period of decades, which meant liabilities would extend far into the future;
- Commercial usage of asbestos in the United States continued to increase through the 1970's, with significant implications for future morbidity;
- Inability to extend the asbestos litigation to include significant responsible parties, such as the United States Government and the tobacco companies, all of whom had contributed to the diseases and injuries of asbestos victims;
- Unmistakable signals from casualty insurers that they could not be counted on by

{00007641.DOC; 2}                               5

**FIRST AMENDED COMPLAINT**

defendant companies in the face of ever-increasing demands, with signs from some
that they would not survive. By mid-1987, two of Flintkote's insurers had become
insolvent, and not until the late 1980's and into the early 1990's did Flintkote reach
agreements as to coverage with only 60% of its insurers;

- Substantial disagreements among ACF members that weakened the effectiveness of
the ACF and hastened its demise. These disagreements were apparent as early as
1986. There were clear indicators that members were going to leave the ACF, and
seven did so in 1987. Persons knowledgeable about the operations and functioning of
the ACF, such as Imasco and S&C, knew or should have known in 1986 that the ACF
would not continue to operate indefinitely as originally agreed upon and also knew or
should have known that disintegration of the ACF was likely in the foreseeable future.

16.   Imasco was quite familiar with the American asbestos litigation. It followed and
monitored that litigation for a variety of reasons, including that it knew there was a synergistic or
combinative effect which produced increased disease rates in persons who smoked its tobacco
products and who were also exposed to asbestos. Consequently Imasco understood that the litigation
posed risks to corporate and insurer solvency.

17.   In the 1980s, Imasco was engaged in a program of corporate diversification.
Specifically, it was seeking to acquire non-tobacco businesses. One target of Imasco's diversification
program in 1986 was a Canadian financial business Canada Trustco Mortgage Company ("Canada
Trustco"). But, Canada Trustco had been acquired by another Canadian company, Genstar
Corporation. So, in order to get control of Canada Trustco, Imasco, operating through a corporate
subsidiary, Imasco Enterprises, Inc. ("IEI"), commenced a hostile purchase of all shares of Genstar
Corporation ("Genstar"). At the time Genstar had a number of businesses and subsidiary
corporations, including several in the United States. Genstar was Flintkote's ultimate parent
company, with a number of wholly owned subsidiary companies between Genstar and Flintkote.
Imasco's stated objective in the purchase was to acquire Genstar's 98.9% holding of Canada Trustco
common shares.

18.   From the outset, Imasco's strategy was to use the value of Genstar's assets, other than

{00007643.DOC; 2}                       6
                              FIRST AMENDED COMPLAINT

Canada Trustco, to finance the purchase of Canada Trustco. The strategy therefore involved restructuring and selling off most of Genstar's assets except Canada Trustco, so as to acquire Canada Trustco at an attractive price, using the liquidation of Genstar's assets, including Flintkote, to pay for the hostile takeover.

19.     Imasco acquired Genstar in August 1986. Then, as it had planned to do, it set about selling most of Genstar's assets and businesses (other than Canada Trustco). To implement this scheme, Imasco dominated and controlled Flintkote and caused it to do its bidding. First it required Flintkote to isolate its asbestos liabilities from its major assets by creating four subsidiaries and then transferring Flintkote's valuable operating assets to them. Then, Imasco caused Flintkote to sell each of the subsidiaries to which Flintkote assets had been transferred, as well as two subsidiaries that had been created previously. Those sales were made to third parties for cash.

20.     Gross proceeds from the sales of the Flintkote assets were approximately $663,500,000 U.S., plus $100,000,000 Canadian. The sales were completed by February 27, 1987. These asset transfers and sales were overseen by Imasco personnel working in San Francisco, California. Imasco assigned S&C to provide legal advice to Flintkote in order to implement the planned liquidation and sale of the Flintkote assets. At Imasco's direction, S&C began representing Flintkote and gave it legal advice in connection with the asset liquidation. S&C continued to represent its original client Imasco in connection with the liquidation throughout the process and thereafter. Flintkote did not give informed written consent to S&C representing both Flintkote and Imasco.

21.     After these transactions, Flintkote's valuable operating businesses were gone. Their profits, cash flow, and credit were no longer available to pay the asbestos claims against Flintkote. Instead, Flintkote was left with only cash from the forced sales of its assets, together with insurance, much of which was contested by the insurers who had written the policies. The cash and insurance were all that Flintkote had with which to pay settlements and judgments in the asbestos litigation. However, the final step in Imasco's scheme to use Genstar's assets to pay for its acquisition of Canada Trustco was to transfer most of Flintkote's cash to Imasco, thereby reimbursing it for monies it expended in the hostile takeover of Genstar. Imasco decided to transfer the cash out of Flintkote

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                    7

FIRST AMENDED COMPLAINT

1  and to itself (through subsidiary corporations which it owned, controlled, and dominated) by cash

2  dividends to be paid out by Flintkote.

3      22.    The first transfer was accomplished through a dividend of $170,200,000 declared in

4  San Francisco, California, by Flintkote's board of directors on December 19, 1986. The dividend

5  was to be paid on December 30, 1986. The money went to Imasco, the sole ultimate parent

6  corporation of Flintkote.

7      23.    At the time of the December 1986 dividend, S&C were and had been outside counsel

8  to Imasco, which ultimately would receive the dividend, and represented Imasco in connection with

9  the acquisition of Genstar and the liquidation of Flintkote. At the same time, S&C represented

10 Flintkote in connection with the liquidation of its assets and in connection with the cash dividends

11 that Imasco desired to receive from Flintkote. In connection with the 1986 dividend, S&C advised

12 Flintkote that S&C had retained consultants to report on Flintkote's potential asbestos liabilities. It

13 advised the Flintkote board that it had received preliminary advice from the consultant, and that there

14 was a draft of the consultant's report. S&C advised the board that it could reasonably go forward and

15 declare the dividend. S&C told the board that it did not believe the consultant's final report would

16 alter its conclusions. S&C concurred in a presentation by Flintkote's general counsel regarding

17 Flintkote's current and potential liabilities. The Flintkote directors in 1986 and 1987 were not

18 knowledgeable about the asbestos litigation and relied upon S&C and its consultants for advice about

19 it. The board minutes do not reflect any benefit to Flintkote or its creditors as a result of the proposed

20 dividend transaction. Imasco paid the consultants for their services, but the board minutes do not

21 show that the board was informed of that fact.

22      24.    Stating that it was doing so in accordance with previous undertakings and "as an

23 inducement" to each of Flintkote's officers and directors "to continue to fulfill his responsibilities" as

24 such, Imasco had issued a letter on December 18, 1986, undertaking to indemnify and hold each of

25 them harmless against any and all actions, suits or claims arising out of their actions, omissions or

26 conduct as officers or directors of Flintkote at any time since Imasco acquired control of Genstar.

27      25.    Imasco and S&C participated by telephone at the December 19, 1986, Flintkote board

28 meeting and said to Flintkote that it would undertake to restore any dividends to Flintkote if a court

(00007643.DOC; 2)                           8

**FIRST AMENDED COMPLAINT**

1    determined them to be improperly declared. On December 18, 1986, Imasco sent a letter confirming

2    that in addition to the December 18, 1986, indemnity letter, Imasco would enter into an undertaking

3    to replace funds to Flintkote to the extent required by an appropriate judicial body.

4         26.    S&C's legal advice and Imasco's domination and control over Flintkote caused the

5    dividend to be paid.

6         27.    The second transfer of money from Flintkote, ultimately to Imasco, was by dividend

7    of $355,000,000 declared by Flintkote at a board meeting at San Francisco, California, on July 22,

8    1987. It was to be paid on August 31, 1987 or before. The money went to Imasco through subsidiary

9    corporations and entities that it controlled and dominated.

10        28.    At the time of the July 1987 dividend, S&C were still outside legal counsel to Imasco

11   and were representing Imasco, including with respect to Flintkote-related issues, such as the

12   consequences and potential liabilities attached to receipt of cash via dividend from Flintkote in the

13   face of Flintkote's asbestos liabilities. At the same time, S&C was representing Flintkote on those

14   same issues, and on the issue of the director's liability in connection with declaring dividends to

15   Imasco in the face of Flintkote's asbestos liabilities. On July 22, 1987, S&C as well as Imasco were

16   present by telephone at the Flintkote board meeting in San Francisco. S&C had prepared a legal

17   memorandum addressed to Flintkote. During the meeting, the memorandum was presented to the

18   board, as was an overview of a study by Resource Planning Corporation ("RPC"), the consultant

19   S&C had retained and whose preliminary report was used by S&C in connection with the December

20   1986 board meeting.

21        29.    The board minutes of the July 1987 meeting reflect that after payment of the

22   dividends, Flintkote would have left retained earnings and paid-in capital of approximately

23   $80,000,000, but the estimated potential exposure from environmental cleanup was not to exceed

24   $20,000,000, and the estimated potential asbestos property damage (not personal injury) exposure

25   taken from the RPC study was $42,000,000.

26        30.    In the July 22, 1987 board meeting, the board members were told that Imasco would

27   undertake to restore dividend monies to the extent the declared dividends were deemed legally

28   improper and necessary to satisfy unpaid judgment creditors of Flintkote. Imasco promised to supply

{00007643.DOC; 2}                           9

FIRST AMENDED COMPLAINT

1   a writing memorializing the understanding.  After the meeting, Imasco issued a letter dated July 27,

2   1987 to Flintkote undertaking to repay to Flintkote any amounts (up to the full amount of dividends

3   declared while Imasco was an indirect owner of Flintkote) finally determined by a court of competent

4   jurisdiction to be due to Flintkote creditors but that cannot be satisfied out of Flintkote's assets

5   because of dividends finally determined to have been improperly paid during Imasco's indirect

6   ownership of Flintkote.  A copy of the July 27, 1987 letter ("Dividend Repayment Contract") is

7   attached as Exhibit A and incorporated by reference.

8       31.    The S&C legal memorandum and the RPC study, both supplied by Imasco's and

9   Flintkote's lawyers S&C, and Imasco's domination and control over Flintkote, caused the dividend to

10  be paid, as was Imasco's plan from the time it took over Genstar.

11      32.    S&C's relationship with Imasco supplied reason to structure S&C's advice so as to

12  ensure that Flintkote would pay the dividends.  The S&C memorandum contained substantial errors,

13  omissions, and misleading statements, all of which tilted the conclusions in the memorandum in favor

14  of Flintkote's payment of these dividends, including the following.

15      33.    The S&C memorandum is dated June 25, 1987, and addressed to Flintkote.  However,

16  it actually spoke to Flintkote's directors as it is focused on whether the directors of Flintkote could

17  declare the dividend yet escape personal liability for doing so.  The memorandum is vague and

18  indefinite as to Flintkote's obligations as a corporation.

19      34.    The S&C memorandum contains legal analysis, including discussion of California

20  law.  In that connection, S&C advised Flintkote that California had adopted the Uniform Fraudulent

21  Conveyance Act.  S&C wrote that a conveyance could be set aside if the debtor would be rendered

22  insolvent by the transfer, and that insolvency is defined in terms of a person's probable liability on

23  existing debts as they became absolute and matured.  S&C advised Flintkote that it was unclear

24  whether tort claims that had not yet matured – because, for example, an asbestos-related disease had

25  not yet manifested itself – were considered existing debts.  That advice misapprehended the

26  controlling definitions, which included as a "debt" any legal liability, whether matured or unmatured,

27  fixed or contingent.  S&C also did not alert Flintkote that under California law, as well as in other

28  jurisdictions that adopted the Uniform Fraudulent Conveyance Act, a voluntary conveyance made

{00007643.DOC; 2}                        10

**FIRST AMENDED COMPLAINT**

1  without fair consideration, where there is existing indebtedness, is presumptively fraudulent, and it

2  would then be incumbent upon the grantee (here, Imasco) to prove the conveyor (here, Flintkote) was

3  solvent. *See Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976).

4  · 35.    S&C failed to advise Flintkote that California in 1986, effective January 1, 1987,

5  changed the law and adopted a version of the Uniform Fraudulent Transfer Act. The new law made a

6  transfer fraudulent as to present or future claims if the debtor reasonably should have believed he

7  would incur debts beyond his ability to pay as they became due. The new statute therefore

8  incorporated an objective test specifically looking to the incurring of future debts. This test was in

9  addition to rules making fraudulent those transfers without fair consideration where the debtor was

10  insolvent or became insolvent as a result of the transfer, or was about to engage in a business for

11  which its remaining assets were unreasonably small in relation to the business.

12      36.    The RPC report is dated June 23, 1987, and reflects that it was prepared for S&C. The

13  RPC report stated that RPC had been retained by S&C to "estimate" the potential costs of pending

14  and possible future asbestos-related property damage claims against Flintkote, but only "to consider"

15  asbestos personal injury claims. RPC devoted cursory treatment to Flintkote's asbestos-related

16  personal injury claims. RPC used a figure of $9.2 million per year, and to 2001 only, for asbestos

17  personal injury claims. The RPC report thus was based on an assumption, known to be questionable

18  by Imasco and S&C, that the ACF would continue to operate with no significant changes in cost to

19  Flintkote for 14 years. S&C assured Flintkote that directors were entitled to rely upon statements in

20  an appraisal by an appraiser selected by the board. Although it was not an appraisal under Delaware

21  law, although it had serious shortcomings in it with respect to Flintkote's asbestos personal injury

22  liabilities, and although the Flintkote board did not select RPC, S&C advised the board that the RPC

23  report ought to be considered an "appraisal" of asbestos-related liabilities upon which the directors

24  could rely. Imasco and S&C did not advise the directors to seek an independent expert analysis

25  regarding Flintkote's asbestos-related personal injury liabilities from a consultant or to retain

26  independent counsel without a conflict of interest.

27      37.    None of Imasco, S&C, or the RPC report advised Flintkote's board of the facts and

28  developments described in paragraph 15, above, relevant to considering Flintkote's future asbestos-

1  related personal injury liabilities.

2      38.  S&C labored under a conflict of interest when it undertook to represent and advise

3  Flintkote while still representing Imasco. Flintkote, a company facing substantial and increasing

4  asbestos-related claims, was obliged to consider and evaluate the interests of existing and future

5  creditors before paying out $525,200,000 in dividends. In contrast, Imasco had every interest in

6  obtaining the $525,200,000 to pay for its Canada Trustco acquisition, as had been Imasco's plan all

7  along. S&C represented both Imasco and Flintkote, with plainly conflicting interests. The

8  declaration of the dividends was tainted by this conflict of interest, by the inadequate and misleading

9  legal advice provided by S&C and by the incomplete analysis in the RPC report and advice, which

10  was procured by S&C for the specific purpose of attempting to justify the legal propriety of the

11  dividends.

12      39.  Imasco improperly caused the dividends to be paid by telling the Flintkote board:

13          •   our lawyers, acting as your lawyers, together with their consultants, say you can do it;

14          •   to induce you to pay us we agree to protect you if someone sues you; and

15          •   if we are wrong about this and creditors are left unsatisfied and a court finally decides

16              the dividends were improper, we will pay them back.

17      40.  From the time Imasco acquired Genstar in August 1986, through September 29, 2003,

18  Imasco held and maintained complete control over and dominated Flintkote through Imasco's

19  indirect 100% ownership of Flintkote. Flintkote was in no position to assert claims against Imasco or

20  to sue Imasco. S&C continued to act as an instrument of Imasco, guiding and giving legal advice to

21  Flintkote, including with respect to the matters alleged herein, until September of 2003. Imasco's

22  plan, which became Flintkote's plan by reason of Imasco's domination and control over Flintkote,

23  and the continuing advice provided by S&C, was to use Flintkote to pay asbestos liabilities for as

24  long as possible, and to attempt to keep Imasco and Flintkote separate for appearances sake, with the

25  goal that when Flintkote ran out of money, no one would be able to recover the dividends or to fasten

26  alter ego liability upon Imasco for Flintkote's asbestos-related claims. That Flintkote had been

27  injured by wrongful acts leading to the dividends, was inherently unknowable, depending upon

28  expertise available only to sophisticated professionals such as S&C and RPC. S&C did not disclose

{20007643.DOC, 2}                          12

FIRST AMENDED COMPLAINT

1  to Flintkote that it had rights with respect to the dividends.

2      41.    From and after the divestiture of its subsidiaries and payment of the dividends,

3  Flintkote operated as an asbestos claims resolution facility. Imasco exercised its domination and

4  control over Flintkote in part through its wholly-owned subsidiaries, Imasco Holdings, Inc. and

5  Imasco Holdings Group, Inc. (collectively, "IHI"). IHI took its orders from Imasco. IHI attorneys

6  were involved in the claim resolution process. Flintkote consistently obtained releases for its parent

7  companies, including Imasco, in settlements with asbestos claimants. Flintkote and IHI shared

8  common officers and directors. Employees of Imasco or IHI were involved in management of

9  Flintkote. S&C continued to advise Imasco or IHI and Flintkote on what should be done with

10  Flintkote, with particular attention to how to avoid alter ego liability for Flintkote's asbestos-related

11  liabilities. Flintkote handled its own asbestos liabilities, rather than join the Center for Claims

12  Resolution as many asbestos defendants had done after the Asbestos Claims Facility disbanded, and

13  Imasco therefore maintained control over the handling of the claims. Following the dividends, as a

14  claim-paying and insurance-pursuing business, Flintkote's reliance on counsel was critical. Flintkote

15  continued to consult S&C, Imasco's outside counsel on asbestos issues, and IHI legal personnel were

16  involved in overseeing Flintkote's legal strategies because of the importance of monitoring the

17  critical issue of asbestos liability. The goals of Imasco throughout were to forestall any liability to

18  repay the dividend and to confine the asbestos-related liabilities to Flintkote.

19      42.    Imasco not only had dismantled all Flintkote's profitable businesses and sold them off,

20  it had taken and used the money to reimburse itself for funds it had expended for buying the one

21  business it did want, Genstar's Canada Trustco, a financial services company in Canada. After

22  Imasco took the $525,200,000 in dividends, Flintkote's remaining assets were woefully insufficient

23  to satisfy its asbestos-related personal injury liabilities.

24      43.    From and after the time of the Imasco hostile takeover, Flintkote did not file public

25  financial statements. It did not publicly disclose its true financial condition and the nature and extent

26  of its asbestos liabilities. Instead, Imasco, as Flintkote's ultimate parent corporation filed public

27  financial statements in Canada that purported to represent Flintkote's financial condition. Imasco

28  represented continuously that Flintkote's asbestos liabilities were insignificant and unimportant.

1  Following the dividend paid in 1986, in its March 31, 1987, public financial statements, Imasco

2  represented, with respect to Flintkote's financial condition, that

3        [C]ertain of the unconsolidated subsidiaries acquired as part of the Genstar transaction are

4        subject to numerous claims and suits, some of which allege significant damage. In the opinion of

5        management, all such claims and suits are adequately covered by insurance, or are provided for in

6        the financial statements, or if not so covered or provided for, the results are not expected to

7        material affect the Corporation's financial condition.

8  Following the dividend paid in 1987, in its December 31, 1988, public financial statements, Imasco

9  repeated the foregoing statement. From the date of the payment of the first dividend in 1986 until

10  within a year of the filing of the Bankruptcy Case, Imasco's financial statements reflected Flintkote

11  as having a substantial positive net worth. The financial disclosures by Imasco were insufficient to

12  alert a reader or creditor to the fact that the dividends had been made while Flintkote was insolvent or

13  had rendered Flintkote insolvent, had caused it to be unable to meet its asbestos liabilities as they

14  became due and were made in violation of California and other law, including California's Uniform

15  Fraudulent Transfer Act and Delaware law respecting declaration of dividends, thereby tolling any

16  applicable limitation period.

17        44.    In 2003, S&C, acting as counsel to Flintkote, commissioned the first ever study of

18  Flintkote's asbestos-related personal injury liabilities, in this case by Chambers Associates, a

19  subsidiary of Navigant Consulting, Inc. ("Navigant"). Navigant issued a report dated August 19,

20  2003. The Navigant report estimated indemnity payments from 2003 onward to range from $1.7422

21  billion to $2.8139 billion, and total payments including defense costs to range from $2.2746 billion to

22  $3.4781 billion.

23        45.    In September, 2003, the shares of Flintkote stock were transferred to a trust, and

24  Flintkote was no longer owned directly or indirectly by Imperial Tobacco.

25                           FIRST CAUSE OF ACTION

26        (By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Negligence-
                                Wrongful Death)

27        46.    Plaintiffs Hopkins reallege and incorporate by reference each and all the allegations of

28  paragraphs 1 through 45, inclusive.

        {00037643.DOC; 2}

                           FIRST AMENDED COMPLAINT

47.    At all times herein mentioned, defendants Plant, Uniroyal, and Imperial Tobacco, an

alter ego of Flintkote, and each of them, were and are engaged in the business of researching,

manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying,

offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, approving,

certifying, facilitating, warranting, rebranding, manufacturing for others, packaging, specifying,

requiring, mandating, or otherwise directing and/or facilitates the use of, or advertising of a certain

product, namely asbestos and other products containing asbestos.

48.    At all times mentioned, said defendants, and each of them, singularly and jointly,

negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed

to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled,

distributed, leased, bought, offered for sale, supplied, sold, inspected, endorsed, contracted for

installation, of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and

advertised, a certain product, namely asbestos, and other products containing asbestos, in that said

products caused personal injuries to users, consumers, workers, bystanders and others, including the

Decedent herein and Decedent's father, William Hopkins, (hereinafter collectively called "exposed

persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said

products hazardous, unsafe, and dangerous for use by "exposed persons."

49.    Said defendants, and each of them, had a duty to exercise due care in the pursuance of

the activities mentioned above and defendants, and each of them, breached said duty of due care.

50.    Said defendants, and each of them, knew, or should have known, and intended that the

aforementioned asbestos and products containing asbestos and related products and equipment,

would be transported by truck, rail, ship, and other common carriers, that in the shipping process the

product would break, crumble, or otherwise be damaged; and/or that such products would be used for

insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other

applications, including, but not limited to unpacking, preparing, suing, sawing, drilling, chipping,

hammering, scraping, sanding, breaking, maintaining, inspecting, "rip-out", and other manipulation

resulting in the release of airborne asbestos fibers and that through such foreseeable use and/or

handling "exposed persons", including decedent herein, would use or be in proximity to and exposed

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}

**FIRST AMENDED COMPLAINT**

1  to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of

2  persons working in proximity to said products, directly or through reentrainment.

3      51.    Decedent has used, handled, or been otherwise exposed to asbestos and asbestos-

4  containing products referred to herein in a manner that was reasonably foreseeable.  Decedent's

5  exposure to asbestos and asbestos-containing products, asbestos related injury, date of diagnosis, and

6  employment status is, on current information and belief, as set forth at various locations and

7  circumstances in Exhibit B, attached to this Complaint and incorporated by reference herein.

8      52.    Plaintiffs are informed and believe, and thereon allege, that progressive lung disease,

9  cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without

10  perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and

11  asbestos-containing products over a period time.

12      53.    Decedent suffered from a condition related to exposure of asbestos and asbestos-

13  containing products.  Decedent was not aware at the time of exposure that asbestos or asbestos-

14  containing products presented risk of injury and/or disease.

15      54.    As a direct and proximate result of the aforesaid conduct of said defendants, and each

16  of them, Decedent suffered permanent injuries to his person, body, and health, including, but not

17  limited to, asbestosis, other lung damage, and cancer and related sequelae, and the mental and

18  emotional distress attendant thereto, and ultimately death, from the effect of exposure to asbestos

19  fibers, all to his general damage in the sums to be proven at trial.

20      55.    As a direct and proximate result of the aforesaid conduct of said defendants, and each

21  of them, Decedent incurred liability for physicians, surgeons, nurses, hospital care, medicine,

22  hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to

23  plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when the true and

24  exact cost thereof is ascertained.  As a direct and proximate result of the aforesaid conduct of said

25  defendants, and each of them, Decedent incurred liability for the reasonable value of medical care

26  provided by Decedent's family members measured by, inter alia, the costs associated with the hiring

27  a registered nurse, home hospice, or other service provider, the true and exact amount thereof being

28  unknown to plaintiffs at this time, and plaintiffs pray leave to amend this complaint accordingly when

Snyder
Miller
& Orton
LLP

[00007643.DOC;2]

FIRST AMENDED COMPLAINT

1    the true and exact costs are known or at time of trial.

2        56.    As a further direct and proximate result of the said conduct of said defendants, and

3    each of them, Decedent incurred loss of income, benefits, entitlements, wages, profits, and

4    commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and

5    extent of which are not yet known to plaintiffs; and leave is requested to amend this complaint to

6    conform to proof at the time of trial.

7        57.    As a further direct and proximate result of the said conduct of said defendants, and

8    each of them, Decedent's exposure to asbestos and asbestos-containing products caused severe and

9    permanent injury to Decedent, and ultimately Decedent died on September 27, 2005.

10       58.    Said defendants, and each of them, and their officers, directors and managing agents

11   participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should

12   have known of, each of the acts set forth herein.

13       59.    The herein-described conduct of said defendants, and each of them, was and is

14   despicable, willful, malicious, fraudulent, outrageous, and in conscious or reckless disregard and

15   indifference to the safety, health, and rights of "exposed persons", including decedent herein, giving

16   rise to decedent's claim herein alleged for punitive damages against said defendants.

17       60.    At all times prior to his death, Decedent was a faithful and dutiful spouse to plaintiff

18   Marlene Hopkins; and parent to plaintiffs Michelle and Michael Hopkins.

19       61.    As a direct and proximate result of the conduct of said defendants, and each of them,

20   and the death of Decedent, Decedent's heirs have sustained pecuniary loss resulting from the loss of

21   care, society, comfort attention, services, and support of Decedent all to the damage of decedent's

22   heirs.

23       62.    As a further direct and proximate result of the conduct of said defendants, and each of

24   them, and the death of Decedent, decedent's heirs have incurred funeral expenses in an amount

25   currently not ascertained.

26       63.    As a direct and proximate result of the acts, omissions, and conduct of said, and each

27   of them, as aforesaid, Decedent's exposure to harm or the Decedent as set forth in Exhibit B, attached

28   to the complaint and incorporated by reference herein.

{00007643.DOC; 2}

Snyder
Miller
& Orton
LLP

FIRST AMENDED COMPLAINT

Apr. 27. 2006  3:06PM                                                No. 2023   P. 19/38

64.    Decedent's personal injury claim against Flintkote was resolved by Judgment filed June 25, 2003, following Flintkote's acceptance of an offer to compromise in action number 408556 in this court.

65.    Imasco completely dominated and controlled Flintkote, deliberately requiring Flintkote to divest itself of its operating businesses and assets solely for the benefit of Imasco. After the divestiture of its businesses, Flintkote did not manufacture or market any products or render any services to third parties. It served only as a vehicle for Imasco, resolving asbestos and other claims, including obtaining releases for Imasco, and prosecuting insurance coverage claims. By causing Flintkote to convert its assets and businesses to cash, and then stripping Flintkote of $525,200,000, most of that cash, Imasco prevented Flintkote both from benefiting from the operating profits of the sold businesses and/or from investing the sale proceeds and using the principal plus earnings to pay claims.

66.    In the years following the dividends, Flintkote's benefit programs were administered by Imasco's subsidiary, IHI. Flintkote, with IHI, filed consolidated financial statements and tax returns.

67.    There became in 1986 and 1987 and thereafter such a unity of interest, and of ownership since Imasco owned indirectly 100% of Flintkote, that separate personalities of Flintkote and Imasco no longer existed. If the companies are treated as separate, inequitable results will follow.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal, and Imperial Tobacco as set forth below.

## SECOND CAUSE OF ACTION
(By Plaintiffs Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Products Liability –
Wrongful Death)

68.    Plaintiffs Hopkins incorporate by reference each and all the allegations of the First Cause of Action.

69.    Defendants Plant, Uniroyal, and Imperial Tobacco, knew and intended that the above-referenced asbestos and asbestos-containing products, would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of their

Snyder
Miller
& Orton
LLP

{00007643 DOC; 2}

FIRST AMENDED COMPLAINT

Apr. 27. 2006  3:06PM                                    No. 2023   P. 20/38

hazards involved in such use.

70.    Said asbestos and asbestos-containing products were defective and unsafe for their intended purpose in that the inhalation or ingestion of asbestos fibers causes serious disease and/or death. The defect existed in the said products at the time they left the possession of defendants, and each of them. Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, cancer, and death to "exposed persons", including Decedent herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and dangerous for use.

71.    "Exposed persons" did not know of the substantial danger of using said products. Said dangers were not readily recognizable by "exposed persons". Said defendants, and each of them, further failed to adequately warn of the risks to which decedent and others similarly situated were exposed.

72.    In researching, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting, representing, endorsing, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos and asbestos-containing products, said defendants, and each of them, did so with conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, in that said defendants, and each of them, had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products, including, but not limited to, asbestosis, other lung damages, and cancer. Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, and each of them, and which knowledge was obtained by said defendants, and each of them on or before 1930, and thereafter.

73.    On or before 1930, and thereafter, said defendants, and each of them, were aware that members of the general public and other "exposed persons", who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, and each of them, knew that

Snyder
Miller
& Orton
LLP

{00007643 DOC; 2}

FIRST AMENDED COMPLAINT

APR 27 2006 15:19                                              PAGE.29

1    members of the general public and other "exposed persons", who came in contact with asbestos and

2    asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and

3    asbestos-containing products was safe, when in fact said exposure was extremely hazardous to health

4    and human life.

5          74.    With said knowledge, said defendants, and each of them, opted to research, manufacture,

6    fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install,

7    contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise said

8    asbestos and asbestos-containing products without attempting to protect "exposed persons" from, or warn

9    "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing

10   products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high

11   risk of injury or death resulting from exposure to asbestos and asbestos-containing products, said

12   defendants, and each of them, intentionally failed to reveal their knowledge of said risk, and

13   consciously and actively concealed and suppressed said knowledge from "exposed persons" and

14   members of the general public, thus impliedly representing to "exposed persons" and members of the

15   general public that asbestos and asbestos-containing products were safe for all reasonably

16   foreseeable uses. Said defendants, and each of them, engaged in this conduct and made these

17   implied representations with the knowledge of the falsity of said implied representations.

18         75.    The above-referenced conduct of said defendants, and each of them, was motivated by

19   the financial interest of said defendants, and each of them, in the continuing, uninterrupted research,

20   design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer

21   for sale, supply; sale, inspection, installation, contracting for installation, repair, marketing,

22   warranting, rebranding, manufacturing for others; packaging, specifying, requiring, mandating; or

23   otherwise directing and/or facilitating the use of, or advertising of asbestos and asbestos-containing

24   products. In pursuance of said financial motivation, said defendants, and each of them, consciously

25   disregarded the safety of "exposed persons" and in fact were consciously willing and intended to

26   permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced

27   persons to work with and be exposed thereto, including plaintiff.

28         76.    Plaintiffs allege that the aforementioned defendants, and each of them, impliedly warranted their

Snyder
Miller
& Orton
LLP

(00007643 DOC; 2)                              20

**FIRST AMENDED COMPLAINT**

Apr. 27. 2006  3:07PM                                              No. 2023   P. 22/38

asbestos and asbestos-containing products, to be safe for their intended use, but that their asbestos and asbestos-
containing products, created an unreasonable risk of bodily harm to exposed persons.

77.    Decedent relied upon defendants', and each of their representations, lack of warnings, and
implied warranties of fitness of asbestos and their asbestos-containing products.  As a direct, foreseeable, and
proximate result thereof, Decedent suffered permanent injury and death as alleged herein.

78.    As a direct and proximate result of the actions and conduct outlined herein,
Plaintiffs Hopkins have suffered the injuries and damages herein alleged.

WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant, Uniroyal,
and Imperial Tobacco as set forth below.

### THIRD CAUSE OF ACTION
**(By Plaintiff Marlene Hopkins Against Plant, Uniroyal, and Imperial Tobacco for Loss of Consortium)**

79.    Plaintiff Marlene Hopkins re-alleges and incorporates by reference each and all the
allegations of the First and Second Causes of Action.

80.    Decedent and plaintiff Marlene Hopkins were married on February 18, 1961, and at all
times relevant to this action were husband and wife.

81.    Prior to Decedent's injuries as alleged, Decedent was able and did perform duties
as a spouse. Subsequent to the injuries and as a proximate result thereof, and until Decedent's
death, Decedent was unable to perform the necessary duties as a spouse and the work and service
usually performed in the care, maintenance, and management of the family home. As a
proximate result thereof, plaintiff Marlene Hopkins was permanently deprived of the consortium of
her spouse, including the performance of duties, all to plaintiff Marlene Hopkin's damages, in an
amount presently unknown to plaintiff, but which will be proved at the time of trial.

82.    Plaintiff Marlene Hopkins' discovery of the cause of Decedent's loss of consortium, as
herein alleged, first occurred within one year last past from the filing of this Complaint.

83.    As a direct and proximate result of the acts of said defendants, and the severe injuries
and death caused thereby to Decedent as set forth in this complaint, plaintiff Marlene Hopkins has
suffered loss of consortium, including but not by way of limitation, loss of services, marital relations,
society, comfort, companionship, love, and affection of said spouse, and has suffered severe mental

{00007643.DOC; 2}

Snyder
Miller
& Orton
LLP

APR 27 2025 15:13

1  and emotional distress, and general nervousness as a result thereof.

2  WHEREFORE, plaintiff Marlene Hopkins prays judgment against defendants Plant,

3  Uniroyal, and Imperial Tobacco as set forth below.

4  ## FOURTH CAUSE OF ACTION

5  (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for Negligence -- Survival)

6  84.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

7  of the First Cause of Action.

8  85.    Plaintiffs bring this action pursuant to California Code of Civil Procedure section

9  377.30 et. seq.  As a direct and proximate result of the actions and conduct outlined herein, Decedent

10  suffered the injuries and damages herein alleged.  Plaintiffs are entitled to recover all damages

11  sustained by Decedent as alleged above.

12  WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

13  set forth below.

14  ## FIFTH CAUSE OF ACTION

15  (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal to Products Liability -- Survival)

16  86.    Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

17  of the First and Second Causes of Action.

18  87.    As a direct and proximate result of the exposure to defendants' products and the

19  conduct outlined herein, Decedent has suffered the injuries and damages herein alleged.

20  88.    Plaintiffs Hopkins are entitled to recover all damages sustained by Decedent as alleged

21  above.

22  WHEREFORE, plaintiffs Hopkins pray judgment against defendants Plant and Uniroyal as

23  set forth below.

24  ## SIXTH CAUSE OF ACTION

25  (By Plaintiffs Hopkins Against Defendants Plant and Uniroyal for False Representation Under
Restatement of Torts Section 402-B -- Survival)

26  89.    Plaintiffs Hopkins re-allege and incorporates by reference each and all the allegations

27  of the First and Second Causes of Action.

28  90.    At the aforementioned time when defendants Plant and Uniroyal, and each of them,

Snyder
Miller
& Orton
LLP

{00007643.DOC, 2}

22

FIRST AMENDED COMPLAINT

1   researched, manufactured, fabricated, designed, modified, tested or failed to test, inadequately

2   warned or failed to warn, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

3   sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented,

4   endorsed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for

5   others, packaged, and advertised the said asbestos and asbestos-containing products, as hereinabove

6   set forth, the defendants, and each of them, expressly and impliedly represented to members of the

7   general public, including the purchasers and users of said product, and other "exposed persons",

8   including the decedent herein and his employers, that asbestos and asbestos-containing products,

9   were of merchantable quality, and safe for the use for which they were intended.

10      91.     The purchasers and users of said asbestos and asbestos-containing products, and other

11   "exposed persons", including the Decedent and his employers, relied upon said representations of

12   said defendants, and each of them, in the selection purchase, and use of asbestos and asbestos-

13   containing products.

14      92.     Said representations by defendants, and each of them, were false and untrue, and

15   defendants knew at the time they were untrue, in that the asbestos and asbestos-containing products,

16   were not safe for their intended use, nor were they of merchantable quality as represented by

17   defendants, and each of them, in that asbestos and asbestos-containing products have very dangerous

18   properties and defects whereby said products cause asbestosis, other lung damages, and cancer, and

19   have other defects that cause injury and damage to the users of said products and other "exposed

20   persons", thereby threatening the health and life of said persons including decedent herein.

21      93.     As a direct and proximate result of said false representations by defendants, and each of

22   them, the Decedent suffered injury and death as set forth.

23      WHEREFORE, plaintiffs pray judgment against defendants Plant and Uniroyal, set forth

24   below.

25                            SEVENTH CAUSE OF ACTION
26           (By Plaintiffs Hopkins Against Defendant Plant for Contractor Liability)

27      94.     Plaintiffs Hopkins re-allege and incorporate by reference each and all the allegations

28   of the First and Second Causes of Action.

Snyder
Miller
& Orton
LLP

{00007643.DOC; 2}                            23

---

FIRST AMENDED COMPLAINT

95.    At all times mentioned herein, defendant Plant, owned, leased, maintained, managed, and/or controlled the premises listed on Exhibit B where Decedent was present. The information provided on Exhibit B is preliminary, based on recall over events covering many years and further investigation and discovery may produce more reliable information.  Additionally, Decedent might have been present at these or other of Plant's premises at other locations and on other occasions.

96.    Prior to and at said times and places, defendant Plant caused certain asbestos-containing insulation, other building materials, products, and toxic substances to be constructed, installed, maintained, used, supplied, replaced, repaired, and/or removed on each of the aforesaid respective premises, by their own workers and/or by various unqualified or unskilled contractors and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to decedent and other persons exposed to said asbestos fibers and toxic substances while present at said premises.

97.    At all times mentioned herein, said defendant Plant knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition, and unreasonable risk of harm and personal injury to decedent and other workers or persons so exposed present on each of the aforesaid respective premises.

98.    At all times relevant herein, Decedent entered said premises and used or occupied each of said respective premises as intended and for Plant's benefit and advantage and at Plant's request and invitation.  In so doing, Decedent was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said defendant Plant.

99.    Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

100.    At all times mentioned herein, Defendant Plant remained in control of the premises where Decedent was performing his work.

Snyder
Miller
& Orton
LLP

{00007643.DOC, 2}                     24
                    FIRST AMENDED COMPLAINT

101.    At all times mentioned herein, defendant Plant owed to decedent and others similarly situated a duty to exercise

ordinary care in the management of such premises so as to avoid exposing workers such as

decedent to an unreasonable risk of harm and to avoid causing injury to said person.

102.    At all times mentioned herein, defendant Plant, knew, or in the exercise of ordinary

and reasonable care should have known, that the premises that were in their control would be used

without knowledge of, or inspection for, defects or dangerous conditions and that the persons present

and using said premises would not be aware of the aforementioned hazardous conditions to which

they were exposed on the premises.

103.    At all times mentioned herein, defendant Plant negligently failed to maintain, manage,

inspect, survey, or control said premises, or to abate, or correct, or to warn decedent of, the existence

of the aforesaid dangerous conditions and hazards on or about said premises.

104.    Prior to and at the times and places aforesaid, defendant Plant caused certain

asbestos-containing insulation, other building materials, products, and toxic substances to be

constructed, installed, maintained, used, replaced, repaired and/or removed on each of their

aforesaid respective premises, by their own workers and/or by employing various contractors,

and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances

into the ambient air and thereby injured decedent.

105.    At all times mentioned herein, defendant Plant:

    a.   Should have recognized that the work of said contractors would create during

the progress of the work, dangerous, hazardous, and unsafe conditions, which could or would

harm decedent and others unless special precautions were taken;

    b.   Knew or had reason to know, that the contractors it had selected and hired to

install, remove, abate, or otherwise handle asbestos-containing materials were unfit, unskilled,

unlicensed, or otherwise unqualified to do so;

FIRST AMENDED COMPLAINT

    c.  Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate, or otherwise handle asbestos-containing materials were competent, or qualified to do so.

    106.  In part, Decedent was exposed to dangerous asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

    107.  The work of contractors on premises controlled by defendant Plant created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances, including but not limited to asbestos.

    108.  Prior to and at said times and places, defendant Plant was subject to certain ordinances, standards, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code § 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VHI, Group 9 (Control of Hazardous Substances), Article 81, § 4150, § 4106, § 4107, and § 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, et seq., which empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate regulations including, but not limited to B.A.A.Q.D. Regulation 11, Rules 2 and 14, Title 40 Code of Federal Regulations, Chapter 1, Part 61, et seq. -- The National Emission Standards for Hazardous Air Pollutants, which required defendant Plant to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said defendant Plant failed to provide the required safeguards and precautions. Defendant's violations of said codes include, but are not limited to:

    (a)  Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

    (b)  Failing to segregate work involving the release of asbestos or other toxic dusts;

Saxcer
Miller
& Orton
LLP

{00007643 DOC. 2}          26

FIRST AMENDED COMPLAINT

(c)    Failing to suppress dust using prescribed ventilation techniques;

(d)    Failing to suppress dust using prescribed "wet down" techniques;

(e)    Failing to warn or educate decedent or others regarding asbestos or other toxic substances on the premises;

(f)    Failing to provide approved respiratory protection devices;

(g)    Failing to ensure "approved" respiratory protection devices were used adequately;

(h)    Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

(i)    Failing to provide adequate housekeeping and clean-up of the work place;

(j)    Failing to adequately warn of the hazards associated with asbestos as required by these statutes;

(k)    Failing to adequately report renovation and disturbance of asbestos-containing materials, including but not limited to B.A.A.O.M.D. Regulation 11, Rules 2 and 14;

(l)    Failing to have an asbestos removal supervisor as required by regulation;

(m)    Failing to get approval for renovation as required by statutes; and

(n)    Failing to maintain records as required by statute.

109.    Defendant Plant was the "statutory employer" of decedent as defined by the California Labor Code and California case law.

110.    Decedent at all times was unaware of the hazardous condition or the risk of personal injury created by defendant's violation of said regulations, ordinances, or statutes.

111.    At all times mentioned herein, Decedent was a member of the class of persons whose safety was intended to be protected by the regulations, standards, statutes, or ordinances described in the foregoing paragraphs.

112.    At all times mentioned herein, said defendant Plant, knew, or in the exercise of

1   ordinary and reasonable care should have known, that the premises that were in its control would be

2   used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present

3   and using said premises would not be aware of the aforesaid hazardous conditions to which they were

4   exposed on the premises, and that such persons were unaware of the aforesaid violations of codes,

5   regulations, and statutes.

6        113.    As a proximate result of the foregoing, Decedent developed asbestos-related illness,

7   which has caused great injury and disability to Decedent, and ultimately death, as previously set

8   forth, and plaintiffs have suffered damages as herein alleged.

9        WHEREFORE, plaintiffs Hopkins pray judgment against defendant Plant, as set forth below.

### EIGHTH CAUSE OF ACTION
10  **(By The Flintkote Plaintiffs Against Imperial Tobacco For Declaration of Alter Ego Liability)**

11       114.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

12  allegations of paragraphs 1 through 45 and 65 through 67, inclusive.

13       115.    An actual controversy exists between The Flintkote Plaintiffs and Imperial Tobacco

14  arising from Imasco's domination and control of Flintkote, including Imasco's causing Flintkote to

15  create the subsidiaries, isolate the asbestos liabilities, sell the subsidiaries, and declare and pay the

16  Dividends, and the use of Flintkote by Imasco solely for Imasco's own purposes, as set forth herein.

17       116.    The Flintkote Plaintiffs contend that Imperial Tobacco is Flintkote's alter ego and is

18  responsible to pay asbestos-related claims asserted against Flintkote, such that if The Flintkote

19  Plaintiffs are correct, the burden of those claims will be borne in whole or in part by Imperial

20  Tobacco.

21       117.    The Flintkote Plaintiffs are informed and believe, and upon such information and

22  belief alleges, that Imperial Tobacco disagrees with each of The Flintkote Plaintiffs' contentions.

23       118.    The Flintkote Plaintiffs have the right to assert alter ego claims against Flintkote's

24  former indirect parent Imperial Tobacco.

25       WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

26  below.

27

28

Snyder
Miller
& Orton
LLP

{00007643 DOC; 2}                          28

**FIRST AMENDED COMPLAINT**

## NINTH CAUSE OF ACTION
**(By The Flintkote Plaintiffs Against Imperial Tobacco For Receiving Illegal Dividends)**

119.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of paragraphs 1 through 45, inclusive.

120.   The dividends of $170,200,000 in 1986 and $355,000,000 in 1987 were not payable out of Flintkote's net profits for either the year in which the dividend was declared or the preceding fiscal year.

121.   The dividends in 1986 and 1987 (collectively, the "Dividends") could be paid only out of surplus defined as the amount in excess of Flintkote's capital by which its assets exceeded its liabilities.  Flintkote's asbestos related personal injury and its other liabilities exceeded its assets.

122.   Imasco and its lawyers, S&C, caused the directors to declare and pay the dividends when they were not authorized under the dividend statutes.

123.   Imasco actively procured and participated in the declarations of the illegal dividends, knew the receipt of the dividends was improper, and reaped the benefits of them.

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## TENTH CAUSE OF ACTION
**(By The Flintkote Plaintiffs Asserting the Rights of a Creditor, Against Imperial Tobacco for Recovery of Illegal Dividends)**

124.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth Cause of Action.

125.   Flintkote is operating its business and conducting its affairs as the debtor and debtor in possession in the Bankruptcy Case.  Flintkote may recover any transfer of money that is voidable under applicable state law by a creditor holding an unsecured claim that is allowable in the Bankruptcy Case.

126.   The transfers of the Dividends, $170,200,000 on or about December 30, 1986, and $355,000,000 on or about August 31, 1987, were transfers of interests of the debtor in property.

127.   At the time of the Dividends, there existed one or more individuals (a) who had suffered from inherently unknowable injuries to a blameless ignorant party as a result of exposure to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, tolling the

Sayse
Miller
& Orton
LLP

{00007643.DOC; 2}                29

FIRST AMENDED COMPLAINT

APR 27 2006 15:28                                         PAGE.19

1   applicable limitation periods until such time as the claimant was chargeable with knowledge that his

2   condition was attributable to asbestos exposure, (b) who were creditors of Flintkote due to exposure

3   to asbestos products manufactured or sold by Flintkote prior to the payment of the Dividends, and (c)

4   who hold allowable claims against Flintkote and its bankruptcy estate.

5        128.   From and after the date of each Dividend, until at least September 29, 2003, Imasco

6   controlled and dominated Flintkote, and did not disclose, and caused Flintkote not to disclose the true

7   nature of Flintkote's financial condition to creditors.  Creditors did not know and could not have

8   known that the transfer of the dividends to Imasco rendered Flintkote insolvent.

9        129.   The Dividends are invalid and avoidable because the Dividends were paid at a time

10  when Flintkote did not have a surplus of assets over liabilities. Because of Imasco's domination and

11  control of Flintkote and because of the suppression of Flintkote's true financial condition in the

12  public financial reporting Imasco released in Canada, this fact was not known and could not

13  reasonably have been known to creditors of Flintkote, including asbestos disease claimants.  The

14  Flintkote Plaintiffs may recover the Dividends from Imasco who was the entity for whose benefit

15  such transfers were made.  To the extent the Dividends passed through entities before their delivery

16  to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere

17  conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the

18  Dividends was not for value or in good faith.

19       WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

20  below.

21                        **ELEVENTH CAUSE OF ACTION**

22  **(By The Flintkote Plaintiffs Asserting the Rights of a Creditor Against Imperial Tobacco For Recovery of Fraudulent Transfers)**

23       130.   The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

24  allegations of the Ninth and Tenth Causes of Action.

25       131.   At the time of the Dividends, or within the applicable limitation period thereafter,

26  there existed (a) one or more individuals who had asbestos-related personal injury lawsuits on file

27  against Flintkote, and those lawsuits remained on file until May 1, 2004, or (b) one or more

28  individuals who suffered from asbestos-related diseases arising as a result of exposure to Flintkote

Snyder
Miller
& Orton
LLP

(00007643.DOC.2)                          30

**FIRST AMENDED COMPLAINT**

1   products who suffered from inherently unknowable injuries and who was blamelessly ignorant,

2   thereby tolling any applicable limitation periods until such time as the each such individual was

3   chargeable with knowledge that his condition was attributable to asbestos exposure, or (c) one or

4   more individuals who suffered from asbestos-related diseases arising as a result of exposure to

5   Flintkote products who did not know and could not reasonably have been known of Flintkote's true

6   financial condition because of Imasco's domination and control of Flintkote and because of the

7   suppression of Flintkote's true financial condition in the public financial reporting Imasco released in

8   Canada, some or all of which serve to toll the applicable limitations period.

9       132.   The Dividend of $170,200,000 was made without receipt of fair consideration by

10  Flintkote who: (a) was or would be rendered insolvent by the transfer and/or (b) was about to be

11  engaged in a business, paying asbestos claims, for which its property remaining after the Dividend

12  was unreasonably small capital.

13      133.   When the Dividend of $355,000,000 was paid in 1987, it constituted a fraudulent

14  transfer in that Flintkote received no reasonably equivalent value for it and one or more of the

15  following was true:  (a) Flintkote was insolvent or became insolvent as a result of the transfer, or (b)

16  Flintkote was engaged in or about to engage in the business of paying asbestos claims for which

17  Flintkote's assets were unreasonably small in relation to the business, or (c) Flintkote reasonably

18  should have believed that it would incur debts beyond its ability to pay as they became due.

19      134.   The separation of Flintkote's asbestos liabilities from its valuable operating assets as a

20  result of the formation of subsidiary corporations, the sale of those subsidiary corporations; and the

21  transfer of the Dividends to Imasco, constituted an integrated scheme of transfers orchestrated by

22  Imasco with actual intent to hinder, delay or defraud one or more present or future creditors of

23  Flintkote, implicating at least the following badges of fraud:

24      •   The proceeds of the scheme were transferred to an insider;

25      •   The resulting financial condition of Flintkote was concealed;

26      •   The transfers, including the separation of asbestos liabilities from operating assets,

27          occurred because Flintkote had been sued and threatened with additional suits;

28      •   The transfers, including the separation of asbestos liabilities from operating assets,

(00007643.DOC: 2)

Snyder
Miller
& O'Hair
LLP

**FIRST AMENDED COMPLAINT**

involved substantially all of Flintkote's assets;

- The consideration ultimately received by Flintkote at the conclusion of the integrated scheme was not reasonably equivalent to the value of the assets transferred;

- Flintkote was insolvent or became insolvent shortly after the transfers comprising the integrated scheme;

- The transfers comprising the integrated scheme were made after substantial contingent and unmatured indebtedness had been incurred, but before such indebtedness had matured.

135.    The Flintkote Plaintiffs may recover the Dividends from Imasco who was the entity for whose benefit such transfers were made. To the extent the Dividends passed through entities before their delivery to Imasco, such entities were mere conduits, or to the extent such intermediate entities were not mere conduits and the transfers were not made for Imasco's benefit, Imasco's ultimate receipt of the Dividends was not for value or in good faith.

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

## TWELFTH CAUSE OF ACTION
### (By The Flintkote Plaintiffs Against Imperial Tobacco for Breach of Fiduciary Duty)

136.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth, Tenth, and Eleventh Causes of Action.

137.    The directors of Flintkote owed a fiduciary duty to Flintkote and to its creditors because by reason of its asbestos-related liabilities, Flintkote was insolvent or in the vicinity of insolvency. Flintkote directors were obliged to consider whether, and reasonably should have believed that, Flintkote would incur debts by reason of asbestos liabilities beyond its ability to pay as they became due.

138.    By reason of the foregoing, Imasco prevented the Flintkote directors from complying with their fiduciary duties in declaring the dividends and ordering them paid.

139.    Imasco, now Imperial Tobacco, actively procured and participated in the failure to comply with fiduciary duties and reaped the benefits of them.

Snyder
Miller
S Orson
LLP

{00007643.DOC; 2}

FIRST AMENDED COMPLAINT

WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth below.

### THIRTEENTH CAUSE OF ACTION
#### (By The Flintkote Plaintiffs Against S&C for Breach of Duty and Negligence)

140.  The Flintkote Plaintiffs re-allege and incorporate by reference each and all the allegations of the Ninth through the Twelfth Causes of Action.

141.  S&C as lawyers represented Flintkote in connection with the 1986 and 1987 dividends. S&C also represented Imasco with respect to the same subject matter. S&C continued to represent Flintkote with respect to the matters alleged herein until within one year of the filing of the Bankruptcy Case.

142.  The relation between attorney and client is a fiduciary relation of the very highest character.

143.  S&C had a duty without informed written consent of each client not to accept representation of more than one client in a matter in which the interests of the clients potentially conflict and not to accept or continue representation of more than one client in which the interests of the clients actually conflict. Absent consent of both clients after full disclosure, S&C had a duty not to accept or continue employment of both clients if it would be likely to involve S&C in representing differing and adverse interests.

144.  S&C breached its duty and accepted and continued representation of Flintkote and Imasco in connection with the Dividends, which was a matter in which the interests of the clients were in stark conflict, adverse, and differing.

145.  Flintkote did not give written consent to S&C's conflicting representation of differing interests.

146.  S&C had a duty to use reasonable care in advising Flintkote. S&C without reasonable care advised the Flintkote directors that they could go forward with the 1986 dividend. S&C in 1987 without reasonable care misrepresented California law to Flintkote as respects rules governing potentially fraudulent transfers. S&C in 1987 also represented, without reasonable care, to the board that the directors could rely upon the RPC report as an appraisal and thus were protected by a

Snyder
Miller
& Orton
LLP

(00007643 DOC; 2)                          33

FIRST AMENDED COMPLAINT

APR 27 2006 15:28                                              PAGE.23

1   principle that directors are entitled to rely on statements in an appraisal by an appraiser selected with

2   reasonable care by the board. But the RPC report was not an appraisal of Flintkote's asbestos-related

3   personal injury liabilities, and RPC was not selected by the board, but rather by Imasco's counsel.

4         147. The conflicted representation and the misrepresentations by S&C proximately caused

5   the declaration and payment of the dividends.

6         WHEREFORE The Flintkote Plaintiffs pray judgment against S&C as set forth below.

7                   **FOURTEENTH CAUSE OF ACTION**

8   **(By The Flintkote Plaintiffs Against Imperial Tobacco For Constructive Trust)**

9         148. The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

10   allegations of the Ninth through the Thirteenth Causes of Action.

11         149. By reason of the foregoing, Imperial Tobacco holds the dividend payments received

12   through the wrongful acts and the complete dominance, control, and authority Imasco held over

13   Flintkote, and by reason of the mistakes engendered by the conflicted representation and negligent

14   advice provided by Imasco's lawyers, shared with Flintkote, as set forth above. The Flintkote

15   Plaintiffs have the right to those dividends and Imperial Tobacco holds them as a constructive trustee

16   for the benefit of The Flintkote Plaintiffs.

17         WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

18   below.

19                   **FIFTEENTH CAUSE OF ACTION**

      **(By The Flintkote Plaintiffs Against Imperial Tobacco For Restitution)**

20         150. The Flintkote Plaintiffs re-allege and incorporate by reference each and all the

21   allegations of the Ninth through the Thirteenth Causes of Action.

22         151. The declarations of the Dividends were invalid because they were the result of

23   conflicted legal representation and erroneous legal advice given by Imasco's lawyers, shared with

24   Flintkote.

25         152. Imasco was the recipient of the Dividends under circumstances where it directly and

26   through its lawyers wrongfully procured payment of the Dividends.

27         153. The Flintkote Plaintiffs are entitled to restitution from Imperial Tobacco of the

28   payments made pursuant to the tainted and invalid declarations of the Dividends.

Snyder
Miller
& Orton
LLP
          {00007643.DOC;2}

FIRST AMENDED COMPLAINT

1    WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

2    below.

3                              SIXTEENTH CAUSE OF ACTION
         (By The Flintkote Plaintiffs against Imperial Tobacco for Declaratory Relief)
4

5    154.    The Flintkote Plaintiffs re-allege and incorporate by reference each and all the
     allegations of the Ninth through the Fifteenth Causes of Action.
6

7    155.    An actual controversy exists between The Flintkote Plaintiffs and Imperial Tobacco
     arising from the Dividend Repayment Contract of July 27, 1987 ("Dividend Repayment Contract").
8

9    156.    The Flintkote Plaintiffs contend that the dividends were improperly paid within the

10   meaning of the Dividend Repayment Contract because they were paid under one or more of the

11   following circumstances

12   •    as illegal dividends;

13   •    as a fraudulent conveyance or fraudulent transfer under California law;

14   •    in breach of fiduciary duty aided and abetted by Imasco;

15   •    as products of conflicted and tainted legal representation by S&C;

16   •    as products of negligent legal advice by S&C;

17   •    as improper by reason of having been induced by the promise in 1986 by Imasco to
          repay, and by the Dividend Repayment Contract in 1987;
18

19   •    as otherwise improper within the meaning of the Dividend Repayment Contract.

20   157.    The Flintkote Plaintiffs are informed and believe, and upon such information and

21   belief alleges, that Imperial Tobacco disagrees with each of The Flintkote Plaintiffs' contentions.

22   158.    In the event the court finally determines that the 1986 and 1987 dividends were

23   improperly paid, then Imperial Tobacco will be obligated to repay to Flintkote any amounts (up to the

24   full amount of the dividends) that are finally determined by a court of competent jurisdiction to be

25   due to Flintkote creditors but that cannot be satisfied out of assets of Flintkote because of the

26   dividends finally determined to have been improperly paid, upon entry of the judgments described in

27   the DRC.

28   159.    The Flintkote Plaintiffs seek a declaration as to the legal rights and duties of the

Sayear
Kstler
& Orten
LLP            {00007643.DOC;2}              35

                            FIRST AMENDED COMPLAINT

1  parties as to propriety of the dividends and duties arising from dividends having been improperly

2  paid.

3      WHEREFORE, The Flintkote Plaintiffs pray judgment against Imperial Tobacco as set forth

4  below.

5                                    PRAYER

6      WHEREFORE, plaintiffs pray judgment:

7      1.    On the First and Second Causes of Action for recovery by plaintiffs Hopkins against

8  defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to

9  proof;

10     2.    On the Third Cause of Action for recovery by plaintiff Marlene Hopkins against

11  defendants Plant, Uniroyal, and Imperial Tobacco jointly and severally, of damages according to

12  proof;

13     3.    On the Fourth, Fifth, and Sixth Causes of Action, for recovery by plaintiffs Hopkins

14  against defendants Plant and Uniroyal of damages according to proof;

15     4.    On the Seventh Cause of Action, for recovery by plaintiffs Hopkins against defendant

16  Plant of damages according to proof;

17     5.    On the Eighth Cause of Action, for an order declaring that Imperial Tobacco is liable

18  as the alter ego of Flintkote with respect to asbestos-related liabilities and is responsible to pay such

19  liabilities;

20     6.    On the Ninth, Tenth, Eleventh, and Twelfth Causes of Action, for recovery by The

21  Flintkote Plaintiffs from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other

22  amount as may be proved;

23     7.    On the Thirteenth Cause of Action, for recovery by The Flintkote Plaintiffs from S&C

24  in the amount of $525,200,000 plus interest, or such other amount as may be proved;

25     8.    On the Fourteenth and Fifteenth Causes of Action, for recovery by The Flintkote

26  Plaintiffs from Imperial Tobacco in the amount of $525,200,000, plus interest, or such other amount

27  as may be proved;

28     9.    On the Sixteenth Cause of Action, for an order declaring and determining in favor of

Snyder
Miller
& Orton
LLP

{00007643.DOC;2}                        36

FIRST AMENDED COMPLAINT

1    The Flintkote Plaintiffs that the $170,200,000 dividend declared and paid in December 1986 and the

2    $355,000,000 dividend declared and paid in July 1987 by Flintkote were improperly paid within the

3    meaning of the Dividend Recovery Contract letter from Imasco dated July 27, 1987, and that upon

4    the occurrence of the remaining determinations described in the Dividend Recovery Contract, that

5    Imperial Tobacco will be obligated to repay to Flintkote the amounts (up to the full amount of the

6    dividends) finally determined to be due to Flintkote creditors but that cannot be satisfied out of the

7    assets of Flintkote because of the payment of the dividends.

8    Date:  4·26·06

9                                                        BRAYTON PURCELL LLP

10

11   Additional Counsel for Plaintiffs The Flintkote      By:
     Company The Official Committee of:                       Gilbert L. Purcell
12   Asbestos Personal Injury Claimants, and                  Attorneys for Plaintiff Marlene Hopkins,
     James J. McMonagle as the Legal Representative           Michelle Hopkins, and Michael Hopkins
13   for Future Asbestos Personal Injury Claimants:

14   Eliot S. Jubelirer (061654)
     Jean L. Bertrand (083250)
15   Morgenstein & Jubelirer
     One Market, Spear Street Tower
16   Thirty-Second Floor                                  SNYDER MILLER & ORTON LLP
     San Francisco, CA 94105
17   Telephone (415) 901-8700

18   Alan Pedlar (State Bar No. 72216)
     The Law Office of Alan Pedlar
19   1112 Via Malibu                                          Stephen M. Snyder
     Aptos, CA 95083                                          Attorneys for Plaintiffs
20   Telephone (831) 688-2667                                 The Flintkote Company, The Official
                                                              Committee of Asbestos Personal Injury
21   Kelly C. Wooster (State Bar No. 41196)                   Claimants, and James J. McMonagle as the
     112 Rock Creek Court                                     Legal Representative for Future Asbestos
22   P.O. Box 62                                              Personal Injury Claimants
     Copperopolis, CA 95228
23   Telephone: (209) 785-2437

24

25

26

27

28

     Snyder
     Miller
     & Orton
     LLP
                        {00007643.DOC;2}
                                    FIRST AMENDED COMPLAINT



San Francisco Superior Courts
Information Technology Group

**Document Scanning Lead Sheet**

Apr-27-2006 3:49 pm

Case Number: CGC-06-450944

Filing Date: Apr-27-2006 3:45

Juke Box: 001    Image: 01435968

COMPLAINT

MARLENE HOPKINS et al VS. PLANT INSULATION COMPANY et al

001C01435968

**Instructions:**
Please place this sheet on top of the document to be scanned.

# EXHIBIT D
## [to the Brief in Support]

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related to Docket Nos. 1433 and 1434** |
| | ) | |
| | ) | **Objections Due: April 13, 2006 at 4:00 p.m. (requested)** |
| | | **Hearing Date: April 17, 2006 at 9:30 a.m. (requested)** |

## DEBTORS' MOTION TO SHORTEN NOTICE PERIODS WITH RESPECT TO CERTAIN PLEADINGS FILED IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

The Flintkote Company ("Flintkote") and Flintkote Mines Limited ("Mines"), the debtors and debtors in possession (the "Debtors") in these jointly-administered cases, hereby move (the "Motion") this Court, pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, Del. Bankr. L.R. 9006-1(e), and § 102 of title 11 of the United States Code (the "Bankruptcy Code"), for an order shortening the applicable notice periods with respect to (i) Debtors' Motion For An Order Approving Certain Joint Prosecution Agreements And Annulling The Automatic Stay In Connection With The Dividend Recovery Litigation (The "Joint Prosecution Motion") and (ii) Application For An Order Authorizing The Debtors To Employ Special Litigation Counsel In Connection With The Dividend Recovery Litigation Pursuant To 11 U.S.C. §§ 327(e) And 328(a) And Granting Related Relief (the "Retention Application"), both of which were filed concurrently herewith. The relief requested herein, in the Joint Prosecution Motion, and in the Retention Application is supported by the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), and the Legal Representative for Future Asbestos Claimants (the "FCR").

4.5.06
#1435

By this Motion, the Debtors seek entry of an order shortening the applicable notice and objection periods with respect to the Joint Prosecution Motion and the Retention Application so that the relief sought in both pleadings are heard at the omnibus hearing scheduled for April 17, 2006 at 9:30 a.m. (prevailing Eastern time). The Debtors request that the Court set an objection deadline of April 13, 2006 at 4:00 p.m. The facts and circumstances regarding the Dividend Recovery Litigation strongly support granting the relief sought in this Motion.

On April 5, 2006, Plaintiffs Flintkote and certain individual asbestos claimants (the "Asbestos Claimants") jointly filed a complaint (the "Complaint") against Defendants Imperial Tobacco Canada Limited (formerly known as Imasco Limited ("Imasco")), Sullivan & Cromwell LLP ("S&C"), other defendants, and Does 1 though 100 in the Superior Court of California, County of San Francisco (the "Superior Court"). The Complaint, among other relief, (i) seeks substantial damages and requests declaratory relief, including with respect to certain contract rights of Flintkote against Imasco, (ii) asserts alter ego, veil piercing and similar theories of recovery against Imasco, and (iii) asserts claims arising out of or related to $525 million in dividends that Imasco, the former ultimate parent of Flintkote, caused Flintkote to pay to Imasco (collectively referred to as the "Dividend Recovery Litigation").

The Dividend Recovery Litigation represents potentially the largest group of assets of the Estates. The Estates Representatives have spent the majority of their efforts in these chapter 11 proceedings during the past year analyzing the facts and law underlying these causes of action, deciding how to jointly represent the Estates in pursuing these actions, and selecting the best litigation team to pursue the actions. The relief sought in the Joint Prosecution

-2-

Agreement and the Retention Application are critical to the Estates and the prosecution of the Dividend Recovery Litigation.

The Debtors, with the support of the ACC and the FCR (together with the Debtors, the "Estate Representatives"), filed the Joint Prosecution Motion and the Retention Application on the same day the Complaint was filed in Superior Court. The Estate Representatives (in consultation with special litigation counsel whom the Debtors seek to retain pursuant to the Retention Application (the "Litigation Team")) determined that it was in the best interest of the Debtors' estates (the "Estates") to refrain from filing the Joint Prosecution Motion or the Retention Application until they received confirmation that the Complaint had been filed in the Superior Court, so as not to prematurely disclose litigation strategy or identify potential defendants or causes of action in the Dividend Recovery Litigation. Nonetheless, with the Complaint now filed and the Dividend Recovery Litigation now pending in the Superior Court, it is important that the Debtors obtain the relief sought the Joint Prosecution Agreement and the Retention Application as soon as practicable to ensure the continued, uninterrupted prosecution of the Dividend Recovery Litigation.

The Joint Prosecution Motion seeks (i) approval of the Joint Prosecution Agreement between the Debtors, the ACC and the FCR that will govern their respective joint participation rights in respect of the Dividend Recovery Litigation, (ii) approval of the Alter Ego Agreement between the Debtors and the Asbestos Claimants that will enable all theories of alter ego recovery to be brought against Imasco in the Dividend Recovery Litigation by plaintiffs (Flintkote and the Asbestos Claimants) who, as a result of the Alter Ego Agreement, collectively have standing to assert all such grounds for relief under terms that are beneficial to the Estates,

and (iii) limited annulment of the automatic stay to ensure that the Dividend Recovery Litigation may proceed in all respects from the date of its commencement.

The relief sought in the Joint Prosecution Agreement is necessary to ensure that the Dividend Recovery Litigation (and the joint management of such litigation by the Estate Representatives) may be pursued in a manner that maximizes the potential benefit to the Estates. It also is necessary to ensure that the Defendants can respond to the Complaint and take other actions in respect of the Dividend Recovery Litigation. With the Complaint having been filed on April 5, 2006, one can reasonably anticipate that the Defendants will be filing pleadings responsive to the Complaint before the next omnibus hearing on May 15, 2006. Unless the Court grants the relief sought in the Joint Prosecution Agreement thereby annulling the automatic stay in respect of the Dividend Recovery Litigation, the Defendants will be barred by operation of the automatic stay from asserting whatever counterclaims or cross-claims they may believe they have, or taking other actions against Flintkote in the Dividend Recovery Litigation. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1204-05 (3d Cir. 1992) (holding that "[m]ultiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay . . . [t]hus, within one case, actions *against* a debtor will be suspended even though closely related claims asserted *by* the debtor may continue"); Sansone v. Walsworth (In re Sansone), 99 B.R. 981, 984-85 (Bankr. C.D. Cal. 1989) (filing of compulsory counterclaim against debtor in action brought by debtor violates the automatic stay). To avoid this potential result, the Court should shorten the notice period so that the Joint Prosecution Motion may be heard at the next omnibus hearing on April 17, 2006.

Retention of the Litigation Team is an intergral part of the Estates' prosecution of the Dividend Recovery Litigation. The Litigation Team has been retained (subject to Court approval) to represent the Estates in all aspects of the Dividend Recovery Litigation after an extensive search throughout the country for the best group of attorneys to pursue these causes of action. The Estate Representatives and the Litigation Team reached agreement on the terms of the Litigation Team's retention under the Fee Agreement on February 27, 2006, and the Estate Representatives requested that the Litigation Team commence work immediately to draft and file the Complaint. Preparation of the Complaint took time, requiring the Litigation Team to review numerous documents, research multiple issues of law, conduct interviews with potential witnesses, and strategize with the Estates Representatives with respect to matters involving the Dividend Recovery Litigation. Between now and the next omnibus hearing on May 15, 2006, the Debtors anticipate that there will likely be a significant amount of activity in the Dividend Recovery Litigation that the Litigation Team will be called upon to handle. The Estate Representatives would like the engagement of the Litigation Team to be authorized as soon as possible, so that the Litigation Team can focus their efforts on the actions that will likely be occurring in the Dividend Recovery Litigation during the first few weeks of the case.

For these reasons, the Debtors request that the Court shorten the notice period in respect of the Joint Prosecution Motion and the Retention Application so that the Estate Representatives have the assurance that the Dividend Recovery Litigation will be efficiently and fullsomely pursued for the maximum benefit to the Estates.

-5-

WHEREFORE, the Debtors respectfully request entry of an order granting this

Motion and such other and further relief as the Court deems just and proper.

Dated: April 5, 2006

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Sandra G. M. Selzer (Bar No. 4283)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400

—and—

SIDLEY AUSTIN LLP
Kevin T. Lantry
Jeffrey E. Bjork
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-6000
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Co-Counsel for Debtors and Debtors in Possession

-6-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related to Docket Nos. 1433 and 1434** |
| | ) | |
| | ) | |

## ORDER SHORTENING NOTICE PERIODS

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") seeking an order to shorten the notice periods and objection deadlines in respect of (i) "Debtors' Motion For Order Approving Certain Joint Prosecution Agreements And Annulling The Automatic Stay In Connection With The Dividend Recovery Litigation" (the "Joint Prosecution Motion") and (ii) "Application For An Order Authorizing The Debtors To Employ Special Litigation Counsel In Connection With The Dividend Recovery Litigation Pursuant To 11 U.S.C. §§ 327(e) And 328(a) And Granting Related Relief" (the "Retention Application"); the Court having reviewed the Motion, and adequate and sufficient notice of the Motion having been given under the circumstances; and it appearing that the relief requested is in the best interests of the Debtors and their estates; it is hereby

ORDERED, that the Motion is granted in its entirety; and it is further

ORDERED, that the Joint Prosecution Motion and the Retention Application shall be heard on April 17, 2006 at 9:30 a.m. (prevailing Eastern time) before this Court at the United

-7-

States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801; and it is further

ORDERED, that all objections to the Joint Prosecution Motion and the Retention Application shall be filed and served on counsel for (a) the Debtors; (b) the Office of the United States Trustee; (c) the Official Committee of Asbestos Personal Injury Claimants; (d) James J. McMonagle as the Legal Representative for Future Asbestos Personal Injury Claimants; and (e) any party requesting special notice in these cases, no later than April ____, 2006 at ___:___ p.m. (prevailing Eastern time).

Dated: _____, 2006

_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

-8-

# EXHIBIT E
## [to the Brief in Support]

## ATTESTATION

I, the undersigned, **WENDI J. BERKOWITZ,** Attorney, practicing law with the firm Morgenstein & Jubelirer LLP, residing and domiciled for the purposes hereof at One Market, Spear Street Tower, 32nd Floor, San Francisco, California, USA, 94105, am the attorney for The Flintkote Company and solemnly affirm that:

1.      I am a member of the California State Bar (CSB #145624).

2.      This copy is a certified true copy of :

- APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION;

**SWORN TO BEFORE ME,** in the City of
SAN FRANCISCO
in the State of California, this 14th
day of April, 2006.

NOTARY PUBLIC

WENDI J. BERKOWITZ
MORGENSTEIN & JUBELIRER LLP



NYRA Y. PIERCE
COMM. # 1633404
NOTARY PUBLIC CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires December 28, 2008

81(07364.1
02914.00001
610832.1

1   ALAN R. BRAYTON (State Bar No. 073685)
    GILBERT L. PURCELL (State Bar No. 113603)
2   DAVID R. DONADIO (State Bar No. 154436)
    BRAYTON PURCELL, LLP
3   222 Rush Landing Road
    P. O. Box 6169
4   Novato, CA 94948-6269
    Telephone: (415) 898-1555
5
    Attorneys for Plaintiffs
6   Marlene Hopkins, Michelle Hopkins, and Michael Hopkins

7   STEPHEN M. SNYDER (State Bar No. 054598)
    JAMES L. MILLER (State Bar No. 071958)
8   SNYDER MILLER & ORTON LLP
    111 Sutter Street, Suite 1950
9   San Francisco, CA 94104
    Telephone: (415) 962-4400
10  Facsimile: (415) 962-4401

11  Attorneys for Plaintiff
    The Flintkote Company
12
    (Additional Counsel Listed on Signature Page)
13

14              SUPERIOR COURT OF CALIFORNIA

15                COUNTY OF SAN FRANCISCO

16

17  MARLENE HOPKINS, Individually, as        Case No.:  CGC06450944
    Wrongful Death Heir, and as Successor-in-
18  Interest to NORMAN HOPKINS, JR.,          APPLICATION FOR DESIGNATION OF
    Deceased; and MICHELLE HOPKINS, and       COMPLEX LITIGATION
19  MICHAEL HOPKINS, as Legal Heirs of
    NORMAN HOPKINS, Deceased, and THE         [C.R.C. 1800 and General Order Re:
20  FLINTKOTE COMPANY,                        Procedure for Approval of Complex
                                              Litigation Designation]
21              Plaintiffs,

22       v.

23  PLANT INSULATION COMPANY;
    UNIROYAL HOLDING, INC.; IMPERIAL
24  TOBACCO CANADA LIMITED; SULLIVAN
    & CROMWELL LLP; and DOES 1 through
25  100,

26              Defendants.

27

28

02914.00001
610164.1
                                    - 1 -

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

1       Pursuant to California Rule of Court 1800 and the Court's General Order Re:

2   Procedure for Approval of Complex Litigation Designation, plaintiffs Marlene, Michelle

3   and Michael Hopkins (the "Hopkins family") and The Flintkote Company ("Flintkote")

4   request that this case be designated complex[1].

5   **THE COURT SHOULD APPROVE A COMPLEX DESIGNATION FOR THIS CASE**

6

7       This is a complicated case with two primary and interrelated claims: to recover

8   (with interest) over $500 million in corporate dividends declared by Flintkote in favor of

9   its ultimate parent, now known as Imperial Tobacco Canada Limited ("Imperial Tobacco")

10  and to establish Imperial Tobacco as the alter ego of Flintkote. These two primary

11  claims are knit together factually and legally. They are expressed in sixteen causes of

12  action against four defendants. (A true and correct copy of the Complaint and the Civil

13  Case Cover Sheet are attached as Exhibit A.) The causes of action include: declaratory

14  relief with respect to a written agreement by Imperial Tobacco (then known as Imasco

15  Limited and referred to here as "Imasco") to return the corporate dividends under

16  specified circumstances; for recovery of the dividends as illegally declared in favor of

17  Imasco; for breach of fiduciary duty by Imasco; for legal malpractice against Sullivan &

18  Cromwell, the attorneys who represented both Flintkote and Imasco in connection with

19  the payment of the illegal dividends; constructive trust; restitution and alter ego claims

20

21     [1] A party must designate a case as "complex," to alert the Court that the action
22  "requires exceptional judicial management to avoid placing unnecessary burdens on the
    court or the litigants and to expedite the case, keep costs reasonable, and promote
23  effective decision making by the court, the parties and counsel." C.R.C. 1800(a).

24     California Rule of Court 1800(b) directs courts, in determining whether a party's
    designation of a case as complex is appropriate, to consider several factors, including:

25     (1)   Is the case likely to involve "[n]umerous pretrial motions raising difficult or
26  novel legal issues that will be time-consuming to resolve"?

27     (2)   Will the case require "[m]anagement of a large number of witnesses or a
    substantial amount of documentary evidence"?

28

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

02914.00001
610164.1

1  asserted in an asbestos-related wrongful death, loss of consortium and survival action

2  brought by the Hopkins family.

3      The asbestos claims are factually interwoven with the dividend recovery and

4  malpractice claims because wrongful activity with respect to the dividend payments to

5  Imasco left Flintkote without the ability to pay its asbestos-related personal

6  injury/wrongful death liabilities. Wrongful conduct by both Imasco and its lawyers,

7  Sullivan & Cromwell, caused the payment of the dividends and that payment and

8  associated misconduct are important factual components in plaintiffs' proof that Imperial

9  Tobacco is the alter ego of Flintkote. Ultimately, having been stripped of the dividends,

10  Flintkote filed a chapter 11 bankruptcy case, now pending in the United States

11  Bankruptcy Court for the District of Delaware. Thus, the wrongful acts by defendants

12  Imperial Tobacco and Sullivan & Cromwell, which caused Flintkote to transfer over half a

13  billion dollars in cash to its former corporate parent, have left the Hopkins family (and all

14  Flintkote asbestos claimants) without an adequate remedy against Flintkote.

15      Plaintiffs believe that this matter will require more than the usual amount of court

16  oversight and supervision. Plaintiffs have named one of Canada's largest tobacco

17  companies and a major international law firm as defendants, and recovery in excess of

18  $500 million is sought. Plaintiffs expect defendants to mount a vigorous defense that will

19  entail significant initial motion practice and after that, protracted discovery. Witnesses

20  number in the many dozens, and documents are voluminous. Flintkote's own document

21  repository consists of approximately 1500 bankers' boxes. Plaintiffs expect that the

22  volume of defendants' documents, particularly Imperial Tobacco's and Sullivan &

23  Cromwell's, will also be significant.

24      For all of the above reasons, plaintiffs request that the Court approve the

25  designation as complex. If there is additional information that the Court wishes to

26  consider before assigning the case to a case management program, plaintiffs are

27  prepared to provide it.

28  //

MORGENSTERN & JUBELIRER LLP
Attorneys at Law
San Francisco

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

Respectfully submitted,

1

2    DATED:  _April 11_, 2006    BRAYTON PURCELL LLP

3

4                                  By _Ala R. Bray_

5                                     Alan R. Brayton
                                     Attorneys for Plaintiffs
6                                     Marlene Hopkins, Michelle Hopkins
                                     and Michael Hopkins
7    DATED:  _April 14_, 2006

8                                  MORGENSTEIN & JUBELIRER LLP

9

10                                 By _Wendy J. Ling for Jean Bertran_

                                     Jean L. Bertrand
11                                    Attorneys for Plaintiff
                                     The Flintkote Company
12

13

14   Additional Counsel for Plaintiff The Flintkote Company:

15   Eliot S. Jubelirer (State Bar No. 061654)
     Jean L. Bertrand (State Bar No. 083250)
16   MORGENSTEIN & JUBELIRER LLP
     One Market, Spear Street Tower, 32nd Floor
17   San Francisco, CA 94105
     Telephone: (415) 901-8700

18   Alan Pedlar (State Br No. 72216)
     THE LAW OFFICE OF ALAN PEDLAR
19   1112 Via Malibu
     Aptos, CA 95083
20   Telephone: (831) 688-2667

21   Kelly C. Wooster (State Bar No. 41196)
     112 Rock Creek Court
22   P. O. Box 62
     Copperopolis, CA 95228
23   Telephone: (209) 785-2437

24

25

26

27

28

APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as      )
Wrongful Death Heir, and as Successor-in-  )
Interest to NORMAN HOPKINS, JR.,       )
Deceased; and MICHELLE HOPKINS, and    )
MICHAEL HOPKINS, as Legal Heirs of     )
NORMAN HOPKINS, Deceased, THE          )
FLINTKOTE COMPANY, THE OFFICIAL        )
COMMITTEE OF THE ASBESTOS             )
PERSONAL INJURY CLAIMANTS, and         )
JAMES J. MCMONAGLE as the LEGAL        · )
REPRESENTATIVE FOR FUTURE              )
ASBESTOS PERSONAL INJURY              )
CLAIMANTS                              )
                                       )
                 Plaintiffs,           )      Civil Action No. _____
                                       )
       vs.                             )
                                       )
PLANT INSULATION COMPANY;              )
UNIROYAL HOLDING, INC.; IMPERIAL       )
TOBACCO CANADA LIMITED;                )
SULLIVAN & CROMWELL LLP; and           )
DOES 1 through 100,                    )
                                       )
                 Defendants.           )
_____       )

### AFFIDAVIT OF REBECCA WORKMAN, PARALEGAL

STATE OF DELAWARE    :
                     : SS:
NEW CASTLE COUNTY    :

      I, Rebecca Workman, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on May 5, 2006, I caused to be served:

### BRIEF OF IMPERIAL TOBACCO CANADA LIMITED IN SUPPORT OF ITS EMERGENCY PETITION FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

1387050/1

Service was completed upon parties on the attached list in the manner indicated thereon.

Date:   May 5, 2006.

*Rebecca Workman*
Rebecca Workman

SWORN AND SUBSCRIBED before me this 5th day of May, 2006.

NOTARY

Notary Public - State of Delaware
My Com              21, 2007

138703(v1

**VIA FIRST CLASS MAIL**

Gilbert L. Purcell, Esquire
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169
(Attorneys for Plaintiff Marlene
Hopkins, Michelle Hopkins, and
Michael Hopkins)

Stephen M. Snyder, Esquire
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
(Attorneys for Plaintiffs The
Flintkote Company, The
Official Committee of Asbestos
Personal Injury Claimants, and
James J. McMonagle as the
Legal Representative for Future
Asbestos Personal Injury Claimants)

Eliot S. Jubelirer, Esquire
Jean L. Bertrand, Esquire
Morgenstein & Jubelirer
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(Additional Counsel for Plaintiffs)

Alan Pedlar, Esquire
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA 95083
(Additional Counsel for Plaintiffs)

Kelly C. Wooster, Esquire
112 Rock Creek Court
P.O. Box 62
Copperopolis, CA 95228
(Additional Counsel for Plaintiffs)

**VIA FIRST CLASS MAIL**

Kevin T. Lantry
Jeffrey E. Bjork
Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA 90013
Attorneys for The Flintkote Company

Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attorneys for Sullivan & Cromwell

Monte S. Travis
Travis & Pon
2001 Fillmore Street
San Francisco, CA 94115-2708
Attorneys for Plant Insulation

Nancy E. Hudgins
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Attorneys for Uniroyal Holdings, Inc.

**VIA HAND DELIVERY**

Laura Davis Jones
James E. O'Neill, III
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, DE 19899-8705
Attorneys for The Flintkote Company

138703 3/1

**VIA HAND DELIVERY**

Marla Eskin, Esquire
Kathleen Campbell, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(Counsel for the Official Committee of
Creditors)

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Legal Representative)

1387163/1