# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, and THE FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTSOS PERSONAL INJURY CLAIMANTS<br><br>        Plaintiffs,<br><br>    vs.<br><br>PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100,<br><br>        Defendants. | Civil Action No. 1:06-CV-00298-JJF |

---

## DECLARATION OF ALAN PEDLAR IN SUPPORT OF DEBTOR'S OPPOSITION TO EMERGENCY PETITION OF IMPERIAL TOBACCO CANADA LIMITED FOR AN ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

I, Alan Pedlar, declare and state as follows:

1.     I am over eighteen years of age and have personal knowledge of the facts set forth herein, and if called as a witness, I would and could testify competently with respect thereto from my own personal knowledge, except as otherwise stated.

2.     I am duly authorized to practice law before the Courts of the State Of California, before the United States District Courts for the Northern, Eastern, Central and Southern Districts of California, the United States Court of Appeals for the Ninth Circuit, the United States Court of Federal Claims, and have been admitted *pro hac vice* in this district in connection with the chapter 11 case for The Flintkote Company and

Flintkote Mines Limited (collectively "Flintkote"), which cases are consolidated for joint administration under Case No. 04-11300 (JKF) (the "Chapter 11 Case").

3.    I am one of the special litigation counsel employed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the Chapter 11 Case to prosecute litigation against Imperial Tobacco Canada Limited ("Imperial Tobacco") and others.

4.    On April 5, 2006, Flintkote filed a complaint in the California Superior Court for the County of San Francisco commencing an action against Imperial Tobacco and others (the "State Court Action"). The State Court Action has since been removed to the United States District Court for the Northern District of California, pending a hearing on Flintkote's motion to remand it to the California Superior Court. The State Court Action is also the subject of Imperial Tobacco's request to this Court to transfer the action to United States District Court for the District of Delaware pursuant to 28 U.S.C. § 157(b)(5).

5.    In filing the State Court Action, Flintkote was represented by Snyder Miller & Orton, LLP, Morgenstein & Jubelirer LLP, Kelly C. Wooster and myself. Upon commencement of the State Court Action, Flintkote promptly moved in the Chapter 11 Case to have the retention of its counsel in the State Court Action approved. That approval was granted on April 5, 2006. At the same time, Flintkote moved to have an agreement by which the State Court Action would be jointly prosecuted by Flintkote and the legal representatives of current and future asbestos claimants. The Bankruptcy Court granted that motion on April 27, 2006. Finally, Flintkote moved the Bankruptcy Court to approve an agreement with its co-plaintiffs in the State Court Action, the Hopkins Family. That agreement establishes guidelines by which the parties will manage the State Court Action, including rules regarding joint settlements and financial contributions to defer litigation expenses. The related motion to approve that agreement also requested modification of the automatic stay of Bankruptcy

Code section 362(a), 11 U.S.C. § 362(a), to the extent applicable to the continued prosecution of alter ego claims by the Hopkins Family against Imperial Tobacco. That agreement, as modified, was approved by the Bankruptcy Court on May 15, 2006.

6.      A copy of the Flintkote's "Application For An Order Authorizing The Debtors To Employ Special Litigation Counsel In Connection With The Dividend Recovery Litigation Pursuant to 11 U.S.C. §§ 327(e) and 328(a) And Granting Related Relief" filed in the Bankruptcy Case (Docket No. 1434) on April 5, 2006, is attached hereto as Exhibit "1". I have not attached the Fee Agreement, Exhibit "A" thereto, because it is attached to Exhibit "2" hereto, nor I have attached the various employment declarations of counsel or the proposed order, Exhibits "B"-"F". A copy of the "Order Authorizing The Debtors To Employ Special Litigation Counsel In Connection With The Dividend Recovery Litigation Pursuant to 11 U.S.C. §§ 327(e) and 328(a) And Granting Related Relief" entered in the Bankruptcy Case (Docket No. 1461) on April 5, 2006, is attached hereto as Exhibit "2", to which the fee agreement is attached as Exhibit "A".

7.      A copy of the "Debtors' Motion For Order Approving Certain Joint Prosecution Agreements And Annulling The Automatic Stay In Connection With The Dividend Recovery Litigation" filed in the Bankruptcy Case (Docket No. 1433) on April 5, 2006, is attached hereto as Exhibit "3". I have not attached (a) the Joint Prosecution Agreement, Exhibit "A" thereto, because it is attached to Exhibit "4" hereto, (b) the Alter Ego Agreement, because it is attached as Exhibit "5" hereto, (c) the Complaint, Exhibit "C" thereto, as it is already in the record in this case, and (d) the proposed order, Exhibit "D" thereto. A copy of the "Order Approving Certain Joint Prosecution Agreement In Connection With The Dividend Recovery Litigation" entered in the Bankruptcy Case (Docket No. 1479) on April 27, 2006, is attached hereto as Exhibit "4". Exhibit "A" to that order is the Joint Prosecution Agreement. A copy of the Alter Ego Agreement, prior to its modification and approval by the bankruptcy court in the Chapter 11 case is attached hereto as Exhibit "5". The Alter Ego Agreement, as

modified and approved by the Bankruptcy Court, is attached as Exhibit "A" to Exhibit 8 hereto.

8.     As set forth in Exhibit "4", the hearing on the Alter Ego Agreement on April 17, 2006 was continued to May 15, 2006. The transcript of the April 17, 2006 hearing is attached hereto as Exhibit "6".

9.     A copy of the "Imperial Tobacco Canada Limited's Memorandum Of Law In Support Of Its Motion To Withdraw The Reference To The Bankruptcy Court With Respect To The Debtors' Joint Prosecution Motion" (Docket No. 1505) is attached hereto as Exhibit "7".

10.     A copy of the order of the Bankruptcy Court in the Chapter 11 Case approving the Alter Ego Agreement, as modified (Docket No. 1539), is attached hereto as Exhibit "8".

11.     A copy of the First Amendment to the Alter Ego Agreement is attached hereto as Exhibit "9". Notice and an opportunity for a hearing regarding this First Amendment are being provided to creditors and other parties in interest.

12.     A copy of "Imperial Tobacco Canada Limited's Motion For Continuance Of Hearing On Joint Prosecution Motion" (Docket No.1501) is attached hereto as Exhibit "10".

13.     A copy of "Imperial Tobacco Canada Limited's Supplemental Pleading In Support Of Its Objection To Debtors' Motion For Order Approving Certain Joint Prosecution Agreements And Annulling The Automatic Stay In Connection With The Dividend Recovery Litigation" (Docket No. 1498) is annexed hereto as Exhibit "11".

I declare under penalty of perjury under the laws of the United State of America that the foregoing is true and correct.

Executed this 18th day of May, 2006, at Aptos, California.

Alan Pedlar

EXHIBIT "1"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Objections Due: April 13, 2006 at 4:00 p.m. (requested)** |
| | ) | **Hearing Date:  April 17, 2006 at 9:30 a.m. (requested)** |

## APPLICATION FOR AN ORDER AUTHORIZING THE DEBTORS TO EMPLOY SPECIAL LITIGATION COUNSEL IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION PURSUANT TO 11 U.S.C. §§ 327(e) AND 328(a) AND GRANTING RELATED RELIEF

The Flintkote Company ("Flintkote") and Flintkote Mines Limited ("Mines")

(collectively, the "Debtors"), submit this application (the "Application") requesting entry of an

order (i) authorizing the Debtors, on behalf of their respective estates (the "Estates"), to employ

and retain a team of lawyers consisting of (a) the law firm of Snyder, Miller & Orton LLP

("SMO"); (b) the law firm of Morgenstein & Jubelirer ("M&J"); (c) Mr. Alan D. Pedlar, Esq., and

his successor professional corporation, if any; and (d) Mr. Kelly C. Wooster, Esq. (collectively, the

"Dividend Recovery Litigation Counsel" or "DRLC") as special litigation counsel pursuant to 11

U.S.C. § 327(e) in connection with the Dividend Recovery Litigation (as defined below)

pursuant to the terms set forth in that certain "Retention And Contingency Fee Agreement" dated

as of February 27, 2006 (the "Fee Agreement"), by and among the Debtors, the Official

Committee of Asbestos Personal Injury Claimants (the "ACC") and James J. McMonagle as the

Legal Representative for Future Asbestos Personal Injury Claimants (the "FCR"), on the one

hand, and the DRLC members, on the other hand, in accordance with 11 U.S.C. § 328(a) and (ii) granting related relief (as specified below) in connection herewith.

In support of this Application, the Debtors respectfully submit (i) the Declaration filed by each DRLC member; and (ii) the Declaration of David J. Gordon (the "Gordon Declaration"), each filed concurrently herewith. In further support hereof, the Debtors respectfully state as follows:

## STATUS OF CASE AND JURISDICTION

1.    On May 1, 2004, Flintkote filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On August 25, 2004, Mines, the wholly-owned subsidiary of Flintkote, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.    On September 9, 2004, the Court entered the "Order (i) Directing Joint Administration; (ii) Directing that Certain Orders in the Chapter 11 Case of the Flintkote Company be Made Applicable to Flintkote Mines Limited" (Docket No. 238) directing the joint administration of these two chapter 11 cases.

3.    The Debtors have continued in possession of their respective properties and have continued to operate and manage their respective businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.    No request has been made for the appointment of a trustee or examiner in these cases. On May 19, 2004, the ACC was appointed by the Office of the United States Trustee. Additionally, the Court appointed James J. McMonagle as the FCR for Flintkote and Mines on August 26, 2004 and September 9, 2004, respectively (Docket Nos. 199 and 238, respectively).

5.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory bases for the relief sought herein are §§ 327(e) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

6.    By this Application, the Debtors seek entry of an order (i) authorizing the retention of DRLC as special litigation counsel in respect of the Dividend Recovery Litigation pursuant to § 327(e) of the Bankruptcy Code, *nunc pro tunc* to February 27, 2006, (ii) approving the Fee Agreement (an executed copy of which is attached hereto as Exhibit A), in accordance with the terms of that certain "Order Appointing Fee Auditor and Establishing Related Procedures Concerning the Allowance and Payment of Compensation and Reimbursement of Expenses of Professionals and Members of the Official Committee and Consideration of Fee Applications" (Docket No. 183, the "Fee Procedures Order") but waiving the 20% holdback requirement solely as it relates to the payment of the allowed, reduced monthly fees of the DRLC members pursuant to the Fee Agreement and (iii) authorizing the law firm of Stutman Treister & Glatt Professional Corporation ("ST&G") (with whom Mr. Pedlar practiced law as "Of Counsel" until his resignation effective March 13, 2006) to submit a single interim request for payment under the proposed Fee Agreement for the period from February 27, 2006, through March 12, 2006, subject to such additional fees as the Court may award in accordance with the Fee Agreement at the conclusion of the engagement.  The ACC and the FCR support the relief sought in this Application.

-3-

### RELEVANT BACKGROUND

A.    Commencement of the Dividend Recovery Litigation.

7.    On April 5, 2006, Plaintiffs Flintkote and an individual asbestos claimant (the "Asbestos Claimant") jointly filed a complaint (the "Complaint") against Defendants Imperial Tobacco Canada Limited (formerly known as Imasco Limited ("Imasco")), Sullivan & Cromwell LLP ("S&C") and Does 1 though 100 in the Superior Court of California, County of San Francisco (the "Superior Court") (Case No. CGC 06450944). The Complaint (i) asserts claims arising out of or related to certain dividends ultimately received by Imasco, the former ultimate parent of Flintkote, (ii) asserts alter ego, veil piercing and similar theories of recovery against Imasco (collectively, "Alter Ego Remedies"), and (iii) requests declaratory relief ((i) – (iii) are collectively referred to herein as the "Dividend Recovery Litigation" or "DRL").

8.    The claims arise from or relate to two dividends, totaling $525 million that were ultimately received by Imasco, the former ultimate parent company of Flintkote, in 1986 and 1987. The dividends were paid as part of an orchestrated scheme whereby Imasco acquired Flintkote's parent company in a hostile takeover; caused Flintkote to separate its operating assets from its asbestos liabilities by forming subsidiary corporations; caused Flintkote to sell off these operating subsidiaries; caused Flintkote to pay Imasco $525,000,000 of the proceeds from those sales; and caused Flintkote to become, for all practical purposes, an asbestos claims paying facility. The payment took the form of two dividends. The result was that Flintkote's asbestos creditors funded a substantial portion of Imasco's hostile acquisition.

9.    The DRL also names S&C as a defendant. S&C historically represented Imasco, but at Imasco's instigation, represented both Imasco and Flintkote in connection with the

dividend transactions.  S&C erroneously and negligently advised Flintkote and its board of directors with respect to the dividends.

10.    As part of the dividend transaction, Imasco agreed to repay to Flintkote (up to the full amount of the dividends) amounts due to Flintkote's creditors, including asbestos personal injury claimants, that cannot be satisfied out of the assets of Flintkote, if a court of competent jurisdiction finally determines that the dividends were improperly paid to Imasco. The respective experts retained by the ACC and the FCR agree that, based upon their analyses, Flintkote's current and future asbestos liabilities are estimated to exceed $3 billion, which is materially in excess of the amount of assets available to satisfy such liabilities.  Similarly, the Debtors commenced these chapter 11 cases because they believed that the amount of their current and future asbestos personal injury liabilities exceeded the value of their assets.

11.    Subject to the approval of this Court, DRLC will serve as special litigation counsel to the Estates in the prosecution of the Dividend Recovery Litigation.[1]

B.    The Selection Process Culminating in the Proposed Retention of DRLC.

12.    The Debtors, the ACC and the FCR (the "Estate Representatives") conducted an extensive search to identify prospective litigation counsel that had the requisite expertise, ability and resources to handle the Dividend Recovery Litigation.  More than twenty potential law firms and individual lawyers were initially identified by the Estate Representatives as prospective leads.   Initial calls were placed by the Estate Representatives to the identified candidates to assess their respective interest.  Informational packets were sent to the candidates who expressed preliminary interest, following the receipt of signed confidentiality agreements

---

[1] The Debtors have filed concurrently herewith their "Motion for an Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay In Connection With the Dividend Recovery Litigation," wherein they seek, among other relief, approval of a Joint Prosecution Agreement, pursuant to which the ACC and the FCR would be conferred standing to represent the Debtors' estates and, with the Debtors, jointly prosecute the Dividend Recovery Litigation.

from such candidates. The Estate Representatives then held a series of telephonic interviews and face-to-face meetings with several leading contenders (including the DRLC members) to further explore their expertise and interest in the representation and to discuss potential fee arrangements (subject in all respects to the terms of signed confidentiality agreements and the protection of attorney-client privilege). The search process lasted several months.

13.    In the end, the Estate Representatives unanimously agreed to retain DRLC as a litigation team based upon, among other things, their extensive litigation and collective jury trial experience, their specific knowledge of and experience in asbestos-related matters (including litigation arising out of asbestos-related chapter 11 cases), and their individual reputations within the legal community. The Estate Representatives and DRLC engaged in good faith, arms-length, negotiations regarding the proposed fee arrangement, which culminated in the terms set forth in the Fee Agreement (as further discussed below). None of the fee arrangements proposed by other candidates were more advantageous or beneficial to the Estates than the arrangement with the DRLC set forth in the Fee Agreement. Accordingly, the Debtors believe that retention of the DRLC as special litigation counsel and approval of the Fee Agreement is in the best interests of their Estates and creditors.

### SUMMARY OF PROPOSED ENGAGEMENT TERMS

14.    DRLC consists of two law firms (SMO and M&J) and two individual lawyers (Mr. Pedlar and Mr. Wooster) who, together, will represent the Estates in respect of the Dividend Recovery Litigation and will be compensated under the terms of Fee Agreement. The terms of DRLC's proposed engagement are summarized below.[2]

---

[2] The following is intended to be a summary of the salient provisions of the Fee Agreement (a true and correct copy of which is attached hereto as Exhibit A), which sets forth the terms of the proposed engagement and the compensation of DRLC in connection with the Dividend Recovery Litigation. In the event that the terms as summarized in this Motion conflict with the terms of the Fee Agreement, the Agreement shall control.

A.    <u>Description of Services to be Provided by DRLC.</u>

15.    Subject to this Court's approval, DRLC will provide the legal and litigation support required by the Estates in connection with the Dividend Recovery Litigation, including, without limitation:

- serving as the co-trial counsel in respect of the Dividend Recovery Litigation;

- advising the Estate Representatives with respect to claims, asserted defenses and strategies in respect of the Dividend Recovery Litigation;

- taking necessary action to vindicate the Estates' rights with respect to the Dividend Recovery Litigation;

- conducting and responding to discovery in respect of the Dividend Recovery Litigation;

- negotiating with the defendants in the Dividend Recovery Litigation and other adverse parties;

- managing the Dividend Recovery Litigation, in accordance with instructions and guidance provided by the Estate Representatives under the terms of the Joint Prosecution Agreement;

- taking other necessary actions to maximize the value of the Estates' interest in respect of the Dividend Recovery Litigation;

- appearing before this Court in respect of matters related to the Dividend Recovery Litigation; and

- rendering all other services with respect to the Dividend Recovery Litigation as may be agreed upon by the Estate Representatives.

16.    The skills and expertise of the DRLC members are not duplicative, but rather are complimentary. Each member is necessary to the representation of the Estates in the Dividend Recovery Litigation given the scope and potential duration of the litigation. The Dividend Recovery Litigation seeks substantial recoveries from multiple defendants; it will be

long and hard fought, involving complex legal issues and multiple theories of recovery; it will require the Estates to conduct and respond to extensive discovery, as well as to prepare and respond to the testimony of various expert witnesses on a number of issues. Working together as a litigation team, DRLC will represent the Estates in all facets of this litigation.

17.    The Debtors believe that DRLC is well qualified and able to serve as their special counsel in the Dividend Recovery Litigation.

B.    Compensation of DRLC Under the Fee Agreement.

18.    Under the Fee Agreement, and as further described below, DRLC will be compensated based upon a combination of monthly fees at Discounted Rates and a potential Contingency Fee tied to net recoveries resulting from the Dividend Recovery Litigation.

19.    Discounted Guideline Rates. DRLC will discount the hourly rates for services provided by attorneys and staff at the normal and customary guideline rates charged to nonbankruptcy clients ("Guideline Rates"). DRLC will charge 40% of Guideline Rates, but capped for each timekeeper at $200 per hour, and the Debtors will pay such discounted Guideline Rates ("Discounted Rates") each month, subject to review and approval by this Court. DRLC anticipates that the core team will consist of Stephen M. Snyder and James L. Miller of SMO; Eliot S. Jubelirer and Jean Bertrand of M&J; and Alan Pedlar and Kelly C. Wooster. The current Guideline Rates for these professionals are Stephen M. Snyder-$600 per hour; James L. Miller-$500 per hour; Eliot S. Jubelirer-$425 per hour; Jean Bertrand-$425 per hour; Alan Pedlar-$650 per hour; and Kelly C. Wooster-$600 per hour. As such, application of the Discounted Rates to these and other timekeepers will result, in some cases, in hourly rates that are less than $200 per hour. Other DRLC attorneys and paralegals may from time to time

perform services on behalf of the Debtors, in connection with the matters described herein, but the fees for their professional services will be capped as set forth above based upon their ordinary rate schedules. The full hourly rates above are subject to periodic increases in the normal course of DRLC's business, although the cap would remain at $200 per hour throughout the litigation.

        20.   <u>Litigation Costs</u>. The Estates shall pay or reimburse DRLC for all costs and expenses of the Dividend Recovery Litigation, including but not limited to costs advanced or incurred by DRLC, such as expert witness fees, consultant fees (provided that the Estate Representatives approve retention of experts and consultants in advance and obtain, if required, appropriate orders of this Court), travel expenses, court fees, costs of discovery, electronic research charges, courier and postage charges, telephone and telecopy charges, charges for messenger services and air couriers, photocopying, expenses for working meals, and non-ordinary overhead expenses, and other charges customarily invoiced by law firms in addition to fees for legal services ("<u>DRL Costs</u>"). DRLC will bill the Debtors monthly for DRL Costs. The Debtors will pay such bills within 30 days. Amounts so paid will be subject to final review and approval by this Court regarding compensation of professionals. The Estates will pay DRL Costs directly to service providers or vendors when client and DRLC determine that such costs will likely exceed $4,000. All requests for reimbursement of DRL Costs will be made in accordance with guidelines in effect in these chapter 11 cases or as the Court may order.

        21.   <u>Result Based Compensation</u>. In addition to Discounted Rates, the Debtors agree to pay DRLC result-based compensation if and when there is a Net Recovery in the Dividend Recovery Litigation. "Net Recovery" means gross recovery, including cash and the value of certain non-cash consideration, less DRL Costs and all fees previously paid to DRLC.

a.   <u>Guideline Rate Restoration</u>.  The Estates will pay DRLC 35% of the Net Recovery until full Guideline Rates for services rendered and billed to the Debtors have been paid to each DRLC member ("<u>Guideline Rate Restoration</u>").  If a Net Recovery does not result in payment of full Guideline Rates to each DRLC member, the Estates will pay, out of such Net Recovery, each such member ratably based on the total dollar amount of services rendered by each member calculated in accordance with each member's Guideline Rates.

b.   <u>Contingency Fee</u>.  When and after any Net Recovery results in Guideline Rate restoration to each DRLC member, the Estates will pay, out of such Net Recovery, DRLC a contingency fee ("<u>Contingency Fee</u>") as follows:

i.      upon any further Net Recovery of less than $32.5 million, the Estates will pay zero percent of such Net Recovery;

ii.     upon any further Net Recovery from $32.5 through $132.5 million, the Estates will pay 20% of such Net Recovery;

iii.    upon any further Net Recovery above $132.5 million, the Estates will pay 15% of such Net Recovery.

22.   <u>Potential Fixed Fee Arrangement</u>.  Federal tort reform legislation, including but not limited to the proposed FAIR Act, may take, freeze or impair access to funds held in asbestos bankruptcy trusts ("<u>Confiscatory Legislation</u>") or may remove asbestos claims from the tort system ("<u>Relevant Tort Reform</u>").  If Confiscatory Legislation is enacted, the parties foresee litigation to invalidate the legislation on constitutional or other grounds ("<u>Taking Litigation</u>").  If a trust is established in connection with these chapter 11 cases, the Estate Representatives desire that the trust be able to pursue the Dividend Recovery Litigation despite the existence of Confiscatory Legislation and during any Taking Litigation.  Although the enactment of Confiscatory Legislation would threaten the trust's ability to pay for legal services,

-10-

DRLC are willing to continue to pursue the Dividend Recovery Litigation under those

conditions, if satisfactory arrangements are made to compensate them for that risk. Accordingly,

> i.      Any proposed plan of reorganization that channels asbestos claims to a trust or that otherwise exposes trust assets to Confiscatory Legislation (a "524(g) Reorganization") shall include a provision for a prepaid escrow to insure availability of funds to DRLC. The plan will provide that the escrow shall be funded by either reorganized Client or the trust established under a 524(g) Reorganization upon passage of Confiscatory Legislation by either the Senate or Congress ("Escrow Funding Date").

> ii.     If there is a 524(g) Reorganization and Confiscatory Legislation is passed, DRLC may elect to be paid a fixed compensation covering services of DRLC in the DRL for up to 18 months in the amounts set forth below ("Fixed Fee"). During the period of the Fixed Fee, DRLC will provide all necessary services in the DRL and will advance litigation costs, subject to reimbursement.

> iii.    DRLC has provided a six-month estimate and an eighteen-month estimate in respect of fees. The Estate Representatives have agreed that the estimate is reasonable and will serve as the basis upon which to calculate the Fixed Fee.

> iv.     Upon or before the Escrow Funding Date, the Debtors (or reorganized Debtors, if applicable) or the trust will establish an escrow for the benefit of DRLC under an escrow agreement and instructions to be approved by DRLC in their discretion.      •

> v.      If Relevant Tort Reform is enacted, DRLC may elect to forego any Contingency Fee and be paid the difference between Guideline Rates and Discounted Rates for past services and shall be paid Guideline Rates for future services. If Relevant Tort Reform is finally ruled invalid, fee arrangements set forth in Paragraph 21 will be reinstated and will apply thereafter.

## AUTHORITY

A.  Retention Of DRLC Is Authorized Under 11 U.S.C. § 327(e) And Warranted Under The Circumstances.

> 23.     This Court may authorize DRLC's retention by the Debtors pursuant to

§ 327(e) of the Bankruptcy Code. Section 327(e) provides, in relevant part, as follows:

> The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

      24.     This Court and other courts in this District have approved a debtor's application under § 327(e) to retain special litigation counsel to represent the estate in litigation arising out of asbestos-related chapter 11 cases.  See, e.g., In re The Flintkote Company and Flintkote Mines Limited, Case No. 04-11300-JKF (Bankr. D. Del. January 6, 2005); In re ACandS, Inc., Case No. 02-12687-JKF (Bankr. D. Del. Nov. 18, 2002; April 28, 2003). Accordingly, the Debtors submit that the Court's approval of this Application is authorized under § 327(e).

      25.     Moreover, the circumstances here warrant the Court's approval of the DRLC's retention, *nunc pro tunc* to February 27, 2006.  The Estate Representatives and DRLC reached agreement on the terms of the Fee Agreement on February 27, 2006, and the Estate Representatives requested that DRLC commence work immediately to draft and file the Complaint.  Preparation of the Complaint took time, requiring DRLC to review numerous documents, research multiple issues of law, conduct interviews with potential witnesses, and strategize with the Estates Representatives with respect to matters involving the Dividend Recovery Litigation.  Moreover, the Estate Representatives, in consultation with the DRLC, determined that it was in the Estates' best interest to refrain from filing this Application until they received confirmation that the Complaint had been filed in the Superior Court and served on the Defendants, so as not to prematurely disclose litigation strategy or identify potential defendants or causes of action which may have been contemplated, but not ultimately pursued, in the Dividend Recovery Litigation.  The Debtors seek *nunc pro tunc* approval to ensure that DRLC may seek payment for its fees and expenses incurred from February 27, 2006.

26.    As set forth in the respective declarations of each of the DRLC and in accordance with the requirements of Bankruptcy Code section 327, none of the DRLC represent or hold any interest adverse to the debtor or the estate with respect to the Dividend Recovery Litigation, and each them has provided a supporting affidavit or verified statement concerning their contacts with all parties in this matter. Therefore, DRLC are in compliance with Bankruptcy Rule 2014 and Local Bankruptcy Rule 2014-1.

B.    The DRLC's Fee Arrangement Is Appropriate Under 11 U.S.C. § 328(a).

27.    Section 328(a) provides for a trustee (or debtor in possession), with Court approval, to employ "a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 327(a). Other courts have approved contingency fee arrangements in respect of § 327(e) professionals. See, e.g., In re Federal-Mogul Global, Inc., 348 F.3d 390, 401-02 (3d Cir. 2003) ("Section 328 permit[s] a Bankruptcy Court to fix a contingent fee schedule at the commencement of a professional's employment"); In re Lytton's, 832 F.2d 395, 400 (7th Cir. 1988) (approving employment of estate professional on contingent fee basis to pursue litigation pending in district court); In re Solfanelli, 230 B.R. 54, 71 (M.D. Pa. 1999) (approving fees representing 25% of the recovery obtained for debtor in state court litigation by attorney employed under § 327(e)).

28.    The Debtors believe that the fee arrangement with DRLC (as summarized above and set forth in the Fee Agreement) is reasonable in light of the scope and potential duration of the Dividend Recovery Litigation. The Debtors believe that the fee arrangement with DRLC is well within market for this type of representation based upon the search efforts of the Estate Representatives in connection with the Dividend Recovery Litigation, and will result in a

substantially reduced monthly cash outlay for the Estates as compared with other fee

arrangements that were discussed with or proposed by other prospective firms in respect of this

matter. Both the ACC and the FCR were involved in the negotiation of the Fee Agreement and

support its approval by this Court. Accordingly, the Debtors request that the Court approve the

Fee Agreement in accordance with 11 U.S.C. § 328(a).

C.   Waiver Of The 20% Holdback Requirement And Modification Of The Fee Procedures
     Order Is Warranted Under These Circumstances.

29.   Under the Fee Procedures Order, the Debtors are authorized to pay to each

Applicant (as defined in the Fee Procedures Order) an amount equal to the 80 percent of the fees

and 100 percent of the expenses requested in the Monthly Fee Statement, to the extent such fees

and/or expenses are not subject to an objection. See Fee Procedures Order ¶ 4(c). The effect of

the Fee Procedures is to create a 20% holdback with respect to allowed monthly fees, which

amount can be paid at the end of each quarter pursuant to an Interim Fee Application if allowed

by this Court (the "20% Holdback").

30.   The Debtors seek to waive the 20% Holdback solely as it relates to the

allowed monthly fees of DRLC calculated at the Discounted Rates in accordance with the Fee

Agreement. The DRLC members have agreed to charge, on a monthly basis, Discounted Rates

equal to only 40% of their Guideline Rates. The Discounted Rates are intended to cover the

overhead expenses of the DRLC members related to the Dividend Recovery Litigation.

Applying the 20% Holdback would materially impact upon the DRLC members' ability to meet

their overhead expenses related to the Dividend Recovery Litigation in those months (prior to the

end of the applicable quarter) in which the holdback applies. Moreover, if the 20% Holdback

requirement is not waived with respect to DRLC, the Debtors believe that DRLC would find it

-14-

necessary to renegotiate the terms of the Discounted Rates in order to take into account the application of the 20% Holdback.

31.    The Fee Procedures Order provides that "[t]he Court shall retain authority to modify this Order upon notice to the parties." Fee Procedures Order ¶ 12. The Debtors respectfully request that the Court modify the Fee Procedures Order (specifically at paragraph 4(c)) such that the 20% Holdback requirement will not apply to the payment of all monthly fees of DRLC.

D.    The Court Should Authorize ST&G To Seek Payment Of Fees For Stub Period.

32.    As of February 27, 2006, the date that the Estate Representatives and DRLC reached agreement on the terms of the Fee Agreement and the Estate Representatives requested that DRLC commence work, Mr. Pedlar was practicing law at ST&G. Effective March 13, 2006, he resigned and commenced practice as a sole practitioner. As a result of this transition, work was performed by ST&G in connection with the Dividend Recovery Litigation from February 27, 2006, through March 12, 2006, for which it was contemplated that ST&G would be compensated, subject to the approval of this Court.

33.    The Debtors seek authority (i) to allow ST&G to make a single interim request for payment under the proposed Fee Agreement for the period from February 27, 2006 through March 12, 2006 (subject to such additional fees as the Court may award at the conclusion of the litigation) and, (ii) to the extent necessary, to retain ST&G as special litigation counsel under the Fee Agreement pursuant to § 327(e) for the period of February 27, 2006 through March 12, 2006. The Debtors seek to retain Mr. Pedlar under the Fee Agreement, in his individual capacity or as an employee of any professional corporation that he may establish, as part of DRLC *nunc pro tunc* to March 13, 2006. Pursuant to Bankruptcy Code section 504(b)(1),

-15-

nothing provided for herein or in the supporting Pedlar Decl. is intended to affect Mr. Pedlar's ability to share whatever compensation that he receives from the estate with ST&G, or ST&G's ability to share whatever compensation that it receives from the estate with Mr. Pedlar, as a result Mr. Pedlar's association with ST&G prior to March 13, 2006. All statements made in Mr. Pedlar's Declaration with respect to his own circumstances are equally true for ST&G, such that ST&G has received no compensation to date, holds no adverse interest to the Debtors or the Estates, and has no conflicts with respect to the matter for which DRLC (and, specifically, Mr. Pedlar) is to be employed.

## NOTICE

34.      Notice of this Motion has been provided to (i) the Office of the United States Trustee, (ii) counsel to the ACC, (iii) counsel to the FCR, and (iv) all parties that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

35.      No previous application or motion for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting this Application and providing such other and further relief as the Court deems necessary.

Dated: April 5, 2006

SIDLEY AUSTIN LLP
Kevin T. Lantry
Jeffrey E. Bjork
555 West Fifth Street
Los Angeles, California 90013-6000
Telephone: (213) 896-6000
Facsimile:  (213) 896-6600

- and -

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

EXHIBIT "2"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related Docket No. 1434** |
| | ) | **Agenda Item No. 3** |
| | ) | **April 17, 2006 at 9:30 a.m.** |

## ORDER AUTHORIZING THE DEBTORS TO EMPLOY SPECIAL LITIGATION COUNSEL IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION PURSUANT TO 11 U.S.C. §§ 327(e) AND 328(a) AND GRANTING RELATED RELIEF

Upon the Application (the "Application") of The Flintkote Company and

Flintkote Mines Limited (collectively, the "Debtors") for entry of an order (i) authorizing the

Debtors to employ special litigation counsel in connection with the Dividend Recovery

Litigation[1] pursuant to 11 U.S.C. §§ 327(e) and 328(a); and (ii) granting related relief; the Court,

having considered the Application, the Gordon Declaration, any objections filed in respect of the

Application and the arguments of counsel; it appearing that due and proper notice of the

Application was given and that no additional notice need be given; after due deliberation, and

good cause having been shown therefor; it is hereby

ORDERED, that the Application is GRANTED in its entirety; and it is further

ORDERED, that the Debtors are authorized to retain (a) the law firm of Snyder,

Miller & Orton LLP; (b) the law firm of Morgenstein & Jubelirer; (c) Mr. Alan D. Pedlar, Esq., and

his successor professional corporation, if any; and (d) Mr. Kelly C. Wooster, Esq., as special

litigation counsel in respect of the Dividend Recovery Litigation ("Dividend Recovery Litigation

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Application.

Counsel"), pursuant to § 327(e) of the Bankruptcy Code, *nunc pro tunc* to February 27, 2006; and it is further

ORDERED, that the Fee Agreement, in the form attached hereto as Exhibit A, is approved in all respects in accordance with the terms of that certain "Order Appointing Fee Auditor and Establishing Related Procedures Concerning the Allowance and Payment of Compensation and Reimbursement of Expenses of Professionals and Members of the Official Committee and Consideration of Fee Applications" (Docket No. 183, the "Fee Procedures Order") as modified by this Order; and it is further

ORDERED, that the 20% holdback requirement set forth in the Fee Procedures Order is waived, solely as it relates to the payment of the allowed, reduced monthly fees of the Dividend Recovery Litigation Counsel members pursuant to the Fee Agreement; and it is further

ORDERED, that law firm of Stutman Treister & Glatt Professional Corporation may submit a single interim request for payment under the Fee Agreement for the period from February 27, 2006, through March 12, 2006, subject to such additional fees as the Court may award in accordance with the Fee Agreement at the conclusion of the engagement; and it is further

ORDERED, that this Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: ___4/17_____, 2006

_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

# EXHIBIT A

42125-001\DOCS_DE:6375.1

## RETENTION AND CONTINGENCY FEE AGREEMENT

This Retention and Contingency Fee Agreement (the "Agreement") is entered into as of February 27, 2006.

1. **Parties To Agreement**. This Agreement is made between The Flintkote Company and Flintkote Mines Limited (collectively, "Client") and Snyder Miller & Orton LLP ("SMO"), Morgenstein & Jubelirer ("M&J"), Alan D. Pedlar, Esq. ("ADP") and Kelly C. Wooster, Esq ("KCW"). SMO, M&J, ADP, and KCW are referred to collectively as "Dividend Recovery Litigation Counsel" or "DRLC" and individually as "Members." The Official Committee of Asbestos Personal Injury Claimants (the "Committee") and The Legal Representative For Future Asbestos Claimants (the "Futures Representative") acknowledge and endorse this Agreement, and have executed it to evidence their consent and endorsement thereof. It is contemplated that, based upon judicial authorization, the Committee and Futures Representative will become clients of DRLC with respect to the claims covered by this Agreement.

2. **Commencement Of Litigation And Judicial Approvals**. Client is the Debtor in Possession in a chapter 11 case pending under title 11 of the United States Code ("Bankruptcy Code") in The United States Bankruptcy Court For the District of Delaware ("Bankruptcy Court"), Case No. 04-11300 ("Bankruptcy Case"). Client wishes to retain DRLC as special counsel to prosecute claims Client has against third parties arising from or related to dividends taken from Client ("Dividend Recovery Litigation" or "DRL"). DRLC are willing to be retained on the terms and conditions set forth in this Agreement, will commence the representation under this Agreement and will promptly prepare and file a complaint in an appropriate forum on the express understanding that Client will, upon the filing of the complaint, immediately seek *nunc pro tunc* approval by the Bankruptcy Court for the retention of DRLC pursuant to this Agreement. If this agreement is not approved by the Bankruptcy Court *nunc pro tunc* and without modification or condition as to each DRLC Member, any and all DRLC Members may, at their option and in their sole discretion, terminate the representation and withdraw as counsel of record in the Dividend Recovery Litigation.

Employment of the DRLC shall be sought pursuant to Bankruptcy Code sections 327 and 328(a), and it is agreed among the parties that the compensation provided for under this agreement shall be reviewed by the

Bankruptcy Court solely under the standards provided for under Bankruptcy Code section 328(a); provided, however, that neither the amount nor the timing of any recovery with respect to the DRL shall be considered a development not capable of being anticipated at the time of the approval of this Agreement.

3.    Scope of Representation.  DRLC will commence and prosecute the Dividend Recovery Litigation on theories and causes of action they consider to be meritorious, against defendants they consider to be appropriate, subject to Client approval, including Imperial Tobacco Canada Limited (formerly Imasco).  DRLC's employment is limited to Client, and any successor thereto with respect to the DRL, and does not include the representation of any creditor of Client or any other Person, as such term is defined in the Bankruptcy Code, except as may be authorized by the Bankruptcy Court.

4.    Contacts and Authority.  Client, Committee, and Futures Representative have agreed upon a protocol for cooperative prosecution of the DRL and have entered into arrangements concerning communications with DRLC.  Pursuant to those arrangements, unless and until otherwise notified by Client (i) DRLC may be instructed by a designated representative of Client or of the Committee or the Futures representative (collectively, "DRL Management Group") and (ii) DRLC shall report to the DRL Management Group with respect to the Dividend Recovery Litigation. Stephen M. Snyder of SMO will coordinate DRLC efforts to maximize efficiency and effectiveness.  In order to promote efficiency and clarity of communication, members of the DRL Management Group may instruct DRLC through Mr. Snyder or such successor as he may appoint.  There shall be a joint interest litigation privilege between and among Client, the Committee, and the Futures Representative to enable DRLC to keep interested parties fully informed as to developments in the DRL, and to enable DRLC to discuss litigation and settlement strategies and developments with all such parties and their professionals.  Neither the Committee nor the Futures Representative shall be deemed to be a client of DRLC unless and until the Bankruptcy Court issues an order authorizing such joint representation and an appropriate engagement agreement has been executed.

5.    Litigation Costs.  Client shall pay or reimburse DRLC for all costs and expenses of the DRL, including but not limited to costs advanced or incurred by DRLC, such as expert witness fees, consultant fees (provided that Client approves retention of experts and consultants in advance and

2

obtains, if required, appropriate orders of the Bankruptcy Court), travel expenses, court fees, costs of discovery, electronic research charges, courier and postage charges, telephone and telecopy charges, charges for messenger services and air couriers, photocopying, expenses for working meals, and non-ordinary overhead expenses, and other charges customarily invoiced by law firms in addition to fees for legal services ("DRL Costs"). DRLC will bill Client monthly for DRL Costs. Client will pay such bills within 30 days. Amounts so paid will be subject to final review and approval by the Bankruptcy Court regarding compensation of professionals and, to the extent required, Client will seek to modify any existing orders of the Bankruptcy Court to accommodate the provisions of this Agreement. Client will pay DRL Costs directly to service providers or vendors when client and DRLC determine that such costs will likely exceed $4,000. All requests for reimbursement of DRL Costs will be made in accordance with guidelines in effect in the Bankruptcy Case or as the Bankruptcy Court may order.

6.    **Discounted Guideline Rates**. DRLC shall charge hourly rates for services provided by attorneys and staff at the normal and customary guideline rates charged to non-bankruptcy clients ("Guideline Rates"). Travel time will be billed portal to portal at normal hourly rates, subject to any limitations thereon in accordance with guidelines in effect in the Bankruptcy Case. As part of a compensation agreement which includes contingency fees and, potentially fixed fees, DRLC will discount Guideline Rates, subject to restoration of the discounted portion as provided in this Agreement. Client will pay such discounted Guideline Rates ("Discounted Rates") each month, subject only to final review and approval by the Bankruptcy Court. DRLC will render monthly statements reflecting the Guideline Rate and Discounted Rate for each timekeeper providing services.

a.    **Discount And Cap**. DRLC will charge and Client will pay 40% of Guideline Rates, but capped for each timekeeper at $200 per hour.

b.    **Core Team And Rates**. DRLC anticipate that the core team for the DRL will consist of Stephen M. Snyder and James L. Miller of SMO; Eliot S. Jubelirer and Jean Bertrand of M&J; Alan D. Pedlar and Kelly C. Wooster. The current Guideline Rates for these professionals are

- Stephen M. Snyder $600 per hour;

- James L. Miller $500 per hour;

3

- Eliot S. Jubelirer $425 per hour;
- Jean Bertrand $425 per hour;
- Alan D. Pedlar $650 per hour
- Kelly C. Wooster $600 per hour.

c.     **Rate Increases**.  Current Guideline Rates will increase in the future, usually annually at the start of each year.  Any increase will be capped at 5% per annum, except for increases based upon associate attorney or staff seniority advances or status changes.

d.     **Result Based Compensation**.  In addition to Discounted Rates, Client agrees to pay DRLC result based compensation if and when there is a Net Recovery in the DRL.  Net Recovery means gross recovery (including cash and the value of non-cash consideration, but excluding recoveries on account of insurance covering asbestos related claims shared between Client and its former parent company and such parent company's parent, affiliate and subsidiary companies (the "Former Parent") and further excluding any value attributable to any release, assignment or other transfer of any interest the Former Parent may have in any such insurance by judgment(s) or settlements(s), less DRL Costs and all fees previously paid to DRLC (except any costs and fees previously factored into a net recovery calculation by reason of prior Net Recoveries, if any).

e.     **Guideline Rate Restoration**.  Client will pay DRLC 35% of Net Recovery until full Guideline Rates for services rendered and billed to Client have been paid to each DRLC Member ("Guideline Rate Restoration").  If a Net Recovery does not result in payment of full Guideline Rates to each DRLC Member, Client will pay, out of such Net Recovery, each such Member ratably based on the total dollar amount of services rendered by each Member calculated in accordance with each Member's Guideline Rates.

f.     **Contingency Fees**.  When and after any Net Recovery results in Guideline Rate restoration to each DRLC Member, Client will pay, out of such Net Recovery, DRLC a contingency fee ("Contingency Fee") as follows:

i.     upon any further Net Recovery of less than $32.5 million, Client will pay zero percent of such Net Recovery;

4

    ii.    upon any further Net Recovery from $32.5 through $132.5 million, Client will pay 20% of such Net Recovery;

    iii.    upon any further Net Recovery above $132.5 million, Client will pay 15% of such Net Recovery.

    g.    **Changes In Arrangements.** Any change of forum from that selected by DRLC will require changes in the fee arrangements from those set forth in this Agreement.

    h.    **Division Of Contingency Fees Among DRLC Members.** Client shall pay each Contingency Fee to DRLC as follows: First, Client shall pay each DRLC Member an amount equal to 50% of the Guideline Rates Client has paid each such Member ("50% Contingent Bonus"). If Net Recovery is not sufficient to pay the 50% Contingent Bonus to each DRLC Member, Client will pay each such Member ratably based upon the total dollar amount of services rendered by each Member calculated in accordance with each Member's Guideline rates. After the 50% Contingent Bonus has been paid to each DRLC Member then Client shall pay any remaining Contingency Fee to each of the Members in the following proportions:

    i.    SMO 30%

    ii.    M&J 30%

    iii.    ADP 20%

    iv.    KCW 20%

7.    **Complementary Individual Claims.** In order to maximize Client's ability to succeed in the DRL for the benefit of Client's creditors, including especially asbestos victims, claims may be pursued in the DRL by certain individual plaintiffs ("Individual Claimant") identified and consented to by Client, Committee and Futures Representative. DRLC agree to cooperate and coordinate with any Individual Claimant and his counsel, and will seek to join such claims in the DRL. Client will, if necessary, enter into a joint prosecution agreement with Individual Claimants under terms acceptable to the DRL Management Group. DRLC's efforts and expenses for such cooperation and coordination will be compensated as part of the Dividend recovery Litigation. DRLC will not represent Individual Claimants.

8.    **Fee Sharing By DRLC.** Client understands and agrees that DRLC may share and reallocate result based compensation payments among

5

the Members in such a manner as they determine in their discretion to be necessary in order to fairly compensate each Member for his or its efforts in and contribution to the DRL.

9. **Fixed Fees**. Federal tort reform legislation, including but not limited to the proposed FAIR Act, may take, freeze or impair access to funds held by Client or its successors or held in asbestos bankruptcy trusts ("Confiscatory Legislation") or may remove asbestos claims from the tort system ("Relevant Tort Reform"). If Confiscatory Legislation is enacted, the parties foresee litigation to invalidate the legislation on constitutional or other grounds ("Taking Litigation"). If a trust is established in connection with its bankruptcy case, Client desires that the trust be able to pursue the Dividend Recovery Litigation despite the existence of Confiscatory Legislation and during any Taking Litigation. Although the enactment of Confiscatory Legislation would threaten the trust's ability to pay for legal services, DRLC are willing to continue to pursue the DRL for Client or a successor trust under those conditions, if satisfactory arrangements are made to compensate them for that risk. Accordingly,

a. Any proposed plan of reorganization that channels asbestos claims to a trust or that otherwise exposes trust assets to Confiscatory Legislation (a "524(g) Reorganization") shall include a provision for a prepaid escrow to insure availability of funds to DRLC. The plan will provide that the escrow shall be funded by either reorganized Client or the trust established under a 524(g) Reorganization upon passage of Confiscatory Legislation by either the Senate or Congress ("Escrow Funding Date").

b. If there is a 524(g) Reorganization and Confiscatory Legislation is passed, DRLC may elect to be paid a fixed compensation covering services of DRLC in the DRL for up to 18 months in the amounts set forth below ("Fixed Fee"). During the period of the Fixed Fee, DRLC will provide all necessary services in the DRL and will advance litigation costs, subject to reimbursement.

c. Counsel have estimated fees (at Guideline Rates) and DRL Costs for a six month period at $4.27 million ("Six Month Estimate") and have estimated such fees and costs for an 18 month period at $12.8 million ("18 Month Estimate"). Client agrees the estimates are reasonable and agree to use the estimates as a basis upon which to calculate the Fixed Fee.

6

d.     Upon or before the Escrow Funding Date, Client (or reorganized Client, if applicable) or the trust will establish an escrow for the benefit of DRLC under an escrow agreement and instructions to be approved by DRLC in their discretion ("Escrow Agreement").

e.     Upon the Escrow Funding Date, reorganized Client or the trust will deposit into the escrow a sum equal to the 18 Month Estimate and the total of all Guideline Rates deferred as of the Escrow Funding Date under the 40/60 discount formula set out in Paragraph 6(a) above ("Deferred Guideline Rates"). Client will assure that the full amount deposited ("Escrow Funds") remains available to DRLC without depletion for escrow expenses or any other charge.

f.     The Escrow Agreement shall provide in substance that upon request of DRLC:

i.     An amount equal to the Six Month Estimate and the Deferred Guideline Rates shall be disbursed to DRLC, and

ii.     If six months has elapsed after passage of Confiscatory Legislation and the DRL is not stayed or dismissed, the remainder of the Escrow Funds shall be disbursed to DRLC.

g.     All Escrow Funds disbursed to DRLC shall be paid irrevocably as a Fixed Fee and as consideration for costs to be advanced by DRLC during the Fixed Fee period.

h.     If Relevant Tort Reform is enacted, DRLC may elect to forego any Contingency Fee and be paid the difference between Guideline Rates and Discounted Rates for past services and shall be paid Guideline Rates for future services. If Relevant Tort Reform is finally ruled invalid, fee arrangements set forth in Paragraph 6 will be reinstated and will apply thereafter.

10.     *Invalidity of Confiscatory Legislation*. If Escrow Funds are disbursed to DRLC and Confiscatory Legislation is finally declared invalid, the Fixed Fee will terminate and the fee structure will revert to that in effect before passage of the Confiscatory Legislation. Client shall have offsets against future Discounted Guideline rates until the Parties are restored to the positions they would have occupied had there been no fixed fee and if the Discounted Guideline Rates had been in place continuously. If Guideline Rate Restoration becomes necessary after the escrowed funds are paid to DRLC, it shall be calculated by recognizing all time devoted by counsel

7

during the Fixed Fee period and the portions of the Fixed Fee attributable respectively to fees and to costs advanced by DRLC.

11. **Final Judicial Affirmation of Confiscatory Legislation.** Upon entry in the Taking Litigation of any judicial order that is not subject to appeal or to review by the United States Supreme Court, that affirms the validity of Confiscatory Legislation or declines to rule it invalid, and if there is no 524(g) proposed plan or Reorganization, then, DRLC may elect to forego any Contingency Fee and, if so, Client will pay as fees immediately due DRLC a sum equal to all Guideline Rates deferred pursuant to Paragraph 6 above and not otherwise paid, and will pay DRLC full Guideline Rates monthly thereafter.

12. **Insurance Coverage Outcome.** If Client's insurance coverage disputes are resolved such that Client has funds or coverage in amounts which render pursuit of the Dividend Recovery Litigation impracticable, DRLC shall be paid the difference between Guideline rates and Discounted rates for their services.

13. **Budgets.** DRLC will submit a one-year litigation plan and budget estimates for the Dividend Recovery Litigation within 30 days of approval of this Agreement by the Bankruptcy Court.

14. **Limited Practice Area Disclosures.** ADP limits his practice to bankruptcy and insolvency matters. SMO and KCW have practiced in the area of asbestos bankruptcy but M&J, SMO and KCW have no special bankruptcy expertise.

15. **Counsel As Witnesses.** SMO, M&J, and KCW have knowledge of facts related to the history of the asbestos litigation and related to Flintkote's involvement in that litigation. Adversaries in the DRL might seek to take the depositions of or to call these lawyers as witnesses. Client understands and accepts this risk and will execute any necessary or appropriate consents required under California or professional responsibility rules.

16. **Prior Representation Of Flintkote.** From about 1985 through about 1988, Mssrs. Snyder, Miller, Jubelirer, Wooster, and Ms. Bertrand represented Flintkote in the asbestos litigation pursuant to the Wellington Agreement and in connection with the handling of asbestos claims by the Asbestos Claims Facility. Other lawyers at M&J also did so. Mssrs. Snyder, Miller and Wooster were Partners of Brobeck, Phleger & Harrison during a time when that firm represented Flintkote and, perhaps, one or more Genstar entities in connection with insurance coverage claims

8

arising out of the asbestos litigation, although none of them represented the company or companies in that litigation and none of them had any involvement in that coverage litigation. Client has consulted with separate counsel concerning the ramifications of these representations and understands and accepts them. Client specifically understands and accepts the risk that adversaries in the DRL might seek to disqualify DRLC based upon some or all of these prior representations. Client agrees to pay DRLC under this Agreement if DRLC are required to oppose disqualification efforts.

17.    **Prior RJR Representation.** More than 25 years ago, Mr. Snyder, while an associate of Brobeck, Phleger & Harrison, represented R. J. Reynolds Tobacco Company ("RJR") in a limited capacity in connection with disputes over procedural issues in litigation against RJR and asbestos defendants. Other members of the Brobeck firm represented RJR in tobacco health litigation. Adversaries in the DRL may seek to use those prior representations to disqualify Mr. Snyder or SMO. Client has consulted with separate counsel concerning this matter, and accepts the risks of such challenges. Client waives all conflicts, if any, arising as a result f such former representation. Client agrees to pay DRLC under this Agreement if DRLC are required to oppose disqualification efforts.

18.    **Disqualification Or Loss Of Counsel.** If any DRLC Member for any reason *ceases to represent Client in the DRL*, including as a result of any fact or circumstance that would render such member's continuing representation unlawful or unethical, each DRLC Member may, in its discretion and for any reason elect to terminate the representation and may withdraw as counsel in all courts in which the DRL is then pending. Under such circumstances any fees payable to such withdrawing DRLC Member shall be determined by the Bankruptcy Court under the standards provided in Bankruptcy Code section 330.

19.    **Plan Of Reorganization; Establishment Of Trust.** Client, Committee and the *Futures Representative* agree that they will neither file nor support a plan of reorganization that is inconsistent with the terms of this Agreement or that fails to implement its terms.

20.    **File Retention.** DRLC have no file retention obligations following termination of the DRL. Upon termination of the DRL, DRLC shall either (i) return the files to Client or (ii) provide reasonable notice to Client of any intention to destroy the files and a reasonable opportunity for Client to arrange to take possession of the files. If Client refuses to accept

9

delivery or fails to take possession of the files within a reasonable period of time following termination of the DRL, Client authorizes DRLC, in their sole discretion, to destroy such files.

21. **California Law**. Unless contrary to applicable federal bankruptcy law, California law, including California professional responsibility rules, shall govern the interpretation and application of this agreement, including but not limited to the entitlement of DRLC to fees under this agreement.

22. **Miscellaneous**.

a. Attorneys with DRLC Members have relatives and significant others in other law firms. Client agrees that it does not consider the representation to be inappropriate in light of these relationships.

b. The contingency fee rates set forth in this Agreement are not set by law, but are negotiable and have been negotiated by Client and DRLC.

c. Pursuant to Business and Professions Code § 6147(a)(3), the parties acknowledge that Client will not be required to pay compensation to DRLC for related matters that arise out of the attorney-client relationship not covered by this Agreement.

d. Client has the right to discharge DRLC as counsel at any time and for any reason. If DRLC are discharged, (i) Client will immediately pay all amounts then due, plus the then deferred *difference* between Guideline Rates and Discounted Rates, and (ii) Client will pay DRLC such additional amounts as are determined to be appropriate by the Bankruptcy Court taking into account the reasonable expectations of DRLC in light of the work done and their rights under this Agreement had they not been discharged, together with Client's justification, if any, for the discharge.

e. This Agreement shall continue in full force and effect notwithstanding appointment of a trustee under either chapter 7 or chapter 11, and notwithstanding conversion of the Bankruptcy Case to one under chapter 7. This Agreement shall be binding upon Client's successors, including any Trustee appointed by the Bankruptcy Court, and the trust and trustees of any trust created pursuant to a 524(g) Reorganization.

10

Dated: March /4 , 2006

THE FLINTKOTE COMPANY

By:
Name: DAVID J GORDON
Its: PRESIDENT

Dated: March 4 , 2006

FLINTKOTE MINES LIMITED

By:
Name: DAVID J GORDON
Its: PRESIDENT

Dated: March ___, 2006

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS

By:
Name:
Its:

Dated: March ___, 2006

LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
PERSONAL INJURY CLAIMANTS

By:
Name:
Its:

Dated: March ___, 2006

MORGENSTEIN & JUBELIRER LLP

By:
Name: Eliot S. Jubelirer

11

Dated: March ___, 2006          THE FLINTKOTE COMPANY

 

By: _____
Name: _____
Its: _____


Dated: March ___, 2006          FLINTKOTE MINES LIMITED

 

By: _____
Name: _____
Its: _____


Dated: March ___, 2006          OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                INJURY CLAIMANTS

 

By: _____
Name: _____
Its: _____


Dated: March _14_ 2006          LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                PERSONAL INJURY CLAIMANTS

By: _____
Name: _James S. Mitchell_____
Its: _PA_____


Dated: March ___, 2006          MORGENSTEIN & JUBELIRER LLP

 

By: _____
Name: Eliot S. Jubelirer

11

order approving this Stipulation in all respects and confirming that the ACC and the FCR have standing to participate as co-representatives of the Estates' interests in the Third Party Claims in accordance with the terms hereof.

Dated: _____, 2006   THE FLINTKOTE COMPANY

By: _____
Name: _____
Its: _____

Dated: _____, 2006   FLINTKOTE MINES LIMITED

By: _____
Name: _____
Its: _____

Dated: 3/13 , 2006   OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

By: _____
Name: _____
Its: _____

Dated: _____, 2006   LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS

By: _____
Name: _____
Its: _____

9

Dated: March ____, 2006                SNYDER, MILLER & ORTON LLP

                                       By: _____
                                       ( Name: Stephen M. Snyder

Dated: March ____, 2006

                                       _~Kelly Woozof~_____
                                       Kelly Q. Weostor, Esq.

Dated: March ____, 2006

                                       _____
                                       Alan D. Pedlar, Esq.

·12

Dated: March ___, 2006                SNYDER, MILLER & ORTON LLP


                                      By: _____
                                      Name:  Stephen M. Snyder

Dated: March ___, 2006


                                      _____
                                      Kelly C. Wooster, Esq.

Dated: March 14, 2006


                                      _____
                                      Alan D. Pedlar, Esq.

12

Dated: March *16*, 2006

SNYDER, MILLER & ORTON LLP

By: _____
Name: Stephen M. Snyder

Dated: March ___, 2006

_____
Kelly C. Wooster, Esq.

Dated: March ___, 2006

_____
Alan D. Pedlar, Esq.

Dated: March ___, 2006          THE FLINTKOTE COMPANY

                                By: _____
                                Name: _____
                                Its: _____


Dated: March ___, 2006          FLINTKOTE MINES LIMITED

                                By: _____
                                Name: _____
                                Its: _____


Dated: March ___, 2006          OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
                                INJURY CLAIMANTS

                                By: _____
                                Name: _____
                                Its: _____


Dated: March ___, 2006          LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
                                PERSONAL INJURY CLAIMANTS

                                By: _____
                                Name: _____
                                Its: _____


Dated: March 17, 2006           MORGENSTEIN & JUBELIRER LLP

                                By: _____
                                Name: Eliot S. Jubelirer


11

# EXHIBIT "3"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Objections Due: April 13, 2006 at 4:00 p.m. (requested)** |
| | ) | **Hearing Date: April 17, 2006 at 9:30 a.m. (requested)** |

## DEBTORS' MOTION FOR ORDER APPROVING CERTAIN JOINT PROSECUTION AGREEMENTS AND ANNULLING THE AUTOMATIC STAY IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

The Flintkote Company ("Flintkote") and Flintkote Mines Limited ("Mines"), the

debtors and debtors in possession (the "Debtors") in these jointly-administered cases, hereby

move the Court (the "Motion") for entry of an order (i) approving an "Agreement for Joint

Prosecution of the Dividend Recovery Litigation" dated April 3, 2006, by and among the

Debtors, the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), and James

J. McMonagle as the Legal Representative for Future Asbestos Personal Injury Claimants (the

"FCR") (the "Joint Prosecution Agreement"), (ii) approving an "Agreement Providing for Joint

Pursuit of Alter Ego Remedies" dated April 4 2006, by and between the Debtors and Marleen

Hopkins, Michelle Hopkins and Michael Hopkins (collectively, the "Asbestos Claimants") and

consented to by the ACC and FCR (the "Alter Ego Agreement"), and (iii) annulling the

automatic stay to allow the Dividend Recovery Litigation (as defined below) to proceed in all

respects from the date of its commencement.

In support of this Motion, the Debtors respectfully submit the Declaration of David Gordon dated April 5, 2006 (the "Gordon Declaration"). In further support hereof, the Debtors respectfully state as follows:

## STATUS OF CASE AND JURISDICTION

1.    On May 1, 2004, Flintkote filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On August 25, 2004, Mines, the wholly-owned subsidiary of Flintkote, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.    On September 9, 2004, the Court entered the "Order (i) Directing Joint Administration; (ii) Directing that Certain Orders in the Chapter 11 Case of the Flintkote Company be Made Applicable to Flintkote Mines Limited" (Docket No. 238) directing the joint administration of these two chapter 11 cases.

3.    The Debtors have continued in possession of their respective properties and have continued to operate and manage their respective businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.    No request has been made for the appointment of a trustee or examiner in these cases. On May 19, 2004, the ACC was appointed by the Office of the United States Trustee. Additionally, the Court appointed James J. McMonagle as the FCR for Flintkote and Mines on August 26, 2004 and September 9, 2004, respectively (Docket Nos. 199 and 238, respectively).

5.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a

-2-

core proceeding pursuant to 28 U.S.C. § 157(b)(2). The bases for the relief sought herein are 11 U.S.C. § 362(d) and applicable case law.

## RELIEF REQUESTED

6.     By this Motion, the Debtors seek entry of an order (i) approving the Joint Prosecution Agreement (substantially in the form attached hereto as Exhibit A), (ii) approving the Alter Ego Agreement (substantially in the form attached hereto as Exhibit B) and (iii) annulling the automatic stay so that the Dividend Recovery Litigation may proceed in all respects from the date of its commencement. The ACC and the FCR support the relief sought in this Motion.

## BASIS FOR RELIEF

A.    Commencement of the Dividend Recovery Litigation.

7.     On April 5, 2006, Plaintiffs Flintkote and the Asbestos Claimants jointly filed a complaint (the "Complaint") against Defendants Imperial Tobacco Canada Limited (formerly known as Imasco Limited ("Imasco")), Sullivan & Cromwell LLP ("S&C") and Does 1 though 100 in the Superior Court of California, County of San Francisco (the "Superior Court") (Case No. CGC 06450944). The Complaint (i) seeks substantial damages and requests declaratory relief, including with respect to certain contract rights of Flintkote against Imasco, (ii) asserts alter ego, veil piercing and similar theories of recovery against Imasco (collectively, "Alter Ego Remedies"), and (iii) asserts claims arising out of or related to certain dividends ultimately received by Imasco, the former ultimate parent of Flintkote (collectively referred to as the "Dividend Recovery Litigation"). A true and correct copy of the Complaint is attached hereto as Exhibit C.

8.      As more fully described in the Complaint, the claims arise from or relate to two dividends, totaling $525 million that were ultimately received by the former ultimate parent company of Flintkote, Imasco (now Imperial Tobacco Canada Limited), in 1986 and 1987.  The dividends were paid as part of an orchestrated scheme whereby Imasco acquired Flintkote's parent company in a hostile takeover, and caused Flintkote to sell off its operating assets and to become, for all practical purposes, an asbestos claims paying facility.  Imasco caused Flintkote to pay it $525 million of the proceeds of the sales.  The payment took the form of two dividends.  The result was that Flintkote, or as it now turns out, Flintkote's asbestos creditors, funded a substantial portion of Imasco's hostile acquisition.  S&C historically represented Imasco, but at Imasco's instigation, represented both Imasco and Flintkote in connection with the dividend transactions.  S&C erroneously and negligently advised Flintkote and its board of directors with respect to the dividends.

9.      As part of the transaction, Imasco agreed to repay to Flintkote (up to the full amount of the dividends) amounts due to Flintkote's creditors, including asbestos personal injury claimants that cannot be satisfied out of the assets of Flintkote if a court of competent jurisdiction finally determines that the dividends were improperly paid to Imasco.  The respective experts retained by the ACC and the FCR agree that, based upon their analyses, Flintkote's current and future asbestos liabilities are estimated to exceed $3 billion, which is materially in excess of the amount of assets available to satisfy such liabilities.  Similarly, the Debtors commenced these chapter 11 cases because they believed that the amount of their current and future asbestos personal injury liabilities materially exceed the value of their assets.

B.      The Purpose Of The Joint Prosecution Agreement.

10.      The Debtors, the ACC and the FCR (the "Estate Representatives") seek to

jointly represent the interest of the Debtors' estates (the "Estates") in the prosecution of the

claims set forth in the Complaint (including, without limitation, all Alter Ego Remedies) and

other claims arising from or related to the Dividend Recovery Litigation, subject to the terms of

the Joint Prosecution Agreement (discussed in detail below).

11.      The Debtors believe that it is in the best interests of the Estates and their

creditors to begin to prosecute the Dividend Recovery Litigation at this time and before

confirmation of a plan in these chapter 11 cases (although confirmation of a plan in these cases is

in no way dependent upon the resolution of the Dividend Recovery Litigation). The Debtors

further believe that the interests of the Estate Representatives are aligned in seeking to maximize

the potential recovery resulting from the Dividend Recovery Litigation. Among other reasons, it

is contemplated (i) that, to the extent necessary, the right to control the Dividend Recovery

Litigation may ultimately be transferred to an asbestos personal injury trust established pursuant

to § 524(g) of the Bankruptcy Code under a confirmed plan or plans of reorganization, and (ii)

that the overwhelming majority, if not all, of any net recovery that ultimately results from the

Dividend Recovery Litigation will be distributed for the benefit of current and future holders of

asbestos personal injury claims against the Debtors pursuant to a confirmed plan of

reorganization.

12.      The Estate Representatives have entered into the Joint Prosecution

Agreement in order to (i) memorialize the Debtors' consent to the ACC and the FCR jointly

representing the Estates' rights in the Dividend Recovery Litigation, (ii) delineate their joint

participation rights in respect of the Dividend Recovery Litigation that will be in effect prior to

confirmation of any plan, and (iii) set forth the manner in which confidential information will be
shared between and among the Estate Representatives and the Estates' special litigation counsel
(the "Dividend Recovery Litigation Counsel" or "DRLC") and applicable privileges maintained.

C.    The Purpose Of The Alter Ego Agreement.

13.    As more fully detailed in the Complaint, the Estate Representatives
believe that substantial grounds exist to hold Imasco responsible for the payment of asbestos
claims against the Debtors. Alter ego liability arises from Imasco's scheme to acquire
Flintkote's indirect parent company; its efforts to force, dominate, and control the liquidation of
Flintkote's assets for the purpose of using sale proceeds to reimburse Imasco for the costs of its
hostile acquisition; and Imasco's complete domination and control over Flintkote's subsequent
activities for the next 16 years, which had the result of forestalling any efforts to recover the
dividends.

14.    In the Dividend Recovery Litigation, Flintkote seeks to establish, among
other things, that Imasco is liable to persons exposed to asbestos in Flintkote's products under
various Alter Ego Remedies. In addition, the Asbestos Claimants (who hold an asbestos-related
wrongful death claim against Flintkote) contend that they have Alter Ego Remedies that they
would be entitled to assert directly against Imasco but for operation of the automatic stay and the
commencement of these chapter 11 cases. Because there is no controlling authority under
California or Ninth Circuit law with regard to whether an individual claimant or a bankruptcy
trustee (or debtor-in-possession), on behalf of an estate, is the correct party to assert theories of
alter ego recovery (as further discussed below), the Debtors have entered into the Alter Ego
Agreement (the terms of which are described in detail below) to enable all theories of alter ego
recovery to be brought against Imasco in the Dividend Recovery Litigation by plaintiffs

-6-

(Flintkote and the Asbestos Claimants) who, as a result of the Alter Ego Agreement, collectively have standing to assert all such grounds for relief.

        15.    Approval of the Alter Ego Agreement will result in several benefits to the Estates:

        (a)    *First*, the arrangement with the Asbestos Claimants will permit a single adjudication of all Alter Ego Remedies against Imasco in the context of the Dividend Recovery Litigation and avoid unnecessary arguments over whether the Alter Ego Remedies are being asserted by the correct party as a matter of California law. By having the Estates and the Asbestos Claimants assert each of the possible grounds for recovery on an alter ego basis, the Superior Court will be in the best position to reach the merits and issue a declaratory judgment in respect of the Alter Ego Remedies against Imasco.

        (b)    *Second*, the successful prosecution of all Alter Ego Remedies by Flintkote and the Asbestos Claimants should result in a direct benefit to all creditors of these Estates by creating *res judicata* and offensive collateral estoppel rights with respect to Imasco. Such rights would benefit not only current asbestos claimants, but future claimants as well.

        (c)    *Third*, the alter ego litigation may be long, expensive and hard fought, all of which would make the pursuit of alter ego remedies by individual claimants very costly and hence less feasible; however, by pooling resources, the Asbestos Claimants can economically pursue an alter ego remedy in conjunction with the Estates' prosecution of the Dividend Recovery Litigation that will inure to the benefit of all claimants.

        (d)    *Fourth*, involvement of the Asbestos Claimants as co-plaintiffs in the Dividend Recovery Litigation will allow the trier of fact to better understand and appreciate the harm that has been caused to at least one of the thousands of individual asbestos claimants by

Imasco's actions, especially its dismemberment of Flintkote as a going concern and the related siphoning of cash to fund its acquisition—cash that otherwise would have been available to satisfy asbestos claims.

D.    The Purpose For Annulling The Automatic Stay.

16.    The Debtors seek to annul the automatic stay in respect of the Dividend Recovery Litigation for two reasons.  First, annulment of the automatic stay is necessary to permit the Superior Court (and any other court of competent jurisdiction before which the Dividend Recovery Litigation may be heard) to fully adjudicate the merits of the Dividend Recovery Litigation from the date of its commencement.  Although Flintkote was not subject to, and did not need relief from, the automatic stay in commencing the Dividend Recovery Litigation, the Defendants will be barred from responding to the Complaint by operation of the automatic stay unless the Court annuls the stay to allow the Dividend Recovery Litigation to proceed in all respects (as further discussed below).  Second, to ensure that all theories of alter ego recovery can be brought against Imasco in the Dividend Recovery Litigation by plaintiffs who collectively have standing, it is appropriate to annul the automatic stay so that the Asbestos Claimants may join with Flintkote in prosecuting all Alter Ego Remedies against Imasco in the Dividend Recovery Litigation without potentially violating the automatic stay.

## SUMMARY OF THE AGREEMENTS[1]

A.    Joint Prosecution Agreement.

---

[1] The following is intended to be a summary of the salient provisions of the Joint Prosecution Agreement and the Alter Ego Agreement (collectively, the "Agreements"), which are attached hereto as Exhibit A and Exhibit B, respectively.  In the event that the terms as summarized in this Motion conflict with the terms of the respective Agreements, the Agreements shall control.

17.    As summarized below, the Joint Prosecution Agreement addresses various matters related to the joint prosecution of the Dividend Recovery Litigation (including the Alter Ego Remedies being asserted by Flintkote and the Asbestos Claimants).

18.    <u>Consent to Joint Prosecution</u>.  The Debtors consent and agree that they, the ACC, and the FCR shall jointly represent the Estates' interests in the Dividend Recovery Litigation.  The Estates will be represented by the Dividend Recovery Litigation Counsel whom the Debtors concurrently seek Court authority to retain on behalf of the Estates.[2]  Because DRLC will represent the Estates in the Dividend Recovery Litigation, none of the Estate Representatives will need, or be entitled, to employ its own separate counsel of record in the Dividend Recovery Litigation.

19.    <u>Rights of Estate Representatives in Respect of Joint Prosecution</u>.  The right of joint participation in respect of the Dividend Recovery Litigation shall include, without limitation, the right to communicate with DRLC, the right to receive full and complete access to all files and communications (whether oral or written) from or received by DRLC, the right to receive full and complete copies of any and all documents that DRLC would or could be required to provide a client under applicable laws and ethical rules or professional canons, and the right to participate equally in all decisions concerning the Dividend Recovery Litigation, including, without limitation, whether to prosecute, dismiss or settle any or all of it.

20.    <u>Case Management</u>.  DRLC shall communicate with regard to day-to-day case management matters related to the Dividend Recovery Litigation directly with Dave Gordon (in his capacity as President of the Debtors and acting on behalf of the Debtors), and shall

---

[2] The DRLC consists of two law firms and two individual lawyers who, together, will represent the Estates in respect of the Dividend Recovery Litigation and will be compensated under the terms of a single fee agreement.  The Debtors have filed concurrently herewith an application to retain DRLC as litigation counsel pursuant to § 327(e) of the Bankruptcy Code, which sets forth the terms of the proposed engagement and the fee arrangement with the DRLC.

communicate with regard to all material litigation strategy matters and settlement discussions with each of Dave Gordon, a designated representative of the ACC, and James McMonagle (in his capacity as the FCR). All material decisions with respect to litigation strategy involving the Dividend Recovery Litigation, and the direction to be given to DRLC in respect of such litigation strategy decisions, shall be determined based upon a majority vote of (i) the Debtors (with the Debtors together receiving a single vote), (ii) the ACC, and (iii) the FCR. If any issues regarding the prosecution of the Dividend Recovery Litigation on behalf of the Estates cannot be resolved pursuant to a majority vote, any Estate Representative may bring a motion asking the Court to address and resolve the issue. This Court shall have exclusive, continuing jurisdiction to decide all matters arising under the Joint Prosecution Agreement.

      21.     <u>Maintenance of Privilege and Confidentiality</u>. The Estate Representatives have exchanged and will exchange among themselves and with DRLC privileged and work-product information, both orally and in documents, including, without limitation, factual analyses, strategies and mental impressions, investigative reports, and other information ("<u>Joint Materials</u>") for the purpose of advancing the Estates' interest in prosecuting the Dividend Recovery Litigation. The Estate Representatives agree (i) that all Joint Materials which the Estate Representatives have exchanged, or will exchange, among themselves and with DRLC are privileged from disclosure, (ii) that they will act to preserve to the maximum extent permitted by applicable law the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections which they may have and (iii) that they will immediately notify counsel for the other Estate Representatives if any other person or entity requests or demands, by subpoena or otherwise, the disclosure or production of any Joint Materials or other protected information, so that the Estate

-10-

Representatives (or any of them) may seek an appropriate protective order or other remedy to assure that such information will be accorded confidential treatment.

22.    Scope of DRLC Representation.  The Estate Representatives agree that all claims asserted in the Dividend Recovery Litigation are claims of the Estates, and not of any of them individually or in any capacity other than as representatives of the Estates.  DRLC shall at all times represent only the Debtors, unless the Court approves DRLC to also represent the ACC and FCR in their capacity as representatives of the Estates.  DRLC shall not represent or be deemed to represent the ACC or the FCR in performing any function except as co-representative of the Estates' claims.  The ACC and the FCR agree that to the extent DRLC, pursuant to a Court order approving this Joint Prosecution Agreement, represents them together with the Debtors as co-representatives of the Estates' rights in the Dividend Recovery Litigation, DRLC is not, by virtue of such representation, representing a party having an adverse interest to the ACC or the FCR in connection with these cases.  Under no circumstances shall any disagreement among the Estates Representatives, or a withdrawal of one or more of the Estates Representatives from the Joint Prosecution Agreement, form the basis for a request to disqualify DRLC, and the Estates Representatives waive any and all such potential conflicts of interest and agree that DRLC may continue to represent the then-acting representatives of the Estates in the Dividend Recovery Litigation.

B.    Alter Ego Agreement.

23.    As summarized below, the Alter Ego Agreement addresses various matters as between the Estate Representatives and the Asbestos Claimants related to all Alter Ego Remedies being asserted in connection with or related to the Dividend Recovery Litigation.

-11-

24.    <u>Partial Transfer of Alter Ego Remedies</u>.  The Debtors have partially transferred to the Asbestos Claimants, and have authorized them to pursue for their own benefit, that portion of the Alter Ego Remedies, if any, held by the Estates against Imasco with respect to Asbestos Claimants' Claim, up to the full amount of Asbestos Claimants' Claim, but subject in all respects to the terms of the Alter Ego Agreement, including limitations on recovery.  In addition, the Asbestos Claimants may assert in the Dividend Recovery Litigation any theories of alter ego recovery that they hold directly.  Nothing in the Agreement shall otherwise affect the Alter Ego Remedies held by the Estate.

25.    <u>Allocation of Net Recoveries From Alter Ego Remedies</u>.  The Asbestos Claimants shall be entitled to retain those net recoveries (after payment of costs as permitted under the Alter Ego Agreement) resulting from their assertion of the Alter Ego Remedies in an amount up to $400,000.  Any net recoveries on account of such Alter Ego Remedies in excess of $400,000 shall be paid or remitted by the Asbestos Claimants to the Estates or to the § 524(g) trust established under a confirmed plan in these cases (if applicable), for distribution to current and future asbestos personal injury claims under a confirmed plan.

26.    <u>Settlement Of Alter Ego Remedies</u>.  Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the ACC and the FCR; provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the ACC and the FCR, shall not be unreasonably withheld.  Any dispute in that regard shall be submitted to the Bankruptcy Court.

27.    <u>Management Of Alter Ego Litigation</u>.  The DRLC (acting under the direction of Debtors, the ACC and the FCR in accordance with the Joint Prosecution Agreement) shall be entitled to manage the litigation (and to advance costs and expenses incurred by the

-12-

Asbestos Claimants in the manner contemplated in the Alter Ego Agreement) on all Alter Ego Remedies common to the Dividend Recovery Litigation and to the Alter Ego Remedies being asserted by the Asbestos Claimants; provided, however, that the Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estates in the Dividend Recovery Litigation to the maximum extent feasible.

28. _Claim Amount_. The Estate Representatives agree that any amount determined to be owed to the Asbestos Claimants on account of any Alter Ego Remedies that they assert in connection with or related to the Dividend Recovery Litigation will be binding on the Debtors and their Estates (including any § 524(g) trust established under a confirmed plan) but will not be enforced, except in accordance with the terms of a confirmed plan of reorganization. Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' claims against Imasco, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

29. _Payment of Expenses of Asbestos Claimants_. The Asbestos Claimants agree to limit the fees payable to his/her counsel in pursuing any Alter Ego Remedies in connection with the Dividend Recovery Litigation to 25% of actual recoveries by the Asbestos Claimants.

## **AUTHORITY**

A.    Approval Of The Joint Prosecution Agreement Will Facilitate The Estates' Management And Prosecution Of The Dividend Recovery Litigation.

30. The Court should approve the Joint Prosecution Agreement for several reasons.

31.    First, the Debtors have consented to jointly prosecute the Dividend
Recovery Litigation with the ACC and the FCR, pursuant and subject to the terms of the Joint
Prosecution Agreement.  Courts in this Circuit and elsewhere have recognized the standing of an
official committee to prosecute an action on behalf of a debtor's estate, particularly where (as
here) the debtor consents to such standing.  See, e.g., Official Comm. of Unsecured Creditors of
Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 330 F.3d 548 (3d Cir. 2003)
(authorizing a committee to bring derivative litigation on behalf of debtor's estate); Official
Unsecured Creditors Committee v. Michaels (In re Marin Motor Oil), 689 F.2d. 445 (3d Cir.
1982) (creditors' committee has an absolute right to intervene in adversary proceedings initiated
by the trustee); In re Nat'l Forge Co., 326 B.R. 532 (W.D. Pa. 2005) (authorizing a creditors'
committee to pursue an action on behalf of the debtor's estate); Commodore Int'l Ltd. v. Gould
(In re Commodore Int'l Ltd.), 262 F.3d 96, 100 (2d Cir. 2001) (granting standing to a committee
"if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court
finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is
'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings").
The relief being sought here is a step removed from the conferral of standing on an official
committee, as addressed in Cybergenics and the above-referenced cases.  It bears emphasis that
the Debtors have not agreed to cede control over the litigation to the ACC and the FCR prior to
confirmation of a plan, nor are the Debtors seeking to confer standing on the ACC and the FCR
for them to pursue this litigation alone.  Rather, the Debtors have agreed to work cooperatively
with the ACC and the FCR in jointly pursuing the Estates' interest in respect of the Dividend
Recovery Litigation, for all the reasons articulated above.

32.    In addition, approval of the Joint Prosecution Agreement (including confirmation of the joint participation rights of the ACC and the FCR in respect of the Dividend Recovery Litigation) is in the best interest of the Estates because it establishes (i) the respective rights of the Estate Representatives to communicate with DRLC, to access information and to manage the litigation, (ii) a mechanism for the Estate Representatives to agree upon the litigation strategy and give clear and unambiguous direction to DRLC in respect of such strategy, and (iii) safeguards designed to ensure that all applicable privileges are maintained between and among the Estate Representatives and DRLC in respect of the Dividend Recovery Litigation. See Commodore, 262 F.3d at 100.

33.    The Joint Prosecution Agreement also is necessary and beneficial to a fair and efficient resolution of these cases. See id. The Debtors, the ACC and the FCR have been working together cooperatively since the outset of these chapter 11 cases and, to that end, they are working together as co-plan proponents to develop and propose a consensual joint plan of reorganization. Because it is contemplated the overwhelming majority, if not all, of any net recovery from the Dividend Recovery Litigation will benefit the current and future asbestos claimants and that control of the litigation ultimately will be transferred to the § 524(g) trust, the Joint Prosecution Agreement will provide continuity in the plan process.

B.    Approval Of The Alter Ego Agreement Will Permit All Theories Of Alter Ego Recovery To Be Asserted In The Dividend Recovery Litigation.

34.    Approval of the Alter Ego Agreement will ensure that the Estates are able to maximize their potential recovery in the Dividend Recovery Litigation. This Court has authority to approve the Alter Ego Agreement in all respects.

35.    Cause exists for the Court to annul the automatic stay pursuant § 362(d) of the Bankruptcy Code, in order to give effect to the terms of the Alter Ego Agreement and allow

the Asbestos Claimants to pursue a portion of the Alter Ego Remedies that may constitute property of the Estates. See 11 U.S.C. §§ 362(a)(3) and (d)(2). There appears to be no controlling case law in California or the Ninth Circuit as to whether an individual claimant or a trustee (or debtor in possession) has standing to assert alter ego-type remedies. Compare Stodd v. Goldberger, 73 Cal. App. 3d 827 (1977) (holding that a trustee in bankruptcy cannot maintain an alter ego claim, because such claims must be brought by one or more real parties in interest), *with* In re Davey Roofing, Inc., 167 B.R. 604, 608 (B.A.P. 9th Cir. 1994) (holding that only a debtor has standing to assert the alter ego claim "where injury to the corporation is alleged"). The issue is one of standing under applicable California law, and that issue can be properly determined by the Superior Court, as and when appropriate, in the context of the Dividend Recovery Litigation. For this reason, the Debtors are not asking this Court to decide who has standing to assert the Alter Ego Remedies, but rather they seek approval of the Alter Ego Agreement which will ensure that all theories of alter ego recovery can and will be asserted against Imasco by a plaintiff (Flintkote or the Asbestos Claimants) with standing because the Asbestos Claimants will be holding and asserting both their own rights and a share of the Estates' rights in such Alter Ego Remedies (i.e., the complete set of Alter Ego Remedies that the Asbestos Claimants held immediately prior to the Petition Date).

36.    It is not uncommon for a court to grant relief from the automatic stay to allow an individual creditor of a debtor to pursue or attempt to realize upon estate property in satisfaction of its claim. In an analogous context, courts have approved stipulations by and between a debtor and a claimant, whereby the automatic stay is lifted to allow the claimant to proceed against the debtor's insurance, or against appeals bonds secured by the debtor's insurance receivables, even though such insurance constitutes property of the estate. See, e.g., In

-16-

re Federal Mogul Global Inc., T&N Limited, et al., Case No. 01-10578 (Docket No. 1868); In re The Flintkote Company and Flintkote Mines Limited, Case No. 04-11300 (Docket No. 669).

   37. The Debtors do not believe that specific Court authorization is required to effectuate the partial transfer back to the Asbestos Claimants of the Estates' interest in the Alter Ego Remedies that they could have asserted prior to the filing of these cases. It bears emphasis that the ACC and the FCR have consented to such transfer. Nonetheless, to the extent that specific Court approval is required, the Debtors request that the Court authorize them to effectuate the transfer to the Asbestos Claimants the Estates' interest in the Alter Ego Remedies pursuant to § 363(b) of the Bankruptcy Code, or otherwise authorize them to abandon to the Asbestos Claimants the Estates' interest in the Alter Ego Remedies, so that the Alter Ego Remedies may be pursued by the Asbestos Claimants in accordance with the terms of the Alter Ego Agreement. See, e.g., St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc., 884 F.2d 688, 698 (2d Cir. 1989) (even where an alter ego claim is property of the estate, "a trustee could choose to abandon a claim, and allow creditors to pursue it independently"); Board of Directors Of Chestnut Grove Condominium Unit Owners' Ass'n v. Resolution Trust Corp., 161 B.R. 860, 863 (D.D.C. 1993) (same).

   38. Pursuing the course of action contemplated by the Alter Ego Agreement will in no manner hinder the Estates' ability to settle or compromise all of the Estates' rights in the Alter Ego Remedies against Imasco on a global basis, because a power of attorney is granted to the Estates under the Alter Ego Agreement which allows the claims and interests of the Asbestos Claimants to be settled by the Estates so long as the Asbestos Claimants receives the agreed upon consideration. In this regard, the Debtors have transferred a limited amount of the Estates' potential recovery that may result from the Alter Ego Remedies, but the Estate

Representatives have retained full authority to manage and control all Alter Ego Remedies asserted in the Dividend Recovery Litigation (including those asserted by the Asbestos Claimants). The Alter Ego Agreement establishes appropriate safeguards to ensure that the Debtors, the ACC and the FCR have equal rights and say in the prosecution (and, if warranted, the settlement) of all Alter Ego Remedies being asserted in connection with or relating to the Dividend Recovery Litigation. For the foregoing reasons, the Alter Ego Agreement is supported by the Debtors, the ACC and the FCR as being a reasonable exercise of the Debtors' business judgment and in the best interests of the Estates.

C.    **Cause Exists To Annul The Automatic Stay To Ensure That The Dividend Recovery Litigation Proceeds In All Respects.**

39.    The Debtors ask this Court to annul the automatic stay so that the Dividend Recovery Litigation may proceed in all respects from the date of its commencement.

40.    The commencement of the Dividend Recovery Litigation, including the filing of the Complaint, was an appropriate exercise of the Debtors' business judgment and did not require the Court to lift or modify the automatic stay prior to its commencement. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1992) ("Although the scope of the automatic stay is broad, the clear language of section 362(a) indicates that it stays only proceedings *against* a 'debtor'--the term used by the statute itself. . . . '[t]he statute does not address actions brought *by* the debtor which would inure to the benefit of the bankruptcy estate'") (emphasis in original) (internal citations omitted); In re Kaiser Aluminum Corp., 303 B.R. 299, 303 (D. Del. 2003) ("the automatic stay does not apply to actions brought by the debtor . . . [r]ather, the automatic stay only applies to actions brought against the debtor,") quoting Rhone-Poulenc Surfactants and Specialties, L.P. v. C.I.R., 249 F.3d 175, 180 (3d Cir. 2001).

-18-

41.    In contrast, the automatic stay bars the Defendants from asserting

whatever counterclaims or cross-claims they may believe they have (which the Debtors dispute

as being valid) or taking other actions against Flintkote in the Dividend Recovery Litigation.

Maritime Elec. Co., Inc., 959 F.2d at 1204-05 (holding that "[m]ultiple claim and multiple party

litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-

party claims are treated independently when determining which of their respective proceedings

are subject to the bankruptcy stay . . . [t]hus, within one case, actions *against* a debtor will be

suspended even though closely related claims asserted *by* the debtor may continue"); Sansone v.

Walsworth (In re Sansone), 99 B.R. 981, 984-85 (Bankr. C.D. Cal. 1989) (filing of compulsory

counterclaim against debtor in action brought by debtor violates the automatic stay).  Moreover,

it is possible that the Defendants might have taken some action in response to the Complaint

before the Court has heard the relief sought in this Motion.  The Estate Representatives want the

Superior Court to fully adjudicate the Dividend Recovery Litigation on the merits.  As such, the

Debtors request that the Court annul the automatic stay to allow the Dividend Recovery

Litigation to proceed in all respects from the date of its commencement, so that all actions taken

in the litigation since its commencement are not violative (or deemed to be violative) of the

automatic stay.

42.    In addition, annulment of the automatic stay to the date of the filing of the

Complaint is necessary and appropriate to allow the Asbestos Claimants to pursue that portion of

the Estates' interest in the Alter Ego Remedies ceded to them in connection with Divided

Recovery Litigation, as described above and permitted under the Alter Ego Agreement.[3]

---

[3] To clarify, the Debtors are not seeking to annul or otherwise modify the automatic stay to allow
individual claimants (other than the Asbestos Claimants) to prosecute Alter Ego Remedies, or other
causes of action, that are held, or may be held, by the Estates.  The automatic stay should remain in full
force and effect with respect to such claimants and the Estates' property.

-19-

43. For these reasons, cause exists for the Court to annul the automatic stay pursuant to § 362(d) so that the Dividend Recovery Litigation can proceed in all respects from the date of its commencement.

## NOTICE

44. Notice of this Motion has been provided to (i) the Office of the United States Trustee, (ii) counsel to the ACC, (iii) counsel to the FCR, and (iv) all parties that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

45. No previous application for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting this Motion and providing such other relief as the Court deems necessary.

Dated: April __5__, 2006

SIDLEY AUSTIN LLP
Kevin T. Lantry
Jeffrey E. Bjork
555 West Fifth Street
Los Angeles, California 90013-6000
Telephone: (213) 896-6000
Facsimile:  (213) 896-6600

- and -

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

# EXHIBIT "4"

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| THE FLINTKOTE COMPANY and | ) Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Related Docket No. 1433 |
| | ) Agenda Item No. 2 |
| | ) April 17, 2006 at 9:30 a.m. |

## ORDER APPROVING CERTAIN JOINT PROSECUTION AGREEMENT IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

Upon the motion (the "Motion") of The Flintkote Company and Flintkote Mines

Limited (collectively, the "Debtors") for entry of an order (i) approving that certain Joint

Prosecution Agreement by and among the Debtors, the ACC and the FCR,[1] (ii) approving that

certain Alter Ego Agreement by and among the Debtors and the Asbestos Claimant and (iii)

annulling the automatic stay to allow the Dividend Recovery Litigation to proceed in all respects

in the Superior Court from the date of its commencement; and the Court having considered the

Motion, the Gordon Declaration, and any objections filed in respect of the Motion; and it

appearing that due and proper notice of the Motion was given and that no additional notice need

be given; and after due deliberation, and good cause having been shown therefor; it is hereby

ORDERED, that the Motion is hereby GRANTED in part; and it is further

ORDERED, that the Joint Prosecution Agreement, in the form attached hereto as

Exhibit A, is approved in all respects; and it is further

ORDERED that the hearing on the balance of the relief requested in the Motion is

continued to May 15, 2006 at 9:30 a.m.; and it is further

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Motion.

28431-001\DOCS_DE:117220.1

ORDERED that Imperial Tobacco Canada Limited and its subsidiaries shall file their supplemental response or opposition to the balance of the relief requested in the Motion on or by May 2, 2006 at 4:00 p.m. and the Debtors shall file their reply on or by May 9, 2006 at 4:00 p.m.

Dated: April 27 , 2006

_Judith K. Fitzgerald_

Honorable Judith K. Fitzgerald

**Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

### Agreement For Joint Prosecution Of Dividend Recovery Litigation

The Flintkote Company ("Flintkote"), Flintkote Mines Limited ("Mines," together with Flintkote, the "Debtors"), the Official Committee of Asbestos Personal Injury Claimants ("Asbestos Creditors Committee" or "ACC"), and James J. McMonagle, the Legal Representative for Future Asbestos Personal Injury Claimants ("Futures Representative" or "FCR," together with the Debtors and the ACC, the "Parties"), hereby enter into this Agreement whereby (a) the Debtors agree with the ACC and FCR that they shall all collectively represent the interests of the Debtors' estates (the "Estates") with respect to any and all claims (including, without limitation, all theories of alter ego recovery) arising out of or related to certain dividends received by the former parent of Flintkote (the "Dividend Recovery Litigation"), including in an action to be filed in the Superior Court of the State Of California, and (b) the Parties agree upon the terms governing their joint participation rights in respect of the Dividend Recovery Litigation.

### RECITALS

A.    On May 1, 2004, Flintkote filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the District of Delaware (the "Court"). On August 25, 2004, Mines filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On September 9, 2004, the Court entered an order directing the procedural consolidation and joint administration of these chapter 11 cases.

B.    On May 19, 2004, the Office of the United States Trustee appointed the Asbestos Creditors Committee. Additionally, the Court appointed James J. McMonagle as the Futures Representative in these chapter 11 cases. The ACC and FCR are the only two official creditor constituencies in the Debtors' chapter 11 cases.

C.    The Parties believe that the Estates have substantial claims against various parties that participated in certain transactions that left Flintkote with insufficient assets to satisfy asbestos-related liabilities. The claims arise from or relate to two dividends, totaling $525 million, that were ultimately received by the former ultimate parent company of Flintkote, Imasco Limited (now known as Imperial Tobacco Canada Limited), in 1986 and 1987. The dividends were paid as part of an orchestrated scheme whereby Imasco acquired Flinktoke's parent company in a hostile takeover, and caused Flintkote to sell off its operating assets and to become, for all practical purposes, an asbestos claims paying facility. Imasco caused Flintkote to pay it $525,000,000 of the proceeds of the sales. The payment took the form of two dividends. The result was that Flintkote, or as it now turns out, Flintkote's asbestos creditors, funded all or a substantial portion of Imasco's hostile acquisition. As part of the transaction, Imasco agreed to repay to Flintkote (up to the full amount of the dividends) amounts due to Flintkote's creditors, including asbestos personal injury claimants that cannot be satisfied out of the assets of Flintkote if a court of competent jurisdiction finally determines that the dividends were improperly paid to

2

Imasco. The Parties intend to jointly prosecute these and other claims arising from or related to the dividends as part of the Dividend Recovery Litigation.

        D.     The Parties will seek a Court order authorizing them to serve jointly as the representatives of the Estates with respect to prosecution of the Dividend Recovery Litigation.

        E.     Because the Parties believe that it is in the best interests of the Estates and the Debtors' creditors to begin to prosecute the Dividend Recovery Litigation as soon as practicable and before confirmation of a plan or plans in these chapter 11 cases, the Parties seek to delineate their joint participation rights in respect of the Dividend Recovery Litigation that will be in effect prior to confirmation of any plan. It is contemplated (i) that, to the extent necessary, the right to control the Dividend Recovery Litigation may ultimately be transferred to an asbestos personal injury trust established pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan or plans of reorganization, and (ii) that the overwhelming majority, if not all, of any net recovery that ultimately results from the Dividend Recovery Litigation will be distributed for the benefit of current and future holders of asbestos personal injury claims against the Debtors pursuant to a confirmed plan of reorganization. For these reasons, the Parties believe that joint representation of the Estates' interests in the Dividend Recovery Litigation is appropriate prior to confirmation of a plan or plans in these chapter 11 cases.

        F.     The interests of the Parties are aligned with respect to prosecution of the Dividend Recovery Litigation. It is essential to the interests of each Party and its counsel that all communications between and among the Parties and the special litigation counsel initially retained by Flintkote (subject to Court approval) to prosecute the Dividend Recovery Litigation ("DRLC"), and all related issues and matters, be shared among the Parties and that the communications remain confidential and protected by attorney-client privilege and as work

3

product. The Parties believe that the sharing of otherwise confidential information between and among themselves and DRLC is essential to the preparation of effective legal positions and the joint prosecution of the Dividend Recovery Litigation. The Parties do not intend to waive any evidentiary privileges as to these communications, but rather intend to share otherwise protected and privileged information without loss of evidentiary privileges or protections including attorney-client privilege and attorney work product. In order to advance the interests of the Parties in consulting with counsel with respect to the Dividend Recovery Litigation, the Parties intend that confidential communications, information and work product will be shared among them and that such shared communications, information and work product will be kept confidential among the Parties and their counsel.

      G.     Accordingly, the Parties have entered into this Agreement to (i) evidence the Debtors' consent to the ACC and the FCR jointly representing the Estates' rights in the Dividend Recovery Litigation, (ii) set forth the Parties' joint participation rights in respect of the Dividend Recovery Litigation and (iii) set forth the manner in which confidential information will be shared between and among the Parties and DRLC and applicable privileges maintained.

## AGREEMENT

      1.     The Debtors hereby consent and agree that they, the ACC, and the FCR shall jointly represent the Estates' interests in the Dividend Recovery Litigation.

      2.     The ACC and the FCR may, but shall not be required to be, named as plaintiffs in the Dividend Recovery Litigation in their capacity as co-representatives of the Estates' rights, subject to any procedural limitations applicable to party capacity in the Dividend Recovery Litigation; provided, however, that the status of the ACC and the FCR as co-representatives of the Estates' interests or as named plaintiffs in the Dividend Recovery

4

Litigation will not entitle them to employ their own counsel of record in the Dividend Recovery Litigation. The Debtors, the ACC, and the FCR all agree that all claims asserted in the Dividend Recovery Litigation are claims of the Estates, and not of any of them individually or in any capacity other than as a representatives of the Estates. They further agree that DRLC shall at all times represent only the Debtors, unless the Court approves DRLC to also represent the ACC and FCR in their capacity as representatives of the Estates. They further agree that DRLC shall not represent or be deemed to represent the ACC or the FCR in performing any function except as co-representative of the Estates' claims. The ACC and the FCR agree that to the extent DRLC, pursuant to a Court order approving this Agreement, represents them together with the Debtors as co-representatives of the Estates' rights in the Dividend Recovery Litigation, DRLC is not, by virtue of such representation, representing a party having an adverse interest to the ACC or the FCR in connection with these cases.

       3.     Whether or not the ACC and/or the FCR actually are named as Plaintiffs in the Dividend Recovery Litigation, each shall have the right, but not the obligation, to participate in client strategy and settlement decisions. The right of joint participation in respect of the Dividend Recovery Litigation shall include, without limitation, the right to communicate with DRLC, the right to receive full and complete access to all files and communications (whether oral or written) from or received by DRLC, the right to receive full and complete copies of any and all documents that DRLC would or could be required to provide a client under applicable laws and ethical rules or professional canons, and the right to participate equally in all decisions concerning the Dividend Recovery Litigation, including, without limitation, whether to prosecute, dismiss or settle any or all of it. DRLC shall communicate with regard to day-to-day case management matters related to the Dividend Recovery Litigation directly with Dave Gordon

5

(on behalf of the Debtors), and shall communicate with regard to all material litigation strategy matters and settlement discussions with each of Dave Gordon, a designated representative of the ACC, and James McMonagle (as the FCR), each of whom is duly authorized to act on behalf of their respective constituencies in exercising their joint participation rights regarding the Dividend Recovery Litigation.

4.    All material decisions with respect to litigation strategy involving the Dividend Recovery Litigation (including, without limitation, with respect to any alter ego claim(s) that might be asserted by an individual claimant in connection with or related to the Dividend Recovery Litigation), and the direction to be given to DRLC in respect of such litigation strategy decisions, shall be determined based upon a majority vote of (i) the Debtors (with the Debtors together receiving a single vote), (ii) the ACC, and (iii) the FCR.

5.    If any issues regarding the prosecution of the Dividend Recovery Litigation on behalf of the Estates cannot be resolved pursuant to a majority vote as set forth above in paragraph 4, any Party hereto may bring a motion asking the Court to address and resolve the issue. The Court shall have exclusive, continuing jurisdiction to decide all matters arising under this Agreement.

6.    The Parties have exchanged and will exchange among themselves and with DRLC privileged and work-product information, both orally and in documents, including factual analyses, strategies and mental impressions, investigative reports, and other information ("Joint Materials") for the purpose of advancing the interests of the Parties who have retained and may retain DRLC and assisting DRLC in prosecuting the Dividend Recovery Litigation. It is reasonably necessary to further the interests of each of the Parties and to accomplish the purposes of consulting with and retaining DRLC that such exchange of information take place in

6

a confidential manner. The Parties hereby agree that all Joint Materials which the Parties have exchanged, or will exchange, among themselves and with DRLC are privileged from disclosure to adverse or other third parties as a result of the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections. The Parties hereby agree to preserve to the maximum extent permitted by applicable law the attorney-client privilege, the joint-defense privilege, the attorney work-product doctrine, the common interest privilege, and all other applicable privileges or protections which they may have. The Parties have communicated with DRLC, and provided Joint Materials to DRLC, in anticipation of retaining them as lawyers, and they hereby agree that all such communications, direct or indirect, and Joint Materials are and will be maintained as confidential and protected as work product and not disclosed except as permitted by this Agreement.

       7.    The Parties agree they will use Joint Materials solely in connection with the Dividend Recovery Litigation and for no other purpose. If another person or entity requests or demands of a Party hereto, by subpoena or otherwise, to disclose or produce any privileged communications, Joint Materials or other protected information related to the Dividend Recovery Litigation, counsel for the Party subject to such request or demand shall immediately notify the other Parties hereto and DRLC, so that the Parties may seek an appropriate protective order or other remedy to assure that such privileged communications, Joint Materials or other protected information will be accorded confidential treatment.

       8.    Any Party may withdraw from participating as a co-representative of the Estates' claims in the Dividend Recovery Litigation at any time and for any reason and without Court approval by providing ten (10) days written notice to the other Parties, but only to the

7

extent that such withdrawal does not impair the right and authority of the other Parties to prosecute the Dividend Recovery Litigation. Under such circumstances, the remaining parties shall serve as co-representatives of the Estates' rights. Any withdrawing Party shall continue to be bound by this Agreement in all respects with regard to the disclosure of any privileged communications, Joint Materials or other protected information received, learned, or obtained at any time in connection with the Dividend Recovery Litigation.

9.      Under no circumstances shall any disagreement among the Parties hereto, or a withdrawal of one or more of the Parties as provided in Paragraph 8 above, form the basis for a request to disqualify DRLC, and the Parties hereto hereby waive all such potential conflicts of interest and agree that DRLC may continue to represent the then-acting representatives of the Estates in the Dividend Recovery Litigation.

10.     The terms of this Agreement may be modified only by (i) the prior written consent of all Parties, (ii) an order of the Court, or (iii) pursuant to a confirmed plan of reorganization.

11.     Following execution of this Agreement by all of the Parties (or their respective counsel on their behalf), the Debtors shall file a motion with the Court seeking an order approving this Agreement in all respects and confirming that the ACC and the FCR have standing to participate as co-representatives of the Estates' interests in the Dividend Recovery Litigation in accordance with the terms hereof.

Dated: 4/3, 2006

THE FLINTKOTE COMPANY

By:
Name: DAVID J GORDON
Its: PRESIDENT

Dated: 4/3, 2006

PLINTKOTE MINES LIMITED

By:
Name: DAVID J GORDON
Its: PRESIDENT

Dated: _____, 2006

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS

By:
Name:
Its:

Dated: _____, 2006

LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
PERSONAL INJURY CLAIMANTS

By:
Name:
Its:

9

Dated: _____, 2006

**THE FLINTKOTE COMPANY**

By: _____
Name: _____
Its: _____

Dated: _____, 2006

**FLINTKOTE MINES LIMITED**

By: _____
Name: _____
Its: _____

Dated: __4/5__, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: _____, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

LA1 764291v2

Dated: _____, 2006     THE FLINTKOTE COMPANY

By: _____
Name: _____
Its: _____

Dated: _____, 2006     FLINTKOTE MINES LIMITED

By: _____
Name: _____
Its: _____

Dated: _____, 2006     OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS

By: _____
Name: _____
Its: _____

Dated: 4/4/, 2006     LEGAL REPRESENTATIVE OF FUTURE ASBESTOS
PERSONAL INJURY CLAIMANTS

By: _____
Name: JAMES J. MCMONAGLE
Its: FCR

LA1 76435/v.2

9

Exhibit "5"

# AGREEMENT PROVIDING FOR
# JOINT PURSUIT OF ALTER EGO REMEDIES

This "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") is entered into as of April 4, 2006, by and among The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") (Debtor and Asbestos Claimants are hereinafter referred to collectively as the "Parties" and individually as a "Party"), with reference to the following facts and recitals:

## RECITALS

A.    Debtor is the debtor and debtor in possession in a case being jointly administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 04-11300 (JKF) (the "Bankruptcy Case").

B.    Asbestos Claimants hold asbestos-related claims against Flintkote (the "Claims") and contend that they additionally have remedies against the present or former, non-debtor affiliates of Debtors for the payment of the Claims on alter ego, veil piercing, or similar theories of recovery (collectively, "Alter Ego Remedies").

C.    The Debtor is about to commence litigation (the "Dividend Recovery Litigation") against, among others, one or more former, non-debtor affiliates of the Debtor (an "Affiliate Defendant") and will assert, among other theories of recovery, Alter Ego Remedies against one or more Affiliate Defendants. The Dividend Recovery Litigation seeks to establish, among other things, that the Affiliate Defendants are liable to persons with asbestos-related claims against the Debtor.

D.    As a result of this Agreement, all theories of alter ego recovery to be asserted against Affiliate Defendants, including Imasco Limited, now known as Imperial Tobacco Canada Limited) ("Imasco"), can be brought in the same action by plaintiffs who collectively have standing to assert all such grounds for relief. This will have several benefits to the Debtor's estate (the "Estate") and its creditors, including the following: (1) the arrangement will allow the assertion that Imasco is the alter ego of the Debtor and therefore responsible for the payment of the claims against the Debtor to be determined on its merits, avoiding unnecessary procedural arguments over whether the Alter Ego Remedies are being asserted by the correct party; (2) a successful prosecution of all potential Alter Ego Remedies by either an individual claimant or the Estate should result in a direct benefit to all creditors of the Estate by creating res judicata and collateral estoppel issue preclusion rights with respect to Imasco; (3) by pooling resources, an individual claimant can more feasibly pursue Alter Ego Remedies in conjunction with the Estate's efforts; and (4) by having individual

claimants in the case, the trier of fact will be more able to appreciate fully the nature of the type of claims being asserted against Flintkote and the harm that has been caused by Imasco's dismantling of the Debtor's going concern operations and the upstreaming of Flintkote's assets.

E.    The Parties wish to proceed promptly with the Dividend Recovery Litigation with the Debtor and Asbestos Claimants as parties. Accordingly, the Parties desire to authorize Asbestos Claimants to proceed on the Alter Ego Remedies on the terms and conditions set forth below.

### NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

### AGREEMENT

### A. Terms Of Joint Pursuit of Alter Ego Remedies.

1.    Authorization To Pursue Alter Ego Remedies. Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants shall be transferred and authorized to pursue for their own benefit that portion of the Alter Ego Remedies, if any, held by the Estate against the Affiliate Defendants that relates to Asbestos Claimants' Claim, as limited by the amount of such Claims, and to have authorized Asbestos Claimants to assert such remedy in the Dividend Recovery Litigation. Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly. Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

2.    Contribution To Dividend Recovery Litigation Expenses. Asbestos Claimants recognize that their costs of litigation will be substantially reduced by the efforts of the Debtors in the Dividend Recovery Litigation, and agree to contribute to such litigation costs in the following manner:

a.    Asbestos Claimants shall limit the fees payable to their counsel in pursuing the Alter Ego Remedies to twenty-five percent (25%) of actual recoveries by Asbestos Claimants, either directly or as a result of any distribution on account of an allowed claim against the Estate as a result of the litigation of Asbestos Claimants' Claims against Imasco; and

b.    Asbestos Claimants shall retain all net recoveries as a result of the assertion of their Alter Ego Remedies (after payment of costs) up to $400,000 and shall pay any excess recoveries to the Estate, which excess recoveries shall be held for the benefit of asbestos claimants, and shall be contributed by the Estate to any asbestos trust established pursuant to section 524(g) of the Bankruptcy Code, or

otherwise, for distribution in accordance with the trust distribution procedures governing such asbestos trust as approved by the Bankruptcy Court, including in connection with confirmation of a plan or plans of reorganization for Flintkote and its affiliates.

      3.    Settlement Of Alter Ego Remedies. Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the Official Committee Of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case (the "Committee") and the "Legal Representative For Future Asbestos Claimants" appointed in the Bankruptcy Case (the "Futures Representative"); provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the Committee and the Futures Representative, shall not be unreasonably withheld. If a dispute arises as to whether such consent by the Asbestos Claimants has been unreasonably withheld, then such dispute shall be submitted to the Bankruptcy Court for determination as a contested matter without the right to a trial by jury. If an asbestos trust is created pursuant to section 524(g) of the Bankruptcy Code, the trustee or trustees of such trust (the "Asbestos Trust Trustee") may act for the Committee, the Futures Representative, and/or the Debtor under this provision to the extent provided in the confirmed plan or plans of reorganization.

      4.    Management Of Alter Ego Litigation. The special litigation counsel retained on behalf of the Estates to prosecute the Dividend Recovery Litigation ("DRLC"), acting under the direction of Debtor, the Committee and the Futures Representative in accordance with the terms of the Joint Prosecution Agreement, shall manage the litigation (and advance the expenses and costs incurred by Asbestos Claimants in respect thereof, subject to and in accordance with paragraph 2 above) on all Alter Ego Remedies issues common to the Dividend Recovery Litigation and the Alter Ego Remedies being asserted by Asbestos Claimants; provided, however, that Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estate in the Dividend Recovery Litigation to the maximum extent feasible.

      5.    Claim Amount. The Parties agree that any amount determined to be owed to Asbestos Claimants on account of Asbestos Claimant's Claim in the Dividend Recovery Litigation shall be binding on the Debtor and the Estate but will not be enforced against the Debtor or the Estate except in accordance with the terms of a confirmed plan of reorganization in these cases and any § 524(g) trust distribution procedures approved by the Court in connection therewith. Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' Claims against Imasco as provided in Paragraph A.2.b, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

3

**B. General Provisions**

1.     Limitation on Third-Party Beneficiaries. No provision contained in this Agreement is intended to confer any rights, or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, the Committee, the Futures Representative, and the Asbestos Trust Trustee, if any.

2.     Successors and Assigns. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and assigns, including, in the case of Debtor, any trustee appointed under chapters 11 or 7 of the Bankruptcy Code, and the Asbestos Trust Trustee, if any.

3.     No Representations or Warranties. Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

4.     Headings. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

5.     Representation By Counsel. The Parties acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel. This Agreement is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

6.     Due Authorization. Each Party to this Agreement hereby represents and warrants that (i) such Party is duly authorized to enter into this Agreement without the permission of any third party; and (ii) the person purporting to execute this Agreement on behalf of such Party has been duly authorized to execute this Agreement on behalf of and bind such Party; provided, however, that this representation and warranty as against Debtor shall be of no force and effect with respect to matters that require the approval of the Bankruptcy Court in the Bankruptcy Case unless and until such approval is obtained.

7.     Entire Agreement; Amendment; Waiver. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Agreement may not be modified or amended except in writing signed by the Parties hereto, with the consent of the Committee and the Futures Representative. No waiver of any term, provision or condition of this Agreement, in any

4

one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

8.     Effective Date. Except as otherwise provided in this paragraph, this Agreement shall be binding upon Asbestos Claimants upon the execution of the Agreement by all signatories below (including the Committee and the Futures Representative), but it shall only be binding upon Debtor and the Estate upon entry of an order of Bankruptcy Court approving it after notice and an opportunity for a hearing. Absent the approval of this Agreement by the Bankruptcy Court, the parties shall be returned to the status quo ante as if this Agreement had not be executed by the Parties, and Asbestos Claimants shall cease any further prosecution involving the assertion of the Alter Ego Remedies in which the Estate has an interest but for the execution of this Agreement.

9.     Governing Law and Choice of Forum. This Agreement shall be governed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, and by the United States Bankruptcy Code. The Bankruptcy Court shall be the exclusive forum to hear, determine and enter appropriate orders and judgments regarding all disputes in respect of this Agreement.

10.     Counterparts. This Agreement may be executed in two or more counterparts by the Parties, and such counterparts shall be considered as and construed to be part of a single agreement. Signatures transmitted by facsimile shall have the same effect as original signatures.

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006

THE FLINTKOTE COMPANY

By: _____
Name: DAVID T GORDON
Its: PRESIDENT

Dated: April 5, 2006

**MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By: _____
    David R. Donadio, Brayton Purcell, LLP,
    authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

6

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006       **THE FLINTKOTE COMPANY** By:

_____ Name:

_____ Its:

Dated: April 5, 2006       **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS** By:

_____ David R. Donadio, Brayton Purcell, LLP, authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006       **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS** By:

_____ Name:

_____ Its:

Dated: April 5, 2006       **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS** By:

_____ Name:

_____ Its:

_____

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006      **THE FLINTKOTE COMPANY**

By: _____
Name: _____
Its: _____


Dated: April 5, 2006      **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By: _____
David R. Donadio, Brayton Purcell, LLP,
*authorized agent and attorney in fact*


The foregoing is approved as to form and content:

Dated: April 5, 2006      **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006      **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _~~John Wingled~~_
Name: ~~JOHN WINSHIP READ~~
Its: ~~AUTHORIZED AGENT AND ATTORNEY~~
~~for JAMES J. MCMONAGLE~~

6

The foregoing is approved as to form and content:

Dated: April _5_, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

Dated: April ___, 2006

By: _____
Name: _____
Its: _____

6

Exhibit "6"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                  . Case No.  04-11300 (JKF)
                                        .
                                        .
  THE FLINTKOTE COMPANY and             .
  FLINTKOTE MINES LIMITED,              .
                                        . 824 Market Street
                                        . Wilmington, Delaware  19801
                    Debtors.            .
. . . . . . . . . . . . . . . . . . . . April 17, 2006
                                        . 9:58 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT

APPEARANCES:

For Debtor/Debtor in
Possession:                     Pachulski, Stang, Ziehl,
                                Young, Jones & Weintraub, P.C.
                                By:  JAMES E. O'NEILL, ESQ.
                                919 Market Street
                                16th Floor
                                P.O. Box 8705
                                Wilmington, DE  19899

                                Sidley, Austin LLP
                                By:  KEVIN T. LANTRY, ESQ.
                                555 West Fifth Street
                                Los Angeles, CA  90013

                                Office of Alan Pedlar
                                By:  ALAN PEDLAR, ESQ.
                                1901 Avenue of the Stars
                                Los Angeles, CA

Audio Operator:                 Jason Smith

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

**APPEARANCES CONTINUED:**

For ACC:                         Caplin & Drysdale, Chartered
                                 By: PETER VAN N. LOCKWOOD, ESQ.
                                 One Thomas Circle, N.W.
                                 Washington, DC  20005


For U.S. Trustee:                Office of the U.S. Trustee
                                 By:  DAVID M. KLAUDER, ESQ.
                                 601 Walnut Street
                                 Room 950W
                                 Philadelphia, PA  19106


For ITCAN:                       Morris, James, Hitchens &
                                 Williams, LLP
                                 By:  STEPHEN M. MILLER, ESQ.
                                 PNC Bank Center
                                 222 Delaware Avenue
                                 10th Floor
                                 P.O. Box 2306
                                 Wilmington, DE  19899

                                 King & Spalding
                                 By:  MARK M. MALONEY, ESQ.
                                      JAMES A. PARDO, JR., ESQ.
                                 191 Peachtree Street NE
                                 Atlanta, GA  30303

For the Futures Rep.:            Young Conaway Stargatt &
                                 Taylor, LLP
                                 By:  EDWIN J. HARRON, ESQ.
                                 The Brandywine Building
                                 1000 West Street
                                 17th Floor
                                 P.O. Box 391
                                 Wilmington, DE  19899

3

1       THE COURT: All right. This is the matter of
2  Flintkote, 04-11300.
3       MR. O'NEILL: Good morning, Your Honor.
4       THE COURT: Good morning.
5       MR. O'NEILL: James O'Neill, Pachulski, Stang, Ziehl,
6  Young, Jones and Weintraub on behalf of the Debtors.  I'm here
7  today with my co-counsel Kevin Lantry from the Sidley and
8  Austin firm.  Your Honor, do you have a copy of the amended
9  agenda?
10       THE COURT: I don't think so.
11       MR. O'NEILL:  I do have an extra one if you --
12       THE COURT: No.  Thank you.
13       MR. O'NEILL:  Going right down the agenda, Your
14  Honor, number one is resolved.  The Court has already entered
15  an order on the supplemental application to employ Irell.
16  Number two, there was an objection which was filed to that and
17  we'll address that briefly.  Item number three, Your Honor, is
18  an uncontested matter which is the application to employ
19  special counsel and I'm going to turn the podium over to my
20  co-counsel Kevin Lantry for that item.
21       THE COURT: Was a certificate of no objection filed?
22       MR. O'NEILL:  No, Your Honor.  There was no
23  certificate of no objection filed.  We can file one.  The Court
24  entered an order shortening notice and the shortening -- the
25  objection created was Thursday and we just didn't have time to

4

1  file the CNO, but we can.  There were no objections which were
2  filed to item number three.
3              THE COURT:  All right.  Thank you.  Mr. Lantry.
4              MR. LANTRY:  Your Honor, Kevin Lantry of Sidley
5  Austin on behalf of the Debtors.  With regard to the
6  application to employ special litigation counsel, as the
7  pleadings indicate, Your Honor, this is with the support of the
8  Asbestos Committee and Futures Rep.  The three of us, the
9  Debtors and the two constituencies have spent many months
10 searching the country for the special litigation counsel.  Also
11 spent quite a bit of time negotiating with them over the terms
12 of their engagement.  So, all of the constituencies in this
13 case support this.  We have talked extensively with the U.S.
14 Trustee about it, they have no objection and want to simply
15 clarify that although we are working hand in glove with the
16 Asbestos Committee and Futures Rep., they are being -- the
17 special litigation counsel is being employed by the Debtors
18 estate.  So, there are no objections, Your Honor, to this
19 motion.  We'd ask that you enter the order.
20             MR. O'NEILL:  And, Your Honor, I have a form of order
21 which I can hand up.
22             THE COURT:  All right.  Okay.  This order, I take it,
23 is going to essentially change the provisions of the normal fee
24 application process because of the discounted rate and so
25 forth, that there won't be a 20 percent hold back.  Is Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Smith -- is Mr. Smith the fee auditor?   I apologize, I've got

2  the cases mixed up.   Is he the fee auditor in this case?

3        MR. O'NEILL:   Yes, Your Honor.   Mr. Smith is the fee

4  auditor in this case.   I don't know that he's seen this order,

5  but we will make sure that he is aware of its entry so that he

6  can conduct or exclude these from his review of --

7        THE COURT:   All right.   And what happens at the end

8  of the case because of this discounted rate, is there an

9  expectation that there's going to be some request for

10  additional fees or bonuses, or --

11        MR. LANTRY:   Your Honor, we talked a good deal about

12  this with the U.S. Trustee's Office.   We mentioned two

13  scenarios.   One, if the litigation has been completed before

14  case is closed, we would bring a final fee application to Your

15  Honor.   If, however, the case is closed and the litigation

16  continues, with the cause of action essentially belonging to

17  the 524(g) estate, then we would have the plan address the

18  final allowance and who would be having authority to finally

19  allow, in accordance with the terms of the engagement.   That's

20  how we discussed with Mr. Klauder, but he may want to speak to

21  that issue, but I think that was the understanding with the

22  U.S. Trustee's Office.

23        THE COURT:   Okay. I understand that with respect to

24  the allowance of the fees, but what I'm asking is, there is a

25  significant discounted rate that all of these conglomerations

6

1  of attorneys are putting into this and my question is, why are

2  they doing that?  I mean, it's almost in the nature of a

3  contingency fee, but it isn't.

4          MR. LANTRY:  That is exactly what it is, Your Honor.

5  It is a contingency fee arrangement, the nature of the

6  contingency is very well spelled out in the agreement and we

7  have negotiated over that with a great deal of effort but,

8  essentially, most of the consideration that they will get is in

9  the contingency, not in the discounted fees.  I can walk you

10 through the terms if that would be helpful, Your Honor.

11         THE COURT:  I'm just trying to figure out what

12 ultimately each of the participants in this litigation recovery

13 group are expecting to get by way of fees.  And I'm not sure I

14 totally grasp.

15         MR. LANTRY:  Let me just give a brief summary.  If

16 there is no recovery, if the litigation fails, they will

17 essentially get their guideline rates, which are pretty much

18 what they charge regular constituencies, regular clients.  If,

19 however, there is a recovery in the litigation, they will only

20 get the discounted rate and that is built in at the bottom of

21 the recovery to make sure that they get the discounted rate,

22 that'll be paid in incremental monthly installments.  But then

23 the amount that they would get up to their guideline rates will

24 be reduced from the overall recovery.

25         Again, Your Honor, it may be helpful to allow Alan

**J&J COURT TRANSCRIBERS, INC.**

7

1 | Pedlar --

2 |         UNIDENTIFIED ATTORNEY:  We don't get anything --

3 |         MR. LANTRY:  Right.

4 |         UNIDENTIFIED ATTORNEY:  (Indiscernible).

5 |         MR. LANTRY:  Right.

6 |         UNIDENTIFIED ATTORNEY:  That's not what you said.

7 |         MR. LANTRY:  Your Honor, again, the provision is

8 | essentially that the estate gets the benefit of their cheaper

9 | guideline rates if there is no success at the end of the day.

10 |        THE COURT:  All right.  So, they're not getting their

11 | regular rates, they're getting the discounted rate if there's

12 | no success --

13 |        MR. LANTRY:  That's correct.

14 |        THE COURT:  And if there is a recovery, then they're

15 | going to get their normal rates with the discounted rate that

16 | they've already been paid subtracted?

17 |        MR. LANTRY:  That's correct.

18 |        THE COURT:  Okay.  Anyone wish to speak to that

19 | matter?

20 |        MR. PEDLAR:  Good morning, Your Honor, Alan Pedlar,

21 | I'm one of the proposed special litigation counsel.  There is a

22 | $200 cap on hourly rates if there's no recovery.  If there's a

23 | recovery, there is a formula in the agree agreement that pays

24 | counsel based on the amount of the recovery from which the

25 | $200 an hour received would be subtracted, but it's not

**J&J COURT TRANSCRIBERS, INC.**

8

1  certainly capped at our normal hourly rates, there's a

2  provision to pay up to 15 percent of the total recovery in the

3  case and it's all laid out in the fee application, but we will

4  do better than our normal hourly rates to the extent there is a

5  large recovery, there is a smaller range of recoveries in which

6  we will only receive our hourly rates.  But I didn't want Your

7  Honor to have her notes reflect that the upside was simply our

8  hourly rates.  There is up to 15 percent of the recovery.

9          THE COURT:  Okay.  That's what I was confused about.

10 There is essentially a staggered agreement where if there is no

11 recovery, then you're going to only the discounted rate.  If

12 there is a range of recoveries, you'll get up to the hourly

13 rates and if there is real success as you hope, then you're

14 getting up to 15 percent of the total damage award less

15 whatever costs and fees have been paid to date.

16         MR. PEDLAR:  That's correct.  There is a range of

17 dollars in which the rate is 20 percent but then after, I

18 believe $100 million dollars, it's down to 15 percent, but it's

19 a combination of a substantially reduced hourly rate plus an

20 upside based on the result, which is a contingent portion of

21 it.

22         THE COURT:  All right, thank you.

23         MR. PEDLAR:  Thank you, Your Honor.

24         MR. LOCKWOOD:  Your Honor, Peter Lockwood for the

25 ACC.  I just want, for the record, to say that the ACC has

**J&J COURT TRANSCRIBERS, INC.**

9

1 been, as Mr. Lantry stated, been involved in this along with

2 the representatives of the Future Claimants Representative and

3 we are totally in support of this and I might add, on a

4 personal note, that I've worked with ironically, most of the

5 gentleman in this team and think that we have been remarkably

6 fortunate in getting the people of their skills and ability to

7 undertake this on the basis that's being proposed here today.

8        MR. KLAUDER:  Good morning, Your Honor, David Klauder

9 for the United States Trustee.  I just wanted to agree with

10 what Mr. Lantry said.  We went over this application

11 extensively with the Debtors, Debtors' counsel, especially the

12 fee structure and we had some of the same questions you did,

13 but once we talked through it and understood it, we were okay

14 with it.  I just wanted to make one thing clear.  I think it's

15 stated in the motion or in the application, although I'm not

16 sure it's exactly clear, we're kind of treating these as four

17 separate retentions and there's going to be four because there

18 are four different lawyers/law firms.  There's going to be four

19 separate fee applications.  So, everything will be clearly set

20 out by the different law firms and four separate fee

21 applications will be filed.

22        THE COURT:  Okay.

23        MR. KLAUDER:  But with that, we have no objection to

24 the application.  Thank you.

25        THE COURT:  All right.  I've signed the order.  I

**J&J COURT TRANSCRIBERS, INC.**

1  just want to make sure that Mr. Smith understands that this is

2  not going to work the normal way, so that he is, you know, on

3  board, please.

4         MR. O'NEILL:  Yes, Your Honor, I will communicate

5  with Mr. Smith today and make sure he gets a copy of the order.

6         THE COURT:  All right.  Oh, Mr. Harron, I'm sorry?

7         MR. HARRON:  Good morning, Your Honor, Ed Harron for

8  Jim McMonagle, the Futures Representative.  Mr. McMonagle just

9  wanted to make sure that I confirmed for the record his support

10  of this application.

11         THE COURT:  All right, thank you.

12         MR. HARRON:  Thank you, Your Honor.

13         MR. LANTRY:  That brings us to item two, Your Honor.

14  This is the Debtors' motion for a joint prosecution agreement,

15  for an alter ego agreement and to annul the automatic stay for

16  a limited respect.

17         There has been no objections to one of the three

18  elements of the relief requested and that's the joint

19  prosecution agreement.  This is an agreement between the

20  Debtors, the Asbestos Committee and Futures Rep. to jointly

21  represent the estates in this litigation, for which this

22  special counsel has been employed.  There are objections to the

23  other two elements of the relief and I would ask Alan Pedlar to

24  address those issues which you have essentially staged todays

25  status conference on.

11

1          THE COURT:  All right.

2          MR. LANTRY:  But I just wanted to clarify that there

3    were no objections to that first one and so we would ultimately

4    want to submit an order at least with respect to the one item

5    going forward.

6          THE COURT:  All right.

7          MR. LANTRY:  Thank you, Your Honor.

8          THE COURT:  Mr. Pedlar.

9          MR. PEDLAR:  Thank you, Your Honor, Alan Pedlar

10   special litigation counsel for the Debtors.

11         Your Honor, since this is now a status conference

12   this morning, I think we should use the time to identify who

13   are parties are and to frame the issues that are presented by

14   the motion.  The objecting party is a Canadian tobacco company

15   that striped over $500 million dollars out of Flintkote,

16   leaving behind insurance rights that are going to prove to be

17   billions of dollars short of paying Flintkote's creditors.  The

18   Debtor has, for perfectly good reasons, decided to sue to get

19   that dividend back and to pierce the corporate veil in

20   California which is the location that Flintkote resides and

21   where all the wrongful conduct took place.  And for good reason

22   that have nothing to do with gamesmanship, Flintkote has also

23   determined that the most effective and efficient way to bring

24   this claim before the trier of fact is to present it with an

25   injured plaintiff.

12

1        This is really no different than granting a tort

2   claimant relief from the stay to pursue insurance coverage and

3   having the estate join in that action for a declaration of

4   insurance coverage.

5        The Debtor in its moving papers cited to the Court

6   the Second Circuit's decision in the St. Paul case, the

7   Resolutions Trust case out of the Bankruptcy Court from the

8   District of Columbia, both of which state that where an alter

9   ego remedy is property of the estate, a trustee could chose to

10  abandon a claim and, thereby, allow a creditor to pursue it

11  independently.  There's nothing illegal or improper about that,

12  nothing wrong with the estate positioning its case in the

13  manner most favorable to the estate.

14        This is going to be a very large and hotly contested

15  case.  In exercising their business judgment to enter into the

16  alter ego agreement, the representatives of the estate

17  determined that they have no interest in trying this case

18  twice, or having it reversed on appeal because of a lack of

19  standing.  By allowing the Hopkins plaintiffs to pursue a slice

20  of the estate's alter ego cause of action if, in fact, it's

21  owned by the estate, we have ensured that there is no standing

22  issue in the case, the case won't have to be tried twice, not

23  subject to appeal on a standing issue.

24        By the alter ego agreement, we centralize in the

25  Hopkins plaintiffs, a party that has the right to pursue

13

1   absolutely every kind, every flavor of alter ego claim that

2   might exist out there.  It ensures that the litigation against

3   Imperial Tobacco will be determined on its merits and not

4   reversed on a standing issue.  And there's simply nothing wrong

5   with that.

6           To put this in context, in the context of this

7   motion, this motion seeks a modification of the automatic stay

8   to allow the litigation to go forward in its entirety,

9   counterclaims, objections, whatever anybody wants to make, and

10  to approve the alter ego agreement.  It is Hornbook law, Your

11  Honor, that only the Debtor has standing to assert the

12  automatic stay, Imperial Tobacco has no standing, whatsoever,

13  on stay issues.  The stay is not for its benefit.

14          Second, approval of the alter ego agreement requires

15  only a determination by this Court that the alter ego agreement

16  is in the best interest of the estate or the Debtor hasn't

17  abused its business judgment in entering into the alter ego

18  agreement.  That's the only issue presented by the motion.  Is

19  doing this in the best interest of the estate.  And let me make

20  a couple of observations on that.

21          The Debtor, the ACC, the FCR, all of their counsel

22  and the special litigation team, it is their unanimous judgment

23  that this is the best way to pursue this claim, that the state

24  court action is presently postured so as to maximize the

25  potential for recovery against Imperial Tobacco.  Unlike the

**J&J COURT TRANSCRIBERS, INC.**

14

1 estate representatives, Imperial Tobacco has no interest in
2 what's in the best interest of the estate, they never have,
3 they never will and so, I would raise two questions this
4 morning in connection with the status conference, since we're
5 trying to ascertain what the issues are.

6          First, because Imperial Tobacco is not a creditor,
7 they have no standing to be heard on this matter.  The only
8 issue presented by this matter is best interest of the estate,
9 and they just simply don't have an interest in this case.

10          Equally important, Your Honor, there is not one
11 sentence in the Imperial Tobacco reply that is devoted to
12 explaining why the alter ego agreement is not in the best
13 interest of the estate, not a single sentence.

14          THE COURT:  Well, I thought that the whole purpose
15 was that they wanted some time to look at the issue.  That's
16 the only reason I gave them time.  I mean, the Debtor filed
17 this -- I understand the Debtor filed the motion shortly after
18 filing the complaint in the state court, but nonetheless, in
19 terms of getting it onto today's calendar, in a very short
20 fashion, and at this point I don't know who has an interest in
21 the case and who doesn't the Debtor is now telling me that it's
22 the defendant that they're trying to sue in the state court
23 system, who is arguing that I shouldn't permit the agreement.
24 Well, that sort of colors things, but until I have an
25 opportunity to hear from the other side, I don't know that.

1  That's why I've put it off for a month.

2          MR. PEDLAR:  Your Honor, I understand that.  I think

3  a status conference is the time and the place to understand the

4  basis for the objection.

5          THE COURT:  Well, I understand if they're the

6  defendant in the case why they want to object, but I put it off

7  as a status conference so I think I'm going to give them a

8  chance to file their papers and I'll hear it next month in May.

9          MR. PEDLAR:  Okay.  And I understand that, but I

10 think that today we should get a statement from them as to why

11 they think they have standing.  I mean, it is a status

12 conference, and we should also ask for, receive an offer of

13 proof of to why this alter ego agreement isn't in the best

14 interest of the estate.

15          They did file an objection, Your Honor, and I

16 recognize, Your Honor, that you don't have a background in this

17 case, there were voluminous pleadings filed, but I want to very

18 briefly talk about the objections they did raise, and then

19 again ask the question, where is the beef, where is the basis

20 to disapprove this on best interest grounds.

21          THE COURT:  Well, isn't that what I'm going to be

22 hearing next month?

23          MR. PEDLAR:  Well, Your Honor, I think the real

24 problem is, to flip this into a 12(b)(6) context, the

25 objections that they have filed in their pleading, in no way go

**J&J COURT TRANSCRIBERS, INC.**

16

1  to the issue presented by this motion, which is best interests

2  of the estate.

3          THE COURT:  Well, that's what you're going to tell me

4  next month.

5          MR. PEDLAR:  Well -- yeah, I think it's very

6  difficult for us to respond on that issue when they haven't

7  articulated a reason why this isn't in best of the estate.

8          THE COURT:  Right.  But that's what they said they

9  wanted an opportunity to do, so I expect at this point that

10  they're going to file their brief on that issue within the time

11  frame that's going to T it up for May 16th, which probably

12  should have already been done, or close to it, and the Debtor

13  and anybody else who wants to object to it will T it up and

14  then I'll hear the argument next month.

15          MR. PEDLAR:  The --

16          THE COURT:  I'm not hearing an argument today.

17  That's the whole point of doing this as a status conference,

18  was to preserve the rights of the other side, so I don't have

19  an argument today.  So --

20          MR. PEDLAR:  I understand, Your Honor.

21          THE COURT:  Okay.

22          MR. PEDLAR:  The briefing schedule or the briefing

23  order you signed authorizes them to file their brief, I think,

24  on May the 2nd.

25          THE COURT:  Okay.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. PEDLAR:  Our problem is that they've already

2    filed on brief.  As we stand here today, we don't know what

3    their arguing.

4          THE COURT:  Well, that's why I wanted a status

5    conference.  So, maybe I should start with them, to find out

6    what they're arguing.

7          MR. PEDLAR:  Perhaps you should.  We would like an

8    opportunity to file a reply brief.

9          THE COURT:  Absolutely.

10          MR. PEDLAR:  Since their opening brief doesn't

11    address it and I don't believe the order was set up with time

12    for them to file and then for us to file.  But I will yield the

13    podium and, perhaps, we can hear from them as to why the think

14    they have standing and why they think this is in the best

15    interest of the estate.

16          THE COURT:  Well, their brief is due May 2nd, the

17    hearings are may 15th, so if your brief is filed by May 9th,

18    that should still be in time to get it into the final binders.

19    Their brief would come in in the preliminary and yours in the

20    final, correct?

21          MR. O'NEILL:  I think the final is due one week

22    before, that would be -- May 8th would be so --

23          THE COURT:  All right.  Okay.  Then why don't I just

24    say you can have until the 9th anyway, and then Mr. O'Neill, if

25    you could just make ceratin to let Ms. Baker know that your

18

1 | reply has been filed and we'll simply get it off the Internet
2 | at that point.

3 |          MR. O'NEILL:  Certainly.

4 |          THE COURT:  Okay.  I take it, since it's now special
5 | litigation counsel that's going to be responding on behalf of
6 | your consortium of who is going to prosecute the complaint in
7 | this state court, so it's only one reply brief that I'll be
8 | getting?

9 |          MR. PEDLAR:  You'll only get one from the Debtors
10 | side, yes.

11 |          THE COURT:  All right.  Okay.  Let me hear from the
12 | other side.  I really think and in terms of status conference,
13 | that's what I need to do.

14 |          MR. MILLER:  Good morning, Your Honor.

15 |          THE COURT:  Good morning.

16 |          MR. MILLER:  Stephen Miller of Morris, James,
17 | Hitchens & Williams, LLP.  I represent Imperial Tobacco Canada
18 | Limited and certain of its wholly owned subsidiaries.  I'd like
19 | to introduce to Your Honor my co-counsel and I filed pro hac
20 | vice papers on Thursday, I know Your Honor probably hasn't had
21 | an opportunity to sign those, but I ask that they be permitted
22 | to speak today.  James Pardo on the far left and Mark Maloney,
23 | both partners at King & Spalding.  And, they will be addressing
24 | the Court today with respect to the status.  I do want to thank
25 | Your Honor for granting the cross-motion for the continuance so

19

1  that this can be used as a status conference.  Thank you very

2  much, Your Honor.

3         THE COURT:  All right, thank you.

4         MR. MALONEY:  Good morning, Judge.  Mark Maloney on

5  behalf of Imperial Tobacco for the record.  I want to address

6  first of all, Judge, and I'm not going to get into a lot of

7  argument because you've made clear you don't want to hear that

8  and we appreciate the opportunity to come back to you next

9  month and make that argument.

10        The claims that are at issue, Judge, the claims that

11 give rise to the need to be here today on the alter ego

12 agreement are grounded in events that occurred about 20 years

13 ago, 19, 20 years ago.  There was a suggestion by Mr. Pedlar

14 that I wanted to address and make abundantly clear.

15        Dividends, in fact, were approved and made in 1986

16 and 1987, for roughly $525 million dollars.  They were done at

17 a time when all reasonable efforts were made to determine that

18 the assets and insurance that was going to be left with the

19 Flintkote Company, would be sufficient to cover anticipated

20 future asbestos liabilities.

21        THE COURT:  That's an issue you're going to take into

22 the state court.  What I want to know is, if you're not a

23 creditor in this case, what standing do you have to raise any

24 objection to what the Debtors intend to do in the state court.

25 You'll have all of your defenses available there.

**J&J COURT TRANSCRIBERS, INC.**

20

1        MR. MALONEY:  I understand, Judge.  I was just
2    responding to a comment that Mr. Pedlar made, and I will move
3    on.

4        Our standing arises, really, from two contexts that
5    Mr. Pardo can step up and address.  He was going to handle that
6    issue if it came up today.  I think the first and most
7    prominent, Imperial Tobacco, through its subsidiaries, GenStar
8    Corporation, is a co-owner of multiple insurance policies that
9    have been identified in the Debtors schedules.  Now that we've
10   been sued, we have a significant interest in examining those
11   insurance policies and finding out what, if any, coverage we
12   have.

13       THE COURT:  Wait, I'm sorry.  Imperial is a co-owner
14   with GenStar?  I lost who owns the insurance policies.

15       MR. MALONEY:  GenStar Corporation, which is a
16   subsidiary of GenStar -- GenStar Corporation which is a
17   subsidiary of Imperial Tobacco --

18       THE COURT:  All right.

19       MR. MALONEY:  Is the co-owner or, perhaps, the owner
20   along with the Flintkote Company as a co-insured, of multiple
21   insurance policies that are included in the Debtors schedules
22   and have actually been subject to some activity in this case as
23   I understand.

24       THE COURT:  So, it's a separate company or is there
25   some veil piercing that's going to mix GenStar together with

**J&J COURT TRANSCRIBERS, INC.**

1    Imperial, so that Imperial has standing?

2          MR. MALONEY:  Well, GenStar, Your Honor, is one of

3    the objecting parties here today, along with Imperial Tobacco.

4          THE COURT:  Okay.

5          MR. MALONEY:  We are here --

6          THE COURT:  Why would it want to object?  If it's an

7    insured and, in fact, there's a method by which the estate can

8    recover $525 million dollars that will not then access it's

9    insurance policies, why would it want to object?  That makes no

10   sense.

11         MR. MALONEY:  Well, Your Honor, GenStar is one of the

12   companies that's in the chain between Flintkote at the bottom

13   and Imperial Tobacco on the top.  We don't know whether GenStar

14   is going to be a named defendant in this case or not.  At this

15   stage, the litigation is not clear in the state court, they've

16   mentioned a number of John Doe's.

17         THE COURT:  Well, did GenStar get part of this $525

18   million dollars of dividends?

19         MR. MALONEY:  Your Honor, I believe it is the case,

20   that the dividends were sent up through a corporate chain,

21   beginning with a company by the name of GenStar Pacific

22   Corporation and then up through, I believe, including GenStar

23   Corporation.

24         THE COURT:  All right.  Anyway, okay, you can lay

25   that all out.  If, in fact, you have standing, please give me a

 1  corporate chain and tell me who it is who's objecting and where
 2  they're standing, because just because GenStar has standing
 3  does not necessarily mean that Imperial has standing.  So, you
 4  know, somebody may, but I certainly don't understand why
 5  GenStar would be objecting to recovery from its parent if the
 6  issue is insurance proceeds that it's then going to lose as a
 7  result of the recovery.  I mean, there may be a conflict, so I
 8  hope you folks are not all trying to represent all these
 9  parties, because that's going to be a problem.

10          MR. MALONEY:  Your Honor, would you prefer some more
11  background on this issue or did you just want it in the briefs
12  when we file on the 2nd?

13          THE COURT:  I think in the briefs will be fine
14  because I think you're going to have to lay it out for me in a
15  written fashion, preferably, including a chart because I'm not
16  going to get it just from this record, when I don't have a
17  context in which to put it.  So, I want to see what your
18  objections are, who's making it and I want a specific
19  representation as to standing for each party who is filing an
20  objection, because it's very possible that some may and some
21  may not have it.

22          MR. MALONEY:  I understand, Judge.

23          THE COURT:  Okay.

24          MR. MALONEY:  Turning to, again, this issue, this
25  lawsuit was anticipated, the Debtors first noted for the

**J&J COURT TRANSCRIBERS, INC.**

23

1  record, I believe, or for this Court's record in a December

2  status conference, that the litigation was anticipated.  We had

3  overtures from the Debtor and from the plaintiffs prior to

4  that.  The form, Judge, I would note is interesting.  The

5  Debtors have asserted this is the largest asset of the estate,

6  there's alter ego and fraudulent conveyance claims in an

7  insolvency context that this court and certainly the district

8  courts in Delaware are very familiar with and deal with all the

9  time.

10       The outcome of this litigation, Judge, will

11  absolutely define what kind of case this will be from the

12  perspective of the creditors.  It will absolutely define that

13  issue.  And, we believe that this case has core principles to

14  this case, core matters, nonetheless, it was filed about as far

15  away from this court as you can imagine, out in California.

16  That's obviously the Debtors' choice of where to attempt to

17  file it in the first instance.  They've made that choice and

18  we'll respond accordingly.  But it brings into focus that a

19  very primary issue that we're here today, and then again in

20  May, Judge, is this issue of standing.  And I'll respond to

21  that briefly with the note that part of the issue is that we

22  wanted to look at this issue more closely and your order is

23  going to allow us to do that.

24       The Debtors have listed four reasons, really, for

25  entering into the alter ego agreement.  I applaud their candor

24

1  for listing as their fourth reason what I believe to be really
2  the only reason, which is to interject an individual plaintiff
3  so that both the Debtor and an individual asbestos plaintiff
4  have dual standing, if you will, to present this issue to the
5  Court.

6         Now, setting aside my disagreement that that is an
7  appropriate use of the bankruptcy process, to interject that
8  issue, the other issues that are raised, the other three issues
9  that are raised, all deal with concerns over potential
10 standing, the need to provide an economical way for individual
11 creditors to present their arguments and to bring all potential
12 alter ego theories before the Court.

13        Judge, I question whether any of those three reasons
14 are legitimate reasons as a legal matter and --

15        THE COURT:  But, so what?  If you have no standing to
16 raise this argument, whether it is or isn't, you know, and it's
17 a defense that you can raise in the lawsuit in state court, you
18 can take it there, but I'm not going to hear this argument on
19 behalf of what the Debtors want to do from an entity that isn't
20 a creditor and that has no standing.  Just because you're going
21 to be sued in the state court doesn't mean that you, your
22 client that is, that your client has standing to object to the
23 process that the Debtor intends to undergo.  If you've got the
24 statute of limitations or statute of repose, or whatever the
25 claims are in the state court, you'll be able to defend.  But

**J&J COURT TRANSCRIBERS, INC.**

1 how does that give you standing to raise the issue here?

2 That's what I care about.  I know how the Debtor has standing.

3       MR. MALONEY:  Judge, I understand, I understand that

4 standing is fundamental to this process, and we will certainly

5 address that issue.  We're happy to address it with you in more

6 detail today, my colleague Mr. Pardo is here and he can explain

7 that issue.

8       THE COURT:  Well, give me a hint.  I'd like a hint

9 as to how there's standing today, and then you can explain it

10 in more detail later.

11       MR. MALONEY:  Judge, I'll defer to my partner, Mr.

12 Pardo.

13       THE COURT:  All right.

14       MR. PARDO:  Good morning, Your Honor.

15       THE COURT:  Good morning.

16       MR. PARDO:  Nice to see you again.  The Third

17 Circuit's decision that controls standing, party in interest

18 standing, in the bankruptcy court is <u>Amatex</u>.  Everybody knows

19 that you do not have to be a creditor, you do not have to be an

20 interest holder, you do not have to have a direct claim upon an

21 asset of the debtor, all you have to have is a significant

22 enough interest and practical -- you have to have a practical

23 interest that will be significantly enough impacted by the

24 Court's decision, in order to be here.  We think we do.  We

25 think we've got it with respect to Imperial Tobacco as a named

1 defendant. because this Debtor is asking this Court to arguably

2 create standing in entities that but for the Court's order,

3 will not have standing, period, end of discussion. That's

4 going to impact who can sue us, what claims can be brought and

5 potentially where they can be brought. And we can think of

6 nothing that would be of a greater interest to a potential

7 defendant in previously commenced litigation, than the Court's

8 ruling on that issue. We think it is, with due respect to this

9 Court, we think it's an absolutely no brainer, under the Third

10 Circuit rule. Again, don't have to be a creditor, don't have

11 to be an interest holder, don't have to have a direct claim.

12      In addition, if you look at the complaint that was

13 exhibited to the Debtors motion, the Debtor names 100 John

14 Doe's and says words to the effect of, we think we'll figure

15 out who those parties are as we go along. We anticipate with a

16 reasonably high degree of certainty, that the parties that the

17 Debtors are targeting are the intermediate companies that

18 existed in the corporate chain of ownership between Flintkote

19 in 1986 and 1987 and Imperial Tobacco which was at the time

20 known as _Amasco_ and at the time of those dividends, one such

21 company is GenStar Corporation.

22      GenStar Corporation, if the Court would take judicial

23 notice of the schedules and statements of affairs that were

24 filed in this case, you will find that there is page after page

25 after page of listings in which GenStar Corporation is either

27

1  the owner of insurance policies, or the co-owner of insurance

2  policies with this Debtor that arguably constitute property of

3  the estate.

4         And, as a result we believe those policies, now that

5  John Doe claims have been raised, will afford our clients

6  potentially rights under those policies. And, thus, we are

7  burdened by an interest -- a co-owner interest with the Debtor

8  in property of the estate that we get to talk about.

9         THE COURT:  But when you -- it's going to give the

10  former, Imperial --

11         MR. PARDO:  Imperial Tobacco.

12         THE COURT:  It's going to give Imperial rights under

13  the policies?

14         MR. PARDO:  No, ma'am.  It will -- it may, and,

15  again, I don't want to burden the Court with more facts than it

16  wants before we filed our briefs. GenStar Corporation is, we

17  understand from Canadian counsel, a corporation that's in the

18  process of dissolution and has been for a number of years. Its

19  assets and liabilities either have been transferred or are in

20  the process of being transferred to Imperial Tobacco as a

21  matter of Canadian law. So, it may well be and, again, we

22  appreciate more that the Court can imagine, the time to look

23  into this so that we can come to the Court with a reasoned and

24  fully thought out and fully presented and accurate presentation

25  and representation.  We heard you loud and clear that you want

28

1 a representation of standing and you want to know how we get

2 there.

3        One of the things we're going to have to work on

4 between now and May 2nd, is to ascertain precisely the status

5 of GenStar Corporation's dissolution under Canadian law and

6 whether those assets have, in fact, been transferred to

7 Imperial Tobacco and, if so, what Imperial Tobacco's rights are

8 under those policies of insurance to obtain among other things,

9 defense costs, which would have the effect of depleting the

10 estates interests, arguably, in the insurance policies.

11        This is not an easy case, this is an incredibly

12 complex case, but the one thing I am comfortable with is that

13 we've got standing to complain under Amatex.  I'm happy to

14 continue or I'm happy just to rest on my brief that hasn't been

15 written yet, but will be filed in two weeks.

16        THE COURT:  I'll be happy to read the brief when it's

17 filed.  Thank you.

18        MR. PARDO:  Thank you, Your Honor, I appreciate it.

19        MR. MALONEY:  Judge, merely to pick up now to cover

20 at least from my perspective, some status issues.  Now that we

21 have time, clearly we're going to review this issue, these

22 issues, this situation, in much greater detail.  We'll in a

23 position to clarify our concerns and as we would do in any

24 case, we'll see if having clarified our concerns, whether

25 there's common ground that might make another hearing

29

1  unnecessary.  I don't hold out much hope on that, but we're

2  obviously going to look at that issue to try to explore

3  resolutions.  There are potential resolutions that might

4  resolve many of the issues that the Debtors say gave rise to

5  their need for the alter ego agreement.  We might be able to

6  look at that.  There's nothing that we're closing the door to

7  at this point.

8        And then if we can't, and if there's a reason to,

9  we'll certainly file our brief on May 2nd and be back here on

10 May 15th to debate the issues again.  By then it's possible,

11 even likely, Judge, that the defendants will have responded to

12 the complaint out in California and that might help to clarify

13 the landscape and the context in which we're in.  That, too,

14 might be helpful.

15       One question I would ask, Judge, I understand that

16 the Court has a standing order with respect to omnibus

17 hearings.  If it is possible that evidence may be needed when

18 we argue this again --

19       THE COURT:  Not that day.

20       MR. MALONEY:  Not that day, okay.  Let me inquire

21 about discovery.  If I'm going to anticipate that if we need to

22 file some discovery or serve some discovery, rather, and the

23 Debtors, the other parties here object to our standing, we've

24 got a holdup on that account, I don't propose to have any

25 solutions to that issue, I raise that as a possibility.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  All I can do at this point is go ahead

2    with the briefing schedule and take whatever other motions you

3    file when they come up, because I don't know at this point, I

4    don't know how to anticipate it, but I can tell you that I

5    won't have time on May 15th for any evidentiary submissions.

6    So, if you think that some evidentiary submissions are

7    necessary and they're documentary, my suggestion is, you put

8    them in the brief so that the Debtor and the other parties have

9    an opportunity to put their, whatever counter-veiling factual

10   assertions are also in the brief and maybe you can get them

11   resolved.  I don't know.  But if not, at least, there can be,

12   you know that type of record.  But I will not be doing an

13   evidentiary hearing on May 15th.

14       MR. MALONEY:  I understand, Judge.  We'll take the

15   direction that the Court has given us now and we'll proceed

16   from there.

17       THE COURT:  Okay.

18       MR. MALONEY:  Thank you.

19       THE COURT:  Mr. Lockwood?

20       MR. LOCKWOOD:  I sort of have a vague feeling of,

21   been here before, Your Honor.  A lot of what we're just

22   hearing, particularly the reliance on Amatex, sounds a lot like

23   what we hear from insurance companies, except that this time

24   around there's not anybody's rights being assigned and no plan

25   confirmation, et cetera.

1         The one thing I would just note is that there's a lot

2  of, I'm from the government and I'm here to help equality, the

3  ITCAN argument here.  As Mr. Pedlar pointed out, the test that

4  you're going to be looking at, ultimately, here is what's in

5  the best interest of the estate and its creditors.  ITCAN is a

6  defendant.  It's not a creditor, the estate wants money from

7  ITCAN.  ITCAN, not surprisingly, doesn't want to pay the money.

8  And to suggest that somehow or other its desire not to pay the

9  money should give rise to standing on a motion, that asks for

10 permission for the estate to move forward in a non-bankruptcy

11 forum, is nothing more than an attempt by a defendant in a

12 commercial dispute, to enlist the bankruptcy court in some way

13 or another to help its defense on the merits.

14         As for this business about the shared insurance, I

15 look forward with great interest to hearing them tell us how a

16 comprehensive general liability policy provides coverage for an

17 illegal dividend, taken by a parent for a subsidiary, because

18 that's the only conceivable way they could try and access the

19 shared insurance is if there was some right under those

20 policies to defend against this action and, you know, I guess

21 we'll just -- we'll get to read it when we see it in their

22 papers.  But I will state for the record, I find that

23 protestation dubious and if they don't have a right, and even

24 if they did have a right to the coverage, basically what they'd

25 be saying is, again, we're here to help the creditors because

32

1  the asbestos claimants, the Future Claimants Representative and

2  the Debtor should not be permitted to make a business judgment

3  that they're willing to run the risk of depletion of shared

4  insurance in order to try and pursue this dividend.  Instead,

5  the defendant in that action should be able to say, oh, Judge,

6  this is a really bad decision because if you let them sue us,

7  then we'll go after the shared insureds and they'll be really

8  sorry that they did that.

9      THE COURT:  Well, that may be part of what they think

10  is not in the best interest of the estate, I don't know.  I'll

11  just have to wait and see because --

12      MR. LOCKWOOD:  Yes, but the question is, Your Honor,

13  why should we be listening to them on what's in the best

14  interest if they're not a creditor?  The Amatex case really,

15  with all due respect to Mr. Pardo, does not say that anybody

16  can come in off the street as a perspective defendant in a

17  commercial action and announce that they're a party in interest

18  because somehow or other something going on in the bankruptcy

19  case or that's going to result from the bankruptcy case might

20  affect them in their capacity as a tort defendant.  I mean that

21  would really open the doors to pretty much anybody coming in on

22  any issue.

23      THE COURT:  Maybe there's the Combustion Engineering

24  solution.  Just open the doors wide open and anybody can come

25  in.

**J&J COURT TRANSCRIBERS, INC.**

1       MR. LOCKWOOD:  Well, hopefully not, Your Honor.

2  Thank you.

3       THE COURT:  All right.  I think in this brief, I

4  really do need, number one, I think the standing is the primary

5  issue, but secondly, if there's going to be a challenge to the

6  Debtors' exercise of the business judgment, I also need to know

7  what that challenge is, because I think Mr. Lockwood is correct

8  that if I can't hear it because there is no standing, or choose

9  not to hear it because there is no standing, nonetheless, if I

10 choose otherwise, I want it laid out, I don't want another

11 continuance for that reason.    Okay.  Yes, Mr. Pedlar?

12      MR. PEDLAR:  Just very briefly, Your Honor.  There

13 was talk of a response in the state court.  One of the reasons

14 we brought this to the Court's attention promptly is, we fully

15 expect them to try to remove the case and so my guess is, the

16 next time we're in court here, this case is now going to be

17 bouncing around in three courts which is why we tried to have

18 this heard promptly.

19      There was a reference to discovery, Your Honor.

20 Since the next hearing is not going to be evidentiary, and

21 since we still haven't heard any kind of offer of proof as to

22 why this isn't in the best business judgment, any type of

23 discovery here is going to be inquiring into the work product

24 discussions among the Committee and the Debtor, the decisions

25 to file this.  We don't think that's a proper topic for

1  discovery.

2       If Your Honor thinks there's a triable issue of fact,

3  based on what they've raised, I think we can deal with that,

4  you know, at the time or after the hearing, but so far, the

5  only thing we've heard this morning is, they want to save us

6  from ourselves with respect to insurance that may or may not

7  apply from an entity that is not a named insured under the

8  policies, but may or may not be, you know, succeeding to those

9  policies under Canadian law.  We don't think there should be

10  discovery that takes place because, obviously, it's just going

11  to be the subject of protective motions and the like with

12  respect to the business judgment exercised between the

13  attorneys and their clients at this point.

14       THE COURT:  Well, as I said, I don't know what it is

15  that is anticipated at this point.  Frankly, with respect to

16  their standing and the Debtors business judgment, I don't see

17  how what goes on in terms of getting this agreement together

18  necessarily leads to that, but with respect to the Debtors'

19  business judgment, I'm going to want some proffers from

20  somebody as to what it's all about, at that next hearing.  So,

21  put it in the papers and then I'll see it and if there's a

22  discovery issue, then, you know, as I said, I'll just have to

23  address it at the next hearing, but I don't expect that there's

24  going to be broad based discovery now because, frankly, in the

25  tort system, you're going to have, or in the state court

35

1  system, that is, you're going to have as much discovery as you

2  need or if it gets removed somewhere, you'll get it in the main

3  action.

4          So, I really am a little, I guess, confused as to how

5  a defendant is going to prevent the Debtor from going forward

6  with an action that the Debtor thinks is in its best interest.

7  So, you need to tell me why this is not in the best interest.

8          MR. LOCKWOOD:  As are we, Your Honor.  Thank you.

9          THE COURT:  Okay.  This matter is continued till May,

10 as I had previously ordered.

11         MR. O'NEILL:  Yes, Your Honor, and we can submit an

12 order on the part of the relief which was not contested today,

13 that was approval of the joint prosecution agreement.

14         THE COURT:  All right.

15         MR. O'NEILL:  And we'll include in that just the

16 briefing schedule as Your Honor set up today.

17         THE COURT:  You're gong to do that on a certification

18 of counsel?

19         MR. O'NEILL:  Yes, Your Honor.

20         THE COURT:  All right.

21         MR. MILLER:  And we would only ask that they

22 circulate that so that we can see that before it gets

23 submitted.

24         MR. O'NEILL:  Certainly, we can do that.

25         THE COURT:  All right.

36

1          MR. O'NEILL:  And, Your Honor, that concludes the

2    matters that are on the agenda for Flintkote today.

3          THE COURT:  Okay, thank you.

4          MR. O'NEILL:  Thank you very much.

5                              *****

6                        **CERTIFICATION**

7

8       I, ELAINE HOWELL, court approved transcriber, certify that

9    the foregoing is a correct transcript from the official

10   electronic sound recording of the proceedings in the

11   above-entitled matter and to the best of my ability.

12

13

14

15   /s/ Elaine Howell              Date:  April 26, 2006

16   ELAINE HOWELL

17   J&J COURT TRANSCRIBERS, INC.

18

19

20

21

22

23

24

25

                    **J&J COURT TRANSCRIBERS, INC.**

Exhibit "7"

### THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Docket Nos. |
| | ) | 1433, 1452, 1458, 1479 |

### IMPERIAL TOBACCO CANADA LIMITED'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT WITH RESPECT TO THE DEBTORS' JOINT PROSECUTION MOTION

Dated: May 5, 2006

MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
Stephen M. Miller
(DE Bar I.D. 2610)
Brett D. Fallon
(DE Bar I.D. 2480)
Carl N. Kunz, III
(DE Bar I.D. 3201)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
Email:  smiller@morrisjames.com
Email:  bfallon@morrisjames.com
Email:  ckunz@morrisjames.com

and

KING & SPALDING LLP
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5100
Email:  jpardo@kslaw.com
Email:  mmaloney@kslaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................... i

INTRODUCTION............................................. 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS...... 2

SUMMARY OF ARGUMENT...................................... 6

STATEMENT OF FACTS....................................... 7

ARGUMENT................................................. 9

   1. The Joint Prosecution Pleadings Impact Non-Core
      Proceedings....................................... 11

   2. The Joint Prosecution Pleadings Do Not Impact
      Uniformity of Bankruptcy Administration............ 14

   3. Withdrawal of Reference Will Reduce Forum Shopping
      and Confusion..................................... 16

   4. Withdrawal of the Reference Will Foster Economical
      Use of Debtors' and Creditors' Resources........... 17

   5. Withdrawal of the Reference Will Expedite the
      Bankruptcy Process................................ 18

   6. The Motion to Withdraw the Reference is Timely...... 18

CONCLUSION............................................... 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

Burger King Corp. v. B-K of Kansas, Inc.,
  64 B.R. 728 (D. Kan. 1986) ...........................11

Hatzel & Buehler Inc. v. Central Hudson Gas &
  Electric Corp.,
  106 B.R. 367 (D. Del. 1989) .........................10

Holland Americas Insurance Co. v. Succession of
  Roy,
  777 F.2d 992 (5th Cir. 1985) ....................10, 11

In re NDEP Corp.,
  203 B.R. 905 (D. Del. 1996) .........................10

In re Northwestern Corp.,
  No. 03-12872, 2005 WL 2320113 (D. Del. Sept.
  22, 2005) ...........................................17

In re Pan Am Corp.,
  163 B.R. at 43 ..................................12, 13

In re Pittsburgh Corning Corp.,
  277 B.R. 74 (Bankr. W.D. Penn.) .....................11

In re Pruitt,
  910 F.2d 1160 (3d Cir. 1990) ................10, 14, 16

In re Smith Corona Corp.,
  205 B.R. 712 (D. Del. 1996) .........................18

In re the Securities Group 1980,
  89 B.R. 196 (M.D. Fla. 1988) ........................18

In re Winstar Communications, Inc.,
  No. 01-01430, 2004 WL 2713101 (D.Del. Nov. 16,
  2004) ...............................................14

### FEDERAL STATUTES

28 U.S.C. § 157(d)........................1, 5, 6, 9, 13, 15

## INTRODUCTION

On April 5, 2006, The Flintkote Company ("Flintkote") and Flintkote Mines Limited (collectively, with Flintkote, the "Debtors"), filed with the Bankruptcy Court (as defined herein) a Motion for Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay in Connection with the Dividend Recovery Litigation (D.I. 1433) (the "Joint Prosecution Motion"). The Bankruptcy Court (as defined below) has already approved certain unopposed aspects of the Joint Prosecution Motion, but certain substantial issues have been held over for a continued hearing currently scheduled for May 15, 2005.

The remaining and undecided issues in the Joint Prosecution Motion bear directly and substantially on what the Debtors have referred to as the Dividend Recovery Litigation (defined herein as the "Pending Action"). For the reasons set forth below, Imperial Tobacco Canada Limited ("ITCAN") seeks withdrawal of the reference with respect to the remaining aspects of the Joint Prosecution Motion because those issues should be decided by the District Court in conjunction with a contemporaneously-filed petition to transfer the Dividend Recovery Litigation to the District Court pursuant to 28 U.S.C. § 157(d).

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On May 1, 2004, Flintkote filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Flintkote's bankruptcy case is pending before the United StatesBankruptcy Court for the District of Delaware (the "Bankruptcy Court") with the case number 04-11300 (JFK) (the "Bankruptcy Case").

On April 5, 2006, Flintkote, together with Marlene Hopkins, Michelle Hopkins, and Michael Hopkins (collectively, the "Asbestos Claimants") filed a complaint (the "Complaint") in Superior Court of California (Unlimited Jurisdiction) for the County of San Francisco (the "California State Court") to initiate a lawsuit (the "Pending Action") against ITCAN and additional defendants, Plant Insulation Company, Uniroyal Holding, Inc., Sullivan & Cromwell LLP, and Does 1 Through 100. On or about April 27, 2006, Flintkote and the Asbestos Claimants filed an amended complaint (the "Amended Complaint") in the Pending Action to add as plaintiffs the Official Committee of the Asbestos Personal Injury Claimants and James J. McMonagle, as the Legal Representative For Future Asbestos Personal

- 2 -

Injury Claimants (collectively, and together with Flintkote and the Asbestos Claimants, the "Plaintiffs").

In the Pending Action, the Asbestos Claimants seek recovery for, among other things, wrongful death and loss of consortium resulting from the death of Norman Hopkins (the "Decedent") whose death was allegedly caused by exposure to asbestos. The Asbestos Claimants seek recovery against ITCAN on the theory that ITCAN is the alter ego of Flintkote and is, therefore, liable for asbestos claims against Flintkote. Flintkote also asserts, among other things, claims against ITCAN for a declaration of alter ego liability and recovery of dividends allegedly paid to ITCAN's predecessor.

As noted above, also on April 5, 2006, the Debtors filed their Joint Prosecution Motion. The Joint Prosecution Motion sought approval of the Joint Prosecution Agreement (as defined in the Joint Prosecution Motion), the Alter Ego Agreement (as defined below), and a related annulment of the automatic stay.

On April 6, 2006, the Bankruptcy Court entered an Order Shortening Notice Periods setting Thursday, April 13, 2006 as the deadline for filing and service of objections to the Joint Prosecution Motion [D.I. 1440].

- 3 -

On April 13, 2006, ITCAN filed its Objection to and
Cross-Motion for Continuance of Hearing on Debtors' Motion
for Order Approving Certain Joint Prosecution Agreements
and Annulling the Automatic Stay in Connection with the
Dividend Recovery Litigation [D.I. 1452] (the "Objection").
On April 14, 2006, the Bankruptcy Court entered its Order
Granting in Part Cross-Motion for Continuance of Hearing
and Setting Status Conference for April 17, 2006 [D.I.
1458] (the "Scheduling Order"). The Scheduling Order set
May 2, 2006 as the deadline for ITCAN to file supplemental
pleadings in support of its Objection.

On April 27, 2006, the Bankruptcy Court entered its
Order Approving Certain Joint Prosecution Agreement in
Connection with the Dividend Recovery Litigation [D.I.
1479] in which it approved the Debtors' entry into the
Joint Prosecution Agreement. The remaining matters in the
Joint Prosecution Motion, to which ITCAN objected, were
continued to May 15, 2006.

On May 2, 2006, ITCAN filed its Supplemental Pleading
on the Issue of Party-in-Interest Standing [D.I. 1497] (the
"Standing Pleading") and its Supplemental Pleading in
Support of its Objection [D.I. 1498] (the "Supplemental
Pleading") (together with the Joint Prosecution Motion, the

- 4 -

Objection, and the Standing Pleading, the "Joint

Prosecution Pleadings").

On the date hereof or as contemporaneously as

possible, ITCAN has filed or will file papers in the

Bankruptcy Court, the United States District Court for the

Northern District of California (the "California District

Court"), and the United States District Court for the

District of Delaware (the "District Court") to accomplish

three things:

- First, ITCAN removed the Pending
  Action to the California District
  Court by filing a Notice of Removal
  pursuant to 28 U.S.C. § 1441 and, in
  the alternative, 28 U.S.C. § 1452.
  Together with the Notice of Removal,
  ITCAN filed a motion with the
  California District Court requesting
  that the court (i) stay consideration
  of any transfer or remand issues and
  (ii) upon the expiration of such
  stay, transfer the Pending Action to
  this Court pursuant to 28 U.S.C.
  § 1404.

- Second, ITCAN filed with the District
  Court the Emergency Petition of
  Imperial Tobacco Canada Limited for
  an Order of Transfer Pursuant to 28
  U.S.C. § 157(b)(5) (the "Transfer
  Petition") in which ITCAN seeks the
  immediate provisional transfer of the
  Pending Action to the District Court.

- Finally, ITCAN filed the instant
  motion seeking that the reference to

- 5 -

> the Bankruptcy Court be withdrawn
> with respect to the Joint Prosecution
> Motion so that the issues raised by
> the Joint Prosecution Motion, which
> have a direct impact on the Pending
> Action, may be resolved by the
> District Court in connection with the
> resolution of the Transfer Petition.

The relief sought by these various pleadings will consolidate all issues regarding the Pending Action in the District of Delaware, the district in which the Bankruptcy Case is pending. This Memorandum of Law addresses ITCAN's request for withdrawal of the reference pursuant to 28 U.S.C. § 157(d).

## SUMMARY OF ARGUMENT

Pursuant to 28 U.S.C. § 157(d), the District Court may withdraw the reference for cause shown. Withdrawing the reference in this instance will promote judicial economy by promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering economical use of resources, and expediting the bankruptcy process. Further, as related actions will be pending in the District Court, it would be more efficient for the District Court to determine the remainder of the matters in the Joint Prosecution Motion as opposed to the Bankruptcy Court ruling on the remainder of the Joint Prosecution Motion and

- 6 -

thereby impacting the District Court's subsequent rulings on standing.

## STATEMENT OF FACTS

Flintkote filed for protection under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on May 1, 2004. According to the Affidavit of David J. Gordon In Support of First Day Motions (the "First Day Affidavit")[1] that was filed in the Bankruptcy Case, Flintkote's bankruptcy filing was caused primarily because the increased number of asbestos claims asserted against Flintkote. First Day Affidavit at ¶ 4. According to Flintkote, in the year prior to the filing of the Bankruptcy Case, 44,000 new asbestos claims were filed against Flintkote. Id. at ¶ 21. As of the filing of the Bankruptcy Case, Flintkote was a defendant in over 155,000 asbestos-related personal injury claims. Id. at ¶ 4. Flintkote's stated goal in the Bankruptcy Case is to form an asbestos personal injury trust pursuant to section 524(g) of the Bankruptcy Code under a confirmed plan of reorganization. Id. at ¶ 6.

Flintkote and the Asbestos Claimants commenced the Pending Action on April 5, 2006 by filing the Complaint in the California State Court. The claims asserted against

---

[1]    A copy of the First Day Affidavit is attached hereto as Exhibit A.

- 7 -

ITCAN in the Pending Action may be broken down into two categories: (1) claims for alter ego liability and (2) claims on various theories to recover corporate dividends. The Asbestos Claimants assert three causes of action against ITCAN comprised of two causes of action for wrongful death (Amended Complaint, Counts I and II)[2] and one cause of action for loss of consortium. Amended Complaint, Count III. The Asbestos Claimants bring each of these claims against ITCAN on the theory that ITCAN is the alter ego of Flintkote. Amended Complaint at ¶ 47. Flintkote also asserts a claim against ITCAN for declaration of alter ego liability. Amended Complaint, Count 8. In addition, Flintkote asserts claims under several different theories to recover dividends paid to ITCAN. Amended Complaint, Counts 9-15 and 16.

On the same day that Flintkote and the Asbestos Claimants filed the Complaint that initiated the Pending Action, Flintkote filed the Joint Prosecution Motion in the Bankruptcy Court. The Joint Prosecution Motion seeks, among other things, the approval of an agreement (the "Alter Ego Agreement") with the Asbestos Claimants whereby Flintkote would transfer to the Asbestos Claimants an

---

[2]    A copy of the Amended Complaint is attached hereto as Exhibit B.

- 8 -

undivided interest in Flintkote's alter ego liability claims against ITCAN, pursuant to Section 363 of the Bankruptcy Code. <u>Joint Prosecution Motion</u> at ¶ 24.  The purpose of the Alter Ego Agreement is to grant standing to the Asbestos Claimants to assert claims against ITCAN.

ITCAN objects to the Alter Ego Agreement because the attempted assignment or transfer of an undivided interest in a cause of action to create artificial standing is unprecedented, improper and unnecessary to the Debtors' stated purpose of seeking to ensure that all theories of alter ego liability may be asserted in the Dividend Recovery Action.  Among other things, ITCAN has argued in its objection to the Alter Ego Agreement that approval of that agreement would effectively prejudge issues related to the Asbestos Claimants' standing -- issues that should be reserved for the court that ultimately presides over the Pending Action.

**ARGUMENT**

A motion to withdraw the reference to the bankruptcy court is governed by 28 U.S.C. § 157(d), which provides in relevant part, "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this

- 9 -

section, on its own motion or on timely motion of any
party, for cause shown."

Although cause is not defined in the statute, the
Third Circuit Court of Appeals enumerated certain non-
exclusive factors for a court to consider when determining
whether "cause" exists for discretionary withdrawal.  These
factors include: 1) promoting uniformity in bankruptcy
administration; 2) reducing forum shopping and confusion;
3) fostering economical use of debtor/creditor resources;
4) expediting the bankruptcy process; and 5) timing of the
request for withdrawal.  In re Pruitt, 910 F.2d 1160, 1168
(3d Cir. 1990) (citing Holland Americas Ins. Co. v.
Succession of Roy, 777 F.2d 992, 999 (5th Cir. 1985)).  The
Delaware District Court has expanded this list to include
consideration of whether the claim is a core or non-core
bankruptcy proceeding and whether the parties have
requested a jury trial.  See In re NDEP Corp., 203 B.R.
905, 913 (D. Del. 1996) (noting that the initial
determination should be regarding core or non-core nature
of proceeding); Hatzel & Buehler Inc. v. Central Hudson Gas
& Electric Corp., 106 B.R. 367, 371 (D. Del. 1989).

1.    **The Joint Prosecution Pleadings Impact Non-Core
      Proceedings.**

ITCAN does not dispute that the transfer of estate

assets pursuant to Section 363 of the Bankruptcy Code is a

core proceeding.  However, whether a matter is a core

proceeding is merely one factor that courts may consider

when ruling on a motion to withdraw the reference.  A

district court may withdraw the reference of a core

proceeding.  See Holland America Ins. Co., 777 F.2d at 998

("The cumulative effect of the grant of original

jurisdiction to the district court and its right to

withdraw the reference … leaves little doubt that the

district court may exercise jurisdiction broadly, even over

'core' bankruptcy matters."); Burger King Corp. v. B-K of

Kansas, Inc., 64 B.R. 728, 732 (D. Kan. 1986) ("Even

assuming arguendo that every claim in this case is a 'core'

proceeding, nothing in section 157 prevents this court from

withdrawing its reference of the case.  Section 157(d) does

not mention the core/non-core distinction, and withdrawal

of the reference is not dependent on the classification of

a claim.") (emphasis in original).

In In re Pittsburgh Corning Corp., 277 B.R. 74, 76

(Bankr. W.D. Penn.) (Fitzgerald, J.), the court held that

although the debtor's objection to a claim was a core
proceeding, the district court should withdraw the
reference on the objection.   Judge Fitzgerald wrote,
"[n]otwithstanding the strong presumption against
withdrawal of the reference of core bankruptcy proceedings,
the presumption can be overcome 'based on a finding by the
Court that the withdrawal of the reference is essential to
preserve a higher interest.'"   Id. at 78 (citing In re Pan
Am Corp., 163 B.R. 41, 43 (S.D.N.Y. 1993)).   In that case,
the court found that because the liquidation of the claim
depended on a related motion for summary judgment that was
pending in the district court, the efficient administration
of justice required that the district court withdraw the
reference to the claim.   Id.

In the instant matter, the withdrawal of the reference
is essential to preserve a higher interest.   If the Alter
Ego Agreement is granted, it will have substantial effects
on non-core proceedings.   The Alter Ego Agreement will
determine in the first instance whether the Asbestos
Claimants have standing to pursue certain of their claims
in the Pending Action.   As set out more fully in the
Supplemental Pleading, ITCAN contends that the Alter Ego
Agreement seeks to provide standing to the Asbestos

- 12 -

Claimants that they do not have in order to entangle personal injury tort claims with what is otherwise a complex commercial dispute.

The Debtors assert that standing can and should be determined by the court in which the Pending Action will be heard.  See Joint Prosecution Motion at ¶ 35.  However, any determination that the Bankruptcy Court makes regarding the Alter Ego Agreement will have a profound impact on, and will otherwise restrict, the presiding court's ability to determine standing.

ITCAN filed the Transfer Petition requesting that the Pending Action be transferred to the District Court pursuant to 28 U.S.C. § 157(b)(5).  Because the District Court will have the Pending Action before it, it should determine the validity of the Alter Ego Agreement.  In the interests of promoting judicial efficiency and the freedom of the presiding judge to determine fundamental issues (such as standing) in the case before it, the court presiding over the Pending Action should also determine whether to approve the Alter Ego Agreement.  See In re Pan Am Corp., 163 B.R. at 43 (finding that promoting judicial efficiency was a higher interest than the presumption against withdrawal of a core proceeding).  Withdrawal of

- 13 -

the reference is essential to preserve the District Court's ability to independently review standing in the Pending Action.

2.    The Joint Prosecution Pleadings Do Not Impact Uniformity of Bankruptcy Administration.

In determining a motion to withdraw the reference, the courts should consider its impact on the uniformity of bankruptcy administration.    In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990).    Resolution of the Joint Prosecution Motion will have no impact on the uniformity of bankruptcy administration for at least two reasons.

First, the Alter Ego Agreement is a litigation tactic designed to impact only the outcome of the Pending Action. There is no suggestion or indication that the Alter Ego Agreement will otherwise have any bearing on the Bankruptcy Case itself.    In other words, the Alter Ego is connected primarily, if not solely, to the Pending Action, not the Bankruptcy Case.    See In re Winstar Communications, Inc., No. 01-01430, 2004 WL 2713101, at *4 (D. Del. Nov. 16, 2004) (finding that when claims are purely bankruptcy-related and resolution will affect the bankruptcy case, uniformity of bankruptcy administration supports denying withdrawal of reference) (Exhibit C).    For this reason, and

as noted above, it is appropriate that the court presiding over the Pending Action make the determinations with respect to the Alter Ego Agreement.

Second, the Alter Ego Agreement is unprecedented and has no legitimate legal purpose. See generally Supplemental Pleading at 4. The issues presented by the Alter Ego Agreement are not routine or common to the bankruptcy process. As such, any decision regarding the Alter Ego Agreement will have little impact on other bankruptcy decisions or the general administration of bankruptcy cases in this jurisdiction or elsewhere.

Finally, by necessity, district courts (particularly the district court of Delaware) are well versed in bankruptcy law. In many circuits (as in the Third Circuit), they sit as appellate courts over the bankruptcy courts, and they are entitled to reserve jurisdiction over bankruptcy cases pursuant to 28 U.S.C. § 157. Accordingly, to the extent that bankruptcy issues are involved in the determination of the Joint Prosecution Motion, the District Court is well-equipped to determine these matters. As a result, uniformity of bankruptcy administration is not implicated by the withdrawal of the reference in this matter.

- 15 -

3.  **Withdrawal of Reference Will Reduce Forum Shopping and Confusion.**

In deciding whether to withdraw the reference, courts often consider whether granting the motion to withdraw the reference will reduce forum shopping and confusion. In re Pruitt, 910 F.2d at 1168. In this case, the Debtors have engaged in forum shopping and other gamesmanship by seeking to effectively determine party standing for the Pending Action in the Bankruptcy Court, while at the same time seeking to prosecute the Pending Action in an entirely separate forum over 3,000 miles away. A withdrawal of the reference will assist in consolidating the Dividend Recovery Litigation with the party standing issues that are at the core of the Joint Prosecution Motion and the Alter Ego Agreement.

A withdrawal of the reference will also reduce the inevitable confusion that would arise if the Debtors were successful in their plan to have one court consider party standing issues and another, separate court preside over the Dividend Recovery Litigation. By consolidating these issues with a single court, the risk of confusion and inconsistent determinations can be avoided entirely.

1187189

**4.    Withdrawal of the Reference Will Foster Economical Use of Debtors' and Creditors' Resources.**

The withdrawal of the reference to the Bankruptcy Court will foster economical use of the Debtors' resources and its creditors' resources, as well as the resources of the Bankruptcy Court and the District Court.  If the Bankruptcy Court decides the Alter Ego Agreement rather than the court presiding over the Pending Action, ITCAN and the Debtors will spend significant amounts of time and resources arguing the impact of the Alter Ego Agreement on a subsequent determination of standing.  If, in contrast, the District Court resolves the matters remaining on the Joint Prosecution Motion, the impact of the Alter Ego Agreement will be more transparent and the District Court will not be burdened with interpreting the effects of an unusual and unprecedented agreement that it did not approve.  See In re Northwestern Corp., No. 03-12872, 2005 WL 2320113, at *2 (D. Del. Sept. 22, 2005) (finding that resolving related proceedings in a single forum would reduce burden on courts by avoiding duplicative proceedings) (Exhibit D).

- 17 -

**5.    Withdrawal of the Reference Will Expedite the Bankruptcy Process.**

The efficiency of the bankruptcy process is not hindered by withdrawing the reference in this case.  The Joint Prosecution Motion only impacts the Pending Action. The Debtors acknowledge that their ability to go forward and confirm a plan does not hinge on the resolution of the Pending Action.  Joint Prosecution Motion at ¶ 11.  As such, the withdrawal of the reference will not hamper the efficiency of the bankruptcy process.  See In re Smith Corona Corp., 205 B.R. 712, 716 (D. Del. 1996) (denying discretionary withdrawal because of concern that it would slow reorganization efforts).  Indeed, streamlining all of the decisions related to the Pending Action within a single court will benefit, rather than impair, the efficient administration of this Bankruptcy Case.

**6.    The Motion to Withdraw the Reference is Timely.**

Because timeliness is not defined in the statute and must be judged in a relative sense, timeliness "must be measured by the stage of the proceedings in the Bankruptcy Court." In re the Securities Group 1980, 89 B.R. 196, 197 (M.D. Fla. 1988) (cited with approval by In re USA Floral

- 18 -

<u>Products, Inc.</u>, 05-00039, 2005 WL 3657096, at *1 (D. Del. July 1, 2005)) (<u>Exhibit E</u>).

ITCAN filed its Motion to Withdraw the Reference just days after it filed its Supplemental Pleading and on the same day it filed its Transfer Petition with respect to the Pending Action.  The Bankruptcy Court has not heard arguments on the merits of the remaining matters of the Joint Prosecution Motion.  As this matter is still in its earliest stages, the Bankruptcy Court has not invested significant time into the relevant issues.  Accordingly, ITCAN's Motion to Withdraw the Reference is timely.

### CONCLUSION

For the foregoing reasons, ITCAN respectfully requests that the District Court withdraw the reference to the Bankruptcy Court of the Joint Prosecution Pleadings.

Dated: May 5, 2006          MORRIS, JAMES, HITCHENS &
                            WILLIAMS LLP


                            Stephen M. Miller
                            (DE Bar I.D. 2610)
                            Brett D. Fallon
                            (DE Bar I.D. 2480)
                            Carl N. Kunz, III
                            (DE Bar I.D. 3201)
                            222 Delaware Avenue, 10th Floor
                            P.O. Box 2306
                            Wilmington, DE  19899-2306
                            Telephone:  (302) 888-6800
                            Fax:        (302) 571-1750

1:187189

E-mail: smiller@morrisjames.com
        bfallon@morrisjames.com
        ckunz@morrisjames.com

and

KING & SPALDING LLP
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone:   (404) 572-4600
Fax:         (404) 572-5129
E-mail: jpardo@kslaw.com
        mmaloney@kslaw.com

Counsel for Imperial Tobacco
Canada Limited

- 20 -

Exhibit 8

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Docket No. 1433 |
| | ) | Agenda Item No. 2 |
| | ) | May 15, 2006 at 9:30 a.m. |

## ORDER APPROVING ALTER EGO AGREEMENT
## IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

Upon the motion (the "Motion") of The Flintkote Company and Flintkote Mines

Limited (collectively, the "Debtors") for entry of an order (i) approving that certain "Agreement

Providing For Joint Prosecution Of Alter Ego Remedies" dated as of April 4, 2006 (the "Alter

Ego Agreement"), and (ii) modifying the automatic stay with respect thereto retroactive to the

date of the commencement of the Dividend Recovery Litigation[1] in the Superior Court, and the

Court having considered the Motion, the support of the relief requested by the ACC and the

FCR, the declarations of David J. Gordon filed in support of the Motion, the objections filed in

respect of the Motion, the supplemental pleadings filed in support of and in opposition to the

Motion, and the arguments of counsel; and it appearing that (a) due and proper notice of the

Motion was given and that no additional notice need be given, (b) the provisions of the Alter Ego

Agreement requiring approval under Bankruptcy Code section 363 are fair and equitable,

supported by a good business reason and were entered into in good faith; and (c) cause has been

established to modify the automatic *stay* nunc pro nunc to the date of the commencement of the

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Motion.

Dividend Recovery Litigation in the Superior Court in order to carry out the purposes of the

Alter Ego Agreement, and good cause having been shown therefor; it is hereby

ORDERED, that the Alter Ego Agreement, in the form attached hereto as <u>Exhibit</u>
<u>A</u>, *without prejudice to the parties seeking approval of* including any subsequent amendments thereto that are approved by the ACC and FCR and do

not have a material adverse impact on the estate, is approved in all respects; and it is further

ORDERED that the automatic stay of Bankruptcy Code section 362 is hereby

modified *nunc pro tunc* to the date of the commencement of the Dividend Recovery Litigation in

the Superior Court to enable the Hopkins Family to pursue alter ego remedies as provided in the

Alter Ego Agreement.


Dated: ___5/15___, 2006



*Judith K. Fitzgerald*
Honorable Judith K. Fitzgerald

-2-

# EXHIBIT "A"

## AGREEMENT PROVIDING FOR
## JOINT PURSUIT OF ALTER EGO REMEDIES

This "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") is entered into as of April 4, 2006, by and among The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") (Debtor and Asbestos Claimants are hereinafter referred to collectively as the "Parties" and individually as a "Party"), with reference to the following facts and recitals:

### RECITALS

A.    Debtor is the debtor and debtor in possession in a case being jointly administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 04-11300 (JKF) (the "Bankruptcy Case").

B.    Asbestos Claimants hold asbestos-related claims against Flintkote (the "Claims") and contend that they additionally have remedies against the present or former, non-debtor affiliates of Debtors for the payment of the Claims on alter ego, veil piercing, or similar theories of recovery (collectively, "Alter Ego Remedies").

C.    The Debtor is about to commence litigation (the "Dividend Recovery Litigation") against, among others, one or more former, non-debtor affiliates of the Debtor (an "Affiliate Defendant") and will assert, among other theories of recovery, Alter Ego Remedies against one or more Affiliate Defendants. The Dividend Recovery Litigation seeks to establish, among other things, that the Affiliate Defendants are liable to persons with asbestos-related claims against the Debtor.

D.    As a result of this Agreement, all theories of alter ego recovery to be asserted against Affiliate Defendants, including Imasco Limited, now known as Imperial Tobacco Canada Limited) ("Imasco"), can be brought in the same action by plaintiffs who collectively have standing to assert all such grounds for relief. This will have several benefits to the Debtor's estate (the "Estate") and its creditors, including the following: (1) the arrangement will allow the assertion that Imasco is the alter ego of the Debtor and therefore responsible for the payment of the claims against the Debtor to be determined on its merits, avoiding unnecessary procedural arguments over whether the Alter Ego Remedies are being asserted by the correct party; (2) a successful prosecution of all potential Alter Ego Remedies by either an individual claimant or the Estate should result in a direct benefit to all creditors of the Estate by creating res judicata and collateral estoppel issue preclusion rights with respect to Imasco; (3) by pooling resources, an individual claimant can more feasibly pursue Alter Ego Remedies in conjunction with the Estate's efforts; and (4) by having individual

claimants in the case, the trier of fact will be more able to appreciate fully the nature of the type of claims being asserted against Flintkote and the harm that has been caused by Imasco's dismantling of the Debtor's going concern operations and the upstreaming of Flintkote's assets.

E.    The Parties wish to proceed promptly with the Dividend Recovery Litigation with the Debtor and Asbestos Claimants as parties. Accordingly, the Parties desire to authorize Asbestos Claimants to proceed on the Alter Ego Remedies on the terms and conditions set forth below.

## NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

## AGREEMENT

### A. Terms Of Joint Pursuit of Alter Ego Remedies.

1.    Authorization To Pursue Alter Ego Remedies. Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants shall be transferred and authorized to pursue for their own benefit that portion of the Alter Ego Remedies, if any, held by the Estate against the Affiliate Defendants that relates to Asbestos Claimants' Claims, as limited by the amount of such Claims, and to have authorized Asbestos Claimants to assert such remedy in the Dividend Recovery Litigation. Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly. Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

*[handwritten margin note: may, without violating the automatic stay, where the Bankr. Court will lift in approving this Agreemen]*

2.    Contribution To Dividend Recovery Litigation Expenses. Asbestos Claimants recognize that their costs of litigation will be substantially reduced by the efforts of the Debtors in the Dividend Recovery Litigation, and agree to contribute to such litigation costs in the following manner:

a.    Asbestos Claimants shall limit the fees payable to their counsel in pursuing the Alter Ego Remedies to twenty-five percent (25%) of actual recoveries by Asbestos Claimants, either directly or as a result of any distribution on account of an allowed claim against the Estate as a result of the litigation of Asbestos Claimants' Claims against Imasco; and

b.    Asbestos Claimants shall retain all net recoveries as a result of the assertion of their Alter Ego Remedies (after payment of costs) up to $400,000 and shall pay any excess recoveries to the Estate, which excess recoveries shall be held for the benefit of asbestos claimants, and shall be contributed by the Estate to any asbestos trust established pursuant to section 524(g) of the Bankruptcy Code, or

2

otherwise, for distribution in accordance with the trust distribution procedures governing such asbestos trust as approved by the Bankruptcy Court, including in connection with confirmation of a plan or plans of reorganization for Flintkote and its affiliates.

3.    Settlement Of Alter Ego Remedies. Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the Official Committee Of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case (the "Committee") and the "Legal Representative For Future Asbestos Claimants" appointed in the Bankruptcy Case (the "Futures Representative"); provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the Committee and the Futures Representative, shall not be unreasonably withheld. If a dispute arises as to whether such consent by the Asbestos Claimants has been unreasonably withheld, then such dispute shall be submitted to the Bankruptcy Court for determination as a contested matter without the right to a trial by jury. If an asbestos trust is created pursuant to section 524(g) of the Bankruptcy Code, the trustee or trustees of such trust (the "Asbestos Trust Trustee") may act for the Committee, the Futures Representative, and/or the Debtor under this provision to the extent provided in the confirmed plan or plans of reorganization.

4.    Management Of Alter Ego Litigation. The special litigation counsel retained on behalf of the Estates to prosecute the Dividend Recovery Litigation ("DRLC"), acting under the direction of Debtor, the Committee and the Futures Representative in accordance with the terms of the Joint Prosecution Agreement, shall manage the litigation (and advance the expenses and costs incurred by Asbestos Claimants in respect thereof, subject to and in accordance with paragraph 2 above) on all Alter Ego Remedies issues common to the Dividend Recovery Litigation and the Alter Ego Remedies being asserted by Asbestos Claimants; provided, however, that Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estate in the Dividend Recovery Litigation to the maximum extent feasible.

5.    Claim Amount. The Parties agree that any amount determined to be owed to Asbestos Claimants on account of Asbestos Claimant's Claim in the Dividend Recovery Litigation shall be binding on the Debtor and the Estate but will not be enforced against the Debtor or the Estate except in accordance with the terms of a confirmed plan of reorganization in these cases and any § 524(g) trust distribution procedures approved by the Court in connection therewith. Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' Claims against Imasco as provided in Paragraph A.2.b, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

3

## B. General Provisions

1.    Limitation on Third-Party Beneficiaries. No provision contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, the Committee, the Futures Representative, and the Asbestos Trust Trustee, if any.

2.    Successors and Assigns. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and assigns, including, in the case of Debtor, any trustee appointed under chapters 11 or 7 of the Bankruptcy Code, and the Asbestos Trust Trustee, if any.

3.    No Representations or Warranties. Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

4.    Headings. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

5.    Representation By Counsel. The Parties acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel. This Agreement is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

6.    Due Authorization. Each Party to this Agreement hereby represents and warrants that (i) such Party is duly authorized to enter into this Agreement without the permission of any third party; and (ii) the person purporting to execute this Agreement on behalf of such Party has been duly authorized to execute this Agreement on behalf of and bind such Party; provided, however, that this representation and warranty as against Debtor shall be of no force and effect with respect to matters that require the approval of the Bankruptcy Court in the Bankruptcy Case unless and until such approval is obtained.

7.    Entire Agreement: Amendment: Waiver. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Agreement may not be modified or amended except in writing signed by the Parties hereto, with the consent of the Committee and the Futures Representative. No waiver of any term, provision or condition of this Agreement, in any

4

one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

8.    Effective Date. Except as otherwise provided in this paragraph, this Agreement shall be binding upon Asbestos Claimants upon the execution of the Agreement by all signatories below (including the Committee and the Futures Representative), but it shall only be binding upon Debtor and the Estate upon entry of an order of Bankruptcy Court approving it after notice and an opportunity for a hearing. Absent the approval of this Agreement by the Bankruptcy Court, the parties shall be returned to the status quo ante as if this Agreement had not be executed by the Parties, and Asbestos Claimants shall cease any further prosecution involving the assertion of the Alter Ego Remedies in which the Estate has an interest but for the execution of this Agreement.

9.    Governing Law and Choice of Forum. This Agreement shall be governed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, and by the United States Bankruptcy Code. The Bankruptcy Court shall be the exclusive forum to hear, determine and enter appropriate orders and judgments regarding all disputes in respect of this Agreement.

10.    Counterparts. This Agreement may be executed in two or more counterparts by the Parties, and such counterparts shall be considered as and construed to be part of a single agreement. Signatures transmitted by facsimile shall have the same effect as original signatures.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006                THE FLINTKOTE COMPANY

                                    By: _____
                                    Name: DAVID J GORDON
                                    Its: PRESIDENT


Dated: April 5, 2006                MARLEEN HOPKINS, MICHELLE HOPKINS AND
                                    MICHAEL HOPKINS, ASBESTOS CLAIMANTS

                                    By: _____
                                        David R. Donadio, Brayton Purcell, LLP,
                                        authorized agent and attorney in fact


The foregoing is approved as to form and content:

Dated: April 5, 2006                OFFICIAL COMMITTEE OF ASBESTOS
                                    PERSONAL INJURY CLAIMANTS


                                    By: _____
                                    Name: _____
                                    Its: _____


                                    LEGAL REPRESENTATIVE OF FUTURE
Dated: April 5, 2006                ASBESTOS PERSONAL INJURY CLAIMANTS

                                    By: _____
                                    Name: _____

                                    Its: _____


6

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006 _____ THE FLINTKOTE COMPANY  By:

_____ Name:

_____ Its:


Dated: April 5, 2006 _____ MARLENE HOPKINS, MICHELLE

HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS  By:

_____ David R. Donadio, Brayton Purcell,

LLP,  authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006 _____ OFFICIAL COMMITTEE OF ASBESTOS

PERSONAL INJURY CLAIMANTS  By:

_____ Name:

_____ Its:


Dated: April 5, 2006 _____ LEGAL REPRESENTATIVE OF FUTURE

ASBESTOS PERSONAL INJURY CLAIMANTS  By:

_____ Name:

_____ Its:

_____

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006          THE FLINTKOTE COMPANY

By: _____
Name: _____
Its: _____


Dated:  April 5, 2006         MARLEEN HOPKINS, MICHELLE HOPKINS AND
                              MICHAEL HOPKINS, ASBESTOS CLAIMANTS

By: _____
   David R. Donadio, Brayton Purcell, LLP,
   authorized agent and attorney in fact


The foregoing is approved as to form and content:

Dated: April 5, 2006          OFFICIAL COMMITTEE OF ASBESTOS
                              PERSONAL INJURY CLAIMANTS

By: _____
Name: _____
Its: _____


                              LEGAL REPRESENTATIVE OF FUTURE
Dated: April 5, 2006          ASBESTOS PERSONAL INJURY CLAIMANTS

By: _John Wrightd_____
Name: _JOHN WRIGHT ODD_____
Its: _AUTHORIZED AGENT AND ATTORNEY_
     _for  JAMES J. MC MONAGLE_____

6

LAL 7625577.3

The foregoing is approved as to form and content:

Dated: April 5, 2006      **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April ___, 2006      **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____

Its: _____

6

# Exhibit 9

## FIRST AMENDMENT TO AGREEMENT PROVIDING FOR
## JOINT PURSUIT OF ALTER EGO REMEDIES

The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") hereby amend the "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") dated as of April 4, 2006, as follows:

1.    Paragraph A.1 of the Agreement is deleted in its entirety and replaced with the following in conformance with the "Order Approving Alter Ego Agreement In Connection With The Dividend Recovery Litigation" entered May 18, 2006, in the Bankruptcy Case (Docket No. 1539):

1.    Authorization To Pursue Alter Ego Remedies.  Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants may, without violating the automatic stay, which the Bankruptcy Court will lift in approving this Agreement, pursue for their own benefit that portion of the Alter Ego Remedies, if any, that relates to Asbestos Claimants' Claims, as limited by the amount of such Claims, and to assert such remedy in the Dividend Recovery Litigation. Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly.  Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

2.    Paragraph A.5 is deleted in its entirety and replaced with the following:

"5.    Claim Amount.  The Claims, if any, of the Asbestos Claimants against Debtor in the Bankruptcy Case shall be liquidated, estimated or valued by matrix or otherwise for distribution purposes in the same manner utilized to liquidate, estimate or value other asbestos claims in the Bankruptcy Case."

Dated: May 18, 2006

THE FLINTKOTE COMPANY

By: _____

David J. Gordon, President

Dated:  May 18, 2006

**MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By:_____

David R. Donadio, Brayton Purcell, LLP,
authorized agent and attorney in fact

2

Dated: May 18, 2006                    **THE FLINTKOTE COMPANY**

Dated: May 18, 2006                    **MARLEEN HOPKINS, MICHELLE HOPKINS AND
                                       MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

                                       By: _____
                                           David R. Donadio, Brayton Purcell, LLP,
                                           authorized agent and attorney in fact

2

The foregoing is approved as to form and content:

Dated: May 18, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____

Ronald E. Reinsel, its counsel

Dated: May___, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____

James J. McMonagle

3

The foregoing is approved as to form and content:

Dated: May___, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
     Ronald E. Reinsel, its counsel

Dated: May 17, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
     John Winship Ready counsel for James J. McMonagle

3

Exhibit "10"

## THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **THE FLINTKOTE COMPANY and** | ) | **Case No. 04-11300 (JKF)** |
| **FLINTKOTE MINES LIMITED,** | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | **Re: Docket No. 1433** |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | Objections Due: May 11, 2006 at 4:00 p.m. (requested) |
| | | Hearing Date: May 15, 2006 at 9:30 a.m. |
| | | (prevailing eastern time) (requested) |

### IMPERIAL TOBACCO CANADA LIMITED'S
### MOTION FOR CONTINUANCE OF HEARING ON JOINT PROSECUTION MOTION

NOW COMES IMPERIAL TOBACCO CANADA LIMITED ("ITCAN"), by

and through its undersigned counsel, and hereby moves this Court for a continuance of the

hearing currently set for May 15, 2006 with respect to the Joint Prosecution Motion (as

hereinafter defined). In support of this Motion, ITCAN respectfully states as follows:

#### Background

1.    On May 1, 2004, The Flintkote Company ("Flintkote") filed a voluntary petition

for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

Flintkote's bankruptcy case is pending before the Bankruptcy Court for the District of Delaware

(the "Bankruptcy Court") with the case number 04-11300 (JKF) (the "Bankruptcy Case").

2.    On April 5, 2006, Flintkote, together with Marlene Hopkins, Michelle Hopkins,

and Michael Hopkins (collectively, the "Asbestos Claimants") filed a complaint (the

"Complaint") in  Superior Court of California (Unlimited Jurisdiction) for the County of San

Francisco (the "California State Court") to initiate a lawsuit (the "Pending Action") against

ITCAN and additional defendants, Plant Insulation Company, Uniroyal Holding, Inc., Sullivan &

Cromwell LLP, and Does 1 Through 100. On or about April 27, 2006, Flintkote and the Asbestos Claimants filed an amended complaint (the "Amended Complaint") in the Pending Action to add as plaintiffs the Official Committee of the Asbestos Personal Injury Claimants and James J. McMonagle, the Legal Representative For Future Asbestos Personal Injury Claimants (collectively, and together with Flintkote and the Asbestos Claimants, the "Plaintiffs").

3.      In the Pending Action, the Asbestos Claimants seek recovery for, among other things, wrongful death and loss of consortium resulting from the death of Norman Hopkins (the "Decedent") whose death was allegedly caused by exposure to asbestos. The Asbestos Claimants seek recovery against ITCAN on the theory that ITCAN is the alter ego of Flintkote and is, therefore, liable for asbestos claims against Flintkote. Flintkote also asserts, among other things, claims against ITCAN for a declaration of alter ego liability and recovery of dividends allegedly paid to ITCAN's predecessor.

4.      On April 5, 2006, the Debtors filed their Motion for Order Approving Certain Joint Prosecution Agreements and Annulling The Automatic Stay In Connection With Dividend Recovery Litigation (the "Joint Prosecution Motion") [D.I. 1433].

5.      On April 6, 2006, the Bankruptcy Court entered an Order Shortening Notice Periods setting Thursday, April 13, 2006 as the deadline for filing and service of objections to the Joint Prosecution Motion [D.I. 1440].

6.      On April 13, 2006, ITCAN filed its Objection to and Cross-Motion for Continuance of Hearing on Debtors' Motion for Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay in Connection with the Dividend Recovery Litigation [D.I. 1452] (the "Objection"). On April 14, 2006, the Bankruptcy Court entered its Order Granting in Part Cross-Motion for Continuance of Hearing and Setting Status Conference

2

for April 17, 2006 [D.I. 1458] (the "Scheduling Order"). The Scheduling Order set May 2, 2006

as the deadline for ITCAN to file supplemental pleadings in support of its Objection.

       7.      On April 27, 2006, the Bankruptcy Court entered its Order Approving Certain

Joint Prosecution Agreement in Connection with the Dividend Recovery Litigation [D.I. 1479] in

which it approved the Debtors' entry into the Joint Prosecution Agreement (the "Initial Joint

Prosecution Order"). The hearing with respect to those issues raised by the Joint Prosecution

Motion that were not addressed by the Initial Joint Prosecution Order were continued until May

15, 2006 at 9:30 a.m.

       8.      On May 2, 2006, ITCAN filed its Supplemental Pleading on the Issue of Party-in-

Interest Standing [D.I. 1497] (the "Standing Pleading") and its Supplemental Pleading in Support

of its Objection [D.I. 1498] (the "Supplemental Pleading") (together with the Joint Prosecution

Motion, the Objection, and the Standing Pleading, the "Joint Prosecution Pleadings").

       9.      On the date hereof or as contemporaneously as possible, ITCAN has filed or will

file papers to accomplish three things:

- First, ITCAN removed the Pending Action to the California District Court by filing a Notice of Removal pursuant to 28 U.S.C. § 1441 and, in the alternative, 28 U.S.C. § 1452. Together with the Notice of Removal, ITCAN filed a motion with the California District Court requesting that the court (i) stay consideration of any transfer or remand issues and (ii) upon the expiration of such stay transfer the Pending Action to the United States District Court for the District of Delaware (the "Delaware District Court") pursuant to 28 U.S.C. § 1404.

- Second, ITCAN filed with the District Court its Emergency Petition for an Order of Transfer Pursuant to 28 U.S.C. § 157(b)(5) (the "Transfer Petition") in which ITCAN seeks the immediate provisional transfer of the Pending Action to the Delaware District Court.

- Finally, ITCAN filed a motion (the "Withdrawal Motion") with the Delaware District Court seeking that the reference to the Bankruptcy Court be withdrawn with respect to the Joint

> Prosecution Motion so that the issues raised by the Joint
> Prosecution Motion, which have a direct impact on the Pending
> Action, may be resolved by that Court in connection with the
> resolution of the Transfer Petition.

10.    ITCAN filed these papers with the goal of consolidating all issues regarding the

Pending Action in the Delaware District Court. By this motion, ITCAN seeks a continuance of

the hearing on the unresolved issues raised by the Joint Prosecution Motion to allow the

Delaware District Court sufficient time to consider the issues regarding the Pending Action that

are currently pending before that court.

### Basis for Relief

11.    As mentioned above, ITCAN has filed today, or is in the process of filing, the

Transfer Petition with the Delaware District Court requesting that the Delaware District Court

transfer the Pending Action to Delaware pursuant to 28 U.S.C. § 157(b)(5).

Section 157(b)(5) provides as follows:

> The district court shall order that personal injury tort and wrongful death claims
> shall be tried in the district court in which the bankruptcy case is pending or in the
> district court in the district in which the claim arose, *as determined by the district
> court in which the bankruptcy case is pending*.

28 U.S.C. § 157(b)(5) (emphasis added).

12.    The basis of the claims brought against ITCAN by the Asbestos Claimants is their

assertion that ITCAN is the alter ego of Flintkote and is, therefore, liable for any wrongful death

claims against Flintkote. In other words, for the Asbestos Claimants to prevail in their action

against ITCAN, they must first establish the validity of a wrongful death claim against Flintkote.

As such, the first three counts in the Complaint are in fact personal injury tort claims against

Flintkote and ITCAN (as Flintkote's alleged alter ego). Likewise, Flintkote's alter ego claims

also are based on Flintkote's liability on asbestos tort claims. Accordingly, under Section

157(b)(5), the Delaware District Court is the court that is empowered to determine in which court

4

the Pending Action should be heard.  See In re Pan Am Corp., 16 F.3d 513, 516 (2d Cir. 1994) (a transfer motion under section 157(b)(5) "should be made to the district court where the bankruptcy is proceeding.").

13.    Because the Delaware District Court will necessarily be considering the Transfer Petition, ITCAN believes it is appropriate and in the interest of judicial economy for the Delaware District Court to decide all issues related to the Pending Action.  Accordingly, ITCAN filed the Withdrawal Motion seeking to withdraw the reference to the Bankruptcy Court with respect to the Joint Prosecution Motion.

14.    As explained in more detail in ITCAN's Memorandum of Law In Support Of Motion to Withdraw The Reference to the Bankruptcy Court, ITCAN believes that it is appropriate to withdraw the reference in this instance because the Joint Prosecution Motion raises issues regarding the standing of the Asbestos Claimants to bring the claims asserted in the Pending Action.  ITCAN believes that issues regarding a party's standing should be determined by the court in which the Pending Action is being heard.

15.    To allow the Delaware District Court sufficient time to consider the Transfer Petition and the Withdrawal Motion, ITCAN requests by this Motion that the Court continue any further consideration of the Joint Prosecution Motion until such time as the Delaware District Court has an opportunity to consider these issues.  The requested continuance will not prejudice the Plaintiffs.  One of the threshold issues to be resolved with respect to the Pending Action is the venue in which the Pending Action will proceed.  Because there will be no significant progress made with respect to the Pending Action until that threshold issue is determined, neither Flintkote nor any of the other Plaintiffs will be harmed by continuing the hearing on the Joint

Prosecution Motion until the Delaware District Court has sufficient time to consider the Transfer

Petition and the Withdrawal Motion.

    **WHEREFORE,** for the foregoing reasons, ITCAN respectfully requests that the Court

continue the hearing on the Joint Prosecution Motion and such other and further relief as the

Court deems just and proper.


Dated: May 5, 2006        MORRIS, JAMES, HITCHENS, & WILLIAMS LLP


        Stephen M. Miller (DE Bar I.D. 2610)
        Brett D. Fallon (DE Bar I.D. 2480)
        Carl N. Kunz, III (DE Bar I.D. 3201)
        222 Delaware Avenue, 10th Floor
        P.O. Box 2306
        Wilmington, DE 19899-2306
        Telephone: (302) 888-6800
        Fax:    (302) 571-1750
        E-mail :  smiller@morrisjames.com
              bfallon@morrisjames.com
              ckunz@morrisjames.com

        and

        KING & SPALDING LLP
        James A. Pardo, Jr.
        Mark M. Maloney
        1180 Peachtree Street
        Atlanta, Georgia 30309
        Telephone: (404) 572-4600
        Fax:    (404) 572-5129
        E-mail: jpardo@kslaw.com
              mmaloney@kslaw.com

        Counsel for Imperial Tobacco Canada Limited

6

Exhibit "11"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **THE FLINTKOTE COMPANY and** | ) | **Case No. 04-11300 (JKF)** |
| **FLINTKOTE MINES LIMITED,** | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | **Related Docket Nos. 1433, 1452, 1458** |
| | ) | |
| | ) | **Hearing Date: May 15, 2006 at 9:30 a.m.** |
| | ) | **(prevailing eastern time)** |

**IMPERIAL TOBACCO CANADA LIMITED'S
SUPPLEMENTAL PLEADING IN SUPPORT OF ITS OBJECTION
TO DEBTORS' MOTION FOR ORDER APPROVING CERTAIN JOINT
PROSECUTION AGREEMENTS AND ANNULLING THE AUTOMATIC
STAY IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION**

NOW COMES IMPERIAL TOBACCO CANADA LIMITED ("Imperial

Tobacco"), by and through its undersigned counsel, and makes and files this Supplemental

Pleading in Support of its Objection to the Debtors' Motion for Order Approving Certain Joint

Prosecution Agreements and Annulling the Automatic Stay in Connection with the Dividend

Recovery Litigation ("Supplemental Pleading"), and hereby respectfully states as follows:

## I. PROCEDURAL OVERVIEW

On April 5, 2006, The Flintkote Company ("Flintkote") and Flintkote Mines

Limited (collectively with Flintkote, the "Debtors") filed with this Court the Debtors' Motion for

Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay in

Connection with the Dividend Recovery Litigation [Docket No. 1433] (the "Joint Prosecution

Motion"). Imperial Tobacco objected to the requested approval of the so-called "Alter Ego

Agreement" [1] and to the requested annulment of the automatic stay [Docket No. 1452] (the

---

[1]    A copy of the Alter Ego Agreement is attached to the Joint Prosecution Motion as Exhibit B.

"Objection"). Imperial Tobacco also objected to the shortened notice period and expedited

hearing sought by the Debtors. The Court granted Imperial Tobacco's request for a continuance

and set May 2, 2006 as the deadline for Imperial Tobacco's supplemental pleading [Docket No.

1458].

During an April 17, 2006 status conference, the Court directed Imperial Tobacco

to show cause in its supplemental pleading as to why the Alter Ego Agreement should not be

approved as an appropriate exercise of the Debtors' business judgment.[2] This Supplemental

Pleading responds to the Court's request and otherwise demonstrates why the Court should

sustain Imperial Tobacco's Objection.[3]

## II. <u>ARGUMENT</u>

In their zeal to use the Bankruptcy Code to obtain a litigation advantage in a case

filed over 3,000 miles from this Court, the Debtors ask this Court to approve an Alter Ego

Agreement that is neither legally defensible nor a reasonable exercise of the Debtors' business

judgment. Instead, the sole purpose of the Alter Ego Agreement is to provide a basis for the

Debtors to link a complex business dispute against Imperial Tobacco (the "Dividend Recovery

Litigation") with personal injury asbestos claims that have nothing to do with that dispute. The

reason for this effort is simple: the Debtors want to parade individual asbestos plaintiffs –

plaintiffs who otherwise would have no standing in this litigation – before the trier of fact in the

Dividend Recovery Litigation in the hope of presenting a more sympathetic case. Public policy

and applicable non-bankruptcy law prohibit trafficking in causes of action in this manner and this

Court should not sanction the Debtors' tactics. Moreover, the Alter Ego Agreement and the

---

[2]     The Court also directed Imperial Tobacco to address the issue of whether it and those of its affiliates that
object to the Joint Prosecution Motion have standing to object to the Joint Prosecution Motion. Imperial Tobacco
has filed contemporaneously a separate pleading on the issue of standing.

[3]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection.

2

requested annulment of the automatic stay will have negative consequences to the Debtors' Estates that the Debtors have either not foreseen or simply ignored to their detriment.

Finally, there can be no mistake that, despite the fact that these Debtors filed their litigation more than 3,000 miles away, the Debtors are affirmatively seeking this Court's federal stamp of approval on their methods so that they can wave this Court's approval order before the court in their distant chosen forum. Imperial Tobacco respectfully submits that neither the Bankruptcy Code nor this Bankruptcy Court should be used in this way. There is no legitimate need for the Alter Ego Agreement and this Court should not authorize its execution.

A.    **APPLICABLE LEGAL STANDARD: THE DEBTORS CANNOT GAIN APPROVAL OF AN OTHERWISE INVALID TRANSACTION.**

Because the Alter Ego Agreement purports to use, sell or transfer the Estates' property (namely, a portion of the Estates' interest in the Alter Ego Remedies) to the Asbestos Claimants outside the ordinary course of business, the appropriate statutory predicate for approval is Section 363(b) of the Bankruptcy Code.[4] The elements necessary for approval of a transfer under Section 363(b) are that (i) the proposed sale is fair and equitable, (ii) there is a good business reason for completing the transfer, and (iii) the transaction is in good faith. See, e.g., In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

Apart from the three-prong test noted above, courts recognize that Section 363 does not empower debtors or trustees to take actions that would not be recognized or sanctioned outside of bankruptcy. Rather, Section 363(b) is an "enabling [statute] that give[s] the trustee the authority to sell or dispose of property if the debtors would have had the same right under state

---

[4]    As an alternative to approval pursuant to Section 363(b) of the Bankruptcy Code, the Debtors have requested that the Court authorize them to abandon to the Asbestos Claimants the Estates' interest in the Alter Ego Remedies, so that the Alter Ego Remedies may be pursued by the Asbestos Creditors in accordance with the terms of the Alter Ego Agreement. However, the Debtors have attempted no showing that the Estates' interest in the Alter Ego Remedies are burdensome to the Estates or of inconsequential value, as required by Section 554(a) of the Bankruptcy Code. See, e.g., In re Unidigital, Inc., 262 B.R. 283, 286 (Bankr. D. Del. 2001).

1385382/1

law." See, e.g., In re Integrated Solutions, Inc., 193 B.R. 722, 729 (Bankr. D.N.J. 1996) (quoting In re Schauer, 835 F.2d 1222, 1225 (8th Cir. 1987)). Section 363(b) evinces "no intent to enlarge the trustee's rights to take such actions beyond the debtor's pre-bankruptcy rights." Id. (quoting In re FCX, Inc., 853 F.2d 1149, 1155 (4th Cir. 1988)). Furthermore, the spirit of Section 363(b) does not "preempt state laws limiting the alienability ... of the assets, even though those limitations may undermine the expeditious liquidation of the bankruptcy estate." Id.

As set forth below, the Alter Ego Agreement is not a legally valid and sustainable transaction. Thus, it should be irrelevant that the Debtors believe they have good reasons for wanting to enter into the transaction. The Court should not approve a transaction that would not be sustained outside of the bankruptcy process. Further, even if the Alter Ego Agreement were otherwise a sustainable transaction, the transaction is not in the best legitimate interests of the Debtors' Estates.

**B.    THE ALTER EGO AGREEMENT IS UNPRECEDENTED, ILLUSORY AND HAS NO LEGITIMATE PURPOSE.**

The Alter Ego Agreement purports to grant an undivided interest in Flintkote's alter ego claims to certain individual Asbestos Claimants. Such an agreement is unprecedented in law. Indeed, there is no legal purpose for the agreement and it would not be sustained outside of bankruptcy. As such, this Court should not approve it.

**1.    The Alter Ego Agreement is Unprecedented.**

The Debtors cite no case that has allowed a debtor, or any party inside or outside of bankruptcy, to assign an undivided interest in a cause of action of the nature involved here. The Debtors would have the Court believe that this behavior is common, but it is in fact unprecedented. The cases cited by the Debtors illustrate the entirely unremarkable situation in

4

which a debtor and a claimant reach a stipulation whereby the automatic stay is lifted to permit the claimant alone to proceed against property of the estate that is of limited, contested or questionable value to the estate. See, e.g., In re Federal Mogul Inc., et al., Case No. 01-10578 (Docket No. 1868) (Bankr. D. Del. June 4, 2002) (approving stipulation allowing third party to pursue insurance proceeds under policies insuring debtor); In re The Flintkote Company and Flintkote Mines Limited, Case No. 04-11300 (Docket No. 669) (Bankr. D. Del. Feb. 16, 2005) (approving lifting of automatic stay to allow asbestos claimants to seek ruling on prepetition appellate bond). It is disingenuous for the Debtors to suggest that these cases lend any support for the litigation tactics the Debtors are attempting here.

Because an assignment of an undivided interest in an alter ego cause of action is unprecedented, it is difficult to ascertain precisely what Flintkote is proposing to assign, as a substantive matter. The Alter Ego Agreement makes clear that the Asbestos Claimants have no ability to settle their "claim" on their own – and the Asbestos Claimants have limited discretion to oppose a settlement by Flintkote. Alter Ego Agreement, P. 3. But because the claim is an "undivided interest," it appears that Flintkote and any other possible participants in such a claim would be bound by a finding that Imperial Tobacco has no alter ego liability to the Asbestos Claimants, a finding that could well occur in a trial where Flintkote itself is not present. Likewise, the Asbestos Claimants would apparently be bound by findings with respect to Flintkote's alter ego claims, even though they would not be present. If the parties anticipate or believe that a finding in connection with either party's claims should be fully applicable to the other, there is no valid reason to have two sets of plaintiffs.

In its simplest terms, however, it appears the Debtors are proposing that Flintkote and the Asbestos Claimants essentially "share" Flintkote's cause of action so that they can both

5

prosecute the cause simultaneously (with the Asbestos Claimants effectively having limited ability to either resolve or oppose the resolution of the claims), thereby seeking to tie at the hip two claims that otherwise have nothing to do with each other. Imperial Tobacco is aware of no authority permitting this kind of arrangement – and the Debtors do not cite any. To the contrary, as set forth below, both law and common sense belie the need for, and reject the legitimacy of, such an arrangement.

    2.    **Despite the Debtors' Assertions, There is No Need for the Alter Ego Agreement.**

In summary, the Debtors cite the following four reasons for the Alter Ego Agreement: (1) the need to ensure standing to pursue all theories of alter ego liability; (2) the desire to apply *res judicata* and collateral estoppel principles against Imperial Tobacco for the benefit of all asbestos creditors; (3) the desire to economically pursue alter ego remedies for the benefit of all asbestos creditors; and (4) the desire to present the Asbestos Claimants to the fact finder so that the fact finder can better understand the harm that they have suffered. None of these reasons hold up to scrutiny because: (a) it is clear that Flintkote has standing to pursue all Alter Ego Remedies against Imperial Tobacco and (b) to the extent the Asbestos Claimants have particular or "personal" alter ego claims to pursue or present to a court, they would not need the Alter Ego Agreement to pursue those claims.

    a.    **The Flintkote Company Has Standing To Pursue the Alter Ego Remedies.**

In an attempt to provide a rationale or legitimate basis for the Alter Ego Agreement, the Debtors have suggested that there is some confusion over whether Flintkote has standing to pursue all Alter Ego Remedies. In fact, there is no confusion even under the law that Debtors cite.

6

The Debtors cite two California opinions, <u>Stodd v. Goldberger</u>, 73 Cal. App. 3d 827 (1977) and <u>In re Davey Roofing, Inc.</u>, 167 B.R. 604 (Bankr. C.D. Cal. 1994), and suggest that these two cases create confusion over whether Flintkote has standing. In fact, these cases do nothing of the sort. In <u>Stodd</u>, the court held merely that the trustee failed to allege an alter ego claim that brought direct harm to the debtor entity. <u>Stodd</u>, 73 Cal. App. 3d at 833. The <u>Stodd</u> court in no way suggested that the trustee did not have standing to bring such a claim had he alleged it. <u>Id.</u> Indeed, in <u>Davey</u>, a case that the Debtors suggest is inconsistent with <u>Stodd</u>, the court held that when the alleged harm is to the corporation or to creditors as a whole, the alter ego claim belongs exclusively to the debtor. <u>Davey</u>, 167 B.R. at 608 (citing <u>Kalb, Voorhies & Co. v. Am. Fin. Corp.</u>, 8 F.3d 130, 132 (2d Cir. 1993)).

The above analysis was made abundantly clear in perhaps the leading case in California on this issue – the Ninth Circuit Bankruptcy Appellate Panel's decision <u>In re Byron Allen Folks</u>, 211 B.R. 378 (B.A.P. 9th Cir. 1997) – a case that the Debtors curiously fail to mention. In <u>In re Folks</u>, the BAP considered <u>Davey</u>, <u>Stodd</u> and numerous other cases in deciding that under California law an alter ego claim belongs exclusively to the debtor and its estate where the claim is based on an alleged harm to creditors generally. <u>In re Byron Allen Folks</u>, 211 B.R. at 385-87 (harmonizing <u>Davey</u>, <u>Stodd</u> and other cases and concluding that debtor has exclusive right to pursue alter ego claims based on generalized harm).

In holding that the alter ego claims before it were property of the estate (and therefore could only be asserted by the trustee), the <u>Folks</u> court concluded that the trustee or debtor had standing to pursue claims alleging general harm to the corporation or to creditors as a whole, but that individual creditors retained standing to pursue claims that were "personal" to them. <u>Id.</u> at 385. The <u>Folks</u> court held that a "cause of action is 'personal' if the claimant

7

himself is harmed and no other claimant or creditor has an interest in the cause" and that a general claim exists "if the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors." Id. at 386-87 (citing Koch Refining v. Farmers Union Cent. Exch., 831 F.3d 1339, 1348-1349 (7th Cir. 1987)). The court then turned to the Second Circuit's Kalb decision for support (as did the Davey court) and stated "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." Id. at 387 (citing Kalb, 8 F.3d at 132). Finally, the court held that "[i]f the alter ego claim constitutes property of the bankruptcy estate, it is a general claim and 'cannot belong to any individual creditor.'" Id. (citing Davey, 167 B.R. at 606).

Several courts in the Ninth Circuit and elsewhere have cited In re Folks for the proposition that a generalized alter ego claim belongs to a debtor's bankruptcy estate (and can only be pursued by the debtor or trustee), while a particularized alter ego claim does not. See, e.g., Trustee of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l, 2004 U.S. Dist. LEXIS 15928 (N.D. Cal. 2004) (attached hereto as Exhibit A); In re Agribiotech, Inc., 319 B.R. 216 (D. Nev. 2004); Moldo v. World Net Dev. Group Inc., 2000 U.S. Dist. LEXIS 19092 (C.D. Cal. 2000) (attached hereto as Exhibit B). In re Folks has also been cited in Collier's Bankruptcy Manual as holding that "the trustee is the proper person to assert a general claim that can be brought on behalf of all creditors (alter ego claim)." 2-544 Collier Bankruptcy Manual, § 544.01 (Matthew Bender 3d ed. rev'd).

In the instant matter, the Alter Ego Remedies are clearly generalized claims. The harm, if any, that allegedly was suffered by the Asbestos Claimants (along with thousands of

other similarly situated creditors) resulted from the distribution of asbestos by Flintkote at a time *prior to* its involvement with Imperial Tobacco. The only alleged harm that Imperial Tobacco (through its predecessor corporation, Imasco Limited, "Imasco") caused these Asbestos Claimants (along with thousands of other similarly situated creditors) stems from Imasco's alleged interactions with Flintkote. These claimants allege only that, as a result of Imasco's alleged conduct, they will not receive payment in full for whatever claims they may have against Flintkote. This is an alleged harm that would necessarily be shared by all current and future creditors of Flintkote. In fact, the Debtors' themselves make the alleged general shared harm to all asbestos claimants a keynote to their Joint Prosecution Motion. Joint Prosecution Motion, p. 7 (referencing harm to thousands of asbestos creditors).

Because the Alter Ego Remedies are comprised of "generalized" claims (and not "particularized" claims), Flintkote alone has standing to assert all Alter Ego Remedies under existing Ninth Circuit precedent interpreting California law. Accordingly, Flintkote's stated reason for entering into the Alter Ego Agreement is entirely illogical; essentially, Flintkote would be entering into the Alter Ego Agreement (and transferring valuable assets of the Estates with no consideration) to ensure the occurrence of something (i.e., that all Alter Ego Remedies can be pursued against Imperial Tobacco in one action) that is already a legal certainty.[5]

---

[5]      Furthermore, despite the existing clarity under California law, to avoid any misunderstanding on this issue and to make the Alter Ego Agreement wholly unnecessary, as a condition to any order rejecting the Alter Ego Agreement Imperial Tobacco is prepared to stipulate both in this Court and in the Dividend Recovery Litigation that Flintkote has standing to assert the Alter Ego Remedies in its own name and for the benefit of its bankruptcy estate. Imperial Tobacco, of course, otherwise expressly reserves all procedural and substantive defenses available to it in the Dividend Recovery Litigation.

9

b.        **To the Extent the Asbestos Claimants Had "Personal" Alter Ego Claims, They Would Not Need the Alter Ego Agreement to Pursue Those Claims.**

Imperial Tobacco disputes that any individual asbestos creditor could allege a particularized or "personal" alter ego claim. The complaint filed in the Dividend Recovery Litigation (the "Complaint") does not suggest that any such claim could be made.[6] If there is no such "personal" or particularized alter ego claim, there is no reason for the Asbestos Claimants to be party plaintiffs. However, assuming solely for the sake of argument that the Asbestos Claimants had a "personal" alter ego claim, that claim would not belong to Flintkote. Accordingly, the Asbestos Claimants would not need (and their standing argument would not benefit from) a grant of an undivided interest in *Flintkote's* Alter Ego Remedies. The Asbestos Claimants would have standing in their own right – without the benefit of the Alter Ego Agreement.[7]

For the above reasons, the Alter Ego Agreement is effectively meaningless. Its purported purpose is to solve a problem that does not exist – namely, a purported lack of standing to pursue the Alter Ego Remedies. Flintkote has standing to pursue all Alter Ego Remedies. The individual Asbestos Claimants do not have standing because the alleged harm is "general" rather than "personal." However, if the Asbestos Claimants believe they have a "personal" claim, they can assert that argument to the court adjudicating the claims and either win or lose that issue. In any event, they do not need the Alter Ego Agreement to assert a

---

[6]        The Complaint is attached to the Joint Prosecution Motion as Exhibit C. On or about May 1, 2006, Flintkote and the other Dividend Recovery Litigation plaintiffs filed their first amended complaint, primarily to add the official committee of asbestos personal injury claimants and the futures representative as plaintiffs, as contemplated by this Court's prior order on the Joint Prosecution Motion.

[7]        To the extent the automatic stay is implicated as a result of the Asbestos Claimants attempted pursuit of the alter ego claims against Imperial Tobacco, Imperial Tobacco does not object to limited relief from the automatic stay for this purpose. In all other respects, Imperial Tobacco objects to an annulment of the automatic stay as unnecessary and unwarranted (for the same reasons set forth herein with respect to the Alter Ego Agreement).

1385382/1

"personal" alter ego claim.    If the Asbestos Claimants do not have standing (and Imperial

Tobacco believes they do not), then Flintkote can pursue the claims on behalf of all creditors –

as contemplated in the standing case law cited by the Debtors' themselves.

**3.    The Alter Ego Agreement Would Not Be Recognized Outside of Bankruptcy.**

As demonstrated above, the Alter Ego Agreement has no legal substance.

Flintkote has ample standing to pursue the Alter Ego Remedies on behalf of the Estates.  If the

individual Asbestos Claimants had "personal" claims, they would not need the Alter Ego

Agreement to pursue those claims.  Thus, the sole purpose of the Alter Ego Agreement is to

improve the Debtors' "optics" in front of the fact finder by "teaming up" with what the Debtors

hope will be sympathetic party plaintiffs who would otherwise have no independent standing

without the Alter Ego Agreement.  As noted below, Imperial Tobacco respectfully submits that

this Court should see and reject the Alter Ego Agreement for what it is – an unseemly litigation

tactic that is contrary to law and public policy.

**a.    The Alter Ego Agreement Contravenes the Law on Standing.**

The Debtors suggest in the Joint Prosecution Motion that they do not seek a

determination on standing and that this issue should be left to the Superior Court.  In truth,

however, the Debtors are seeking to prejudge and predetermine standing, and to contravene the

very California law standing principles to which they cite.  The Court should reject the Debtors'

attempts to "deal around" the law on standing.

As noted above, the California law on standing cited by the Debtors is in fact

quite clear.  As more thoroughly outlined above, in In re Folks, the Ninth Circuit BAP cited both

the Stodd and Davey decisions for the proposition that California recognizes two different alter

ego claims, (i) one alleging injury to the corporation or creditors in general, and (ii) another

11

alleging injury directed to a specific individual creditor. The Folks court held that *only* a trustee or debtor in possession could pursue a "general" claim that could be brought by any creditor of the debtor, and *only* an individual creditor could pursue a "personal" or "individualized" claim. In re Folks, 211 B.R. at 385. The Alter Ego Agreement directly contradicts these limitations on standing because the Debtors seek to *ensure* that the individual Asbestos Claimants *stay* in the case regardless of the applicable standing principles. This is why the Alter Ego Agreement purports to allow the Asbestos Claimants to "share" Flintkote's standing – thus ensuring that they will stay in the case regardless of whether they have standing on their own.

None of the case law cited by the Debtors (and none of the case law located by the undersigned) contemplates "shared" standing. To the contrary, the cases noted above draw clear distinctions between those types of claims that can and cannot be brought by a debtor or trustee, and those claims that can and cannot be brought by an individual creditor. Nonetheless, the Debtors hope to obtain this Court's seal of approval for their procedure – which is nothing more than a thinly veiled attempt to avoid the rules of standing.

Further, and as noted, the Debtors seek this Court's approval under the insidious guise that they in fact are not seeking a determination of whether any party has standing. This simply is not true. By seeking approval of the Alter Ego Agreement, the Debtors seek, inappropriately, to predetermine standing for *both* Flintkote and the Asbestos Claimants. For these reasons alone, the Court should refuse to approve the Alter Ego Agreement, thereby permitting the presiding judge to decide standing issues under applicable law.

**b.    The Alter Ego Remedies Are Not Assignable Under California Law and Public Policy.**

In Baum v. Metzger, 72 Cal. App. 4th 54 (1999), in holding that a plaintiff could not maintain causes of action in state court on malpractice and breach of fiduciary duty claims

12

that had been assigned to it by a bankruptcy trustee with bankruptcy court approval, the California Court of Appeal held that while "the Bankruptcy Code specifically includes property in the bankruptcy estate regardless of state law restrictions on assignment, it does not authorize the bankruptcy trustee to sell or assign assets that are nonassignable under applicable state law." Baum, 72 Cal. App. 4th at 71. In reaching this holding, the court noted that only "choses in action" may be assigned pursuant to California law. Under California law, assignable choses in action are those "arising out of an obligation or breach of contract" or "arising out of the violation of a right of property or a wrong involving injury to personal or real property." Id. (citations omitted). The court mentions at several places in the opinion that "causes of action for *personal injury* arising out of tort are not assignable nor are those founded upon wrongs of a purely personal nature such as to the reputation or the feelings of the one injured." Id. (emphasis added); see also Curtis v. Kellogg & Andelson, 73 Cal. App. 4th 492 (1999) (holding that legal malpractice claim cannot be assigned by trustee under California law).

In the Complaint, the Asbestos Claimants alleged three types of actions against Imperial Tobacco (all based on the theory of alter ego liability): Negligence – Wrongful Death; Products Liability – Wrongful Death; and Loss of Consortium. All three of these causes of action are torts that arise out of personal injury. Pursuant to the Alter Ego Agreement, Flintkote has assigned rights to the Asbestos Claimants to pursue these personal injury tort claims against Imperial Tobacco as Flintkote's alleged alter ego. Accordingly, the Court should reject the Alter Ego Agreement as it violates (and is unenforceable under) California law.

As noted repeatedly above, if the Asbestos Claimants believe they have a "personal" alter ego claim that is particular to them and could not be asserted by asbestos claimants generally, then they will have the opportunity to demonstrate that point and can stand

13

or fall based on the merits of their argument. They do not need the Alter Ego Agreement. To the extent the Alter Ego Agreement purports to grant standing to the Asbestos Claimants that they do not otherwise have, the agreement is contrary to the standing principles cited above (and those cited by the Debtors). In either case, the Alter Ego Agreement does not constitute a valid and legally sustainable use of the Debtors' property under Section 363 of the bankruptcy. As such, the Court should refuse to approve it.

      **C.**    **EVEN IF THE ALTER EGO AGREEMENT WERE AN OTHERWISE VALID USE OF THE DEBTORS' PROPERTY, THE AGREEMENT IS NOT IN THE BEST LEGITIMATE INTERESTS OF THE DEBTORS' ESTATES.**

      In their single-minded pursuit of a litigation advantage in the Dividend Recovery Litigation, the Debtors have either overlooked or failed to properly consider certain consequences of their unprecedented tactics. For the reasons noted below, the Court should conclude that the Debtors have failed to properly apply their business judgment in entering into the Alter Ego Agreement.

      **1.**    **Under the Alter Ego Agreement, Flintkote Has Essentially Authorized a Lawsuit Against Itself.**

      As a result of the Alter Ego Agreement, the Debtors have essentially teamed up with the very parties they have been fighting for more than thirty-five years. Has Flintkote simply given up and decided to no longer contest asbestos liability? Certainly nothing in the Joint Prosecution Motion attempts to justify such a decision, and on the personal injury claims at least, Flintkote would logically be aligned as a defendant, not a plaintiff. Nonetheless, the Complaint (literally, the end-result of the Alter Ego Agreement), suggests that Flintkote may have decided to concede liability by listing Flintkote as a plaintiff.

The Complaint includes allegations that Imperial Tobacco (as the alter ego of Flintkote), among other things, (a) negligently and carelessly researched, manufactured and sold products containing asbestos, (b) failed to exercise due care in manufacturing and selling products containing asbestos, (c) knew, or should have known, and intended that its products would be transported and installed, and that such products would release airborne asbestos fibers which would harm handlers, and (d) that such products were handled by Decedent (as defined in the Complaint) and caused his death. Complaint, p. 14-16. Who do the Debtors believe will defend or contest these allegations? Imperial Tobacco – perhaps the only named defendant with a motive to contest these allegations – is hardly the best or most appropriate party to mount a defense to these allegations. As the Complaint itself alleges, Imperial Tobacco (through its corporate predecessors, including Imasco) did not become involved with Flintkote until 1986 – a point in time *after* Flintkote ceased the manufacture of asbestos containing products. Of course, the most appropriate party to contest and defend against these allegations is Flintkote itself – the same party that has been contesting these types of claims for over thirty-five years. Indeed, it is at the very least curious that Flintkote – who obviously has limited resources to pay claims – would consciously engineer a scenario in which it will either concede or not defend against some of the most damning allegations it has faced over the years.

2.    **The Debtors Have Not Considered the Consequences of their Actions.**

What consequences will this odd yet self-imposed scenario hold for the Debtors and their estates? The Joint Prosecution Motion does not even suggest that the Debtors have applied any thought at all to this issue (much less sound business judgment). Imperial Tobacco is confident that it will soundly defeat the alter ego allegations. In that inevitable event, the Debtors may be left only with the self-inflicted wound of conceded or insufficiently contested

15

allegations of intentional exposure to hazardous products. What impact will this have on the claims pool? How will this impact or impair the ability to administer a fair claims resolution process? The Debtors themselves suggest that they want the Dividend Recovery Litigation to result in *res judicata* for the benefit of all asbestos claimants. See Joint Prosecution Motion, p. 7. But they apparently give no consideration to the negative consequences of their strategy.

The Debtors will certainly attempt to hide behind the fact that the Asbestos Claimants Committee and the Futures Representative have endorsed their actions and are willing to assume the risks. However, it is hardly surprising that the Committee and the Futures Representative have no problem with the Debtors' procedure. The present and future asbestos claimants will benefit from Flintkote's failure to defend allegations of asbestos liability. If the Debtors have unfettered authority, and are otherwise willing, to accede to the wishes of the asbestos claimants, then the Debtors serve no substantive function in this bankruptcy case. Likewise, if the asbestos claimants' demands and desires control this issue, the Court's only function would be to ask if this class of creditors agrees with the Debtors' decision. Needless to say, the Debtors' function and this Court's function are far broader than that. See In re The Lionel Corporation, 722 F.2d 1063, 1071 (2d Cir. 1983) (concluding that creditor committee's insistence on transaction could not support debtor's business judgment, noting that court cannot simply "follow the hue and cry of the most vocal special interest groups"). The Court must be satisfied that the Debtors have exercised their judgment for the benefit of all creditors and interest holders in the case – including non-asbestos creditors and other parties who are not aligned with the interests of asbestos claimants.

13R53R2/1

3.     **Proper Business Judgment Would Not Support the Alter Ego Agreement.**

The appropriate course for the Debtors is for Flintkote to pursue its Alter Ego Claims in a way that does not expose the Estate to findings regarding specific asbestos liability allegations. The alter ego theory is a relatively simple one: Flintkote alleges that Imperial Tobacco should be responsible for Flintkote's liabilities – whatever those liabilities are. It is not at all necessary (or, for the Debtors' legitimate interests, desirable) to litigate specific allegations of asbestos personal injury liability to determine whether Imperial Tobacco is the alter ego of Flintkote. However, the Alter Ego Agreement attempts to ensure this result because it grants artificial standing to the Asbestos Claimants to assert their claims directly against Flintkote, and, by extension only, against Imperial Tobacco as the alleged alter ego. In the absence of the Alter Ego Agreement, Flintkote alone would prosecute the Alter Ego Remedies without essentially asserting allegations against itself – as is the case now.

For the reasons noted above, Imperial Tobacco submits that the Debtors have not demonstrated a proper exercise of their business judgment in entering into the Alter Ego Agreement. As noted, the Alter Ego Agreement sets the stage for Flintkote to team up with its former adversaries and essentially sue itself for personal injury asbestos liability. The Joint Prosecution Motion is devoid of any analysis suggesting that the Debtors have even considered the risks associated with this procedure. Aside from the unseemly nature of setting up allegations with no party willing and able to contest them, this procedure presents unnecessary risks to the Debtors and their Estates. If the Court were to refuse approval of the Alter Ego Agreement, the Debtors would not be harmed. Flintkote would still be able to pursue all Alter Ego Remedies (as noted above) but could do so without the risks associated with the current procedure. Accordingly, the Court should reject the Alter Ego Agreement.

17

**D.    ANY APPROVAL OF THE ALTER EGO AGREEMENT SHOULD BE LIMITED SO AS NOT TO RESTRICT THE COURT PRESIDING OVER THE DIVIDEND RECOVERY LITIGATION.**

Any approval by this Court of the Alter Ego Agreement runs the risk that such approval will restrict or impair the court that presides over the Dividend Recovery Litigation. As noted above, notwithstanding the Debtors' assertions, it is difficult to imagine how approval of the Alter Ego Agreement will not have a profound impact on the presiding court's analysis of standing issues. Indeed, Imperial Tobacco believes it is the Debtors' specific intention to contravene applicable standing rules through this Court's approval of the Alter Ego Agreement. Regardless of the Court's decision on the Alter Ego Agreement, the Court should, at a minimum, take precautions to avoid prejudging issues that should, and in the normal course would, come before and be decided by the court presiding over the Dividend Recovery Litigation. See In re Combustion Engineering, Inc., 391 F. 3d 190, 209 (3d Cir. 2004) (recognizing this Court's use of limiting provisions in plan to make clear that contractual rights of insurers would not be prejudiced or impaired as a result of Court's approval of plan).

The presiding court should have unfettered ability to apply standing principles and otherwise determine whether it is appropriate to have the Asbestos Claimants participate as parties in the Dividend Recovery Litigation if these claimants do not have "personal" alter ego claims. Accordingly, this Court should note in any approval order that the Court's approval of the agreement is without prejudice to any future determination by the presiding judge, including, without limitation, (1) whether "shared" standing by agreement is permissible in the jurisdiction and in the court in which the Dividend Recovery Litigation is ultimately administered, (2) whether the Alter Ego Agreement constitutes unauthorized claim trading under applicable law, (3) whether the Asbestos Claimants have a "personal" alter ego cause of action, (4) whether the Asbestos Claimants' claims should be tried at all or, if so, together with the Debtors' claims, and

18

(5) whether any evidence offered by or through the Asbestos Claimants should be admitted in any trial or proceeding of the Dividend Recovery Litigation.

### III. CONCLUSION

For the foregoing reasons Imperial Tobacco respectfully requests that the Court sustain its Objection and reject the Alter Ego Agreement and proposed annulment of the automatic stay.

Dated: May 2, 2006

MORRIS, JAMES, HITCHENS, & WILLIAMS LLP

Stephen M. Miller (DE Bar I.D. 2610)
Carl N. Kunz, III (DE Bar I.D. 3201)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306
Telephone: (302) 888-6800
Fax:         (302) 571-1750
E-mail: smiller@morrisjames.com
            ckunz@morrisjames.com

and

KING & SPALDING LLP
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Fax:         (404) 572-5129
E-mail: jpardo@kslaw.com
            mmaloney@kslaw.com

Counsel for Imperial Tobacco Canada Limited

19

1385382/1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as          )
Wrongful Death Heir, and as Successor-in-  )
Interest to NORMAN HOPKINS, JR.,           )
Deceased; and MICHELLE HOPKINS, and        )
MICHAEL HOPKINS, as Legal Heirs of         )
NORMAN HOPKINS, Deceased, and THE          )
FLINTKOTE COMPANY, THE OFFICIAL            )
COMMITTEE OF CLAIMANTS, and                )
JAMES J. MCMONAGLE as the LEGAL            )
REPRESENTATIVE FOR FUTURE                  )
ASBESTSOS PERSONAL INJURY                  )
CLAIMANTS                                  )
                  Plaintiffs,              )
                                           )
          vs.                              )      Civil Action No. 1:06-CV-00298-JJF
                                           )
PLANT INSULATION COMPANY;                  )
UNIROYAL HOLDING, INC.; IMPERIAL           )
TOBACCO CANADA LIMITED;                    )
SULLIVAN & CROMWELL LLP;  and              )
DOES 1 through 100,                        )
                                           )
                  Defendants.              )

## CERTIFICATE OF SERVICE

I, James E. O'Neill, hereby certify that on the 19th day of May 2006, I caused a

copy of the following document(s) to be served in the manner indicated on the individuals on the

attached service list(s):

1. **Debtor's Opposition to Emergency Petition of Imperial Tobacco Canada Limited for an Order of Transfer Pursuant to 28 U.S.C. § 157(B)(5)**

2. **Declaration of David J. Gordon in Support of Debtor's Opposition to Emergency Petition of Imperial Tobacco Canada Limited for an Order of Transfer Pursuant to 28 U.S.C. § 157(B)(5)**

3. **Declaration of Alan R. Brayton in Support of Debtor's Opposition to Emergency Petition of Imperial Tobacco Canada Limited for an Order of Transfer Pursuant to 28 U.S.C. § 157(B)(5)**

4.    **Declaration of Alan Pedlar in Support of Debtor's Opposition to Emergency Petition of Imperial Tobacco Canada Limited for an Order of Transfer Pursuant to 28 U.S.C. § 157(B)(5)**

James E. O'Neill (Bar No. 4042)

Flintkote District Court Service List
Case No. 06-298-JJF
Doc. # 118154
005 – Hand Delivery
013 – First Class Mail

*HAND DELIVERY*
*(Co-Counsel for Debtors and Plaintiff,*
*The Flintkote Company)*
James E. O'Neill
Laura Davis Jones
Pachulski, Stang, Ziehl, Young, Jones
& Weintraub P.C.
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705

*HAND DELIVERY*
*(Office of the United States Trustee)*
David Klauder, Esquire
Office of the United States Trustee
844 King Street, Lock Box 35, Room 2311
Wilmington, DE  19801

*HAND DELIVERY*
*(Counsel to the Official Committee of*
*Asbestos Personal Injury Claimants)*
Marla Eskin, Esquire
Campbell & Levine, LLC
800 King Street, Ste 300
Wilmington, DE  19801

*HAND DELIVERY*
*(Counsel to the Legal Representative*
*for Future Claimants)*
Edwin J. Harron
Young Conaway Stargatt & Taylor
1000 West Street, 17th Floor
Wilmington, DE 19801

*HAND DELIVERY*
*(Counsel for Defendant Imperial*
*Tobacco Canada Limited)*
Stephen M. Miller
Brett D. Fallon
Carl N. Kunz, III
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801

*FIRST CLASS MAIL*
*(Co-Counsel for Defendant Imperial*
*Tobacco Canada Limited)*
L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
King & Spalding LLP
1180 Peachtree Street, N.W.
Atlanta, GA  30309

*FIRST CLASS MAIL*
*(Co-Counsel for Debtors and*
*Plaintiff, The Flintkote Company)*
Jeffrey E. Bjork, Esquire
Sidley Austin Brown & Wood LLP
555 W. 5th Street, Suite 4000
Los Angeles, California 90013

*FIRST CLASS MAIL*
*(Counsel to the Official Committee of*
*Asbestos Personal Injury Claimants)*
Elihu Inselbuch, Esquire
Rita Tobin, Esquire
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY  10152-3500

*FIRST CLASS MAIL*
*(Counsel to the Official Committee of*
*Asbestos Personal Injury Claimants)*
Philip E. Milch
Campbell & Levine, LLC
1700 Grant Building, 310 Grant Street
Pittsburgh, PA  15219

*FIRST CLASS MAIL*
*(Counsel to the Legal Representative*
*for Future Claimants)*
Matthew E. Albers
Vorys, Sater, Seymour & Pease LLP
2100 One Cleveland Ctr.
1375 E. 9th St.
Cleveland, Ohio 44114

*FIRST CLASS MAIL*
*(Counsel for Plaintiff, The Flintkote*
*Company)*
Stephen M. Snyder, Esquire
Snyder Miller & Orton LLP
111 Sutter, Ste 1950
San Francisco, CA 94104

*FIRST CLASS MAIL*
*(Counsel for Plaintiff, The Flintkote*
*Company)*
Eliot S. Jubelirer
Morgenstein & Jubelirer
One Market
Spear Street Tower. 32nd Floor
San Francisco, CA 94105

*FIRST CLASS MAIL*
*(Counsel for Plaintiff, The Flintkote*
*Company)*
Alan Pedlar, Esquire
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA 95083

*FIRST CLASS MAIL*
*(Counsel for Plaintiff, The Flintkote*
*Company)*
Kelly C. Wooster, Esquire
112 Rock Creek Court
P.O. Box 62
Copperopolis, CA 95228

*FIRST CLASS MAIL*
*(Counsel for Plaintiff Marlene Hopkins,*
*Michelle Hopkins and Michael Hopkins)*
Gilbert L. Purcell, Esquire
Brayton Purcell, LLP
222 Rush Landing Road
Novaro, CA 94948

*FIRST CLASS MAIL*
*(Counsel for Sullivan & Cromwell)*
Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olsen LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071

*FIRST CLASS MAIL*
*(Counsel for Plant Insulation)*
Monte S. Travis
Travis & Pon
2001 Fillmore Street
San Francisco, CA 94115

*FIRST CLASS MAIL*
*(Counsel for Uniroyal Holdings, Inc.)*
Nancy E. Hudgins
Uniroyal Holdings, Inc.
565 Commercial Street, 4th Floor
San Francisco, CA 94111

DOCS_DE:118154.1