## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, Individually, as )
Wrongful Death Heir, and as Successor-in- )
Interest to NORMAN HOPKINS, JR., )
Deceased; and MICHELLE HOPKINS, and )
MICHAEL HOPKINS, as Legal Heirs of )
NORMAN HOPKINS, Deceased, THE )
FLINTKOTE COMPANY, THE OFFICIAL )
COMMITTEE OF THE ASBESTOS )
PERSONAL INJURY CLAIMANTS, and )
JAMES J. MCMONAGLE as the LEGAL )
REPRESENTATIVE FOR FUTURE )
ASBESTOS PERSONAL INJURY )
CLAIMANTS )
 )
              Plaintiffs, )      Civil Action No. 1:06-CV-00298 JJF
 )
    vs. )
 )
PLANT INSULATION COMPANY; )
UNIROYAL HOLDING, INC.; IMPERIAL )
TOBACCO CANADA LIMITED; )
SULLIVAN & CROMWELL LLP; and )
DOES 1 through 100, )
 )
             Defendants. )

## RESPONSE OF IMPERIAL TOBACCO CANADA LIMITED
## TO DEBTOR'S OPPOSITION TO EMERGENCY PETITION FOR AN
## ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com

Attorneys for Imperial Tobacco Canada  Limited

Dated:  May 31, 2006

1398202/1

# TABLE OF CONTENTS

I.    Introduction ................................................................................................1

II.   Background ..................................................................................................2

    A.    This Case Is Not Centered In California As Plaintiffs Suggest. ...........................2

    B.    The Bankruptcy Case Is Fundamentally Intertwined With The Pending Action. ...4

III.  Law and Argument .......................................................................................7

    A.    Section 157(b)(5) Applies To The Pending Action And Transfer Is Required. ......7

    1.    Flintkote's Own Liabilities Are At Issue In The Pending Action. ..........................8

    2.    The Primary Factor To Be Considered By The Court Is Whether Jurisdiction Exists. ...................................................................................................9

    3.    Transfer Is Required In This Case. .................................................................12

    4.    ITCAN Can Invoke Section 157(b)(5). ...........................................................14

        a.    Section 157(b)(5) Is Not Limited To Claims Against A Debtor. .............14

        b.    Flintkote Cannot Veto The Application of Section 157(b)(5) .................17

    B.    There Is No Basis For Abstention In This Case. .............................................18

    1.    In The Context Of § 157(b)(5), A Court's Ability To Abstain Is Limited. ...........18

    2.    Every Factor Cited By Flintkote Mandates Transfer Not Abstention. .................19

        a.    The Pending Action Will Have A Substantial Impact On The Bankruptcy Case. ...................................................................................19

        b.    State Law Issues Do Not Predominate. ...........................................20

        c.    The Law Of Delaware Applies To The Principal State Law Claim Asserted By Flintkote. ...............................................................23

        d.    There Is A Related Proceeding Already Pending.  That Related Proceeding Is The Bankruptcy Case. ...............................................26

        e.    There Is A Jurisdictional Basis Other Than Section 1334. ..................29

        f.    The State Court Action Is Significantly Related To The Bankruptcy Case ...................................................................................29

        g.    The Pending Action Is Not Determined Exclusively By State Law. .........31

        h.    Potential Severance of Claims Is Not At Issue. .................................32

        i.    The Pending Action Is Not An Unnecessary Burden On This Court's Docket. ...........................................................................32

|       | j. | Flintkote's Forum Shopping Should Not Be Condoned. | 33 |
|       | k. | The Right To Jury Trial Does Not Favor Abstention. | 34 |
|       | l. | The Presence Of Non-Debtor Parties Does Not Support Abstention. | 35 |
|       | m. | The Use Of § 157(b)(5) In This Case Is Consistent With The Intent Of The Statute. | 35 |
| C. | | ITCAN Is Not Seeking Transfer For An Improper Purpose. | 36 |
| D. | | The Claims Asserted By The Hopkins Plaintiffs And Flintkote May Be Transferred Under § 157(b)(5). | 37 |
| E. | | There Is No Basis For Mandatory Abstention. | 38 |
| IV. | Conclusion | | 39 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

A.H. Robins Company, Inc. v. Piccinin,
   788 F.2d 994 (4th Cir. 1986) ...............................................................12, 14, 28, 35

Astropower Liquidating Trust,
   335 B.R. 309 (Bankr. D. Del. 2005) .................................................................31

At Home Corp. v. Cox Communications, Inc.,
   2003 U.S. Dist. LEXIS 18320, Case No. 02-1486 (JJF) (D. Del. Oct. 8, 2003) ...................34

Banco Nacional de Cuba v. Sabbatino,
   376 U.S. 398 (1964)..................................................................................22

In re Best Products Co., Inc.,
   168 B.R. 35 (S.D.N.Y. 1994)...........................................................................21

In re Biglari Import & Export, Inc.,
   142 B.R. 777 (Bankr. W.D. Tex. 1992)..................................................................21

Blanton v. IMN Financial Corp.,
   260 B.R. 257 (M.D.N.C. 2001).........................................................................18

Bliss Technologies, Inc.,
   307 B.R. 598 (Bankr. E.D. Mich. 2004) ...............................................................21

Celotex Corp. v. Edwards,
   514 U.S. 300 (1995)..................................................................................10

Davis v. Costa-Gavras,
   580 F. Supp. 1082 (S.D.N.Y. 1984)....................................................................36

In re Dow Corning Corp.,
   86 F.3d 482 (6th Cir. 1996) ....................................................................9, 12, 15, 16

In re Eagle-Picher Industries, Inc.,
   189 B.R. 681 (Bankr. S.D. Ohio 1995)..................................................................13

Edgar v. MITE Corp,
   457 U.S. 624 (1987)..................................................................................24

In re Federal Mogul
   282 B.R. 301 (Bankr. D. Del. 2002) ...................................................................18

In re Federal-Mogul Global, Inc.,
    300 F.3d 368 (3d Cir. 2002)..................................................................11, 16

In re Finley,
    62 B.R. 361 (Bankr. N.D. Ga. 1986) ......................................................11, 29

In re Finley,
    286 B.R. 163 (Bankr. W.D. Wash. 1992) ......................................................21

Fletcher v. Atex, Inc.,
    68 F.3d 1451 (2d Cir. 1995)..........................................................................24

In re Folks,
    211 B.R. 378 (9th Cir. B.A.P. 1997)..............................................................22

Freeman v. Northwest Acceptance Corp.,
    754 F.2d 553 (5th Cir. 1985) ...............................................................8, 10, 39

In re Gruntz,
    202 F.3d 1074 (9th Cir. 2000) .......................................................................11

H.J. Rowe Inc. v. Sea Products, Inc.,
    221 B.R. 214 (Bankr. N.D. Ill 1998) .............................................................27

Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A. (In re Hen
    House Interstate, Inc.),
    530 U.S. 1 (2000)..........................................................................................15

Hohl v. Bastian,
    279 B.R. 165 (W.D. Pa. 2002)......................................................................18

In re Icarus Holdings, LLC,
    290 B.R. 171 (Bankr. M.D. Ga. 2002)...........................................................22

J.T. Thorpe Co. v. America Motorists,
    2003 U.S. Dist. LEXIS 26016 (S.D. Tex. 2003) ...........................................35

Kalb, Voorhis & Co. v. American Financial Corp.,
    8 F.3d 130 (2d Cir. 1993)..............................................................................24

Koch Refining v. Farmers Union Central Exchange,
    831 F.2d 1339 (7th Cir. 1987) .......................................................................22

MacLeod v. Dalkon Shield Claimants Trust,
    967 F. Supp. 856 (D. Md. 1997)....................................................................25

Mitsubishi Caterpillar Forklift America, Inc. v. Superior Serv. Associates, Inc.,
    81 F. Supp. 2d 101 (D. Me. 1999) ................................................................9

Mobil Oil Corp. v. Linear Films, Inc.,
    718 F. Supp. 260 (D. Del. 1989) ................................................................12

In re Mobile Tool International, Inc.,
    320 B.R. 552 (Bankr. D. Del. 2005) ......................................................20, 33

NBD Bank, N.A. v. Fletcher,
    176 B.R. 445 (Bankr. W.D. Mich. 1995) ...................................................22

PHP Liquidating, LLC v. Robbins,
    291 B.R. 592 (D. Del. 2005) .....................................................................22

In re PRS Insurance Group, Inc.,
    335 B.R. 77 (Bankr. D. Del. 2005) ...........................................................11

In re Pan Am Corporation,
    16 F.3d 513 (2d Cir. 1994) ........................................................................12

In re Pan Am Corporation,
    950 F.2d 839 (2d Cir. 1991) ................................................................19, 38

Rahl v. Bande,
    316 B.R. 127 (S.D.N.Y. 2004) .............................................................21, 29

Rosener v. Majestic Management (In re OODC, LLC),
    321 B.R. 128 (D. Del. 2005) .....................................................................22

In re Rosenfield,
    62 B.R. 515 (Bankr. N.D. Tex. 1986) .......................................................21

Shubert v. Roche Holding AG,
    157 F. Supp. 2d 542 (E.D. Penn. 2001) .....................................................27

Solomon v. Continental American Life Insurance Co.,
    472 F.2d 1043 (3d Cir. 1973) ....................................................................28

In re Startec Global Communications Corp.,
    292 B.R. 246 (Bankr. D. Md. 2003) ..........................................................11

Towe Antique Ford Foundation v. IRS,
    999 F.2d 1387 (9th Cir. 1993) ...................................................................34

Tracy v. Consolidated R. Corp.,

723 F. Supp. 1051 (D. Del. 1989)..................................................................28

Trustees of the National Elevator Industrial, Pension, Health Benefit and
    Education Funds v. Lutyk,
    332 F.3d 188 (3d Cir. 2003)....................................................................8

United States v. Golden Acres,
    684 F. Supp. 96 (D. Del. 1998)...............................................................34

Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc.,
    707 F. Supp. 1429 (D. Del. 1989).............................................................28

In re Worldcom, Inc. Securities Litigation,
    293 B.R. 308 (S.D.N.Y. 2003)................................................................17

**STATE CASES**

Dow Jones Co. v. Avenel,
    151 Cal. App. 3d 144 (1984)..................................................................35

Grosset v. Wenaas,
    2005 WL 3747917 (Petition for Review filed in California Supreme Court
    Case No. S139285, November 29, 2005) ....................................................25

Grosset v. Wenaas, 35 Cal. Rptr.3d 58 (Cal. 4th Dist. Ct. App. 2005) ........................24

Mabon, Nugent & Co. v. Texas America Energy Corp.,
    1988 WL 5492 (Del. Ch. Jan. 27, 1988) ...................................................13

Pauley Petroleum, Inc. v. Continental Oil Co.,
    239 A.2d 629 (Del. 1968) ....................................................................13

Regal Row Fina, Inc., v. Washington Mutual Bank,
    2004 WL 2826817 (N.D. Tex Dec. 9, 2004) ...............................................27

Roy v. Superior Court,
    127 Cal. App. 4th 337 (2005) ...............................................................36

State Farm Mutual Automobile Insurance Co. v. Superior Court,
    114 Cal. App. 4th 434 (Cal. 2d Dist. Ct. App. 2003) .....................................24

Sunnyside Development Co., LLC v. Opsys Ltd.,
    2005 WL 1876106 (N.D. Cal. Aug 08, 2005) .............................................24

iv

## FEDERAL STATUTES

11 U.S.C. § 524(g)(2)(B)(ii) ............................................................................13, 14, 33

11 U.S.C. § 544............................................................................................21, 22

28 U.S.C. § 1334....................................................................................2, 9, 17, 38

28 U.S.C. § 1452..............................................................................................17

# I.
## Introduction

At their most basic level, the issues presently before the court can be reduced to a single question: should The Flintkote Company ("Flintkote") be permitted to effectively sever the most substantial issues remaining in its Bankruptcy Case[1] and send those matters to a California state court for decision, or must those issues remain in Delaware before this Court where they can be decided, properly, as part of a concerted and coordinated resolution of the Bankruptcy Case? The answer to this question is obvious. This Court, in concert with the Bankruptcy Court, is the only Court in which all of the relevant issues common to both the Pending Action and the Bankruptcy Case can be determined -- and this fact compels the transfer of the Pending Action to this Court.

This begs the question of what motive Flintkote may possibly have for filing the Pending Action against Imperial Tobacco Canada Limited ("ITCAN") in the most distant forum it could find from the location of its bankruptcy case. Flintkote's recent actions make clear exactly what Flintkote hopes to accomplish – whenever possible, obtain rulings that are critical to the process of this case from the Bankruptcy Court (while asserting that ITCAN lacks standing to raise objections to relief) and then use those rulings (by mischaracterizing their effect, if necessary), preferably in a state court that has no familiarity with or concern for the Bankruptcy Case. As a result of Flintkote's actions, if the Pending Action is not transferred to Delaware, ITCAN will be forced to continue litigating issues related to the Pending Action in two separate venues located on opposite ends of the country.

---

[1] Capitalized terms not defined herein shall have the meaning given to such terms in the Brief of Imperial Tobacco Canada Limited In Support of Its Emergency Petition For An Order of Transfer Pursuant to 28 U.S.C. § 157(b)(5) (D.I. 3).

Anticipating these very problems, ITCAN filed the Emergency Petition seeking to transfer the Pending Action to this Court. ITCAN believes that such a transfer is appropriate for the following reasons:

First, the Pending Action falls within the scope of 28 U.S.C. § 157(b)(5) because it essentially requires an adjudication of all of Flintkote's asbestos liabilities;

Second, this Court has unquestionable jurisdiction over the Pending Action; and

Third, a transfer pursuant to § 157(b)(5) is warranted because it will centralize the adjudication of issues that go to the very heart of Flintkote's Bankruptcy Case.

Flintkote filed its Opposition to Emergency Petition of Imperial Tobacco Canada Limited For An Order of Transfer Pursuant to 28 U.S.C. § 157(b)(5) (D.I. 19) (the "Response") on May 19, 2006. In the Response, Flintkote contends that ITCAN is not able to invoke the provisions of § 157(b)(5) because the statute was only intended to be used for the benefit of a debtor. Alternatively, Flintkote argues that the court should abstain from exercising the transfer provisions of § 157(b)(5). Flintkote's interpretation of § 157(b)(5) is contrary both to the plain language of the statute and applicable case law. The primary factor in an analysis under § 157(b)(5) is whether jurisdiction exists under 28 U.S.C. § 1334. If it does, then § 157(b)(5) applies regardless of whether it is being invoked by a debtor or a non-debtor. With respect to Flintkote's abstention arguments, each of the factors discussed by Flintkote mandates transfer, not abstention.

## II.
## Background

### A.    This Case Is Not Centered In California As Plaintiffs Suggest.

Plaintiffs have misled the Court in suggesting that Flintkote and all of its operations are and have been centered in the State of California. Flintkote's move to

2

California is a relatively recent event in its larger corporate history. Indeed, virtually all of Flintkote's active business history (including those activities giving rise to alleged asbestos liability) occurred prior to its move to California.

From its inception in the early 1900s until 1987, Flintkote was engaged primarily in the manufacture, processing and distribution of building materials. (Declaration of Mario Tombari, attached hereto as Exhibit A, ¶ 2) (the "Tombari Declaration"). Flintkote's business in the United States was nationwide. Flintkote had manufacturing facilities across the United States, including facilities in Kentucky, Maryland, Massachusetts, New York, New Jersey, Pennsylvania, Georgia, Illinois, Wisconsin, Minnesota, Texas, Colorado, Oregon, Nevada, and Virginia. Id. ¶ 5-7. Flintkote also maintained distribution facilities across the country, including facilities in Florida, Georgia, Alabama, North Carolina, Virginia, Maryland, Pennsylvania, New Jersey, Missouri, Tennessee, Louisiana, Texas, Oklahoma, and Nevada. Id. ¶ 5.

Flintkote's subsidiaries or business divisions had their principal places of business in, among other places, New York, Kentucky, Texas, Maryland, and Ontario. Id. ¶ 8.

Flintkote is a Delaware corporation. (Amended Complaint, ¶ 2). Beginning in the early 1930s, Flintkote maintained its corporate offices in New York. (Tombari Declaration, ¶ 3). In 1976, Flintkote moved its headquarters to Stamford, Connecticut. Id. ¶ 4. In 1984, it moved them to San Francisco to join the executive offices of Genstar Corporation, Flintkote's then relatively new parent corporation. Id. ¶ 15. By the time Flintkote's executive offices were moved to San Francisco in 1984, Flintkote had ceased producing asbestos products. Id. ¶ 14.

3

Flintkote stopped active business operations in 1987. Id. ¶ 17. Since then, Flintkote has been engaged solely in claim resolution, litigation and insurance activities related to liabilities arising from its prior operations (Affidavit of David J. Gordon in Support of First Day Motions, ¶ 10) (the "First Day Affidavit").[2]

**B.    The Bankruptcy Case Is Fundamentally Intertwined With The Pending Action.**

Flintkote filed the Bankruptcy Case in Delaware on May 1, 2004, and it is still pending in the United States Bankruptcy Court for the District of Delaware. Flintkote's bankruptcy was caused primarily because of the increased number of asbestos claims asserted against Flintkote. Id. ¶ 4. Flintkote's stated goal is to form an asbestos personal injury trust pursuant to § 524(g) of the Bankruptcy Code under a confirmed plan of reorganization. Id. ¶ 6.

As of the filing of the Bankruptcy Case, Flintkote stated that it was a defendant in over 155,000 asbestos-related personal injury claims. Id. ¶ 4. According to the schedule of claims filed by Flintkote in the Delaware Bankruptcy Case and the proofs of claim filed against Flintkote, Flintkote is the subject of over 171,000 asbestos claims in 48 states plus the District of Columbia and other territories. (Declaration of Mark M. Maloney, attached hereto as Exhibit B, ¶ 11) (the "Maloney Declaration"). The five states in which the most claims are pending are Texas, Mississippi, West Virginia, Ohio, and Louisiana. Id. *Only 2.14% of the claims are in California.* Id.

On April 5, 2006, Flintkote and the Hopkins Plaintiffs filed the complaint (the "Complaint") in the Pending Action in the Superior Court of California for the County of San Francisco. On April 27, 2006, they filed an amended complaint (the "Amended

---

[2] A copy of the First Day Affidavit is attached as Exhibit B to ITCAN's Brief in Support of Emergency Petition (D.I. 3).

Complaint") to add the "Asbestos Committee" and the "Futures Representative" as plaintiffs.

The Hopkins Plaintiffs assert seven causes of action for damages resulting from the death of Norman Hopkins, whose death was allegedly caused by exposure to asbestos. ITCAN is named as a defendant in only three of them. (Amended Complaint, Causes of Action 1-3). The Hopkins Plaintiffs seek to recover from ITCAN on the theory that ITCAN is the alter ego of Flintkote and is therefore liable for asbestos claims against Flintkote. (Amended Complaint, ¶ 47).

The Hopkins Plaintiffs' remaining four causes of action seek recovery only from defendants Uniroyal and Plant. (Amended Complaint, Causes of Action 4-7). The Hopkins Plaintiffs are the only plaintiffs that assert claims against Uniroyal and Plant. Id. Upon information and belief, counsel for Uniroyal has admitted that it has an agreement with plaintiffs' counsel not to defend asbestos actions, and counsel for Plant has stated that it has a well-known policy not to consent to removal.

Flintkote asserts eight causes of action against ITCAN to obtain either a declaration of alter ego liability or recovery of dividends allegedly paid to ITCAN's predecessor. (Amended Complaint, Causes of Action 8-12; 14-16). Flintkote asserts one cause of action against the law firm of Sullivan and Cromwell LLP ("S&C") for alleged breach of duty and negligence in the legal services performed by S&C in 1986 and 1987. (Amended Complaint, Cause of Action 13).

The Asbestos Committee and the Futures Representative join Flintkote as plaintiffs in the claims asserted by Flintkote against ITCAN and S&C. The Hopkins

Plaintiffs do not join in the claims asserted by Flintkote, and Flintkote does not join in the claims asserted by the Hopkins Plaintiffs.

On the same day Flintkote and the Hopkins Plaintiffs filed the Complaint, Flintkote filed in the Bankruptcy Court a motion (the "Joint Prosecution Motion") for an order approving certain joint prosecution agreements and to annul the automatic stay to permit the Hopkins Plaintiffs to pursue the Pending Action (which it refers to as the "Dividend Recovery" litigation). (Maloney Declaration, ¶ 3). In the Joint Prosecution Motion, Flintkote sought, among other things, approval of an agreement (the "Alter Ego Agreement") between Flintkote and the Hopkins Plaintiffs. Id. ¶ 4.

As originally drafted, the Alter Ego Agreement provided for, among other things, (i) relief from the automatic stay so that the Hopkins Plaintiffs could pursue whatever alter ego claims they may have against ITCAN and (ii) the partial transfer by Flintkote to the Hopkins Plaintiffs of Flintkote's alter ego remedies against ITCAN. Id. ¶ 5.

Flintkote made its Joint Prosecution Motion on an expedited basis at a hearing on the Monday following a holiday weekend. Id. ¶ 6. Flintkote refused ITCAN's request for a continuance and argued that ITCAN had no standing to be heard in the Bankruptcy Case. Id. ¶ 7.

The Bankruptcy Court, however, granted ITCAN's request for a continuance and continued the hearing until May 15, 2006. Id. ¶ 8. In the interim, ITCAN filed an objection to the Alter Ego Agreement on the grounds that Flintkote was attempting to secure rulings from the Bankruptcy Court that would potentially prejudge important issues that should be left to the presiding court in the Pending Action. Id. ¶ 9.

6

At the May 15 hearing, the Bankruptcy Court refused to approve the Alter Ego Agreement in its original form and "blue penciled" the Alter Ego Agreement to delete approval of or authorization for a partial transfer by Flintkote to the Hopkins Plaintiffs of Flintkote's alter ego remedies against ITCAN. Id. ¶ 10. As a result, the Hopkins Plaintiffs are entitled to pursue whatever individual claims they may have against ITCAN, but the Bankruptcy Court specifically refused to approve the Alter Ego Agreement to the extent it arguably granted the Hopkins Plaintiffs standing to pursue claims otherwise belonging to Flintkote. (See May 15, 2006 Hearing Transcript, attached to Maloney Declaration as Exhibit B, p. 10) ("I want to make sure in the process that I'm not prejudging who has standing . . .") (the "May Hearing Transcript"). The Asbestos Committee urged the Bankruptcy Court to approve the original form of the agreement so as to prevent the presiding court in the Pending Action from denying standing to the Hopkins Plaintiffs -- but the Bankruptcy Court refused to prejudge that issue. Id. at pp. 26-29.

## III.
## Law and Argument

**A.    Section 157(b)(5) Applies To The Pending Action And Transfer Is Required.**

The Pending Action calls specifically for a determination of Flintkote's own asbestos personal injury tort liability and § 157(b)(5) is therefore fully invoked. Likewise, in light of the nature of the claims asserted and their fundamental and pervasive connection with the Bankruptcy Case, this Court has unquestionable jurisdiction, indeed arguably exclusive jurisdiction, to adjudicate the Pending Action. Under these circumstances, it makes no difference that ITCAN, rather than the debtor, has invoked § 157(b)(5). Congress did not enact § 157(b)(5) for the exclusive use of a

7

debtor.  Because the requirements for a § 157(b)(5) transfer are amply demonstrated in

this case, transfer of the Pending Action is appropriate and required.

### 1.    Flintkote's Own Liabilities Are At Issue In The Pending Action.

Flintkote argues that § 157(b)(5) does not apply because the Pending Action

"does not involve a personal injury claim against the debtor."  (Response, p. 9).  This

statement is unsupportable and completely ignores the content of the Amended

Complaint.   The Hopkins Plaintiffs specifically allege and seek a determination that

Flintkote's actions caused the wrongful death of Norman Hopkins.  (Amended

Complaint, ¶¶ 11, 46-67).

The Amended Complaint does not allege that ITCAN itself committed any

actions giving rise to personal injury tort, other than as the alleged after-the-fact alter ego

of Flintkote.  As alleged, ITCAN did not have any involvement with Flintkote until after

Flintkote ceased production of asbestos containing products.  (Amended Complaint, ¶ 19;

Tombari Declaration, ¶ 14).   As such, the conduct allegedly giving rise to personal injury

tort claims is the alleged conduct of Flintkote itself.  The fact that Flintkote is not named

as a defendant to the Hopkins Plaintiffs' claims is irrelevant.  In this regard, the Pending

Action is misaligned as to Flintkote.  See, e.g., Freeman v. Northwest Acceptance Corp.,

754 F.2d 553, 559 (5th Cir. 1985) (requiring under Rule 19(a) that subsidiary be joined as

defendant in alter ego action against parent corporation).

Likewise, with respect to Flintkote's alter ego claims, Flintkote's own asbestos

liability is directly and explicitly implicated by law:  An alter ego claim is necessarily

based on the existence of an underlying claim.  Trustees of the Nat. Elevator Indus,

Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 193 n.6  (3d Cir. 2003)

(alter ego is not a cause of action, it is a means for imposing liability for an underlying

8

claim); Mitsubishi Caterpillar Forklift Am., Inc. v. Superior Serv. Associates, Inc., 81 F. Supp. 2d 101, 112-13 (D. Me. 1999) (same).

In the Pending Action, the underlying claims for which an alter ego remedy is sought consist of Flintkote's own asbestos personal injury tort liability for thousands upon thousands of claims currently pending against Flintkote, as well as any future claims that may be asserted. (Amended Complaint, ¶ 116). Flintkote itself has stated that these asbestos claims are "factually interwoven" with the claims asserted in the Pending Action.[3] Consequently, this case does not just involve one personal injury claim against the debtor, it will in fact involve a determination of all of the personal injury claims against the debtor. As such, because Flintkote's own personal injury tort liability is directly at issue, the Pending Action directly and fully invokes the provisions of § 157(b)(5).

### 2.     The Primary Factor To Be Considered By The Court Is Whether Jurisdiction Exists.

Once § 157(b)(5) is invoked, the primary factor in determining a transfer request is whether the district court has subject matter jurisdiction. See In re Dow Corning Corp., 86 F.3d 482, 488 (6th Cir. 1996) ("The first issue to be resolved is whether the district court has subject matter jurisdiction . . . over certain claims pending against the nondebtor defendants."). There is no question that bankruptcy jurisdiction exists in this case, indeed, this Court arguably has exclusive jurisdiction over the Pending Action.

The general rule is that jurisdiction exists under 28 U.S.C. § 1334 if "the outcome of [a] proceeding could conceivably have any effect on the estate being administered in

---

[3] See Application for Designation of Complex Litigation, filed in the California Superior Court, Case No. CGC06450944 (April 14, 2006), attached as Exhibit E to ITCAN's Brief in Support of Emergency Petition (D.I. 3).

1398202/1

bankruptcy." <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 308 n.6 (1995).  This standard is unquestionably met in this case.  Flintkote itself has stated that the Pending Action "represents potentially the largest group of assets" of its bankruptcy estate.[4]  See <u>Celotex</u>, 514 U.S. at 308 n.5 (1995) ("Proceedings 'related to' the bankruptcy include (1) causes of action owned by the debtor which become property of the estate . . . .").  Indeed, the relation between the Pending Action and the Bankruptcy Case is so close that it has prompted the Bankruptcy Court to question why they are not pending in the same venue. (May Hearing Transcript, p. 10) ("Why the heck is the [Bankruptcy Case] pending in the District of Delaware if all of the relevant litigation is going to take place in California . . .").

Flintkote does not dispute that jurisdiction exists with respect to the alter ego claims it asserts.  (Response, p. 33).  Attempting to avoid this fact, Flintkote mistakenly presumes that ITCAN's transfer request is limited to the claims by the Hopkins Plaintiffs and does not apply to the claims asserted by Flintkote.  Flintkote's presumption is incorrect.  As discussed above, both the alter ego claims asserted by the Hopkins Plaintiffs and the alter ego claims asserted by Flintkote will require an adjudication of Flintkote's asbestos liability.  Thus, both sets of claims fall within the scope of § 157(b)(5).[5]

---

[4] See *Debtors' Motion to Shorten Notice Periods With Respect to Certain Pleadings Filed in Connection with the Dividend Recovery Litigation*, filed in the Bankruptcy Case (Bankruptcy Docket No. 1435) on April 5, 2006, a copy of which was attached as <u>Exhibit D</u> to ITCAN's Brief in Support of Emergency Petition (D.I. 3), at page 2.

[5]     Regardless, even if the jurisdictional analysis is limited to the claims of the Hopkins Plaintiffs, jurisdiction would still exist.   The fact that Flintkote was not named as a defendant to the Hopkins Plaintiffs' claim does not change the fact that resolution of that claim will necessarily require a determination of whether the Hopkins Plaintiffs have a claim against Flintkote.  See, e.g., <u>Freeman v. Northwest Acceptance Corp.</u>, 754 F.2d 553, 559 (5th Cir. 1985) (requiring under Rule 19(a) that subsidiary be joined as defendant in alter ego action against parent corporation).

10

In this regard, Flintkote's reliance on Federal Mogul is misplaced. In that case, the court found that the existence of a possible indemnification claim against a debtor was not sufficient to create "related to" jurisdiction because there was no "unity of identity" between the debtor and the parties with the possible indemnification claim. In re Federal-Mogul Global, Inc., 300 F.3d 368, 384 (3d Cir. 2002). This case presents the exact type of "unity of identity" that the Third Circuit found to be lacking in Federal Mogul because the Hopkins Plaintiffs can not recover from ITCAN unless they are first able to establish a claim against Flintkote.

Indeed, Flintkote concedes that its assertion of alter ego remedies against ITCAN are based upon its authority under § 544, and it has further asserted fraudulent conveyance claims against ITCAN under § 544(b). Of course, an action under § 544(b) presents not only a federal question claim, but also a "core" bankruptcy proceeding. 28 U.S.C. § 157(b)(2)(H). Many cases hold that core proceedings are within the exclusive jurisdiction of bankruptcy courts. See, e.g., In re Gruntz, 202 F.3d 1074, 1080-81 (9th Cir. 2000) (en banc); In re PRS Insurance Group, Inc., 335 B.R. 77, 82-84 (Bankr. D. Del. 2005) (finding that bankruptcy court has exclusive jurisdiction over fraudulent transfer claims); In re Finley, 62 B.R. 361, 368 (Bankr. N.D. Ga. 1986) ("bankruptcy court . . . is given exclusive jurisdiction to hear and determine, as core proceedings, issues such as . . . determination and recovery of preferences and fraudulent conveyances"); In re Startec Global Communications Corp., 292 B.R. 246, 254 (Bankr. D. Md. 2003) ("[A]voidance is sought solely under a provision of the Bankruptcy Code and is a cause of action that may only exist within a bankruptcy case. As such this cause of action is within this court's exclusive jurisdiction.").

11

For the above-noted reasons, this Court's subject matter jurisdiction is undeniable. This is the fundamental distinguishing factor between this case and all of the cases cited by Flintkote in which the court refused the transfer or removal of the case. (See Response, p. 12.) In each of those cases the courts found jurisdiction to be lacking. In this case, the presence of jurisdiction is unassailable.

### 3.    Transfer Is Required In This Case.

Once a case, such as the Pending Action, is determined to fall within the jurisdictional grant of § 1334, the next determination is whether transfer of the case is warranted under § 157(b)(5). See Dow 86 F.3d at 495 (after finding "related to" jurisdiction, "we next address the power of the district court. . . pursuant to 28 U.S.C. § 157(b)(5)."). The focus of this analysis is whether the transfer of the case will centralize the administration of a bankruptcy case. See In re Pan Am Corporation, 16 F.3d 513, 516 (2d Cir. 1994) ("Congress enacted section 157(b)(5) to expand the district court's venue-fixing powers with an eye to centralizing adjudication of a bankruptcy case."); A.H. Robins Company, Inc. v. Piccinin, 788 F.2d 994, 1011 (4th Cir. 1986) (the purpose of § 157(b)(5) is "to centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case").

The goal of centralizing administration of the Bankruptcy Case overwhelmingly compels transfer of the Pending Action. Flintkote's alter ego claims are founded upon the allegation that Flintkote was unable to pay present and future asbestos claims in 1986 and 1987. (Amended Complaint, ¶¶ 43, 121). To prove alter ego liability under Delaware law, Flintkote will have to demonstrate not only the existence of asbestos claimants, but also that ITCAN had an intent to defraud these asbestos claimants. See Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989) (stating that

12

"fraud or something like it is required" to establish alter ego liability under Delaware law) (citations omitted); see also Pauley Petroleum, Inc. v. Continental Oil Co., 239 A.2d 629, 633 (Del. 1968) (same); Mabon, Nugent & Co. v. Texas Am. Energy Corp., 1988 WL 5492, *3 (Del. Ch. Jan. 27, 1988) (fraud is basis on which to pierce corporate veil under Delaware law).[6] Accordingly, resolution of ITCAN's alleged liability will require a determination of the nature and extent of Flintkote's asbestos liability with respect to current and future claims, as well as an analysis of what future claims were reasonably anticipated in 1986 and 1987.

These same determinations of asbestos liability will need to be made in the Bankruptcy Case. Flintkote's stated goal for the Bankruptcy Case is to form an asbestos personal injury trust pursuant to § 524(g) of the Bankruptcy Code under a confirmed plan of reorganization. (First Day Affidavit ¶ 6). For that to occur, Flintkote will be required to prove that it is likely to be subject to substantial future asbestos claims and that the actual amounts of such claims cannot be determined. 11 U.S.C. § 524(g)(2)(B)(ii). Thus, to confirm a plan containing an asbestos trust, Flintkote will need to obtain an estimation of its future asbestos liability. See, e.g., In re Eagle-Picher Industries, Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995) (describing estimation process in connection with creation of asbestos trust).

Moreover, Flintkote will also be required to show that any trust created under a plan of reorganization will be in a financial position to pay present claims and future demands that involve similar claims in substantially the same manner. 11 U.S.C. § 524(g)(2)(B)(ii)(V). Any analysis of Flintkote's financial position and ability to pay

---

[6]    For the convenience of the Court, copies of all unpublished decisions are attached hereto as Exhibit F.

future claims will undoubtedly require some evaluation of the largest asset of Flintkote's bankruptcy estate, which by Flintkote's own admission, is the Pending Action.

Thus, under Flintkote's approach, a California state court jury would estimate its liability and make a determination as to whether ITCAN should be held responsible for that liability while at the same time, the Bankruptcy Court will necessarily be considering the same issues as part of confirmation of any plan. There is simply no reason for two separate courts to hold trials on Flintkote's asbestos liability, and there is no court better suited to make a determination of the scope of a debtor's liability than the district court in which a bankruptcy case is pending. See 11 U.S.C. § 524(g)(3)(A) (stating that any plan containing a 524(g) injunction must be confirmed by the district court); see also Robins, 788 F.2d at 1012 (estimation of a debtor's liability is a "mandatory obligation" of the court handling the bankruptcy case).

Because transfer of the Pending Action will centralize the administration of the Bankruptcy Case, transfer is appropriate under § 157(b)(5).

### 4.    ITCAN Can Invoke Section 157(b)(5).

As noted above, Flintkote is unable to credibly deny (1) that the Pending Action invokes Flintkote's own personal injury tort liability, (2) that this Court has jurisdiction over the Pending Action, or (3) that transfer of the Pending Action will serve to centralize (as opposed to literally divide by nearly 3,000 miles) the administration of the Bankruptcy Case. Accordingly, Flintkote is left only with the baseless argument that ITCAN, as a nondebtor party, cannot utilize § 157(b)(5).

### a.    Section 157(b)(5) Is Not Limited To Claims Against A Debtor.

Flintkote first argues that because Flintkote is not a named defendant, ITCAN is necessarily invoking § 157(b)(5) based solely upon claims against ITCAN, a non-debtor

14

party.  (Response, p. 9).  As noted above, Flintkote's argument ignores both the form and substance of the Amended Complaint.  However, even if Flintkote's blind-to-the-truth argument were correct, § 157(b)(5) is not limited to claims asserted against a debtor.  Flintkote's arguments to the contrary have no support in either the plain language of the statute or the cases that have considered the issue.

On its face, § 157(b)(5) applies to "personal injury tort and wrongful death claims."  28 U.S.C. § 157(b)(5).  Congress could have limited the application of the statute by including the phrase "against a debtor" so that the statute would only apply to "personal injury tort and wrongful death claims against a debtor."  Congress, however, did not include this limiting language, so there is no reason for Flintkote to presume that § 157(b)(5) applies only to claims against a debtor.  See Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A. (In re Hen House Interstate, Inc.), 530 U.S. 1, 6 (2000) ("Congress says in a statute what it means and means in a statute what it says there.").

Flintkote cites no case which holds that the application of § 157(b)(5) is limited to claims against a debtor.  Instead, Flintkote concedes, as it must, that in the case of In re Dow Corning Corp., 86 F.3d 482 (6th Cir. 1996), the court expressly held that § 157(b)(5) applies to claims against non-debtors.  (Response, p. 11 n.11).  Flintkote, however, tries to limit the application of the Dow decision to cases where a non-debtor is a co-defendant with a debtor.[7]  There is nothing in the Dow decision that supports this conclusion.  Instead, the court broadly stated:

> Section 157(b)(5) should be read to allow a district court to fix venue for cases pending against nondebtor defendants which are "related to" a debtor's bankruptcy proceedings pursuant to Section 1334(b).  This approach will further the prompt, fair, and complete resolution of all claims "related to" bankruptcy proceedings, and harmonize Section

---

[7] As noted above, if properly aligned, Flintkote would be a co-defendant with ITCAN.

1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate.

In re Dow Corning Corp., 86 F.3d at 497. Thus, the court broadly held that § 157(b)(5) applied to "all claims" related to bankruptcy proceedings, and there is no indication that the Dow holding was to be limited to situations where a debtor and non-debtor are co-defendants.

Similarly, nothing in the Federal Mogul decision supports the view that § 157(b)(5) can be used only for claims against a debtor. Although the district court in Federal Mogul ultimately did deny a request for transfer under § 157(b)(5), that denial was based on the court's conclusion (a conclusion that could not be reached in this case) that the claims against the non-debtors were not related to the pending bankruptcy and, therefore, that the court did not have jurisdiction over the claims for which transfer was sought. In re Federal-Mogul Global, Inc., 300 F.3d at 372 (3d Cir. 2002).

The decision was not based on the fact that the transfer request was made by non-debtors. Indeed, if that had been the basis for the court's ruling, it would not have been necessary for the court to consider the jurisdiction question at all; the court could have simply rejected the transfer request outright on the grounds that the request was made by non-debtors. Of course, that is not what the court did. Based on the request made by non-debtors, the court entered a provisional transfer order pursuant to section 157(b)(5) so that it could consider whether subject matter jurisdiction was present. Id. at 374. Thus, the history of the Federal Mogul case actually supports the view that non-debtors may invoke the provisions of § 157(b)(5) and that the primary factor for a court to consider is whether jurisdiction exists and not whether the party seeking transfer is a non-debtor.

16

### b.    Flintkote Cannot Veto The Application Of Section 157(b)(5).

Undeterred, Flintkote argues that even if claims against a non-debtor are subject to § 157(b)(5), a non-debtor should not be able to invoke § 157(b)(5) over a debtor's objection. (Response, p. 12).  While this is obviously a convenient argument from a debtor's perspective, it is clearly wrong.  If the argument were correct, it would essentially make a debtor the ultimate arbiter of whether it is appropriate for a court to exercise its jurisdiction.  That certainly is not the rule.  At most, a debtor's consent may be a factor in an abstention analysis, but it is not determinative in the first instance of whether federal jurisdiction exists and whether a case falls within the purview of § 157(b)(5).  If that were the case, bankruptcy debtors alone would essentially hold the keys to the federal courthouse.

Indeed, in each and every one of the cases cited by Flintkote on page 12 of its Response to support its proposition that cases removed by non-debtors are regularly remanded, the determining factor was whether the court had subject matter jurisdiction. In each of the cases cited, the courts simply found that the removed actions were not related to a pending bankruptcy case and, therefore, were not subject to jurisdiction under § 1334.   None of the cases supports the proposition that a non-debtor may not remove or seek the transfer of a case where a court does have jurisdiction under § 1334.

Essentially, Flintkote takes a series of cases where courts found "related to" jurisdiction to be lacking and tries to elevate them to a general rule that a non-debtor can never invoke bankruptcy jurisdiction.   That certainly is not the rule.  Non-debtors routinely remove cases under 28 U.S.C. § 1452 when those cases fall within a court's jurisdiction pursuant to 28 U.S.C. § 1334.  See, e.g., In re Worldcom, Inc. Securities Litigation, 293 B.R. 308, 312-16 (S.D.N.Y. 2003) (case between non-debtors removed on

17

grounds that case was related to a pending bankruptcy case); <u>Hohl v. Bastian</u>, 279 B.R. 165, 176 (W.D. Pa. 2002) (same); <u>Blanton v. IMN Financial Corp.</u>, 260 B.R. 257, 263 (M.D.N.C. 2001) (same). Just as non-debtors can rely on the removal provisions of § 1452, there is no reason that they cannot also rely on transfer provisions of § 157 when a case falls within the jurisdiction of § 1334.

As noted above, this Court's subject matter jurisdiction is unquestionable. As such, there is no legitimate basis for Flintkote to contest the application of § 157(b)(5) in this case.

**B.    There Is No Basis For Abstention In This Case.**

    **1.    In The Context Of § 157(b)(5), A Court's Ability To Abstain Is Limited.**

Perhaps recognizing that the Pending Action is plainly within this Court's jurisdiction under § 1334 and falls squarely within the terms of § 157(b)(5), Flintkote devotes the vast majority of its Response to its argument that the Court should abstain from transferring the Pending Action. Flintkote goes so far as to say that the abstention analysis must be conducted in the first instance. Flintkote cites <u>Federal Mogul</u> as support for this proposition. (Response, p. 14). This is a blatant mischaracterization of the <u>Federal Mogul</u> decision. In that case, the court first conducted an analysis of whether the claims were within its subject matter jurisdiction and only conducted an abstention analysis as an alternative basis for its decision with respect to a portion of the claims. <u>In re Federal Mogul</u>, 282 B.R. 301, 313 (Bankr. D. Del. 2002) ("[T]he Court has acknowledged that subject matter jurisdiction is at least a closer question with respect to Chrysler. To remove any doubt, therefore, . . . the Court also finds as an alternative, independent ground that it would exercise its discretion to abstain . . . .").

18

Moreover, the determination that a case falls within the purview of § 157(b)(5) must be made prior to any abstention analysis because, in the context of § 157(b)(5), a court's ability to abstain is limited. In Pan Am, the court recognized that § 157(b)(5) provides that the district court "shall order" whether a case should be tried in the district where the bankruptcy case is pending or in the district where the claim arose. In re Pan Am Corporation, 950 F.2d 839, 844 (2d Cir. 1991). Based on the mandatory "shall order" language, the court noted that even though courts had considered an abstention analysis in the context of § 157(b)(5), "the district court, if it elects to abstain . . . may be contravening the legislative history." Id. at 845. The court concluded that "Congress has indicated that courts should not be too quick to abstain from exercising their transfer power under 28 U.S.C. § 157(b)(5). Transfer should be the rule, abstention the exception." Id. (emphasis added).

Thus, prior to considering whether abstention is appropriate, a court must first determine whether § 157(b)(5) is applicable so that it can conduct its abstention analysis with the recognition that in the context of § 157(b)(5) abstention should be the rare exception. In this case, however, the criteria for abstention are not met under any standard. ITCAN addresses below each of the factors discussed by Flintkote.

**2.    Every Factor Cited By Flintkote Mandates Transfer Not Abstention.**

      **a.    The Pending Action Will Have A Substantial Impact On The Bankruptcy Case.**

In support of its abstention request, Flintkote first argues that the Pending Action will have no effect on the efficient administration of the estate. (Response, p. 16). Flintkote simply loses all credibility with this argument. Flintkote itself has stated that the Pending Action "represents potentially the largest group of assets" of its bankruptcy

19

estate.[8]  The Bankruptcy Court has also recognized that the Pending Action "is the

significant piece of [Flintkote's] estate."  (May Hearing Transcript, p. 11).  This

prompted the Bankruptcy Court to question why the Pending Action and the Bankruptcy

Case are not pending in the same venue.  Id. at p. 10 ("Why the heck is the [Bankruptcy

Case] pending in the District of Delaware if all of the relevant litigation is going to take

place in California . . .").

     In essence, Flintkote is asking this Court to ignore what Flintkote is seeking to

obtain in the Pending Action:  a judgment that ITCAN, a solvent entity, is financially

responsible for all of Flintkote's asbestos liability.  As such, the outcome of the Pending

Action will literally define and determine the substantive outcome of the Bankruptcy

Case.  How can Flintkote even suggest that the Pending Action will have no impact on

the administration of its estate?  See In re Mobile Tool International, Inc., 320 B.R. 552,

558 (Bankr. D. Del. 2005) (denying motion to abstain and finding that adversary

proceedings were not remote from the underlying bankruptcy case because "[t]hey

involve potential liabilities of the Estate, the very essence of a bankruptcy case.").

     In addition, as noted above, the issues raised by the Pending Action are the exact

same issues that will necessarily have to be decided as part of the Bankruptcy Case.  (See

supra pp. 12-14).  Thus, for all of these reasons, the Pending Action is not merely related

to the Bankruptcy Case, in effect, it is the Bankruptcy Case.

### b.    State Law Issues Do Not Predominate.

Flintkote's second argument in favor of abstention is its contention that the

Pending Action is purely a state law action.  The claims asserted by Flintkote, however,

---

[8] See *Debtors' Motion to Shorten Notice Periods With Respect to Certain Pleadings Filed in Connection with the Dividend Recovery Litigation*, filed in the Bankruptcy Case (Bankruptcy Docket No. 1435) on April 5, 2006, a copy of which is attached to  ITCAN's Brief in Support of Emergency Petition (D.I. 3) as Exhibit D, at page 2.

are federal question claims.  Flintkote concedes that it is bringing claims against ITCAN based on the authority provided by 11 U.S.C. § 544.  (Response, p. 17).  Numerous cases state that an action brought pursuant to 11 U.S.C. § 544 is within a district court's federal question jurisdiction.  See, e.g., In re Best Products Co., Inc., 168 B.R. 35, 51 (S.D.N.Y. 1994) ("the court possesses federal question jurisdiction over any claim based on § 544(b) of the Bankruptcy Code"); In re Biglari Import & Export, Inc., 142 B.R. 777, 783 n. 10 (Bankr. W.D. Tex. 1992) (noting that claims brought under § 544 of the bankruptcy code were federal question claims that could be removed pursuant to § 1441); In re Finley, 286 B.R 163, 170 (Bankr. W.D. Wash. 1992) ("The rights of a trustee under 11 U.S.C. § 544(a) is [sic] a federal question . . . ."); In re Rosenfield, 62 B.R. 515, 519 (Bankr. N.D. Tex. 1986) ("The status of the trustee under § 544 [of the Bankruptcy Code] and the attendant powers flowing from that status constitute federal questions").

The fact that an action under 11 U.S.C. § 544 incorporates some aspect of state law is not enough to defeat federal question jurisdiction.  See Rahl v. Bande, 316 B.R. 127, 136-137 (S.D.N.Y. 2004) (finding that action under § 544(b)(1) raised a federal question because "[t]he mere fact that federal law incorporates state law does not defeat federal question jurisdiction. . . .") (citing 13B WRIGHT, MILLER & COOPER, FEDERAL PRACTICE & PROCEDURE, CIV. 2D § 3563 at 56-57 (1984)); Bliss Technologies, Inc., 307 B.R. 598, 604 (Bankr. E.D. Mich. 2004) ("it is federal bankruptcy law that gives rise to and defines this cause of action for the trustee, and state law only supplements the power granted by federal bankruptcy law").

In addition, with respect to the claims brought by the Hopkins Plaintiffs, there is the threshold issue of whether the Hopkins Plaintiffs even have standing to pursue their

alter ego claims or whether Flintkote is the sole entity with standing to pursue alter ego

claims pursuant to 11 U.S.C. §544.   In re Folks, 211 B.R. 378, 387 (9th Cir. B.A.P.

1997) (if a claim is for generalized harm to all creditors of the debtor, the trustee is the

appropriate party to bring it); PHP Liquidating, LLC v. Robbins, 291 B.R. 592, 599 (D.

Del. 2005) ("Section 544(b) of the Bankruptcy Code grants only trustees or debtors-in-

possession standing to pursue general claims held by the debtor's creditors"); Rosener v.

Majestic Mgmt. (In re OODC, LLC), 321 B.R. 128, 136 (D. Del. 2005) ("most other

courts have found that the trustee in bankruptcy has standing to bring successor liability

(or alter ego) suits on behalf of all creditors").

This threshold issue is one of federal, not state, law.   See Koch Refining v.

Farmers Union Central Exchange, 831 F.2d 1339, 1343 (7th Cir. 1987) (finding that only

bankruptcy trustee had standing to assert alter ego claims and noting that whether such

claims were property of the estate is a federal question under § 541 of the Bankruptcy

Code); In re Icarus Holdings, LLC, 290 B.R. 171, 175 (Bankr. M.D. Ga. 2002) (whether

or not alter ego claims were property of bankruptcy estate is a federal question); NBD

Bank, N.A. v. Fletcher, 176 B.R. 445, 454 (Bankr. W.D. Mich. 1995) (refusing to remand

*alter ego* claims brought by creditor because creditor had no standing).

Finally, the Pending Action brings into issue the federal common law of foreign

relations.  See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425 (1964) (finding

that federal question jurisdiction encompasses questions of federal common law,

including questions of international law and international relations).  Here, the question

of whether to allow Flintkote's claims to proceed in the United States turns on the effect

to be given to a Canadian statute establishing Quebec as the exclusive jurisdiction for the

claims at issue in this case, a question that itself raises a federal question.  Under Canadian law, Quebec has "exclusive jurisdiction" over any action involving civil liability for "damage suffered in or outside Quebec as a result of exposure to or the use of raw materials, whether processed or not, originating in Quebec."  See C.C.Q., Arts. 3129, 3151.  A foreign judgment obtained in contravention of Quebec's exclusive jurisdiction will not be recognized or enforced by Canadian courts.  See Worthington v. Atlas Turner, Inc., 2004 A.C.W.S.J. 15980, 2004 A.C.W.S.J. Lexis 8287 (2004) (refusing to recognize or enforce a judgment entered in New York against a Quebec manufacturer of asbestos)[9]; see also, C.C.Q., Arts. 3155(1), 3164, 3165(1).  Allowing Flintkote's claims to proceed in the United States would be an implicit determination that the Canadian statute at issue is invalid.   Thus, the application of the federal common law of foreign relations will necessarily be required to resolve the Pending Action.

Given the above-noted issues, Flintkote is simply wrong in its assertion that state law issues will predominate in the Pending Action, and this factor does not weigh in favor of abstention.

### c.    The Law Of Delaware Applies To The Principal State Law Claim Asserted By Flintkote.

Flintkote's third argument in support of its abstention request is that the Pending Action involves numerous issues of state law.  (Response, p. 19).  ITCAN does not dispute that the Pending Action, in some respects, will turn on issues of state law.  The principal state law questions, however, will be questions of Delaware law.  Flintkote's ultimate goal is to have ITCAN held responsible, as the purported alter ego of Flintkote, for all of Flintkote's asbestos liabilities.  Flintkote is a Delaware corporation.  Under the

---

[9] Worthington is published in French, but an English language summary is available on Lexis.

doctrine that the internal affairs of a corporation are governed by the laws of the state of incorporation, the alter ego claims will be governed by Delaware law.  See, e.g., Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (Delaware law applies to alter ego claims related to Delaware corporation); Kalb, Voorhis & Co. v. American Financial Corp., 8 F.3d 130, 132 (2d Cir. 1993) (applying internal affairs doctrine to find that alter ego claims governed by law of state of incorporation); Sunnyside Development Co., LLC v. Opsys Ltd., 2005 WL 1876106, *3 (N.D. Cal. Aug 08, 2005) (law of the jurisdiction of incorporation should control alter ego claim).

The result is no different even if California choice of law principles apply as argued by Flintkote.  Flintkote argues that California follows a "governmental interest analysis" on choice of law questions and that there is no basis for a court to conclude that any government other than California has an interest in the Pending Action.  Flintkote ignores, however, the fact that the internal affairs doctrine is an integral part of the governmental interest analysis conducted by California courts.  See, e.g., State Farm Mutual Automobile Ins. Co. v. Superior Court, 114 Cal. App. 4th 434, 443, 444 (Cal. 2d Dist. Ct. App. 2003) (applying Delaware law to lawsuit regarding the issuance of dividends because "[u]nder the prevailing conflicts practice, [courts] have consistently applied the law of the state of incorporation to the entire gamut of internal corporate affairs.") (quoting McDermott, Inc. v. Lewis, 531 A.2d 206, 215-216 (Del. 1987)).  Indeed, at least one California court has recognized that the internal affairs doctrine is more than a mere choice of law principle because it is mandated by constitutional principles.  See Grosset v. Wenaas, 35 Cal. Rptr.3d 58, 66 (Cal. 4th Dist. Ct. App. 2005) (relying on Edgar v. MITE Corp, 457 U.S. 624 (1987), to hold that under the commerce

24

clause a state has no interest in regulating the internal affairs of foreign corporations and, therefore, application of the internal affairs doctrine is mandated by constitutional principles).[10]

Thus, the fact that state law issues may apply is no reason to deny transfer when to do so would result in a California court deciding issues of Delaware law. See, e.g., MacLeod v. Dalkon Shield Claimants Trust, 967 F. Supp. 856, 859 (D. Md. 1997) (denying remand because "state court [was] not called upon to apply its own law to a state law claim").

Moreover, Flintkote's argument that California is the state with the greatest "government interest" is fundamentally incorrect. This is not a case involving a California corporation that conducted business exclusively in California. Flintkote is a Delaware corporation that conducted operations throughout the United States from the early 1900s through 1987. (Tombari Declaration, ¶ 2). Flintkote had its office in California for only the last three years of that period. Id. ¶ 15. Even during that brief period, Flintkote continued operations nationwide. Id. ¶ 16. Thus, Flintkote's insistence that this is a "California case" is based primarily on the fact that Flintkote happened to move its corporate offices to California during the tail-end of its active business operations.

Since 1987, Flintkote's sole purpose has been to resolve its asbestos liabilities. Flintkote contends that the pending asbestos claims are "factually interwoven" with the

---

[10] Grossett is on appeal, but the issue there is not whether California follows the internal affairs doctrine, but "whether or not the internal affairs doctrine should be expanded." See Grosset v. Wenaas, 2005 WL 3747917 at *15 (Petition for Review filed in California Supreme Court Case No. S139285, November 29, 2005).

claims asserted in the Pending Action.[11]  The allegations in the Pending Action will

therefore necessarily involve some determination with respect to the pending asbestos

claims which, given the nature of Flintkote's prior nationwide operations, include claims

asserted by thousands upon thousands of non-California residents.  Indeed, an analysis of

the pending prepetition asbestos personal injury claims against Flintkote reveals that little

more than a meager two percent (specifically 2.14%) of such claims were pending in

California.  (Maloney Declaration, ¶ 11).  Thus, according to this data, the impact of a

resolution of the Pending Action will be felt primarily outside the borders of California.

Because Delaware, and not California law, will apply to the primary claims

asserted by Flintkote, this factor weighs in favor of transfer, not abstention.

        **d.**      **There Is A Related Proceeding Already Pending.  That Related Proceeding Is The Bankruptcy Case.**

Flintkote next argues that transfer is inappropriate because there is a related

proceeding already pending in California.  The heart of this argument is Flintkote's

blatant mischaracterization of the proceedings before the Bankruptcy Court regarding the

Joint Prosecution Motion.  Flintkote states that its choice to file the Pending Action in

California was made known to the Bankruptcy Court and then cites a case for the

proposition that a bankruptcy court's permission to prosecute a claim in state court is

sufficient grounds for remand.  (Response, p. 20).

It is true, of course, that the Bankruptcy Court is aware that the Pending Action

was filed in California.  Flintkote's implication that the Bankruptcy Court approved that

procedure, however, is completely false.  Flintkote never sought or obtained court

authority to file the Pending Action in California state court.  The issue was simply never

---

[11] See *Application for Designation of Complex Litigation*, filed in the California Superior Court, Case No. CGC06450944 (April 14, 2006), attached as Exhibit E to ITCAN's Brief in Support of Emergency Petition (D.I. 3).

before the Bankruptcy Court. If anything, the Bankruptcy Court's unsolicited comments regarding Flintkote's chosen forum for the Pending Action simply show the court's confusion as to why the Pending Action and the Bankruptcy Case were not filed in the same forum. (May Hearing Transcript, p. 10-11).

After mischaracterizing the proceedings before the Bankruptcy Court, Flintkote simply rehashes its argument that the Pending Action should proceed in California based on its contention that all facts of the Pending Action are centered in California. As discussed above, however, this contention is incorrect.

Moreover, this case does not present a situation where a party would be prejudiced by the removal of a pending state court action that is on the brink of trial. See Shubert v. Roche Holding AG, 157 F. Supp. 2d 542, 547 (E.D. Penn. 2001) (comity not important factor if case has not spent much time in state court); H.J. Rowe Inc. v. Sea Products, Inc., 221 B.R. 214, 221 (Bankr. N.D. Ill 1998) (refusing to remand where the proceedings in the state court were "not sufficiently advanced such that concerns for comity and waste of judicial resources are implicated."). Here, there has been no activity by the state court. No state court judgments will be impaired, nor will judicial resources be wasted by a federal court's hearing this case. See Regal Row Fina, Inc., v. Washington Mutual Bank, 2004 WL 2826817, at *10 (N.D. Tex Dec. 9, 2004) (where case will affect bankruptcy proceedings and minimal activity in the state court eliminates danger that federal court will impair any state judgments, comity does not favor remand).

Similarly, no party will be prejudiced because witnesses will likely be located all over the country. Indeed, it appears that many key witnesses are actually located much closer to Delaware than California.[12]

Finally, Flintkote's reliance on the fact that its chosen counsel reside in California is equally irrelevant. The convenience of counsel is not a proper factor for a court to consider on a motion to transfer. See Solomon v. Continental American Life Ins. Co., 472 F.2d 1043, 1047 (3d Cir. 1973); Tracy v. Consolidated R. Corp., 723 F. Supp. 1051, 1053 (D. Del. 1989); Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc., 707 F. Supp. 1429, 1437 n. 7 (D. Del. 1989). Thus, the fact that Flintkote chose to employ counsel in California has no bearing on whether this case should be transferred under § 157(b)(5).

In sum, the arguments made by Flintkote for the proposition that transfer is inappropriate because there is a related proceeding already pending in California are all without merit. To the extent the existence of a related proceeding is relevant to the analysis, it weighs in favor of transfer. Under § 157(b)(5), the related proceeding the Court should focus on is the Bankruptcy Case because the primary consideration in an analysis under § 157(b)(5) is whether the transfer of a case will centralize the administration of a bankruptcy case. See A.H. Robins Company, Inc. v. Piccinin, 788 F.2d 994, 1011 (4th Cir. 1986). In this case, that goal will obviously be furthered by transferring the Pending Action to Delaware.

---

[12] See *Defendant Sullivan & Cromwell LLP's Notice of Joinder and Joinder in Defendant Imperial Tobacco Canada Limited's Motion to (i) Stay Consideration of Transfer and Remand Issues or (ii) Transfer This Action to the United States District Court for the District of Delaware,* a copy of which is attached hereto as Exhibit C, at pp. 2-3.

### e. There Is A Jurisdictional Basis Other Than Section 1334.

Flintkote contends that the Court should abstain because the personal injury claims asserted by the Hopkins Plaintiffs are based entirely on state law. (Remand Motion, p. 21). Notably, Flintkote omits any discussion of the jurisdictional basis for its own claims in this section. As discussed in detail above, this Court has federal question jurisdiction over the claims asserted by Flintkote under § 1331, see, e.g., Rahl v. Bande, 316 B.R. 127, 136-137 (S.D.N.Y. 2004), and the claims asserted by Flintkote are actually within this Court's exclusive jurisdiction. In re Finley, 62 B.R. 361, 368 (Bankr. N.D. Ga. 1986).

In any event, even focusing solely on the claims brought by the Hopkins Plaintiffs, it is easy to see that resolution of these claims raise questions of federal law. Contrary to Flintkote's portrayal, this is not a straightforward personal injury suit brought by the Hopkins Plaintiffs against ITCAN. Instead, the Hopkins Plaintiffs seek to hold ITCAN responsible as the alter ego of Flintkote. Thus, as discussed above, a threshold issue that must be resolved is whether the Hopkins Plaintiffs even have standing to pursue their alter ego claims or if Flintkote, as a debtor-in-possession, is the only party with the standing to assert these claims.

Accordingly, Flintkote's contention that the sole jurisdictional basis for the Pending Action is § 1334 is incorrect, and abstention is not appropriate for this reason.

### f. The State Court Action Is Significantly Related To The Bankruptcy Case.

The next factor addressed by Flintkote is essentially the same as the first factor -- whether or not the Pending Action is significantly related to the Bankruptcy Case and will, therefore, effect the efficient administration of the Bankruptcy Case. In an attempt to shift the focus away from the indisputable fact that the Pending Action is inherently

intertwined with the Bankruptcy Case, Flintkote tries to argue that ITCAN has no standing to argue the point. (Response, p. 23). Flintkote cites no authority for this bizarre proposition. It is simply contrary to all principles of due process for Flintkote to be able to sue ITCAN and then argue that ITCAN is without standing to dispute abstention factors raised by Flintkote. Flintkote's attempt to shift the focus away from the relevant question, therefore, should be rejected.

The relevant question is whether the Pending Action is significantly related to the Bankruptcy Case. It unquestionably is. By Flintkote's own admission, it represents the largest asset of the Bankruptcy Case, and it raises issues that necessarily must be addressed as part of the plan confirmation process.

Rather than address the substantive issues that will have to be addressed to confirm a plan containing an asbestos personal injury trust under § 524(g) of the Bankruptcy Code, Flintkote simply states, in conclusory fashion, that the pendency of the Pending Action is not necessary to plan development. This conclusory statement, however, does not address the real issue. The issue is not whether the pendency of the Pending Action is necessary to plan development. The issue is whether the Pending Action, once filed, will have a significant impact on the Bankruptcy Case. It certainly will, for, as discussed in detail above, it raises the exact same issues that must be resolved for any plan containing an asbestos personal injury trust under § 524(g) of the Bankruptcy Code to be confirmed.

The conclusory statements contained in the Declaration of David J. Gordon similarly fail to squarely address the issue. (Gordon Declaration, ¶ 6). Notably, Mr. Gordon only states that the Pending Action will not affect Flintkote's "ability to propose"

30

a plan or plans of reorganization.  (Gordon Declaration, ¶ 6).   Again, Flintkote's ability

to propose a plan of reorganization is not at issue.  The issue is whether the Pending

Action will impact any plan that may be filed.  Mr. Gordon never addresses that issue,

and, as discussed above, any contention that the Pending Action will not have an impact

on a plan of reorganization simply would not be credible.

Thus, as with the other factors, this factor weighs in favor of transfer, not

abstention.

### g.    The Pending Action Is Not Determined Exclusively By State Law.

In its discussion of the seventh abstention factor, Flintkote cites the case of

Astropower Liquidating Trust, 335 B.R. 309 (Bankr. D. Del. 2005) for the proposition

that the court should consider the substance rather than the form of an asserted core

proceeding.  A review of this case, however, reveals that it is not helpful to Flintkote's

cause because the court refused to abstain from hearing a fraudulent conveyance claim

asserted under § 544 of the Bankruptcy Code.  Id. at 331.  Likewise, there is no basis in

this case for the Court to abstain from considering the avoidance actions asserted by

Flintkote under § 544.

Moreover, as discussed extensively above, the Pending Action raises federal

issues regarding whether the Hopkins Plaintiffs even have standing to pursue their alter

ego claims and regarding the application of Canadian law.   In any event, as discussed in

detail above, to the extent state law issues apply, it will be the law of Delaware, and not

California, that primarily will be at issue.  Thus, this factor further weighs in favor of

transfer to Delaware.

31

1398202/1

h.    **Potential Severance Of Claims Is Not At Issue.**

Flintkote's argument with respect to severance of claims is apparently based on its

presumption that ITCAN is only seeking to transfer the claims asserted by the Hopkins

Plaintiffs and is not seeking also to transfer the claims asserted by Flintkote. (Response,

p. 24) (arguing that severing the alter ego claims of Flintkote from the alter ego claims of

the Hopkins Plaintiffs would be inappropriate). ITCAN, however, is seeking the transfer

of the entire Pending Action, not just the claims asserted by the Hopkins Plaintiffs.

Flintkote's asbestos liability underlies the alter ego actions asserted by both Flintkote and

the Hopkins Plaintiffs. Indeed, Flintkote itself has contended that the pending asbestos

claims are "factually interwoven" with the claims asserted in the Pending Action.[13]

Flintkote will not be able to prevail on its alter ego and fraudulent conveyance claims

without a determination of the amount of its underlying asbestos liability.

Thus, ITCAN agrees that the claims asserted against it by the Hopkins Plaintiffs

should not be severed from the alter ego claims asserted by Flintkote. Both sets of claims

fall within the purview of § 157(b)(5), and they should both be transferred to Delaware.

Potential severance of claims is simply a non-issue in this case.

i.    **The Pending Action Is Not An Unnecessary Burden On This Court's Docket.**

Flintkote argues that the Pending Action will be an unnecessary burden on this

Court. To the extent Flintkote is concerned about judicial economy, it is hard to imagine

a more inefficient procedure than having a California state court adjudicate issues that

will necessarily have to be resolved as part of the Bankruptcy Case. Under § 524(g) of

the Bankruptcy Code, this Court is the court that will be considering issues regarding the

---

[13] See *Application for Designation of Complex Litigation*, filed in the California Superior Court, Case No. CGC06450944 (April 14, 2006), attached as Exhibit E to ITCAN's Brief in Support of Emergency Petition (D.I. 3).

32

confirmation of a plan.  11 U.S.C. § 524(g)(3)(A) (stating that any plan containing a 524(g) injunction must be confirmed by the district court).  Thus, regardless of whether this Court abstains from transferring the Pending Action, the Court will still have to resolve issues regarding Flintkote's asbestos liabilities -- the exact same issues raised by the Pending Action.  Accordingly, principles of judicial economy support a transfer of the Pending Action to this Court rather than having identical issues pending in both Delaware and California.

> **j.     Flintkote's Forum Shopping Should Not Be Condoned.**

In its Response, Flintkote accuses ITCAN of forum shopping.  Certainly, it is true that ITCAN believes the Pending Action should proceed in Delaware rather than California.  This belief, however, is simply driven by ITCAN's legitimate interest in wanting to avoid the possibility of being required to litigate relevant issues in multiple venues.  ITCAN has no ulterior motive.  ITCAN's legitimate goal of seeking to avoid inconsistent rulings is itself reason enough to deny Flintkote's abstention request.  See In re Mobile Tool International, 320 B.R. 552, 557 (Bankr. D. Del. 2005) (declining to abstain because abstention would lead to possibility of multiple or inconsistent judgments).

Flintkote's own actions confirm ITCAN's concern about having to litigate issues in two distant venues.  Flintkote originally sought to have the Bankruptcy Court prejudge issues regarding the standing of the Hopkins Plaintiffs instead of letting the court presiding over the Pending Action make that decision.  While seeking that relief, Flintkote also argued that ITCAN had no standing to argue the issue in the Bankruptcy Court.  Thus, Flintkote essentially tried to preclude ITCAN from ever having a reasonable opportunity to raise this fundamental standing issue.  Now, after the

33

Bankruptcy Court denied Flintkote's request to vest standing in the Hopkins Plaintiffs, Flintkote wrongly implies that the Bankruptcy Court approved the filing of the Pending Action in California.

These actions make clear that Flintkote's decision to file the Pending Action in California was motivated, in large part, by the desire to "whipsaw" ITCAN by (a) obtaining rulings from the Bankruptcy Court (while asserting that ITCAN lacks standing to raise objections to relief) that are critical to the process of the Pending Action and (b) mischaracterizing those rulings, preferably in a state court with no familiarity or concern for the Bankruptcy Case. This type of gamesmanship should not be condoned.

Put simply, Flintkote chose its forum two years ago when it filed the Bankruptcy Case in Delaware. The fact that it seeks an improper litigation advantage by forcing ITCAN to protect itself in two distant venues undercuts Flintkote's claim that its choice of forum for the Pending Action should be given any deference. See At Home Corp. v. Cox Communications, Inc., 2003 U.S. Dist. LEXIS 18320, Case No. 02-1486 (JJF) (D. Del. Oct. 8, 2003) (transferring case when facts lead to the conclusion that the plaintiff was forum shopping).

### k.     The Right To Jury Trial Does Not Favor Abstention.

Flintkote contends that its right to a jury trial also requires that the case be remanded. (Response, p. 28). As an initial matter, however, it is not at all clear that Flintkote is even entitled to a jury trial under either Delaware or California law. See Towe Antique Ford Found. v. IRS, 999 F.2d 1387 (9th Cir. 1993) (denied a jury trial in a veil-piercing case; noted that veil-piercing is an equitable remedy); United States v. Golden Acres, 684 F. Supp. 96, 103 (D. Del. 1998) (under Delaware law it was absolutely clear that alter ego was an equitable remedy for which there is no right to jury

34

trial); <u>Dow Jones Co. v. Avenel</u>, 151 Cal. App. 3d 144, 147-48 (1984) (it is "well-settled"

that alter ego is an equitable remedy and jury trials may not be demanded as of right in

equitable matters).  Regardless, this Court is perfectly capable of conducting a jury trial

to the extent one is necessary, so this factor carries no weight in the abstention analysis.

<u>J.T. Thorpe Co. v. Am. Motorists</u>, 2003 U.S. Dist. LEXIS 26016, at *25 (S.D. Tex. 2003)

(when parties have access to jury trial in both forums, the jury trial factor carries no

weight in an equitable remand analysis).

        **l.**      **The Presence Of Non-Debtor Parties Does Not Support Abstention.**

       Flintkote tries to rely on the presence of the Hopkins Plaintiffs and Plant, two

California residents, to support its abstention request.  There is no reason, however, that

the location of a single alleged creditor and an unrelated third party should be a factor at

all in the analysis of whether claims that go to the very heart of the Bankruptcy Case

should be heard in any district other than where the Bankruptcy Case is pending.  In other

words, to the extent this factor is at all relevant in the analysis, it is completely

overwhelmed by the inherent interrelation between the Pending Action and the

Bankruptcy Case.

        **m.**     **The Use Of § 157(b)(5) In This Case Is Consistent With The Intent Of The Statute.**

       Flintkote's final argument in support of its abstention request is its claim that the

court should abstain because § 157(b)(5) is intended solely for the benefit of the debtor.

(Response, p. 29).  As discussed above, however, there is nothing to support this view,

and transfer in this case will further the goals of § 157(b)(5).  See <u>A.H. Robins Company,</u>

<u>Inc. v. Piccinin</u>, 788 F.2d 994, 1011 (4th Cir. 1986) (the purpose of § 157(b)(5) is "to

centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case").

## C.    ITCAN Is Not Seeking Transfer For An Improper Purpose.

In an attempt to portray ITCAN's transfer request in a bad light, Flintkote contends that ITCAN is seeking transfer solely to avoid a personal jurisdiction fight that it would otherwise lose in California state court. (Response, pp. 29-31). This is incorrect. First, ITCAN disagrees with Flintkote's interpretation of Roy v. Superior Court, 127 Cal.App.4th 337, 345 (2005). In that case, a defendant waited until the eve of trial to challenge personal jurisdiction. That is not the case here. ITCAN properly preserved its right to challenge personal jurisdiction in any court, and because Flintkote features the issue so prominently in its Response, it is clear that there is no risk of Flintkote being caught off-guard by a personal jurisdiction challenge as was the case in Roy.

The issue of whether Flintkote's interpretation of Roy is correct, however, is not before the Court at this time. If the Pending Action is transferred, however, any personal jurisdiction issues will be resolved as if the case had never been transferred. See, e.g., Davis v. Costa-Gavras, 580 F. Supp. 1082, 1086-87 (S.D.N.Y. 1984) ("When a transferor court has not ruled on the propriety of venue or jurisdiction, the transferee court must determine whether venue and jurisdiction would have been proper in the transferor court in order to decide which forum state's law will apply.").

In other words, ITCAN gains no advantage with respect to the personal jurisdiction issue if its transfer request is granted. ITCAN has no ulterior motive by seeking a transfer of the Pending Action. Its sole aim is to litigate all relevant issues in a single forum rather than two distant venues on opposite ends of the country.

36

**D.    The Claims Asserted By The Hopkins Plaintiffs And Flintkote May Be Transferred Under § 157(b)(5).**

Separate and apart from its abstention analysis, Flintkote contends that § 157(b)(5) provides only for the transfer of claims rather than an entire cause of action. (Response, p. 35).  Thus, Flintkote questions whether there is a basis for the Court to transfer the entire Pending Action under § 157(b)(5).  Notably absent from Flintkote's Response, however, is any objection to the transfer of the entire Pending Action if the Court determines that the Pending Action asserts claims within the scope of § 157(b)(5). In any event, as discussed above, all of the claims asserted against ITCAN by Flintkote and the Hopkins Plaintiffs fall within the scope of § 157(b)(5) because they are all grounded in Flintkote's asbestos personal injury tort liability.  Thus, even if the Court were inclined to transfer only a portion of the claims asserted in the Pending Action, that transfer would still include all of the claims pending against ITCAN.

The fact that the Hopkins Plaintiffs may have to litigate against Plant and Uniroyal separately in California is no reason to deny transfer.  Plant and Uniroyal are nothing more than sham defendants who were named in the Pending Action for one reason – to provide a pretext for keeping this action in state court in California.  There are no specific factual allegations against Plant or Uniroyal in the Amended Complaint. (Amended Complaint, ¶¶ 11-45).

If more were needed, the Court has only to look at the docket sheet in California.[14]  Either (1) the plaintiffs have not bothered to serve, or promptly serve, Plant and/or Uniroyal or, (2) if they have been served, Plant and Uniroyal have failed to answer

---

[14] A copy of the federal and state court docket in California is attached hereto as Exhibit D.

the Amended Complaint. If still more were needed, counsel for Uniroyal has admitted that it has an agreement with plaintiffs' counsel not to defend asbestos actions.[15]

Apart from the complete absence of any specific factual allegations against either Plant or Uniroyal in the Amended Complaint, the Hopkins Plaintiffs previously sued over 100 defendants in San Francisco Superior Court in 2002 for asbestos related claims. See Norman Hopkins et al. v. Asbestos Defendants, San Francisco Superior Court, Case No. 02-408556. There is no indication from this case that the Hopkins Plaintiffs actively pursued claims against Plant or Uniroyal in this prior litigation. As such, it is improper for the Hopkins Plaintiffs to suggest that their purported claims are somehow now significant to them, in this separately-filed Pending Action.

Even if the Hopkins Plaintiffs do have a valid claim against Plant or Uniroyal, that would not be a sufficient basis to deny transfer when other claims asserted in the Pending Action undoubtedly do fall within the scope of § 157(b)(5). The purpose of § 157(b)(5) is to centralize proceedings related to a bankruptcy case. Transfer is the rule, abstention the exception. Pan Am, 950 F.2d at 844. Thus, the convenience of one alleged creditor is simply irrelevant to the analysis.

**E.    There Is No Basis For Mandatory Abstention.**

Flintkote's final argument is a half-hearted suggestion that the mandatory abstention provisions of 28 U.S.C. § 1334(c) apply to the Hopkins Plaintiffs' claims. (Response, p. 36). This argument is easily refuted. Mandatory abstention does not apply to claims for the liquidation or estimation of personal injury tort claims against a debtor's bankruptcy estate. 28 U.S.C. § 157(b)(4). In this case, as discussed above, the Hopkins

---

[15] See *Declaration of Rohit Singla* filed in California District Court, attached hereto as Exhibit E., at ¶ 2.

Plaintiffs' claims are, in fact, claims against Flintkote's estate. The fact that Flintkote was not named as a defendant does not change this result. See, e.g., Freeman v. Northwest Acceptance Corp., 754 F.2d 553, 559 (5th Cir. 1985) (requiring under Rule 19(a) that subsidiary be joined as defendant in alter ego action against parent corporation).

## IV.
## Conclusion

This Court has jurisdiction over the Pending Action, and transfer of the Pending Action will further the purposes of § 157(b)(5) by centralizing proceedings related to the Bankruptcy Case. The factors discussed by Flintkote do not support its abstention request but instead show the need to transfer the Pending Action from California.

Accordingly, ITCAN respectfully requests that the Court enter an order pursuant to 28 U.S.C. § 157(b)(5) to transfer the Pending Action to this Court and grant such further relief as the Court deems appropriate.

1398202/1

This 31st day of May, 2006.

Respectfully submitted,

MORRIS, JAMES, HITCHENS &
WILLIAMS LLP

Stephen M. Miller (#2610)
Brett D. Fallon (#2480)
222 Delaware Avenue, 10th Floor
Post Office Box 2306
Wilmington, Delaware 19899-2306
Telephone: (302) 888-6800
Telecopier: (302) 571-1750
E-mail: smiller@morrisjames.com
Email: bfallon@morrisjames.com

and

KING & SPALDING LLP
L. Joseph Loveland
James A. Pardo, Jr.
Mark M. Maloney
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: 404-572-4600
Fax: 404-572-5141
jloveland@kslaw.com
jpardo@kslaw.com
mmaloney@kslaw.com

Attorneys for Defendant Imperial Tobacco
Canada Limited

40

1398202/1

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARLENE HOPKINS, Individually, as<br>Wrongful Death Heir, and as Successor-in-<br>Interest to NORMAN HOPKINS, JR.,<br>Deceased; and MICHELLE HOPKINS, and<br>MICHAEL HOPKINS, as Legal Heirs of<br>NORMAN HOPKINS, Deceased, THE<br>FLINTKOTE COMPANY, THE OFFICIAL<br>COMMITTEE OF THE ASBESTOS<br>PERSONAL INJURY CLAIMANTS, and<br>JAMES J. MCMONAGLE as the LEGAL<br>REPRESENTATIVE FOR FUTURE<br>ASBESTOS PERSONAL INJURY<br>CLAIMANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
|             Plaintiffs, | )   Civil Action No. 1:06-CV-00298<br>)   (JJF) |
|    vs. | )<br>) |
| PLANT INSULATION COMPANY;<br>UNIROYAL HOLDING, INC.; IMPERIAL<br>TOBACCO CANADA LIMITED;<br>SULLIVAN & CROMWELL LLP; and<br>DOES 1 through 100, | )<br>)<br>)<br>)<br>) |
|             Defendants. | )<br>) |

**DECLARATION OF MARIO TOMBARI IN SUPPORT OF
IMPERIAL TOBACCO CANADA LIMITED'S RESPONSE
TO DEBTOR'S OPPOSITION TO EMERGENCY PETITION FOR AN
ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)**

I, Mario Tombari, declare and state as follows:

1.    I am the Director of Corporate Income Tax for Imperial Tobacco Canada

Limited ("ITCAN"). The facts stated in this declaration are true to the best of my

knowledge, information and belief based on my review of certain corporate records of

ITCAN and its present and former direct and indirect subsidiaries, including The

Flintkote Company ("Flintkote").

2.     From its inception in the early 1900s until 1987, Flintkote was engaged in the manufacture, processing and distribution of building materials.

3.     Beginning in the early 1930s, Flintkote's corporate offices were located in New York.

4.     In 1976, Flintkote relocated its corporate offices to Stamford, Connecticut.

5.     In 1978, Flintkote maintained building products facilities in Los Angeles, California; Chicago, Illinois; Mt. Carmel, Illinois; Cornell, Wisconsin; Portland, Oregon; Ennis, Texas; St. Paul, Minnesota; Jersey City, New Jersey; Peachtree City, Georgia; Freemont, California; Florence, Colorado; Savannah, Georgia; Las Vegas, Nevada; Camden, New Jersey and Sweetwater, Texas.   It also maintained distribution facilities in California, Oregon, Florida, Georgia, Alabama, North Carolina, Virginia, Maryland, Pennsylvania, New Jersey, Missouri, Tennessee, Louisiana, Texas, Oklahoma and Nevada.

6.     In 1978, Flintkote had stone products plants located in White Marsh, Maryland; Oxford, Massachusetts; Kenvil, New Jersey; Batavia, New York; Fredonia, Pennsylvania; and Lockport, New York.

7.     In 1978, Flintkote had cement and lime operations located in Redding, California; San Andreas, California; Kosmosdale, Kentucky; Glenn Falls, New York; Howes Cave, New York; Frederick, Maryland; Texas, Maryland; Nelson, Arizona; City of Industry, California; Richmond, California; Apex, Nevada; Henderson, Nevada; Sloan, Nevada; Dolomite, Utah and Stephens City, Virginia.

8.     Subsidiaries of Flintkote maintained their principal places of business in California, New York, Kentucky, Texas, Maryland and Ontario.

9.     In 1980, Flintkote shareholders approved an agreement of merger with Dorster, Inc. whereby Flintkote became an indirect, wholly-owned subsidiary of Genstar Limited.

10.    In 1980, Flintkote had building products plants located in Little Rock, Arkansas; Los Angeles, California; Peachtree City, Georgia; Chicago Heights, Illinois; Mt. Carmel, Illinois; St. Paul, Minnesota; Jersey City, New Jersey; Portland, Oregon; Ennis, Texas; Cornell, Wisconsin; Freemont, California; Florence, Colorado; Savannah, Georgia; Las Vegas, Nevada; Camden, New Jersey and Sweetwater, Texas.

11.    In 1980, Flintkote had stone products plants located in White Marsh, Maryland; Oxford, Massachusetts; Gibbsboro, New Jersey; Kenvil, New Jersey; Batavia, New York; Fredonia, Pennsylvania; Milford, Virginia and Lockport, New York.

12.    In 1980, Flintkote had cement and lime operations located in Redding, California; San Andreas, California; Frederick, Maryland; Nelson, Arizona; City of Industry, California; Richmond, California; Apex, Nevada; Henderson, Nevada; Sloan, Nevada; Dolomite, Utah and Stephens City, Virginia.

13.    In addition to the operations listed above, in 1980, Flintkote operated twenty-two sand, gravel and crushed stone plants in California, Maryland, Pennsylvania, New York, Virginia and Canada. It had seventeen ready-mix concrete plants in California and Maryland. It had ten bituminous concrete plants in California, Maryland, New York and Canada. Flintkote operated four cement distribution terminals in California, Nevada and Oregon, and it had fifty-one building product distribution facilities throughout Alabama, Arkansas, California, Florida, Georgia, Louisiana, Maryland, Mississippi, Missouri, New Jersey, Nevada, North Carolina, Oklahoma,

Pennsylvania, Tennessee, Texas and Virginia. It had roofing product warehouses in California and Michigan and a truck and automotive parts distribution center in South Carolina.

14.    Between 1982 and 1984, Flintkote ceased production and distribution of asbestos related materials.

15.    In 1984, Flintkote moved its corporate offices to San Francisco, California, where its new corporate parent was located. Flintkote continued to operate facilities nationwide.

16.    In 1986, Flintkote had operations related to its stone, gypsum and lime operations in Maryland, Texas, Virginia, Massachusetts, Pennsylvania, New York, Michigan, Illinois, Tennessee, New Jersey, Georgia, Colorado, California, Nevada, Arizona and Utah.

17.    Flintkote ceased all manufacturing and distribution operations in 1987.


[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct. Executed this 30th day of May, 2006 at Montreal, province of Quebec, Canada.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, THE FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:06-CV-00298 (JJF) |
| vs. | ) ) | |
| PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF MARK M. MALONEY IN SUPPORT OF
IMPERIAL TOBACCO CANADA LIMITED'S RESPONSE
TO DEBTOR'S OPPOSITION TO EMERGENCY PETITION FOR AN
ORDER OF TRANSFER PURSUANT TO 28 U.S.C. § 157(B)(5)**

I, Mark M. Maloney, declare and state as follows:

1.     I am a partner at King & Spalding LLP. The facts stated in this declaration are true to the best of my knowledge, information and belief based on my personal knowledge and my review of relevant documents filed in the bankruptcy case ("Bankruptcy Case") of The Flintkote Company ("Flintkote") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2.     King & Spalding LLP represents Imperial Tobacco Canada Limited ("ITCAN"), a defendant in the above captioned case (the "Pending Action").

3.     On the same day that Flintkote and Marlene Hopkins, Michelle Hopkins and Michael Hopkins (collectively, the "Hopkins Plaintiffs") filed the Complaint that initiated the Pending Action, Flintkote filed in the Bankruptcy Case the *Debtors' Motion For Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay In Connection With Dividend Recovery Litigation* (the "Joint Prosecution Motion").

4.     In the Joint Prosecution Motion, Flintkote sought, among other things, approval of an agreement (the "Alter Ego Agreement") between Flintkote and the Hopkins Plaintiffs.

5.     As originally drafted, the agreement would have provided for, among other things, (i) limited relief from the automatic stay so that the Hopkins Plaintiffs could pursue whatever alter ego claims they may have against ITCAN and (ii) the partial transfer by Flintkote to the Hopkins Plaintiffs of Flintkote's alter ego remedies against ITCAN.

6.     Flintkote sought approval of the Joint Prosecution Motion on an expedited basis, and set a hearing for April 17, 2006.

7.     Flintkote refused ITCAN's request for a continuance of the April 17, 2006 hearing.

8.     The Bankruptcy Court granted ITCAN's request for a continuance and continued the hearing on the Joint Prosecution Motion until May 15, 2006.  The Bankruptcy Court converted the April 17 hearing to a status conference.  At the status

conference, Flintkote argued that ITCAN had no standing to be heard in the Bankruptcy Case.

9.    Prior to the May 15, 2006 hearing, ITCAN filed an objection to the Alter Ego Agreement, arguing, among other things, that Flintkote was attempting to secure rulings from the Bankruptcy Court that would potentially prejudge important issues that should be left to the presiding court in the Pending Action.

10.   At the May 15 hearing, the Bankruptcy Court refused to approve the Alter Ego Agreement in its original form. True and correct copies of the original Alter Ego Agreement and proposed order offered by Flintkote are attached as Exhibit A hereto. A true and correct copy of the hearing transcript from the May 15, 2006 hearing before the Bankruptcy Court is attached as Exhibit B hereto. True and correct copies of the approval order signed by the Bankruptcy Court and the revised Alter Ego Agreement approved by the Bankruptcy Court are attached as Exhibit C hereto.

11.   I caused to be reviewed the schedules of claims filed by Flintkote in the Bankruptcy Case, as well as the proofs of claim filed by asbestos claimants in the Bankruptcy Case (the "Claims Analysis"). According to the Claims Analysis, Flintkote is subject to asbestos claims in 48 states plus the District of Columbia and other territories. (See Claims Analysis, attached hereto as Exhibit D). The five states in which the most claims are pending are: Texas, Mississippi, West Virginia, Ohio, and Louisiana. (See Claims Analysis). Only 2.14% of such claims are in California. (See Claims Analysis).

3

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31st day of May, 2006 at Atlanta, Georgia.

# EXHIBIT A

**[to the Declaration of Mark M. Maloney]**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related Docket No. 1433** |
| | ) | **Agenda Item No. 2** |
| | ) | **May 15, 2006 at 9:30 a.m.** |

## ORDER APPROVING ALTER EGO AGREEMENT
## IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

Upon the motion (the "Motion") of The Flintkote Company and Flintkote Mines

Limited (collectively, the "Debtors") for entry of an order (i) approving that certain "Agreement

Providing For Joint Prosecution Of Alter Ego Remedies" dated as of April 4, 2006 (the "Alter

Ego Agreement"), and (ii) modifying the automatic stay with respect thereto retroactive to the

date of the commencement of the Dividend Recovery Litigation[1] in the Superior Court, and the

Court having considered the Motion, the support of the relief requested by the ACC and the

FCR, the declarations of David J. Gordon filed in support of the Motion, the objections filed in

respect of the Motion, the supplemental pleadings filed in support of and in opposition to the

Motion, and the arguments of counsel; and it appearing that (a) due and proper notice of the

Motion was given and that no additional notice need be given, (b) the provisions of the Alter Ego

Agreement requiring approval under Bankruptcy Code section 363 are fair and equitable,

supported by a good business reason and were entered into in good faith; and (c) cause has been

established to modify the automatic *nunc pro nunc* to the date of the commencement of the

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Motion.

Dividend Recovery Litigation in the Superior Court in order to carry out the purposes of the Alter Ego Agreement, and good cause having been shown therefor; it is hereby

ORDERED, that the Alter Ego Agreement, in the form attached hereto as <u>Exhibit A</u>, including any subsequent amendments thereto that are approved by the ACC and FCR and do not have a material adverse impact on the estate, is approved in all respects; and it is further

ORDERED that the automatic stay of Bankruptcy Code section 362 is hereby modified *nunc pro tunc* to the date of the commencement of the Dividend Recovery Litigation in the Superior Court to enable the Hopkins Family to pursue alter ego remedies as provided in the Alter Ego Agreement.


Dated: _____, 2006



_____
Honorable Judith K. Fitzgerald

-2-

EXHIBIT "A"

## AGREEMENT PROVIDING FOR
## JOINT PURSUIT OF ALTER EGO REMEDIES

This "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") is entered into as of April 4, 2006, by and among The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") (Debtor and Asbestos Claimants are hereinafter referred to collectively as the "Parties" and individually as a "Party"), with reference to the following facts and recitals:

## RECITALS

A.    Debtor is the debtor and debtor in possession in a case being jointly administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 04-11300 (JKF) (the "Bankruptcy Case").

B.    Asbestos Claimants hold asbestos-related claims against Flintkote (the "Claims") and contend that they additionally have remedies against the present or former, non-debtor affiliates of Debtors for the payment of the Claims on alter ego, veil piercing, or similar theories of recovery (collectively, "Alter Ego Remedies").

C.    The Debtor is about to commence litigation (the "Dividend Recovery Litigation") against, among others, one or more former, non-debtor affiliates of the Debtor (an "Affiliate Defendant") and will assert, among other theories of recovery, Alter Ego Remedies against one or more Affiliate Defendants. The Dividend Recovery Litigation seeks to establish, among other things, that the Affiliate Defendants are liable to persons with asbestos-related claims against the Debtor.

D.    As a result of this Agreement, all theories of alter ego recovery to be asserted against Affiliate Defendants, including Imasco Limited, now known as Imperial Tobacco Canada Limited) ("Imasco"), can be brought in the same action by plaintiffs who collectively have standing to assert all such grounds for relief. This will have several benefits to the Debtor's estate (the "Estate") and its creditors, including the following: (1) the arrangement will allow the assertion that Imasco is the alter ego of the Debtor and therefore responsible for the payment of the claims against the Debtor to be determined on its merits, avoiding unnecessary procedural arguments over whether the Alter Ego Remedies are being asserted by the correct party; (2) a successful prosecution of all potential Alter Ego Remedies by either an individual claimant or the Estate should result in a direct benefit to all creditors of the Estate by creating res judicata and collateral estoppel issue preclusion rights with respect to Imasco; (3) by pooling resources, an individual claimant can more feasibly pursue Alter Ego Remedies in conjunction with the Estate's efforts; and (4) by having individual

claimants in the case, the trier of fact will be more able to appreciate fully the nature of the type of claims being asserted against Flintkote and the harm that has been caused by Imasco's dismantling of the Debtor's going concern operations and the upstreaming of Flintkote's assets.

E.    The Parties wish to proceed promptly with the Dividend Recovery Litigation with the Debtor and Asbestos Claimants as parties. Accordingly, the Parties desire to authorize Asbestos Claimants to proceed on the Alter Ego Remedies on the terms and conditions set forth below.

**NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:**

**AGREEMENT**

**A. Terms Of Joint Pursuit of Alter Ego Remedies.**

1.    Authorization To Pursue Alter Ego Remedies. Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants shall be transferred and authorized to pursue for their own benefit that portion of the Alter Ego Remedies, if any, held by the Estate against the Affiliate Defendants that relates to Asbestos Claimants' Claim, as limited by the amount of such Claims, and to have authorized Asbestos Claimants to assert such remedy in the Dividend Recovery Litigation. Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly. Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

2.    Contribution To Dividend Recovery Litigation Expenses. Asbestos Claimants recognize that their costs of litigation will be substantially reduced by the efforts of the Debtors in the Dividend Recovery Litigation, and agree to contribute to such litigation costs in the following manner:

a.    Asbestos Claimants shall limit the fees payable to their counsel in pursuing the Alter Ego Remedies to twenty-five percent (25%) of actual recoveries by Asbestos Claimants, either directly or as a result of any distribution on account of an allowed claim against the Estate as a result of the litigation of Asbestos Claimants' Claims against Imasco; and

b.    Asbestos Claimants shall retain all net recoveries as a result of the assertion of their Alter Ego Remedies (after payment of costs) up to $400,000 and shall pay any excess recoveries to the Estate, which excess recoveries shall be held for the benefit of asbestos claimants, and shall be contributed by the Estate to any asbestos trust established pursuant to section 524(g) of the Bankruptcy Code, or

2

otherwise, for distribution in accordance with the trust distribution procedures governing such asbestos trust as approved by the Bankruptcy Court, including in connection with confirmation of a plan or plans of reorganization for Flintkote and its affiliates.

3.    Settlement Of Alter Ego Remedies.  Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the Official Committee Of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case (the "Committee") and the "Legal Representative For Future Asbestos Claimants" appointed in the Bankruptcy Case (the "Futures Representative"); provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the Committee and the Futures Representative, shall not be unreasonably withheld.  If a dispute arises as to whether such consent by the Asbestos Claimants has been unreasonably withheld, then such dispute shall be submitted to the Bankruptcy Court for determination as a contested matter without the right to a trial by jury.  If an asbestos trust is created pursuant to section 524(g) of the Bankruptcy Code, the trustee or trustees of such trust (the "Asbestos Trust Trustee") may act for the Committee, the Futures Representative, and/or the Debtor under this provision to the extent provided in the confirmed plan or plans of reorganization.

4.    Management Of Alter Ego Litigation.  The special litigation counsel retained on behalf of the Estates to prosecute the Dividend Recovery Litigation ("DRLC"), acting under the direction of Debtor, the Committee and the Futures Representative in accordance with the terms of the Joint Prosecution Agreement, shall manage the litigation (and advance the expenses and costs incurred by Asbestos Claimants in respect thereof, subject to and in accordance with paragraph 2 above) on all Alter Ego Remedies issues common to the Dividend Recovery Litigation and the Alter Ego Remedies being asserted by Asbestos Claimants; provided, however, that Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estate in the Dividend Recovery Litigation to the maximum extent feasible.

5.    Claim Amount.  The Parties agree that any amount determined to be owed to Asbestos Claimants on account of Asbestos Claimant's Claim in the Dividend Recovery Litigation shall be binding on the Debtor and the Estate but will not be enforced against the Debtor or the Estate except in accordance with the terms of a confirmed plan of reorganization in these cases and any § 524(g) trust distribution procedures approved by the Court in connection therewith.  Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' Claims against Imasco as provided in Paragraph A.2.b, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

3

**B. General Provisions**

1.    <u>Limitation on Third-Party Beneficiaries</u>. No provision contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, the Committee, the Futures Representative, and the Asbestos Trust Trustee, if any.

2.    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and assigns, including, in the case of Debtor, any trustee appointed under chapters 11 or 7 of the Bankruptcy Code, and the Asbestos Trust Trustee, if any.

3.    <u>No Representations or Warranties</u>. Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

4.    <u>Headings</u>. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

5.    <u>Representation By Counsel</u>.  The Parties acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel.  This Agreement is a negotiated document.  As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

6.    <u>Due Authorization</u>.  Each Party to this Agreement hereby represents and warrants that (i) such Party is duly authorized to enter into this Agreement without the permission of any third party; and (ii) the person purporting to execute this Agreement on behalf of such Party has been duly authorized to execute this Agreement on behalf of and bind such Party; provided, however, that this representation and warranty as against Debtor shall be of no force and effect with respect to matters that require the approval of the Bankruptcy Court in the Bankruptcy Case unless and until such approval is obtained.

7.    <u>Entire Agreement; Amendment; Waiver</u>.    This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.  This Agreement may not be modified or amended except in writing signed by the Parties hereto, with the consent of the Committee and the Futures Representative.  No waiver of any term, provision or condition of this Agreement, in any

4

one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

8.    Effective Date. Except as otherwise provided in this paragraph, this Agreement shall be binding upon Asbestos Claimants upon the execution of the Agreement by all signatories below (including the Committee and the Futures Representative), but it shall only be binding upon Debtor and the Estate upon entry of an order of Bankruptcy Court approving it after notice and an opportunity for a hearing. Absent the approval of this Agreement by the Bankruptcy Court, the parties shall be returned to the status quo ante as if this Agreement had not be executed by the Parties, and Asbestos Claimants shall cease any further prosecution involving the assertion of the Alter Ego Remedies in which the Estate has an interest but for the execution of this Agreement.

9.    Governing Law and Choice of Forum. This Agreement shall be governed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, and by the United States Bankruptcy Code. The Bankruptcy Court shall be the exclusive forum to hear, determine and enter appropriate orders and judgments regarding all disputes in respect of this Agreement.

10.    Counterparts. This Agreement may be executed in two or more counterparts by the Parties, and such counterparts shall be considered as and construed to be part of a single agreement. Signatures transmitted by facsimile shall have the same effect as original signatures.

5

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006

THE FLINTKOTE COMPANY

By: _____
Name: _DAVID J GORDON_____
Its: _PRESIDENT_____

Dated: April 5, 2006

**MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

By: _____
    David R. Donadio, Brayton Purcell, LLP,
    authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

Dated: April 5, 2006

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

6

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006      **THE FLINTKOTE COMPANY  By:**

_____ Name:

_____ Its:


Dated: April 5, 2006      **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS  By:**

_____ David R. Donadio, Brayton Purcell, LLP,  authorized agent and attorney in fact

The foregoing is approved as to form and content:

Dated: April 5, 2006      **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS  By:**

_____ Name:

_____ Its:


Dated: April 5, 2006      **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS  By:**

_____ Name:

_____ Its:

_____

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006                **THE FLINTKOTE COMPANY**

                                    By: _____
                                    Name: _____
                                    Its: _____


Dated:  April 5, 2006               **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

                                    By:_____
                                        David R. Donadio, Brayton Purcell, LLP,
                                        authorized agent and attorney in fact


The foregoing is approved as to form and content:

Dated: April 5, 2006                **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

                                    By: _____
                                    Name:_____
                                    Its: _____

Dated: April 5, 2006                **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

                                    By: _John Wingled_____
                                    Name: _JOAN WINSHIP REED_____
                                    Its: _AUTHORIZED AGENT AND ATTORNEY_
                                         _for JAMES J. MCMONAGLE_

6

LA1 763597v.1

The foregoing is approved as to form and content:

Dated: April 5, 2006

**OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____
Name: _____
Its: _____

**LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

Dated: April ___, 2006

By: _____
Name: _____
Its: _____

6

LA1 763597v.1

# EXHIBIT B

**[to the Declaration of Mark M. Maloney]**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .    Chapter 11
                                    .
THE FLINTKOTE COMPANY and           .    Case No. 04-11300(JKF)
FLINTKOTE MINES LIMITED,            .    Jointly Administered
                                    .
            Debtors.                .    May 15, 2006 (11:06 a.m.)
                                    .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1          THE COURT: This is the matter of Flintkote, 04-

2   11300.  The participants I have listed by phone are only Mr.

3   Reinsel (phonetical).  Is there anyone else?  Is Mr. Reinsel

4   on?

5          MR. REINSEL: I am, Your Honor.

6          THE COURT: Okay, thank you.  I'll take entries in

7   court, please.  Mr. O'Neill?

8          MR. O'NEILL: James O'Neill, Your Honor, for the

9   debtors.

10          MR. PEDLAR: Alan Pedlar for the debtors.  With me

11   is Stephen Snyder of Snyder Miller & Orton, lead litigation

12   counsel for the debtor.

13          MR. LOCKWOOD: Peter Lockwood for the Asbestos

14   Claimant's Committee, Your Honor.

15          MR. LANTRY: Kevin Lantry for the debtors.

16          MS. ESKIN: Marla Eskin for the Asbestos Claimants

17   Committee.

18          MS. MINELLA: Maribeth Minella on behalf of the

19   Futures Representative.  I have with me John Read from the

20   law firm Vorys Sater Seymour & Pease also for the Futures

21   Representative.

22          MR. MALONEY: Your Honor, Mark Maloney on behalf of

23   Imperial Tobacco.

24          MR. PARDO: Your Honor, Jim Pardo on behalf of

25   Imperial Tobacco as well.

3

1          MR. MILLER: Stephen Miller on behalf of Imperial

2    Tobacco also, Your Honor.

3          THE COURT: Okay, Mr. O'Neill.

4          MR. O'NEILL: Good morning, Your Honor.  Turning to

5    the amended agenda for today's hearing, I just wanted to

6    briefly note that the Court has already entered an order on

7    item number 1 on the agenda, which is the debtors' sixth

8    motion for an extension of the exclusive periods, and also,

9    the Court has entered an order on item number 3, which is

10   Imperial Tobacco Canada's limited motion for continuance.

11   The Court entered an order denying that motion.  So, the

12   remaining matter is item number 2, which is the continued

13   hearing on debtors' motion for order approving joint

14   prosecution agreements, and for that matter, I'm going to

15   turn the podium over to special counsel Alan Pedlar.

16          THE COURT: Mr. Pedlar.

17          MR. PEDLAR: Good morning, Your Honor.  Your Honor,

18   with respect to the approval of the alter ego agreement, I've

19   now read three briefs that Imperial Tobacco has filed and a

20   fourth brief that it requested to file, and I still haven't

21   seen a single reason why the alter ego agreement shouldn't be

22   approved.  Unfortunately, most of Imperial Tobacco's

23   arguments are based on a misconstruction of the alter ego

24   agreement.  The alter ego agreement and the related motion

25   have two objectives.  One is to modify the automatic stay so

4

1    that remedies can be asserted against Imperial Tobacco in a

2    manner identical to the manner that remedies could have been

3    asserted against Imperial Tobacco had there not been the

4    circumstance of the Chapter 11 case, and we've repeatedly

5    said that there is no reason why a non-debtor party should be

6    able to take advantage of the procedures of the Chapter 11

7    case to structure litigation against us.  The other aspect of

8    the alter ego agreement was to set the guidelines by which

9    the parties will manage the litigation regarding joint

10   settlements and financial contributions if in fact the

11   litigation is successful.  There have been no objections to

12   the second aspect of the alter ego agreement which is the

13   aspect that we believe § 363 covers.  There have been no

14   creditor or party in interest objections in this case

15   whatsoever to the alter ego agreement, and with regard to

16   lifting the automatic stay, Imperial Tobacco argues that this

17   is a sale of the personal injury cause of action.  Well,

18   first, our alter ego is a remedy.  It's not a claim.  Here

19   the claim is the Hopkins family's wrongful death claim.  It's

20   not someone else's claim.  They are asserting their own

21   claim, and the relief we're requesting, with respect to the

22   automatic stay, is really no different than practice that's

23   longstanding in the Bankruptcy Courts with respect to

24   insurance matters.  This Court can modify the automatic stay

25   to allow a tort claimant to go forward against an insurance

1    carrier and no one would argue that that's an assignment of

2    the tort claim to anyone.  Here we are just asking the Court

3    to modify the automatic stay so that a tort claimant can go

4    forward against Imperial Tobacco on an alter ego claim.  And

5    upon such request, like an insurer, Imperial Tobacco just

6    simply doesn't have standing to oppose relief from the stay

7    to have a tort claimant go forward against it in litigation.

8    Moreover, in the insurance context, if that tort claimant -

9    or if the insurance company denied liability to that tort

10   claimant, there would be nothing wrong with a debtor joining

11   in that litigation to sue for declaratory relief with respect

12   to coverage, and that's exactly what Flintkote has done in

13   the state court action.  The tort claimant is asserting an

14   alter ego claim, and Flintkote is coming in to assert

15   declaratory relief that in fact Imperial Tobacco is the alter

16   ego of Flintkote and responsible to pay all of its

17   obligations.  Imperial Tobacco also mis-characterizes the

18   agreement by saying that it provides for an undivided

19   interest in all alter ego claims held by the estate.  It

20   simply doesn't do that.  It allows the alter ego remedies

21   that could be asserted by the Hopkins family, absent the

22   bankruptcy, to be asserted by the Hopkins family, obviously

23   limited by the amount of their claim.  This is explicit in

24   the alter ego agreement which states that the alter ego

25   agreement, quote, "Provides that the Hopkins family shall

6

1    be", sorry, quote, "authorized to pursue for their own

2    benefit that portion of the alter ego remedies, if any, held

3    by the estate against Imperial Tobacco that relates to the

4    Hopkins family's claim as limited by the amount of their

5    claim." They're pursuing their own alter ego claims.

6    They're not pursuing undivided interest in everybody's claim.

7    Imperial Tobacco also argues that this agreement is

8    unprecedented, and first, that's not true. We have cited the

9    Court to several cases dealing with relief from the stay with

10   respect to alter ego remedies, and in particular, the Court

11   in The Board of Directors vs. Chestnut Grove Condos, a

12   Bankruptcy opinion, out of the District of Columbia, the

13   Court noted that the assertion of alter ego remedies by

14   individuals is controlled by the Court to, one, make sure

15   that there is a benefit to all creditors if the alter ego

16   agreement goes forward, and second, to protect the estate

17   from inconsistent judgments. There is no risk of an

18   inconsistent judgment here because the estate is in the same

19   action for this alter ego claimant, and we believe pursuit of

20   this alter ego claim, essentially a test case, is going to

21   have substantial benefits to all creditors if successful. We

22   just want this case to be in the posture that it could have

23   been brought, absent the bankruptcy case. We believe in

24   California, both the corporation and the individuals have

25   alter ego remedies, and we should be allowed to pursue that.

1    And recently, in investigating the recent motion filed by

2    Imperial Tobacco, the District Court under § 157(b)(5), I

3    came across this quote from the Packer decision of the Third

4    Circuit, which I really think sums it up, quote, "Bankruptcy

5    jurisdiction was not conferred for the convenience of those

6    not in bankruptcy."  And what Imperial Tobacco is trying to

7    do here is use the circumstance of Flintkote's bankruptcy to

8    structure litigation against it, and that's just simply not

9    correct.  As an aside, Your Honor, the last time we were on

10   the record I speculated that the next time we'd be back, this

11   case would be bouncing around in three courts.  I

12   underestimated Imperial Tobacco's desire to get out of

13   California.  The case is now actually involved in four

14   courts.  Ten days ago, Imperial Tobacco went on a

15   unprecedented forum shopping spree.  They moved to withdraw

16   the reference from this Court.  They moved to continue the

17   hearing.  They removed this case from the Superior Court to

18   the District Court for the Northern District of California.

19   They moved to transfer from the Northern District of

20   California to Delaware, and they filed a 157(b) motion before

21   the District Court here to move this case to Florida.  We are

22   responding to each of those in turn.  We think -

23           THE COURT: To move it to - Which case to Florida?

24           MR. PEDLAR: That's - I'm sorry.  I miss - They're

25   trying to move the California case, I'm sorry, to here, to

1    the District Court here.

2              THE COURT: Oh, okay.

3              MR. PEDLAR: Yes, I just - I misspoke.  We are

4    responding to each of these.  We think they all border on the

5    frivolous, and we believe that this case will in fact end up

6    back in the Superior Court in California.  In their reply,

7    they also purport to scold the estate representatives for not

8    having analyzed this matter properly.  We explained

9    extensively in Section 3(b)(2) of our reply brief that we

10   had, of course, analyzed this.  There's really no harm that

11   can be befall the Flintkote estate from this.  If the Hopkins

12   family wins on their alter ego claim, Imperial Tobacco will

13   be responsible to pay it, and there will be a major

14   contribution to this estate in terms of identifying a party

15   that's responsible for payment of all of the claims against

16   the estate.  If the Hopkins families do not obtain a judgment

17   against Imperial Tobacco, then there's not going to be a

18   judgment entered, and the Flintkote estate won't be harmed in

19   any way by that.  The bottom line, I think, Your Honor, is

20   the alter ego agreement is not illegal.  The request to

21   modify the automatic stay is based on sound business reasons,

22   which I will just state very briefly for the record.  Those

23   business reasons supported in this case by the declaration of

24   David Gordon are that the joint prosecution to hold Imperial

25   Tobacco responsible as Flintkote's alter ego with individual

1    payments, we believe maximizes the potential for success in

2    the litigation.  If they are successful, the Hopkins family

3    are successful, they will share and help defer the costs of

4    that litigation.  Economically, an individual court claimant

5    may not be able to pursue an alter ego claim, but they can

6    economically pursue it in connection with the estate's

7    assertion of its own alter ego rights and its avoiding power

8    rights.  We think a successful prosecution will have

9    tremendous benefits in terms of identifying, based on *res*

10   *judicata* and collateral estoppel grounds, a party responsible

11   to pay all the claims of this estate, and the alter ego

12   agreement insures that the case won't have to be tried by

13   some reason of standing, and there has been a recent

14   development in that area, Your Honor.  We cited Your Honor to

15   two - one bankruptcy case, one federal district court case

16   out of California where the judges had denied to the estate

17   the right to assert alter ego claims and contended that they

18   were only held by individuals.  The removal to the District

19   Court in California was originally assigned to a magistrate

20   for determination.  Imperial Tobacco objected to that and

21   insisted it be assigned to a district judge.  It was in fact

22   assigned to Judge Patel, who wrote one of the two opinions

23   that said the corporation doesn't hold the alter ego right in

24   California, the individual holds it.  So, it's absolutely

25   essential that the Hopkins be granted authority to proceed in

1    this case.  We fully expect this case to end up back in the

2    Superior Court, but if it doesn't, we are in front of a

3    District Judge who's once already held that the alter ego

4    agreements have to be asserted by individuals.  That's

5    certainly a reason to have the Hopkins family in the case.

6    And we believe the alter ego agreement eliminates the

7    possibility of inconsistent judgments.

8              THE COURT: Well, I guess the question that I have

9    is this: What exactly are you asking me to approve?  If

10   you're asking me to lift the stay so that the Hopkins and the

11   debtor can join in a litigation without making any ruling as

12   to who has standing or who has what causes of action, I'm

13   happy to lift the stay, you know.  If that's what the debtor

14   wants, the stay's there for the benefit of the debtor.  If

15   the debtor doesn't want to take advantage of it, I guess go

16   litigate.  But that raises - but I want to make sure in the

17   process that I'm not prejudging who has standing or who has

18   rights and responsibilities under the California law because

19   that's not what I would be doing in lifting the stay.  That's

20   number one, and my second question is, Why the heck is the

21   case pending in the District of Delaware if all of the

22   relevant litigation is going to take place in California, and

23   this is a California debtor?

24             MR. PEDLAR: Why is the bankruptcy case?

25             THE COURT: Yes.

1            MR. PEDLAR: I can't -

2            THE COURT: If this is the significant piece of this

3    estate, which is what it seems to be, and the debtor now

4    wants to bring this action in California, and its motion

5    lists all sorts of reasons why this case is appropriately

6    venued in California; why is it here?

7            MR. PEDLAR: I can't speak to the bankruptcy case,

8    Judge, it's been pending for some time.  The litigation was

9    filed in California for exactly the reasons you described,

10   because the actions and activities of Imperial Tobacco that

11   have given rise to all of these problems and turning -

12   including stripping $525 million out of this estate, took

13   place in California.  We, of course, weren't involved in the

14   decision to file the case here.  We don't really think that

15   that impacts the litigation.  There is a motion before Judge

16   Farnan now with respect to a 157(b)(5) where he will

17   determine whether or not this case, you know, should be, you

18   know, drawn to this district.  On your first point, Your

19   Honor, I can assure you that we are asking for nothing more

20   than approval of the agreement under 363, and that's the

21   aspects of the agreement that deals with joint

22   representation, settlement of the case, division of expenses,

23   and whatnot, and we are not asking this Court for any ruling

24   whatsoever on standing.  We are asking this Court simply to

25   lift the stay so that the Hopkins family and the Flintkote

1    estate can pursue this action in exactly the same manner they

2    could have pursued it had the bankruptcy not been filed, and

3    Imperial Tobacco is free in the litigation, wherever it may

4    end up being heard, to argue that only the Hopkins family has

5    standing, that only the Flintkote family has standing, and we

6    are free to take the position that both parties have

7    standing.  And so, we are not asking Your Honor to anything

8    other than simply lift the stay and leave to the trial court

9    every other substantive decision in the case.  We are not

10   asking Your Honor to prejudge standing in any way whatsoever.

11   I have, in fact, with me a proposed order that does just

12   that.  It simply lifts the stay.  I think it was improper for

13   Imperial to suggest that Your Honor should give a series of

14   guidance instructions through the state court.  We certainly

15   didn't ask for it, and it's not the relief requested in the

16   motion.  We are simply asking for approval of the agreement

17   which allows them to file it, but not determines whether they

18   have a right to file, and relief from the stay.  And we think

19   in that context, it's really inappropriate for the defendant

20   to be in here attempting to use the jurisdiction of this

21   Court to structure litigation against it when we're really

22   only seeking to file the same piece of litigation we could

23   have filed outside of bankruptcy, and we think there are good

24   business reasons stated.  There is certainly no illegality to

25   this.  It is precedented to grant relief from the stay, and

1    we are only asking then to go forward with this litigation in

2    a manner structured that has the unanimous approval of not

3    only the debtor but the ACC and the Futures Representatives

4    in this case.  Every constituency in this case believes the

5    right thing to do was to sue Imperial Tobacco in the

6    California Superior Court with the Hopkins family.

7          THE COURT: Okay, anybody else want to speak on

8    behalf of the motion before I turn to the opposition?

9          MR. LOCKWOOD: I just want to make three brief

10   points, Your Honor, in support of Mr. Pedlar's eloquent

11   argument.  One, which also responds to Your Honor's question

12   earlier which is that the California Superior Court will

13   decide, unless Your Honor decides differently, whether or not

14   the debtor has standing to assert alter ego claims under

15   California law against Imperial Tobacco, whether the Hopkins

16   family has standing under California law to assert claims

17   against Imperial Tobacco, or whether they both have standing

18   to do so.  Secondly, while there's some suggestion in

19   Imperial Tobacco's cases that the Hopkins family and the

20   debtor estate are competing here for funds in some way or

21   another, the fact of the matter is that Imperial Tobacco has

22   nowhere in its papers suggested that it is a limited fund,

23   and what an alter ego remedy does is it simply says that

24   anybody who has claims against Flintkote can assert those

25   claims against Imperial Tobacco.  Absent the showing that

1   Imperial Tobacco doesn't have enough money to pay Hopkins'

2   claims, as well as the remaining claims of the other

3   creditors of Flintkote state, assuming that there was an

4   alter ego determination, there's absolutely no competition in

5   any way, shape, or form here, and certainly Imperial Tobacco

6   has not suggested or shown any such.  Finally, what the Court

7   is being asked to do in considering lifting the automatic

8   stay, which as Mr. Pedlar said is the only remedy being

9   sought in this part of it, the other part about expense

10  sharing has not been challenged nor could it be by Imperial

11  Tobacco, because they're not a creditor, but with respect to

12  the lift stay, the burden on Imperial Tobacco is to show -

13  assuming it has standing at all as a perspective defendant,

14  is to show that somehow or another it is not to the benefit

15  of the debtors' estate to lift that stay.  Imperial Tobacco's

16  motivation as to why it doesn't want to lift the stay, have

17  it lifted against it, has been made transparent in its papers

18  it's afraid somehow or another its litigation defenses might

19  be somewhat less strong if both the Hopkins family and the

20  debtor were pursuing it in the same lawsuit in California.

21  But nowhere in the papers is there any explanation as to why

22  that's a detriment given the lack of competition among the

23  two for recovery that I mentioned earlier, why that is - that

24  detriment to Imperial Tobacco is also a detriment to the

25  debtor estate rather than, if anything, a benefit to the

1    debtor estate.  Failing a showing that this is not for the

2    benefit of the debtor estate, which as Mr. Pedlar noted, is

3    the unanimous conclusion not only of the debtor but all of

4    its creditors represented by my constituency and the Futures

5    Rep as well, there's absolutely no reason why this Court

6    should not grant the motion.  Thank you, Your Honor.

7              THE COURT: Anyone else?  Okay.

8              MR. MALONEY: Good morning, Judge.

9              THE COURT: Good morning.

10             MR. MALONEY: Again, for the record, Mark Maloney on

11   behalf of Imperial Tobacco.  I'll refer to it as ITCAN for

12   brevity.  Judge, if I could, I'd like to really frame this

13   issue specifically if for no other reason than to save time.

14   Mr. Pedlar said that all they're seeking, and I believe,

15   Judge, you keyed on this issue with one of your comments, is

16   all that's being sought here a mere relief of the automatic

17   stay so that whatever standing rights these various

18   plaintiffs have, they can assert them and whomever the

19   presiding court is can call balls and strikes on that issue.

20   I believe the Court has indicated, I'm happy to do that.  I

21   don't think that you're persuaded that we have a very good

22   claim that that can be avoided here.  I will note, just as an

23   aside, that I think there's some interesting issues and

24   interesting potential consequences with this agreement and

25   those consequences are avoided by the debtors in their

1   argument today, merely by the assumption that this case is

2   going to play out the way they want it to, and if it doesn't,

3   and certainly we're here to make sure that it doesn't, there

4   could be some consequences, but we'll rest on our papers on

5   that, Judge.  I don't want to get caught up in that, because

6   what I'm most interested in discussing is a dispute that I

7   believe is critical here.  This is not merely a request for

8   relief from the automatic stay, at least not under the

9   agreement that I'm looking at and the proposed order that is

10  attached to it.  I'm looking at Section (a)(1), very first

11  part of the agreement after the recitals, and Mr. Pedlar

12  focused on the idea that really all this does is it allows

13  the asbestos claimants to pursue for their own benefit their

14  own claims.  Well, that's not actually what this says, and

15  I'm quoting, it says, "The asbestos claimants shall be

16  transferred" they're getting something here, "and authorized"

17  presumably by this Court, "to pursue for their own benefit

18  that portion of the alter ego remedies, if any, held by the

19  estate."  That's the essence of this agreement that we're

20  concerned with, Judge.  Because if what this -

21         THE COURT: I thought Mr. Pedlar read me something

22  that said limited to the amount of their claims.

23         MR. PEDLAR: He's talking -

24         MR. MALONEY: Okay.  I'm happy to continue.  Judge,

25  limited to the amount of their claim, I don't think anybody

1    could ever argue that if these plaintiffs are given authority

2    through whatever mechanism to pursue an alter ego claim

3    against Imperial Tobacco, against ITCAN, that they could ever

4    receive more than whatever it is their damage is.  I don't

5    think that that's a real issue here.

6            MR. PEDLAR: Your Honor, he, again, stopped in mid-

7    sentence and didn't read the whole sentence.

8            THE COURT: But I have - I don't have with me a

9    copy.  It's probably in the binder, but may I see it, please.

10           MR. PEDLAR: Yes.

11           THE COURT:  Okay, you're looking at paragraph

12   (a)(1) of the agreement.  It's captioned, Authorization to

13   Pursue Alter Ego Remedies.  It states, "Upon the occurrence

14   of the effective date, as defined below, retroactive to the

15   date of the commencement of the dividend recovery litigation,

16   asbestos claimants shall be transferred and authorized to

17   pursue for their own benefit that portion of the alter ego

18   remedies, if any, held by the estate against the affiliate

19   defendants that relates to the asbestos claimants' claim as

20   limited by the amount of such claims and to have authorized

21   asbestos claimants to assert such remedy in the dividend

22   recovery litigation.  Asbestos claimants shall also be

23   entitled to assert in the dividend recovery litigation any

24   alter ego remedies that they hold directly.  Except as

25   expressly provided for herein, this provision shall not

18

1    otherwise affect the alter ego remedies held by the estate."

2    I can only read this to say that the asbestos claimants who

3    are defined as the Hopkins family on the wrongful death

4    claims at this point in time have the right to assert both on

5    their own behalf, for themselves, their own claims, and if

6    the estate has such a claim, that claim, period.  It doesn't

7    give them full-blown abilities to assert alter ego claims

8    that the estate may hold for the benefit of anybody else

9    because it's defined, asbestos claimants, if I recall - maybe

10   I'd better double check what'S defined as the Hopkins family,

11   and this document says that they are - yes, okay.  It is

12   defined - a defined term, Marlene Hopkins, Michelle Hopkins,

13   and Michael Hopkins collectively the asbestos claimant.  So

14   this paragraph says that those claimants are authorized to

15   pursue for their own benefit the portion of the alter ego

16   claims, if any, that are held by the estate and held by them

17   directly.

18          MR. MALONEY: And it's the first of those two

19   points, Judge.  If all we're talking about is the claims held

20   by them directly, then you don't need that first point.

21   They're getting something, and, Judge, what they're getting,

22   let's be clear, we're in bankruptcy, and the law interpreting

23   state law in Delaware, which by the way we think controls

24   here, or California which they've already - is ambiguous to

25   some extent, the law is clear that in the bankruptcy context,

1   the standing that is afforded to an individual creditor

2   claimant to pursue claims is limited to the extent that that

3   creditor has a claim that is distinct from claims that other

4   creditors could bring.  This is the whole purpose behind the

5   Bankruptcy Code, Judge, and the 544 and the vesting of claims

6   with the estate, it's the debtor that has the ability to

7   bring general harm-type alter ego claims.

8           THE COURT: That's true except when the debtor

9   decides, I think, by the Cybergenics opinion that it's going

10  to, I'll say, abnegate that responsibility in favor of some

11  other group.  Now, typically, it's a creditors committee, but

12  is it limited to a creditors committee?  I'm mean, I've got

13  Third Circuit precedent that says that certain actions, I

14  don't know that this is a recovery action, I guess it is in a

15  theory since it's an alter ego claim, it's a remedy that's

16  being asserted not a private action directly that's being

17  asserted; correct?

18          MR. MALONEY: Judge -

19          THE COURT: Actually, it's a defense.  What's really

20  happening is the debtors are defending a claim saying that

21  it's not me, it's you who should be paying.  Isn't it the

22  equivalent of liability over claim?

23          MR. MALONEY: Well, Judge, certainly alter ego does

24  not exist absent an underlying claim.

25          THE COURT: Right, that's the Hopkins claim.

1          MR. MALONEY: But I believe that alter ego is - call

2     it a remedy, call it a claim, the point is, is that to pursue

3     that remedy - we'll use that phrase, that term - to pursue

4     that remedy where the damage was to creditors as a whole as

5     opposed to a specific creditor, something done specifically

6     between the alleged bad actor and the creditor that creates

7     in that creditor a claim that no other creditor could bring,

8     that's the kind of claim that in this context a creditor can

9     bring.  And I believe it can bring it without relief from the

10    automatic stay, but that's a separate issue, but it has that.

11    It didn't give that up under 544 as part of, you know, what

12    we're talking about here and the investing of claims with the

13    estate, and, Judge, what you mentioned with respect to

14    Cybergenics, I believe it's identical to the same cases that

15    are cited elsewhere in the debtors' brief.  We're not talking

16    about a situation here where the debtor is saying, I don't

17    want to do this for whatever reason, and I'm willing to

18    abandon the claim to someone else.  Typically it is a

19    creditors committee.  That's not what we're talking about.

20    The debtor is going to pursue these claims.  What it wants is

21    a co-pilot, and that is an arrangement that is being approved

22    here, Judge, and I think, with all due respect to what the

23    debtors want to do and certainly with respect to what the

24    Court needs to approve here as opposed to what the debtors

25    would like the Court to add to it, that issue of whether

1    there ought to be a co-pilot arrangement with plaintiffs or

2    whether the debtor, which is the way it ought to work, which

3    is the way the Code is designed to work and the body of law,

4    you could pursue in general remedies, there's no reason to

5    have anybody else there.  Flintkote's going to carry this

6    ball and prove or not that an alter ego remedy exists with

7    respect to the debts that Flintkote owes.

8            THE COURT: There's no reason why they can't join

9    together in litigation if they want to be co-plaintiffs.

10   I'm not sure about the assignment of the estate's cause of

11   action.  That may be a different issue from whether or not

12   there can be co-plaintiffs pursuing a case that arises out of

13   the same series of transactions.  In fact, they may be

14   necessary parties in interest and essential parties to the

15   litigation.

16           MR. MALONEY: Again, Judge, I think those are issues

17   for the presiding court to determine and to determine

18   unfettered by - We're sitting here, Mr. Pedlar and I, maybe

19   calling, you know, each other the kettle or the pot, and

20   you're going to have to decide which one is less black, but

21   their arguing that we're trying to get this Court to make

22   predictive rulings or, you know, advisory rulings.  We're

23   just trying to avoid that.  We're trying to make sure that

24   when the presiding court gets whatever it gets here, this co-

25   plaintiff operation, that it has the ability to determine on

1  its own whether that's appropriate.

2          THE COURT: Okay.  I think I need to know from the

3  debtor how it is that the estate can give up this particular

4  cause of action if that's what it is, whatever the estate is

5  giving up, because it appears to me that you're right.

6  Fiduciary duty on behalf of general claims rests with the

7  estate, and it should not be necessarily in the hands of the

8  Hopkins but to the extent that the debtor wants to pursue it

9  and so do the Hopkins, I really don't see any reason why if

10  they want to co-join in the suit, the Court can't authorize

11  them to co-join in the suit without prejudice to the state

12  court determining whether they're appropriate parties, but

13  for purposes of this joint agreement, I think if the debtor

14  wants the stay lifted so that they can join in a suit

15  together, that's okay.

16          MR. MALONEY: Judge, if you -

17          MR. PEDLAR: If I can clear that up, I think it

18  would be somewhat helpful.  The problem that we identified in

19  our brief is that under California law, which we believe

20  applies, and which, by the way, was the only law argued by

21  Imperial Tobacco in connection with this motion, there is a

22  real uncertainty we've provided the Court, and it may well be

23  that under California law, we know under California law -

24          THE COURT: Well, there may be an uncertainty as to

25  who has the cause of action at all, but what reason is that

1   to have the estate give it up?  I mean, if the estate owns it

2   and you're going to be in a joint agreement anyway, why isn't

3   the estate presenting it?

4           MR. PEDLAR: We are not giving up - We are only -

5   Let me take two minutes and sort of - to explain it.  We are

6   not giving up the right the estate has.  Under -

7           THE COURT: I think you are.

8           MR. PEDLAR: Well, let me explain what the intent of

9   this language is.

10          THE COURT: Well then, let's modify the language,

11  but okay.

12          MR. PEDLAR: I can tell you what we believe we're

13  doing.

14          THE COURT: All right.

15          MR. PEDLAR: In California, we believe that both an

16  individual - we know from the cases we cited that an

17  individual can assert specific harm and general harm.

18          THE COURT: Right.

19          MR. PEDLAR: The only issue in California is whether

20  a corporation can or not, and we don't want to get caught

21  trying this case only to have some court say, Sorry, this

22  wasn't the corporation's cause of action.

23          THE COURT: You pick your venue.  You want to go

24  back to California.  If that's your risk, then that's your

25  risk.

1          MR. PEDLAR: We picked our venue with the Hopkins

2      family.

3          THE COURT: Well -

4          MR. PEDLAR: We are not transferring - and this

5      language is not intended to transfer a share of the estate's

6      claim.  This thing which is intended to allow the Hopkins

7      family to assert whatever rights they have under -

8          THE COURT: But that's not what it says.  It says,

9      Asbestos claimants shall be transferred and authorized.

10         MR. PEDLAR: We had difficulty with picking the

11     language, Your Honor, because to some extent it's an

12     abandonment, but it was an abandonment for consideration

13     because of the cost sharing and whatnot, so we couldn't call

14     it an abandonment because of the consideration aspect.  So we

15     called it a transfer, but that - it is not intended to

16     transfer a cause of action that is held only by Flintkote to

17     the Hopkins family.  If the Hopkins family do not, under

18     applicable law, have the right to pursue alter ego remedies,

19     the intention is that they will not be able to pursue them,

20     and that the state court will hold that - they don't get a

21     right to pursue the alter ego claims that the corporation

22     has.  They get a right -

23         THE COURT: That's what this is giving them -

24         MR. PEDLAR: No.

25         THE COURT:  - because there's a specific sentence

1    that says also they have the right to pursue them directly.

2    What else are you giving them?

3            MR. PEDLAR: Well, we believe, under California law,

4    that they also have the right to pursue what are called

5    general claims, general harm claims.

6            THE COURT: So, they may, but for their own benefit

7    -

8            MR. PEDLAR: But those -

9            THE COURT:  - not for the benefit of the estate.

10           MR. PEDLAR: But those - that's exactly right, but

11   those claims, those general claims are the claims that got

12   swept up in the automatic stay.  Because they are general

13   claims it may well be that the automatic stay applies -

14           THE COURT: That's fine.  I've already said, to the

15   extent the debtor doesn't care -

16           MR. PEDLAR: That's all -

17           THE COURT:  - that it's not going to be protected

18   by the benefit of the stay, the stay is for its benefit, I'll

19   lift the stay.

20           MR. PEDLAR: We are -

21           THE COURT: That's not this issue.

22           MR. PEDLAR: We are not attempting to transfer a

23   cause of action or a claim to the Hopkins that they don't

24   already have.

25           THE COURT: Well, then, let's rewrite this

1   agreement.

2           MR. PEDLAR: Okay.  If need be to clarify that is

3   fine with us, because we are not attempting to do that.  We

4   are attempting to allow them to assert whatever alter ego

5   rights they have.  We are allowing Flintkote to assert

6   whatever alter ego rights it may have, and that will be

7   determined by the Court that tries the matter, and we believe

8   - or the Court with jurisdiction to make that determination,

9   and we believe the result in California is that both the

10  Hopkins family and the Flintkote estate can pursue them.  But

11  if it turns out that the Hopkins can't pursue general claims,

12  this agreement is not creating that right in their -

13          THE COURT: Okay. Well, I think it's - If that's the

14  case, it's too confusing.  So, I think we need to rewrite

15  that paragraph.

16          MR. LOCKWOOD: Your Honor, before we rewrite this,

17  could I make one point about this.  I want to come back to

18  the point that I made earlier about the Hopkins family and

19  the debtor aren't competing here.

20          THE COURT: Yes.

21          MR. LOCKWOOD: You yourself pointed out that this is

22  a remedy.  It's not a claim.  The Hopkins family is not suing

23  Imperial Tobacco for the tort of alter ego.

24          THE COURT: Right.

25          MR. LOCKWOOD: The debtor is suing to the extent

1   it's raising a claim, as Mr. Pedlar said, for a declaratory

2   judgment.  So the alter ego is an overlap.  If the Hopkins

3   family could either have a right to get its own tort claim

4   established or it might have the right to in effect get a

5   general judgment saying that - a declaratory judgment, if you

6   will, a general claim saying that it and all the other

7   creditors - This Circuit had a case Raytec (phonetical) vs.

8   White where a state court decision in Washington, Schmall

9   (phonetical) vs. AC&S was determined one plaintiff had an

10  alter ego claim against a successor corporation to another,

11  and that was then brought into the Bankruptcy Court and we

12  attempted to establish collateral estoppel over the debtor in

13  that case, and the Third Circuit in Raytec v. White said,

14  Yes, you can have a collateral estoppel.  That was a general

15  type claim arising out of the particularized assertion by the

16  tort claimant.  The concern I have about rewriting this

17  agreement is that Imperial Tobacco is not here to help the

18  debtor.

19          THE COURT: I understand that.

20          MR. LOCKWOOD: It's not here to help the creditor.

21          THE COURT: I understand, and I'm not either, but

22  I'm also not here to give causes of action away when the

23  debtor's telling me that that's not the intent, and -

24          MR. LOCKWOOD: It says -

25          THE COURT: - that's how I read this.

1        MR. LOCKWOOD: - if any, Your Honor.

2        THE COURT: No, Mr. -

3        MR. LOCKWOOD: It says if any.

4        THE COURT: Mr. Lockwood, I'm the one that has to

5   approve this.  I don't understand it that way.  So if what

6   Mr. Pedlar is telling me is that the estate is not giving up

7   any of its own causes of action, but it's simply trying to

8   ascertain that the Hopkins have the right to pursue whatever

9   cause of action they have in the state court in California,

10  it's very easy to write it that way.

11       MR. LOCKWOOD: The concern I think that Mr. Pedlar

12  has identified and that Imperial Tobacco is attempting to

13  take advantage of here is there's some ambiguity as to how

14  the so-called general claim -

15       THE COURT: I understand that.

16       MR. LOCKWOOD:  - might sort itself out here -

17       THE COURT: But they're picking that venue.

18       MR. LOCKWOOD:  - in the state court litigation.

19       THE COURT: I understand, but they're picking that

20  venue.  So that's their risk.  That's their litigation risk.

21  They want to sue in California.  They know what the risk is.

22       MR. LOCKWOOD: But why does Your Honor feel it

23  necessary to make sure that somehow or another the debtor

24  isn't giving something to the Hopkins.  Remember the Hopkins

25  can only under this agreement recover their own damages.

1   They can't get any money from Imperial Tobacco Company for

2   the rest of my constituencies' claims.

3          THE COURT: So why do they need to pursue the claim

4   for the estate?

5          MR. LOCKWOOD: Because it's a belt and suspenders

6   exercise here.  Everybody's trying to make sure that Imperial

7   Tobacco in the state court litigation won't be able to find a

8   crack to fall through.

9          THE COURT: Well, I can't guarantee that.  I mean

10  that's the nature of litigation.

11         MR. LOCKWOOD: I know you can't, Your Honor, but

12  you're not being asked to make rulings on -

13         THE COURT: But I am.  I'm being asked to approve

14  this agreement, and I do not understand the agreement to read

15  what Mr. Pedlar just told me it's intended to do, so I want

16  it rewritten to express what Mr. Pedlar told me.

17         MR. LOCKWOOD: But, Your Honor, Your Honor, Your

18  Honor -

19         THE COURT: Mr. Lockwood, that's my ruling.

20         MR. LOCKWOOD: Please - Bear with me for a minute.

21  You're saying we're asking you to interpret the agreement and

22  want you to approve it.

23         THE COURT: Well, yes.

24         MR. LOCKWOOD: That's what Imperial Tobacco is

25  asking you.  We're not - We're saying let the state court -

1          THE COURT: No, I'm not doing that.  I'm not

2    approving an alter ego agreement that says what I - that I

3    think says something different from what the debtor is

4    telling me the intent of the agreement is.  That would be

5    disingenuous, and I'm not going there.  So, if you want me to

6    approve an agreement, I want to know what the intent is.

7    That's the only basis on which I have to judge the debtor's

8    business judgment.

9          MR. LOCKWOOD: The intent is to the extent legally

10   permissible and necessary for purposes of the state court

11   cause of action to take what is basically an indivisible

12   concept, alter ego, and to make sure that either or both of

13   Flintkote and the Hopkins family at the end of the day is

14   left standing asserting that.  That's the intent.  And Your

15   Honor doesn't really have to go beyond that in parsing this

16   agreement, I don't think, in order to say, Okay, I'll approve

17   this agreement.  You take it to the state court judge and let

18   him sort out exactly how that plays out in the state court

19   litigation.

20          THE COURT: That's what I intend to do.  Let him

21   interpret it when it plays out in the state court litigation,

22   but I'm not approving an agreement that says something that's

23   different than what the debtor has alerted me that the intent

24   is, and in my view, looking at the four corners of the

25   document, without another single thing, it says, Transferred

1    and authorized.  Transferred has a specific meaning, and I

2    think that's the problem.

3           MR. LOCKWOOD: Can we confer for a moment, Your

4    Honor?

5           THE COURT: Yes.

6           MR. PEDLAR: I have a quick fix to the language,

7    Your Honor.

8           THE COURT: All right.

9           MR. PEDLAR: And all the constituencies who are in

10   court can agree to it on the record.

11          THE COURT: All right.

12          MR. PEDLAR: Paragraph (1) in the fourth line, if

13   you strike, "shall be" - it shall be, "shall be" and strike

14   "transferred and".  So, it shall be authorized to pursue for

15   their own benefit that portion of the alter ego remedies if

16   any.  Strike "held by the estate against the affiliate

17   defendants".  And put in, "that is subject to the automatic

18   stay".  So that it reads, "Asbestos claimants shall be

19   authorized to pursue for their own benefit that portion of

20   the alter ego remedies, if any" - I guess it should be, I'm

21   sorry - that portion "if any, that is subject to the

22   automatic stay that relates to asbestos claimants' claims as

23   limited by the amount of such claims and to authorize them to

24   assert such remedy in the dividend recovery litigation."  So

25   that is all they are saying is, to the extent they have those

1  claims and they got swept into the estate - To the extent,

2  they have a general claim that's been swept into the estate

3  by the automatic stay, they get relief from the stay to

4  pursue that.  We are not then transferring anything to them.

5  They're pursuing their own claims.

6          THE COURT: Okay.  That seems to take the transfer

7  issue out.

8          MR. PARDO: Your Honor, I believe there's still

9  mischief here.  If you were instead, in order to honor Mr.

10 Pedlar's original statement to the Court, simply say that

11 "Upon the occurrence of the effective date, retroactive to

12 the date of the commencement of the litigation, asbestos

13 claimants shall", and then pick up the third line from the

14 bottom of that paragraph, "be entitled to assert in a

15 recovery action, any alter ego remedies that they hold

16 directly."

17         THE COURT: Oh, no, I think they're also entitled to

18 assert whatever they think is an appropriate remedy.  It may

19 not win, but they're entitled to assert it, and if they think

20 they've got a general right to recover, they're entitled to

21 assert it, and to the extent it's covered by the automatic

22 stay, it's no longer covered.  I'm not saying they have that

23 right, but if they intend to assert it, I think they can.

24         MR. PARDO: And can't - As long as there is language

25 in your order explaining that all of this is going to be left

1  up to the California court, in other words, what we do not

2  want to have happen, Your Honor.

3          THE COURT: So you want a sentence that says, This

4  Court is not conferring standing.

5          MR. PARDO: Right.

6          THE COURT:  This Court is authorizing the

7  litigation to be commenced.

8          MR. PARDO: Right, because we don't want them coming

9  with your order in one hand and this agreement in the other,

10 and waiving it in the California court or whatever court it

11 winds up in and saying -

12         THE COURT: Well, I can't confer standing.

13         MR. PARDO:  - Judge Fitzgerald vested standing and

14 jurisdiction in this by transferring the claim.

15         THE COURT: I don't think I have that kind of power

16 anyway.

17         MR. PARDO: Well, that's our issue.

18         UNIDENTIFIED SPEAKER:  The transcript of this

19 hearing is clear, Your Honor.  We're not going to take that

20 position.

21         MR. PEDLAR: Can I ask for the record whether that

22 modification is acceptable with the Futures and the ACC?

23         MR. READ: Yes, for the Futures Rep it is.

24         MR. LOCKWOOD: Yes, for the ACC, Your Honor.

25         THE COURT: So, essentially what I'm being asked to

1    do is put at the end of paragraph (1) that any interpretation

2    of this order is left to the discretion of the state court or

3    whatever court hears it, the trial court.

4              UNIDENTIFIED SPEAKER: No.

5              THE COURT: Because I am not conferring standing.  I

6    want to make it very clear.

7              MR. PEDLAR: Absolutely.

8              THE COURT: I am permitting the Hopkins to file

9    whatever they choose to file.

10             MR. PEDLAR: The Hopkins will be entitled to assert

11   whatever remedy - alter ego remedy they would have had absent

12   the filing of this bankruptcy case.  That's what you're

13   saying.  They can bring the same alter ego remedy that they

14   could have brought -

15             THE COURT: Right, anyway.

16             MR. PEDLAR: That's all -

17             THE COURT: That's what I'm attempting to do.

18   Lift the stay with respect to whatever alter ego remedy they

19   have.

20             MR. PARDO: And not authorizing - because it's the

21   authorization.

22             THE COURT: All right.  So I can - Well, if I say

23   may pursue, I mean, I'm not sure that -

24             MR. MALONEY: Judge, if I can clear it up.  The

25   authority that this Court is giving is only with respect to

1  authorizing them notwithstanding the automatic stay, which

2  the Court is lifting.

3      THE COURT: Right, that's correct.

4      MR. MALONEY: And that's the limit of it. And our

5  concern, frankly, as bolstered by Mr. Lockwood's comments

6  wanting to keep the original language in there, is that

7  anything beyond that is going to empower this Court to -

8  empower these plaintiffs to take something more than what I

9  think this Court is intending to give.

10     THE COURT: All right, let me see.  What about this:

11 The asbestos claimants may, without violating the automatic

12 stay, which is hereby lifted, pursue for their own benefit

13 the portion of alter ego, blah, blah, blah, that was formerly

14 subject to the stay.  It takes the word "authorized" out.  It

15 says they can file an action.  Seems to me that they've got

16 the right to pursue whatever they choose to pursue and

17 somebody else will say whether it's an appropriate action or

18 not.

19     MR. LOCKWOOD: I'm sorry.

20     THE COURT: It takes the word "authorized" out.  The

21 asbestos claimants may, without violating the automatic stay,

22 which is hereby lifted, pursue for their own benefit that

23 portion of the alter ego remedies, if any, that is subject to

24 the automatic stay, that relates the asbestos claimants'

25 claim as limited by the amount and so forth to the end of the

1  paragraph.

2           MR. LOCKWOOD: Your Honor, you sound like you say,

3  which is automatically lifted.  This is an agreement

4  language.  Are you saying we agree it is going to say that

5  the -

6           THE COURT: Oh, all right, which the Court will -

7  No, I'll say which the Court will lift in approving the

8  agreement then.  You're correct, thank you.

9           MR. PARDO: Your Honor, I believe that language

10  would be satisfactory so long as your covering order makes

11  clear that you're not, through the approval of this order,

12  attempting to confer standing.

13           THE COURT: Well, I don't think I need to do

14  anything more than lift the automatic stay.  This agreement's

15  going to do -

16           MR. LOCKWOOD: Your Honor, with all due respect,

17  this - it reminds me of insurance neutrality.  We have a

18  stranger to this bankruptcy case coming in here and telling

19  Your Honor that she should write an opinion saying certain

20  things so that it will benefit them in some state court

21  litigation.

22           THE COURT: Let me make this clear.  I'm not

23  attempting to benefit Imperial Tobacco in creating this

24  agreement or in approving this agreement.  I am attempting to

25  make sure that it reflects what I intend to do and lift the

1    stay.  So, to the extent that somebody is pointing out to me

2    that it doesn't have that effect, I'm happy to hear it.  I'm

3    not making rulings in favor of Imperial Tobacco.  I agree

4    with you.  This stay is not for their benefit, and they don't

5    have the right to contest the fact if the debtor wants to

6    lift the stay.

7         MR. LOCKWOOD: And they don't have the right to ask

8    Your Honor to make declaratory judgments in your order about

9    standing issues that they may or may want to assert somewhere

10   else.

11        THE COURT: No, they don't probably have that right

12   either.  But nonetheless, I think this does what I need it to

13   do.  It says, Upon the occurrence of the effective date as

14   defined in paragraph (b)(8) below, retroactive to the date of

15   the commencement of the dividend recovery litigation,

16   asbestos claimants may, without violating the automatic stay,

17   which the Court will lift in approving the agreement, pursue

18   for their own benefit that portion of the alter ego remedies,

19   if any, that are subject to the automatic stay that relate to

20   their claim as limited by the amount of the claim – What's

21   the rest?  - and to have authorized asbestos claimants to

22   assert such remedy in the dividend - oh, and to assert such

23   remedy in the dividend recovery litigation.  So, what I'm

24   saying is, they can bring anything they choose without

25   violating the stay related to the alter ego claims.

1            MR. PEDLAR: That's fine.

2            THE COURT: Okay.  So, I need  - I guess, paragraph

3    (1) redone or else I need another copy of it because this one

4    is kind of a mess.  And you said you had a different order?

5            MR. PEDLAR: Well, this is the order, Your Honor.

6            THE COURT: All right.

7            MR. PEDLAR: I think we all would prefer if you

8    would just interlineate and approve it, and we can always

9    pull it off the docket to get copies.

10            THE COURT: Okay.  Actually, I don't think I need

11    the words "subject to the automatic stay" since I say they

12    can do it without violating the stay.  That's just in lieu of

13    the parenthetical clause that's going to add more words.  Do

14    you agree?

15            MR. PARDO: I'm sorry, where are you, Your Honor?

16            THE COURT: I don't think I need that it's subject

17    to the automatic stay since I'm saying they may without

18    violating the stay which I lift.  I don't think I need the

19    second assertion in there that says that they can do it

20    without violating the stay.

21            MR. PARDO: Oh, you are back on paragraph (1)?

22            THE COURT: Yes.  I'm rewriting paragraph (1)

23    because no one would have been able to read the last version.

24    So, now, this is how it reads - make sure I've got all the

25    changes: Upon the occurrence of the effective date as defined

1  in paragraph (b)(8) below, retroactive to the date of the

2  commencement of the dividend recovery litigation, asbestos

3  claimants may, without violating the automatic stay which the

4  Bankruptcy Court will lift in approving this agreement,

5  pursue for their own benefit that portion of the alter ego

6  remedies, if any, that relates to asbestos claimant's claim

7  as limited by the amount of such claims - I think that should

8  be asbestos claimants' claims - as limited by the amount of

9  such claims and to assert such remedy in the dividend

10  recovery litigation.  Then the rest of this paragraph remains

11  the same.

12          MR. PARDO: Your Honor, why the additional - why

13  does that next sentence remain in?

14          THE COURT: Because they also have the right to

15  pursue whatever direct claims they choose and to the extent

16  that it was barred by the - I'm leaving it in, period.  I

17  don't see any - if the stay doesn't cover it, then it's

18  irrelevant.  If the stay does cover it, it's lifted.

19          MR. PARDO: That's fine.

20          THE COURT: All right, what other -

21          MR. PARDO: On the order, Your Honor, two

22  suggestions.  On the bottom of the last line on page 1,

23  established to modify the automatic - I believe you need to

24  insert the word "stay".

25          THE COURT: Thank you.

1              MR. PEDLAR: My apologies, Your Honor.

2              MR. PARDO: And on the carryover paragraph, the

3     first order paragraph –

4              THE COURT: Yes.

5              MR. PARDO: I don't believe it's appropriate for the

6     Court to approve subsequent amendments.  And I would object

7     to the language in all respects such, and I would propose

8     that that simply read, order that the alter ego agreement in

9     the form attached to it as Exhibit A is approved.

10             THE COURT: All right.  I'm going to change it to

11    say, Approved as attached Exhibit A without prejudice to the

12    parties seeking approval of any subsequent amendments that

13    are also approved by the ACC and FCR. That way it simply

14    won't be an issue.

15             MR. PARDO: Thank you, Your Honor.

16             MR. PEDLAR: Your Honor, are you saying that we need

17    to seek court approval then with respect to a change that is

18    only beneficial to the estate.  We obviously would not change

19    anything that's been the subject of anything this morning,

20    but we –

21             THE COURT: Yeah, I think under these circumstances

22    it would be better to do it.  You can do it on negative

23    notice, but nonetheless, I think it would probably be better

24    to do it that way.

25             MR. PEDLAR: Thank you, Your Honor.

1           THE COURT: Okay, that order will be entered.

2           MR. PEDLAR: Thank you.

3           MR. PARDO: Thank you, Your Honor.

4           UNIDENTIFIED SPEAKER: Thank you very much.

5           THE COURT: Thank you.

6           (Whereupon at 12:03 p.m. the hearing in this matter

7    was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18

19           I, Elaine M. Ryan, approved transcriber for the

20    United States Courts, certify that the foregoing is a correct

21    transcript from the electronic sound recording of the

22    proceedings in the above-entitled matter.

23

24    /s/ Elaine M. Ryan                         May 22, 2006
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221

# EXHIBIT C

**[to the Declaration of Mark M. Maloney]**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| THE FLINTKOTE COMPANY and | ) | Case No. 04-11300 (JKF) |
| FLINTKOTE MINES LIMITED, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Related Docket No. 1433 |
| | ) | Agenda Item No. 2 |
| | ) | May 15, 2006 at 9:30 a.m. |

## ORDER APPROVING ALTER EGO AGREEMENT
## IN CONNECTION WITH THE DIVIDEND RECOVERY LITIGATION

Upon the motion (the "Motion") of The Flintkote Company and Flintkote Mines

Limited (collectively, the "Debtors") for entry of an order (i) approving that certain "Agreement

Providing For Joint Prosecution Of Alter Ego Remedies" dated as of April 4, 2006 (the "Alter

Ego Agreement"), and (ii) modifying the automatic stay with respect thereto retroactive to the

date of the commencement of the Dividend Recovery Litigation[1] in the Superior Court, and the

Court having considered the Motion, the support of the relief requested by the ACC and the

FCR, the declarations of David J. Gordon filed in support of the Motion, the objections filed in

respect of the Motion, the supplemental pleadings filed in support of and in opposition to the

Motion, and the arguments of counsel; and it appearing that (a) due and proper notice of the

Motion was given and that no additional notice need be given, (b) the provisions of the Alter Ego

Agreement requiring approval under Bankruptcy Code section 363 are fair and equitable,

supported by a good business reason and were entered into in good faith; and (c) cause has been

established to modify the automatic _stay_ nunc pro nunc to the date of the commencement of the

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the
Motion.

Dividend Recovery Litigation in the Superior Court in order to carry out the purposes of the

Alter Ego Agreement, and good cause having been shown therefor; it is hereby

ORDERED, that the Alter Ego Agreement, in the form attached hereto as <u>Exhibit</u>

*without prejudice to the parties seeking approval of*

<u>A</u>, ~~including~~ any subsequent amendments thereto that are approved by the ACC and FCR and do

not have a material adverse impact on the estate, is approved in all respects; and it is further

ORDERED that the automatic stay of Bankruptcy Code section 362 is hereby

modified *nunc pro tunc* to the date of the commencement of the Dividend Recovery Litigation in

the Superior Court to enable the Hopkins Family to pursue alter ego remedies as provided in the

Alter Ego Agreement.

Dated: _____5/15_____, 2006

*Judith K. Fitzgerald*

Honorable Judith K. Fitzgerald

-2-

EXHIBIT "A"

## AGREEMENT PROVIDING FOR
## JOINT PURSUIT OF ALTER EGO REMEDIES

This "Agreement Providing For Joint Pursuit Of Alter Ego Remedies" (the "Agreement") is entered into as of April 4, 2006, by and among The Flintkote Company ("Debtor") and Marleen Hopkins, Michelle Hopkins and Michael Hopkins (collectively, "Asbestos Claimants") (Debtor and Asbestos Claimants are hereinafter referred to collectively as the "Parties" and individually as a "Party"), with reference to the following facts and recitals:

## RECITALS

A.    Debtor is the debtor and debtor in possession in a case being jointly administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 04-11300 (JKF) (the "Bankruptcy Case").

B.    Asbestos Claimants hold asbestos-related claims against Flintkote (the "Claims") and contend that they additionally have remedies against the present or former, non-debtor affiliates of Debtors for the payment of the Claims on alter ego, veil piercing, or similar theories of recovery (collectively, "Alter Ego Remedies").

C.    The Debtor is about to commence litigation (the "Dividend Recovery Litigation") against, among others, one or more former, non-debtor affiliates of the Debtor (an "Affiliate Defendant") and will assert, among other theories of recovery, Alter Ego Remedies against one or more Affiliate Defendants. The Dividend Recovery Litigation seeks to establish, among other things, that the Affiliate Defendants are liable to persons with asbestos-related claims against the Debtor.

D.    As a result of this Agreement, all theories of alter ego recovery to be asserted against Affiliate Defendants, including Imasco Limited, now known as Imperial Tobacco Canada Limited) ("Imasco"), can be brought in the same action by plaintiffs who collectively have standing to assert all such grounds for relief. This will have several benefits to the Debtor's estate (the "Estate") and its creditors, including the following: (1) the arrangement will allow the assertion that Imasco is the alter ego of the Debtor and therefore responsible for the payment of the claims against the Debtor to be determined on its merits, avoiding unnecessary procedural arguments over whether the Alter Ego Remedies are being asserted by the correct party; (2) a successful prosecution of all potential Alter Ego Remedies by either an individual claimant or the Estate should result in a direct benefit to all creditors of the Estate by creating res judicata and collateral estoppel issue preclusion rights with respect to Imasco; (3) by pooling resources, an individual claimant can more feasibly pursue Alter Ego Remedies in conjunction with the Estate's efforts; and (4) by having individual

claimants in the case, the trier of fact will be more able to appreciate fully the nature of the type of claims being asserted against Flintkote and the harm that has been caused by Imasco's dismantling of the Debtor's going concern operations and the upstreaming of Flintkote's assets.

E.    The Parties wish to proceed promptly with the Dividend Recovery Litigation with the Debtor and Asbestos Claimants as parties.  Accordingly, the Parties desire to authorize Asbestos Claimants to proceed on the Alter Ego Remedies on the terms and conditions set forth below.

## NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

## AGREEMENT

### A. Terms Of Joint Pursuit of Alter Ego Remedies.

1.    Authorization To Pursue Alter Ego Remedies.  Upon the occurrence of the Effective Date (as defined in Paragraph B.8 below), retroactive to the date of the commencement of the Dividend Recovery Litigation, Asbestos Claimants shall be *may, without violating the automatic stay, which the* pursue for their own benefit that portion of the Alter Ego Remedies, if any, held by the Estate against the Affiliate Defendants that relates to Asbestos Claimants' Claim, as limited by the amount of such Claims, and to have authorized Asbestos Claimants to assert such remedy in the Dividend Recovery Litigation.  Asbestos Claimants shall also be entitled to assert in the Dividend Recovery Litigation any Alter Ego Remedies that they hold directly.  Except as expressly provided for herein, this provision shall not otherwise affect the Alter Ego Remedies held by the Estate.

*may, without violating the automatic stay, which the Bkr. Court will lift in approving this Agreement.*

2.    Contribution To Dividend Recovery Litigation Expenses.  Asbestos Claimants recognize that their costs of litigation will be substantially reduced by the efforts of the Debtors in the Dividend Recovery Litigation, and agree to contribute to such litigation costs in the following manner:

a.    Asbestos Claimants shall limit the fees payable to their counsel in pursuing the Alter Ego Remedies to twenty-five percent (25%) of actual recoveries by Asbestos Claimants, either directly or as a result of any distribution on account of an allowed claim against the Estate as a result of the litigation of Asbestos Claimants' Claims against Imasco; and

b.    Asbestos Claimants shall retain all net recoveries as a result of the assertion of their Alter Ego Remedies (after payment of costs) up to $400,000 and shall pay any excess recoveries to the Estate, which excess recoveries shall be held for the benefit of asbestos claimants, and shall be contributed by the Estate to any asbestos trust established pursuant to section 524(g) of the Bankruptcy Code, or

2

otherwise, for distribution in accordance with the trust distribution procedures governing such asbestos trust as approved by the Bankruptcy Court, including in connection with confirmation of a plan or plans of reorganization for Flintkote and its affiliates.

3.     Settlement Of Alter Ego Remedies.  Claims related to the pursuit of Alter Ego Remedies shall not be settled without the consent of Debtors, the Asbestos Claimants, the Official Committee Of Asbestos Personal Injury Claimants appointed in the Bankruptcy Case (the "Committee") and the "Legal Representative For Future Asbestos Claimants" appointed in the Bankruptcy Case (the "Futures Representative"); provided, however, the consent of the Asbestos Claimants to any settlement approved by the Debtors, the Committee and the Futures Representative, shall not be unreasonably withheld.  If a dispute arises as to whether such consent by the Asbestos Claimants has been unreasonably withheld, then such dispute shall be submitted to the Bankruptcy Court for determination as a contested matter without the right to a trial by jury.  If an asbestos trust is created pursuant to section 524(g) of the Bankruptcy Code, the trustee or trustees of such trust (the "Asbestos Trust Trustee") may act for the Committee, the Futures Representative, and/or the Debtor under this provision to the extent provided in the confirmed plan or plans of reorganization.

4.     Management Of Alter Ego Litigation.  The special litigation counsel retained on behalf of the Estates to prosecute the Dividend Recovery Litigation ("DRLC"), acting under the direction of Debtor, the Committee and the Futures Representative in accordance with the terms of the Joint Prosecution Agreement, shall manage the litigation (and advance the expenses and costs incurred by Asbestos Claimants in respect thereof, subject to and in accordance with paragraph 2 above) on all Alter Ego Remedies issues common to the Dividend Recovery Litigation and the Alter Ego Remedies being asserted by Asbestos Claimants; provided, however, that Asbestos Claimants shall manage the particulars of their claim for recovery, but in a manner that is consistent with the interest of the Estate in the Dividend Recovery Litigation to the maximum extent feasible.

5.     Claim Amount.  The Parties agree that any amount determined to be owed to Asbestos Claimants on account of Asbestos Claimant's Claim in the Dividend Recovery Litigation shall be binding on the Debtor and the Estate but will not be enforced against the Debtor or the Estate except in accordance with the terms of a confirmed plan of reorganization in these cases and any § 524(g) trust distribution procedures approved by the Court in connection therewith.  Such claim shall be (a) allowed in the amount of any excess recovery turned over to the estate on account of Asbestos Claimants' Claims against Imasco as provided in Paragraph A.2.b, (b) classified as an asbestos personal injury claim against Flintkote and the Estate, and (c) treated under any asbestos trust established in the Bankruptcy Case in accordance with the trust distribution procedures governing any such asbestos trust.

3

## B. General Provisions

1.    Limitation on Third-Party Beneficiaries. No provision contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, the Committee, the Futures Representative, and the Asbestos Trust Trustee, if any.

2.    Successors and Assigns. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective legal representatives, successors, and assigns, including, in the case of Debtor, any trustee appointed under chapters 11 or 7 of the Bankruptcy Code, and the Asbestos Trust Trustee, if any.

3.    No Representations or Warranties. Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

4.    Headings. The descriptive headings of the several paragraphs of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

5.    Representation By Counsel. The Parties acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each Party has executed this Agreement with the consent and on the advice of such independent legal counsel. This Agreement is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

6.    Due Authorization. Each Party to this Agreement hereby represents and warrants that (i) such Party is duly authorized to enter into this Agreement without the permission of any third party; and (ii) the person purporting to execute this Agreement on behalf of such Party has been duly authorized to execute this Agreement on behalf of and bind such Party; provided, however, that this representation and warranty as against Debtor shall be of no force and effect with respect to matters that require the approval of the Bankruptcy Court in the Bankruptcy Case unless and until such approval is obtained.

7.    Entire Agreement; Amendment; Waiver. This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Agreement may not be modified or amended except in writing signed by the Parties hereto, with the consent of the Committee and the Futures Representative. No waiver of any term, provision or condition of this Agreement, in any

4

one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

8. Effective Date. Except as otherwise provided in this paragraph, this Agreement shall be binding upon Asbestos Claimants upon the execution of the Agreement by all signatories below (including the Committee and the Futures Representative), but it shall only be binding upon Debtor and the Estate upon entry of an order of Bankruptcy Court approving it after notice and an opportunity for a hearing. Absent the approval of this Agreement by the Bankruptcy Court, the parties shall be returned to the status quo ante as if this Agreement had not be executed by the Parties, and Asbestos Claimants shall cease any further prosecution involving the assertion of the Alter Ego Remedies in which the Estate has an interest but for the execution of this Agreement.

9. Governing Law and Choice of Forum. This Agreement shall be governed in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions, and by the United States Bankruptcy Code. The Bankruptcy Court shall be the exclusive forum to hear, determine and enter appropriate orders and judgments regarding all disputes in respect of this Agreement.

10. Counterparts. This Agreement may be executed in two or more counterparts by the Parties, and such counterparts shall be considered as and construed to be part of a single agreement. Signatures transmitted by facsimile shall have the same effect as original signatures.

5

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006                THE FLINTKOTE COMPANY

                                    By:
                                    Name:  DAVID J GORDON
                                    Its:   PRESIDENT


Dated: April 5, 2006                **MARLEEN HOPKINS, MICHELLE HOPKINS AND
                                    MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

                                    By:_____
                                        David R. Donadio, Brayton Purcell, LLP,
                                        authorized agent and attorney in fact


The foregoing is approved as to form and content:

Dated: April 5, 2006                **OFFICIAL COMMITTEE OF ASBESTOS
                                    PERSONAL INJURY CLAIMANTS**

                                    By: _____
                                    Name:_____
                                    Its:  _____

                                    **LEGAL REPRESENTATIVE OF FUTURE
                                    ASBESTOS PERSONAL INJURY CLAIMANTS**

Dated: April 5, 2006
                                    By: _____
                                    Name:_____

                                    Its:  _____

6

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

| Dated: April 5, 2006 | THE FLINTKOTE COMPANY  By: |
|---|---|
| | Name: |
| | Its: |

| Dated: April 5, 2006 | MARLEEN HOPKINS, MICHELLE |
|---|---|

HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS  By:

_David R. Donadio, Brayton Purcell,_

LLP,  authorized agent and attorney in fact

The foregoing is approved as to form and content:

| Dated: April 5, 2006 | OFFICIAL COMMITTEE OF ASBESTOS |
|---|---|

PERSONAL INJURY CLAIMANTS  By:

| | Name: |
|---|---|
| | Its: |

| Dated: April 5, 2006 | LEGAL REPRESENTATIVE OF FUTURE |
|---|---|

ASBESTOS PERSONAL INJURY CLAIMANTS  By:

| | Name: |
|---|---|
| | Its: |

**IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

Dated: April 5, 2006        **THE FLINTKOTE COMPANY**

                        By: _____
                        Name: _____
                        Its: _____


Dated: April 5, 2006        **MARLEEN HOPKINS, MICHELLE HOPKINS AND MICHAEL HOPKINS, ASBESTOS CLAIMANTS**

                        By: _____
                           David R. Donadio, Brayton Purcell, LLP,
                           authorized agent and attorney in fact


The foregoing is approved as to form and content:

Dated: April 5, 2006        **OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS**

                        By: _____
                        Name: _____
                        Its: _____


Dated: April 5, 2006        **LEGAL REPRESENTATIVE OF FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS**

                        By: *John Wayland*
                        Name: *JOHN WAYLAND REED*
                        Its: *AUTHORIZED AGENT AND ATTORNEY for JAMES J. MC MONAGLE*

6

The foregoing is approved as to form and content:

Dated: April 5, 2006

**OFFICIAL COMMITTEE OF ASBESTOS**
**PERSONAL INJURY CLAIMANTS**

By: _____

Name: _____

Its: _____

Dated: April __, 2006

**LEGAL REPRESENTATIVE OF FUTURE**
**ASBESTOS PERSONAL INJURY CLAIMANTS**

By: _____

Name: _____

Its: _____

6

# EXHIBIT D

**[to the Declaration of Mark M. Maloney]**

| Flintkote Claims Analysis | | |
|---|---|---|
| State | Number of Pending Claims | Percentage |
| AK | 8 | 0.0047% |
| AL | 87 | 0.0506% |
| AR | 605 | 0.3520% |
| AZ | 44 | 0.0256% |
| CA | 3682 | 2.1423% |
| CO | 193 | 0.1123% |
| CT | 145 | 0.0844% |
| DC | 28 | 0.0163% |
| DE | 440 | 0.2560% |
| FL | 2780 | 1.6175% |
| GA | 3472 | 2.0201% |
| HI | 54 | 0.0314% |
| IA | 14 | 0.0081% |
| ID | 6 | 0.0035% |
| IL | 2813 | 1.6367% |
| IN | 1606 | 0.9344% |
| KS | 3 | 0.0017% |
| KY | 221 | 0.1286% |
| LA | 6784 | 3.9471% |
| MA | 965 | 0.5615% |
| MD | 4318 | 2.5123% |
| ME | 11 | 0.0064% |
| MI | 3004 | 1.7478% |
| MN | 179 | 0.1041% |
| MO | 514 | 0.2991% |
| MS | 41291 | 24.0239% |
| MT | 74 | 0.0431% |
| NC | 784 | 0.4561% |
| ND | 239 | 0.1391% |
| NE | 70 | 0.0407% |
| NH | 1 | 0.0006% |
| NJ | 1951 | 1.1351% |
| NM | 88 | 0.0512% |
| NV | 34 | 0.0198% |
| NY | 5473 | 3.1843% |
| OH | 10825 | 6.2982% |
| OK | 538 | 0.3130% |
| OR | 61 | 0.0355% |
| PA | 5430 | 3.1593% |
| RI | 293 | 0.1705% |
| SC | 305 | 0.1775% |
| TN | 915 | 0.5324% |
| TX | 51514 | 29.9718% |
| UT | 222 | 0.1292% |
| VA | 6315 | 3.6742% |
| WA | 377 | 0.2193% |
| WI | 189 | 0.1100% |
| WV | 12452 | 7.2448% |
| WY | 16 | 0.0093% |
| MARIANA ISLANDS, PHILLIPPINES | 4 | 0.0023% |
| PUERTO RICO | 430 | 0.2502% |
| VIRGIN ISLANDS | 8 | 0.0047% |
| TOTAL | 171875 | 100.0000% |

EXHIBIT C

1  BRAD D. BRIAN (SBN 079001)
   brad.brian@mto.com
2  GREGORY D. PHILLIPS (SBN 118151)
   greg.phillips@mto.com
3  STUART N. SENATOR (State Bar No. 148009)
   stuart.senator@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Los Angeles, CA  90071-1560
   Telephone:   (213) 683-9100
6  Facsimile:   (213) 687-3702

7  ROHIT K. SINGLA (SBN 213057)
   rohit.singla@mto.com
8  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
9  San Francisco, CA 94105-2907
   Telephone:   (415) 512-4000
10  Facsimile:   (415) 512-4077

11  Attorneys for Defendant
   SULLIVAN & CROMWELL LLP

12

13  **UNITED STATES DISTRICT COURT**

14  **NORTHERN DISTRICT OF CALIFORNIA**

15  **SAN FRANCISCO DIVISION**

16  MARLENE HOPKINS, Individually and as
   Wrongful Death Heir, and as Successor-in-
17  Interest to NORMAN HOPKINS, JR., Deceased;
   and MICHELLE HOPKINS, and MICHAEL
18  HOPKINS, as Legal Heirs of NORMAN
   HOPKINS, Deceased, and THE FLINTKOTE
19  COMPANY, THE OFFICIAL COMMITTEE OF
   THE ASBESTOS PERSONAL INJURY
20  CLAIMANTS, and JAMES J. MCMONAGLE as
   the LEGAL REPRESENTATIVE FOR FUTURE
21  ASBESTOS PERSONAL INJURY
   CLAIMANTS,

22                Plaintiffs,

23        vs.

24  PLANT INSULATION COMPANY;
   UNIROYAL HOLDING, INC.; IMPERIAL
25  TOBACCO CANADA LIMITED; SULLIVAN
   & CROMWELL LLP; and DOES 1 through 100,

26              Defendants.

CASE NO.  C06-3051-BZ

**DEFENDANT SULLIVAN &
CROMWELL LLP'S NOTICE OF
JOINDER AND JOINDER IN
DEFENDANT IMPERIAL TOBACCO
CANADA LIMITED'S MOTION TO
(i) STAY CONSIDERATION OF
TRANSFER AND REMAND ISSUES
OR (ii)  TRANSFER THIS ACTION
TO THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF DELAWARE UPON
THE EXPIRATION OF THE
REQUESTED STAY**

DATE:   TBD
TIME:   TBD
JUDGE:  TBD

27

28

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE THAT defendant Sullivan & Cromwell LLP ("Sullivan

3    & Cromwell") hereby joins in the Motion to (i) Stay Consideration of Transfer and Remand

4    Issues or (ii) Transfer this Action to the United States District Court for the District of Delaware

5    Upon the Expiration of The Requested Stay, filed on or about May 5, 2006 by defendant Imperial

6    Tobacco Canada Limited ("Imperial").

7    Imperial has moved to transfer this action to the United States District Court for

8    the District of Delaware under Title 28, section 157(b)(5) of the United States Code.  This Court

9    should stay all proceedings to permit the Delaware District Court to rule on that motion.  Section

10   157 requires that the venue for personal injury actions relating to a bankruptcy proceeding should

11   be decided by the District Court in which the bankruptcy is pending.  Flintkote filed its

12   bankruptcy proceedings in the District of Delaware.

13   Transfer to the United States District Court for the District of Delaware is in the

14   interests of justice because related proceedings arising out of plaintiff Flintkote's bankruptcy have

15   been and will be pending in that District Court.  For example, Flintkote's entire plan of

16   reorganization will require District Court approval as it will apparently include an asbestos

17   personal injury trust and a related injunction under Section 524(g) of the Bankruptcy Code.  *See*

18   Imperial Tobacco's moving papers, at 8; 11 U.S.C. § 524(g)(3)(A).  Imperial Tobacco also has

19   stated its intent to seek withdrawal of the reference to the Bankruptcy Court of Flintkote's motion

20   to obtain permission to pursue this action against Sullivan & Cromwell and Imperial.  That

21   withdrawal request will also require consideration by the District Court.  11 U.S.C. § 157(d).

22   Appeals from bankruptcy court orders are also, in the first instance, to the United States District

23   Court for the District of Delaware.  28 U.S.C. § 158(a).  One such appeal in the Flintkote

24   bankruptcy has already been determined by the Delaware District Court.  *In re Kaiser Aluminum*

25   *and In re The Flintkote Co., consolidated,* 327 B.R. 554 (D. Del. 2005).  If a jury trial is requested

26   with respect to any adversary proceeding involving the Flintkote bankruptcy, any party can

27   require that such trial be conducted by the District Court.  11 U.S.C. § 157(e).

28   Moreover, the claim against Sullivan & Cromwell here is based upon alleged

1181607.3                          - 1 -        SULLIVAN & CROMWELL'S JOINDER IN STAY AND
                                                TRANSFER MOTION - CASE NO. C06-3051 BZ

1  actions by Sullivan & Cromwell undertaken as an attorney for and agent of Flintkote.  Flintkote is

2  incorporated in Delaware.  Under Delaware law, Sullivan & Cromwell therefore can be

3  indemnified by, and has a potential claim against, Flintkote's bankruptcy estate for its costs of

4  defense in this action.  *See, e.g.*, 8 Del. C. § 145(a), (c).  This action has been initiated post-

5  petition by the Flintkote Plaintiffs on behalf of the Flintkote bankruptcy estate, so Sullivan &

6  Cromwell's claim would be an administrative claim which gives it priority over almost every

7  other class of claims.  It makes sense that the litigation and ultimate resolution of the underlying

8  claim against Sullivan & Cromwell be overseen by the District Court for the state whose law

9  would govern the indemnification claim and the District in which the bankruptcy is pending.

10          In addition, two of the plaintiffs who are parties to the sole claim against Sullivan

11  & Cromwell in this litigation – the "Official Committee of the Asbestos Personal Injury

12  Claimants" and the "Legal Representative for Future Asbestos Personal Injury Claimants" – are

13  creations of the Delaware federal court; to the extent that they have authority to bring their claim

14  against Sullivan & Cromwell, that authority derives from the Delaware federal court.  The only

15  other plaintiff who is a party to the claim against Sullivan & Cromwell in this litigation, The

16  Flintkote Company, is a Delaware corporation that chose the District of Delaware as the district

17  in which its bankruptcy proceeding would be heard.

18          Any claim against Sullivan & Cromwell is property of Flintkote's bankruptcy

19  estate and is being pursued pursuant to a "joint prosecution agreement" over which the Delaware

20  federal court has exclusive jurisdiction.  *See* Imperial Tobacco's moving papers, Ex. B.  When

21  issues arise that require the plaintiffs to obtain further direction with respect to the joint

22  prosecution agreement, it will be more expeditious as well as convenient if this action is pending

23  in the district with jurisdiction over those joint prosecution agreement issues.

24          Finally, many witnesses whom documents relied upon by the First Amended

25  Complaint ("Complaint") identify as central to the claim against Sullivan & Cromwell are located

26  much closer to Delaware than to California.  For example, the Sullivan & Cromwell partner

27  identified as having participated in the board meetings at which the Flintkote dividends in

28  question were approved works in New York City.  *See* Complaint, ¶ 25 (Sullivan & Cromwell

1    participated by phone in December 19, 1986 board meeting), ¶ 28 (Sullivan & Cromwell

2    participated by phone in July 22, 1987 board meeting); attached Declaration of Mark F.

3    Rosenberg, ¶ 2 & Ex. A (December 19, 1986 board meeting minutes, identifying Philip L.

4    Graham of Sullivan & Cromwell); *id.*, ¶ 3 & Ex. B (July 22, 1987 board meeting minutes also

5    identifying Mr. Graham); www.sullcrom.com[1] (identifying Mr. Graham as officed in New York).

6    Resource Planning Corporation – which is alleged to have advised on Flintkote's asbestos-related

7    liabilities in 1986 and 1987 (*e.g.,* Complaint, ¶¶ 23, 28, 36)– is identified on the title page of its

8    June 23, 1987 report as having been located in the District of Columbia.  Rosenberg Decl., ¶ 4 &

9    Ex. C at Ex. A thereto (report attached to June 25, 1987 memo referenced in Complaint, ¶¶ 23,

10   28, 36).[2]  The lead partner for Flintkote at the law firm Thompson, Hine & Flory (now known as

11   Thompson Hine LLP) – which also prepared a report in conjunction with the June 25, 1987 memo

12   referenced in the Complaint (Rosenberg Decl., ¶ 4 & Ex. C, at p. 29 & Ex. B thereto) –

13   represented Flintkote from the firm's Cleveland, Ohio office; Michael L. Hardy, whose initials

14   "MLH" appear at the end of the report (*id.*), is listed by his law firm as the "Partner in Charge" of

15   the Cleveland office.[3]  The consulting firm of Chambers Associates, which the Complaint alleges

16   was hired to conduct "the first ever study of Flintkote's asbestos-related personal injury

17   liabilities" (Complaint, ¶ 44), is headquartered in the District of Columbia.[4]

18            Under all of these circumstances, it will serve the interests of justice for this

19   litigation (including any remand motion that might be filed) also to be heard by the United States

20   District Court for the District of Delaware, all as stated more fully in Imperial Tobacco's motion.

21   Transfer is appropriate under both the general authority of Title 28, section 1404(a) and the

22

23   [1] The particular URL is: http://www.sullcrom.com/lawyers/detail.aspx?attorney=51&pid=&iid=&rid=. Attached Declaration of Stuart N. Senator, ¶ 2 & Ex. D.

24   [2] Resource Planning Corporation appears now to be operating under the name Analysis Research

25   Planning Consulting (ARPC), still in the District of Columbia.  *See* www.arpc.com; http://www.arpc.com/index_files/Leadership_Team.htm (listing Tom Florence– whose resume is included in the RPC materials attached to the June 25, 1987 memo – as President of ARPC).

26   Senator Decl., ¶ 3 & Ex. E.

27   [3] *See* URL: http://www.thompsonhine.com/lawyers/bio.php?bioID=131.  Senator Decl., ¶ 4 & Ex. F.

     [4] *See* URL: http://www.corporate-ir.net/ireye/ir_site.zhtml?ticker=nci&script=410&layout=0&item_id=189189.

28   Senator Decl., ¶ 5 & Ex. G.

1   specific authority of Title 28, section 1412, which applies where the litigation relates to a case or

2   proceeding under Title 11.

3

4   DATED: May 9, 2006                          MUNGER, TOLLES & OLSON LLP

5

6                                               By:_____/S/_____

7                                                              BRAD D. BRIAN

8                                               Attorneys for Defendant
                                                SULLIVAN & CROMWELL LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT D

**U.S. District Court**
**California Northern District (San Francisco)**
**CIVIL DOCKET FOR CASE #: 3:06-cv-03051-MHP**


Hopkins et al v. Plant Insulation Company et al
Assigned to: Hon. Marilyn H. Patel
Demand: $0
Cause: 28:1441 Petition for Removal

Date Filed: 05/05/2006
Jury Demand: Defendant
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Marlene Hopkins**
*Individually, as Wrongful Death Heir,*
*and as Successor-in-Interest to*
*Norman Hopkins, Jr., Deceased*

represented by **Gilbert L. Purcell**
Brayton & Purcell, LLP
222 Rush Landing Road
P.O. Box 6169
Novato, CA 94948-6169
415/898-1555
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan R. Brayton**
Brayton & Purcell, LLP
222 Rush Landing Road
P.O. Box 6169
Novato, CA 94948-6169
415/898-1555
*ATTORNEY TO BE NOTICED*

**David R. Donadio**
Brayton Purcell, LLP
222 Rush Landing Road
P.O. Box 6169
Novato, CA 94948-6169
415/898-1555
Fax: 415/898-1247
Email: DDonadio@braytonlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michelle Hopkins**

represented by **Gilbert L. Purcell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan R. Brayton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David R. Donadio**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Michael Hopkins**                    represented by  **Gilbert L. Purcell**
*as Legal Heirs of Norman Hopkins,*                    (See above for address)
*Deceased*                                             *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Alan R. Brayton**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **David R. Donadio**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**The Flintkote Company**              represented by  **Stephen M. Snyder**
*The Official Committee of the*                        Snyder Miller & Orton, LLP
*Asbestos Personal Injury Claimants*                   111 Sutter, Ste 1950
                                                       San Francisco, CA 94104
                                                       415-962-4402
                                                       Fax: 415-962-4401
                                                       Email: ssnyder@smollp.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Alan Duane Pedlar, Esq.**
                                                       The Law Office Of Alan Pedlar, A
                                                       Professional Corporation
                                                       1112 Via Malibu
                                                       Aptos, CA 95003
                                                       (831) 688-2667
                                                       Fax: (831) 401-2402
                                                       Email: apedlar@cruzio.com
                                                       *ATTORNEY TO BE NOTICED*

**Eliot S. Jubelirer**
Morgenstein & Jubelirer LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
415-901-8700
Fax: 415-901-8701
*ATTORNEY TO BE NOTICED*

**James L. Miller**
Snyder Miller & Orton
111 Sutter, Ste 1950
San Francisco, CA 94104
415-962-4403
Fax: 415-962-4401
Email: jmiller@smollp.com
*ATTORNEY TO BE NOTICED*

**Jean L. Bertrand**
Morgenstein & Jubelirer LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
415-901-8700
Fax: 415-901-8701
Email: jlb@mjllp.com
*ATTORNEY TO BE NOTICED*

**Kelly C. Wooster**
Snyder Miller & Orton, LLP
111 Sutter, Ste 1950
San Francisco, CA 94104
415-962-4416
Fax: (209) 785-8455
Email: kcw@caltel.com
*ATTORNEY TO BE NOTICED*

**Peter P. Meringolo**
Snyder Miller & Orton, LLP
111 Sutter, Ste 1950
San Francisco, CA 94104
415/962/4414
Fax: 415/962/4401
Email: pmeringolo@smollp.com
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**James J. McMonagle**                    represented by    **Stephen M. Snyder**
*as the Legal Representative for*                          (See above for address)
*Future Asbestos Personal Injury*                         *LEAD ATTORNEY*
*Claimants*                                               *ATTORNEY TO BE NOTICED*

                                                           **Alan Duane Pedlar, Esq.**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Eliot S. Jubelirer**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **James L. Miller**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Jean L. Bertrand**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kelly C. Wooster**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Peter P. Meringolo**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Plant Insulation Company**


**<u>Defendant</u>**

**Uniroyal Holding, Inc.**


**<u>Defendant</u>**

**Imperial Tobacco Canada Limited**        represented by    **Loren Kieve**
                                                           Quinn Emanuel Urquhart Oliver &
                                                           Hedges, LLP

50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6600
Fax: 415-875-6700
Email:
lorenkieve@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James A. Pardo, Jr.**
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
404-572-4600
Fax: 404-572-5100
*ATTORNEY TO BE NOTICED*

**L. Joseph Loveland**
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
404-572-4600
Fax: 404-572-5100
*ATTORNEY TO BE NOTICED*

**Mark M. Maloney**
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
US
404-572-4600
Fax: 404-572-5100
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sullivan & Cromwell LLP**          represented by   **Brad D. Brian**
Munger Tolles & Olson LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
213-683-9100
Fax: 213-683-3702
Email: BrianBD@mto.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory D. Phillips**
Munger Tolles & Olson LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
213-683-9100
Fax: 213-687-3702
*ATTORNEY TO BE NOTICED*

**Rohit K. Singla**
Munger Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105-2907
415/512-4032
Fax: 415/512-4077
Email: singlark@mto.com
*ATTORNEY TO BE NOTICED*

**Stuart N. Senator**
Munger Tolles & Olson LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
213-683-9528
Fax: 213-687-3702
Email: stuart.senator@mto.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/05/2006 | 1 | NOTICE OF REMOVAL - [No Process] from San Francisco County Superior Court. Their case number is CGC-06-450944. [Filing Fee: $350.00, Receipt Number 3385252]. Filed by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | 2 | EXHIBITS in Support of re [1] Notice of Removal. Filed by Defendant Imperial Tobacco Canada Limited. (Related document(s)[1]). (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | 3 | ADR SCHEDULING ORDER: Case Management Statement due 7/31/2006 & Initial Case Management Conference set for 8/7/2006 at 4:00 P.M.. (Attachments: #(1) Standing Order). (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | 4 | NOTICE OF MOTION & MEMORANDUM in Support of Motion to (i) Stay Consideration of Transfer & Remand Issues or (ii) Transfer this |

| | | |
|---|---|---|
| | | Action to the United States District Court for the District of Delaware Upon the Expiration of the Requested Stay. Filed by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | 5 | EXHIBITS In Support of re [4] Notice of & Memorandum in Support of MOTION to (i) Stay Consideration of Transfer & Remand Issues or (ii) Transfer this Action to the United States District Court for the District of Delaware Upon the Expiration of the Requested Stay. Filed by Defendant Imperial Tobacco Canada Limited. (Related document(s)[4]). (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | | RECEIVED ORDER: [Proposed] Order Staying Proceedings Pending Consideration by the United States District Court for the District of Delaware of Transfer Pursuant to 28 U.S.C. Section 157(b)(5) re [4] Submitted by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Entered: 05/08/2006) |
| 05/05/2006 | 6 | JOINDER in re [1] Notice of Removal. Filed by Defendant Sullivan & Cromwell LLP, Sullivan & Cromwell LLP. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | 7 | APPLICATION of Attorney L. Joseph Loveland For Leave to Appear in Pro Hac Vice [Filing Fee: $210.00, Receipt No. 3385253]. Filed by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | | RECEIVED ORDER: [Proposed] Order Granting Application of L. Joseph Loveland for Admission Pro Hac Vice re [7] Submitted by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Entered: 05/08/2006) |
| 05/05/2006 | 8 | APPLICATION of Mark M. Maloney for Leave to Appear in Pro Hac Vice [Filing Fee: $210.00, Receipt No. 3385253]. Filed by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | | RECEIVED ORDER: [Prorposed] Order Granting Application of Mark M. Maloney for Admission Pro Hac Vice re [8] Submitted by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Entered: 05/08/2006) |
| 05/05/2006 | 9 | APPLICATION of Attorney James A. Pardo, Jr. for Leave to Appear in Pro Hac Vice [Filing Fee: $210.00, Receipt No. 3385253]. Filed by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | | RECEIVED ORDER: [Prorposed] Order Granting Application of James |

| | | |
|---|---|---|
| | | A. Pardo, Jr. for Admission Pro Hac Vice re [9] Submitted by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Entered: 05/08/2006) |
| 05/05/2006 | 10 | CORPORATE DISCLOSURE STATEMENT Filed by Defendant Imperial Tobacco Canada Limited. (tn, COURT STAFF) (Filed on 5/5/2006) (Entered: 05/08/2006) |
| 05/05/2006 | | CASE DESIGNATED for Electronic Filing. (tn, COURT STAFF) (Entered: 05/08/2006) |
| 05/08/2006 | 13 | SUPPLEMENTAL PROOF OF SERVICE Filed by Defendant Imperial Tobacco Canada Limited re [7] Application for leave to appear in Pro Hac Vice, [1] Notice of Removal, [4] MOTION to Stay & MOTION to Transfer Case, [9] Application for leave to appear in Pro Hac Vice, [10] Notice (Other), 3 ADR Scheduling Order, [2] Exhibits, [5] Exhibits, [8] Application for leave to appear in Pro Hac Vice & *Received Proposed Orders.* (tn, COURT STAFF) (Filed on 5/8/2006) (Entered: 05/10/2006) |
| 05/09/2006 | 11 | Joinder *in Defendant Imperial Tobacco Canada Limited's Motion to (i) Stay Consideration of Transfer and Remand Issues or (ii) Transfer this Action to the United States District Court for the District of Delaware Upon the Expiration of the Requested Stay* by Sullivan & Cromwell LLP, Sullivan & Cromwell LLP. (Brian, Brad) (Filed on 5/9/2006) (Entered: 05/09/2006) |
| 05/09/2006 | 12 | Declaration of Mark F. Rosenberg and Stuart N. Senator in Support of 11 Joinder, *In Defendant Imperial Tobacco Canada Limited's Motion to (i) Stay Consideration of Transfer and Remand Issues or (ii) Transfer this Action to the United States District Court for the District of Delaware upon the Expiration of the Requested Stay* filed bySullivan & Cromwell LLP. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C Part 1# 4 Exhibit C Part 2# 5 Exhibit D# 6 Exhibit E# 7 Exhibit F# 8 Exhibit G)(Related document(s)11) (Brian, Brad) (Filed on 5/9/2006) (Entered: 05/09/2006) |
| 05/10/2006 | 14 | Brief *regarding Declination to proceed before a Magistrate Judge and Request for assignment to a United States District Judge* filed byImperial Tobacco Canada Limited. (Kieve, Loren) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 15 | MOTION to Remand *Action to State Court and Memo of Points and Authorities* filed by The Flintkote Company. Motion Hearing set for 6/21/2006 10:00 AM in Courtroom G, 15th Floor, San Francisco. (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 16 | Declaration of David J. Gordon in Support of 15 MOTION to Remand |

| | | |
|---|---|---|
| | | *Action to State Court and Memo of Points and Authorities* filed byThe Flintkote Company. (Related document(s)15) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 17 | Declaration of Alan R. Brayton in Support of 15 MOTION to Remand *Action to State Court and Memo of Points and Authorities* filed byThe Flintkote Company. (Related document(s)15) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 18 | Declaration of Alan Pedlar in Support of 15 MOTION to Remand *Action to State Court and Memo of Points and Authorities* filed byThe Flintkote Company. (Related document(s)15) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 19 | EXHIBITS re 18 Declaration in Support *Exhibit 1 to Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 20 | EXHIBITS re 18 Declaration in Support *Exhibit 2 to Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 21 | EXHIBITS re 18 Declaration in Support *Exhibit 3 to Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 22 | EXHIBITS re 18 Declaration in Support *Exhibit 4 to Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 23 | EXHIBITS re 18 Declaration in Support *Exhibit 5 to Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 24 | EXHIBITS re 18 Declaration in Support *Exhibit 6 of Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 25 | EXHIBITS re 18 Declaration in Support *Exhibit 7 to Pedlar Declaration* filed byThe Flintkote Company. (Related document(s)18) (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 26 | Proposed Order re 15 MOTION to Remand *Action to State Court and Memo of Points and Authorities* by The Flintkote Company. (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 27 | Certificate of Interested Entities (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/10/2006 | 28 | NOTICE by The Flintkote Company *Corporate Disclosure Statement* |

| | | |
|---|---|---|
| | | (Miller, James L.) (Filed on 5/10/2006) (Entered: 05/10/2006) |
| 05/11/2006 | 29 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (ls, COURT STAFF) (Filed on 5/11/2006) (Entered: 05/11/2006) |
| 05/11/2006 | 30 | NOTICE of Appearance by Peter P. Meringolo (Meringolo, Peter) (Filed on 5/11/2006) (Entered: 05/11/2006) |
| 05/12/2006 | 31 | ORDER REASSIGNING CASE. Case reassigned to Judge Marilyn H. Patel for all further proceedings. Judge Bernard Zimmerman no longer assigned to the case. Signed by Executive Committee on 5/12/06. (ha, COURT STAFF) (Filed on 5/12/2006) (Entered: 05/12/2006) |
| 05/12/2006 | 32 | STIPULATION *TO EXTEND SULLIVAN & CROMWELL LLP'S TIME TO RESPOND TO THE COMPLAINT* by Sullivan & Cromwell LLP. (Singla, Rohit) (Filed on 5/12/2006) (Entered: 05/12/2006) |
| 05/12/2006 | 33 | Supplemental MOTION to Stay *(i) Consideration of Transfer Remand Issues or (ii) Transfer this Action to the United States District Court for the District of Delaware Upon the Expiration of the Requested Stay* filed by Imperial Tobacco Canada Limited. Motion Hearing set for 6/19/2006 02:00 PM. (Kieve, Loren) (Filed on 5/12/2006) (Entered: 05/12/2006) |
| 05/15/2006 | 34 | Amended MOTION to Remand *Action to State Court* filed by The Flintkote Company. Motion Hearing set for 6/19/2006 02:00 PM in Courtroom 15, 18th Floor, San Francisco. (Attachments: # 1 Proof of Service)(Meringolo, Peter) (Filed on 5/15/2006) (Entered: 05/15/2006) |
| 05/16/2006 | 35 | STIPULATION AND ORDER extending time for defendant Sullivan & Cromwell LLP to respond to complaint; Signed by Judge Marilyn Hall Patel on 5/15/2006. (awb, COURT-STAFF) (Filed on 5/16/2006) (Entered: 05/16/2006) |
| 05/16/2006 | 36 | Certificate of Interested Entities (Singla, Rohit) (Filed on 5/16/2006) (Entered: 05/16/2006) |
| 05/17/2006 | 37 | DEMAND for Trial by Jury by Sullivan & Cromwell LLP. (Brian, Brad) (Filed on 5/17/2006) (Entered: 05/17/2006) |
| 05/19/2006 | 38 | CERTIFICATE OF SERVICE by Michael Hopkins, The Flintkote Company, James J. McMonagle, Marlene Hopkins, Michelle Hopkins re 34 Amended MOTION to Remand *Action to State Court* (gba, COURT STAFF) (Filed on 5/19/2006) (Entered: 05/23/2006) |
| 05/19/2006 | 39 | CERTIFICATE OF SERVICE by Michael Hopkins, The Flintkote Company, James J. McMonagle, Marlene Hopkins, Michelle Hopkins re 34 Amended MOTION to Remand *Action to State Court (Rohit K. Singla)* (gba, COURT STAFF) (Filed on 5/19/2006) (Entered: 05/23/2006) |

| 05/23/2006 | 40 | CLERK'S NOTICE re: Failure to E-File and/or Failure to Register as an E-Filer re: #38-39 Proofs of Service on Amended Motion to Remand (gba, COURT STAFF) (Filed on 5/23/2006) (Entered: 05/23/2006) |
|---|---|---|
| 05/24/2006 | 41 | STIPULATION *TO EXTEND SULLIVAN & CROMWELL LLP'S TIME TO RESPOND TO THE COMPLAINT* by Sullivan & Cromwell LLP. (Singla, Rohit) (Filed on 5/24/2006) (Entered: 05/24/2006) |
| 05/26/2006 | 42 | STIPULATION AND ORDER extending time to 6/20/2006 for defendant Sullivan & Cromwell to respond to first amended complaint; Signed by Judge Marilyn Hall Patel on 5/26/2006. (awb, COURT-STAFF) (Filed on 5/26/2006) (Entered: 05/26/2006) |
| 05/30/2006 | 43 | Memorandum in Opposition *to Defendants' Motion to Stay or Transfer* filed byThe Flintkote Company. (Meringolo, Peter) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/30/2006 | 44 | Declaration of James L. Miller in Support of 43 Memorandum in Opposition *to Defendants' Motion to Stay or Transfer* filed byThe Flintkote Company. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3# 4 Exhibit Exhibit 4# 5 Exhibit Exhibit 5# 6 Exhibit Exhibit 6# 7 Exhibit Exhibit 7# 8 Exhibit Exhibit 8# 9 Exhibit Exhibit 9)(Related document(s)43) (Meringolo, Peter) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/30/2006 | 45 | Proposed Order re 43 Memorandum in Opposition *to Defendant's Motion to Stay or Transfer* by The Flintkote Company. (Meringolo, Peter) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/30/2006 | 46 | Declaration of Rohit K. Singla *In Supoprt of Defendant Sullivan & Cromwell LLP's Opposition to Plaintiffs' Motion to Remand* filed bySullivan & Cromwell LLP. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12)(Brian, Brad) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/30/2006 | 47 | Memorandum in Opposition *to Plaintiff's Motion to Remand* filed byImperial Tobacco Canada Limited. (Kieve, Loren) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/30/2006 | 48 | Declaration of Mark M. Maloney in Support of 47 Memorandum in Opposition filed byImperial Tobacco Canada Limited. (Related document(s)47) (Kieve, Loren) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/30/2006 | 49 | Declaration of Mario Tombari in Support of 47 Memorandum in Opposition filed byImperial Tobacco Canada Limited. (Related document(s)47) (Kieve, Loren) (Filed on 5/30/2006) (Entered: 05/30/2006) |

| 05/30/2006 | <u>50</u> | Memorandum in Opposition *to Plaintiffs' Motion to Remand* filed bySullivan & Cromwell LLP. (Brian, Brad) (Filed on 5/30/2006) (Entered: 05/30/2006) |
| 05/31/2006 | <u>51</u> | Proposed Order re <u>47</u> Memorandum in Opposition by Imperial Tobacco Canada Limited. (Kieve, Loren) (Filed on 5/31/2006) (Entered: 05/31/2006) |

**Superior Court of California, County of San Francisco**
Case Number: CGC-06-450944
Title: MARLENE HOPKINS et al VS. PLANT INSULATION COMPANY et al
Cause of Action: OTHER NON EXEMPT COMPLAINTS
Generated: May-31-2006 8:39 am PST

<u>Register of Actions</u>    <u>Parties</u>    <u>Attorneys</u>    <u>Calendar</u>    <u>Payments</u>    <u>Documents</u>

# Register of Actions

Date Range: First Date [ APR-05-2006 ]    Last Date [ MAY-05-200 ] (Dates must be entered as MMM-DD-YYYY)

[ Descending Date Sequence    ▼ ]    [ ALL FILING TYPES    ▼ ]    [ Submit ]

| Date | Proceedings | Document | Fee |
|------|-------------|----------|-----|
| MAY-05-2006 | FIRST APPEARANCE FEE PD W/COMPLEX FEE FILED BY DEFENDANT SULLIVAN & CROMWELL LLP | | 885.00 |
| MAY-05-2006 | NTC OF REMOVAL FILED BY DEFENDANT SULLIVAN & CROMWELL LLP | | |
| MAY-05-2006 | NOTICE OF FILING NOTICE OF REMOVAL FILED BY DEFT IMPERIAL TOBACCO CANADA LIMITED | | |
| MAY-04-2006 | ANSWER TO 1ST AMENDED COMPLAINT FILED BY DEFENDANT IMPERIAL TOBACCO CANADA LIMITED | View | 885.00 |
| MAY-04-2006 | POS OF FIRST AMENDED COMPLT FILED BY PLTF | | |
| MAY-02-2006 | PROOF OF HAND DELIVERY AMENDED COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY , AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS MCMONAGLE, JAMES AS THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS | | |
| APR-27-2006 | 1ST AMENDED COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY , AS WRONGFUL DEATH HEIR AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS MCMONAGEE, JAMES AS THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS AS TO DEFENDANT PLANT INSULATION COMPANY UNIROYAL HOLDING, INC. IMPERIAL TOBACCO CANADA LIMITED SULLIVAN & CROMWELL LLP DOES 1-100 | View | |
| APR-20-2006 | PROOF OF HAND DELIVERY (APPLICATION FOR DESIGNATION OF COMPLEX LIT) FILED BY PLAINTIFF THE | | |

| | | | |
|---|---|---|---|
| | FLINTKOTE COMPANY AS TO DEFENDANT SULLIVAN & CROMWELL LLP | | |
| APR-20-2006 | SUMMONS ON COMPLAINT, PROOF OF SERVICE ONLY, FILED BY PLAINTIFF THE FLINTKOTE COMPANY SERVED APR-07-2006, PERSONAL SERVICE, ON DEFENDANT IMPERIAL TOBACCO CANADA LIMITED | | |
| APR-20-2006 | PROOF OF PERSONAL SERVICE (APPLICATION FOR DESIGNATION OF COMPLEX LITIGATION) PARTY SERVED: IMPERIAL TOBACCO CANADA LIMITED FILED BY PETITIONER THE FLINTKOTE COMPANY | | |
| APR-14-2006 | APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY | | 40.00 |
| APR-10-2006 | SUMMONS ON COMPLAINT, PROOF OF SERVICE ONLY, FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY SERVED APR-07-2006, SUBSTITUTE SERVICE ON NATURAL PERSON, ON DEFENDANT SULLIVAN & CROMWELL LLP | | |
| APR-05-2006 | NOTICE TO PLAINTIFF | View | |
| APR-05-2006 | OTHER NON-EXEMPT COMPLAINTS, COMPLAINT FILED BY PLAINTIFF HOPKINS, MARLENE , INDIVIDUALLY, AS WRONGFUL DEATH HEIR, AND AS SUCCESSOR-IN-INTEREST TO NORMAN HOPKINS, JR., DECEASED HOPKINS, MICHELLE , AS LEGAL HEIR OF NORMAN HOPKINS, DECEASED HOPKINS, MICHAEL , AS LEGAL HEIR OF NORMAN HOPKINS THE FLINTKOTE COMPANY AS TO DEFENDANT PLANT INSULATION COMPANY UNIROYAL HOLDING, INC. IMPERIAL TOBACCO CANADA LIMITED SULLIVAN & CROMWELL LLP DOES 1-100 SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR SEP-08-2006 PROOF OF SERVICE DUE ON JUN-05-2006 CASE MANAGEMENT STATEMENT DUE ON AUG-24-2006 COMPLEX LITIGATION ASSIGNMENT REQUESTED BY FILING PARTIES, FEE INCLUDED IN FILING FEE | View | 885.00 |

EXHIBIT E

1    BRAD D. BRIAN (SBN 079001)
       brad.brian@mto.com
2    GREGORY D. PHILLIPS (SBN 118151)
       gregory.phillips@mto.com
3    STUART N. SENTAOR (SBN 148009)
       stuart.senator@mto.com
4    MUNGER, TOLLES & OLSON LLP
     355 South Grand Avenue
5    Thirty-Fifth Floor
     Los Angeles, CA  90071-1560
6    Telephone:    (213) 683-9100
     Facsimile:    (213) 687-3702
7
     ROHIT K. SINGLA (SBN 213057)
8      rohit.singla@mto.com
     MUNGER, TOLLES & OLSON LLP
9    560 Mission Street
     San Francisco, CA 94105-2907
10   Telephone:  (415) 512-4000
     Facsimile:  (415) 512-4077
11
     Attorneys for Defendant
12   SULLIVAN & CROMWELL LLP

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                     SAN FRANCISCO DIVISION

16   MARLENE HOPKINS, Individually and as          CASE NO.  C06-3051-MHP
     Wrongful Death Heir, and as Successor-in-
17   Interest to NORMAN HOPKINS, JR., Deceased;     DECLARATION OF ROHIT K.
     and MICHELLE HOPKINS, and MICHAEL             SINGLA IN SUPPORT OF
18   HOPKINS, as Legal Heirs of NORMAN            DEFENDANT SULLIVAN &
     HOPKINS, Deceased, and THE FLINTKOTE          CROMWELL LLP'S OPPOSITION
     COMPANY, THE OFFICIAL COMMITTEE OF           TO PLAINTIFFS' MOTION
19   THE ASBESTOS PERSONAL INJURY                  TO REMAND
     CLAIMANTS, and JAMES J. MCMONAGLE as
20   the LEGAL REPRESENTATIVE FOR FUTURE
     ASBESTOS PERSONAL INJURY
21   CLAIMANTS,

22                Plaintiffs,

23         vs.

24   PLANT INSULATION COMPANY;
     UNIROYAL HOLDING, INC.; IMPERIAL
25   TOBACCO CANADA LIMITED; SULLIVAN
     & CROMWELL LLP; and DOES 1 through 100,
26
                 Defendants.
27

28

1        1.    I am an attorney with Munger, Tolles & Olson LLP, counsel for defendant

2 Sullivan & Cromwell LLP ("Sullivan & Cromwell"). I am admitted to practice in the state of

3 California. I make this declaration in connection with Sullivan & Cromwell's Opposition to

4 Plaintiffs' Motion to Remand. The following is based on personal knowledge except where

5 otherwise stated.

6        2.    On or about April 24, 2006, I had a conversation with Nancy E. Hudgins,

7 counsel for Uniroyal Holdings, Inc ("Uniroyal"), during which she stated that Uniroyal has an

8 agreement with plaintiffs' counsel (the Brayton Purcell firm) not to defend asbestos actions. She

9 stated to me in that conversation that Uniroyal had not been served with a Complaint in this

10 action. I spoke with a paralegal at Ms. Hudgins' firm on or about May 2 who again confirmed

11 that Uniroyal had not been served. The docket for this case in state and federal court does not

12 indicate that Uniroyal was ever served with the complaint.

13        3.    On or about April 24, 2006, I had a conversation with Monty S. Travis,

14 counsel for Plant Insulation, during which he stated that Plant Insulation has a well-known policy

15 not to consent to removal.

16        4.    On information and belief, Plant Insulation is a small installer and

17 distributor of insulation products for HVAC systems. This conclusion is based on discussions

18 with Mr. Travis and research on the company.

19        5.    A true and correct copy of the Affidavit of David J. Gordon's in Support of

20 First Day Motions is attached hereto as Exhibit 1.

21        6.    A true and correct copy of the June 14, 2004 Order Authorizing the Debtor

22 to Employ and Compensate Certain Professionals is attached hereto as Exhibit 2.

23        7.    A true and correct copy of Debtors's Motion to Shorten Notice Period With

24 Respect to Certain Pleadings Filed in Connection with the Dividend Recovery Litigation is

25 attached hereto as Exhibit 3.

26        8.    A true and correct copy of the May 1, 2004 Motion for an Order

27 Authorizing the Debtor to Employ and Compensate Certain Professionals is attached hereto as

28 Exhibit 4.

9.    A true and correct copy of the Motion for Order Approving Certain Joint Prosecution Agreements and Annulling the Automatic Stay In Connection with the Dividend Recovery Litigation is attached hereto as Exhibit 5.

10.    A true and correct copy of the Transcript of the Proceedings, U.S. Bankruptcy Court, Delaware, Case No. 04-11300 (JKF) May 15, 2006 is attached hereto as exhibit 6.

11.    A true and correct copy of the Application for Designation of Complex Litigation is attached hereto as Exhibit 7.

12.    A true and correct copy of the Declaration of Mark F. Rosenberg in Support of Defendant Sullivan & Cromwell LLP's Joinder in Imperial Tobacco Limited's Motion to (i) Stay Consideration of Transfer and Remand Issues; (ii) Or Transfer This Action to the United State District Court for the District of Delaware Upon Expiration of the Requested Stay is attached hereto as Exhibit 8.

13.    A true and correct copy of the Order Authorizing the Proposed Legal Representative For Future Claimants to Retain and Employ Analysis, Research, and Planning Corporation As Claims Evaluation Consultants is attached hereto as Exhibit 9.

14.    A true and correct copy of the Uniroyal Record of Good Standing from the Connecticut Secretary of State is attached hereto as Exhibit 10.

15.    A true and correct copy of the Order Authorizing the Debtor to Employ and Compensate Certain Professionals is attached hereto as Exhibit 11.

16.    A true and correct copy of the Complaint, its exhibits and the docket in *Marlene Hopkins, et al., v. Asbestos Defendants,* San Francisco Superior Court, Case Number 05-446752 are attached hereto as Exhibit 12.

1     I declare under penalty of perjury that the foregoing is true and correct.

2     Executed this 30th Day of May, 2006, in San Francisco, California.

By: _____

ROHIT K. SINGLA

SINGLA DECL. ISO S&C'S OPP. TO
PLAINTIFFS' MOTION TO REMAND
CASE NO. C06-3051 MHP

<u>EXHIBIT F</u>



Not Reported in A.2d

Not Reported in A.2d, 1988 WL 5492 (Del.Ch.), Fed. Sec. L. Rep. P 93,674
**(Cite as: Not Reported in A.2d)**

Page 1

H

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
MABON, NUGENT & CO., Federated High
Income Securities, Inc., and Federated High Yield
Trust, Plaintiffs,
v.
TEXAS AMERICAN ENERGY CORP. and Texas
American Oil Corp., Defendants.
Submitted: May 12, 1987.
Decided: January 27, 1988.

Norman M. Monhait, of Morris, Rosenthal,
Monhait & Gross, P. A., Wilmington, and Stephen
Lowey, Richard Bemporad, and David Harrison, of
Lowey, Dannenberg & Knapp, P. C., New York
City of counsel, for plaintiffs.
David A. Drexler, and Michael Houghton, of
Morris, Nichols, Arsht & Tunnell, Wilmington, and
Koether, Harris & Hoffman, New York City of
counsel, for defendants.

MEMORANDUM OPINION
BERGER, Vice Chancellor.
*1 This is a purported class action brought by three
companies that hold debentures issued by
defendant, Texas American Oil Corp. ('TAO').
Plaintiffs seek, among other things, a determination
that TAO's parent, defendant Texas American
Energy Corp. ('TAE'), is liable for the payment of
all principal and interest due under the debentures.
After answering the amended complaint ('
Complaint'), defendants moved for judgment on the
pleadings. For the reasons discussed hereafter,
defendants' motion must be denied except as to the
fraud and breach of contract claims against TAE,
which will be dismissed.

TAO issued approximately $25 million in face
amount of twenty year 12% subordinated
debentures pursuant to a trust indenture dated

August 15, 1979 (the 'Indenture'). At the time the
debentures were issued, TAO was an independent,
publicly held oil and gas company. However, on
June 16, 1980, pursuant to an Agreement and Plan
of Merger and Reorganization, TAE was
incorporated and TAO became a wholly-owned
subsidiary of TAE. There was no transfer of assets
or liabilities under the reorganization and the
consolidated assets and liabilities of TAE and its
subsidiaries immediately after the reorganization
were identical to those of TAO and its subsidiaries
immediately prior to the reorganization. The
directors and principal officers of TAO became the
directors and principal officers of TAE.

According to the Complaint, the stated reason for
the reorganization was to allow TAO management
greater flexibility for diversification of TAO
through acquisitions. One such acquisition took
place a few months after the reorganization. TAE
acquired by merger all of the stock of Western
Kentucky Gas Resources Company ('WKG'), an
operating public utility engaged in the business of
purchasing and distributing natural gas to its
customers in Kentucky. In order to pay for this
acquisition, TAE borrowed $23 million and, as
security for TAE's loan, the lender obtained a lien
on certain of TAO's oil and gas assets as well as all
of the common stock of Texas American
Petrochemical, Inc. ('TAPI'), a wholly-owned
subsidiary of TAO. After this acquisition, WKG's
gas distribution properties and assets were
distributed to TAE by dividend. In connection with
the WKG merger and dividend, TAE assumed all of
WKG's liabilities (amounting to approximately $23
million) and obtained a $12 million line of credit
guaranteed by TAO and TAPI.

Over the next few years, TAE and TAO engaged in
various intercorporate transactions that allegedly
demonstrate that 'joint management' operated the
two corporations as a single consolidated company.
Those transactions include: (a) the transfer of
assets from TAO to TAE for no consideration; (b)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2

Not Reported in A.2d, 1988 WL 5492 (Del.Ch.), Fed. Sec. L. Rep. P 93,674
**(Cite as: Not Reported in A.2d)**

loans from TAO to TAE; (c) TAO guarantees of TAE's bank indebtedness and assignments of TAO's assets to TAE's lenders for no consideration; and (d) the payment of a dividend from TAO to TAE in the form of 100% of the stock of TAPI.

As of the end of 1983, TAE was indebted to TAO in the approximate amount of $26.5 million. In May, 1984, TAE and TAO amended their existing Joint Credit Agreement under which they had obtained a $40 million revolving line of credit from certain lending banks. The amendment required TAO to reduce its existing indebtedness to the banks and TAE to reduce its existing indebtedness to TAO. During 1984 and 1985, TAE reduced its existing indebtedness to TAO by approximately $20 million. TAE obtained the funds to make these reductions in indebtedness primarily through the sale of TAE preferred stock and a private placement of TAE common stock to a newly-formed Employee Stock Ownership Plan.

**\*2** In 1986 the companies were advised that TAO's borrowing base under the amended Joint Credit Agreement would have to be reduced to $12.8 million. In order to accomplish this, TAE borrowed $8.5 million and used those funds to repay its remaining indebtedness to TAO as well as to advance TAO additional funds so that TAO could reduce its indebtedness to the lending banks to the $12.8 million borrowing base. The $8.5 million loan obtained by TAE was guaranteed by TAO and, as collateral for the advances made by TAE to TAO, TAE received a second lien on TAO's oil and gas properties.

Shortly after the 1986 restructuring, TAE announced that it would not make the August 15, 1986 interest payment on the debentures. No interest payment was made when due or for thirty days thereafter. As a result, there was a default under the terms of the Indenture and plaintiffs and others, holding in the aggregate more than 25% of the outstanding debentures, declared the principal and all accrued interest immediately due and payable by notice dated September 15, 1986. This action was filed the following day.

The complaint purports to state five claims for relief

on behalf of a class consisting of all of the debenture holders. Plaintiffs allege that TAE is liable on the debentures under either of three theories: (1) TAO is the alter ego and instrumentality of TAE and, therefore, the ' corporate veil' should be pierced; (2) estoppel; and (3) fraud. In addition, plaintiffs claim that both defendants breached the Indenture and that TAE should be enjoined from appropriating TAO's assets and credit to the detriment of the debenture holders.

The first issue is whether plaintiffs are precluded from bringing this action by the terms of the Indenture. Section 7.7 of the Indenture contains a ' no action' provision. The holders of at least 25% of the aggregate principal amount of the debentures must make a written demand upon the trustee and offer indemnification to the trustee before instituting any action for the enforcement of any remedy under the indenture. The debenture holders may proceed with such an action only if the trustee refuses the demand or fails to take any action within a reasonable time. This requirement does not apply to an action brought to enforce the payment of principal and interest if both payments are not made when due. Although plaintiffs are seeking, among other things, the payment of principal and interest, they seek to impose liability on TAE rather than TAO, the issuer. Thus, defendants argue that the demand requirement must be satisfied before this action may be maintained.

Defendants also contend that 'no recourse' clause in Article IX of the indenture bars plaintiffs' claims. That article provides:
**\*3** No recourse shall be had for the payment of the principal of or premium, if any, or interest on any Debenture or for any claim based thereon or otherwise in any manner in respect thereof, or in respect of this Indenture, to or against any incorporator, stockholder, officer or director, as such, past, present or future of the Company . . . all such liability being expressly waived and released by the acceptance of any such Debenture and as part of the consideration for the issue thereof.

Since TAE is the stockholder of TAO, defendants argue that any claims plaintiffs might otherwise have against TAE were waived.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                     Page 3

Not Reported in A.2d, 1988 WL 5492 (Del.Ch.), Fed. Sec. L. Rep. P 93,674
**(Cite as: Not Reported in A.2d)**

Restrictive indenture provisions, such as these, have been enforced by our courts where the claim is one for breach of contract. See Simons v. Cogan, et al., Del. Ch., Civil Action No. 8890, Allen, C. (December 2, 1987); Norte & Co. v. Manor Healthcare Corp., Del. Ch., Civil Action No. 6827, Berger, V. C. (November 21, 1985). Here, only one of plaintiffs' five claims is a contract claim and only a portion of that claim is dismissible on this ground. The Fourth Claim for Relief alleges that TAO breached the Indenture by its failure to pay interest when due on August 15, 1986 and that TAE caused TAO to default in this manner. The claim against TAO is not dismissible because the 'no action' provision of the Indenture does not impair the debenture holders' unconditional right to institute suit to enforce the payment of principal and interest. To the extent that the Fourth Claim for Relief purports to state a claim for breach of contract against TAE, however, the 'no recourse' provision of the Indenture bars the claim. Accordingly, that portion of the Fourth Claim for Relief relating to TAE is dismissed.

Plaintiffs' remaining claims are not contractual and, therefore, the restrictions in the Indenture do not apply. Continental Illinois Nat'l Bank & Trust Co. v. Hunt Int'l Resources Corp., et al., Del. Ch., Civil Action No. 7888, Jacobs, V. C. (February 27, 1987); see also Simons v. Cogan, et al., supra, slip op. at 24.

Although plaintiffs' equitable claims are not barred by the Indenture, they still must be analyzed to determine their legal sufficiency. The first such claim is that TAE is the 'alter ego' or 'instrumentality' of TAO and, thus, is liable for the payment of the debentures. It is settled law that courts will disregard the corporate entity under appropriate circumstances. Martin v. D. B. Martin Co., Del. Ch., 88 A. 612 (1913); Buechner v. Farbenfabriken Bayer Aktiengesell., Del. Supr., 154 A.2d 684 (1959); Pauley Petroleum Inc. v. Continental Oil Co., Del. Supr., 239 A.2d 629 (1968). Fraud is frequently cited as a basis on which to pierce the corporate veil, but it is not the only one:
'It may be done only in the interest of justice, when such matters as fraud, contravention of law or

contract, public wrong, or where equitable consideration among members of the corporation require it, are involved.

Id. at 633.

*4 The federal courts find support in Delaware law for the theory that liability may be imposed upon a parent without regard to equitable considerations if an agency relationship exists between the parent and its subsidiary. Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil, Inc., 456 F. Supp. 831 (D. Del. 1978); Satellite Financial Planning Corp. v. First Nat'l Bank of Wilmington, 633 F. Supp. 386 (D. Del. 1986). To establish liability under an agency theory, plaintiffs must show that the parent dominates and controls the subsidiary.

To the extent that plaintiffs' claim is based upon the agency theory, I find it to be deficient. The debentures were issued by TAO before TAE came into existence. Thus, I do not see how it can be said that TAO was the agent of TAE when the debentures were issued. However, I am satisfied that the complaint adequately alleges facts to support the 'traditional' equitable approach to piercing the corporate veil. As noted above, the Court will disregard the corporate entity where equitable considerations require this remedy in the interests of justice. The equitable considerations in this case are the facts alleged in support of plaintiffs' estoppel claim.

The complaint alleges that, during the period from 1980 through 1985, TAE led plaintiffs to believe that it had assumed TAO's obligations under the debentures. Plaintiffs allegedly formed this belief because: (1) immediately after the 1980 reorganization, the consolidated assets and liabilities of TAE, including TAO, were the same as the consolidated assets and liabilities of TAO prior to the reorganization; (2) during the period from 1981 through 1985, TAE and TAO were operated by joint management, obtained finances through a Joint Credit Agreement and engaged in various intercorporate transfers of assets and borrowings, thereby indicating that TAE and TAO were operating as one company; (3) during that same period, TAE's Form 10-Ks filed with the Securities

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4

Not Reported in A.2d, 1988 WL 5492 (Del.Ch.), Fed. Sec. L. Rep. P 93,674
**(Cite as: Not Reported in A.2d)**

and Exchange Commission listed the debentures as part of the consolidated long term debt of TAE; and (4) Moody's and other credit rating services allegedly described the debentures as obligations of TAE.

Plaintiffs claim that they purchased and held the debentures in reliance on the belief that TAE had assumed TAO's obligations under the debenture. Accordingly, they claim that TAE is now estopped from denying its liability to the debenture holders. Estoppel arises where 'a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.' Wilson v. American Ins. Co., Del. Supr., 209 A.2d 902, 904 (1965). Plaintiffs argue that the facts described above state all of the necessary elements of an estoppel claim.

Defendants vigorously dispute the suggestion that the use of consolidated financial statements could expose a parent to liability for its subsidiary's debts. They point out that consolidated financial reporting is mandated both by generally accepted accounting principles and federal law. See 'Accounting Standards,' Financial Accounting Standards Board, p. 7873 (1985); SEC Regulation S-X § 210.3-01(a) (CCH). Defendants also contest plaintiffs' characterization of the representations made in TAE's financial statements. Although the debentures are listed as part of TAE's consolidated long term debt, the notes to the financial statements explain that the accounts of all of TAE's subsidiaries have been consolidated and that the debentures are redeemable at the option of TAO. In addition, each of the Form 10-Ks included the Indenture itself as an attachment. Finally, defendants contend that the estoppel claim is defective because plaintiffs could have learned the truth if they had asked TAE. In order to succeed on an estoppel claim, plaintiffs must not only lack knowledge of the true state of affairs but also the means of knowledge of the truth. Wilson v. American Ins. Co., supra.

Defendants' arguments are not sufficient to defeat plaintiffs' estoppel claim on a motion for judgment on the pleadings. The estoppel claim does not rest solely on the fact that TAE filed consolidated

financial statements. Plaintiffs rely, in addition, on the nature of the 1980 reorganization, the course of transactions between the companies over a period of years and Moody's alleged statement that the debentures are obligations of TAE.

*5 Moreover, even when reporting on a consolidated basis, a company could make it clear that certain obligations are those of a subsidiary and not the parent. The Financial Accounting Standards Board suggests that, '[c]onsolidated statements, in which one column is used for the parent company and other columns for particular subsidiaries or groups of subsidiaries, often are an effective means of presenting the pertinent information.' ' Accounting Standards,' Financial Accounting Standards Board, p. 7879 (1985). Indeed, TAE's 1985 Form 10-K, filed in April, 1986, expressly stated that the subordinated debentures are payable by TAO.

A motion for judgment on the pleadings is in the nature of a motion to dismiss in that plaintiffs' well pleaded allegations are deemed admitted. Fagnani v. Integrity Fin. Corp., Del. Super., 167 A.2d 67 (1960). The allegations discussed above, viewed in the light most favorable to plaintiffs, state a factual basis for plaintiffs' alleged belief that TAE had assumed TAO's obligations under the debentures. The question as to whether plaintiffs had the means of learning the truth or, stated another way, exercised reasonable diligence, is a question of fact that cannot be resolved at the current stage of the litigation. See Second Nat'l Bank of New Haven v. Dyer, Conn. Supr., 9 A.2d 503 (1939); 28 Am.Jur.2d Estoppel and Waiver § 80.

Based upon the foregoing, I conclude that plaintiffs' estoppel claim is adequately pled. Accordingly, there are equitable considerations that would support piercing the corporate veil.

Plaintiffs fraud claim, however, must be dismissed. It is not predicated upon the theory that TAE intentionally misrepresented that it had assumed TAO's obligations. Rather, ¶78 of the complaint alleges:
TAE's course of conduct, as described herein, starting with the acquisition of WKG in 1980 with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5

Not Reported in A.2d, 1988 WL 5492 (Del.Ch.), Fed. Sec. L. Rep. P 93,674
**(Cite as: Not Reported in A.2d)**

assets of TAO, and culminating with the second lien on TAO's oil and gas properties, which the Joint Management caused TAO to give to TAE, and with the dividend paid to holders of TAE's Preferred Stock while TAO was unable to meet its interest obligations to the holders of the Debentures, has operated as a fraud upon all holders of the Debentures, which TAE knowingly and intentionally caused and for which TAE is liable to the Class.

The elements of a claim of fraud 'consist of a false representation of a material fact knowingly made with intent to be believed to one who, ignorant of its falsity, relies thereon and is thereby deceived.' Harmon v. Masoneilan Int'l, Inc., Del. Supr. 442 A.2d 487, 499 (1982). There is nothing in the complaint to suggest that any of the intercorporate transactions detailed therein were concealed from or misrepresented to plaintiffs. While it may be that plaintiffs were misled into believing TAE had assumed liability for the debentures, they do not allege that TAE intentionally disseminated any false information. As a result, I conclude that the complaint fails to state a claim for fraud.

Based upon the foregoing, defendants' motion for judgment on the pleadings is granted with respect to plaintiffs' breach of contract and fraud claims against TAE. In all other respects, defendants' motion is denied.

*6 IT IS SO ORDERED.

Del.Ch., 1988.
Mabon, Nugent & Co. v. Texas American Energy Corp.
Not Reported in A.2d, 1988 WL 5492 (Del.Ch.), Fed. Sec. L. Rep. P 93,674

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
SUNNYSIDE DEVELOPMENT COMPANY,
LLC, Plaintiff,
v.
OPSYS LIMITED and CDT Limited, Defendants.
No. C 05-0553 MHP.

Aug. 8, 2005.

Stanley G. Hilton, Law Offices of Stanley G.
Hilton, San Jose, CA, for Plaintiff.
Justin Myer Lichterman, James E. Burns, Jr., Orrick
Herrington & Sutcliffe LLP, San Francisco, CA, for
Defendants.

*MEMORANDUM & ORDER*
PATEL, J.

Re: Defendants' Motion to Dismiss

*\*1* On December 14, 2004, plaintiff Sunnyside
Development Company, LLC filed this action for
breach of contract and fraud in state court, naming
Opsys Limited and CDT Limited as defendants.
That action was subsequently removed to this court,
and defendants now move for partial dismissal of
plaintiff's first amended complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6). Having
considered the parties' arguments and for the
reasons stated below, the court enters the following
memorandum and order.

*BACKGROUND* [FN1]

FN1. All facts are drawn from plaintiff's
first amended complaint and from the
documents incorporated by reference
therein.

Plaintiff Sunnyside Development Company is the
lessor of a commercial property located at 47375
Fremont Boulevard in Fremont, California. On
February 15, 2001, plaintiff agreed to lease
commercial space at the Fremont Boulevard
property to defendant Opsys Limited, with the lease
term running from May 1, 2001 through April 30,
2008. Pursuant to the conditions of the lease
agreement, Opsys Limited agreed to pay plaintiff a
monthly base rent, to make certain capital
improvements, and to conduct its business in an
environmentally safe manner.

Opsys Limited continued to make rental payments
to plaintiff until October 2002. At that time,
defendant CDT Limited ("CDT") acquired control
of Opsys' British business, Opsys UK Limited ("
Opsys UK"). As part of the corporate
reorganization accompanying that transaction,
plaintiff, Opsys Limited, and Opsys' United States
subsidiary, Opsys US, signed a novation agreement
that purportedly assigned Opsys Limited's rights
and obligations under the lease to Opsys US. Under
the terms of paragraph six of the novation
agreement, the assignment was subject to a number
of conditions precedent, including a provision
requiring that both parties execute a second
amendment to the lease.

Plaintiff received no rental payments after October
2002, and Opsys U.S. was forced into involuntary
bankruptcy by four of its creditors in May 2003. On
December 14, 2004, plaintiff filed this action in the
Superior Court for Alameda County, pleading
causes of action for breach of contract and fraud
under California law. That action was subsequently
removed to this court, and on February 28, 2005,
defendants moved to dismiss plaintiff's complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6)
, arguing that plaintiff had failed to state a claim
under either of the asserted causes of action. With
respect to plaintiff's breach of contract claims,
defendants argued that CDT was never a party to
the Fremont Boulevard lease and that Opsys

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Limited had been released from its obligations under the lease agreement by the October 2002 novation agreement. As for plaintiff's fraud claim, defendants argued that plaintiff had failed to plead the elements of fraud with particularity, as is required by Federal Rule of Civil Procedure 9(b).

On April 22, 2005, the court issued an order granting defendants' motion in part and denying it in part. Specifically, the court agreed with defendants that plaintiff's complaint fails to allege that CDT had ever been a party to the lease agreement, thus warranting dismissal of the breach of contract claim against CDT. The court also dismissed the fraud claims against both defendants on the ground that plaintiff had failed to satisfy the pleadings requirements of Rule 9(b). However, in considering the breach of contract claim against Opsys Limited, the court rejected defendants' argument that the terms of the novation agreement warranted granting their motion to dismiss. Specifically, the court concluded that because defendants had failed to submit a signed copy of the second amendment to the lease, it could not be determined from the face of the pleadings whether all of the conditions precedent to releasing Opsys Limited from liability for failure to comply with the conditions of the lease had been fulfilled.[FN2] Thus, drawing all reasonable inferences in favor of the nonmoving party, the court held that plaintiff had stated a claim for breach of contract against Opsys Limited.

> FN2. The court also rejected defendants' argument that plaintiff was judicially estopped from denying the validity and enforceability of the novation agreement.

**\*2** On May 11, 2005, plaintiff filed an amended complaint, having been granted leave to do so for the purpose of curing the deficiencies that the court had identified in its April 2005 order. In the amended complaint, plaintiff again pleads causes of action for breach of contract and fraud against both defendants. However, in contrast to plaintiff's prior pleadings, the amended complaint now alleges that Opsys Limited acted as the alter ego of CDT in entering into and breaching the lease agreement,

thereby entitling plaintiff to recover damages for breach of contract from CDT as well as from Opsys. As for plaintiff's fraud claims, the gravamen of those claims continues to lay, as it did in the initial complaint, in plaintiff's theory that Opsys Limited induced plaintiff to enter into the February 2001 lease agreement without ever having any intention to perform its obligations as lessee of the Fremont Boulevard property, although plaintiff now seeks to overcome the hurdle posed by Rule 9(b)'s particularity requirement by identifying several of Opsys Limited's officers as the source of the actionable misrepresentations that defendants allegedly made.

On May 31, 2005, defendants moved for partial dismissal of the amended complaint, arguing that plaintiff had again failed to state a claim for breach of contract against CDT or to plead adequately the required element fraud against either defendant. The following memorandum and order addresses those arguments.

### LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Unless it appears beyond doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her to relief, a motion to dismiss must be denied. *Lewis v. Telephone Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir.1996) (citation omitted); *see also Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When assessing the legal sufficiency of a plaintiff's claims, the court must accept as true all material allegations of the complaint, and all reasonable inferences must be drawn in favor of the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir.1996) (citations omitted). Dismissal is proper under Rule 12(b)(6) " only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro,* 250 F.3d at 732 (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3

Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

*DISCUSSION*

*I. Breach of Contract (Against CDT)*

Defendants first move to dismiss plaintiff's breach of contract claim against CDT. While plaintiff concedes that CDT is not a party to the lease agreement that is the subject of its breach of contract claims, it nevertheless asserts that Opsys Limited acted as CDT's alter ego in entering into and subsequently breaching the lease. Thus, according to plaintiff, the court should pierce CDT's corporate veil and hold it liable for Opsys Limited's failure to perform its contractual duties.

*3 As an initial matter, the court notes that although neither party has addressed the issue of choice of law, CDT is incorporated in the United Kingdom. As there is no relevant contractual choice of law provision, the choice of law issue turns on whether the law of the forum state or the law of CDT's place of incorporation should govern the alter-ego inquiry. In this diversity action, the answer to that question must be determined based on California choice of law rules. *See Klaxon Co. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

In *Schlumberger Logelco, Inc. v. Morgan Equipment Co.,* No. C 94-1776 MHP, 1996 WL 251951 (N.D.Cal. May 3, 1996) (Patel, J.), this court considered a similar issue arising from a plaintiff's attempt to hold an Austrian corporation liable for breach of contract and various torts under an alter-ego theory. *See id.* at *1, *3. Applying the "governmental interest" analysis that California courts employ in adjudicating choice of law issues, *see In re Yagman,* 796 F.2d 1165, 1170 (9th Cir.1986), *amended on denial of reh'g,* 803 F.2d 1085 (9th Cir.1986), *cert. denied,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987), the court observed that Austria, as the state of incorporation, had "a substantial interest in determining whether to pierce the corporate veil of one of its corporations." *Schlumberger,* 1996 WL 251951, at *3. The court therefore concluded that Austrian law supplied the rules of decision for determining whether to hold the defendant corporation liable under an alter-ego

theory. *Id.* at *4.

In the absence of any attempt by either party to brief the choice of law issue, the court sees no reason to depart from the analysis set forth in the *Schlumberger* case. Thus, applying that analysis in the case at bar, the court must look to British corporations law for the purpose of determining whether plaintiff has alleged facts that support piercing CDT's corporate veil. [FN3] In essence, the theory of alter-ego liability set forth in the amended complaint turns on allegations that defendants entered into secret negotiations in early 2001, pursuant to which CDT sought to acquire Opsys Limited's British operations and to divest itself of any liability associated with the target company's American business, including Opsys' contractual liability to plaintiff. According to plaintiff, the allegations concerning this collaboration, which it alternatively characterizes as a conspiracy to breach the lease agreement,[FN4] are sufficient to permit a finding that Opsys Limited acted as CDT's alter-ego in its dealings with plaintiff.

> FN3. It should be noted that under California choice of law rules, the court need only reach the question of "governmental interest" if the substantive law of the foreign jurisdiction differs materially from California law. *See Abogados v. AT & T, Inc.,* 223 F.3d 932, 934 (9th Cir.2000) (applying California choice of law rules). It is at least debatable that the scope of the United Kingdom's veil-piercing doctrine is broader than its California equivalent. *Compare Palmers Company Law* § 2.1519 ¶ 11 (2004) (observing that "[i]t has sometimes been argued that there is emerging in English and Scottish law a general principle that all companies in a group of companies will be treated as a single entity"), *with American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996) (citations and original alterations omitted) (noting that under California law, a parent corporation will be held liable for the debts of its subsidiary under an alter-ego theory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4

Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

only if the plaintiff proves "(1) that there is such unity of interest and ownership that the separate personalities of [the parent and subsidiary corporations] no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice"). In any event, as the court finds that British law does not permit CDT's corporate veil to be pierced in the instant action, its conclusion would not change if California law supplied the rules of decision with respect to the alter-ego issue.

FN4. Plaintiff's amended complaint also characterizes CDT's conduct as tortious interference with contractual relations. Pl.'s Am. Compl. ¶ 11. However, because plaintiff has failed to plead that cause of action, the court need not consider whether it has stated a claim under that theory.

The court finds this argument unavailing. Certainly, the corporations law of the United Kingdom recognizes circumstances where a corporate subsidiary can be considered the alter ego of its parent corporation. *See Palmers Company Law* § 2.1519 ¶ 11 (2004) (observing that "there are many cases in which the distinction between parent and subsidiary company has been ignored by the court"). It nevertheless remains true that piercing the corporate veil under British law generally requires that the parent exercise a significant degree of control over the subsidiary, going beyond mere formal ownership and coordination of corporate strategies and extending to the direct supervision of the subsidiary's day-to-day business activities. *See, e.g., Adams v. Cape Indus., Plc.,* [1990] Ch. 433 (holding that facts establishing a disregard for corporate formalities among members of an integrated mining group and the parent's strategic supervision of the subsidiary in question were not sufficient to pierce the parent's corporate veil under an alter-ego theory). In any event, plaintiff does not allege that the parent-subsidiary relationship in question even existed at the time that it entered into the lease agreement with Opsys Limited, much less that the relationship was one in which the parent controlled the affairs of the subsidiary to such an extent as would justify piercing CDT's corporate

veil. In fact, the court is unaware of any authority, in British law or otherwise, that would permit it to pierce the veil of an acquiring corporation based on the facts alleged in the amended complaint, and plaintiff has done nothing to assist the court in identifying any authority that so holds. For that reason, the court must conclude that the allegations in plaintiff's amended complaint do not support holding CDT liable for the breach of contract under an alter-ego theory.

**\*4** This alone is sufficient to justify dismissal of plaintiff's breach of contract claim against CDT. In addition, defendants correctly point out that plaintiff's alter-ego theory is premised upon allegations of fraudulent conduct. As the Ninth Circuit observed in *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097 (9th Cir.2003), such allegations are deemed to "sound in fraud" even if they are pleaded in support of a cause of action in which fraud is not a required element. *See id.* at 1103-04. Consequently, a plaintiff alleging a fraudulent course of conduct to support such a claim must satisfy the heightened pleading standard of Federal Rule Civil Procedure 9(b), *id.,* which requires that the circumstances constituting fraud be pleaded with particularity. Fed. R. Civ. Pro. 9(b). Moreover, where, as here, a plaintiff levels allegations of fraud against more than one defendant, Rule 9(b) " requires that a plaintiff plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant." *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997) (Smith, J.). That requirement is clearly not satisfied by plaintiff's allegations against CDT, as the only particularized allegations of fraud in the amended complaint involve the conduct of Opsys Limited and its officers. Thus, even if the facts that plaintiff has alleged would permit a jury to hold CDT liable under an alter-ego theory (and they do not), those allegations are not pleaded with adequate specificity to withstand a motion to dismiss under Rule 9(b). Thus, for this reason, as well as for the reasons stated above, the court holds that plaintiff's breach of contract claim against CDT must be dismissed.

II. *Fraud (Against Both Defendants)*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 5

Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

The second issue raised by defendants' motion to dismiss requires the court to consider whether plaintiff's amended complaint states a claim for fraud. Under California law, the elements of fraud are (1) a misrepresentation by the defendant; (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Bank of the West v. Valley Nat'l Bank of Ariz.,* 41 F.3d 471, 477 (9th Cir.1994) (citation omitted) (applying California law). Defendants argue that plaintiff's amended complaint fails to allege at least two of these elements, the existence of an actionable misrepresentation and scienter, and thus urges the court to dismiss the fraud claims that plaintiff has leveled against both Opsys Limited and CDT.

Before turning to the substance of those allegations, the court notes that while plaintiff repeatedly alleges that "defendants" engaged in fraudulent conduct, nothing in the amended complaint identifies any specific false or misleading statement that CDT or its employees or agents might have made in connection with the Fremont Boulevard lease. As the court has previously noted, such generalized allegations of fraud are not sufficient to state a claim under Federal Rule of Civil Procedure 9(b). Moreover, the preceding discussion makes it equally clear that CDT cannot be held liable for any fraudulent acts that Opsys Limited might have committed in the course of its dealings with plaintiff. Thus, for the same reasons that plaintiff is unable to state a claim for breach of contract against CDT, the fraud claim against CDT must also be dismissed.

**\*5** That leaves the court to consider whether plaintiff can state a claim for fraud against Opsys Limited. As noted above, Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Under Ninth Circuit law, those "circumstances" include the precise "time, place, and nature of the misleading statements, misrepresentations, [or] specific acts of fraud." *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994) (citations omitted), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995). In addition, the Ninth Circuit has observed that

plaintiffs seeking to satisfy Rule 9(b) must "set forth an explanation as to why the statement or omission complained of was false and misleading." *In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc).

What plaintiff has alleged in the amended complaint is in essence a claim for promissory fraud. Specifically, plaintiff asserts that at or about the time that the February 2001 lease agreement was signed, Opsys Limited CEO Gary Rhea and other representatives of "defendants" made promises to comply with the conditions of that agreement without ever having any intention of keeping that promise. Pl.'s Am. Compl. ¶ 15. There is little doubt that these alleged misrepresentations are sufficiently specific so as to permit defendants to identify the circumstances of the alleged fraud and to answer plaintiff's amended complaint, which would generally be enough to satisfy the requirements of Rule 9(b). *See Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996); *see also Vess,* 317 F.3d at 1106 (citation and original alteration omitted) (noting that Rule 9(b) requires a plaintiff to allege facts that are " specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong"). The court thus finds that plaintiff has adequately pleaded at least one actionable misrepresentation.

That being the case, a plaintiff seeking to state a claim for fraud must also plead knowledge of falsity, or scienter. *See GlenFed,* 42 F.3d at 1546. It is true that the requirement for pleading scienter is less rigorous than that which applies to allegations regarding the "circumstances that constitute fraud," as Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Nonetheless, nothing in the Federal Rules of Civil Procedure relieves a plaintiff of the obligation to " set forth facts from which an inference of scienter could be drawn." *Cooper v. Pickett,* 137 F.3d 616, 628 (9th Cir.1997) (quoting *Glenfed,* 42 F.3d at 1546). In the complaint at issue here, the sum of the "facts" tending to show scienter is a reference to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

existence of "much evidence" that Opsys Limited never intended to perform its obligations under the lease agreement. Pl.'s Am. Compl. ¶ 15. Even when viewed in the light most favorable to plaintiff, such a conclusory statement falls well short of what would be required to permit a reasonable finder of fact to infer that Opsys Limited was acting with fraudulent intent when it entered into the lease agreement in February 2001.

*6 Other than the above-cited allusion to "evidence" of defendants' intent to defraud, the sole basis for inferring scienter from the allegations in the amended complaint is premised upon plaintiff's assertion that Opsys Limited promised to comply with the terms of the lease agreement but failed to do so. However, the mere fact that a party breaches a promise to perform a condition of contract is as a matter of law insufficient to give rise to an inference that the breaching party acted with fraudulent intent at the time that the promise was made. *See Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30, 216 Cal.Rptr. 130, 702 P.2d 212 (1985) (quoting *People v. Ashley*, 42 Cal.2d 246, 263, 267 P.2d 271 (1954)) (noting that "something more than nonperformance is required to prove the defendant's intent not to perform his promise"). Thus, seeing that plaintiff has made no effort to allege facts beyond Opsys Limited's failure to perform as promised in its attempt to plead the scienter element of common law fraud, the court is compelled to conclude that plaintiff's fraud claims against both defendants fail as a matter of law. The court therefore grants defendants' motion for partial dismissal in its entirety.

### III. *Leave to Amend*

The sole remaining issue is whether, in light of the foregoing discussion, plaintiff should be given leave to file a second amended complaint. In determining whether it should grant leave to amend a complaint, the court must consider (1) the plaintiff's bad faith; (2) undue delay; (3) prejudice to the defendant; (4) futility of amendment; and (5) whether the plaintiff has previously amended his or her pleadings. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir.2004) (citing *Bonin v. Calderon*, 59 F.3d 815, 845 (9th

Cir.1995)), *reh'g and reh'g en banc denied*, 375 F.3d 810 (9th Cir.2004), *cert. denied*, --- U.S. ----, 125 S.Ct. 1395, 161 L.Ed.2d 192 (2005). Here, plaintiff has already failed in two attempts to plead facts that might lend support to its conclusory allegations regarding defendants purportedly fraudulent and conspiratorial conduct. Because there is no reason to believe that a third attempt to do so would be any more successful than the first two, the court sees no reason to grant plaintiff leave to amend its pleadings. Accordingly, the court holds that plaintiff's breach of contract claim against CDT and its fraud claims against both defendants should be dismissed with prejudice.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for partial dismissal is GRANTED. Plaintiff's claims for breach of contract against defendant CDT and its claims for fraud against both defendants are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

N.D.Cal.,2005.
Sunnyside Development Co., LLC v. Opsys Ltd.
Not Reported in F.Supp.2d, 2005 WL 1876106 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 733624 (Trial Pleading) Answer of Defendant Opsys Limited to Second Amended Complaint for Monet Ary Damages (Feb. 3, 2006)
• 2006 WL 432026 (Trial Pleading) Second Amended Complaint (Jan. 17, 2006)
• 2005 WL 2869015 (Trial Pleading) Answer of Defendant Opsys Limited to First Amended Complaint for Monetary Damages (Sep. 12, 2005)
• 2005 WL 694585 (Trial Motion, Memorandum and Affidavit) Defendants Opsys Limited and Cdt Limited's Motion to Dismiss Plaintiff's Complaint for Monetary Damages, Or, in the Alternative, Motion for Summary Judgment; Memorandum of Points & Authorities (Feb. 28, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 3747917                                                          Page 1

2005 WL 3747917 (Cal.)


Supreme Court of California.
Richard GROSSET, Plaintiff,
v.
Eric P. WENAAS; et al. Neal Waddington; John Bolger; Terry M. Flannagan, Ph.D.;
Lawrence E. Fox; John C. Stiska; Gloria Purdy; Scott Ruple; Thomas K. Gregory;
and Does I through 50, inclusive, Defendants and Resp. Sik-Lin Huang,
Intervener and Appellant.
**Nos. S139285, D043684.**
November 29, 2005.

Appeal from the San Diego Superior Court Honorable E. Mac Amos, Judge

Superior Court Case No. GIC 775153

Petition for Review

Gretchen M. Nelson (SBN 112566), Kreindler & Kreindler LLP, 707 Wilshire Blvd.,
Suite 5070, Los Angeles, CA 90017, Telephone: (213) 622-6469, Telecopier: (213)
622-6019, gnelson@kreindler.com.

George A. Shohet (SBN 112697), Law Offices of George A. Shohet, 245 Main Street,
Suite 310, Venice, CA 90291, Telephone: 310-452-3176, Telecopier: 310- 452-2270,
gshohet@aol.com, Attorneys for Plaintiff and Appellant.

*i TABLE OF CONTENTS

ISSUES PRESENTED ... 2

INTRODUCTION ... 3

A. Overview of the Issue ... 3

B. Background of the Action ... 5

C. Why Review is Warranted ... 6

STATEMENT OF RELEVANT FACTS ... 10

WHY REVIEW SHOULD BE GRANTED ... 15

I. THIS COURT SHOULD DECIDE IF THE INTERNAL AFFAIRS DOCTRINE MANDATES THAT
CALIFORNIA COURTS BLINDLY APPLY THE LAWS OF THE STATE OF INCORPORATION ON ALL
ISSUES RELATING TO CORPORATE GOVERNANCE AND REGULATION WITHOUT REGARD TO THIS
COURT'S GOVERNMENTAL INTEREST ANALYSIS ... 15

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                    Page 2

2005 WL 3747917 (Cal.)


   II. REVIEW IS WARRANTED TO RESOLVE A CLEAR CONFLICT AMONG THE APPELLATE COURTS AS
TO WHETHER CALIFORNIA IMPOSES A CONTINUOUS OWNERSHIP REQUIREMENT ON SHAREHOLDERS
WHO PURSUE A DERIVATIVE CLAIM AGAINST FAITHLESS OFFICERS AND DIRECTORS ... 25

CONCLUSION ... 29

CERTIFICATE OF COMPLIANCE ... 31

                              *ii TABLE OF AUTHORITIES

Cases

*Alford v. Shaw* (N.C. 1990) 398 S.E.2d 445 ... 27

*Allstate Ins. Co. v. Hague* (1981) 449 U.S. 302 ... 19

*CTS Corp. v. Dynamics Corp of Am.* (1987) 481 U.S. 69 ... 20

*Cohen v. Beneficial Loan Corp.* (1948) 337 U.S. 541 ... 17, 29

*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036 ... 7, 21

*Edgar v. MITE Corp.* (1982) 457 U.S. 624 ... 20

*Friese v. Moores, et al.,* Fourth District Civil No. D046348 ... 4

*Gaillard v. Natomas* (1985) 173 Cal.App.3d 410 ... passim

*Gillis v. Pan American Western Pet. Co.* (1935) 3 Cal.2d 249, *overruled in part on other grounds, Mary Pickford Co. v. Bayly Bros.* (1939) 12 Cal.2d 501 ... 8, 17

*Grosset v. Wenaas* (2005) 133 Cal.App.4th710 [35 Cal.Rptr.3d 58] ... 6

*Havlicek v. Coast-to-Coast Analytical Serv., Inc.* (1995) 39 Cal.App.4th 1844 ... 21, 23

*Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119 ... 28

*Hogan v. Ingold* (1952) 38 Cal.2d 802 ... 17

*iii In re General Instrument Corp. Sees. Litig.* (N.D. Ill. 1998) 23 F.Supp.2d 867 ... 27

*Kamen v. Kemper Fin. Serv.* (1991) 500 U.S. 90 ... 20

*McDermott Inc. v. Lewis* (1987) 531 A.3d 206 ... 20

*Nedloyd Lines B. V v. Superior Court* (1992) 3 Cal.4th 459 ... 17

*North Am. Asbestos Corp. v. Superior Court* (1986) 180 Cal.App.3d 902 ... 16, 20, 22

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                    Page 3

2005 WL 3747917 (Cal.)


*Osher v. JNI Corp.* No. 01-CV-0557-J (NLS) (S.D. Cal.) ... 12

*Pearce v. Superior Court* (1984) 149 Cal.App.3d 1058 ... 18, 29

*People v. Hanson* (2000) 23 Cal.4th 355 ... 9

*Phillips Petroleum Co. v. Shutts* (1985) 472 U.S. 797 ... 19

*Reed v. Norman* (1957) 48 Cal.2d 338 ... 27

*Rudnick v. Superior Court* (1970) II Cal.3d 924 ... 29

**\*iv** *Shelton v. Thompson* (Ala. 1989) 544 So.2d 845 ... 27

*Shields v. Singleton* (1993) 15 Cal.App.4th 1611 ... 27

*State Farm Mut. Auto Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434 ... 23

*The Pacific Lumber Co. v. Superior Court* (1990) 226 Cal.App.3d 371 ... 27

*Valtz v. Penta Investment Corp.* (1983) 139 Cal.App.3d 803 ... 18, 19, 22

*Vantage Point Venture Partners 1996 v. Examen, Inc.* (Del. 2005) 871 A.2d 1108 ... 15, 20

*Wait v. Kern River Mining Co.* (1909) 157 Cal.16 ... 8, 17

*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906 ... 23

*Weingand v. Atlantic Sav. & Loan Ass'n.* (1970) 1 Cal.3d 806 ... 16, 27

*Wilson v. Louisiana v. Pacific Resources, Inc.* (1982) 138 Cal.App.3d 216 ... 8, 17, 18, 22

                    CONSTITUTION, STATUTES AND RULES

15 U.S.C. § 78u ... 12

Cal. Constitution, Article XII, § 15 (1879) [repealed 1972] ... 16

Corporations Code section 102(a) ... 19

**\*v** Corporations Code section 162 ... 19

Corporations Code section 800 ... passim

Corporations Code section 834 [repealed] ... 18, 27

Corporations Code section 2115 ... 22


                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                    Page 4

2005 WL 3747917 (Cal.)


Corporations Code section 2116 ... 19

Corporations Code section 25402 ... 4, 12

Corporations Code section 25502.5 ... 4

California Rules of Court, rule 28(b)(1) ... 9, 25

TEXTS

2 Ballantine & Sterling, *California Corporations Law* (4th ed. 1998) § 292.02(1)(a)
... 27

Ballantine, *Abuses of Shareholders Derivative Suits: How Far is California's New
""Security for Expenses'' Act Sound Regulation* 37 Cal.L.Rev. 399 (1949) ... 17

Buxbaum, *The Threatened Constitutionalization of the Internal Affairs Doctrine in
Corporation Law,* 75 Cal.L.Rev. 29 (1987) ... 7

Greenfield, *Democracy and the Dominance of Delaware in Corporate Law,* 67 Law &
Contemp. Prob. 135, 136 (Autumn 2004) ... 25

Greenwood, *Democracy and Delaware: The Mysterious Race to the Bottom/Top,* Yale Law
& Policy Rev. 381 (Spring 2005) ... 7

Hem, *Delaware Courts' Delicate Response to the Corporate Governance Scandals of
2001 and 2002: Heightening Judicial Scrutiny on Directors of Corporations,* 41
Willamette L.Rev. 207 (Winter 2005) ... 24

**vi** Oldman, *Califbrnia Regulates Pseudo-Foreign Corporations - Trampling upon the
Tramp,* 17 Santa Clara L.Rev. 85 (1977) ... 16

Rubenfeld, *State Takeover Legislation and the Commerce Clause: The ""Foreign
Corporations Problem,* 36 Clev. St. L.Rev. 355 (1988) ... 6-7, 19

Tung, *Origins of the Internal Affairs Doctrine,* Loyola Law School (Los Angeles),
Legal Studies Research, Research Paper No. 2005-8 (March 2005), at
*http://ssrn.com/abstract=699581* ... 7

OTHER AUTHORITIES

Rest. 2d Conf. of Laws section 302(2) ... 21, 23

Rest. 2d Conf. of Laws section 304 ... 21

Rest. 2d Conf. of Laws section 305 ... 21

Rest. 2d Conf. of Laws section 306 ... 21

Rest. 2d Conf. of Laws section 309 ... 21

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                          Page 5

2005 WL 3747917 (Cal.)


American Law Institute, *Principles of Corp. Governance* (1994) § 7.02(a)(2) ... 28

                              *2 ISSUES PRESENTED

  A. Does the ""internal affairs doctrine'' preclude application of Califoria's
Corporations Code to foreign corporations including those that exercise most, if
not all, of their corporate vitality within this state?

  B. Does California Corporations Code section 800 allow a plaintiff to maintain
standing to prosecute a shareholder derivative action even if he is forced to sell
his shares as a result of a corporate merger?

                              *3 INTRODUCTION

  A. Overview of the Issue

  This petition raises an issue that has never before been addressed by this Court
-- the extent to which the internal affairs doctrine may be used to deny relief to
individuals and corporations that are adversely affected by violations of
California's corporate laws. The internal affairs doctrine is a conflict of laws
principle that frequently requires application of the law of the state of
incorporation to internal matters between the corporation, its managers and
shareholders.

  The Fourth District in this case transformed this principle into a constitutional
mandate that obligates a court to apply the law of the state of incorporation
regardless of the local interests at stake, the extent of the contacts that a
foreign corporation and its managers have with California and in contravention of
portions of California's Corporations Code that expressly apply to foreign
corporations. Not surprisingly, the court's opinion conflicts with decisions of
this Court and other Courts of Appeal.

  If the opinion is allowed to stand, it will essentially eviscerate many of the
protections provided by the California Corporations Code to shareholders and
others who have been wronged by directors and officers acting in California on
behalf of foreign corporations nominally incorporated in Delaware and other
states. And, the down-stream *4 implication of the opinion on the Legislature's
right to enact laws for the protection of shareholders and resident corporations
is prodigious. Indeed, the significance of the issue is underscored by the fact
that defendants in other cases are already relying on the Fourth District's
opinion to support the dismissal of insider trading claims brought against
corporate insiders residing and acting in California. [FN1]

     FN1. Only days after the opinion was issued, corporate insiders were relying
  on it to support the dismissal of insider trading claims brought under
  Corporations Code sections 25402 and 25502.5. These claims are asserted against
  California residents acting as the directors of a Delaware corporation
  headquartered in California and were dismissed on grounds that they are barred by
  application of the internal affairs doctrine. (See *Friese v. Moores, et al.*,
  Fourth District Civil No. D046348.)

              © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                          Page 6

2005 WL 3747917 (Cal.)


As an alternative prong to its determination that Delaware law applies, the
Fourth District held that section 800, even if applicable to this case, has an
implied ""continuous ownership'' requirement that precludes a shareholder from
continuing to prosecute a derivative action after she is forced to sell her shares
due to a corporate merger. The opinion squarely conflicts with a longstanding
published decision of the First District. (Gaillard v. Natomas (1985) 173
Cal.App.3d 410.)

Review should be granted to address an issue of first impression as to whether
the internal affairs doctrine trumps the Corporations Code, as *5 well as to
resolve the conflict between the Fourth District's opinion and decisions of other
California courts.

B. Background of the Action

This shareholder derivative action is brought against California directors and
officers of the nominal defendant JNI Corporation (""JNI''). Plaintiff alleges
breaches of fiduciary duty, insider trading and other serious wrongdoing by the
defendants. JNI is a Delaware corporation solely by virtue of having filed its
certificate of incorporation in that state. Otherwise, it is headquartered in
California, its directors, officers and other employees are California residents
and all of its business activities are conducted out of California.

Following lengthy proceedings over more than 2 years, the trial court dismissed
this lawsuit without addressing the merits of the claims in this case. The
dismissal was based on a report by a Special Litigation Committee (""SLC'')
appointed by JNI's Board of Directors. Shortly thereafter, plaintiff was forced to
sell his shares as a result of a merger in which JNI became a wholly owned
subsidiary of Applied Micro Circuits Corporation (""AMCC'').

After plaintiff appealed the dismissal order, defendants filed a motion to
dismiss on the grounds that plaintiff lost standing to pursue this case as a
result of the merger with AMCC. On October 20, 2005, the *6 Fourth District
granted defendants' motion. In a published decision with far-reaching
implications, the court held that the issue of standing was governed by the
internal affairs doctrine and Delaware law controlled. (Appendix at pp. 15- 17.)
[FN2] The court also disagreed with the opinion of the First District in Gaillard
and held that California law imposes a continuing ownership requirement on
shareholders pursuing a derivative lawsuit. (Id., at p. 26.)

    FN2. (Grosset v. Wenaas (2005) 133 Cal.App.4th 710 [35 Cal.Rptr.3d 58].)

C. Why Review is Warranted

Review is warranted in this case to address an issue of first impression as to
whether the internal affairs doctrine bars claims brought under California law
against the directors and officers of corporations who engage in wrongful acts in
this state, but are nominally incorporated elsewhere.

Scholarly work on the internal affairs doctrine undercuts any plausible

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                    Page 7

2005 WL 3747917 (Cal.)

explanation for transforming the doctrine, an ordinary conflict of laws rule, into
a behemoth capable of decimating a state's ability to regulate a foreign
corporation's activities within its own borders. [FN3]

     FN3. (Rubenfeld, State Takeover Legislation and the Commerce Clause: The
""Foreign Corporations Problem, 36 Clev. St. L.Rev. 355, 357 i (1988)
[demonstrating that the internal affairs doctrine is not a constitutional mandate
and that the justifications offered by the Delaware Supreme Court for treating it
as such are erroneous]; Buxbaum, The Threatened Constitutionalization of the
Internal Affairs Doctrine in Corporation Law, 75 Cal.L.Rev. 29, 34-35 (1987)
[analyzing United States Supreme Cout cases discussing the internal affairs
doctrine and explaining that these did not " "constitutionalize'' the doctrine];
Greenwood, Democracy and Delaware: The Mysterious Race to the Bottom/Top, Yale Law
& Policy Rev. 381, 429-30 (Spring 2005) [arguing against the expansion of the
internal affairs doctrine because, inter alia, it unfairly delegates state
sovereignty to corporate managers and is inconsistently applied given the
difficulty in determining what are " "internal'' versus ""external'' affairs];
Tung, Origins of the Internal Affairs Doctrine, Loyola Law School (Los Angeles),
Legal Studies Research, Research Paper No. 2005-8 (March 2005), at http://
ssm.com/abstract =699581 [comprehensive historical analysis demonstrating the
internal affairs doctrine did not arise due to its theorized functionality or
constitutional basis but rather from a fortuitous sequence of events, driven by
ideology, interest group influences and institutional inertia].)

     *7 The Fourth District's opinion creates confusion in an extremely important area
of the law, one that affects the day-to-day operation of California's Legislature
and their ability to enact laws to regulate the conduct of corporate entities
located in this state as well as governmental entities engaged in policing
corporations located in this State to ensure that they comply with California's
laws. The opinion further creates uncertainty for the judiciary when reviewing
corporate action. It is therefore critical that this Court grant review. (See
Diamond Multimedla Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036,
1044-45.)

     *8 Specifically, review is warranted because the Fourth District's opinion
creates a conflict among California courts on two fronts.

     1. The opinion is in conflict with earlier opinions on the application of the
internal affairs doctrine. In a series of cases commencing as early as 1909, this
Court and other intermediate courts of appeal have declined to blindly apply the
internal affairs doctrine to bar claims against foreign corporations. (See Wait v.
Kern River Mining Co. (1909) 157 Cal.16, 21; Gilis v, Pan American Western Pet. Co.
(1935) 3 Cal.2d 249, 252-54, overruled in part on other grounds, Mary Pickford
Co. v. Bayly Bros. (1939) 12 Cal.2d 501; Wilson v. Louisiana v. Pacific Resources,
Inc. (1982) 138 Cal.App.3d 216, 224.)

     2. The decision creates a conflict as to the proper interpretation of
Corporations Code section 800 and a shareholder's standing to pursue a derivative
claim after having been forced to sell shares in a merger. Corporations Code
section 800 explicitly provides the procedure for instituting and maintaining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                          Page 8

2005 WL 3747917 (Cal.)

shareholder derivative suits on behalf of both domestic and foreign corporations
in California. (Corp Code § 800, subd. (b)(1).) [FN4] Nowhere in the statute did
the California legislature impose a requirement that a shareholder continuously
maintain an ownership interest *9 in the corporation in order to proceed with a
properly filed derivative lawsuit.

FN4. All statutory references are to the Corporations Code unless otherwise
stated.

In the only California decision, before this case, to consider the scope of
section 800, the appellate court interpreted the statute to permit a shareholder
to proceed with a derivative action after a merger eliminated plaintiff's
shareholdings in a corporation. (*Gaillard, supra,* 173 Cal.App.3d 410.) Here,
however, in a published decision, the Court of Appeal expressly disagreed with
*Gaillard,* and in a tortured interpretation of section 800 held that California
imposes a continuous ownership requirement on shareholders who pursue derivative
claims. It imposed such a requirement in the face of a statute that by its express
terms does not preclude a shareholder, forced out as a result of a merger, from
pursuing redress for wrongdoing by corporate insiders.

The Court of Appeal in this case has created a clear conflict between the
appellate courts of this State that this Court should resolve. (*People v. Hanson*
(2000) 23 Cal.4th 355, 358; Rule 28(b)(1), Cal. Rules of Court.)

                    *10 STATEMENT OF RELEVANT FACTS

This shareholder derivative action was filed on behalf of the nominal corporate
defendant JNI, a manufacturer of computer components that are utilized in storage
networks. (1 JA 40; 6 JA 1363.) [FN5] Plaintiff alleges that the defendants
breached their fiduciary duty to JNI (and ultimately its shareholders) and
violated California's insider trading laws by, among other things, concealing
adverse material information and thus duping an unsuspecting public about JNI's
product development problems and lower than expected revenues. (6 JA 1363-64;
1414-1417a.)

FN5. Citations are to the Joint Stipulated Appendix filed in the appellate
court. Certain documents were directed by the Court of Appeal to be filed under
seal. Designations as to those documents filed are underseal are by the preface
""US.''

On October 19, 2000, JNI issued a secondary public offering selling its stock at
$74 per share. (6 JA 1380.) Less than three weeks later the stock soared to
$122.50 per share. (US[Supp.] 10 JA 2409-10.) Four days later, with the release of
information questioning the company's competitive stance, the stock lost 35% of
its value dropping to $70 - the largest percentage decline on both the New York
Stock Exchange and NASDAQ for that day. (*Ibid.*) By December 11, 2000, JNI's stock
price had plummeted to $34.75 and it continued its descent -- never recovering. (
*Ibid.*)

*11 In the months leading up to the secondary offering, the defendants repeatedly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                          Page 9

2005 WL 3747917 (Cal.)

touted the company's alleged success at expanding its product lines into critical
new markets. (US[Supp.] 10 JA 2409; US12 JA 2654-2658.) But, for months, customers
had been returning JNI's new products in droves because they were ""not
desirable.'' (US 12 JA 2638-2647.) Internal company documents prepared by the
defendants confirmed the bleak outlook for the company's future. (*Id.,* at
2647-2653.)

Undeterred, company insiders continued to proclaim the products success because a
successful secondary offering was the only way they could sell their personal
stockholdings. Driven by greed, they successfully pumped up the stock price and
then sold nearly $32 million of JNI stock during the offering based on inside
information that was not disclosed to the public, in addition to the more than $29
million the defendants garnered in insider stock sales in the weeks leading up to
the offering.

On September 23, 2001, plaintiff filed his complaint against members of JNI's
board alleging that the defendants damaged JNI through breaches of fiduciary duty,
gross mismanagement, waste of corporate assets and violated California's insider
trading laws. (1 JA 39 and 6 JA 1414-1418.) [FN6] Plaintiff alleged that
defendants' actions (i) exposed JNI to tens, if **12** not hundreds, of millions of
dollars in damages from federal securities class action lawsuits filed against JNI
and certain defendants; [FN7] (ii) wasted corporate assets in investigating and
defending those lawsuits; (iii) damaged JNl's reputation, credibility and caused a
loss of investor confidence as a result of defendants' insider trading, market
manipulation and securities fraud. (*Id.,* at pp. 1364; 1414; 1416.) Plaintiff
sought relief in the form of damages on behalf of JNI from all of the defendants
and he also asserted claims under California's insider trading statute, (Corp.
Code § 25402), against all but three of the defendants. (*Id.,* at pp. 1414-1417a.)

    FN6. After this case was filed, the original plaintiff voluntarily sold his
shares of JNI stock. (5 JA 1194.) The current plaintiff, Sik-Lin Huang, was
permitted leave to intervene. (6 JA 1361(a).)

    FN7. The federal securities class actions were consolidated under the lead
case *Osher v. JNI Corp.* No. 01-CV-0557-J (NLS) (S.D. Cal.). (2 JA 357- 404.) The
district court strictly applied the Private Securities Litigation Reform Act
(""PSLRA''), 15 U.S.C. § 78u, to deny plaintiffs discovery and dismissed the cases
finding that the PSLRA's stringent pleading requirements were not met. That ruling
is presently on appeal.

After two demurrers in which defendants contested the sufficiency of plaintiffs
allegations that demand on JNI's board of directors would have been futile, the
trial court ultimately held that plaintiff had properly alleged self-dealing and
breaches of loyalty against the board and excused plaintiff from making a
pre-filing demand. (3 JA 725-727; 6 JA 1361(a)-(c).) Following the denial of their
demurrer to plaintiffs' second amended **13** complaint, defendants named two new
members to the Board and appointed them to be a Special Litigation Committee
(""SLC''). (7 JA 1615.) After spending a little more than four months
investigating the complex fraudulent scheme implemented by the defendants, on
February 19, 2003, the SLC issued its report recommending the complete dismissal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                     Page 10

2005 WL 3747917 (Cal.)


of this lawsuit. (8 JA 1679.)

 Following limited discovery, plaintiff challenged the SLC's report with a massive
evidentiary record, including expert testimony, that not only proved the
underlying fraud but exposed numerous factual inaccuracies in the report.
(US[Supp.]10 JA 2400-2402; 2414-2419; US I JA 2499-2500; US12 JA 2632-2633;
2658-2663.)

 In spite of plaintiff's considerable evidentiary showing, the court granted the
SLC's motion to dismiss without addressing plaintiffs expert testimony or any
other evidence demonstrating the unreasonableness of the SLC's conclusions.
(US[Supp.] 18 JA 4620-4629.) The court essentially deferred to the SLC's
conclusions accepting the SLC's argument that it should not engage in merits or
fact analysis of the underlying issues. (*Id.*)

 A few days after the trial court dismissed the action, JNI merged with AMCC.
(Vol. 2, Exh. 24 to Defendants' Motion for Judicial Notice in Support of Motion to
Dismiss Appeal, filed July 19, 2004.) All of the shareholders of JNI, including
the plaintiff, were forced to sell their shares **14 to the acquiring company. (
*Ibid.*) JNI, which continues to conduct activities in California, was folded into
the umbrella of AMCC. (*Ibid.*)

 After plaintiff appealed from the trial court's ruling, defendants sought to
dismiss the appeal on the basis that the merger eliminated plaintiff's standing.
The Court of Appeal ordered that the motion to dismiss be heard in conjunction
with the appeal. (Appendix at p. 12.)

 On October 20, 2005, the appellate court issued its published opinion.
(Appendix.) The court declined to address any of the issues relating to the merits
of the trial court's decision to dismiss plaintiffs complaint deciding instead to
dismiss the appeal on standing grounds. (Appendix at p. 14, n. 3.)

                      **15 WHY REVIEW SHOULD BE GRANTED

I. THIS COURT SHOULD DECIDE IF THE INTERNAL AFFAIRS DOCTRINE MANDATES THAT
CALIFORNIA COURTS BLINDLY APPLY THE LAWS OF THE STATE OF INCORPORATION ON ALL
ISSUES RELATING TO CORPORATE GOVERNANCE AND REGULATION WITHOUT REGARD TO THIS
COURT'S GOVERNMENTAL INTEREST ANALYSIS.

 This petition raises a vital issue of corporate governance - whether or not the
internal affairs doctrine should be expanded to gut the California Corporations
Code's statutes applicable to foreign corporations, their managers and
shareholders. Embracing the recent Delaware Supreme Court's holding in
*VantagePoint Venture Partners 1996 v. Examen, Inc.* (Del. 2005) 871 A.2d 1108, the
Court of Appeal in its published decision held that the internal affairs doctrine
is mandated by constitutional principles and declined to apply Corporations Code
section 800 that sets out the requirements for instituting and maintaining
shareholder derivative lawsuits in this state. [FN8] Section 800 by its express
terms applies to both foreign and domestic corporations. [FN9]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917 (Cal.)

FN8. (Appendix at pp. 14-21.)

FN9. (See Corp. Code § 800(b)(1) [stating that ""[n]o action may be instituted or maintained in right of any domestic or *foreign* corporation by any holder of shares ...'' unless certain criteria are met].) Foreign corporations are often incorporated in one state, but conduct substantially all of their business in another. In JNI's case it had no operations or other significant contacts with Delaware its state of incorporation. Such corporations are sometimes referred to as ""pseudo-foreign corporations.'' (*See, e.g.,* Oldman, *California Regulates Pseudo-Foreign Corporations - Trampling upon the Tramp,* 17 Santa Clara L.Rev. 85, 99-10 (1977) [explaining the importance and legitimacy of California's regulatory control over such corporations].)

**\*16** Never before in the history of Califomia's conflict of laws jurisprudence has the internal affairs doctrine been elevated to the lofty status of nullifying a California statute that is expressly applicable to a foreign corporation and its managers. Indeed, it is the law and policy of this state to apply equal standards to foreign and domestic corporations. [FN10] The impact of the Court of Appeal's opinion on section 800 is to write out foreign corporations and their managers from the reach of the statute. [FN11] Perhaps even more troubling, with the sweep of a pen the court erased over **\*17** one hundred years of California legislative and case law development in the conflict of laws arena. [FN12]

FN10. (Cal. Const. art. XII, § 15 (1879) [repealed 1972] [""No corporation organized outside the limits of this state shall be allowed to transact business within this state on more favorable conditions than are prescribed by law to similar corporations organized under the laws of this state''].) The repeal of Article XII, § 15 was intended to remove unnecessary words from the Constitution and ""there was no change in law or policy'' in doing so. (*North Am. Asbestos Corp. v. Superior Court* (1986) 180 Cal.App.3d 902, 909 [""[t]hough the Legislature added definitional sections in 1931 and took other steps to tighten up the corporation laws, it never took deliberate action to abrogate the original policy of treating foreign corporations no more favorably than domestic corporations with respect to their capacity to be sued'' [citation omitted]].)

FN11. Although directors and officers of a corporation are typically defendants in shareholder derivative litigation, the corporation is also named as a nominal defendant. (*Weingand v. Atlantic Sav. & Loan Ass'n.* (1970) 1 Cal.3d 806, 818.)

FN12. (*See Wait v. Kern River Mining Co., supra,* 157 Cal. at 21 [refusing to apply the internal affairs doctrine to a foreign corporation whose contacts and activities were all located in California and whose sole contact with the foreign state was its filing of a certificate of incorporation there]; *Gillis v. Pan American Western Pet. Co., supra,* 3 Cal.2d at 252-54 [rejecting application of the internal affairs doctrine and holding that California has a legitimate right to regulate the conduct of foreign corporations in order to safeguard California residents from dishonest corporations]; *Nedloyd Lines B. V v. Superior Court* (1992) 3 Cal.4th 459, 491, n.13 (Kennard, J. concurring and dissenting) [noting criticism of internal affairs doctrine as inconsistent with the State's general

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                      Page 12

2005 WL 3747917 (Cal.)

approach to resolving conflict-of-law questions and stating that, even assuming
the doctrine applies in a given case, it would still require a determination
whether California or the foreign jurisdiction has a ""more significant
relationship'' to the parties]; *Wilson v. Louisiana v. Pacific Resources, Inc.,
supra,* 138 Cal.App.3d at 224 [internal affairs doctrine ""has never been followed
blindly in California....''].)

  The Legislature's power to regulate the conduct of shareholder derivative cases
brought in the courts of this state is ""plenary.'' (*Hogan v. Ingold* (1952) 38
Cal.2d 802, 811-12 [citing *Cohen v. Beneficial Loan Corp.* (1948) 337 U.S. 541,
549, 552].) It is up to the Legislature and the courts of this state to determine
who may bring a shareholder derivative action. (*Ibid*; Ballantine, *Abuses of
Shareholders Derivative Suits: How Far is California's New ""Security for
Expenses'' Act Sound Regulation* 37 Cal.L.Rev. 399, 417 (1949) [ noting ""wide and
flexible power'' to regulate derivative suits, but emphasizing the ""fundamental
policy of the law and *18 duty of government'' to provide a ""remedy'' for ""every
recognized wrong'' [footnote and citations omitted].) California has not ceded
that power lo Delaware or any other state. Indeed, over the years, the California
Legislature and the courts have relaxed or flexibly applied the standing rules of
section 800 (and its predecessor section 834) to facilitate such suits given their
important role in curbing managerial abuse. (*Gaillard*, 173 Cal.App.3d at 415 and
418; *Pearce v. Superior Court* (1984) 149 Cal.App.3d 1058, 1065-66.)

  Ironically, the Court of Appeal's constitutional argument turns the conflicts
issue on its head. Because section 800 by its express terms applies to foreign, as
well as domestic, corporations, the Legislature has already resolved the issue.
Unless section 800 is somehow unconstitutional -- which it is not -- the full
faith and credit clause requires application of the statute in this case. (*Valtz
v. Penta Investment Corp.* (1983) 139 Cal.App.3d 803, 807; *Wilson, supra,* 138
Cal.App.3d at 224.)

  The notion that the defendants, all of whom are California residents who engaged
in wrongful acts in this state, would be ""surprised'' by the application of
California law to their conduct is untenable. The Court of Appeal's reliance on
the Fourteenth Amendment Due Process Clause in support of the application of
Delaware law rather than section 800, leads to the implausible conclusion that
California's connection to the parties and *19 claims was so minimal as to offend
traditional notions of fair play. (*Allstate Ins. Co. v. Hague* (1981) 449 U.S. 302,
312-13 [""[f]or a state's substantive law to be selected in a constitutionally
permissible manner, that State must have a significant contact or significant
aggregation of contacts, creating state interests, such that the choice of its law
is neither arbitrary nor fundamentally unfair'']; *Phillips Petroleum Co. v. Shutts*
(1985) 472 U.S. 797, 821.) Nor has uncertainty in the application of a particular
jurisdiction's law or a desire for uniform regulation resulted in one state's law
being held unconstitutional because it conflicted with the law of another state.
(Rubenfeld, *supra,* 36 Clev. St. L. Rev. at 358-61 and 370-71.) [FN13]

  FN13. There is no suggestion that application of section 800 in this case
results in JNI facing the dilemma of violating one state's laws in order to comply
with another's. (*Valtz, supra,* 139 Cal.App.3d at 808.)

            © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917 (Cal.)

In ruling as it did, the Court of Appeal also ignored the Legislature's careful
approach in developing a Corporations Code that draws distinctions between foreign
and domestic corporations, acceptable and unacceptable conduct by their managers
and, most importantly for present purposes, when the internal affairs doctrine
applies. [FN14]

    FN14. The Corporations Code codifies the internal affairs doctrine in  section
2116 providing for the application of foreign law in certain instances.
Additionally, sections 102(a) and 162 of the Code state that its provisions apply
to foreign corporations when expressly stated. (Corp. Code §§ 102(a) and 162.) (
See also North American Asbestos Corp. v. Superior Court, supra, 180 Cal.App.3d at
908-910 [applying section 2010 to a foreign corporation and stating that ""there
are a myriad of statutory provisions that apply to foreign corporations....''].)

**20** The dubious constitutional basis for the court's decision is predicated on
the VantagePoint opinion and an earlier Delaware Supreme Court decision, McDermott
Inc. v. Lewis (1987) 531 A.3d 206. Both of these Delaware cases stretch the
holdings of three United States Supreme Court decisions beyond the breaking point
in reaching their conclusions. Relying on dicta in Kamen v. Kemper Fin. Serv.
(1991) 500 U.S. 90; CTS Corp. v. Dynamics Corp of Am. (1987) 481 U.S. 69, 89-93;
and Edgar v. MITE Corp. (1982) 457 U.S. 624, 645- 46, the Delaware Supreme Court
ruled that ""application of the internal affairs doctrine is mandated by
constitutional principles, except in rarest situations, e.g., when the law of the
state of incorporation is inconsistent with a national policy on foreign or
interstate commerce.'' (VantagePoint, supra, 871 A.3d at 1113 [footnotes,
citations and quotations omitted].)

VantagePoint misstates these decisions and the language the high court employed.
Although the United States Supreme Court acknowledges the application of the
internal affairs doctrine generally to matters of internal corporation
administration, it has not held that the doctrine is **21** constitutionally mandated
nor has it eliminated the recognized exceptions in instances where, for example, a
state has chosen to regulate foreign corporations with substantial connections to
that state. (See also Rest. 2d Conf. of Laws §§ 302(2), 304, 305, 306 and 309
[noting the foregoing exception to the internal affairs doctrine].)

Until now the California courts have upheld those provisions of the Corporations
Code that apply to foreign corporations against constitutional challenges similar
to those raised by the VantagePoint court and the Court of Appeal in this case.

    ^ (Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036,
1064-65 [antifraud statutes of Corporations Code could be constitutionally applied
against a Delaware corporation and its officers and directors for the benefit of
both resident and non-resident shareholder class members].)

    ^ (Havlicek v. Coast-to-Coast Analytical Serv., Inc. (1995) 39 Cal.App.4th 1844,
1854-55 [rejecting constitutional challenges predicated on the commerce and full
faith and credit clauses in a case involving the inspection rights of directors of
a Delaware corporation which had significant contacts with California].)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                        Page 14

2005 WL 3747917 (Cal.)


**\*22** ^ (*North Am. Asbestos Corp. v. Superior Court, supra,* 180 Cal.App.3d at 910 [holding that California could constitutionally authorize suit against a dissolved foreign corporation where it had a policy or statute that permitted such suits and it had granted the foreign corporation a license to conduct business in the state].)

^ (*Valtz v. Penta Investment Corp., supra,* 139 Cal.App.3d at 807-810 [declining to hold that application of California's shareholder inspection rights statute to a Delaware corporation with operations and headquarters in California violated the full faith and credit, due process, commerce and equal protection clauses of the U.S. Constitution].)

^ (*Wilson v. Louisiana v. Pacific Resources, Inc., supra,* 138 Cal.App.3d at 225-31 [rejecting constitutional challenges under the commerce, contract, due process and equal protection clauses to section 2115 which applies various provisions of California's Corporations Code to foreign corporations with substantial business and other ties to California].)

**\*23** It is abundantly clear that without this Court's intervention, there will be massive confusion between those courts that adhere to the historical conflict of laws jurisprudence and the Fourth District's opinion in this case.

Even those California courts that have previously applied the internal affairs doctrine acknowledge the necessity of applying California law when ""a foreign corporation has sufficient contacts with the state such as conducting business or having an office here.'' (*State Farm Mut. Auto Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 448 [citations omitted].) [FN15] In *State Farm,* the court ruled that an Illinois corporation with its corporate headquarters and other substantial contacts in that state was subject to Illinois rather than California law with regard to the timing and manner of issuing dividends to policyholders. ( *Id.,* at p. 443.) In so ruling, the court did not inflate the internal affairs doctrine to constitutional proportions. To the contrary, the court recognized that ""as codified in the Corporations Code, California law governs certain internal affairs of a foreign corporation....'' (*Id.,* at p. 448.) (*Accord* Rest. 2d Conf. of Laws, § 302, corn. g [""The reasons for applying the local law of the state of incorporation carry less weight when the corporation has little or no contact **\*24** with this state other than the fact that it was incorporated there. In such situations, some other state will almost surely have a greater interest than the state of incorporation in determination of the particular issue''].)

FN15. California follows a governmental interest analysis in resolving conflict of laws issues. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919-20; *Havlicek, supra,* 39 Cal.App.4th at 1851.)

In stark contrast to these authorities, the Fourth District here refused to engage in a governmental interest analysis based on its incorrect conclusion that the internal affairs doctrine made doing so ""irrelevant.'' (Appendix at p. 20.) Worse still is the risk that many statutes of California's Corporations Code will be nullified harming the interests of shareholders, corporate managers and even the foreign corporations themselves, who may no longer rely on the enabling,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remedial and prophylactic provisions of the Code.

 For our nation, the result is likewise untoward. Delaware, the state with the vast majority of corporate charters, will call the shots on corporate governance issues without regard to the interests of those most affected by its laws and with no democratic accountability. [FN16] To preserve the carefully *25 crafted comity between California's corporate law and the law of Delaware and other jurisdictions, this Court should grant this petition, resolve the conflict among the appellate courts of this State and return the internal affairs doctrine to its proper place in the conflict of laws analysis.

    FN16. Today, ""more than half a million business entities have their legal home in Delaware including more than 50% of all U.S. publicly-traded companies and 58% of the Fortune 500.'' (See State of Delaware, Department of State: Division of Corporations website at *http://www.state.de.us/corp.*; Hern, *Delaware Courts' Delicate Response to the Corporate Governance Scandals of 2001 and 2002: Heightening Judicial Scrutiny on Directors of Corporations,* 41 Willamette L.Rev. 207, 228 (Winter 2005) [stating that Delaware's ""corporate friendly laws'' help it to generate over $500 million per year in tax revenues from its incorporated firms, which is 20% of the state's budget [footnote omitted]]; Greenfield, *Democracy and the Dominance of Delaware in Corporate Law,* 67 Law & Contemp. Probs. 135, 136 (Autumn 2004) [arguing that the rigid application of the internal affairs doctrine is an anomaly in conflict of laws jurisprudence and ""is illegitimate as a democratic matter and inefficient as an economic matter''].)

II. REVIEW IS WARRANTED TO RESOLVE A CLEAR CONFLICT AMONG THE APPELLATE COURTS AS TO WHETHER CALIFORNIA IMPOSES A CONTINUOUS OWNERSHIP REQUIREMENT ON SHAREHOLDERS WHO PURSUE A DERIVATIVE CLAIM AGAINST FAITHLESS OFFICERS AND DIRECTORS.

 Rule 28(b)(1) states that ""[t]he Supreme Court may order review of a Court of Appeal decision: (1) when necessary to secure uniformity of decision or to settle an important question of law....'' This is a textbook example of precisely such a case.

 The Fourth District in this case freely acknowledges a conflict with the First District's decision in *Gaillard.* (Appendix at p.24.) In *Gaillard,* the court interpreted section 800's contemporaneous ownership requirement to permit a shareholder to proceed with a derivative action *26 even after a merger eliminated the plaintiffs shareholdings in the subject corporation. The *Gaillard* court held that section 800 does not require a shareholder plaintiff to maintain continuing ownership in the corporation throughout the course of the derivative litigation. (*Id.* at pp. 414-15.) Rather, once the plaintiff establishes that she owned the shares at the time of the transaction or any part of which she complains, the standing requirement is satisfied. (*Ibid.*) Of paramount interest to the court in *Gaillard* was the unfairness to the plaintiff of reading into section 800 a continuing ownership requirement where none exists. (*Id.* at p. 419.) The court held that to do so would create an ""anomalous result'' in the context of a forced sale merger:

 We could well have a situation where a shareholder files a derivative action,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917 (Cal.)

navigates laboriously through the pleading stage, undertakes extensive discovery, incurs sizeable monetary obligations, and then, after an elapse of several years, is precluded from proceeding further because his or her corporation has just merged with another. It could not have been the intention of the Legislature that the adjudication of an alleged wrong be concluded in this manner.

(173 Cal.App.3d at pp. 415 and 414.)

The *Gaillard* court carefully interpreted section 800(b)(1) finding that its holding was not only supported by the plain language of the statute, but also by the Legislative intent behind it, as well as analogous decisions *27 by the California courts and opinions by leading commentators. (173 Cal.App.3d at p. 415.)
[FN17] Courts from other jurisdictions have interpreted section 800(b)(1), or similar statutes, in a manner consistent with *Gaillard*. (*In re General Instrument Corp. Sees. Litig.* (N.D. 111. 1998) 23 F.Supp.2d 867, 872; *Alford v. Shaw* (N.C. 1990) 398 S.E.2d 445, 449-50; *Shelton v. Thompson* (Ala. 1989) 544 So.2d 845, 848-49.) [FN18]

FN17. (*See, e.g., Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 16187 [ section 800(b)(1) ""requires that the plaintiff have been a shareholder of the corporation at the time of the wrong alleged in the complaint'']; *The Pacific Lumber Co. v. Superior Court* (1990) 226 Cal.App.3d 371, 376 [section 800(b)(1) ""[prohibits an individual from bringing a derivative action unless he was a shareholder both at the time he filed the derivative action and at the time of the transaction of which he complains'']; 2 Ballantine & Sterling, *California Corporations Law* (4th ed. 1998) § 292.02(1)(a) at pp. 14-16 [""[a] plaintiff who satisfies the contemporaneous ownership requirement at the commencement of the derivative action has standing to proceed with the action following the merger of the plaintiffs corporation with another corporation after the action is filed even if, as a result of the merger, the plaintiff involuntarily loses his or her shareholder status'' [footnote omitted]].)

FN18. Moreover, while interpreting section 800's predecessor statute, section 834, this Court has on two previous occasions allowed derivative actions to proceed where the plaintiffs did not meet the literal standing requirements of the statute. (*Weingand v. Atlantic Sav. & Loan Ass'n., supra*, 1 Cal.3d at 818-19; *Reed v. Norman* (1957) 48 Cal.2d 338, 342.)

Here, the Court of Appeal rejected *Gaillard's* careful analysis and sound conclusion. ""The *Gaillard* court concluded that because section 800 only required a. plaintiff to allege ownership at the time of the underlying transaction and at the time of filing suit, there was no continuous *28 ownership rule in California:... We find the reasoning in *Gaillard* unpersuasive and the case itself distinguishable.'' (Appendix at pp. 22 and 24.) Without engaging in any analysis of section 800, the court chose instead to follow what it considered the ""majority rule that continuous stock ownership is necessary for standing to pursue a derivative action,'' relying almost entirely on decisions from non-California courts. (Appendix at pp. 27.) [FN19] As a result, the court held that plaintiff could not continue to pursue derivative claims after he was forced to sell his JNI shares following the merger with AMCC. (Appendix at p. 28.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917 (Cal.)

   FN19. The only California decision that the court relied on is *Heckmnann v. Ahmanson* (1985) 168 Cal.App.3d 119. *Heckmann* involved a unique situation where the shareholder used a derivative case to promote a takeover bid and as leverage to force the corporation to buy back its shares at a premium. (*Id.,* at pp. 124, 125, 128-30.) The issue presented in *Heckmann,* was whether the trial court acted properly in issuing an injunction to prevent the greenmail suitor from disposing of the proceeds he reaped from the attempted takeover. Without any analysis of section 800 or any other California case, the court, in passing, stated that " "[o]nce a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of remaining shareholders.'' (*Id.* at p. 130 [citations omitted].) *Heckmann* is distinguishable from *Gaillard* and this case because the shareholder there voluntarily sold his shares rather than being forced to do so. The American Law Institute in fashioning a derivative standing rule has drawn the distinction between forced and voluntary sales. In the former case, standing is not lost while in the latter it is. (A.L.I, Principles of Corp. Governance (1994) § 7.02(a)(2)].)

   There is a clear conflict among the appellate courts creating a propensity for more inconsistent rulings on an important corporate **29** governance issue. Moreover, it is an issue of significance. As early as 1949, the U.S. Supreme Court recognized the importance of derivative lawsuits. (See *Cohen v. Beneficial Industrial Loan Corp.* (1949) 337 U.S. 541, 549 [""this remedy born of stockholder helplessness was long the chief regulator of corporate management...It is argued, and not without reason, that without it there would be little practical check on such abuse''].) [FN20]

   FN20. (See *Pearce v. Superior Court, supra,* 149 Cal.App.3d at 1065 [""[g]reat evils ... will result if undue obstacles are placed in the path of a shareholder who has legitimate grounds for suing. The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution''].)

   Allowing this decision to stand will surely impair the ability of shareholders to ensure that corporate officers and directors perform their corporate duties faithfully and in accordance with California laws. The issue has already arisen in two cases and in the wake of the corporate scandals of this decade it will surely arise again. Given the hundreds of foreign corporations headquartered in California, it is vital that this Court grant review in order to bring clarity to the law and set guidelines for future cases. (*Rudnick v. Superior Court* (1970) 11 Cal.3d 924, 928.)

                                   CONCLUSION

   If allowed to stand, the Court of Appeal's decision will lead to untoward and unacceptable results. Already the decision is being used by **30** directors and officers of California-based Delaware corporations as a shield to prevent the application of California corporate laws on issues for which California has the greatest interest. Further, the decision has created a sharp conflict in the law concerning the application of the internal affairs doctrine and whether a shareholder must retain his shares continuously in order to pursue a derivative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3747917                                                    Page 18

2005 WL 3747917 (Cal.)


claim. It is respectfully submitted that this petition should be granted in order
that this Court may resolve these issues and secure uniformity in this area that
is now in conflict and to settle the very important question of law as to when the
internal affairs doctrine should be permitted to trump the California Corporations
Code.

  Appendix not available.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

**c**
Briefs and Other Related Documents

United States District Court,N.D. Texas, Dallas
Division.
REGAL ROW FINA, INC., et al., Plaintiffs,
v.
WASHINGTON MUTUAL BANK, FA Successor
by Merger to Bank United, et al., Defendants.
**No. Civ.A. 3:04-CV-1033-.**

Dec. 9, 2004.

James M. Suggs, Jr., Suggs & Associates, Irving,
TX, for Plaintiffs.
Jeff D. Carruth, Winstead Sechrest &
MinickRenaissance Tower, R. Spencer Shytles,
Graham Bright & Smith, Aamer Ravji, Bickel &
Brewer-Dallas, Michael J. Collins, Dallas, TX,
Defendants.

*MEMORANDUM ORDER*
FISH, Chief J.
*1 Before the court is the motion of the plaintiffs
Regal Row Fina, Inc., Shiraz Poonawala, and
Yasmin Poonawala (collectively, the "plaintiffs") to
remand this case to the state district court from
which it was previously removed and to impose
sanctions on the defendant in this case. For the
reasons discussed below, the motion is denied.

*I. BACKGROUND*

Regal Row Fina, Inc. ("Regal Row") is a debtor in a
chapter 11 bankruptcy case, No. 04-33857-SAF-11,
*In re Regal Row, Inc.,* pending before United States
Chief Bankruptcy Judge Steven A. Felsenthal in the
United States Bankruptcy Court for the Northern
District of Texas (the "bankruptcy case"). Notice of
Removal and Request for Referral to Bankruptcy
Court ("Washington Mutual's Notice of Removal")
¶ 3. Shiraz Poonawala and Yasmin Poonawala

(collectively, the "Poonawalas") are the owners of
Regal Row and served as the primary guarantors on
the company's debt. Brief in Support of Washington
Mutual Bank F.A.'s Response to Plaintiffs' Motion
to Remand ("Washington Mutual's Response Brief"
) at 3. Together, Regal Row and the Poonawalas
commenced this suit. *See generally* Plaintiffs'
Original Petition ("Petition"), *attached to*
Washington Mutual's Notice of Removal as Exhibit
A-4. Washington Mutual, F.A. ("Washington
Mutual"), successor by merger to Bank United, is a
secured creditor of Regal Row and a party in
interest with respect to the bankruptcy case.
Washington Mutual's Notice of Removal ¶ 4.

In 1999, the plaintiffs entered into negotiations with
Atlantic Oil & Gas, Inc., p/k/a North Atlantic Oil &
Gas, Ltd. ("Atlantic Oil & Gas"), to purchase real
property, construct improvements thereon, and to
operate a gas station, C-Store, and Grandy's fast
food restaurant. Petition ¶ 12. In July 1999,
plaintiff Yasmin Poonawala purchased the real
property which is the subject of this dispute;
Washington Mutual served as the lender for this
purchase. *Id.* Following this initial transaction,
Washington Mutual provided additional financing
to Regal Row in October 1999, in the amount of
$1,537,000.00, which was guaranteed by the
Poonawalas. *Id.* Pursuant to the Deed of Trust, the
Security Agreement, and the Financing Statements,
Washington Mutual holds a first priority security
interest in and against substantially all of Regal
Row's real property and personal
property-including, but not limited to, all of Regal
Row's furniture, fixtures, equipment, and inventory
(collectively, the "collateral"). Washington Mutual's
Response Brief at 2-3; Claims Register for *In re
Regal Row Fina, Inc., attached to* Appendix in
Support of Defendant Washington Mutual Bank,
F.A.'s Response to Plaintiffs' Motion to Remand as
Exhibit G ("Exhibit G") at 56; Washington Mutual's
Proof of Claim in *In re Regal Row Fina, Inc.,
attached to* Appendix in Support of Defendant
Washington Mutual Bank, F.A.'s Response to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
(Cite as: Not Reported in F.Supp.2d)

Page 2

Plaintiffs' Motion to Remand as Exhibit H ("Exhibit H") at 59; Cash Collateral Order, *attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand as Exhibit O ("Exhibit O") at 209. Regal Row uses the collateral to operate a Fina-branded convenience store and gas station, as well as a Grandy's restaurant franchise. Washington Mutual's Response Brief at 3; Debtor's Schedules and Statement of Financial Affairs for *In re Regal Row Fina, Inc., attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand as Exhibit B ("Exhibit B") at 9.

*2 On April 2, 2004, the plaintiffs commenced this lawsuit, Cause No. 04-02755, *Regal Row Fina, Inc., Shiraz Poonawala and Yasmin Poonawala, Plaintiffs v. Washington Mutual Bank, F.A. Successor by Merger to Bank United, Kimela L. Jacobs and North Atlantic Oil & Gas, Ltd., f/k/a Atlantic Oil & Gas, Inc., Defendants,* in the 162d Judicial District Court in and for Dallas County, Texas. Brief in Support of Plaintiffs' Motion to Remand ("Plaintiffs' Motion to Remand") ¶ 2. The plaintiffs alleged counts of fraud, constructive fraud, fraud in a real estate transaction, breach of contract, negligent misrepresentation, and breach of fiduciary duty. Petition ¶¶ 16-44. The petition sought money damages and an award of costs and attorney's fees against Washington Mutual. *See generally id.* Specifically, the plaintiffs claim that prior to the July 1999 purchase and the October 1999 financing, there were several meetings and conversations between the parties to this suit during which time Washington Mutual made certain representations. *Id.* ¶ 13. As a result of these representations, the plaintiffs claimed that they believed they had acquired real estate, improvements, and personal property to operate the business at a cost they understood to be the cost of construction. *Id.* ¶ 14. However, the plaintiffs stated that the value of their acquisition was less than the amount the plaintiffs paid to Washington Mutual, thereby allowing Washington Mutual to receive a financial benefit by reason of the excess charges. *Id.*

On April 5, 2004, Regal Row filed a chapter 11

proceeding in the bankruptcy court in this district. [FN1] Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand (" Washington Mutual's Response") at 1-2. Washington Mutual filed its answer to the state court suit on May 7, 2004. *See generally* Defendant Washington Mutual's, FA's Original Answer (" Washington Mutual's Answer"), *attached to* Index of Exhibits to Notice of Removal and Request for Referral to Bankruptcy Court as Exhibit A-10. Then, Washington Mutual removed the lawsuit by filing a notice of removal and request for referral to bankruptcy court on May 12, 2004. *See generally* Washington Mutual's Notice of Removal.

FN1. On May 5, 2004, plaintiffs Shiraz and Yasmin Poonawala commenced an individual chapter 11 proceeding, Case No. 04-35147-BJH-11, which is pending before United States Bankruptcy Judge Barbara J. Houser in the United States Bankruptcy Court for the Northern District of Texas. Washington Mutual's Response Brief at 2 n. 4. The plaintiffs have requested that this proceeding be transferred to United States Chief Bankruptcy Judge Felsenthal's court where the Regal Row bankruptcy proceeding is currently pending. *See* Bankruptcy Docket, *In re Shiraz M. and Yasmin Poonawala, attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand as Exhibit C ("Exhibit C") at 39. Additionally, before filing their individual chapter 11 proceeding, the Poonawalas filed a second lawsuit against Washington Mutual. Washington Mutual's Response Brief at 2 n. 4. The second lawsuit, Cause No. C200400187, *Shiraz R. Poonawala, Individually and d/b/a Alvarado Texaco Travel and Truck Plaza, SYP Enterprises, Inc. and Yasmin Poonawala, Plaintiffs v. Washington Mutual Bank, FA Successor by Merger to Bank United, Kimela L. Jacobs and Alvarado Joint Venture, a Partnership, Defendants,* in the 18th Judicial District Court in and for Johnson

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

County, Texas (the "second lawsuit"), contains allegations against Washington Mutual that are similar to the claims made in the instant case. *Id.* On June 8, 2004, Washington Mutual removed the second lawsuit to the United States District Court for the Northern District of Texas and it was assigned to United States District Court Judge Solis. See *id.* On September 9, 2004, the court referred the second lawsuit to the bankruptcy court because it was "related" to the bankruptcy proceeding pending before United States Bankruptcy Judge Houser. *Id.*

Washington Mutual filed a separate motion requesting the court to refer the removed lawsuit to the bankruptcy court on May 24, 2004.[FN2] *See generally* Motion for Referral of Removed Proceeding to Bankruptcy Court ("Washington Mutual's Motion for Referral"). On June 11, 2004, the plaintiffs filed their motion to remand this case to the state court from which it was previously removed.[FN3] *See generally* Plaintiffs' Motion to Remand.

FN2. Washington Mutual's motion for referral was unopposed, and an order granting the referral pursuant to the standing order of reference was entered by the court on June 30, 2004. The order for referral, however, was subsequently vacated by another order on July 1, 2004.

FN3. In their reply brief, the plaintiffs argue that this court should not consider Washington Mutual's response brief because it was untimely filed. Reply Brief of Plaintiffs in Response to Defendant Washington Mutual's Response to Plaintiffs' Motion to Remand ("Plaintiffs' Reply Brief") ¶¶ A1-A5. Although Local Rule 7.1(e) does allow for this court to strike this brief, the court will consider the response brief on its merits.

## II. ANALYSIS

### A. "Related To" Jurisdiction

Removal of a case from state to federal court is permissible if the federal court would have had jurisdiction over the case at the time of the removal. *See* 28 U.S.C. § 1441. Section 1441 provides that " any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

*3 Washington Mutual removed this case pursuant to 28 U.S.C. § 1452, which allows the removal of claims related to bankruptcy cases. According to § 1452, a party can remove a case to federal court if the district court has jurisdiction over the cause of action under 28 U.S.C. § 1334. 28 U.S.C. § 1452(a) . The bankruptcy jurisdiction of district courts and bankruptcy courts is conferred by 28 U.S.C. § 1334. Section 1334(a) provides for exclusive jurisdiction " of all cases under title 11." 28 U.S.C. § 1334(a). The statute also confers on the district courts original, but not exclusive, jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *Id.* § 1334(b). The Fifth Circuit has stated that in determining whether jurisdiction under this statute exists, it is necessary to decide only whether a matter is at least "related to " the bankruptcy:

For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between proceedings " arising under", "arising in a case under", or "related to a case under", title 11. These references operate conjunctively to define the scope of jurisdiction. Therefore, it is necessary only to determine whether a matter is at least "related to" the bankruptcy. The Act does not define "related" matters. Courts have articulated various definitions of "related," but the definition of the Court of Appeals for the Third Circuit appears to have the most support: "whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy."

*Matter of Wood,* 825 F.2d 90, 93 (5th Cir.1987)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

(emphasis in original) (citations omitted). Since this case does not arise under title 11, removal of the case to this court is proper only if it is a civil proceeding arising in or related to a case under title 11. *See* 28 U.S.C. § 1334(b).

Washington Mutual argues that this civil proceeding is related to the title 11 bankruptcy cases filed by the plaintiffs. Civil proceedings which are "related to" a bankruptcy for removal purposes include the following: "(1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate." *Celotex Corporation v. Edwards*, 514 U.S. 300, 308 n. 5, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); accord *Arnold v. Garlock, Inc.*, 278 F.3d 426, 434 (5th Cir.2001). Washington Mutual claims that since it is the largest creditor of Regal Row and the Poonawalas are the guarantors on the Regal Row debt, any damages won by the plaintiffs in this case would affect the amount Regal Row is required to pay Washington Mutual in reorganization. Washington Mutual's Response ¶ 6. Therefore, this action would fall into the first type of "related to" proceeding set out by the Supreme Court.

In the Fifth Circuit, the test for whether a proceeding properly invokes federal bankruptcy " related to" jurisdiction is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. *Arnold*, 278 F.3d at 434 (citing *In re Canion*, 196 F.3d 579, 585 (5th Cir.1999)). The test is simply whether an effect is possible; certainty of an effect is not a requirement. *Id.* Therefore, "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and ... in any way impacts upon the handling and administration of the bankrupt estate." *Matter of Zale Corporation*, 62 F.3d 746, 752 (5th Cir.1995) (quoting *In re Walker*, 51 F.3d 562, 569 (5th Cir.1995)). At a minimum, the outcome of this case would have an effect on Regal Row's estate since any recovery of monetary damages would necessarily accrue to the estate. Therefore, the court finds that it has subject matter jurisdiction over this case under 28 U.S.C. § 1334. Removal under these circumstances was

proper.

## B. *Timeliness of Removal*

**\*4** The plaintiffs argue that Washington Mutual's removal was improper because it was untimely. Plaintiffs' Motion to Remand ¶¶ B1-B7. The timeliness of the removal of an action that is related to a bankruptcy proceeding is governed by Federal Rule of Bankruptcy Procedure 9027. Rule 9027 provides that if the civil action is initiated after the commencement of the bankruptcy case, the notice of removal must be filed within 30 days of receiving either the complaint, or the summons if the complaint did not accompany the summons. Fed. R. Bankr. P. 9027(a)(3). Alternatively, if the civil action was filed before the initiation of a bankruptcy case, the notice of removal must be filed within the longest of 90 days of the order for relief, 30 days of an order terminating a stay, or 30 days after the qualification of a chapter 11 trustee, but not later than 180 days after the order for relief. *See* Fed. R. Bankr. P. 9027(a)(2). The plaintiffs filed this case on April 2, 2004, and Regal Row filed its bankruptcy petition three days later on April 5, 2004. Given the filing date of the bankruptcy case, it appears that removal would have been timely at any time until July 4, 2004. Thus, Washington Mutual's notice of removal, filed May 12, 2004, was timely.

The plaintiffs contend that because the current action is not "related to" the bankruptcy proceeding, it is irrelevant that Washington Mutual filed its notice of removal within 90 days of the order of relief in that case. Plaintiffs' Motion to Remand ¶ B-7. Specifically, the plaintiffs claim that the value of the property they acquired from Washington Mutual was far less than the amount the plaintiffs paid to Washington Mutual. As a result, the plaintiffs believe, Washington Mutual received a monetary benefit in excess of what it was entitled to receive. Since any monetary judgment to redress this allegedly tortious conduct would belong to the debtor's estate, a determination of whether Washington Mutual is liable to the plaintiffs could conceivably affect Regal Row's bankruptcy estate, either positively or negatively. Therefore, the court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 5

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

concludes that this action is sufficiently "related to" Regal Row's bankruptcy case that Rule 9027(a)(2) was satisfied and that, under the provisions of that rule, removal of this case was timely.

### C. Abstention

The plaintiffs contend that even if this action is related to a bankruptcy proceeding and was timely removed, this court should abstain from exercising jurisdiction and should remand the case to the state court pursuant to § 1334(c). Plaintiffs' Motion to Remand ¶ C-5. There are two types of abstention that are potentially applicable: (1) section 1334(c)(1) provides for *discretionary* abstention in cases that are related to bankruptcy actions; (2) section 1334(c)(2), on the other hand, provides for *mandatory* abstention in particular cases that are related to bankruptcy actions. Specifically, 28 U.S.C. § 1334(c) provides that:

*5 (1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c). Thus, the court must consider the different standards used in applying discretionary or mandatory abstention doctrines created by this statute and determine, under those standards, the nature of its authority over the causes of action in this case.

### 1. Mandatory Abstention

The mandatory abstention provision requires that the proceeding be "related to a case under title 11 but not arising in a case under title 11 or arising in a case under title 11...." 28 U.S.C. § 1334(c)(2). Essentially, all proceedings-whether they are described as "core" or only "otherwise related" to a bankruptcy case-are related proceedings. A "related" proceeding, but one that does not "arise under" or " arise in" title 11, is one that is "otherwise related" within the meaning of 28 U.S.C. § 157(c)(1). See *Matter of Wood,* 825 F.2d at 97. Section 1334(c)(2) , however, does not apply to "core" proceedings set out in 28 U.S.C. § 157(b). *Matter of Wood,* 825 F.2d at 97 ("core" proceedings equate to proceedings "arising under" title 11). To determine if mandatory abstention applies to the instant case, the court must determine whether this case constitutes a core proceeding or an otherwise related proceeding within the meaning of 28 U.S.C. § 157. *In re Chiodo,* 88 B.R. 780, 782 (W.D.Tex.1988).

Congress has unequivocally expressed its intent that bankruptcy matters are to be resolved exclusively in a federal forum. *See* 28 U.S.C. § 1334; *MSR Exploration, Limited v. Meridian Oil, Inc.,* 74 F.3d 910, 913 (9th Cir.1996). "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corporation,* 514 U.S. at 308 (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)). Nevertheless, not all matters related to bankruptcies fall within the ambit of those subject to federal power. As a result, the distinctions made between "core" and "non-core" proceedings in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333, are instructive. [FN4]

> FN4. The 1984 Act was passed in response to the decision rendered in *Northern Pipeline Construction Company v. Marathon Pipe Line Company,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) , which drew a distinction between the " restructuring of debtor creditor relations, which is at the core of the federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 6

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

bankruptcy power," and "the adjudication of state-created private rights." *Id.* at 71. Specifically, in regards to the latter, the Supreme Court held that Congress did not have the power to grant jurisdiction to Article I bankruptcy courts over proceedings related to a bankruptcy case involving rights "created by state law" and "independent of and antecedent to the reorganization petition that conferred jurisdiction upon the Bankruptcy Court." *Id.* at 84. Nevertheless, as to the first function, the Court noted that "[o]f course, bankruptcy adjudications themselves, as well as the manner in which the rights of debtors and creditors are adjusted, are matters of federal law." *Id.* at 84 n. 36.

*6 In general, a "core proceeding" in bankruptcy is one that "invokes a substantive right provided by title 11 or ... a proceeding that, by its nature, could arise only the context of a bankruptcy case." *Matter of Wood,* 825 F.2d at 97. On the other hand, " non-core proceedings" are those not integral to the restructuring of debtor-creditor relations and not involving a cause of action arising under title 11. See *Windsor Communications Group, Inc. v. Grant,* 75 B.R. 713, 721 (E.D.Pa.1985). In other words, they are proceedings in which the outcome "could *conceivably* have any effect on the estate being administered in bankruptcy." [FN5] *Matter of Wood,* 825 F.2d at 93 (quoting *Pacor,* 743 F.2d at 994) (emphasis in original).

FN5. The nature of the proceeding and whether it is coined "core" or "non-core" determines the court's authority. In "core" proceedings, bankruptcy courts have the authority to "hear and determine all [matters] ... and may enter appropriate orders and judgments." 28 U.S.C. § 157(b)(1). In "non-core" proceedings, unless the parties consent, bankruptcy courts may only make recommended findings of fact and conclusions of law which are subject to *de novo* review in the district court. 28 U.S.C. § 157(c)(1)-(2).

The non-exhaustive list of "core" bankruptcy proceedings set forth in 28 U.S.C. § 157(b) includes:
(A) matters concerning the administration of the estate;
(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C) counterclaims by the estate against persons filing claims against the estate;
(D) orders in respect to obtaining credit;
(E) orders to turn over property of the estate;
(F) proceedings to determine, avoid, or recover preferences;
(G) motions to terminate, annul, or modify the automatic stay;
(H) proceedings to determine, avoid, or recover fraudulent conveyances;
(I) determinations as to the dischargeability of particular debts;
(J) objections to discharges;
(K) determinations of the validity, extent, or priority of liens;
(L) confirmations of plans;
(M) orders approving the use or lease of property, including the use of cash collateral;
(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2).

This case qualifies as a core proceeding under several of the § 157(b)(2) criteria, for it directly affects the administration of the estate. As stated above, Washington Mutual is the largest creditor of Regal Row; it was Washington Mutual's collection activity that eventually brought on the filing of the bankruptcy case. Washington Mutual's Response

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

Brief at 10. Washington Mutual has filed a proof of claim [FN6] in the bankruptcy case and has actively participated in hearings in which Regal Row sought authority from the bankruptcy court to use Washington Mutual's cash collateral. *Id.* at 10, 14; Exhibit G, *attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand at 56; Exhibit H, *attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand at 59; Claims Register for *In re Shiraz M. and Yasmin Poonawala, attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand as Exhibit J ("Exhibit J") at 111; Washington Mutual's Proof of Claim in *In re Shiraz M. and Yasmin Poonawala*-Regal Row guarantees, *attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand as Exhibit K ("Exhibit K") at 118; Washington Mutual's Proof of Claim in *In re Shiraz M. and Yasmin Poonawala*-Alvarado Truck Stop, *attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand as Exhibit L ("Exhibit L") at 140; Exhibit O, *attached to* Appendix in Support of Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand at 209. As a result, any recovery that Regal Row receives from this case would naturally be applied against the indebtedness evidenced by the promissory note executed by Regal Row in favor of Washington Mutual. Washington Mutual's Response Brief at 11.

> FN6. "A claim against the estate is instituted by filing a proof of claim as provided by the bankruptcy rules. The filing of the proof invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution." *Matter of Wood*, 825 F.2d at 97.

*7 Another significant factor is that this case is a proceeding involving the allowance or disallowance of claims or counterclaims or exemptions from property of Regal Row's estate. 28 U.S.C. § 157(b)(2)(B). Washington Mutual contends-and the court agrees-that because Washington Mutual has filed a proof of claim in Regal Row's bankruptcy case and because this case is intertwined with its proof of claim, the case necessarily affects the allowance or disallowance of claims against Regal Row's bankruptcy estate. Washington Mutual's Response Brief at 12. Thus, before Regal Row can confirm a reorganization plan in the bankruptcy court, the extent of Regal Row's net obligation to Washington Mutual must be established. Washington Mutual's Response Brief at 12.

Additionally, the court concludes that this proceeding, if not originally a core proceeding, has been converted into one by Washington Mutual's filing of a proof of claim. *See* 28 U.S.C § 157(b)(2)(C). Even though Washington Mutual's proof of claim was filed after the plaintiffs filed their state court petition, Washington Mutual-by filing its proof of claim-converted the plaintiffs' adversary proceeding involving state tort law claims "related to" Regal Row's bankruptcy to a proceeding to adjudicate a counterclaim "arising under" title 11. Numerous courts have found claims asserted by the debtor against a person who has filed proof of claims against the estate to be counterclaims within the meaning of § 157(b)(2)(C) , and therefore core proceedings, notwithstanding the fact that the claims were asserted by procedures other than counterclaiming against the proof of claim itself. See, *e.g.*, *In re Performance Nutrition, Inc.*, 239 B.R. 93, 99 (Bankr.N.D.Tex.1999) (holding that claims in a bankruptcy trustee's adversary complaint against two persons who had filed proofs of claims against the estate were counterclaims); *Allen v. City Finance Company*, 224 B.R. 347, 352 (S.D.Miss.1998) (holding that claims asserted in a complaint filed by a debtor against a creditor who had filed proofs of claims were essentially counterclaims against the creditor); *Pan American World Airways, Inc. v. Evergreen International Airlines, Inc.*, 132 B.R. 4, 7 (S.D.N.Y.1991) (holding that claims in a complaint initiated by the debtor against an entity that had not yet filed a proof of claim in the bankruptcy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 8

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

proceeding, but intended to do so, were counterclaims within the meaning of § 157(b)(2)(C) ). Furthermore, because any judgment entered in the determination of this case has the potential to eliminate Washington Mutual's liens, the lawsuit clearly falls within the definition of a proceeding to determine the validity, extent, or priority of Washington Mutual's liens. *See* 28 U.S.C. § 157(b)(2)(K).

Finally, this case is properly considered a core proceeding by virtue of the "catch-all" provision because the plaintiffs' claims against Washington Mutual would likely "affect[ ] the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship." 28 U.S.C. § 157(b)(2)(O); see *Matter of Baudoin,* 981 F.2d 736, 741, 742 (5th Cir.1993) (holding that the same lender liability claim would have been a "core proceeding" in the personal bankruptcy of the corporation's owners, by virtue of the "catch all" provision of § 157(b)(2)(O), where the bank, although listed in the debtors' chapter 7 petition, had filed no proof of claim). Therefore, the court concludes that any potential judgment from this case would be an asset of the bankruptcy estate, possibly resulting in additional funds available for distribution by the bankruptcy court. That this case is inextricably interwined with the bankruptcy proceeding cannot, in these circumstances, reasonably be disputed. See, *e.g., Matter of Paso Del Norte Oil Company,* 755 F.2d 421, 425 (5th Cir.1985) (stating that a determination of core status relies on whether it is possible to administer the estate without resolving the controversy, or whether the controversy is tied to matters pertaining to bankruptcy); *Holland America Insurance Company v. Succession of Roy,* 777 F.2d 992, 998 (5th Cir.1985) (stating that adversary proceedings that do not intimately involve the debtor-creditor relationship and that rest solely in state law are not properly brought before the federal bankruptcy court); *In re Marr Broadcasting Company, Inc.,* 79 B.R. 673, 677 (Bankr.S.D.Tex.1987) (concluding that it was possible to administer the estate without resolving the state law controversy when the suit involved a party who was not a creditor of the debtor).

*8 The plaintiffs in this case are seeking to recover monetary damages from Washington Mutual based on its allegedly tortious conduct. Any damages that the plaintiffs would recover, would affect the amount that Regal Row is required to pay Washington Mutual, its largest secured creditor, through reorganization. Because this action is a core proceeding under 28 U.S.C. § 157(b), mandatory abstention does not apply.

*2. Permissive Abstention & Equitable Remand*

Since this case is within the bankruptcy court's "core " jurisdiction, the decision whether to abstain from hearing it lies within the court's discretion. See *Matter of Southmark Corporation,* 163 F.3d 925, 932 (5th Cir.), *cert. denied,* 527 U.S. 1004, 119 S.Ct. 2339, 144 L.Ed.2d 236 (1999). There are two statutory provisions a court must consider when determining whether to abstain or remand. First, § 1334(c)(1) authorizes abstention, as requested by the plaintiffs here, in the interest of justice. 28 U.S.C. § 1334(c)(1). Second, § 1452(b) provides that the "court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." [FN7] 28 U.S.C. § 1452(b). Together, § 1452(b) and § 1334(c) evince a congressional policy that the trial of state law created issues and rights should be allowed to proceed in state court, at least where there is no basis for federal jurisdiction independent of § 1334 and the litigation can be timely completed in state court. *Lee v. Miller,* 263 B.R. 757, 763 (S.D.Miss.2001). Because the statutes are similar in purpose, the circumstances which weigh in favor of discretionary abstention or dictate mandatory abstention under § 1334(c), weigh in favor of or constrain remand under § 1452(b). *Id.* (citing *Twyman v. Wedlo, Inc.,* 204 B.R. 1006, 1020 (Bankr.N.D.Ala.1996)).

> FN7. According to the Fifth Circuit, equitable considerations that are relevant to a decision to remand include:
> (1) forum non conveniens;
> (2) a holding that, if the civil action has been bifurcated by removal, the entire

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 9

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

action should be tried in the same court;
(3) a holding that a state court is better able to respond to questions involving state law;
(4) expertise of the particular court;
(5) duplicative and uneconomic effort of judicial resources in two forums;
(6) prejudice to the involuntarily removed parties;
(7) comity considerations; and
(8) a lessened possibility of an inconsistent result.
*Browning v. Navarro,* 743 F.2d 1069, 1076 n. 21 (5th Cir.1984) (citations omitted); see also *In re Fairchild Aircraft Corporation,* Bankruptcy No. 90-50257C, 1990 WL 119650, at *1, 4 (Bankr.W.D.Tex. June 18, 1990).

When determining whether to exercise discretionary abstention and equitable remand, there are fourteen factors that a court must consider and balance. These factors include:
(1) the effect or lack thereof on the efficient administration of the estate if the court decides to remand or abstain;
(2) extent to which state law issues predominate over bankruptcy issues;
(3) difficult or unsettled nature of applicable law;
(4) presence of related proceeding commenced in state court or other non-bankruptcy proceeding;
(5) jurisdictional basis, if any, other than § 1334;
(6) degree of relatedness or remoteness of proceeding to main bankruptcy case;
(7) the substance rather than the form of an asserted core proceeding;
(8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;
(9) the burden of the ... court's docket;
(10) the likelihood that the commencement of the proceeding in the [district] court involves forum shopping by one of the parties;
(11) the existence of a right to a jury trial;
*9 (12) the presence in the proceeding of non-debtor parties;
(13) comity; and
(14) the possibility of prejudice to other parties in

the action.

*Davis v. Life Investors Insurance Company of America,* 282 B.R. 186, 194 n. 7 (S.D.Miss.2002).

These factors, taken as a whole, do not weigh in favor of remand. The first factor weighs against remanding this action to state court. Washington Mutual alleges that one of the primary reasons it removed this action was so that the case could be coordinated with Regal Row's bankruptcy proceedings. Washington Mutual's Response Brief at 17. Specifically, Washington Mutual is concerned that the adjudication of this case would impact certain provisions in the proposed plan of reorganization. There are unanswered questions with respect to how quickly the state court lawsuit will be heard if this court abstains from hearing the case or refers it to the bankruptcy court. Because resolution of the issues raised in this case are central to Regal Row's chapter 11 bankruptcy, any delay could have a substantial effect on its ability to effectively reorganize. Moreover, although Regal Row filed its proposed plan on October 7, 2004, this plan is still awaiting confirmation by the bankruptcy court. Thus, there is still much to accomplish in the pending bankruptcy proceeding with which to coordinate this action.

To the extent that the state law issues predominate, if a state law issue is not unsettled, or if there is no state authority directly on point, then this court is equally qualified to resolve those issues. Therefore, the second and third factors cut against abstention in favor of the Texas state court proceedings. See *Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad Company,* 6 F.3d 1184, 1189 n. 8 (7th Cir.1993). Nevertheless, factors four and five weigh in favor of abstention since, if remand of the entire case were made, the parties would be able to litigate this case in a state court, and no basis for federal jurisdiction exists except the court's bankruptcy jurisdiction. Since the court has determined that this proceeding is a "core proceeding," factor six does not favor abstention.

Factors seven and eight do not weigh in favor of abstention simply because, as stated above, this action is a core proceeding. Although it appears, on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

the basis of the complaint, that the subject matter of this case fits squarely within the realm of the state court's plenary jurisdiction, the pendency of the bankruptcy proceeding transforms the nature of this case. Since the instant case will ultimately determine what Regal Row must pay to Washington Mutual in reorganization, it will directly affect the pending bankruptcy action.

As for factors nine and ten, it is likely that the bankruptcy court's docket would not be overburdened by this case and it does not appear that Washington Mutual initiated removal proceedings for the improper purpose of forum shopping. Factor eleven, the existence of a right to a jury trial, weighs in favor of abstention to the state court, but does not in itself counsel remand. The plaintiffs filed a jury demand in state court; however, they failed to file a statement under Rule 9027(e)(3) FN8 to contest the bankruptcy judge's role in deciding the case. Consequently, the plaintiffs have waived their right to a jury. Factor twelve strongly weighs in favor of removal because the parties to the lawsuit involve the plaintiffs, who are debtors in the related Chapter 11 bankruptcy proceedings, and Washington Mutual, the largest secured creditor of the plaintiffs.

> FN8. Rule 9027(e)(3) provides that "[a]ny party who has filed a pleading in connection with the removed claim or cause of action, other than the party filing the notice of removal, shall file a statement admitting or denying any allegation in the notice of removal that upon removal of the claim or cause of action the proceeding is core or non-core. If the statement alleges that the proceeding is non-core, it shall state that the party does or does not consent to entry of final orders or judgment by the bankruptcy judge." Fed. R. Bankr. P. 9027(e)(3).

**\*10** Factor thirteen, comity, does not weigh in favor of abstention. Although the plaintiffs initially filed this case-containing exclusively state law claims-in a state court, the case will affect the bankruptcy proceedings. Moreover, given that the only activity

that occurred in the state court was the filing of a petition by the plaintiffs and an answer by the defendant, there is no danger that a ruling issued by the bankruptcy court will impair any judgments of the state court. Finally, there has been no showing that any of the parties would be unduly prejudiced should this case proceed in the Northern District of Texas.

Since the permissive abstention factors weigh in favor of retaining jurisdiction over the lawsuit, neither abstention nor equitable remand is appropriate in this case.

### C. Motion for Referral to the Bankruptcy Court

This case clearly involves factual determinations that can be most efficiently made by the bankruptcy judge presiding over Regal Row's bankruptcy action. Regal Row is already engaged in proceedings before the bankruptcy court in this district. The bankruptcy court is familiar with the facts underlying this dispute and United States Chief Bankruptcy Judge Felsenthal is in a better position than the undersigned to assess the issues involving the contracts and relationships between the parties. Consolidation of this action and the one before the bankruptcy court is a more prudent use of judicial resources by two courts presiding over different branches of the same litigation. Therefore, pursuant to 28 U.S.C. § 157(a),FN9 this court refers this case to the bankruptcy court where Regal Row's chapter 11 action is currently pending.

> FN9. Section 157(a) provides that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). Therefore, if a case is at least "related to" a chapter 11 proceeding, then the case may be referred to the bankruptcy court.

### D. Motion for Costs and Expenses

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 11

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

The plaintiffs rely on 28 U.S.C. § 1447(c) as well as Fifth Circuit case law as the basis for awarding the plaintiff costs and expenses incurred in removal proceedings. Plaintiffs' Motion to Remand ¶¶ 5, 7-8; see *Avitts v. Amoco Production Company,* 111 F.3d 30, 32 (5th Cir.), *cert. denied,* 522 U.S. 977, 118 S.Ct. 435, 139 L.Ed.2d 335 (1997). Specifically, the plaintiffs contend that because Washington Mutual's removal of this case was improper, an award of costs and expenses, including attorney's fees to the plaintiffs, is justified. Plaintiffs' Motion to Remand ¶¶ 9-10.

Section 1447(c) provides that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). Thus, this provision grants courts the discretion to award costs and expenses incurred in opposing an improper removal action. See *id.; Valdes v. Wal-Mart Stores, Inc.,* 199 F.3d 290, 292 (5th Cir.2000). Even though the instant case was removed pursuant to § 1452, the specialized bankruptcy removal statute, a district court still retains authority to award attorney fees and costs pursuant to § 1447(c). See *Coward v. AC and S, Inc.,* No. 02-51175, 2004 WL 75425, at *1, 2-3 (5th Cir. Jan.14, 2004) (holding that a district court is not without power to award attorney fees and costs pursuant to § 1447(c) after a remand has been certified because if § 1447(c) were not applicable, the court would be left hearing cases for which it has no subject matter jurisdiction); see also *Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 129, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995) ("There is no express indication in § 1452 that Congress intended that statute to be the exclusive provision governing removals and remands in bankruptcy.").

\*11 Under the standard set forth in § 1447(c), it is apparent that the legal and factual elements present in this case do not support an award of costs and expenses. An award for costs and expenses is within the sound discretion of the court. *Valdes,* 199 F.3d at 292. The motive for removal should not be the sole concern, but instead, the court should determine whether the defendant had "objectively reasonable" grounds to believe that removal was legally proper. *Id.* at 293-94. To make such a

determination, the court must objectively examine the removing party's actions in light of the legal and factual elements. *Id.* at 293. Washington Mutual had "objectively reasonable" grounds to believe that removal was a proper course of action. It was reasonable for Washington Mutual to view the state court lawsuit as one falling under the jurisdiction of the bankruptcy courts since it involved the debtor-creditor relationship. Therefore, based on the above facts, the court concludes that the plaintiffs' motion for costs and expenses should be denied.

### D. *Rule 11 Sanctions*

The plaintiffs seek to have sanctions imposed upon Washington Mutual pursuant to Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiffs' Motion to Remand ¶¶ IV.11-IV.17. The plaintiffs maintain, as the basis for sanctions, that in an effort to make the removal action appear timely, Washington Mutual has attempted to mislead the court by making false representations and omitting certain facts. *Id.*

Federal Rule of Civil Procedure 11 provides in relevant part:
(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-
(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
(1) How Initiated.
(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

**\*12** Fed. R. Civ. P. 11(b)-(c)(1)(a).

In this case, the plaintiffs did not properly follow the procedures set forth in Rule 11(c)(1)(A). The certificate of service attached to the motion indicates that it was served upon Washington Mutual's counsel on June 11, 2004. The motion for remand was then filed with the court that same day. Thus, the plaintiffs did not wait the required 21 days after serving the motion to allow Washington Mutual to withdraw or correct the alleged misrepresentations before filing the motion with the court. Although the plaintiffs transmitted a letter to Washington Mutual on June 9, 2004 to satisfy Local Rule 7.1, they never mentioned their intention to file a request for Rule 11 sanctions. Furthermore, the motion filed by the plaintiffs contained not only their arguments as to why the case should be remanded, but also their arguments for why sanctions are warranted. *See generally* Plaintiffs' Motion to Remand. The plaintiffs have not complied with Rule 11(c)(1)(A) with respect to the filing of a separate Rule 11 motion. Therefore, the court finds that the plaintiffs' request for the imposition of sanctions should be denied.

In response to the plaintiffs' request, Washington Mutual has moved for sanctions against the plaintiffs for their failure to address the appropriate standard for removal in their briefs. Washington Mutual's Response Brief at 23. Additionally, it

argues that the plaintiffs' failure to contest core jurisdiction in a timely manner entitles it to sanctions. *Id.* Nevertheless, Washington Mutual's motion for sanctions is undercut by the very argument it presents in its response brief in opposition to the plaintiffs' motion for sanctions. *See* Washington Mutual's Response Brief at 23. Just as the plaintiffs failed to comply with Rule 11(c)(1)(A) , Washington Mutual's motion suffers from the same deficiencies and its motion is denied for the same reasons.

### III. *CONCLUSION*

For the reasons discussed above, the plaintiffs' motion to remand is DENIED. This case is REFERRED to the bankruptcy court, pursuant to 28 U.S.C. § 157(a), for consideration by that court in conjunction with the Chapter 11 case, *In re Regal Row, Inc.,* No. 04-33857-SAF-11.

The plaintiffs' motions for attorneys fees and for Rule 11 sanctions are DENIED. Washington Mutual's motion for sanctions is also DENIED.

SO ORDERED.

N.D.Tex.,2004.
Regal Row Fina, Inc. v. Washington Mutual Bank,
Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882

Briefs and Other Related Documents (Back to top)

• 2004 WL 3720218 (Trial Motion, Memorandum and Affidavit) Reply Brief of Plaintiffs in Response to Defendant Washington Mutual's Response to Plaintiffs' Motion to Remand (Jul. 21, 2004)
• 2004 WL 3720217 (Trial Motion, Memorandum and Affidavit) Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand (Jul. 7, 2004)
• 2004 WL 3720215 (Trial Motion, Memorandum and Affidavit) Defendant Washington Mutual Bank, F.A.'s Response to Plaintiffs' Motion to Remand (Jul. 6, 2004)
• 2004 WL 3720216 (Trial Motion, Memorandum and Affidavit) Brief in Support of Defendant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 14 of 14

Not Reported in F.Supp.2d                                                    Page 13

Not Reported in F.Supp.2d, 2004 WL 2826817 (N.D.Tex.), 53 Collier Bankr.Cas.2d 882
**(Cite as: Not Reported in F.Supp.2d)**

Washington Mutual Bank F.A.'s Response to
Plaintiffs' Motion to Remand (Jul. 6, 2004)
• 2004 WL 3720213 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Motion to Remand (Jun.
11, 2004)
• 2004 WL 3720214 (Trial Motion, Memorandum
and Affidavit) Brief in Support of Plaintiffs' Motion
to Remand (Jun. 11, 2004)
• 3:04cv01033 (Docket) (May. 12, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2003 US DIST LEXIS 18320

AT HOME CORPORATION, Plaintiff, v. COX COMMUNICATIONS, INC., COX@HOME INC., COMCAST CORPORATION, COMCAST ONLINE COMMUNICATIONS, INC., COMCAST PC INVESTMENTS INC., BRIAN L. ROBERTS and DAVID M. WOODROW, Defendants.

Civil Action No. 02-1486-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2003 U.S. Dist. LEXIS 18320*

October 8, 2003, Decided

**DISPOSITION:** [*1] Comcast Defendants' Motion for Improper and Inconvenient Venue and Cox Defendants' Motion To Transfer Pursuant To *28 U.S.C. § 1404* were granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation contended that defendants, group one defendants and group two defendants, committed securities violations and breaches of fiduciary duty. The group one defendants moved to dismiss or transfer the action for improper and inconvenient venue. The group two defendants moved to dismiss or transfer for improper venue, or in the alternative, to transfer pursuant to 28 U.S.C.S. § 1404.

**OVERVIEW:** As to the motion filed by the group one defendants, a corporation one, two, and three and an individual, the corporation one and the corporation two were not residents of Delaware. The individual was not a resident of Delaware and did not transact business in Delaware. While the corporation three was organized under Delaware law, it was not qualified to do business in Delaware, and its slight connection to Delaware was overwhelmed by the lack of connection of the other three group one defendants. The court found that plaintiff had not shown that any acts or transactions involved in the case occurred in Delaware. Further, none of plaintiff's factual allegations demonstrated a connection to Delaware. With regard to the public interest factors, plaintiff was engaging in forum shopping and attempting to force the case into the district. Additionally, the local interest of New York, where the transactions that formed the basis of the claims asserted, was stronger than the local interest of Delaware in resolving the dispute. The court found that the convenience of the parties and witnesses

was best be served by transferring the action to the district where proper venue existed.

**OUTCOME:** The group one defendants' motion for improper and inconvenient venue and the group two defendants' motion to transfer were granted. The case was transferred.

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN1] See *28 U.S.C.S. § 1404(a)*.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2] In the Third Circuit, decisions on motions to transfer are guided by the private and public factors announced in Jumara v. State Farm. When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed when it is due to legitimate, rational concerns. The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN3] When a court finds or it appears based on the circumstances that a party is making an effort at forum shopping, transfer is warranted.

Case 1:06-cv-00298-JJF    Document 25-8    Filed 05/31/2006    Page 21 of 33

Page 2
2003 U.S. Dist. LEXIS 18320, *

**COUNSEL:** Edmond D. Johnson, Esquire and Michael L. Vild, Esquire of THE BAYARD FIRM, Wilmington, Delaware.

Of Counsel: Joseph S. Allerhand, Esquire, Richard W. Slack, Esquire, and Daniel S. Cahill, Esquire of WEIL, GOTSHAL & MANGES LLP, New York, New York.

Counsel for Plaintiff At Home Corporation.

Donald E. Reid, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware.

Of Counsel: Michael D. Hays, Esquire, Michael D. Rothberg, Esquire, and Daniel D. Prichard, Esquire of DOW, LOHNES & ALBERTSON, PLLC, Washington, District of Columbia.

Counsel for Defendants Cox Communications, Inc., Cox@Home, Inc., and David M. Woodrow.

Barry M. Klayman, Esquire of WOLF, BLOCK, SCHORR AND SOLIS-COHEN, LLP, Wilmington, Delaware.

Of Counsel: Michael S. Shuster, Esquire and Sheron Korpus, Esquire of WHITE & CASE LLP, New York, New York.

Counsel for Defendants Comcast Corporation, Comcast Online Communications, Inc., Comcast PC Investments Inc., and Brian L. Roberts.

**JUDGES:** Farnan, District Judge.

**OPINIONBY:** Farnan

**OPINION:** [*2]

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is the Motion To Dismiss (D.I. 21-1) Or Transfer This Action For Improper And Inconvenient Venue (D.I. 21-2) filed by Comcast Corporation, Comcast Online Communications, Inc., Comcast PC Investments Inc., and Brian L. Roberts (collectively "Comcast Defendants") and the Motion to Dismiss (D.I. 15-1) or Transfer For Improper Venue (D.I. 15-2), or In The Alternative, To Transfer Pursuant To *28 U.S.C. § 1404* (D.I. 15-3) filed by Cox Communications, Inc., Cox@Home, Inc., And David M. Woodrow (collectively

"Cox Defendants"). For the reasons discussed, the Court will grant the Comcast Defendants' Motion for Improper and Inconvenient Venue (21-2) and the Cox Defendants' Motion To Transfer Pursuant To *28 U.S.C. § 1404* (D.I. 15-3).

### BACKGROUND AND ALLEGATIONS OF THE PARTIES

In this action, At Home Corporation ("At Home") contends defendants Comcast Corporation ("Comcast"), Comcast Online Communications, Inc. ("Comcast Online"), Comcast PC Investments Inc. ("Comcast PC"), and Brian L. Roberts and Defendants Cox Communications, [*3] Inc. ("Cox"), Cox@Home, and David M. Woodrow ("Woodrow") have committed securities violations and breaches of fiduciary duty.

The Comcast Defendants assert that the lack of any connection with Delaware makes a transfer of the action to the Southern District of New York appropriate. The Comcast Defendants contend that the Southern District of New York is an easier and more convenient venue. The Comcast Defendants allege essentially the same arguments in support of their motion to dismiss the case for lack of jurisdiction and improper venue.

By their motion to transfer or dismiss, the Comcast Defendants contend that neither they nor this action have sufficient connections to Delaware to make venue proper here. They assert that Comcast, Comcast Online, and Mr. Roberts have no presence in Delaware. The Comcast Defendants assert that the transactions at issue in At Home's securities law claim did not occur in Delaware and that the Court's subject matter jurisdiction over the claim of breach of fiduciary duty is dependent on jurisdiction over the securities law claim. Consequently, the Comcast Defendants assert, both claims must be dismissed or transferred.

The Cox Defendants also support [*4] transferring this case. The Cox Defendants assert because Comcast is an indispensable party to the instant case and venue is improper as to Comcast, venue is improper as to Cox. Cox claims that the transactions creating the claims At Home asserts are not related to Delaware, and that New York is a more convenient venue for the instant case.

At Home responds that venue is proper in Delaware, and that Delaware is a more convenient venue than New York because the action has significant connections to Delaware.

### DISCUSSION

The Court will first consider the Motions to Transfer filed by the Comcast and Cox Defendants. *28 U.S.C. § 1404(a)* states that [HN1] "for the convenience of parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought."

[HN2] In the Third Circuit, decisions on motions to transfer are guided by the private and public factors announced in *Jumara v. State Farm Ins. Co. 55 F.3d 873, 879 (3rd Cir. 1995)*. When determining whether or not transfer is warranted in the circumstances presented, district courts must balance all of the relevant [*5] factors and respect that a plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed when it is due to legitimate, rational concerns. *Id. at 883*. The burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer, and a transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. See *Continental Cas. Co. v. American Home Assurance Co., 61 F. Supp.2d 128, 131 (D.Del. 1999)*.

## PRIVATE CONSIDERATIONS

The Court finds that the Comcast Defendants do not have a significant relation to Delaware. Comcast and Comcast Online are not residents of Delaware. Comcast is incorporated, and has its principal place of business, in Pennsylvania. Comcast Online has merged with Comcast and is not a distinct entity. Mr. Roberts is not a resident of Delaware and does not transact business in Delaware. While Comcast PC is organized under Delaware law, it is not qualified to do business in Delaware, and its slight connection to Delaware is overwhelmed by the lack of connection of the other three Comcast Defendants.

The Court also finds [*6] that At Home has not shown that any acts or transactions involved in this case occurred in Delaware. Further, the Court finds that none of At Home's factual allegations demonstrate a connection to Delaware.

## PUBLIC CONSIDERATIONS

With regard to the public interest factors, the Court finds that At Home is engaging in forum shopping and attempting to force this case into the District of Delaware. Obviously, [HN3] when a Court finds or it appears based on the circumstances that a party is making an effort at forum shopping, transfer is warranted. Additionally, the Court finds that the local interest of New York, where the transactions that form the basis of the claims asserted is stronger than the local interest of Delaware in resolving this dispute.

After considering the relevant factors for transfer of this case, the Court finds, balancing the relevant private and public factors, that the convenience of the parties and witnesses will best be served by transferring this action to the Southern District of New York where proper venue exists. Accordingly, the Motion to Transfer under 1404(a) will be granted and the case will be transferred to the Southern District of New York.

## CONCLUSION [*7]

For the reasons discussed, the Court will grant the Comcast Defendants' Motion for Improper and Inconvenient Venue and the Cox Defendants' Motion To Transfer Pursuant To *28 U.S.C. § 1404*. An Order consistent with this Memorandum Opinion has been entered.

LEXSEE 2003 U.S. DIST. LEXIS 26016

**J.T. THORPE COMPANY, et al., Plaintiffs, v. AMERICAN MOTORISTS, et al., Defendants.**

**CIVIL ACTION NO. H-02-4598**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2003 U.S. Dist. LEXIS 26016*

**June 6, 2003, Decided**

**DISPOSITION:** The plaintiffs' motions for abstention and/or remand were granted. Defendant AMICO's motion to expedite was denied as moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs sued defendants, insurance carriers, alleging state law claims for breach of contract and declaratory relief. Several plaintiffs filed for bankruptcy. One of the insurance carriers removed the action to federal court. Plaintiffs moved to remand. Another insurance company moved for abstention or in the alternative for remand. The insurance company also moved to expedite.

**OVERVIEW:** Plaintiffs asserted that the insurance carriers failed to provide the full extent of insurance coverage for asbestos-related litigation claims. One of the insurance carriers removed the action because it was concerned about the impact of various plaintiffs' bankruptcy proceedings. Plaintiffs and some of the insurance carriers entered into a stipulation in which they stated that the bankruptcy proceedings would have no adverse impact on the insurance carriers' coverage defense in this case. The court found that prior to that prior to removal, the state court had entered several of the necessary orders to keep a case moving forward, and the case was preferentially set for trial. The motion to abstain was timely because it was filed within the 30 days required of a motion for remand. A failure to contest venue did not constitute as a consent to federal jurisdiction. There were no "countervailing circumstances" that weighed in favor of keeping the action in federal court. Because there was very little left of the bankruptcy proceedings there was not a need to coordinate this action with the bankruptcy actions and the case should be equitably remanded under *28 U.S.C.S. § 1452*(b).

**OUTCOME:** The motions for abstention and/or remand were granted. The motion to expedite was denied as moot.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
*Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations*
[HN1] See *28 U.S.C.S. § 1334*(c)(2).

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*
[HN2] under *28 U.S.C.S. § 1334* courts must abstain from hearing a state law claim if the following requirements are met: (1) a motion has been timely filed requesting abstention; (2) the cause of action is essentially one that is premised on state law; (3) the claim is a noncore proceeding, i.e., it is "related to" a case under title 11 of the United States Code, but does not arise under or in a case under title 11; (4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under *28 U.S.C.S. § 1334*(b); (5) an action has been commenced in state court; and (6) the action could be adjudicated timely in state court.

*Bankruptcy Law > Case Administration > Commencement > Abstention*

2003 U.S. Dist. LEXIS 26016, *

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN3] The United States Court of Appeals for the Fifth Circuit has clearly stated that abstention under *28 U.S.C.S. § 1334*(c) applies to cases that were removed from state court as well as actions where a parallel state court proceeding has been commenced. It is the majority opinion that abstention does apply to removed cases.

*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN4] The party moving for mandatory abstention need not show that the action can be more timely adjudicated in state court, but only that the matter can be timely adjudicated in state court.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Removal > Postremoval Remands > General Overview*
*Criminal Law & Procedure > Appeals > Remands & Remittiturs*
[HN5] A naked assertion that the matter can be timely adjudicated in the state court, without more is insufficient to satisfy the requirement of mandatory abstention. However, when faced with a motion to remand, it is the defendant's burden to establish the existence of federal jurisdiction over the controversy.

*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN6] With regard to abstention, a movant's evidence that state trial docket is not congested and that trial will likely occur within the next year is sufficient to establish timely adjudication if the non-movant fails to provide any evidence negating the likelihood of a timely adjudication in state court.

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Civil Procedure > Venue > General Overview*
*Civil Procedure > Federal & State Interrelationships > Abstention*
[HN7] While few courts have construed the word "timely" in *28 U.S.C.S. § 1334*(c)(2), a party acts in a timely fashion when he or she moves as soon as possible after he or she should have learned the grounds for such a motion.

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview*
*Civil Procedure > Jurisdiction > Diversity Jurisdiction > General Overview*
[HN8] *28 U.S.C.S. § 1334*(c)(2) does not ask a court to examine whether new grounds for federal jurisdiction have arisen while the case was before the federal court. Instead, the inquiry is whether the action could not have been commenced in a court of the United States absent jurisdiction under this section.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Removal*
*Civil Procedure > Removal > Basis > General Overview*
*Civil Procedure > Removal > Proceedings > Unanimity*
[HN9] The plain language of *28 U.S.C.S. § 1452* differs from the language of *28 U.S.C.S. § 1441*(a) in that § 1452 permits a party to remove an action from state court. Under § 1452, any one party may remove the state court action without the consent of the other parties.

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Governments > Courts > Judicial Comity*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN10] With regard to mandatory abstention, dismissal makes sense when there is a parallel state court proceeding satisfying the *28 U.S.C.S. § 1334*(c)(2) requirement that an action has been commenced in state court. However, where the action commenced in state court is the same action before the federal district court, it does not appear to be in the spirit of comity and respect for state law to dismiss an action. A plaintiff may be able to refile the action in state court. However, the action could be barred by the applicable statute of limitations which, if the original action has been dismissed, would result in non-enforcement of state laws. This does not appear to have been the legislature's intent in passing § 1334(c)(2). As the term "abstain" is not defined in § 1334, the United States District Court for the Southern District of Texas finds that dismissal would be absurd and remand would be consistent with the legislative purpose of § 1334 where the only state court action has been removed and is the action pending before the federal district court.

*Civil Procedure > Federal & State Interrelationships > Abstention*

2003 U.S. Dist. LEXIS 26016, *

[HN11] Mandatory abstention, if met, requires a district court to remand the case to state court.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Removal*
*Civil Procedure > Removal > Basis > General Overview*
*Governments > Courts > Judicial Comity*
[HN12] *28 U.S.C.S. § § 1452*(b) (remand) and 1334(c) (abstention) are kindred statutes and the analysis under each have considerable overlap. Section 1452(b) favors comity and the resolution of state law questions by state courts, as does § 1334(c). Together, § § 1452(b) and 1334(c) strongly evince a congressional policy that, absent countervailing circumstance, the trial of state law created issues and rights should be allowed to proceed in state court, at least where there is no basis for federal jurisdiction independent of § 1334 and the litigation can be timely completed in state court. Because the statutes are similar in purpose and spirit, circumstances which weigh in favor of discretionary abstention or dictate mandatory abstention under the respective subsections of § 1334(c), likewise weigh in favor of or constrain remand under § 1452(b). Therefore, in the usual case, whenever the principles of "mandatory abstention" would compel remand of a removed action, the facts will have counseled remand of the case.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Removal*
*Civil Procedure > Removal > Basis > General Overview*
*Civil Procedure > Removal > Postremoval Remands > General Overview*
[HN13] See *28 U.S.C.S. § 1452*(b).

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Removal*
[HN14] Courts often examine the following 14 factors when deciding whether to equitably remand a case removed under *28 U.S.C.S. § 1334*(b):(1) the effect or lack thereof on the efficient administration of the estate if the court recommends abstention; (2) extent to which state law issue predominate over bankruptcy issues; (3) difficulty or unsettled nature of the applicable law; (4) presence of related proceeding commenced in state court or other nonbankruptcy proceeding; (5) jurisdictional basis, if any, other than § 1334; (6) degree of relatedness or remoteness of proceeding to main bankruptcy case; (7) the substance rather than the form of an asserted core

proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the bankruptcy court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; (12) the presence in the proceeding of nondebtor parties; (13) comity; and (14) the possibility of prejudice to other parties in the action.

*Bankruptcy Law > Case Administration > Commencement > Abstention*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*
[HN15] *28 U.S.C.S. § 1334*(c) expresses a strong congressional desire that in respect to non-core proceedings the federal courts should not rush to usurp the traditional precincts of the state courts.

COUNSEL:  [*1]  For J T Thorpe Company, Plaintiff: Aaron R Lancaster, Gilbert Heintz et al, Washington, DC; Dulce Maria Stenglein, Nickens Keeton et al, Houston, TX; J Mark Lawless, Nickens Keeton et al, Austin, TX; John E Heintz, Gilbert Heintz et al, Washington, DC; Lee Howard Shidlofsky, Nickens Keeton et al, Austin, TX; Michael D Raibman, Gilbert Heintz et al, Washington, DC; Richard D Milone, Gilbert Heintz et al, Washington, DC; Scott N Godes, Gilbert Heintz et al, Washington, DC.

For Thorpe Corporation, Plaintiff: Aaron R Lancaster, Gilbert Heintz et al, Washington, DC; Dulce Maria Stenglein, Nickens Keeton et al, Houston, TX; J Mark Lawless, Nickens Keeton et al, Austin, TX; John E Heintz, Gilbert Heintz et al, Washington, DC; Lee Howard Shidlofsky, Nickens Keeton et al, Austin, TX; Michael D Raibman, Gilbert Heintz et al, Washington, DC; Richard D Milone, Gilbert Heintz et al, Washington, DC; Scott N Godes, Gilbert Heintz et al, Washington, DC.

For Thorpe Products Company, Plaintiff: Aaron R Lancaster, Gilbert Heintz et al, Washington, DC; Dulce Maria Stenglein, Nickens Keeton et al, Houston, TX; J Mark Lawless, Nickens Keeton et al, Austin, TX; John E Heintz, Gilbert Heintz et al,  [*2]  Washington, DC; Lee Howard Shidlofsky, Nickens Keeton et al, Austin, TX; Michael D Raibman, Gilbert Heintz et al, Washington, DC; Richard D Milone, Gilbert Heintz et al, Washington, DC; Scott N Godes, Gilbert Heintz et al, Washington, DC.

2003 U.S. Dist. LEXIS 26016, *

For American Motorists Insurance Company, Defendant: G Byron Sims, Brown Sims PC, Houston, TX; John F Maher, Tressler Soderstrom et al, Chicago, IL; Mark T Beaman, Attorney at Law, Austin TX; Paul Byron Starr, Germer Gertz et al, Austin, TX.

For St Paul Fire and Marine Insurance Company, Defendant: A Hugh Scott, Choat Hall et al, Boston, MA; Andrew R McCloskey, Luce Forwad et al, San Diego, CA; Cathleen M Stryker, Ball & Weed, San Antonio, TX; J Michael Myers, Ball & Weed, San Antonio, TX; John A Nadas, Choate Hall et al, Boston, MA; John L Riedl, Luce Forwad et al, San Diego, CA; John Dwyer, Cozen O'Connor, Philadelphia, PA.

For The St Paul Insurance Company, Defendant: A Hugh Scott, Choat Hall et al, Boston, MA; Andrew R McCloskey, Luce Forwad et al, San Diego, CA; Cathleen M Stryker, Ball & Weed, San Antonio, TX; J Michael Myers, Ball & Weed, San Antonio, TX; John A Nadas, Choate Hall et al, Boston, MA; John L Riedl, Luce Forwad [*3] et al, San Diego, CA; John Dwyer, Cozen O'Connor, Philadelphia, PA.

For Federal Insurance Co, Defendant: J Stephen Gibson, Shannon Gracey et al, Dallas, TX; John Dwyer, Cozen O'Connor, Philadelphia, PA; Michael W Huddleston, Shannon Gracey et al, Dallas, TX.

For Vigilant Insurance Company, Defendant: J Stephen Gibson, Shannon Gracey et al, Dallas, TX; John Dwyer, Cozen O'Connor, Philadelphia, PA; Michael W Huddleston, Shannon Gracey et al, Dallas, TX.

For Home Indemnity Co, (Successor is the Home Insurance Company), Defendant: Carrie E Reed, Nixon Peabody LLP, San Francisco, CA; Gene Francis Creely, II, McGlinchey Stafford, Houston, TX.

For Republic Insurance Company, Defendant: Don David Martinson, Fanning Harper et al, Dallas, TX; George L Lankford, Fanning, Harper & Martinson, Dallas, Tx.

For Forum Insurance Company also known as Colonial Penn Franklin, Defendant: Kevin J Kuhn, Vedder Price et al, Chicago, IL; Margaret A Arnold, Vedder Price et al, Chicago, IL; Ron K Eudy, Sneed Vine et al, Austin, TX.

For Interstate Fire & Casualty Company, Defendant: D Douglas Shureen, Rivkin Radler LLP, Santa Rosa, CA; Matt Dow, Jackson Walker, Austin, TX; Ted Smith, [*4] Rivkin Radler LLP, Santa Rosa, CA.

For First State Insurance Company, Defendant: Edward B Parks, II, Hogan & Hartson LLP, Washington, DC; J Wiley George, Andrews Kurth LLP, Houston, TX; James P Ruggeri, Hogan & Hartson LLP, Washington, DC.

For Twin City Insurance Company, Defendant: Edward B Parks, II, Hogan & Hartson LLP, Washington, DC; J Wiley George, Andrews Kurth LLP, Houston, TX; James P Ruggeri, Hogan & Hartson LLP, Washington, DC.

For Old Republic Insurance Company, Defendant: Dena Economou, Karbal Cohen et al, Chicago, IL; Edward A Cohen, Karbal Cohen et al, Chicago, IL; J Wiley George, Andrews Kurth LLP, Houston, TX; Stacy Freel, Karbal Cohen et al, Chicago, IL; Wayne Karbal, Karbal Cohen et al, Chicago, IL.

For Mt McKinley Insurance Company formerly known as Gibraltar Casualty Company, Defendant: Brian Scott Martin, Thompson Coe et al, Houston, TX; Janis Harlan Detloff, Thompson Coe et al, Houston, TX.

For Landmark Insurance Company, Defendant: Kara Lyrae Kellogg, Brown Sims PC, Houston, TX; Mark Christopher Clemer, Brown Sims PC, Houston, TX.

For Lexington Insurance Company, Defendant: Kara Lyrae Kellogg, Brown Sims PC, Houston, TX; Mark Christopher [*5] Clemer, Brown Sims PC, Houston, TX.

For National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Defendant: Kara Lyrae Kellogg, Brown Sims PC, Houston, TX; Mark Christopher Clemer, Brown Sims PC, Houston, TX.

For Harbor Insurance Company, Defendant: Alan P Jacobus, Carroll Burdick et al, San Francisco, CA; Betina Baumgarten, Carroll Burdick et al, San Francisco, CA; Gerald James Landon, Hughes and Luce LLP, Austin, TX; Jill M Cronin, Van Osselaer Cronin et al, Austin, TX; Paul J Van Osselaer, Hughes & Luce, Austin, TX; Reggie Griner, Carroll Burdick et al, San Francisco, CA; Rodney L Eshelman, Carroll Burdick et al, San Francisco, CA; Betina AS Baumgarten, Carroll Burdick et al, San Francisco, CA.

For United States Fire Insurance Company, Defendant: Brian Scott Martin, Thompson Coe et al, Houston, TX; James F Martin, Cohn Baughman et al, Chicago, IL; Janis Harlan Detloff, Thompson Coe et al, Houston, TX; Kevin F Lee, Thompson Coe et al, Austin, TX; Patrick M Shine, Cohn & Baughman, Chicago, IL.

For Unigard Mutual Insurance Company also known as Seaton Insurance Company, Defendant: Don David Martinson, Fanning Harper et al, Dallas, TX; George L Lankford, [*6] Fanning, Harper & Martinson, Dallas, Tx.

For American Home Assurance Company, Defendant: Kara Lyrae Kellogg, Brown Sims PC, Houston, TX; Mark Christopher Clemer, Brown Sims PC, Houston, TX.

For Colonial Penn Insurance Company, Defendant: Kevin J Kuhn, Vedder Price et al, Chicago, IL.

**JUDGES:** JOHN D. RAINEY, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOHN D. RAINEY

**OPINION:**

### ORDER

Pending before the Court are Defendant American Motorists Insurance Company's ("AMICO") Motion for Abstention or in the Alternative Motion for Remand (Dkt. # 27), Defendant AMICO's Motion to Expedite (Dkt. # 31), and Plaintiffs' (collectively "Thorpe") Motion to Remand (Dkt. # 34). Having considered the motions, responses, and applicable law, the Court is of the opinion that the motions for remand should be granted and the motion to expedite should be denied as moot.

### Background

This case was originally filed by Thorpe in the 201st District Court of Travis County, Texas on December 30, 1998. Plaintiffs seek recovery against various insurance carriers on state law claims for breach of contract and declaratory relief under *Texas Civil Practice & Remedies Code § 37.001, et seq.* Specifically, Plaintiffs [*7] allege that the Defendants failed to provide the full extent of insurance coverage for asbestos-related litigation claims.

On October 11, 2002, several of the Plaintiffs filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in Southern District of Texas. ("Bankruptcy Court"). On November 7, 2002, Defendant United States Fire Insurance Company ("US Fire") removed this action to the United States District Court in the Western District of Texas. The action was removed under *28 U.S.C. § 1334(b)*, which allows the removal of claims that "related to" a bankruptcy proceeding. On the same day, US Fire also moved to transfer the case to the Southern District of Texas.

On December 2, 2002, Defendant AMICO moved for the federal district court to either abstain or remand. On December 3, 2002, US Fire's motion to transfer venue was granted. Plaintiffs filed their own motion to remand on December 6, 2002. On December 11, 2002, the case was transferred to the Southern District of Texas.

Concerned about the impact of the bankruptcy proceedings on this action, US Fire moved for an expedited status hearing prior to [*8] the Bankruptcy Court's hearings on the proposed confirmation plan which were scheduled to begin on Monday, December 16, 2002. This Court held a conference on December 13, 2002 regarding the impact of the bankruptcy proceedings on this case. The parties agreed to enter into a stipulation stating that the bankruptcy proceedings would have no adverse impact on the insurers' coverage defenses in this case. The confirmation hearing in the bankruptcy proceedings was postponed to allow the parties to work out such a stipulation. On December 17, 2002, the parties presented a stipulation to Judges Karen Brown, Vanessa Gilmore, and the undersigned. n1 Two insurer defendants who were asserting objections to the bankruptcy plan did not join in the stipulation. The Stipulation and Order entered as docket entry # 46 were signed by the participating insurers, Plaintiffs, and the three judges.

n1 Judge Brown and Judge Gilmore were jointly overseeing the bankruptcy proceedings.

The confirmation hearing in the bankruptcy proceedings [*9] was held on December 17-18, 2002. An order confirming the proposed plan was entered on January 29, 2003. Defendants AMICO and Seaton Insurance Company (formerly Unigard Insurance Company) appealed the order confirming the plan to the Fifth Circuit on January 31, 2003. On February 4, 2003, Judge Karen Brown signed an order denying a motion to stay implementation of the plan pending appeal.

### Discussion

AMICO and Plaintiffs move to have this Court either abstain from hearing this action under the abstention provisions in *28 U.S.C. § 1334(c)* or to remand this action under *28 U.S.C. § 1452*. US Fire has filed a brief in opposition to the motion. Several other defendants have also indicated that they oppose the relief requested. The Court will examine mandatory abstention first.

### A. Mandatory Abstention Under *28 U.S.C. § 1334(c)(2)*

*28 U.S.C. § 1334(c)(2)* provides:

[HN1] (c) . . . (2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a [*10] case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

Accordingly, [HN2] under this statute, courts must abstain from hearing a State law claim if the following requirements are met: (1) a motion has been timely filed requesting abstention; (2) the cause of action is essentially one that is premised on state law; (3) the claim is a non-core proceeding, i.e., it is "related to" a case under title 11 but does not arise under or in a case under title 11; (4) the proceeding could not otherwise have been commenced in federal court absent federal jurisdiction under § 1334(b); (5) an action has been commenced in state court; and (6) the action could be adjudicated timely in state court. See Schuster v. Mims (In re Rupp & Bowman Co.), 109 F.3d 237, 239 (5th Cir. 1997); Gober v. Terra + Corp. (In re Gober), 100 F.3d 1195, 1206 (5th Cir.1996); Broyles v. U.S. Gypsum Co., 266 B.R. 778, 782-83 (E.D. Tex. 2001); [*11] Lee v. Miller, 263 B.R. 757, 763 (S.D. Miss. 2001); Chickaway v. Bank One Dayton, N. A., 261 B.R. 646, 649 (S.D. Miss. 2001); WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp., 75 F. Supp. 2d 596, 605 (S.D. Tex. 1999).

The Plaintiffs' complaint only asserts rights under Texas law. Thus, the second element is present. In its Notice of Removal, US Fire concedes that the Court's jurisdiction over this action is based on 28 U.S.C. § 1334(b)'s "related to" jurisdiction, n2 so the third element is not contested. This action was originally commenced in state court, so the fifth element is also present. n3

n2 See Dkt. # 1 (Notice of Removal), P 13.

n3 [HN3] The Fifth Circuit has clearly stated that abstention under § 1334(c) applies to cases that were removed from state court as well as actions where a parallel state court proceeding has been commenced. See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.), 163 F.3d 925, 929 (5th Cir. 1999); see also In re

United States Brass Corp., 173 B.R. 1000, 1004 (Bankr. E.D.Tex. 1994) ("it is the majority opinion that abstention does apply to [removed] cases . . ."). Thus, the original action filed by Plaintiffs in Texas state court is the action that was "commenced" in state court for purposes of § 1334(c).

[*12]

However, US Fires argues that the movants have not established the other three elements that would require this Court to abstain from hearing this action. Specifically, US Fire argues that movants have failed to present sufficient evidence to establish that the case commenced in Texas state court can be "timely adjudicated," that the motions to abstain were "timely," or that this case "could not have been commenced in a court of the United States absent jurisdiction [under § 1334]."

**(1) The Action Can Be Timely Adjudicated in State Court**

[HN4] The party moving for mandatory abstention need not show that the action can be *more timely* adjudicated in state court, but only that the matter can be timely adjudicated in state court. WRT Creditors Liquidation Trust, 75 F. Supp. 2d at 605. US Fire correctly cites WRT for the proposition that [HN5] a naked assertion that the matter can be timely adjudicated in the state court, without more is insufficient to satisfy the requirement of mandatory abstention. See id. at 605-06. However, the very next sentence in WRT also points out that "when faced with a motion to remand, it is the defendant's burden [*13] to establish the existence of federal jurisdiction over the controversy." Id. at 606. Arguably, the burden may be different where the issue is whether Congress has mandated that the Court not exercise its jurisdiction rather than whether federal jurisdiction exists in the first place. Regardless, the courts that have noted that naked allegations are not sufficient to establish that the matter can be timely adjudicated in a state court have not required much in the way of proof to establish this element when the non-movant failed to present any counter evidence. See, e.g., WRT Creditors Liquidation Trust, 75 F. Supp. 2d at 606 (finding that[HN6] movant's evidence that state trial docket was not congested and that trial would likely occur within the next year sufficient to establish timely adjudication where non-movant had failed to provide any evidence negating the likelihood of a timely adjudication in state court); Allied Mech. & Plumbing Corp. v. Dynamic Hostels Hous. Dev. Fund Co., 62 B.R. 873, 878 (Bankr. S.D.N.Y. 1986) ("A naked assertion that the matter can be timely adjudicated in the state court, without more is insufficient to [*14] satisfy this requirement. However, in the instant case it appears that discovery proceedings are continuing, the state court has rendered decisions on motions and the case is ac-

tively proceeding towards a trial. . . . This court is satisfied that the state law breach of contract dispute between the parties can be efficiently and timely adjudicated in the state forum.").

In this action, AMICO has provided the Court with evidence that, prior to removal, the state court had entered several of the necessary orders to keep a case moving forward, such as scheduling orders and a discovery control plan. Furthermore, at the time this case was removed, AMICO alleges that the case was preferentially set for trial on March 31, 2003. These orders are evidence that the state court was adjudicating this matter in a timely fashion. US Fire's only argument against the likelihood of timely adjudication in state court is that the action had been pending in state court for 4 years without resolution or entry of a dispositive order. However, the case was stayed for approximately 2 of those years so that the parties could engage in settlement discussions. When the case was not stayed, it has been adjudicated [*15] in a timely fashion and there is no evidence that it will continue in anything other than a timely fashion.

Accordingly, the Court finds that movants have provided sufficient evidence to meet whatever burden they have to show the existence of the sixth requirement for mandatory abstention under § 1334(c)(2).

**(2) A Motion Has Been Timely Filed Requesting Abstention**

US Fire argues primarily that Plaintiffs' motion for remand was not timely because it was filed after Plaintiffs had filed another motion, and received the requested relief, in federal court. However, AMICO's motion to abstain or remand was the first motion it filed in federal court. *Section 1334(c)(2)* only requires the "timely motion of a party." *In re Chiodo, 88 B.R. 780, 785 (Bankr. W.D. Tex. 1988).* If AMICO's motion to abstain under § 1334(c) was timely, it is irrelevant if Plaintiffs' motion was timely or untimely.

[HN7] "While few courts have construed the word timely' in § 1334(c)(2), . . . a party acts in a timely fashion when he or she moves as soon as possible after he or she should have learned the grounds for such a motion." *In re NOVAK, 116 B.R. 626, 628 (N.D. Ill. 1990).* [*16] AMICO's first response to US Fire's removal and motion to transfer venue was to file a motion for abstention or remand. US Fire does not contest that AMICO filed it within the 30 days required of a motion for remand. Instead, US Fire argues that it is untimely for a motion for abstention because AMICO did not contest the motion to transfer venue. AMICO's failure to contest which federal court it ended up in does constitute consent to federal court jurisdiction such that its motion to abstain, filed before the district court ruled on the motion to transfer venue, should be considered untimely.

Accordingly, the Court finds that AMICO's motion to abstain was timely filed. As a party's motion to abstain was timely filed, the first of the requirements for mandatory abstention has been established.

**(3) This Case "Could Not Have Been Commenced in a Court of the United States Absent Jurisdiction Under § 1334**

The only basis for federal jurisdiction asserted in US Fire's Notice of Removal was "related to" jurisdiction under § 1334(b). n4 US Fire argues that two new grounds for federal jurisdiction have arisen since removal. US Fire contends that the Court has jurisdiction to enforce [*17] the Stipulation and Order entered on December 17, 2002 as docket entry # 46 in this action. US Fire also alleges that all of the non-diverse defendants have or will soon have formally settled with Plaintiffs, which allows for the possibility of diversity jurisdiction. However, [HN8] § 1334(c)(2) does not ask a Court to examine whether new grounds for federal jurisdiction have arisen while the case was before the federal court. Instead, the inquiry is whether the "action *could not have been commenced* in a court of the United States absent jurisdiction under this section." The specific wording only looks at the time of commencement. At the time US Fire removed this action, the only basis for federal jurisdiction was § 1334(b)'s "related to" jurisdiction. Therefore, regardless of whether US Fire is correct that the interim developments in this action have given rise to new grounds for federal jurisdiction, this action could not have been removed to federal court at the time it was removed absent jurisdiction under § 1334. Accordingly, the fourth requirement for mandatory abstention exists in this case.

---

n4 AMICO also brings up that it did not consent to removal, and, under 28 U.S.C. § 1441 (a), removal usually requires the consent of all defendants. However, this case was removed under § 1452. [HN9] "The plain language of *section 1452* differs from the language of *28 U.S.C. § 1441(a)* in that *section 1452* permits a party' to remove an action from state court. *Sommers v. Abshire, 186 B.R. 407, 409 (E.D. Tex. 1995).* Under § 1452, any one party may remove the state court action without the consent of the other parties. *Id.; see also Beasley v. Pers. Fin. Corp., 279 B.R. 523, 529 (S.D. Miss. 2002)* ("Accordingly, the Court finds that all of the Defendants to this action were not required to join in the notice of removal filed by Defendant American Security Insurance Company under *28 U.S.C. § 1452*."). Therefore, US Fire's removal under § 1452 was proper even if

Case 1:06-cv-00298-JJF    Document 25-8    Filed 05/31/2006    Page 31 of 33

Page 8
2003 U.S. Dist. LEXIS 26016, *

not all of the defendants consented to the removal.

[*18]

### (4) Remand vs. Dismissal as the Proper Course of Action When Abstaining Under § 1334(c)

Having found that this case meets all of the requirements of § 1334(c)(2), the court must abstain from hearing this matter under § 1334(c)(2). However, the parties disagree about what the proper course of action should be when a court must abstain under this section. Plaintiffs suggest that the Court should remand the case back to Texas state court if the Court is required to abstain under § 1334(c)(2). US Fire insists that the proper course of action is to dismiss an action if a federal court abstains from hearing it for any reason. To support its position, US Fire cites *Lozano v. Swift Energy Co. (In re Wright), 231 B.R. 597 (Bankr. W.D. Tex. 1999). Lozano* contains a thorough and thoughtful discussion of whether a district court should dismiss or remand an action if the court finds all of the elements necessary for mandatory abstention. While the Court finds the analysis in *Lozano* quite persuasive, it does not agree with the *Lozano* court's ultimate conclusion that mandatory abstention may require dismissal in even absurd circumstances if the parties have [*19] not also moved for equitable remand under § 1452(b). n5 [HN10] Dismissal makes sense when there is a parallel state court proceeding satisfying the § 1334(c)(2) requirement that an action has been commenced in state court. However, where the action commenced in state court is the same action before the federal district court, it does not appear to be in the spirit of comity and respect for state law to dismiss an action. A plaintiff may be able to refile the action in state court. However, the action could be barred by the applicable statute of limitations which, if the original action has been dismissed, would result in non-enforcement of state laws. This does not appear to have been the legislature's intent in passing § 1334(c)(2). Therefore, the Court takes note of the *Lozano* court's statement that "the Supreme Court has directed that it is the courts' obligation to construe statutes to avoid absurd results, if alternative interpretations are available and consistent with the legislative purpose." *Lozano, 231 B.R. at 603* (citing *Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575, 73 L. Ed. 2d 973, 102 S. Ct. 3245 (1982)*). As the term "abstain" is not defined in § 1334, the [*20] Court finds that dismissal would be absurd and remand would be consistent with the legislative purpose of § 1334 where the only state court action has been removed and is the action pending before the federal district court.

n5 While the *Lozano* court found that a court may still be required to dismiss an action if it finds mandatory abstention applies, the court sidestepped the issue by granting equitable remand under § 1452(b) rather than dismissing the case.

Other courts in the Fifth Circuit have remanded cases to state court upon finding that they must abstain from hearing the case under § 1334(c) without discussion of the issue. *See, e.g., WRT Creditors Liquidation Trust, 75 F. Supp. 2d at 613* ([HN11] "mandatory abstention, if met, requires a district court to remand the case to state court"). Accordingly, the Court finds that remand is the proper course of action when it must abstain from hearing an action that was removed from state court.

### B. Equitable Remand

Alternatively, [*21] the Court finds that this case should be equitably remanded back to Texas state court under § 1452(b). n6 [HN12] *Title 28 U.S.C. § § 1452(b)*(remand) and *1334(c)*(abstention) are kindred statutes and the analysis under each have considerable overlap. *See Lee, 263 B.R. at 763. Section 1452(b)* favors comity and the resolution of state law questions by state courts, as does § *1334(c). Id.* Together, § § *1452(b)* and *1334(c)* strongly evince a congressional policy that, absent countervailing circumstance, the trial of state law created issues and rights should be allowed to proceed in state court, at least where there is no basis for federal jurisdiction independent of § *1334* and the litigation can be timely completed in state court. *Id.* Because the statutes are similar in purpose and spirit, circumstances which weigh in favor of discretionary abstention or dictate mandatory abstention under the respective subsections of § *1334(c)*, likewise weigh in favor of or constrain remand under § *1452(b). Id.* Therefore, in the usual case, whenever the principles of "mandatory abstention" would compel remand of a removed action, the facts will have counseled [*22] remand of the case. *Lozano, 231 B.R. at 604.*

n6 *Title 28 U.S.C. § 1452(b)* provides:

[HN13] The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision to not remand, is not reviewable by

appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title.

The Court finds no "countervailing circumstances" in this case that would weigh in favor of keeping this action in federal court. To the contrary, the facts of this case counsel remand. The [HN14] courts often examine the following fourteen factors when deciding whether to equitably remand a case removed under § 1334(b):

(1) the effect or lack thereof on the efficient administration of the estate if the Court recommends abstention;

(2) extent to which [*23] state law issue predominate over bankruptcy issues;

(3) difficulty or unsettled nature of the applicable law;

(4) presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(5) jurisdictional basis, if any, other than § 1334;

(6) degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7) the substance rather than the form of an asserted core proceeding;

(8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9) the burden of the bankruptcy court's docket;

(10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11) the existence of a right to a jury trial;

(12) the presence in the proceeding of nondebtor parties;

(13) comity; and

(14) the possibility of prejudice to other parties in the action.

*Beasley, 279 B.R. at 533-34; accord In re Republic Reader's Serv., Inc., 81 B.R. 422, 429 (Bankr. S.D. Tex. 1987).*

US Fire alleges that one of the primary [*24] reasons it removed this action was so that it could be coordinated with Thorpes's bankruptcy proceedings. In particular, US Fire was concerned that certain provision in the proposed plan of reorganization would impact this case. However, not only does the parties' Stipulation and Order entered on December 17, 2002 alleviate those concerns, but the plan of reorganization in Thorpe's bankruptcy proceeding has been confirmed by the Bankruptcy Court. The order confirming the plan has been appealed to the Fifth Circuit, but Judge Brown denied the appellants' motion to stay the implementation of the pending the appeal. Thus, there is very little left of the bankruptcy proceeding with which to "coordinate" this action. Accordingly, the first, second, and sixth factors weigh heavily in favor of remanding this action to state court.

Many of the factors do not affect the analysis here. Neither the third nor fourth factor weigh in favor of or against remand. The Court has already discussed the fifth factor, jurisdiction other than jurisdiction under § 1334. While US Fire's arguments regarding possible additional grounds for federal jurisdiction are more applicable here, the Court finds that [*25] this factor does not weigh strongly either in favor of remanding or denying remand. The seventh and ninth factors are not relevant in this case. As Plaintiffs commenced the bankruptcy action, and they are seeking remand, the tenth factor does not have any weight here. The parties would have access to a jury trial in either situation, so the eleventh factor also has no weight here. Furthermore, the twelfth and fourteenth factors may weigh slightly in favor of remand, but do not strongly affect the analysis either way.

However, as this action involves only state law claims that the Stipulation and Order mandates are not affected by the bankruptcy proceedings, the eighth factor weighs in favor of remand. As discussed above, the thirteenth factor, comity, also weighs heavily in favor of remand. [HN15] *"Section 1334(c)* expresses a strong congressional desire that in respect to non-core proceedings the federal courts should not rush to usurp the traditional precincts of the state courts." *Lee, 263 B.R. at 763.*

2003 U.S. Dist. LEXIS 26016, *

The federal court has not issued any rulings on any substantive matters. The state court can read and interpret the parties' Stipulation and Order as competently as the [*26] federal courts. Most importantly, all of the claims are state law claims which require only the application of state law. Furthermore, the Fifth Circuit has approved of remanding cases in similar situations. *See, e.g., Gober, 100 F.3d at 1207* ("We find no abuse of discretion [in the court's decision to remand] because we agree that Gober's claims hinge solely on questions of state law and invoke no substantive right created by federal bankruptcy law. Gober's claims exist wholly outside of bankruptcy -- indeed, Gober asserted them in state court almost a decade before he filed his bankruptcy petition.").

Accordingly, an analysis of the relevant factors shows that they ultimately weigh in favor of equitably remanding this case under *§ 1452(b)*.

## Conclusion

For the reasons given above, Defendant AMICO's and Plaintiffs' motions for abstention and/or remand are GRANTED. Defendant AMICO's motion to expedite is DENIED as moot. Accordingly, this action is hereby REMANDED to the 201st District Court of Travis County, Texas.

It is so ORDERED.

Signed this 6th day of June, 2003.

JOHN D. RAINEY

UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MARLENE HOPKINS, Individually, as Wrongful Death Heir, and as Successor-in-Interest to NORMAN HOPKINS, JR., Deceased; and MICHELLE HOPKINS, and MICHAEL HOPKINS, as Legal Heirs of NORMAN HOPKINS, Deceased, THE FLINTKOTE COMPANY, THE OFFICIAL COMMITTEE OF THE ASBESTOS PERSONAL INJURY CLAIMANTS, and JAMES J. MCMONAGLE as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:06-CV-00298 JJF |
| vs. | ) ) ) | |
| PLANT INSULATION COMPANY; UNIROYAL HOLDING, INC.; IMPERIAL TOBACCO CANADA LIMITED; SULLIVAN & CROMWELL LLP; and DOES 1 through 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF REBECCA WORKMAN, PARALEGAL

STATE OF DELAWARE    :
                     :  SS:
NEW CASTLE COUNTY    :

I, Rebecca Workman, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on May 31, 2006, I caused to be served:

**RESPONSE OF IMPERIAL TOBACCO CANADA LIMITED TO DEBTOR'S**
**OPPOSITION TO EMERGENCY PETITION FOR AN ORDER OF TRANSFER**
**PURSUANT TO 28 U.S.C. § 157(B)(5)**

1398358/1

Service was completed upon parties on the attached list in the manner indicated thereon.

Date:  May 31, 2006.

Rebecca Workman

SWORN AND SUBSCRIBED before me this 31st day of May, 2006.

NOTARY

ELLEN J. ZICKEFOOSE
Notary Public - State of Delaware
My Comm. Expires Feb. 21, 2007

1398358/1

**VIA FEDERAL EXPRESS**

Gilbert L. Purcell, Esquire
Brayton Purcell, LLP
222 Rush Landing Road
Novato, CA 94948-6169
(Attorneys for Plaintiff Marlene
Hopkins, Michelle Hopkins, and
Michael Hopkins)

Stephen M. Snyder, Esquire
Snyder Miller & Orton LLP
111 Sutter Street, Suite 1950
San Francisco, CA 94104
(Attorneys for Plaintiffs The
Flintkote Company, The
Official Committee of Asbestos
Personal Injury Claimants, and
James J. McMonagle as the
Legal Representative for Future
Asbestos Personal Injury Claimants)

Eliot S. Jubelirer, Esquire
Jean L. Bertrand, Esquire
Morgenstein & Jubelirer
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(Additional Counsel for Plaintiffs)

Alan Pedlar, Esquire
The Law Office of Alan Pedlar
1112 Via Malibu
Aptos, CA 95003
(Additional Counsel for Plaintiffs)

Kelly C. Wooster, Esquire
112 Rock Creek Court
P.O. Box 62
Copperopolis, CA 95228
(Additional Counsel for Plaintiffs)

**VIA FEDERAL EXPRESS**

Kevin T. Lantry
Jeffrey E. Bjork
Sidley Austin LLP
555 West Fifth Street
Los Angeles, CA 90013
Attorneys for The Flintkote Company

Gregory D. Phillips
Rohit K. Single
Brad D. Brian
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Attorneys for Sullivan & Cromwell

Monte S. Travis
Travis & Pon
2271 California Street
San Francisco, CA 94115-2813
Attorneys for Plant Insulation

Nancy E. Hudgins
565 Commercial Street, 4th Floor
San Francisco, CA 94111
Attorneys for Uniroyal Holdings, Inc.

**VIA HAND DELIVERY**

Laura Davis Jones
James E. O'Neill, III
Pachulski Stang Ziehl Young Jones &
Weintraub LLP
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, DE 19899-8705
Attorneys for The Flintkote Company

1398358/1

**VIA HAND DELIVERY**

Marla Eskin, Esquire
Kathleen Campbell, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(Counsel for the Official Committee of
Creditors)

James L. Patton, Jr., Esquire
Edwin J. Harron, Esquire
Young Conaway Stargatt & Taylor LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(Counsel to Legal Representative)

1398358/1